UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Case No. 1:21-CR-623 (CRC) |
| MICHAEL ECKERMAN and : | |
| KIRSTYN NIEMELA, : | |
| : | |
| Defendants. : | |

**UNITED STATES' MOTION *IN LIMINE* REGARDING
AUTHENTICATION OF CERTAIN VIDEO AND PHOTO EVIDENCE**

At trial during its case-in-chief, the government expects to offer several video clips and photographs depicting the defendants on January 6, 2021, that were obtained by the FBI from publicly-available sources such as YouTube, Facebook, and Twitter, as well as video clips taken by cameras and cellphones carried by journalists and rioters. As set forth below, the FBI case agent's testimony will satisfy the low bar required for this Court, as the gatekeeper of admissible evidence, to make an initial ruling of authenticity to admit the evidence and then to allow the jury, as the fact finder, to make the final determination as to whether the admitted evidence is authentic and how much weight to give it.

## BACKGROUND

Much of the riot at, and the attack on, the United States Capitol Building was recorded on video: on surveillance footage captured by mounted U.S. Capitol Police ("USCP") cameras; by body-worn cameras affixed to Metropolitan Police Department ("MPD") officers; and by cameras and cellphones carried by journalists and rioters. The government's case-in-chief in this matter will rely in part on USCP and MPD camera footage to prove the defendants' specific conduct and the larger context in which it took place. Should the defense not stipulate to the authenticity of

these two types of footage, the government will call appropriate USCP and MPD witnesses at trial. But the government also intends to introduce footage from videos taken by other rioters or by journalists, which FBI agents obtained via open sources or searches of other individuals' devices. For this type of video evidence, the government seeks a pretrial ruling on authenticity.

**ARGUMENT**

Under Federal Rule of Evidence 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 901(b) provides a non-exhaustive list of examples of evidence that satisfy this requirement, including comparisons to authenticated specimen and examining the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." FRE 901(b)(3), (4).

Establishing an item's authenticity is not "a particularly high hurdle." *United States v. Ortiz*, 966 F.2d 707, 716 (1st Cir. 1992); *see also United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) ("The burden to authenticate under Rule 901 is not high"); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 927 (3d Cir. 1986) ("The burden of proof for authentication is slight."); *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) ("The threshold for the Court's determination of authenticity is not high, … and the proponent's burden of proof for authentication is slight[.]") (citation and quotation marks omitted).

Rule 901 "requires only a prima facie showing of genuineness" for the evidence to be admissible. *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997). Stated differently, "[t]he standard the district court must apply in evaluating a document's authenticity is whether there is enough support in the record to warrant a reasonable person in determining that the evidence is

what it purports to be." *United States v. Blanchard*, 867 F.3d 1, 6 (1st Cir. 2017). After clearing that low hurdle, the evidence should *first* be admitted and then *subsequently* allow the fact finder to make the ultimate decision regarding its authenticity and probative value. *See Vidacak*, 553 F.3d at 349 ("The district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic."); *United States v. Belfast*, 611 F.3d 783, 819 (11th Cir. 2010) ("Once that *prima facie* case is established, the evidence is admitted and the ultimate question of authenticity is decided by the jury.").

To make out a *prima facie* showing of authenticity, "circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981). Establishing authenticity of photographic evidence does not require testimony from a witness who was physically present and observing the scene at the time it was captured by the camera. *United States v. Rembert*, 863 F.2d 1023, 1027 (D.C. Cir. 1988). And, importantly, the party seeking to admit evidence need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994). Nor is the government required to establish that the proffered evidence has not been altered or staged. *United States v. Broomfield*, 591 F. App'x 847, 852 (11th Cir. 2014) (finding sufficient evidence of authenticity even though "there was no testimony establishing that the recording equipment was reliable or that the video was not altered or staged").[1]

---

[1] As a side note, the Eleventh Circuit also held that the factors articulated in *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir. 1977), are inapplicable in criminal cases where the government finds a video on YouTube, holding that if the *Biggins* factors applied, "the prosecution could seldom, if ever, authenticate a video that it did not create." *Broomfield*, 591 F. App'x at 852.

3

Indeed, questions concerning possible alterations go to the weight the fact finder should give the evidence, not to its authenticity. *United States v. Safavian*, 435 F. Supp. 2d 36, 41 (D.D.C. 2006) (arguments that earlier emails included in email chain may have been altered before being forwarded are "more appropriately directed to the weight the jury should give the evidence, not to its authenticity"). The government "must only 'demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated.'" *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) (quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997)); *see also, e.g.*, *United States v. Bowens*, 938 F.3d 790, 794-95 (6th Cir. 2019) (explaining that while "[a]nyone *could have* used the defendants' Facebook accounts, just as the pictures *could have* depicted the men smoking tobacco cigars, and 'getting high' *could have* been a reference to skydiving," there was sufficient circumstantial evidence "for the jury to infer that the accounts belonged to the defendants, and that the defendants were the authors of the posts [which were] about using marijuana" (emphasis added)).

In deciding preliminary questions about the admissibility of these photos and videos, "[t]he court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). In other words, the government may rely upon hearsay and otherwise inadmissible evidence in establishing the authenticity of the video evidence described in this motion. *See, e.g.*, *United States v. White*, 116 F.3d 903, 914 (D.C. Cir. 1997). Of course, even with a pretrial ruling that evidence is authentic, and thus admissible, the government must introduce sufficient evidence at trial from which a reasonable fact finder could reach the same conclusion regarding authenticity. *See, e.g.*, *United States v. Gammal*, 831 F. App'x 539, 542 n.6 (2d Cir. 2020) (unpublished) ("Insofar as the District Court relied on non-public information to make its preliminary determination, it did not err because it did not do so in lieu of the presentation of sufficient authenticating public evidence

4

later at trial."); *United States v. Puttick*, 288 Fed. App'x 242, 246 (6th Cir. 2008) (unpublished) ("It is permissible for the judge to make a preliminary determination as to authentication, admit the evidence conditionally under Rule 104(b), and then allow the jurors to be the final arbiters of whether it was actually authenticated."); *United States v. Branch*, 970 F.2d 1368, 1371 (4th Cir. 1992) ("Thus, even though the district court may have ruled during an in camera proceeding that the proponent had presented sufficient evidence to support a finding that a tape recording was authentic, evidence that would support this same ruling must be presented again, to the jury, before the tape recording may be admitted.").

### **FRE 901(b)(3) – Comparison with a Known Specimen**

"Authentication by comparison is routine." *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1371 (Fed. Cir. 2021). For example, photos and videos of a scene can be authenticated by comparison with previously-admitted exhibits that show the same scene from other angles. *See United States v. Hoyt*, 946 F.2d 127 (D.C. Cir. 1991) ("[W]e will assume without deciding that the photograph was sufficiently authenticated by comparison with previously admitted Government Exhibit 11, which showed the door from another angle."); *Diaz v. County of Ventura*, 512 F. Supp. 3d 1030, 1035 (C.D. Cal. 2021) ("Here, the videos can be authenticated through other evidence on the record—namely, other video and photographic evidence of the incident that Green provides."); *State v. Haight-Gyuro*, 186 P.3d 33, 38 (Ariz. Ct. App. 2008) (finding video sufficiently authenticated by comparison with separately authenticated photographs); 5 Weinstein's Federal Evidence § 901.03 ("When authentication of an item of evidence is accomplished by comparison with a specimen, the specimen itself must be proved to be authentic […] Nor does it matter what type of evidence the specimen consists of; the requirements for authenticating all types of

later at trial."); *United States v. Puttick*, 288 Fed. App'x 242, 246 (6th Cir. 2008) (unpublished) ("It is permissible for the judge to make a preliminary determination as to authentication, admit the evidence conditionally under Rule 104(b), and then allow the jurors to be the final arbiters of whether it was actually authenticated."); *United States v. Branch*, 970 F.2d 1368, 1371 (4th Cir. 1992) ("Thus, even though the district court may have ruled during an in camera proceeding that the proponent had presented sufficient evidence to support a finding that a tape recording was authentic, evidence that would support this same ruling must be presented again, to the jury, before the tape recording may be admitted.").

### **FRE 901(b)(3) – Comparison with a Known Specimen**

"Authentication by comparison is routine." *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1371 (Fed. Cir. 2021). For example, photos and videos of a scene can be authenticated by comparison with previously-admitted exhibits that show the same scene from other angles. *See United States v. Hoyt*, 946 F.2d 127 (D.C. Cir. 1991) ("[W]e will assume without deciding that the photograph was sufficiently authenticated by comparison with previously admitted Government Exhibit 11, which showed the door from another angle."); *Diaz v. County of Ventura*, 512 F. Supp. 3d 1030, 1035 (C.D. Cal. 2021) ("Here, the videos can be authenticated through other evidence on the record—namely, other video and photographic evidence of the incident that Green provides."); *State v. Haight-Gyuro*, 186 P.3d 33, 38 (Ariz. Ct. App. 2008) (finding video sufficiently authenticated by comparison with separately authenticated photographs); 5 Weinstein's Federal Evidence § 901.03 ("When authentication of an item of evidence is accomplished by comparison with a specimen, the specimen itself must be proved to be authentic […] Nor does it matter what type of evidence the specimen consists of; the requirements for authenticating all types of

specimens … are the same: prima facie proof that they are what their proponent claims them to be.").

In other January 6 trials in this district, the Court found similar "open-source" evidence to be authentic by comparison under Rule 901(b)(3). *United States v. Rodean*, 1:21-cr-57-TNM, Dkt. 50 (D.D.C. Apr. 20, 2022); *United States v. Seefried, et al.*, 1:21-cr-287-TNM, Dkt. 56 (D.D.C. May 20, 2022). In both *Rodean* and *Seefried*, the Court compared screenshots of video from a known authenticated source (USCP CCTV), which showed the Senate Wing Doors from the inside facing out, with screenshots of video footage taken by an unspecified rioter showing the Senate Wing Doors from the outside looking in. *See, e.g.*, *Rodean*, Dkt. 50 at 2. The Court noted similar objects depicted in both sets of screenshots: doors of a building flanked by windows, a crowd of rioters near the windows, and a wooden beam sticking through a shattered window. *Id.* The Court found these similarities sufficient and granted the government's pretrial motion to find the video taken by the unspecified rioter to be authentic. *Id.* at 6.

Here, the government anticipates offering video clips from USCP mounted cameras and MPD body-worn cameras, as well as from sources other than the USCP. Some of these other sources include reporters who were present in the Capitol on January 6, 2021, the defendants' fellow rioters, or other members of the crowd. Many of the videos were obtained through open-source means and are publicly available, though agents obtained some from searches of other defendants' devices. For any such videos, the government will establish authenticity by asking the jury to compare them with other authenticated exhibits, in particular, to USCP and MPD camera footage. Fed. R. Evid. 901(3). This footage will confirm that such videos are what they purport to be—i.e., recordings of the same events, captured from slightly different perspectives, and in some cases depicting events and sounds that were not captured by the USCP or MPD cameras. In

addition, the distinctive features of the interior of the Capitol building and of the other individuals depicted in the footage will help authenticate the videos. *Id*. at 901(4).

The government expects that the case agent will testify that he has been investigating January 6 Capitol riot-related cases since January 6, 2021; that he has reviewed hours of video footage recorded by USCP CCTV cameras, MPD body-worn cameras, journalists, and rioters; and that he is personally familiar with the locations depicted in those videos from being physically present at the Capitol on other days. He will assist the Court and the jury in identifying similarities between USCP and MPD videos and the other non-government and/or open-source videos offered by the government.

For example, the case agent and/or a USCP officer will testify about mounted surveillance cameras at the Capitol, one of which shows the defendants, on January 6, 2021, ascending the Capitol's northwest exterior stairs linking the West Plaza and Lower West Terrace to the Upper West Terrace. A screenshot from that USCP CCTV surveillance video, which does not contain audio, appears below. Defendant Eckerman is circled in yellow and is wearing a tactical vest, a red baseball-style hat, and neon yellow gloves.



The case agent and/or USCP officer will further testify that video recorded by another rioter on his cell phone shows the same incident and time period from a slightly different perspective, directly behind defendant Eckerman. The other rioter's cell phone video also captures defendant Niemela and their companion, separately prosecuted defendant Stefanie Chiguer.[2] A screenshot from the other rioter's cell phone video appears below. The group consisting of defendant Eckerman, defendant Niemela, and defendant Chiguer is circled in red. Defendant Niemela is separately framed in green, while defendant Eckerman is separately framed in blue.

---

[2] Chiguer was initially charged with misdemeanor offenses alongside defendant Niemela in a separate case, *United States v. Chiguer*, 22-cr-25. Chiguer has since pleaded guilty and awaits sentencing before Judge Amit P. Mehta.



    The case agent and/or USCP officer can identify common architectural features to establish that both videos depict the same exterior staircase, common clothing items to establish that both videos show the same people, particularly the defendants, and common gestures and movements to show that both videos show the same moment when rioters, including the defendants, ascended the staircase and accessed the exterior upper level of the Capitol, from which they ultimately entered the Capitol through the Senate Wing Door.

    Similarly, the case agent will testify that USCP CCTV surveillance footage of the interior of the Capitol shows the defendants with a group of other rioters, near the Memorial Doors and bust of George Washington, breaching the police line and then heading up the stairs. In the USCP

CCTV video, which does not contain audio, the defendants can be seen amidst a crowd of other rioters, confronting and pushing against a small group of USCP officers attempting to block the mob from accessing the nearby staircase and further penetrating the Capitol building. In the screenshot below, defendant Eckerman is framed in red, defendant Niemela is framed in green, and defendant Chiguer is framed in blue. Ultimately, defendant Eckerman wormed his way through the crowd to the front of the police line, where he shoved Officer K.Y. (framed in yellow) as the mob forcibly breached the line. The defendants then climbed the nearby stairs to reach the upper level of the Capitol.



Through the case agent, the government will also introduce a video obtained from other rioters and an independent journalist that shows the same breach and stair ascension from a slightly different perspective and that includes audio. These videos show the defendants in the

10

same area, just after the breach, climbing the stairs the police had been defending. Three screenshots from those videos appear below. The first depicts defendant Eckerman (framed in yellow) and defendant Niemela (framed in green):



The second captures defendant Eckerman and defendant Chiguer (framed in yellow):



And the third shows defendant Eckerman, recognizable by his distinctive yellow gloves and tactical vest, ascending the stairs:



The case agent can identify common architectural and physical features (e.g., the distinctive chandelier, ceiling curves, and bannister) to establish that both videos depict the same location, common clothing items and objects (e.g., signs and flagpoles) to establish that both videos show the same people, and common gestures and movements to show that both videos show the same moment: when defendant Eckerman forcibly interfered with the police's efforts to prevent rioters from further penetrating the Capitol and then enjoyed the fruit of that effort—namely, ascending the stairs the officers had tried to protect.

As a third example from a different location, the case agent will testify that USCP CCTV surveillance footage of the interior of the Capitol shows the defendants with a group of rioters in the Statuary Hall Connector, just outside the House Chamber doors. In the USCP CCTV video, which does not contain audio, the defendants can be seen approaching a police line of

approximately six USCP officers guarding the entry to the House Chamber, where some members of Congress remained trapped inside, unable to evacuate due to the advancing mob. A man in a gray hoodie standing just to the left and ahead of the defendants can be seen in the video gesturing at the crowd, while a USCP officer is holding a wooden pole as a barricade to hold back the rioters. The defendants are, at most, two rows back from the police line. On the CCTV surveillance, a man towards the front of the line can be seen holding a cell phone on a "selfie stick," filming the events in question. Ultimately, the rioters, including the defendants, pushed forward, breaching the police line. A screenshot from the CCTV video of this area is below, with the defendants framed in yellow and the man in the gray hoodie waving his arms framed in green.



Through the case agent, the government will also introduce a video obtained from open sources, as well as a search of a different defendant's device,[3] which feature the same events

---

[3] The footage was seized from defendant John Sullivan, a.k.a. JaydenX, a Capitol rioter charged in *U.S. v. Sullivan*, 21-cr-78, which is pending before Judge Sullivan.

described above. A screenshot from the video, featuring defendant Eckerman (framed in yellow) near the man in the gray hoodie waving his arms (framed in green), appears below.



As in the other instances, the case agent will point out how the architectural features, lighting fixtures, and the mob's behavior—including the movements of the defendants and those around them—match up in these two videos.

The government will use a similar approach to introduce and authenticate other non-government-produced photographs and videos, if not stipulated to by the parties. In each instance, as illustrated above, the case agent will be able to point out similarities sufficient to satisfy the low *prima facie* showing required for this Court to admit the offered photos and videos into evidence and allow the jury to make the final factual determinations about their authenticity. *See Vidacak*, 553 F.3d at 349; *Belfast*, 611 F.3d at 819. As with all admitted evidence, it will then be up to the jury, as the finder of fact, to determine how much weight to afford this evidence.[4]

---

[4] Alternatively, the Court may find the agent's testimony establishes the authenticity of the proffered photos and videos due to their "appearance, contents, substance, internal patterns, or other distinctive characteristics … taken together with all the circumstances." FRE 901(b)(4). In addition, the government anticipates calling witnesses at trial who are familiar with defendant Eckerman's voice and can identify the speaker in certain videos taken on January 6, 2021, as the

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court find the open source photo and video evidence offered by the government to be authentic and admissible.

> MATTHEW M. GRAVES
> UNITED STATES ATTORNEY
> D.C. Bar No. 481 052
>
> */s/ Michael M. Gordon*
> MICHAEL M. GORDON
> Assistant United States Attorney
> Florida State Bar No. 1026025
> 400 N. Tampa St., Suite 3200
> Tampa, Florida 33602
> michael.gordon3@usdoj.gov
> Telephone: 813-274-6370
>
>
> */s/ Jessica Arco*
> JESSICA ARCO
> Trial Attorney-Detailee
> D.C. Bar No. 1035204
> 601 D St., NW
> Washington, D.C. 20530
> jessica.arco@usdoj.gov
> Telephone: 202-514-3204

---

defendant. FRE 901(b)(5).