```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2      - - - - - - - - - - - - - - - - x
       THE UNITED STATES OF AMERICA,
3                                       Criminal Action No.
                      Plaintiff,        1:21-cr-623-CRC-2
4                                       Monday, January 23, 2023
       vs.                              9:12 a.m.
5
       KIRSTYN NIEMELA,
6
                      Defendant.
7      - - - - - - - - - - - - - - - - x

8      _____

                    TRANSCRIPT OF JURY TRIAL
9         HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                  UNITED STATES DISTRICT JUDGE
10     _____
       APPEARANCES:
11     For the United States:     MICHAEL MATTHEW GORDON, ESQ.
                                  DOJ-USAO
12                                400 North Tampa Street, Suite 3200
                                  Tampa, FL 33602
13                                (813) 274-6370

14                                JESSICA ARCO, ESQ.
                                  U.S. DEPARTMENT OF JUSTICE
15                                950 Pennsylvania Avenue NW
                                  Washington, DC 20530
16                                (202) 532-3867

17     For the Defendant:         PAUL GARRITY, ESQ.
                                  LAW OFFICES OF PAUL GARRITY
18                                14 Londonderry Road
                                  Londonderry, NH 03053
19                                (603) 434-4106

20                                RICHARD F. MONTEITH, JR., ESQ.
                                  LAW OFFICES OF RICHARD F. MONTEITH
21                                14 Londonderry Road
                                  Londonderry, NH 03053
22                                (603) 437-2733

23     Court Reporter:            Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
24                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
25                                Washington, DC  20001
                                  (202) 354-3187
```

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, we're on the
 3    record for Criminal Case 21-623 -- this is Defendant 2 --
 4    United States of America vs. Kirstyn Niemela.
 5            Counsel, please approach the lectern and identify
 6    yourselves for the record starting with the government.
 7            MS. ARCO:  Good morning, Your Honor; Jessica Arco
 8    appearing on behalf of the United States.
 9            THE COURT:  Ms. Arco, good to see you in person.
10            MS. ARCO:  Likewise.
11            MR. GORDON:  Good morning, Your Honor.
12            THE COURT:  Good morning.
13            MR. GORDON:  Mike Gordon with the United States;
14    and also with us at the government counsel table is
15    paralegal specialist Tekiah Jones as well as FBI Special
16    Agent Mark Hastbacka.
17            THE COURT:  Okay.  Good morning, everybody.  I
18    hope you had a nice weekend.
19            MR. GARRITY:  Good morning, Your Honor; Paul
20    Garrity for Kirstyn Niemela.
21            THE COURT:  Okay.  Good morning, Mr. Garrity.
22    Good to meet you.
23            MR. GARRITY:  Nice to meet you, too.
24            MR. MONTEITH:  And good morning as well; Attorney
25    Rick Monteith on behalf of Kirstyn Niemela.
```

1           THE COURT:  Mr. Monteith, nice to meet you in

2      person as well.

3           And, Ms. Niemela, how are you feeling this

4      morning?

5           THE DEFENDANT:  All right.

6           THE COURT:  Good.  Welcome to Washington.

7           All right.  Obviously we had our pretrial

8      scheduled for last week but were not able to conduct it

9      because we were in another jury trial.  The jury for that

10     trial is currently deliberating, or they should be within

11     minutes when they all arrive, so we've got a couple of balls

12     in the air this week.  You'll see Ms. Jenkins going back and

13     forth.

14          Frankly, I think this is the first time I've ever

15     had two juries working at the same time, but we'll get

16     through it, and we will manage.

17          So, first of all, let's -- we can deal with some

18     of the other pretrial issues this morning, if we have a

19     chance; if not, at one of the breaks.  But let's talk about

20     voir dire first.

21          My process is as follows.  I think we have 60

22     members of the panel.  There may be 65.  We will bring them

23     all in the courtroom, seat them in the gallery, and hand

24     them all index cards.

25          I looked over your questions.

1              Cody, did we get everyone a copy?

2              You should all have a copy of the questions.  We

3    boiled it down to about 41.  We will ask each one of the

4    questions.  They're all yes or no.  The jurors will indicate

5    the question number, if their answer is yes.

6              We will then collect all the cards.  We'll call

7    them up individually.  We'll put the panel in another room

8    so it will just be the questioned juror at the witness

9    stand.  I will ask some brief follow-up questions going to

10   any questions that they answered yes to.  I'll give each

11   side an opportunity for brief follow-up limited to those

12   affirmative answers.  And then, if you have a challenge for

13   cause, you should lodge it after we dismiss the juror but

14   before the next juror takes the stand.  Okay?

15             We will qualify -- we need 32 unless -- I mean,

16   this is a misdemeanor case.  I didn't pose this, but if you

17   were to forgo some of your preliminaries on a proportional

18   basis, that might expedite things.  But obviously the

19   defense has a right to ten; the government has a right to

20   six.  If you choose to keep all of those, we will need to

21   qualify at least 32 in order to allow for enough for each

22   side to exercise all of their strikes.

23             Once we get to 32 -- and I'll usually qualify a

24   couple more just to be safe, you know, 33 or 34 -- then

25   we'll bring them all back in in that order.  We'll seat the

 1    first 14 in the box, the rest in the audience, and then

 2    you'll exercise your peremptories all at one time.

 3               I don't do successive rounds.  Ten for the

 4    defense; six for the government against the nonalternate

 5    seats.

 6               I didn't bring out my bowl to pick papers out of,

 7    but we're going to select two of the 14 seats in advance so

 8    you will know which seats the alternate jurors will be

 9    sitting in.

10               The first round of strikes will go against the

11    nonalternate seats, and you can strike from the box and from

12    the audience.  And then we'll do a second round of strikes

13    where you get one each against those two alternate seats.

14    All right?  But we'll go over this more when we get there.

15               But talk amongst yourselves at some point, if you

16    want -- if you would agree to cut down the number of

17    peremptories to, say, you know, five and three as opposed to

18    ten and six or some number, you know, in that range.  But

19    obviously that's up to you.  It just might expedite things a

20    bit.

21               Any questions on that process?  Don't be shy.

22               MR. GARRITY:  One second.

23               THE COURT:  Sure, just approach.  Also, make sure

24    that you're either speaking into the mic at counsel table or

25    the mic at the lectern so that the court reporter can pick

 1    everything up.

 2              MR. GARRITY:  One second, Your Honor.

 3              THE COURT:  Sure.

 4              (Defense counsel confer)

 5              MR. GARRITY:  Your Honor, I guess there's one

 6    question I have.

 7              THE COURT:  Sure.

 8              MR. GARRITY:  And Rick and I are used to the model

 9    up in New Hampshire where there's a board, and there's a

10    stick that moves.

11              THE COURT:  A stick that moves?  Like a Ouija

12    board?

13              MR. GARRITY:  It's even something I can follow,

14    but if we don't strike -- say, for example, they pick 32,

15    and we don't strike Juror, say, for example, No. 6 or if we

16    don't strike any from the first 12, those are the jurors,

17    the first 12.

18              And if you're picking 32, and say, for example, we

19    don't have a challenge to 6 or 9, Nos. 6 or 9, is it the

20    first 12?

21              THE COURT:  Yes.  So if you do not strike, you

22    know, 6, and the government does not strike 6, 6 will be on

23    the jury.

24              MR. GARRITY:  So it's the first 12.

25              THE COURT:  Yes.

1              MR. GARRITY:  Okay.  I just wanted to clarify

2     that, Your Honor.  Thank you.

3              THE COURT:  On the voir dire questions, I included

4     sort of a -- you know, in one question a combination of the

5     questions that the defense proposed both on QAnon and on

6     same-sex relationships.  Did the government have any

7     objection to that, or -- all right.

8              And just out of curiosity, on the same-sex

9     relationship issue, how is that going to come up at trial?

10              MR. GARRITY:  I can address it, Your Honor.

11              THE COURT:  Sure.

12              MR. GARRITY:  Stefanie Chiguer -- and I'm not sure

13     if I'm pronouncing her last name correctly.  I think we all

14     have different pronunciations for her last name.  But one of

15     the witnesses for the government will be Stefanie Chiguer.

16     She was one of the individuals that went into the Capitol

17     with Ms. Niemela, and the state of their relationship is

18     going to be put forward, I think, during the context of this

19     case either in the context of Ms. Chiguer's credibility --

20     she gave different versions of the relationship to the FBI.

21     But I think it's going to come in when she testifies in any

22     event.

23              THE COURT:  Okay.  And she was charged, correct?

24              MR. GARRITY:  She was charged, and she's pled, and

25     she's a cooperating witness for the government.

```
1              THE COURT:  Okay.

2              MR. GARRITY:  And, just on another note, Judge, I

3     didn't get a chance to go through all of the voir dire

4     questions, but was the Court intending to ask a question

5     about the January 6th Committee report, final report?  That

6     was one of the questions we had put forward.

7              THE COURT:  I'll work that in.

8              MR. GARRITY:  Thank you.

9              THE COURT:  All right.  We're still waiting on our

10    jury list, so why don't we cover a few more things.

11             The parties' witness lists.  Ms. Arco, do you want

12    to come to the lectern?  Let's just go over these real

13    quick.

14             Ms. Chiquer we've talked about.  How long do you

15    anticipate for her?

16             MS. ARCO:  Likely an hour.  I imagine the cross-

17    examination may take longer than that.

18             THE COURT:  Okay.  Lieutenant Detorie?

19             MS. ARCO:  Approximately 30 to 45 minutes.

20             THE COURT:  And is that a he or she?

21             MS. ARCO:  It's a she.

22             THE COURT:  And what will she testify about?

23             MS. ARCO:  She'll testify as to her experiences in

24    the Crypt area of the Capitol where Ms. Niemela and her

25    companions were.  They passed directly in front of Officer
```

1    Detorie.

2              THE COURT:  And Agent Glavey is the head of the

3    Secret Service detail, right?

4              MS. ARCO:  Yes.  She'll be doing the now standard

5    overview testimony related to the vice president.

6              THE COURT:  All right.  So 30 minutes?

7              MS. ARCO:  45 minutes.

8              THE COURT:  45, okay.  Gregorczyk?

9              MS. ARCO:  That's one of the defense witnesses,

10   Your Honor.

11             THE COURT:  He's on the government's witness list.

12             MS. ARCO:  Oh, yes, I mean depending on what comes

13   out in the defense case, we may reserve him for rebuttal,

14   but we don't expect to call him in our case-in-chief.

15             THE COURT:  He'll be a rebuttal witness, okay.

16             Special Agent Hastbacka.  That's you, right?

17             SPECIAL AGENT HASTBACKA:  Yes.

18             THE COURT:  What's this guy going to testify to?

19             MS. ARCO:  He's the lead case agent in

20   Ms. Niemela's matter.  He'll talk about his process of the

21   investigation.  We'll go over the Facebook exhibits, likely

22   some group chat exhibits, and we'll likely take the jury

23   through most of the video footage.

24             THE COURT:  Okay.  So that's an hour and a half,

25   two?

```
 1              MS. ARCO:  Two, two and a half, to be safe.

 2              THE COURT:  Okay.  And Tia Summers?

 3              MS. ARCO:  She's our U.S. Capitol Police overview

 4     witness.  Approximately an hour.

 5              And, Your Honor, as you know, my co-counsel

 6     recently put on some of these witnesses.  I may be

 7     underestimating the overview witnesses.

 8              THE COURT:  Or you're so practiced that you will

 9     get it right on the dot.

10              MS. ARCO:  That's what we're hoping.

11              THE COURT:  Okay.

12              All right.  Mr. Garrity, go over the defense

13     witnesses.

14              Mr. Eckerman?

15              MR. GARRITY:  I'm sorry, Your Honor?

16              THE COURT:  Mr. Eckerman?

17              MR. GARRITY:  No, it's Mark Leach, Your Honor.  We

18     don't have Mr. Eckerman as a witness.

19              THE COURT:  Oh, I'm sorry.  I'm sorry.  I'm sorry.

20              Mr. Leach?

21              MR. GARRITY:  He was with Ms. Niemela and

22     Ms. Chiguer when they came down from New Hampshire down to

23     Washington, D.C.  He went onto the Capitol grounds but did

24     not go into the Capitol itself.

25              In terms of -- and he will testify as to what he
```

1    observed as he approached the Capitol and what was present

2    when he went up to the Capitol grounds.

3              THE COURT:  Okay.  That's fine.

4              MR. GARRITY:  In terms of length of his testimony,

5    I think his direct may last 30 minutes, Your Honor.

6              THE COURT:  Okay.  And Ms. Sevigny?

7              MR. GARRITY:  She is a friend or used to be a

8    friend of both Ms. Niemela and Ms. Chiguer.  She will

9    provide testimony in terms of conversations and observations

10   with Ms. Chiguer after she returned from Washington, D.C.,

11   and perhaps some testimony in terms of what took place in

12   conversations with Ms. Chiguer prior to going to Washington,

13   D.C.

14             THE COURT:  Is that impeachment of the

15   government's testimony elicited from Ms. Chiguer or --

16             MR. GARRITY:  It's probably more in the context of

17   impeachment, Your Honor.

18             THE COURT:  Okay.  And Gregorczyk?

19             MR. GARRITY:  Impeachment, depending upon what

20   Ms. Chiguer says.

21             THE COURT:  Okay.

22             MR. GARRITY:  He was present for some of the

23   interviews for Ms. Chiguer.

24             THE COURT:  So day and a half, Counsel; is that

25   fair?  Total?

```
 1              MS. ARCO:  I think two is more realistic, Your
 2    Honor.
 3              THE COURT:  Okay.
 4              MR. GORDON:  Your Honor, just for jury planning
 5    purposes, I would think that -- you know, we'll all be happy
 6    if we're quicker, but I think the most likely scenario is
 7    jury selection takes all day today.  Between both sides, we
 8    probably -- both sides are resting probably at the end of
 9    the day on Wednesday.
10              THE COURT:  Yes.
11              MR. GORDON:  And then to the jury.
12              THE COURT:  Okay.  So just for scheduling
13    purposes, I have to be in California on Friday.  I'm leaving
14    I think Thursday at around 6:00, so we may have to knock off
15    a little early Thursday afternoon.
16              If the jury still has the case, I'll probably get
17    another judge to take any verdict that comes on Friday so I
18    don't think that this will -- that will affect the schedule
19    if we can wrap up the evidence by end of the day Wednesday.
20              All right.  We have our jury sheet.  Are they
21    ready, Lauren?
22              THE COURTROOM DEPUTY:  One second, Your Honor.
23              (Pause)
24              THE COURT:  All right.  Counsel, just sit tight.
25    She's going to let them in and line them up.  It will take a
```

```
 1    minute.

 2              (Pause)

 3              MS. ARCO:  Your Honor, if I may?

 4              THE COURT:  Sure.

 5              MS. ARCO:  I am in a state of affairs right now

 6    where --

 7              THE COURT:  I didn't notice.

 8              MS. ARCO:  It's from the side.

 9              -- where I may need to abruptly break.  I'm fairly

10    confident that won't happen as long as I, you know, have

11    meals and --

12              THE COURT:  Of course.

13              MS. ARCO:  But I'm tapering off from...

14              THE COURT:  Of course.  Of course.

15              MS. ARCO:  So if that should happen, I'll get on

16    the phone and request if we can break.

17              THE COURT:  Yes, or just give me the high sign.

18              MS. ARCO:  Okay.  Thank you so much.

19              (Pause)

20              THE COURT:  Oh, and Defense Counsel, we've been

21    using these phones in lieu of bench conferences.  We call

22    them "the bat phones."  If you pick up the receiver, there's

23    a button right in the middle of the hand set.  I'll put the

24    husher on.  Do you want to test it out?

25              (Testing of communication devices)
```

```
 1            THE COURT:  Counsel, if the other jury comes back
 2     with a note or with a verdict, I'm just going to ask you to
 3     vacate temporarily.
 4            (Pause)
 5            THE COURT:  All right.  While we're waiting,
 6     Counsel, I've reviewed the defense's objections to some of
 7     the government's exhibits, and I guess my one sort of
 8     overarching question is, you know, typically, when we have
 9     the obstruction charge, all of the sort of the Facebook
10     exhibits that talk about why people went to Washington and
11     their sort of political views and what they thought about
12     the election, that stuff comes in to going to intent to
13     obstruct.  What's the relevance of those -- of that evidence
14     to the four misdemeanor charges?  Is there an obstruction of
15     official functions in one of the charges?
16            MS. ARCO:  Yes, both the -- one of the 1752
17     charges, the 1752(a)(2) charge, has a specific intent
18     element with respect to an intent to disrupt the official
19     government business, and one of the disorderly conduct
20     charges under the 5104 sections also has a specific intent
21     related to disrupting official government business.  So we
22     do think that evidence related to her intent and her
23     knowledge of what was going on that day is certainly
24     relevant.
25            We think a lot of those posts go to her motive,
```

1    certainly for storming the Capitol.  And, you know, whether

2    or not she intended to be disruptive, whether she was merely

3    following the crowd, I think certainly her state of mind,

4    her motive, what was animating her to go to D.C. in the

5    first place and then join what we would call a mob I think

6    is highly relevant, Your Honor.

7              And I do have an update on the objections.  So

8    after considering the defense's objections, the government

9    has affirmatively decided not to seek to introduce in its

10   case-in-chief I believe it's either 14 or 16 exhibits, and I

11   have those numbers, if you'd like.

12             THE COURT:  Just give me the general flavor.

13             MS. ARCO:  Certain of her Facebook

14   posts and then posts or comments in the group chat from

15   Mr. Eckerman's phone, her companion that she went with into

16   the Capitol, have some more outlandish ideas, and we

17   understand the defense's position.  We think some of them

18   would surely be fair game depending on what comes out in the

19   defense case, but in our case-in-chief I think we would not

20   seek to introduce various of those exhibits.

21             THE COURT:  So then --

22             MS. ARCO:  We've advised defense counsel of that

23   as well.

24             THE COURT:  You anticipated my next point.  Were

25   there 403 objections?

1          I mean, I will just let you introduce whatever it

2     is you want to introduce, and if the defense still objects,

3     we'll just deal with it on a case-by-case basis.

4          MS. ARCO:  Thank you, Your Honor.

5          THE COURT:  All right.

6          Counsel, take a look at Questions 23 and 25.

7     Those were the ones that we came up with in response to your

8     proposals.  Just make sure that those are acceptable to you.

9          MR. GORDON:  Your Honor, the only thought I'd have

10    is replacing, in 24, "significant other" with "anybody

11    you're close to" or something.  We wouldn't want to limit

12    that to just their significant other.  If their views or the

13    views of someone important to them would affect their

14    ability to be fair and impartial, I think that would be

15    worth knowing.

16          THE COURT:  I don't see "significant other" in --

17          MS. ARCO:  That would be in Question 24, Your

18    Honor.

19          MR. GORDON:  It says, "Do you think that your

20    political views or those of your significant other would

21    affect your ability to serve as a fair and impartial juror?"

22          THE COURT:  "Someone close to you"?

23          MR. GORDON:  Yes, Your Honor.

24          THE COURT:  Okay.

25          (Pause)

1          THE COURT:  And to the members of the audience,

2     when we bring in the jurors there are going to be about 50

3     of them, so I think we will have enough room for you to

4     stay, but if you could move to the back row so that we can

5     fill in the jurors in front of you, I'd appreciate that.

6          Thank you.

7          (Pause)

8          MR. GARRITY:  Your Honor, if I may?  Just looking

9     at Question 19 -- and I believe this addresses our concerns

10    about the Committee's final report.

11         THE COURT:  Yes.

12         MR. GARRITY:  There doesn't appear to be any

13    follow-up question.  Is it the Court's intention that that

14    question would prompt some questions at sidebar?

15         THE COURT:  Yes.  So if someone were to answer yes

16    to that question, I would follow-up:  How closely have you

17    read them?  Do you have any takeaways from it?  Have you

18    drawn any conclusions from it?

19         MR. GARRITY:  Okay.  Thank you.

20         (Pause)

21         THE COURTROOM DEPUTY:  Your Honor, the jury panel.

22         (Venire enters courtroom)

23         THE COURT:  Okay.  Counsel, you can be seated.

24         Okay.  Good morning, everybody.

25         VENIRE IN UNISON:  Good morning.

 1          THE COURT:  Welcome to the United States District
 2   Court for the District of Columbia.  My name is Christopher
 3   Cooper, and I will be the presiding judge in this matter.
 4   Thank you very much for your service and for your patience
 5   this morning.
 6          Before we start, let me just introduce you to --
 7   you've met Ms. Jenkins, who is our courtroom deputy.  She
 8   makes sure that the trains run on time.
 9          Over on this side of the courtroom is one of my
10   law clerks and another member of court staff.
11          To my right is Ms. Moreira, who is our court
12   reporter, who is taking down everything that occurs during
13   the proceedings.
14          I will introduce you to counsel in this case and
15   the parties in a moment.
16          So this is the next phase of jury selection where
17   our goal is to pick a fair and impartial group of 14 of you
18   to serve on the jury in this case.  We're going to do two
19   things.  I'm going to ask you a series of questions directed
20   to everyone in the panel, and then following that, we're
21   going to bring you all up individually in the order in which
22   you came in this morning for some follow-up questions
23   regarding your answers or nonanswers to the questions that I
24   asked the entire group.  All right?
25          So just to give you a bit of background.  This is

1    a criminal case entitled *United States vs. Niemela*, and in

2    the case the defendant, Kirstyn Niemela -- who you will meet

3    in a moment -- is charged by indictment with four offenses

4    related to her conduct at the United States Capitol on

5    January 6, 2021.

6            Specifically, Ms. Niemela is charged with

7    unlawfully entering or remaining in the United States

8    Capitol building and grounds at a time when they were a

9    restricted area.

10           She is also charged with engaging in disorderly

11   and disruptive conduct while inside the United States

12   Capitol building as well as unlawfully parading,

13   demonstrating, or picketing in the building.

14           Ms. Niemela, who is presumed to be innocent,

15   denies the allegations and has pled not guilty to the

16   charges.

17           All right.  You should all have an index card and

18   a pen with you.  The first thing I need you to do is take a

19   look at your juror number and write that number on the upper

20   right-hand corner of your index cards.

21           I'm going to ask you a series of questions, and if

22   your answer is yes to any of the questions -- all the

23   questions will be yes-or-no questions.  If your answer is

24   yes to a question, please write the number of that question

25   on your card.

1          So don't write yes or no.  Don't try to explain

2     your answer.  Simply write the question number on your card.

3     All right?

4          Now, before I start asking the questions, we need

5     each of you to stand up and raise your right hand to swear

6     that you will answer all of the questions truthfully.

7          (Venire sworn)

8          THE COURT:  Okay.  And if anyone has a question

9     while I go through the list of questions -- and there are

10    about 41, 42 questions -- just raise your hand, and I'll be

11    happy to answer it.

12         Question 1:  Based on my conversations with the

13    lawyers, I expect the presentation of evidence in this case

14    to conclude by Wednesday or possibly Thursday of this week.

15    The typical trial day lasts from 9:30 a.m. to 5:00 p.m. with

16    15-minute breaks in the morning and in the afternoon and an

17    hour or hour-and-15-minute lunch break.  Do any of you have

18    any difficulty with hearing, seeing, understanding the

19    English language, or do you have any other health-related

20    condition that would impair your ability to sit as a juror

21    and devote your full attention to this trial given the

22    schedule that I've just described?

23         So if there are any health issues -- eyesight,

24    hearing, et cetera -- that would keep you from being

25    attentive and alert during the trial based on the schedule

1    that I just laid out, please write 1 on your card.

2              Question 2:  Apart from your general knowledge of

3    the events of January 6, 2021, do you know or have you heard

4    or read anything, or watched any videos, about Ms. Niemela's

5    alleged activities on that day?  If yes, write 2 on your

6    card.

7              Question 3:  Do you or anyone you are close to

8    live or work in the area of the Capitol building located at

9    First Street Southeast in Washington, D.C., or are you

10   otherwise closely familiar with that area?  If yes, write 3

11   on your card.

12             Question 4:  Were you at or near the U.S. Capitol

13   on January 6, 2021?  If yes, write 4 on your card.

14             The government is represented in this case by

15   prosecutors from the U.S. Attorney's Office in Washington,

16   D.C., and Tampa, Florida.  Ms. Arco or Mr. Gordon, if you

17   would like to introduce yourselves and the other members of

18   your team.

19             MS. ARCO:  Good morning.  My name is Jessica Arco.

20             MR. GORDON:  Hi, I'm Mike Gordon.  And also with

21   us is FBI Special Agent Mark Hastbacka as well as Paralegal

22   Specialist Tekiah Jones.

23             THE COURT:  Okay.  Do you know any of the

24   prosecutors in this case or other members of the

25   government's trial team?  If yes, write 5 on your card.

1          Sorry, is there a question, ma'am?

2          THE COURTROOM DEPUTY:  One second.

3          THE COURT:  Let's get a microphone for you.

4          PROSPECTIVE JUROR:  My question was for No. 3 at

5     or near the Capitol.  What is the -- what would you consider

6     near?  Like if I lived within a one-mile radius?

7          THE COURT:  I'll let you use your best judgment,

8     all right?

9          PROSPECTIVE JUROR:  All right.

10          THE COURT:  We can talk about it at the desk

11     later.

12          PROSPECTIVE JUROR:  Okay.

13          THE COURT:  All right.  I will now ask

14     Ms. Niemela's counsel to introduce themselves and the

15     defendant.

16          MR. GARRITY:  Good morning, everyone.  My name is

17     Paul Garrity, and I represent Kirstyn Niemela.

18          MR. MONTEITH:  This is a little awkward.  This is

19     a new system here.

20          But good morning.  My name is Rick Monteith.  I

21     also represent Kirstyn Niemela.

22          We're from New Hampshire.  I'm from Manchester,

23     and Paul is from Londonderry.  So I doubt anybody knows us,

24     but nice to meet you.

25          THE COURT:  Okay.  Thank you.  And, Counsel, feel

1    free to come to the lectern, if you like, instead of having

2    to look through two layers of Plexiglas.

3              MR. GARRITY:  Thank you, Your Honor.

4              THE COURT:  All right.  If anyone knows either

5    Mr. Garrity or Mr. Monteith or Ms. Niemela, please write 6

6    on your card.

7              Question 7:  Please take a moment to look at the

8    other jurors on the jury panel or the other potential

9    jurors.  Do you recognize or think that you know any other

10   member of the panel?  If yes, write 7 on your card.

11             Question 8:  During the presentation of evidence,

12   you may hear testimony from or about the following persons.

13   That doesn't mean they're going to testify, but they may be

14   witnesses or you may hear evidence about the following

15   people:

16             Stefanie Chiguer, C-H-I-G-U-E-R; Lieutenant Brooke

17   Detorie, D-E-T-O-R-I-E; Special Agent Liz Glavey, G-L-A-V-

18   E-Y; Officer Gregorczyk, G-R-E-G-O-R-C-Z-Y-K; Special Agent

19   Mark Hastbacka, H-A-S-T-B-A-C-K-A; Captain Tia Summers;

20   Renae Sevigny, S-E-V-I-G-N-Y; Michael Eckerman; Candy

21   Eckerman; Crystal Herman; and Mark Leach.

22             If you know or think you might know any of these

23   individuals, please write 8 on your card.

24             Question 9:  Please take a moment to look at my

25   staff or other courtroom staff that you may have seen

1    earlier today.  Do you know me or any member of the Court or

2    the courthouse or courtroom staff?  If yes, write 9 on your

3    card.

4              Question 10:  If you are selected for this jury, I

5    will instruct you that your job is to determine whether the

6    defendant committed the charged offenses beyond a reasonable

7    doubt based on the evidence presented and that you are not

8    to consider the potential punishment that the defendant

9    could receive, if she is found guilty.  Would you have any

10   difficulty or hesitation following that instruction?

11             Question 11:  The government has the burden of

12   proving Ms. Niemela guilty beyond a reasonable doubt, and

13   she is presumed innocent unless and until the government

14   meets that burden.  This burden of proof never shifts to the

15   defendant.  Would you have any difficulty or hesitation with

16   respecting this allocation of the burden of proof?

17             If you would have difficulty accepting that burden

18   of proof, please write 11 on your card.

19             12:  Because Ms. Niemela is presumed to be

20   innocent, she need not testify nor offer any evidence at

21   trial.  Do you think her decision not to testify or to call

22   witnesses or to put on any evidence would make you think it

23   is more likely that she is guilty?

24             And I don't know whether she will testify or

25   choose to put on evidence.  But if she were to choose not

1    to, would that make it more likely that she is guilty in

2    your view?  If yes, write 12 on your card.

3            Question 13:  There has been an indictment in

4    this case.  An indictment is not evidence of a crime.  It

5    merely initiates a criminal case and is a formal way of

6    presenting the charges.  Would the fact that an indictment

7    charged Ms. Niemela with a crime lead you to believe that

8    she is guilty or make it more difficult for you to apply the

9    presumption of innocence?  If yes, write 13 on your card.

10           14:  Under certain circumstances the government

11   can obtain authorization from a judge to search a home or

12   electronic media to obtain evidence like emails, text

13   messages, video recordings, letters, financial information,

14   or other materials and information.  I will instruct you

15   that any evidence that is presented to you at this trial was

16   obtained legally and that you can consider it.  Do you have

17   any concerns about your ability to follow this instruction?

18   If yes, write 14.

19           15:  If you are selected as a juror in this case,

20   I will instruct you to avoid all media coverage, including

21   radio, TV, podcasts, and social media and not to use the

22   Internet with regard to this case for any purpose.  That is,

23   you will be forbidden from reading anything about the case,

24   listening to radio or podcasts about the case, watching TV

25   news or anything on the Internet about the case, or doing

1  any independent research through Google or Tweets or any

2  other means.

3         Do you have any reservations or concerns about

4  your ability or willingness to follow this instruction?

5         Okay.  Question 16:  As I said, Ms. Niemela has

6  been charged with four crimes relating to Congress's meeting

7  at the United States Capitol on January 6, 2021, to certify

8  the Electoral College vote for president.  Do you have such

9  strong feelings about the events of January 6th, or those

10 who have been charged with crimes for their participation in

11 those events, that it would be difficult for you to follow

12 the Court's instructions and render a fair and impartial

13 verdict, if you were chosen as a juror?

14         Question 17:  Do you or does someone close to you

15 have any direct or indirect connection to the events at the

16 U.S. Capitol on January 6, 2021?

17         18:  Have you ever watched video of what happened

18 at the Capitol on January 6, 2021, on the news, the

19 Internet, or on social media?

20         19:  Have you watched any portion of the

21 television coverage of hearings by the January 6th Committee

22 in the House of Representatives, or have you read the

23 Committee's report or news articles regarding its final

24 report?  So any exposure to either the hearings conducted by

25 the January 6th House Committee or the Committee's final

1    report, answer 18 on your card -- I'm sorry, 19 on your

2    card.

3          Question 20:  Do you have any strong personal

4    feelings or opinions about the outcome of the 2020

5    presidential election such that they would impact your

6    ability to be a fair and impartial juror in this case?

7          21:  Do you believe the 2020 presidential election

8    was stolen, corrupt, or fraudulent?  If yes, 21 on your

9    card.

10         22:  Do you have an opinion about people who

11   believe that the 2020 presidential election was stolen,

12   corrupt, or fraudulent that would make it difficult for you

13   to serve as a fair and impartial juror in this case?

14         23:  You may hear evidence in this case about the

15   group QAnon.  Do you have an opinion about QAnon believers

16   or supporters -- assuming that you know what QAnon is --

17   that would make it hard for you to serve as a fair and

18   impartial juror if the evidence showed that the defendant

19   was a supporter of QAnon?

20         24:  Do you think that your political views, or

21   those of someone close to you, would affect your ability to

22   serve as a fair and impartial juror in this case?

23         25:  You may hear evidence in this case that the

24   defendant, Ms. Niemela, was involved in a same-sex

25   relationship on or around January 6, 2021.  Do you have any

1    strong feelings or opinions about individuals involved in

2    same-sex relationships that would interfere with your

3    ability to be fair and impartial if you were selected as a

4    juror?  25.

5            Okay.  The following set of questions relate to

6    you, members of your immediate family, and close personal

7    friends.  And when I say "members of your immediate family,"

8    I don't mean your second cousin from Peoria.  I mean close

9    family members and close friends that might influence your

10   views on issues that are relevant to this case.  Okay?  So

11   use your best judgment as to whom to include in the category

12   of immediate family or close personal friends.

13           26:  Has any member of that group ever been

14   arrested or charged with any offense other than a traffic

15   offense?

16           27:  Has any member of that group ever served as a

17   witness in any judicial proceeding?

18           28:  Has any member of that group been the victim

19   or witness to a crime?

20           29:  Has any member of that group ever worked in

21   any aspect of the legal field either as a lawyer, a

22   prosecutor, a defense attorney, a secretary, paralegal,

23   court reporter, investigator, law clerk?  Any prior

24   employment or current employment in the legal field, write

25   29 on your card.

1          30:  Has any member of that group ever applied for

2     employment with, were employed by, or received training by

3     any local, state, or federal law enforcement agency?  And

4     obviously that would include agencies like the FBI, Homeland

5     Security, the Secret Service, the Park Police, the Capitol

6     Police, or any other law enforcement agency.

7          31:  Has any member of that group ever served in

8     the military?

9          32:  Has any member of that group worked for the

10    legislative branch of the United States?  Meaning the

11    Congress, including the Senate and the House of

12    Representatives or any ancillary body that's serving the

13    legislative branch of the United States.

14         33:  Has any member of that group ever been a

15    party to or involved in any legal action or dispute with an

16    agency of the United States or had any interest in such

17    legal action or dispute or its outcome?

18         So any dispute with a federal agency or had some

19    interest, financial or emotional interest, in such a

20    dispute, answer "33" on your card.

21         Has any member of that group ever been the subject

22    of any investigation by a government agency, or do you have

23    any case pending in federal or state court?

24         35.  And now we're back to just questions related

25    to you.  Have you had any experience as a juror in a

1   previous trial or experience on a grand jury?  So any prior

2   jury experience either on a trial jury or grand jury, write

3   35 on your card.

4          36:  Several witnesses in this case will be law

5   enforcement officers.  I will instruct you that the

6   testimony of a law enforcement officer is to receive no

7   greater or no lesser consideration simply because that

8   witness is a law enforcement officer.  Would you have any

9   difficulty following that instruction?

10          37:  Have you had any unpleasant experiences with

11   a defense attorney or defense investigator or with a

12   prosecutor or a government investigator, whether here in

13   D.C. or otherwise, that would make it difficult for you to

14   be a fair juror in this case?

15          Question 38:  Do you have any moral, religious, or

16   ethical beliefs that prevent you from sitting in judgment of

17   another person?  If yes, write 38 on your card.

18          39.  The Court has obviously taken a number of

19   precautions due to the COVID-19 pandemic.  We see the

20   Plexiglas.  The jurors are masked.  We've done air flow

21   testing in the courtrooms.  Despite those precautions, is

22   there any reason that serving on a jury during the pandemic

23   would make it difficult for you to fulfill your duties as a

24   juror?

25          So despite the precautions that the Court has

1     taken, if there's anything that would make you hesitate or

2     lead you to believe that it would be difficult for you to

3     fulfill your duties as a juror because we're still in the

4     midst of COVID-19, at least to some extent, please write 39

5     on your card.

6            Question 40.  As I said, I expect the presentation

7     of evidence to conclude Wednesday or possibly Thursday.

8     After the close of evidence, the jury will deliberate until

9     it has reached a decision.  I cannot tell you how long

10    deliberations will take because that is up to the jury

11    itself.  Would serving as a juror in this case be an extreme

12    hardship given that schedule?

13           And when I say "extreme hardship," I say that

14    recognizing that jury service is inconvenient for everyone;

15    that serving on a jury may require you to forgo work or

16    family obligations to some extent.  And so extreme hardship

17    is something more than that.  And I will also say that if I

18    were to exclude someone based on an extreme hardship, their

19    name would go back to the jury office, and you would be

20    called for another panel in the not-so-distant future.

21    Okay?

22           So with those caveats, would serving on the jury

23    be an extreme hardship for anyone?  If yes, write 40 on your

24    card.

25           And 41 is my final question.  It is a catch-all

1    question.  Is there any reason that I have not asked about

2    this morning that you think would make it difficult for you

3    to serve as an impartial and fair juror in this case?  If

4    there's anything else, write 41 on your card, and we can

5    discuss it individually.

6              All right.  Any questions?

7              All right.  Ms. Jenkins will collect your cards.

8              THE COURT:  Okay.  So the next phase is we will

9    call each of you up individually.  But I like not to have

10   folks wait around unnecessarily, so what I'd like to do is,

11   if you're in the jury box or in the first row of the

12   audience on my right, just follow Ms. Jenkins, and she will

13   put you in another courtroom -- is that right, Ms. Jenkins?

14             THE COURTROOM DEPUTY:  Yes, Your Honor.

15             THE COURT:  Okay.

16             -- where you all can wait there and come up

17   individually.

18             If you are in the second or third row of the

19   audience, why don't you come back here at 11:30.  Okay?

20   That might be a little before we need you, but just to be

21   safe, why don't you come back at 11:30.

22             Don't go yet.

23             And then if you are in the last row on this side

24   or in the first row on the left side, why don't you come

25   back at 2:00.  Okay?

1          But for everyone, including those who are leaving

2     for the moment, please do not discuss the case with anyone.

3     There's a natural temptation to, you know, call your friends

4     or your loved ones to say that you may be on a jury and to

5     talk to them about the case.  Please resist the urge to do

6     that.  Please do not do any independent research about the

7     case.  Don't go Google it or don't go Google anything about

8     Ms. Niemela or anything else related to the case.  Again, no

9     discussions about the case.

10         Ms. Niemela is entitled to a trial based only on

11    the evidence that is presented at trial, and when jurors go

12    out and try to do independent research it deprives

13    defendants of that right, so it's a very important

14    admonishment.

15         But with that, Ms. Jenkins, all right to release

16    them until those times?

17         THE COURTROOM DEPUTY:  Yes, Your Honor.  And those

18    that are returning at a later period, if you can actually

19    report to Courtroom 19 that's in the other wing of the

20    courthouse.  But if you can just actually report to the

21    sixth floor, someone can direct you.

22         THE COURT:  Why don't we have them report directly

23    to Courtroom 19 just to make it one stop instead of two?

24         THE COURTROOM DEPUTY:  Yes.

25         THE COURT:  Okay.  So for those on this side that

 1    I indicated, 11:30; and for those in the back and on the

 2    left side, 2:00.  All right?

 3               (Venire exits courtroom)

 4               THE COURTROOM DEPUTY:  Are you ready for the first

 5    one, Judge?

 6               THE COURT:  Yes.

 7               THE COURTROOM DEPUTY:  Your Honor, this is Juror

 8    No. 1695.

 9               THE COURT:  Okay.  You're our lead-off hitter this

10    morning.  Ms. Reeker; is that correct?

11               PROSPECTIVE JUROR NO. 1695:  Yes.

12               THE COURT:  Feel free to slip your mask off.

13               All right.  Welcome, ma'am.  You answered yes to a

14    number of my questions.  You think there's something about

15    the nature of the case that would make it difficult for you?

16               PROSPECTIVE JUROR NO. 1695:  Yes, sir.

17               THE COURT:  Tell us about that.

18               PROSPECTIVE JUROR NO. 1695:  I'm sorry?

19               THE COURT:  Tell us about that.  Why did you

20    answer yes to that question?

21               PROSPECTIVE JUROR NO. 1695:  Yes, because I work

22    for the U.S. Department of State, and during the previous

23    administration I worked for political appointees.

24               The other part of my situation is that my husband

25    also works for the Department of State, and he testified

```
 1          during the impeachment of the former president.

 2                    THE COURT:  Okay.  And that's just a little too

 3          close to home for you.  Obviously --

 4                    PROSPECTIVE JUROR NO. 1695:  Yes, sir.

 5                    THE COURT:  -- if we excluded every employee of a

 6          federal agency from juries in Washington, D.C., we would not

 7          be able to pick a jury.

 8                    PROSPECTIVE JUROR NO. 1695:  Yes, sir.

 9                    THE COURT:  But a little too close to home?

10                    PROSPECTIVE JUROR NO. 1695:  Yes, sir.

11                    THE COURT:  Okay.  Ma'am, you can step down.

12                    PROSPECTIVE JUROR NO. 1695:  Thank you.

13                    THE COURT:  Okay.  The Court will strike 1695 for

14          cause.

15                    THE COURTROOM DEPUTY:  Your Honor, this is Juror

16          1597.

17                    THE COURT:  Good morning, ma'am.

18                    PROSPECTIVE JUROR NO. 1597:  Good morning.

19                    THE COURT:  How are you?  Feel free to slip your

20          mask off.

21                    You're with the Smithsonian; is that right?

22                    PROSPECTIVE JUROR NO. 1597:  Yes.

23                    THE COURT:  And what do you do for them?

24                    PROSPECTIVE JUROR NO. 1597:  I work on a project

25          at the African-American History and Culture Museum.  I'm a
```

```
 1    program manager.
 2              THE COURT:  Great.  Which project?
 3              PROSPECTIVE JUROR NO. 1597:  Pardon me?
 4              THE COURT:  Are you working on a particular
 5    project now?
 6              PROSPECTIVE JUROR NO. 1597:  Yes.
 7              THE COURT:  What is it?
 8              PROSPECTIVE JUROR NO. 1597:  It's in the Office of
 9    Visitor and Guest Services, funding to address issues of
10    accessibility and visitor experience.
11              THE COURT:  Great.  I took my kids there over the
12    holiday break.  We had a wonderful visitor experience, if
13    that's worth anything.
14              PROSPECTIVE JUROR NO. 1597:  I appreciate it.
15    Thank you.
16              THE COURT:  All right.  You answered yes to a few
17    of my questions.  You live or work near the Capitol?
18              PROSPECTIVE JUROR NO. 1597:  It mentioned about
19    having people close to you who live and work near the
20    Capitol.
21              THE COURT:  Yes.
22              PROSPECTIVE JUROR NO. 1597:  That's the case for
23    me.
24              THE COURT:  And who's that?
25              PROSPECTIVE JUROR NO. 1597:  I have some good
```

1    friends who work in the House of Representatives.

2              THE COURT:  Okay.  Were they present on January

3    6th?

4              PROSPECTIVE JUROR NO. 1597:  Yes.

5              THE COURT:  And were they -- how were they

6    affected, if at all?

7              So they were present in the Capitol on January

8    6th?

9              PROSPECTIVE JUROR NO. 1597:  Yes.

10             THE COURT:  Okay.

11             PROSPECTIVE JUROR NO. 1597:  Not physically

12   affected.  Emotionally affected.

13             THE COURT:  And have you spoken to them about

14   that?

15             PROSPECTIVE JUROR NO. 1597:  Yes.

16             THE COURT:  But you did not answer the question

17   that asks do you have such strong feelings or is there

18   anything about the nature of the charges that would affect

19   you from being an impartial juror.  So I guess I'll ask an

20   open-ended question.

21             To what extent would your relationships with these

22   folks affect your service here, do you think?  And be

23   honest.

24             PROSPECTIVE JUROR NO. 1597:  Because of what they

25   experienced, I do feel strongly that they should not have

1     had to have that experience.

2              I would like to think that I could be fair based

3     on the evidence.  I did scribble some questions on the side

4     that I wasn't sure of.  But in this conversation it does

5     affect me.

6              THE COURT:  Okay.  And do you think you'd be able

7     to put that aside, or would you have trouble putting that

8     aside?

9              PROSPECTIVE JUROR NO. 1597:  I can't promise to

10    put it totally 100 percent aside.  I would be mindful of it.

11    I would strive to work with the evidence presented.

12             THE COURT:  Okay.

13             All right.  You followed the coverage of both the

14    events themselves and the House hearings; is that right?

15             PROSPECTIVE JUROR NO. 1597:  That's correct.

16             THE COURT:  How closely?

17             PROSPECTIVE JUROR NO. 1597:  I was watching on

18    January 6th -- the day of -- 2021, and I have been watching

19    coverage of the investigation as well as the January 6th

20    Committee hearings.

21             THE COURT:  And have you drawn any conclusions

22    based on what you watched about the hearings or of the

23    hearings?

24             PROSPECTIVE JUROR NO. 1597:  Yes.

25             THE COURT:  And share those with us.

```
 1              PROSPECTIVE JUROR NO. 1597:  I feel that the --
 2    that the break-in was unlawful, the break-in to the Capitol
 3    was unlawful, and that it -- even in feeling -- and while I
 4    disagree with the assertion that the election was
 5    illegitimate, I think that there were peaceful means for
 6    protesting, and that breaking in violently -- forcibly
 7    breaking into the Capitol -- was not justified.  That that
 8    was illegal.
 9              THE COURT:  Okay.  So obviously lots of people
10    came to Washington on January 6th.  Lots of people made
11    their way into the Capitol.  They did so for different
12    reasons.  They did different things.  They've been charged
13    with different crimes.  Some of them have not been charged
14    with crimes.
15              The purpose of this trial would be to give this
16    lady a fair trial based on the evidence of what she did or
17    did not do, not the other thousands of people who may have
18    been there.
19              With that in mind, do you think you could be fair
20    based on your knowledge of J6 and your relationships with
21    the folks who were there that day?
22              PROSPECTIVE JUROR NO. 1597:  I'm not sure.  I
23    think so, but I'm not sure.
24              THE COURT:  Okay.  Counsel?
25              MR. GORDON:  Good morning, Ms. Anderson.
```

1          PROSPECTIVE JUROR NO. 1597:  Good morning.

2          MR. GORDON:  So when you say you're not sure --

3     you understand what Judge Cooper's saying about the idea

4     that while there were thousands of people there, this trial

5     is just about one person, this defendant.  Right?  And as

6     you sit here today -- you've never seen her before, right?

7          PROSPECTIVE JUROR NO. 1597:  That's correct.

8          MR. GORDON:  You don't have knowledge about what

9     she did or didn't do on January 6th.  Right?

10         PROSPECTIVE JUROR NO. 1597:  Correct.

11         MR. GORDON:  So, you know, if you -- are you

12    saying -- are we understanding you correctly that if you

13    hear evidence that she went inside, that you're going to

14    kind of automatically think that she's guilty of the four

15    specific crimes she's charged with even before getting into

16    what those crimes are and what they require and what the

17    evidence is?

18         Is that what you're saying?  That you're kind of

19    automatically going to find her guilty because you -- as

20    soon as you know that she went in?

21         PROSPECTIVE JUROR NO. 1597:  Well, while I think

22    that going in was wrong, I think the evidence as to what

23    occurred once there -- how did she get in, what occurred

24    while she was there -- I think those are the points of

25    consideration.  Yes, I'll stop.

41

1        MR. GORDON:  Do you think you'll be able to --

2   regardless of whether going in itself was right or wrong.

3   It's not a moral question, right?  We're dealing with four

4   very specific crimes.

5        Do you think you could listen to Judge Cooper

6   explain to you what the crimes are and what the government

7   would have to prove, and then listen to the trial, take all

8   that evidence in, and then go back in the jury room and kind

9   of analytically and fairly and impartially match up the

10  evidence to the crimes and see whether or not you think

11  they're proven?  Do you think you can do that?

12       PROSPECTIVE JUROR NO. 1597:  Yes, I would draw the

13  distinction with -- yes, I acknowledge that I do think it

14  was wrong to enter the Capitol at that time.  However, I

15  recognize that this is a deliberation about the specific

16  actions of an individual that will be -- evidence will be

17  presented relative to those actions, and that that's what I

18  would have to judge.

19       MR. GORDON:  And do you think you could fairly and

20  impartially do that?

21       PROSPECTIVE JUROR NO. 1597:  Yes.

22       MR. GORDON:  All right.  Thank you, Your Honor.

23       MR. GARRITY:  Good morning, Ms. Anderson.

24       PROSPECTIVE JUROR NO. 1597:  Good morning.

25       MR. GARRITY:  I noticed you gave a lot of thought

 1    and consideration to your answers to Judge Cooper's

 2    questions.  Is it fair to say that your friends who were at

 3    the Capitol and their -- how they were impacted by the

 4    events of January 6th, did they -- did their feelings

 5    emotionally impact you?

 6            PROSPECTIVE JUROR NO. 1597:  Their feelings were

 7    in addition to, frankly, the shock I felt of watching the

 8    Capitol be breached that way.

 9            MR. GARRITY:  So is it fair to say that knowing

10    your friends and their reactions to January 6th and how that

11    impacted you, and your own view of what happened on January

12    6th impacted you strongly --

13            PROSPECTIVE JUROR NO. 1597:  Yes.

14            MR. GARRITY:  -- in a way that you would view

15    people involved in the January 6th events in a negative way?

16    Is that fair to say?

17            PROSPECTIVE JUROR NO. 1597:  I would say I would

18    have lots of questions.

19            I recognize that individual motives are

20    individual.  Just that.  And that there were lots of people

21    with various reasons.  Most of those reasons I don't

22    particularly understand, but I recognize there are different

23    reasons.

24            MR. GARRITY:  Am I correct that it would be

25    difficult to put your emotional view of the events of

43

```
 1    January 6th aside if you were to sit on the jury?

 2              PROSPECTIVE JUROR NO. 1597:  Would you repeat your

 3    question, please?

 4              MR. GARRITY:  Sure.  I think you're saying that

 5    the events of January 6th have an emotional impact on you.

 6    Is that right?

 7              PROSPECTIVE JUROR NO. 1597:  Correct.

 8              MR. GARRITY:  Am I correct that it would be

 9    difficult to put that emotional view of January 6th aside if

10    you were to sit on the jury?

11              PROSPECTIVE JUROR NO. 1597:  I would not be able

12    to totally separate it, no.

13              MR. GARRITY:  And I believe you also said watching

14    the January 6th hearings and reading about it, that impacted

15    your view of the people involved in the events of January

16    6th?

17              PROSPECTIVE JUROR NO. 1597:  The hearings for me

18    provided some examples and some distinctions of what

19    motivated different people for being there.

20              MR. GARRITY:  I guess I'll just ask one last

21    question.

22              PROSPECTIVE JUROR NO. 1597:  Sure.

23              MR. GARRITY:  If you were in the position of

24    Ms. Niemela, would you like -- would you want someone with

25    your viewpoints and emotional view of the events of January
```

 1    6th sitting on the jury?

 2              PROSPECTIVE JUROR NO. 1597:  So you're saying if I

 3    were on trial, would I want someone unemotional to be --

 4              MR. GARRITY:  No.  I guess what I'm saying -- and

 5    I don't mean to cut you off.  If you were in Ms. Niemela's

 6    shoes, would you want someone with your views sitting on the

 7    jury?

 8              And I apologize if that's not the clearest

 9    question.

10              PROSPECTIVE JUROR NO. 1597:  What I'm

11    processing -- there are a lot -- I think what I would want

12    is someone who is informed but -- that's a very good

13    question, and it's a hard one to answer.

14              THE COURT:  Okay.  We're going to cut it off.  We

15    have to get to more jurors.

16              MR. GARRITY:  Okay.  Thank you very much.

17              THE COURT:  Thank you, ma'am.  You can go back to

18    the courtroom.  Okay?

19              All right.

20              MR. GORDON:  Your Honor, we don't object to the

21    obviously coming motion for cause from the defense.

22              THE COURT:  All right.

23              Move for cause, Counsel?

24              MR. GARRITY:  Yes, Your Honor.

25              THE COURT:  All right.  The Court will sustain the

```
 1    challenge.
 2            So this is an example of just -- you know, we're
 3    going to see this throughout the day.  I actually think she
 4    probably could be fair, but I think the combination of
 5    having a personal relationship with someone who was there,
 6    her hesitancy -- I actually think she probably, at the end
 7    of the day, is a very responsible person and would do a good
 8    job, but her hesitancy to how sure she could be -- and she
 9    also answered yes to the QAnon question.  So for all of
10    those reasons the Court will sustain the defense's motion to
11    strike for cause 1597.
12            We're stumbling out of the blocks, Counsel.
13            THE COURTROOM DEPUTY:  Your Honor, this is Juror
14    No. 0420.
15            THE COURT:  Good morning, ma'am.
16            PROSPECTIVE JUROR NO. 0420:  Good morning.  Good
17    morning.
18            THE COURT:  Please feel free to slip your mask
19    off.  How are you feeling this morning?
20            PROSPECTIVE JUROR NO. 0420:  I'm fine, thank you.
21            THE COURT:  Doing well.  You're Ms. Burke, right?
22            PROSPECTIVE JUROR NO. 0420:  Yes.
23            THE COURT:  And you work --
24            PROSPECTIVE JUROR NO. 0420:  I work for the
25    Capitol.
```

```
 1                THE COURT:  You work for the Architect of the
 2       Capitol.
 3                PROSPECTIVE JUROR NO. 0420:  Yes.
 4                THE COURT:  You're a custodian; is that right?
 5                PROSPECTIVE JUROR NO. 0420:  Yes.
 6                THE COURT:  And were you employed there on January
 7       6th?
 8                PROSPECTIVE JUROR NO. 0420:  Yes, I was.
 9                THE COURT:  Were you there on January 6th?
10                PROSPECTIVE JUROR NO. 0420:  I just missed out on
11       it.
12                THE COURT:  Just missed out on it.
13                Do you know if some of your colleagues were there?
14                PROSPECTIVE JUROR NO. 0420:  Yes, yes.
15                THE COURT:  Did you talk to them about it?
16                PROSPECTIVE JUROR NO. 0420:  Yes.
17                THE COURT:  Would this be a little too close to
18       home for you, to serve on this jury?
19                PROSPECTIVE JUROR NO. 0420:  Yes.  Yes, it would.
20                THE COURT:  You think it would?
21                PROSPECTIVE JUROR NO. 0420:  Yes.
22                THE COURT:  All right.  Thank you very much for
23       your service.  You may step down.
24                PROSPECTIVE JUROR NO. 0420:  Oh, you're welcome.
25                THE COURT:  All right.  The Court will strike 420
```

1     for cause.

2               THE COURTROOM DEPUTY:  Your Honor, Juror No. 2471.

3               THE COURT:  Good morning, ma'am.  Please step up.

4          How are you this morning?

5               PROSPECTIVE JUROR NO. 2471:  Good.  Thank you.

6               THE COURT:  You can take your mask off, if you're

7          comfortable.

8               PROSPECTIVE JUROR NO. 2471:  Yes, I am.

9               THE COURT:  You're Ms. Rashid?

10              PROSPECTIVE JUROR NO. 2471:  Yes.

11              THE COURT:  Nice to meet you.  You answered yes to

12         Question 18.  You've heard some -- you viewed the videos and

13         followed some of the coverage of January 6th?

14              PROSPECTIVE JUROR NO. 2471:  I just saw one video.

15              THE COURT:  Okay.  Back at the time it happened,

16         or since then?

17              PROSPECTIVE JUROR NO. 2471:  At the time it

18         happened.

19              THE COURT:  Okay.  And you haven't really followed

20         it?

21              PROSPECTIVE JUROR NO. 2471:  No.

22              THE COURT:  And you didn't answer yes to any of my

23         other questions.  You understood all the questions, right?

24              PROSPECTIVE JUROR NO. 2471:  Yes, yes.

25              THE COURT:  Okay.  And so when you were sitting

```
1     out there and I said this would be a January 6th case,

2     anything pop into your mind?

3               PROSPECTIVE JUROR NO. 2471:  The video.

4               THE COURT:  Just the video?

5               PROSPECTIVE JUROR NO. 2471:  Yes.

6               THE COURT:  Nothing else?

7               PROSPECTIVE JUROR NO. 2471:  Nothing else.

8               THE COURT:  Okay.  Counsel?

9               MR. GORDON:  Good morning, Ms. Rashid.

10              PROSPECTIVE JUROR NO. 2471:  Good morning.

11              MR. GORDON:  Rashid, right?

12              PROSPECTIVE JUROR NO. 2471:  Yes.

13              MR. GORDON:  I see here that you do program

14    support for the World Bank.

15              PROSPECTIVE JUROR NO. 2471:  Program assistant.

16              MR. GORDON:  Program assistant.  Can you explain

17    kind of what that is.  What's your job to a layperson?

18              PROSPECTIVE JUROR NO. 2471:  Yes.  So I support

19    the team that works with the bad projects.  We call them

20    jeopardy projects.  And then we -- the financial terms, we

21    restructure the projects, or we sell them, or we just

22    override them.  So my job is to make sure that when we do

23    the restructuring, the memorandum is in good shape,

24    especially the procedure.

25              So I'm a champion of procedure of that part.  And
```

1    also I do some part of procurement of that.

2              THE COURT:  I'm sorry, ma'am, you said jeopardy

3    projects?

4              PROSPECTIVE JUROR NO. 2471:  Yes.

5              THE COURT:  So projects that are in financial

6    jeopardy?

7              PROSPECTIVE JUROR NO. 2471:  Yes.

8              THE COURT:  Okay.

9              MR. GORDON:  Can you tell us what the highest

10   stakes decision you have to make in your job is?

11             PROSPECTIVE JUROR NO. 2471:  It's the procedures.

12   Like the highest stakes is I don't have my supervisor

13   around, and I have to make a decision that this memo have to

14   go in or have to go out, and if that memo is late, we're

15   losing millions of dollars, and that could mean my job would

16   be in jeopardy.

17             So that's what I do every time.  I take risks.

18             MR. GORDON:  And how often do you have to make

19   that decision or that process occurs?

20             PROSPECTIVE JUROR NO. 2471:  I could say that I do

21   that every day; however, those urgent ones would be maybe

22   once or twice or maybe four times a year -- a month, sorry.

23   A month.

24             MR. GORDON:  Thank you, Your Honor.

25             THE COURT:  Any questions, Counsel?

1          MR. MONTEITH:  Good morning.

2          PROSPECTIVE JUROR NO. 2471:  Good morning.

3          MR. MONTEITH:  So I'd just like to ask a few

4     questions about your responses.

5          Just so we're clear here, you said you saw a few

6     videos of the January 6th?

7          PROSPECTIVE JUROR NO. 2471:  One video.

8          MR. MONTEITH:  One.

9          PROSPECTIVE JUROR NO. 2471:  Exclusive, yes.  Just

10    one.

11         MR. MONTEITH:  Do you remember what kind of media

12    it was?

13         PROSPECTIVE JUROR NO. 2471:  It could be a clip

14    from CNN.  It could be.  It's been a long time.  I don't --

15    but I think it's CNN.

16         MR. MONTEITH:  Do you remember what that -- what

17    you saw in the video?

18         PROSPECTIVE JUROR NO. 2471:  Just chaos.  At that

19    time we just heard that something has happened, so it was a

20    lot of people like -- it was a lot of noise.

21         And I think it's a personal video.  Somebody just

22    put it there.  It wasn't that clear.

23         MR. MONTEITH:  Uh-huh.

24         PROSPECTIVE JUROR NO. 2471:  But we know what was

25    happening in the Capitol, and it was a lot of chaos, a lot

1   of commotions.

2          MR. MONTEITH:  I see.  Was it right on -- I know

3   it was a while ago, but January 6th?  Was it that day, or

4   the day after?

5          PROSPECTIVE JUROR NO. 2471:  It wasn't -- I don't

6   know the date.  It was around that time.

7          MR. MONTEITH:  And do you remember how long it

8   was, the video?

9          PROSPECTIVE JUROR NO. 2471:  The clip?  I don't

10  remember.  It was not -- it was kind of short.

11         MR. MONTEITH:  Right.  Did you form any

12  impressions or opinions after watching that video?

13         PROSPECTIVE JUROR NO. 2471:  No, not at all.

14         And at that time it was something new.  We just

15  heard some things happened.

16         MR. MONTEITH:  Okay.  And you said you haven't

17  read anything about January 6th?

18         PROSPECTIVE JUROR NO. 2471:  I mean, you hear from

19  other people.

20         I am not into that.  I'm a very busy mother, and I

21  have a lot of other things that I do.

22         MR. MONTEITH:  What you've either read or heard,

23  have you formed an opinion as to what --

24         PROSPECTIVE JUROR NO. 2471:  Can you repeat that

25  question again?

```
 1              MR. MONTEITH:  Okay, sure.  As far as to what you

 2     have seen or heard or spoken to with other people, have you

 3     formed any opinions as to whether -- the rightfulness of it

 4     or the wrongfulness of it?

 5              PROSPECTIVE JUROR NO. 2471:  Just a mixture of

 6     feelings from it.  I mean, I don't -- I remember my husband,

 7     we spoke a little bit.  And I have a little child.  He

 8     wanted to know what was going on when I was watching the

 9     video.

10              But it wasn't that it was positive or negative.

11     It was a bit tense.  We don't know what's going on.

12              MR. MONTEITH:  I see.  Okay.  Thank you.

13              THE COURT:  Thank you, Counsel.

14              All right.  Ma'am, you can feel free to step down.

15              PROSPECTIVE JUROR NO. 2471:  Thank you.

16              THE COURT:  Okay.  Any challenge to 2471?

17              MR. GORDON:  Not from the government.

18              THE COURT:  These are just challenges for cause,

19     Counsel.

20              MR. MONTEITH:  Not for cause.

21              THE COURT:  Excuse me?  No challenge?

22              MR. MONTEITH:  No challenge.

23              THE COURT:  All right.  2471 is qualified.

24              THE COURTROOM DEPUTY:  Your Honor, Juror No. 1092.

25              THE COURT:  Good morning, sir.
```

```
 1                    PROSPECTIVE JUROR NO. 1092:  Good morning.

 2                    THE COURT:  How are you?  Feel free to slip your

 3       mask off.

 4                    You're Mr. Allenspach?

 5                    PROSPECTIVE JUROR NO. 1092:  Yes, sir.

 6                    THE COURT:  It says you do fundraising for 9Marks.

 7       What is 9Marks?

 8                    PROSPECTIVE JUROR NO. 1092:  It's a Christian

 9       ministry that trains pastors.

10                    THE COURT:  Great.  How long have you been doing

11       that?

12                    PROSPECTIVE JUROR NO. 1092:  Five and a half

13       years.

14                    THE COURT:  What did you do before that?

15                    PROSPECTIVE JUROR NO. 1092:  I worked with college

16       students for another Christian ministry.

17                    THE COURT:  Great.

18                    All right.  You answered yes to a few of my

19       questions.  You followed some coverage of January 6th

20       obviously.

21                    PROSPECTIVE JUROR NO. 1092:  I read some news

22       articles.

23                    THE COURT:  Okay.  And have you -- was that just

24       back at the time that it happened, or have you followed

25       since then?
```

```
1                    PROSPECTIVE JUROR NO. 1092:  Just back at the
2        time.
3                    THE COURT:  Okay.  And where did you read those
4        news articles?
5                    PROSPECTIVE JUROR NO. 1092:  The Wall Street
6        Journal.
7                    THE COURT:  Question 30.  You know some folks who
8        have been employed by law enforcement?
9                    PROSPECTIVE JUROR NO. 1092:  Yes.  My wife is a
10       retired federal air marshal.
11                   THE COURT:  Oh.  And was she in law enforcement
12       before that?
13                   PROSPECTIVE JUROR NO. 1092:  No.  She spent 13
14       years with FAMS, and that was the full duration of her time
15       in law enforcement.
16                   THE COURT:  So after 9/11?
17                   PROSPECTIVE JUROR NO. 1092:  It was.
18                   THE COURT:  And someone close to you served in the
19       military?
20                   PROSPECTIVE JUROR NO. 1092:  Yes.  My father-in-
21       law was a Marine pilot.
22                   THE COURT:  And someone has worked for the
23       legislative branch in some capacity?
24                   PROSPECTIVE JUROR NO. 1092:  Yes.  A close friend
25       of mine has served as chief of staff for a senator.
```

1          THE COURT:  Okay.  Was he or she at the Capitol on

2     January 6th?

3          PROSPECTIVE JUROR NO. 1092:  He was.

4          THE COURT:  And have you spoken to him about it,

5     his experience that day?

6          PROSPECTIVE JUROR NO. 1092:  Yes, briefly.  Not at

7     length.

8          THE COURT:  Okay.  Do you know if he was

9     particularly affected or traumatized by the events?

10          PROSPECTIVE JUROR NO. 1092:  Certainly not

11     traumatized.  He's a pretty resilient guy.

12          THE COURT:  So I take it his experience would not

13     influence your fairness or impartiality if you served on

14     this jury?

15          PROSPECTIVE JUROR NO. 1092:  I don't believe so.

16          THE COURT:  Okay.  Counsel?

17          MR. GORDON:  Good morning, Mr. Allenspach.

18          PROSPECTIVE JUROR NO. 1092:  Hey, good morning.

19          MR. GORDON:  Which senator is that that your

20     friend's the chief of staff for?

21          PROSPECTIVE JUROR NO. 1092:  Senator Inhofe from

22     Oklahoma.  He's now retired.

23          MR. GORDON:  Do you know whether he was an

24     objector to the certification or not?

25          PROSPECTIVE JUROR NO. 1092:  I do not know.

1          MR. GORDON:  Okay.  I understand your friend

2     wasn't traumatized.  How -- you know, sort of on a scale of

3     1 to 10, where 1 is you had one conversation with him about

4     it for a few -- a minute or two back when it happened and

5     never talked about it since, and 10 is it's all you ever

6     talk to him about and talk to him about it every day since,

7     can you describe or characterize how in-depth you've talked

8     to your friend about January 6th?

9          PROSPECTIVE JUROR NO. 1092:  I'd say 1.  We have a

10    lot of other things that we talk about.

11         MR. GORDON:  Okay.  And would his experience

12    impact your ability to be fair and impartial in this case?

13         PROSPECTIVE JUROR NO. 1092:  I don't believe so,

14    but I don't plan to talk to him more about the events.

15         MR. GORDON:  All right.  Thank you, Your Honor.

16         MR. GARRITY:  Good morning.

17         PROSPECTIVE JUROR NO. 1092:  Good morning.

18         MR. GARRITY:  Just to follow up on some of your

19    answers.

20         You indicated you read some articles in *The Wall*

21    *Street Journal* --

22         PROSPECTIVE JUROR NO. 1092:  Yes, sir.

23         MR. GARRITY:  -- about the events of January 6th?

24         PROSPECTIVE JUROR NO. 1092:  Yes.

25         MR. GARRITY:  Did you -- aside from those

1    articles, did you watch any of the news coverage related to

2    it?

3               PROSPECTIVE JUROR NO. 1092:  Not substantially.

4    We don't have a TV in our home.

5               MR. GARRITY:  You're probably better off.  It

6    saves on the cable bill.

7               *The Wall Street Journal* articles that you read,

8    was this shortly after the January 6th events?

9               PROSPECTIVE JUROR NO. 1092:  It was.

10              MR. GARRITY:  Do you recall what the content of

11   those articles was?

12              PROSPECTIVE JUROR NO. 1092:  It would have been

13   linked to their daily summary that's on the front page.

14              MR. GARRITY:  And did those articles have a

15   viewpoint one way or the other about the events of January

16   6th?

17              PROSPECTIVE JUROR NO. 1092:  No.  Any article that

18   I would have read would have been outside of the opinion

19   section.

20              MR. GARRITY:  And reading those articles, did

21   you -- did they cause you to come to sort of any conclusions

22   with respect to what took place on January 6th?

23              PROSPECTIVE JUROR NO. 1092:  Can you be more

24   specific as to the conclusions?

25              MR. GARRITY:  Well, I guess --

```
 1              PROSPECTIVE JUROR NO. 1092:  I mean, as a resident

 2      of the neighborhood, you know, I grieved that there was

 3      something that happened in the Capitol.

 4              MR. GARRITY:  All right.  I guess the better way

 5      to ask it:  Reading those articles, did it lead you to come

 6      to an opinion one way or the other on the rightfulness or

 7      wrongness of what took place on January 6th?

 8              PROSPECTIVE JUROR NO. 1092:  I would say my

 9      opinion on it was that -- it seemed as though a protest went

10      too far, was my opinion.

11              MR. GARRITY:  Was that the opinion you had then,

12      or is it the opinion you have now?

13              PROSPECTIVE JUROR NO. 1092:  That's the opinion

14      that I had during -- while reading the article, and I think

15      that's the opinion that I still hold.

16              MR. GARRITY:  And your friend -- I just want to

17      make sure I have it correct -- your friend is the son of

18      Senator Inhofe?

19              PROSPECTIVE JUROR NO. 1092:  The former chief of

20      staff.

21              MR. GARRITY:  I'm sorry.

22              PROSPECTIVE JUROR NO. 1092:  Yes.

23              MR. GARRITY:  And did you ever have any

24      interaction with Senator Inhofe?

25              PROSPECTIVE JUROR NO. 1092:  I have met him
```

 1    briefly, but no substantive interactions.

 2              MR. GARRITY:  And the events of January 6th didn't

 3    affect your friend; is that right?

 4              PROSPECTIVE JUROR NO. 1092:  No, no.

 5              THE COURT:  Okay, Counsel.

 6              MR. GARRITY:  Okay.  Thank you, Your Honor.

 7              THE COURT:  Thank you very much.  You can step

 8    down.

 9              Any challenge to 1092?

10              MR. GORDON:  Not from the government.

11              MR. GARRITY:  One second, Your Honor.

12              THE COURT:  Okay.

13              MR. GARRITY:  No, Your Honor.  Thank you.

14              THE COURT:  1092 is qualified.

15              THE COURTROOM DEPUTY:  Are you ready for the next

16    one, Your Honor?  This is Juror No. 2599.

17              THE COURT:  Good morning, sir.

18              PROSPECTIVE JUROR NO. 2599:  Good morning.

19              THE COURT:  You're Mr. Montgomery?

20              PROSPECTIVE JUROR NO. 2599:  Yes, sir.

21              THE COURT:  Feel free to slip your mask off.

22              You're a consultant with Deloitte?

23              PROSPECTIVE JUROR NO. 2599:  Yes, sir.

24              THE COURT:  Do you consult on any government

25    projects?

1             PROSPECTIVE JUROR NO. 2599:  I do.

2             THE COURT:  Any law enforcement agencies?

3             PROSPECTIVE JUROR NO. 2599:  Homeland Security.

4             THE COURT:  The contracts with Homeland Security,

5     generally what do they involve?

6             PROSPECTIVE JUROR NO. 2599:  Health security and

7     public health.

8             THE COURT:  Nothing related to the Capitol?

9             PROSPECTIVE JUROR NO. 2599:  No, Your Honor.

10            THE COURT:  Okay.  Do you have a significant

11    other?

12            PROSPECTIVE JUROR NO. 2599:  I do, a spouse.

13            THE COURT:  What does he or she do?

14            PROSPECTIVE JUROR NO. 2599:  She's a teacher in a

15    school in D.C.

16            THE COURT:  Okay.  You answered yes to a number of

17    questions.

18            Question 3, you know someone who lives on Capitol

19    Hill.

20            PROSPECTIVE JUROR NO. 2599:  Myself.

21            THE COURT:  Where do you live?

22            PROSPECTIVE JUROR NO. 2599:  At 1317 Emerald

23    Street.

24            THE COURT:  Were you at home on January 6th?

25            PROSPECTIVE JUROR NO. 2599:  So January 2021 I

1    lived a few blocks from the Capitol at Second Ave. by Union

2    Station.

3              THE COURT:  Were you home that day?

4              PROSPECTIVE JUROR NO. 2599:  Yes, sir.

5              THE COURT:  Did you see or hear anything related

6    to the demonstrations on January 6th?

7              PROSPECTIVE JUROR NO. 2599:  Yes.  Yes, Your

8    Honor.

9              THE COURT:  Were you -- did your home experience

10   any vandalism or damage?

11             PROSPECTIVE JUROR NO. 2599:  Not my home, but some

12   of the businesses and other properties on our street.

13             THE COURT:  Okay.  And what generally did you

14   observe?  Were you outside of sort of the restricted area,

15   or did you actually go and --

16             PROSPECTIVE JUROR NO. 2599:  I didn't leave my

17   home, but I observed lots of cars and trucks driving by with

18   people who were presumably by the Capitol and that sort of

19   thing.

20             THE COURT:  Okay.  So I guess the overarching

21   question is, having lived there, having had neighbors whose

22   property was affected, do you think that you would have

23   trouble putting that aside, the effect that it had on your

24   neighbors and your neighborhood, in assessing the individual

25   guilt or innocence of Ms. Niemela knowing that people came

 1      to the Capitol from -- with lots of different motivations?

 2      They did lots of different things.  Some went in.  Some

 3      didn't.  Would your ability to be fair be affected by your

 4      experience on Capitol Hill?

 5                  PROSPECTIVE JUROR NO. 2599:  I would say so, Your

 6      Honor.

 7                  THE COURT:  You think so?

 8                  Okay.  You can step down.

 9                  PROSPECTIVE JUROR NO. 2599:  Okay.

10                  THE COURT:  All right.  The Court will strike him

11      for cause.  We are not doing great, Counsel.

12                  Good morning, ma'am.

13                  PROSPECTIVE JUROR NO. 2650:  Good morning.

14                  THE COURT:  You are Ms. Pincus; is that correct?

15                  PROSPECTIVE JUROR NO. 2650:  Yes.

16                  THE COURT:  All right.  It says here that you work

17      for the Consumer Technology Association.

18                  PROSPECTIVE JUROR NO. 2650:  Correct.

19                  THE COURT:  What is that, and what do you do for

20      them?  And you can slip your mask off.

21                  PROSPECTIVE JUROR NO. 2650:  It's a trade

22      association for tech companies.  I work in their membership

23      department.

24                  THE COURT:  All right.  You answered yes to my

25      first question.  You think that that schedule would be

```
1    difficult for you based on some health concern.  Is that

2    fair?

3                 PROSPECTIVE JUROR NO. 2650:  Yes.  I have two

4    young kids, 1 and 3, so I just would need to arrange child

5    care for the later hours of the day for them.

6                 THE COURT:  And would you be able to do that?

7                 PROSPECTIVE JUROR NO. 2650:  I can check after

8    this.  I'll have to check in and find likely a babysitter

9    basically to be able to watch them.

10                THE COURT:  Okay.  Do you have a go-to babysitter?

11                PROSPECTIVE JUROR NO. 2650:  I do.

12                THE COURT:  You know folks who live on Capitol

13   Hill.

14                PROSPECTIVE JUROR NO. 2650:  Yes.  I was actually

15   living there during January 6th.  We moved from that area

16   about a year ago.

17                THE COURT:  Okay.  And did you -- were you home

18   that day?

19                PROSPECTIVE JUROR NO. 2650:  I was home, yes.

20                THE COURT:  Did you observe any of the events of

21   the day?

22                PROSPECTIVE JUROR NO. 2650:  Yes.  My daughter was

23   actually in day care at 7th and Pennsylvania, so I had to go

24   pick her up.  So along that way things were going on, and I

25   did observe, yes.
```

```
 1              THE COURT:  Did you observe what was going on sort

 2   of outside the restricted area, or did you go into the

 3   restricted area?

 4              PROSPECTIVE JUROR NO. 2650:  No, I did not go

 5   closer than 7th and Pennsylvania Southeast, but obviously --

 6              THE COURT:  7th and Pennsylvania Southeast?

 7              PROSPECTIVE JUROR NO. 2650:  Yes.  Obviously cars,

 8   people going there, people going there in support of it;

 9   that's what I observed.

10              THE COURT:  Okay.  Was your -- did you have any

11   property damaged at your home that day?

12              PROSPECTIVE JUROR NO. 2650:  No.

13              THE COURT:  Any of your neighbors have property

14   damage as a result of what happened?

15              PROSPECTIVE JUROR NO. 2650:  Not directly around

16   me, no.

17              THE COURT:  Okay.  And obviously, you know,

18   there will be evidence presented at this trial as to what

19   Ms. Niemela may have seen or did not see that day and what

20   she did at the Capitol that day.  Do you think that you

21   would be able to consider that evidence and put aside

22   anything that you may have seen that day?

23              PROSPECTIVE JUROR NO. 2650:  I think it would be

24   hard.

25              THE COURT:  Why do you say that?
```

1        PROSPECTIVE JUROR NO. 2650:  Just being there in

2   that area and I think it would just be -- it would be

3   difficult.

4        THE COURT:  Let me ask you -- let me ask it

5   another way.

6        PROSPECTIVE JUROR NO. 2650:  Okay.

7        THE COURT:  I will instruct you that you must put

8   aside, A, your general feelings about January 6th and any

9   evidence that you may have read about in the paper or, in

10  your case, observed from afar.  Would you have difficulty

11  following that instruction?

12       PROSPECTIVE JUROR NO. 2650:  No.

13       THE COURT:  Are you sure about that?

14       PROSPECTIVE JUROR NO. 2650:  Yes.

15       THE COURT:  Okay.  So moving to coverage.  You've

16  obviously seen coverage of January 6th, either on TV or in

17  the papers.

18       PROSPECTIVE JUROR NO. 2650:  Yes.

19       THE COURT:  And that was at the time that it

20  happened?

21       PROSPECTIVE JUROR NO. 2650:  Yes.

22       THE COURT:  And have you followed it since then?

23  Or let me -- how closely have you followed it since then?

24       PROSPECTIVE JUROR NO. 2650:  Not closely.

25       THE COURT:  Okay.  You say you may have seen some

1       of the coverage of the hearings in the House of

2       Representatives.

3                  PROSPECTIVE JUROR NO. 2650:  Yes.

4                  THE COURT:  How -- again, how closely?  What have

5       you -- what do you remember seeing?

6                  PROSPECTIVE JUROR NO. 2650:  When the hearings

7       were on TV, we had them on in our house.

8                  THE COURT:  And did you draw any conclusions or

9       any takeaways in particular?

10                 PROSPECTIVE JUROR NO. 2650:  No.

11                 THE COURT:  Okay.  You said -- you answered yes to

12      the QAnon question.  Tell me about that.  Why did you answer

13      yes?

14                 PROSPECTIVE JUROR NO. 2650:  I know -- I've read

15      about QAnon.  I've seen a documentary on it.  I'm just

16      familiar with it.

17                 THE COURT:  Okay.  So if you were to hear evidence

18      that the defendant may have ascribed to some views supported

19      by QAnon in some way, shape, or form, would you be able to

20      still consider what she did based on the evidence at the

21      trial?

22                 Obviously -- let me put it like this.  There's

23      nothing illegal about being a member of QAnon or supporting

24      certain views ascribed by that group.  Would you be able to

25      appreciate that concept?

1          PROSPECTIVE JUROR NO. 2650:  No.  I think it would

2     be hard based on what I think about it and my views on it

3     versus someone who does follow it.

4          THE COURT:  All right.  Counsel?

5          MR. GORDON:  Good morning, Ms. Pincus.

6          PROSPECTIVE JUROR NO. 2650:  Hi.

7          MR. GORDON:  So just to be clear, the defendant's

8     been charged with four crimes, but none of them are for

9     being a member of QAnon.  All right?  So the concern that we

10    all have is that we don't want to pick a juror who is going

11    to, even if they hear the evidence in the trial and hear the

12    charges, think that maybe she's not guilty, right?  Maybe

13    the law requires, you know, the government prove X, Y and Z,

14    and they only proved X and Y but not Z, but I hate QAnon so

15    much that if I hear the defendant believed in QAnon, I'm

16    going to convict her anyway.  That's the fear.

17          Are you saying that your feelings about QAnon are

18    so deep or so strong that you're going to approach this case

19    with bias and that you would not be able to fairly and

20    impartially evaluate the evidence?

21          PROSPECTIVE JUROR NO. 2650:  No.

22          MR. GORDON:  Okay.  Do you think it would -- even

23    if it's not so far as you would just definitely convict her,

24    is it so -- is it strong enough, your feelings about QAnon,

25    that it would infect you with bias?  In other words, that

1    you would -- as you analyzed things, as you listened to

2    things, do you think that it would shade or color your views

3    based on your feelings about QAnon and not just based on the

4    evidence in front of you?

5              PROSPECTIVE JUROR NO. 2650:  No.

6              MR. GORDON:  So you think you could be a fair and

7    impartial juror here?

8              PROSPECTIVE JUROR NO. 2650:  Yes.

9              MR. GORDON:  Nothing further, Your Honor.

10             MR. MONTEITH:  Good morning.  So as Attorney

11   Gordon said, it's our role here to try to get -- and Judge

12   Cooper as well -- just people that are going to be fair in

13   this case.  Right?  That come in with as open of a mind as

14   possible.  Right?  And I would say that I come in here with

15   my own life experiences, and you do as well.  Right?  And

16   they kind of shape the way we think of things.

17             And I hate to dwell on it, but, you know, it

18   seemed like you were thinking hard about, you know, your

19   answers and almost like you're put on the spot.  Right?  But

20   this organization, this QAnon organization, it seems like

21   you have some strong feelings about it.  Is that fair?

22             PROSPECTIVE JUROR NO. 2650:  I wouldn't say strong

23   feelings.  I just know what it is, and I read about it or

24   I've watched like a documentary on it, and I've heard about

25   it.  So when the question was asked, I was honest and said

1    yes.

2              MR. MONTEITH:  So what's your opinion -- and after

3    reading about it and watching the documentary, what's your

4    opinion about this group?

5              PROSPECTIVE JUROR NO. 2650:  It's a far right

6    conspiracy group.

7              MR. MONTEITH:  Okay.  Is it a good thing or a bad

8    thing?

9              PROSPECTIVE JUROR NO. 2650:  I don't agree with

10   it.

11             MR. MONTEITH:  Okay.  And as far as -- and do you

12   think people that might have, you know, an association with

13   it or speak about it in some manner or fashion, would that

14   affect your ability to be a fair person in this case?

15             PROSPECTIVE JUROR NO. 2650:  I would be able to be

16   a fair person, yes.

17             MR. MONTEITH:  I'm sorry, you would be?

18             PROSPECTIVE JUROR NO. 2650:  A fair person, yes.

19             MR. MONTEITH:  Right, right.  So with regards to

20   the January 6th -- the events on that date, obviously you

21   are kind of close to it via where you live, right?

22             PROSPECTIVE JUROR NO. 2650:  Yes.

23             MR. MONTEITH:  And you do watch the news?

24             PROSPECTIVE JUROR NO. 2650:  Yes.

25             MR. MONTEITH:  And, again, what's your opinion, in

 1   a general sense, as to the righteousness or wrongfulness of

 2   people that were there or may have gone into the Capitol?

 3   Have you formed an opinion about that after watching what

 4   you watched and talking to your friends and --

 5            PROSPECTIVE JUROR NO. 2650:  I think it was wrong,

 6   what happened.

 7            MR. MONTEITH:  All right.  So coming in here, and

 8   without hearing anything on this case, you have formed an

 9   opinion that what happened on that day and anybody that has

10   gone in the Capitol, that it was wrong, and it was wrong for

11   those people to have done that.

12            PROSPECTIVE JUROR NO. 2650:  Yes.

13            MR. MONTEITH:  Okay.  Thank you.

14            THE COURT:  All right, Counsel.

15            All right.  Thank you very much.  You can step

16   down and go back to the courtroom.

17            Oh, I'm sorry, one more question.

18            You answered yes that you have family members or

19   yourself in the legal field.

20            PROSPECTIVE JUROR NO. 2650:  Yes.

21            THE COURT:  Are you related to Andrew Pincus?

22            PROSPECTIVE JUROR NO. 2650:  No.

23            THE COURT:  No, okay.  Who do you know?

24            PROSPECTIVE JUROR NO. 2650:  My father- and

25   mother-in-law are both attorneys.  My mother-in-law is a

```
 1            trial attorney, and my uncle and aunt as well.

 2                      THE COURT:  Okay.  Do any of them do criminal

 3            work?

 4                      PROSPECTIVE JUROR NO. 2650:  No.

 5                      THE COURT:  Okay.  Thank you.

 6                      MR. GORDON:  No challenge from the government.

 7                      MR. GARRITY:  We challenge for cause.

 8                      THE COURT:  Grounds?

 9                      MR. GARRITY:  Your Honor, I know she voiced to the

10            Court that she could be fair, but I would submit her true

11            views are voiced by her views of QAnon -- there will be some

12            evidence, perhaps, presented at this trial with respect to

13            QAnon -- but maybe most importantly her views about what

14            took place on January 6th.  She voiced pretty clearly that

15            she thought the events of January 6th were wrong, and she

16            was personally viewing the events of January 6th as well.

17                      So we would challenge for cause.

18                      THE COURT:  Okay.  I'll overrule your objection.

19            We will qualify 2650.  She said that she could be fair

20            notwithstanding her immediate reaction to QAnon, which I

21            think will be a common reaction amongst most jurors in this

22            or any other district frankly.  And she was seven blocks

23            away and didn't observe anything on the grounds.

24                      THE COURTROOM DEPUTY:  Your Honor, Juror No. 2572.

25                      THE COURT:  Good morning, ma'am.
```

```
 1                PROSPECTIVE JUROR NO. 2572:  Good morning.

 2                THE COURT:  All right.  Feel free to slip your

 3      mask off.  Thank you.

 4                You're Ms. Cromwell; is that correct?

 5                PROSPECTIVE JUROR NO. 2572:  Yes, I am.

 6                THE COURT:  And you're an accountant for the

 7      Center For Audit Quality.  Tell us what that is.

 8                PROSPECTIVE JUROR NO. 2572:  Yes.  So I'm a CPA.

 9      The Center For Audit Quality is -- we're the voice of the

10      public accounting profession.  So we work with the large

11      accounting firms to interact with SEC and PCAOB and

12      regulators that impact the accounting and auditing

13      profession.

14                THE COURT:  Got it.  Do you have a significant

15      other?

16                PROSPECTIVE JUROR NO. 2572:  No.

17                THE COURT:  All right.  You answered yes to

18      Question 18.  You've followed at least some coverage of

19      January 6th.  Tell us what you recall following and how

20      closely have you followed since the events themselves.

21                PROSPECTIVE JUROR NO. 2572:  Yes.  So I was at

22      home at my parents house in Massachusetts, and I remember

23      just during the workday the notifications started coming in

24      and just kind of like reading the live updates on like CNN

25      and those other apps, seeing it.
```

 1          And then, you know, in the days that followed it

 2     was on social media, and, you know, I had friends who were

 3     here in D.C., so talking to them about just what was going

 4     on and everything.

 5          Since then, to the extent that it's come up in the

 6     news, I've kind of read up on it, what's happening, as there

 7     have been updates.  Yes.

 8          THE COURT:  Okay.  Counsel?

 9          MR. GORDON:  Nothing from the government, Your

10     Honor.

11          THE COURT:  Counsel?

12          MR. GARRITY:  Good morning.

13          PROSPECTIVE JUROR NO. 2572:  Good morning.

14          MR. GARRITY:  Just a follow-up on your answers.

15     You watched the events of January 6th on January 6th?

16          PROSPECTIVE JUROR NO. 2572:  Yes.

17          MR. GARRITY:  You watched them -- the news

18     coverage?

19          PROSPECTIVE JUROR NO. 2572:  More like following

20     it on like live updates on like news stories rather than

21     watching the news.

22          MR. GARRITY:  Sure.  And since then you've

23     followed the subsequent news reports; is that right?

24          PROSPECTIVE JUROR NO. 2572:  Yes.  There have

25     been, I guess, like wide updates about it.  Not following it

1    like super closely, but, you know, when there's stuff that's

2    coming out.

3          MR. GARRITY:  Sure.  And does that include the

4    January 6th Committee hearings as well?

5          PROSPECTIVE JUROR NO. 2572:  I mean, I know that

6    they were going on, but not -- I didn't follow them very

7    closely.

8          MR. GARRITY:  And the news reports that you

9    watched or looked at on January 6th and since then, have

10   they led you to form any sort of opinion with respect to the

11   events of January 6th?

12         PROSPECTIVE JUROR NO. 2572:  I mean, I have my

13   personal view that -- I don't know if I should say this.

14         I mean, like my personal view is I disagree with

15   what went on that day, and so that's kind of just formulated

16   from reading the updates and knowing what was going on.

17         MR. GARRITY:  Sure.  And would your personal

18   view -- if you were to sit on the jury, would your personal

19   view impact your view of the evidence and the instructions

20   you'll receive from Judge Cooper?

21         PROSPECTIVE JUROR NO. 2572:  I don't believe that

22   it would.

23         MR. GARRITY:  You'd be able to put them aside?

24         PROSPECTIVE JUROR NO. 2572:  Yes.

25         MR. GARRITY:  Thank you.

```
 1              THE COURT:  Okay.  Thanks, Counsel.

 2              All right.  Ma'am, you can step down.  Go back to

 3      the other courtroom.

 4              MR. GORDON:  No challenge from the government?

 5              MR. GARRITY:  No challenge, Your Honor.

 6              THE COURT:  2572 is qualified.

 7              All right.  Counsel, we have a verdict in our

 8      other case.  It will take 15 minutes for Ms. Jenkins to get

 9      the parties and prepare everything to accept the verdict, so

10      why don't we press on, and when we have to break, we will

11      break to take the verdict.  Okay?

12              THE COURTROOM DEPUTY:  Your Honor, Juror No. 0503.

13              THE COURT:  Good morning, ma'am.  Feel free to

14      slip your mask off, if you'd like.

15              PROSPECTIVE JUROR NO. 0503:  Okay.  Thank you.

16              THE COURT:  Thank you for your service.  You are

17      Ms. Allen; is that correct?

18              PROSPECTIVE JUROR NO. 0503:  Yes.

19              THE COURT:  All right.  And it says you are a

20      communication strategist for something called MORI

21      Associates.  Tell us what MORI Associates it.

22              PROSPECTIVE JUROR NO. 0503:  MORI Associates is --

23      it's a contracting company for NASA.

24              THE COURT:  NASA.  And does it have any other

25      federal contracts besides NASA?
```

```
1              PROSPECTIVE JUROR NO. 0503:  No.

2              THE COURT:  And how long have you been doing that?

3              PROSPECTIVE JUROR NO. 0503:  Since 2019.

4              THE COURT:  Okay.  And do you have a significant

5    other?

6              PROSPECTIVE JUROR NO. 0503:  I do.  We're engaged.

7              THE COURT:  And what does he or she do?

8              PROSPECTIVE JUROR NO. 0503:  Right now they

9    currently work in the House of Representatives.

10             THE COURT:  Okay.  Who do they work for?

11             PROSPECTIVE JUROR NO. 0503:  Feenstra.

12             THE COURT:  I'm sorry?

13             PROSPECTIVE JUROR NO. 0503:  Representative

14   Feenstra.

15             THE COURT:  Okay.  And did they work on the Hill

16   on January 6th?

17             PROSPECTIVE JUROR NO. 0503:  Yes, in the Senate.

18             THE COURT:  In the Senate.  For whom?

19             PROSPECTIVE JUROR NO. 0503:  I can't remember if

20   Johnny Isakson had retired at that time and Kelly Loeffler

21   had taken over, but either Johnny or Kelly at that time.

22             THE COURT:  All right.

23             PROSPECTIVE JUROR NO. 0503:  Georgia Senate.

24             THE COURT:  From Georgia.

25             PROSPECTIVE JUROR NO. 0503:  Uh-huh.
```

1          THE COURT:  Were they present in the Capitol on

2     January 6th?

3          PROSPECTIVE JUROR NO. 0503:  I don't think so, no.

4          THE COURT:  Okay.  Were they -- and I'm sorry, is

5     it a he or a she?

6          PROSPECTIVE JUROR NO. 0503:  It's he.  I'm

7     actually 100 percent sure they were not in the Capitol on

8     January 6th.

9          THE COURT:  Have you had conversations with him

10    about what happened in the Capitol that day?

11         PROSPECTIVE JUROR NO. 0503:  I mean, at like home

12    I guess, yes, talking about it on the news.  But not

13    something that we followed a lot.

14         THE COURT:  Okay.  Fair to say that he was not so

15    affected by the events that you could not be a fair juror in

16    this case?

17         PROSPECTIVE JUROR NO. 0503:  Oh, no.

18         THE COURT:  That's fair?

19         PROSPECTIVE JUROR NO. 0503:  Yes, that's fair.

20         THE COURT:  Okay.  You answered yes to 18.  You've

21    followed coverage of January 6th, correct?

22         PROSPECTIVE JUROR NO. 0503:  Yes.

23         THE COURT:  Just back at the time, or how closely

24    have you followed it over time?

25         PROSPECTIVE JUROR NO. 0503:  Just back at the

```
 1   time.
 2             THE COURT:  Okay.  And you have someone close to
 3   you who's served in the military?
 4             PROSPECTIVE JUROR NO. 0503:  Yes.  Not currently;
 5   retired.  My dad.
 6             THE COURT:  Okay.  And the person that worked in
 7   the legislative branch, that's your fiance?
 8             PROSPECTIVE JUROR NO. 0503:  Uh-huh.
 9             THE COURT:  Anybody else?
10             PROSPECTIVE JUROR NO. 0503:  I had a few friends
11   at that time I think also working in the either Senate or
12   House.
13             THE COURT:  Okay.  And have you talked to them
14   about it?
15             PROSPECTIVE JUROR NO. 0503:  No.
16             THE COURT:  And have you met either Representative
17   Feenstra or Former Senator Loeffler or Former Senator
18   Isakson?
19             PROSPECTIVE JUROR NO. 0503:  I have met Isakson.
20   I have not met Feenstra or Loeffler.
21             THE COURT:  Okay.  And how close are you to
22   Mr. Isakson?  Just met him socially?
23             PROSPECTIVE JUROR NO. 0503:  Yes.  I met him just
24   a few times, yeah.
25             THE COURT:  Okay.  Counsel?
```

 1          MR. GORDON:  Good morning, Ms. Allen.

 2          PROSPECTIVE JUROR NO. 0503:  Good morning.

 3          MR. GORDON:  Have you -- do you -- well, let me

 4     ask this first.  Does your fiance attend political events, I

 5     assume, as part of his job?

 6          PROSPECTIVE JUROR NO. 0503:  Yes.

 7          MR. GORDON:  And has he been part of any events

 8     that are in support of the January 6th or people being

 9     prosecuted for January 6th conduct?

10          PROSPECTIVE JUROR NO. 0503:  Oh, no.

11          MR. GORDON:  Why do you say it that way?  "Oh,

12     no."

13          PROSPECTIVE JUROR NO. 0503:  I just -- like he

14     hasn't been involved in any of the January 6th stuff.

15          MR. GORDON:  What is his role specifically for

16     Representative Feenstra?

17          PROSPECTIVE JUROR NO. 0503:  I think he's the new

18     tax; so he covers like tax, education, and -- tax,

19     education, and one other thing.  He just got the job like

20     January 3rd.

21          MR. GORDON:  Is that a policy person?

22          PROSPECTIVE JUROR NO. 0503:  Yes.  He's an LA.

23          MR. GORDON:  Okay.  Was he an LA for Senators

24     Isakson and Loeffler as well?

25          PROSPECTIVE JUROR NO. 0503:  He was an LC at that

```
1    time.
2              MR. GORDON:  Okay.  Got it.
3              And then, in your conversations with him, has he
4    expressed any opinions about either what happened on January
5    6th or the Department of Justice's handling of it since?
6              PROSPECTIVE JUROR NO. 0503:  We don't really talk
7    about it, so no.
8              MR. GORDON:  Is his connection to Congress going
9    to be an issue for you in this case in any way?  Like will
10   it impact your ability to be fair and impartial?
11             PROSPECTIVE JUROR NO. 0503:  No, I don't think so.
12             MR. GORDON:  Okay.  Thank you, Your Honor.
13             THE COURT:  All right.  Briefly, Counsel.
14             MR. MONTEITH:  I don't know whether to say good
15   morning or good afternoon.  I just have a few questions for
16   you.
17             PROSPECTIVE JUROR NO. 0503:  Okay.
18             MR. MONTEITH:  So based upon the news reports that
19   you've watched and the media that you may have read, what
20   opinions have you formed about January 6th?
21             PROSPECTIVE JUROR NO. 0503:  I honestly haven't
22   followed it too closely.  Like, I mean, it was around me,
23   and it seemed scary that -- I don't know, just the way of
24   the media portrayal.  But I don't feel like I've had like
25   too much like looking into it, I guess.
```

1          MR. MONTEITH:  I mean, I'm not -- so Attorney

2   Garrity and I aren't from here, but, you know, when it did

3   happen we thought it was kind of like a big thing.

4          PROSPECTIVE JUROR NO. 0503:  Yes.

5          MR. MONTEITH:  And, you know, people are always

6   talking about it and forming opinions and things like that.

7   So we felt that -- I mean, I come from the point where it

8   must have been something big down here, right?

9          PROSPECTIVE JUROR NO. 0503:  Oh, yeah, right.

10          MR. MONTEITH:  Yes.

11          PROSPECTIVE JUROR NO. 0503:  I mean, so I lived

12   half a block from the Capitol, so while I didn't go

13   outside -- you know, you just turn on the TV.

14          MR. MONTEITH:  Right.

15          PROSPECTIVE JUROR NO. 0503:  And so, but, yeah,

16   just like I don't know.  The thought that people can go on

17   Capitol grounds that easily was really the big thing that I

18   took away from that.

19          MR. MONTEITH:  So, you know, with regards to this

20   big event, what opinions have you formed about it, is really

21   my question?

22          PROSPECTIVE JUROR NO. 0503:  I mean, I haven't

23   really thought about it.  So I know that it's something

24   going on.  And I guess I feel like I would need more

25   information before really forming a super solid opinion.

```
 1                    I try to stay out of politics.

 2                    MR. MONTEITH:  I see.  Some people do that.

 3                    And then one last issue.  Your conversations with

 4         your fiance, did you -- did he have a strongly formed

 5         opinion?

 6                    PROSPECTIVE JUROR NO. 0503:  I can't recall.  I

 7         mean, not strong enough for us to -- for me to even recall

 8         this.  This, what, happened in 2020?  So, I mean, it's not

 9         something that we've talked about really past that.

10                    MR. MONTEITH:  All right.  Thank you.

11                    THE COURT:  Okay.  Thank you, ma'am.  You can step

12         down.

13                    PROSPECTIVE JUROR NO. 0503:  Thank you.

14                    MR. GORDON:  No challenge from the government.

15                    MR. MONTEITH:  No challenge.

16                    THE COURT:  All right.  0503 is qualified.

17                    Why don't we take five.  The court reporter needs

18         to change over her program.

19                    Counsel, just, you know, if -- there are numerous

20         questions in the questionnaire designed to elicit whether

21         folks have strong feelings about January 6th.  If there's an

22         open-ended question to every single panel member, you know,

23         "What's your feelings about January 6th generally?" we're

24         going to be here all day, and I think, you know, everyone

25         has some feelings.
```

```
 1            I understand you want to get a sense of who they

 2     are, but if through the other questions no obvious biases or

 3     prejudices are elicited, I may start cutting those questions

 4     off.  Okay?

 5            All right.  Let's take five and reconvene.  And if

 6     you guys could just clear your tables, that would be great.

 7            (Recess taken)

 8            THE COURTROOM DEPUTY:  Your Honor, Juror No. 1047.

 9            THE COURT:  Good morning, sir.  Thank you for your

10     patience.  You can slip your mask off, if you'd like.

11     You're Mr. McBride?

12            PROSPECTIVE JUROR NO. 1047:  Correct.

13            THE COURT:  And it says here you're an economist.

14            PROSPECTIVE JUROR NO. 1047:  I was.  I'm retired

15     now.

16            THE COURT:  And with whom did you work before you

17     retired?

18            PROSPECTIVE JUROR NO. 1047:  USDA.

19            THE COURT:  And do you have a significant other?

20            PROSPECTIVE JUROR NO. 1047:  Yes.

21            THE COURT:  And what do they do?

22            PROSPECTIVE JUROR NO. 1047:  She worked for the

23     State Department.  She's retired also.

24            THE COURT:  Okay.  What did she do for the State

25     Department?
```

1              PROSPECTIVE JUROR NO. 1047:  She was an

2      instructional specialist in leadership and management

3      training.

4              THE COURT:  Okay.  You answered yes to a couple of

5      my questions.  You followed some coverage of the events of

6      January 6th and the House hearings; is that right?

7              PROSPECTIVE JUROR NO. 1047:  Yes.

8              THE COURT:  Did you just follow the events at the

9      time, or how closely have you followed in the last couple of

10     years?

11             PROSPECTIVE JUROR NO. 1047:  I followed them at

12     the time.  I watched a lot of the hearings, and I watched --

13     I follow the news, and whatever comes up on the news I tend

14     to notice.

15             THE COURT:  Any takeaways from the hearings?  What

16     did you think?

17             PROSPECTIVE JUROR NO. 1047:  Well, they were

18     pretty compelling.  I think the big takeaway was that the

19     president had a big role in the process and was the main

20     party.

21             THE COURT:  So this case is not a relitigation of

22     the election, but obviously it has some political overtones.

23     Do you think your views about the president's role in

24     January 6th would affect your ability to sit in judgment of

25     a Trump supporter who came to D.C. and did whatever she did?

```
1                    PROSPECTIVE JUROR NO. 1047:  No, I don't think so.
2                    THE COURT:  Okay.  And you have prior jury
3        experience?
4                    PROSPECTIVE JUROR NO. 1047:  Yes.
5                    THE COURT:  Tell us about -- how many times?
6                    PROSPECTIVE JUROR NO. 1047:  Twice.  I was on a
7        jury with the D.C. courts.  They were criminal cases.
8                    THE COURT:  Take the last one.
9                    PROSPECTIVE JUROR NO. 1047:  Well --
10                   THE COURT:  What kind of case?
11                   PROSPECTIVE JUROR NO. 1047:  It was a robbery.
12       That was a robbery.  The other was a drug case.
13                   THE COURT:  Okay.  For both of them did the juries
14       reach verdicts?
15                   PROSPECTIVE JUROR NO. 1047:  Not the first one.
16       We hung on the first one.
17                   And we were not guilty on the second.
18                   THE COURT:  Not guilty on the second?
19                   PROSPECTIVE JUROR NO. 1047:  No.
20                   THE COURT:  Were you the foreperson --
21                   PROSPECTIVE JUROR NO. 1047:  No, I was not.
22       Neither one.
23                   THE COURT:  Okay.  Anything about those two
24       experiences make you hesitate to be on a jury again?
25                   PROSPECTIVE JUROR NO. 1047:  Not hesitate.  No.
```

1   They were eye opening, but I wouldn't be hesitating.

2           THE COURT:  Okay.  Counsel?

3           MR. GORDON:  Nothing from the government.

4           MR. GARRITY:  Good afternoon.  I had to check to

5   see if it was morning or afternoon.

6           You watched the January 6th hearings?

7           PROSPECTIVE JUROR NO. 1047:  Correct.

8           MR. GARRITY:  And you thought they made a

9   compelling case, right?

10           PROSPECTIVE JUROR NO. 1047:  Yes.

11           MR. GARRITY:  Did that leave you with a negative

12   impression not only of Former President Trump's role but of

13   his supporters?

14           PROSPECTIVE JUROR NO. 1047:  I would say -- you

15   know, I'm a little bit -- maybe a little bit because of

16   the way they followed him.  You know, I thought it was a

17   little -- I don't know.  Everything seemed pretty obvious to

18   me.

19           I mean, he had his chance to go through the

20   courts, and the court -- and he couldn't prove the case or

21   he didn't prove it sufficiently, and so that's where it

22   should have ended.  And it didn't.

23           MR. GARRITY:  In that -- your view from those

24   hearings, would it impact at all your decision-making in

25   this case, if you were to sit on the jury?

```
 1                    PROSPECTIVE JUROR NO. 1047:  No, I don't think so.
 2      I could look at somebody and see what they did and decide
 3      whether it broke the law or not.
 4                    MR. GARRITY:  Thank you very much.
 5                    PROSPECTIVE JUROR NO. 1047:  Sure.
 6                    THE COURT:  Okay.  Thank you very much.  You can
 7      step down.
 8                    PROSPECTIVE JUROR NO. 1047:  Okay.
 9                    MR. GORDON:  No challenge from the government.
10                    THE COURT:  Counsel?  Counsel?
11                    MR. GARRITY:  I'm sorry.  No challenge, Your
12      Honor.
13                    THE COURT:  1047 is qualified.
14                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 1333.
15                    THE COURT:  Good morning, sir.
16                    PROSPECTIVE JUROR NO. 1333:  Good morning.
17                    THE COURT:  You're Mr. Scott?
18                    PROSPECTIVE JUROR NO. 1333:  That's right.
19                    THE COURT:  Okay.  Feel free to remove your mask.
20                    PROSPECTIVE JUROR NO. 1333:  Thank you.
21                    THE COURT:  And you work with BCG.
22                    PROSPECTIVE JUROR NO. 1333:  That's correct.
23                    THE COURT:  Do you work on any government
24      assignments?
25                    PROSPECTIVE JUROR NO. 1333:  Yes, I do.
```

```
 1                   THE COURT:  And for which agencies or parts of the
 2       government?
 3                   PROSPECTIVE JUROR NO. 1333:  Mostly defense and
 4       security sector.
 5                   THE COURT:  Okay.  Homeland Security?
 6                   PROSPECTIVE JUROR NO. 1333:  It's not a current
 7       client.
 8                   THE COURT:  Excuse me?
 9                   PROSPECTIVE JUROR NO. 1333:  Not a current client.
10                   THE COURT:  Not a current client.  Is it a former
11       client?
12                   PROSPECTIVE JUROR NO. 1333:  Not that I'm aware
13       of, but potential future client.
14                   THE COURT:  And do you have a significant other?
15                   PROSPECTIVE JUROR NO. 1333:  Yes.
16                   THE COURT:  And what do they do?
17                   PROSPECTIVE JUROR NO. 1333:  She works in
18       democracy development.
19                   THE COURT:  International?
20                   PROSPECTIVE JUROR NO. 1333:  International, yes.
21                   THE COURT:  You answered yes to a few of my
22       questions.
23                   PROSPECTIVE JUROR NO. 1333:  That's correct.
24                   THE COURT:  Either you or someone you know lives
25       near Capitol Hill.
```

```
 1              PROSPECTIVE JUROR NO. 1333:  That's correct.  I

 2    live about three quarters of a mile.

 3              THE COURT:  Did you live there on January 6th?

 4              PROSPECTIVE JUROR NO. 1333:  Yes.

 5              THE COURT:  Were you home on January 6th?

 6              PROSPECTIVE JUROR NO. 1333:  Yes.

 7              THE COURT:  Did you observe any of the protests or

 8    surrounding events personally?

 9              PROSPECTIVE JUROR NO. 1333:  Not on that day, but

10    I had noticed activity in the neighborhood in the days

11    beforehand.

12              THE COURT:  Okay.  But you were home on the 6th?

13              PROSPECTIVE JUROR NO. 1333:  Yes.

14              THE COURT:  And you just watched on TV or out your

15    window?

16              PROSPECTIVE JUROR NO. 1333:  That's correct.

17              THE COURT:  Okay.  Was any of your property

18    affected that day?  Damaged that day?

19              PROSPECTIVE JUROR NO. 1333:  No.

20              THE COURT:  Okay.  You answered yes to -- with a

21    question mark about the question about the presumption of

22    innocence and the fact that the defendant need not testify

23    or offer any evidence on her behalf and that the government

24    always carries the burden of proof until the end of the

25    trial.  And you answered that you might have some concerns
```

1      about adhering to that presumption but with a question mark.

2      Why did you answer yes to that?

3              PROSPECTIVE JUROR NO. 1333:  I answered with a

4      question mark because it's something I'd need to reflect on

5      further before giving a definitive answer.

6              THE COURT:  Okay.  And have you reflected since

7      you were filling out your card?

8              PROSPECTIVE JUROR NO. 1333:  I had actually

9      forgotten what the question was.

10             THE COURT:  Okay.

11             PROSPECTIVE JUROR NO. 1333:  Given the number of

12     them.

13             THE COURT:  Okay.  Well, let me read the question

14     to you.  Because Ms. Niemela is presumed innocent, she need

15     not testify or offer any evidence.  Do you think her

16     decision not to testify or to call witnesses or to put on

17     any evidence would make you think she is more -- that it is

18     more likely that she is guilty?

19             PROSPECTIVE JUROR NO. 1333:  On further

20     reflection, I would say no.

21             THE COURT:  Okay.  You said that there might be

22     something about the nature of the charged offenses that

23     would make you hesitate or might make it difficult for you

24     to be fair and impartial.  Why did you answer yes to that?

25             PROSPECTIVE JUROR NO. 1333:  Because I found the

1    events of January 6, 2021, very disturbing and continue to

2    have strong feelings about that.

3              THE COURT:  Okay.  So we're obviously in

4    Washington, D.C.  Lots of people found the events

5    disturbing.  There were hundreds, if not thousands, of

6    people who came to Washington from different parts of the

7    country for different reasons who did different things, who

8    did not do different things.

9              The jury in this case will assess Ms. Niemela's

10   responsibility based on what she did or did not do, okay, as

11   one member of the many who came based on the evidence that

12   has been presented.

13             And I want you to give me an honest answer.  Do

14   your general feelings about being disturbed about what

15   happened generally, would that impair your ability to give

16   this young lady a fair shot?

17             PROSPECTIVE JUROR NO. 1333:  No.

18             THE COURT:  Okay.  You followed some of the

19   hearings, and you followed some of the coverage of January

20   6th.  How closely -- tell us about how closely you followed

21   the various proceedings.

22             PROSPECTIVE JUROR NO. 1333:  I have not read the

23   report itself.  I've read some summaries of the report and

24   some analysis of it.  I have seen some clips on the news of

25   the coverage, the hearings.  But I would not say I've

1    followed it deliberately.

2              THE COURT:  Okay.  Have you drawn any conclusions

3    or do you have any takeaways from the January 6th hearings,

4    the House hearings, congressional hearings that you've

5    watched?

6              PROSPECTIVE JUROR NO. 1333:  No.

7              THE COURT:  You answered yes to the question

8    about QAnon.  Obviously it's not illegal to adhere to the

9    beliefs of QAnon in some way, shape, or form.  That's not

10   why Ms. Niemela is on trial.  Tell me why you think it might

11   affect your impartiality, your views of QAnon.

12             PROSPECTIVE JUROR NO. 1333:  Because from my

13   understanding of the organization, of the group, and what

14   adherents to QAnon believe represent a very significant

15   danger to our country.

16             THE COURT:  And same question with respect to the

17   evidentiary burden.  Do you think that's something that you

18   could put aside in a case involving an individual based on

19   what she did or did not do that day, or not?

20             PROSPECTIVE JUROR NO. 1333:  Yes.

21             THE COURT:  Okay.  All right.  And you or someone

22   close to you has either worked in the legal profession or in

23   law enforcement in some way.  Tell us about that.

24             PROSPECTIVE JUROR NO. 1333:  That's correct.  I

25   have various friends who work in the legal profession.

```
 1                    THE COURT:  Are any of them criminal lawyers or
 2          criminal defense lawyers or prosecutors?
 3                    PROSPECTIVE JUROR NO. 1333:  No.
 4                    THE COURT:  Okay.  And law enforcement?
 5                    PROSPECTIVE JUROR NO. 1333:  I have some friends
 6          who work in the Department of Homeland Security.
 7                    THE COURT:  Okay.  And is that through your work
 8          at BCG or otherwise?
 9                    PROSPECTIVE JUROR NO. 1333:  It's not connected to
10          my work.
11                    THE COURT:  Okay.
12                    PROSPECTIVE JUROR NO. 1333:  They're friends in
13          the neighborhood.
14                    THE COURT:  Friends from the neighborhood.
15                    Do you know if any of them have been involved in
16          the January 6th -- the investigation of the events that took
17          place?
18                    PROSPECTIVE JUROR NO. 1333:  Not to the best of my
19          knowledge.
20                    THE COURT:  So you haven't talked to them about
21          that?
22                    PROSPECTIVE JUROR NO. 1333:  No.
23                    THE COURT:  Okay.  Counsel?
24                    MR. GORDON:  Good morning, Mr. Scott.
25                    PROSPECTIVE JUROR NO. 1333:  Good morning.
```

 1              MR. GORDON:  The core of the job, as a BCG

 2    consultant, right, are to come into businesses that are

 3    experiencing a problem in some respect and figure out the

 4    solution that they haven't been able to figure out for

 5    themselves.  Is that fair?

 6              PROSPECTIVE JUROR NO. 1333:  Broadly speaking,

 7    yes.

 8              MR. GORDON:  And is it fair that often a problem

 9    you'd encounter is that there is either some kind of group

10    think or some kind of bias, and it takes an outside observer

11    to come in and analyze, and then you arrive at the solution?

12              PROSPECTIVE JUROR NO. 1333:  Yes.  Sometimes that

13    external expertise and perspective is helpful to clients.

14              MR. GORDON:  So what we're concerned about here --

15    you said you have some concerns about QAnon or that you

16    regard it as a danger to the country.  You understand that

17    Ms. Niemela is not here on trial for anything about her

18    political beliefs.

19              PROSPECTIVE JUROR NO. 1333:  Correct.

20              MR. GORDON:  Okay.  And that it wouldn't matter if

21    she believed in -- you can say anything.  It doesn't matter

22    if she believed in that.  The question is whether or not she

23    violated four specific federal laws.

24              PROSPECTIVE JUROR NO. 1333:  Yes.

25              MR. GORDON:  And so what we're concerned about is

1    that you or any juror might be biased and convict her not

2    because the government proves its case, but because of

3    concern about QAnon.

4                PROSPECTIVE JUROR NO. 1333:  I understand that

5    concern, yes.

6                MR. GORDON:  Could you then do that?  Could you

7    separate out, approach the case analytically?

8                Listen to Judge Cooper.  He'll tell you what the

9    law is; you'll watch the trial and hear the evidence; and

10   then put those two things together -- the law from Judge

11   Cooper, the evidence from the trial -- and decide whether or

12   not you think Ms. Niemela is guilty based on that and not

13   sort of color, shade, or infect that analysis with any

14   feelings you have from outside.  Could you do that?

15               PROSPECTIVE JUROR NO. 1333:  Yes.  I can maintain

16   that sense of objectivity.

17               MR. GORDON:  You're pretty practiced at doing

18   that, right?

19               PROSPECTIVE JUROR NO. 1333:  Yes.

20               MR. GORDON:  Okay.  Nothing further, Your Honor.

21               MR. MONTEITH:  Good afternoon.  It appears that

22   you have some strongly held beliefs and feelings about this

23   QAnon issue.

24               PROSPECTIVE JUROR NO. 1333:  Yes.

25               MR. MONTEITH:  And that when you came in here this

 1   morning, you've already made up your mind about what this

 2   group is and the fact that they're a danger to our

 3   community.

 4          PROSPECTIVE JUROR NO. 1333:  I wouldn't

 5   necessarily say I've made up my mind.  I said to the best of

 6   my understanding of what I know.

 7          MR. MONTEITH:  Okay.  But in here with the strong

 8   feelings about it, right?

 9          PROSPECTIVE JUROR NO. 1333:  Like I said, yes, I

10   have strong feelings.

11          MR. MONTEITH:  And then -- and the same thing

12   about what you understand happened on January 6th as well.

13   Is that fair to say?

14          PROSPECTIVE JUROR NO. 1333:  Yes, I have strong

15   feelings about what happened on January 6th.

16          MR. MONTEITH:  Okay.  Thank you.

17          THE COURT:  All right.  Sir, thank you very much.

18          I detect an English accent.  Where are you from?

19          PROSPECTIVE JUROR NO. 1333:  Norfolk.

20          THE COURT:  Norfolk.

21          Counsel?

22          MR. GORDON:  No challenge from the government,

23   Your Honor.

24          MR. MONTEITH:  Judge, for cause.

25          THE COURT:  And you can do it from the table.

1    Just make sure the mic's in front of you.

2         MR. MONTEITH:  But a gentleman that comes in with

3    such strong feelings.  I understand he did say he could put

4    them aside, but his demeanor and his -- and the content of

5    his words, "I have these really strong beliefs."

6         There's going to be some evidence, some reference

7    to Q or QAnon, and to have somebody to come into the

8    courtroom with these beliefs as strong as Mr. Scott's, I

9    think he should be excused for cause.

10        THE COURT:  Okay.  I'll overrule your challenge.

11   He said that he could put those aside.  I have a lot of

12   confidence in a guy like that, that he could do that.  So

13   1333 is qualified.

14        Just briefly, on that topic, now that the

15   government has agreed not to get into certain things that

16   QAnon may believe in, how much is that really going to be a

17   part of the evidence?

18        MR. GORDON:  So, Your Honor, it's definitely going

19   to come up.

20        THE COURT:  I know it's going to come up.

21        MR. GORDON:  It's not a focus of the case, but

22   because it's so intermixed with some of the defendant's

23   Facebook posts that are specifically about January 6th and

24   her reasons for going, we can't excise it entirely from the

25   trial.

```
1              I understand that it creates an issue with almost

2      every juror, and it's causing this process to take a long

3      time, but I don't think we reasonably can cut it out.

4              THE COURT:  Okay.  But if it's a necessary-but-

5      tangential issue, it's one thing.  If it is a central issue,

6      it's another thing in terms of assessing their answers.

7              MR. GORDON:  That's right, Your Honor.  It is not

8      a central issue, but I would call it -- necessary but

9      tangential is correct.

10             THE COURT:  Okay.

11             THE COURTROOM DEPUTY:  Your Honor, Juror No. 2685.

12             THE COURT:  Good morning, ma'am.

13             PROSPECTIVE JUROR NO. 2685:  Good morning.

14             THE COURT:  I think it's still -- nope, it's

15     afternoon.

16             All right.  You're Ms. Gider?

17             PROSPECTIVE JUROR NO. 2685:  Yes.

18             THE COURT:  All right.  You can slip your mask

19     off, if you'd like.

20             It says here you're a fundraiser with Young

21     Invincibles.

22             PROSPECTIVE JUROR NO. 2685:  Yes.

23             THE COURT:  Tell us what Young Invisibles is.

24             PROSPECTIVE JUROR NO. 2685:  Young Invincibles is

25     a national nonprofit organization that advocates for young
```

1    adults toward economic security and political power.

2                THE COURT:  How long have you been doing that?

3                PROSPECTIVE JUROR NO. 2685:  Almost five years.

4                THE COURT:  What did you do before?

5                PROSPECTIVE JUROR NO. 2685:  I worked at Alliance

6    For Justice.

7                THE COURT:  Okay.  Do you have a significant

8    other?

9                PROSPECTIVE JUROR NO. 2685:  I do not.

10               THE COURT:  Okay.  You answered yes to a number of

11   my questions.  Either you or someone you know live on

12   Capitol Hill?

13               PROSPECTIVE JUROR NO. 2685:  Yes.

14               THE COURT:  Who is that?

15               PROSPECTIVE JUROR NO. 2685:  Friends that I know

16   live on Capitol Hill.

17               THE COURT:  Okay.  Were they home on January 6th?

18               PROSPECTIVE JUROR NO. 2685:  They were.

19               THE COURT:  Was there property damage in some --

20               PROSPECTIVE JUROR NO. 2685:  There was no property

21   damage, no.

22               THE COURT:  Were they especially affected by the

23   events, to your knowledge?

24               PROSPECTIVE JUROR NO. 2685:  To my knowledge,

25   other than generalized fear and concern, they were not

1    directly affected.

2              THE COURT:  Okay.  You answered yes to 17, do you

3    or someone you know have a direct or indirect connection to

4    the events at the Capitol?  Why did you answer yes to that?

5              PROSPECTIVE JUROR NO. 2685:  I've had a number of

6    friends who were working there that day.

7              THE COURT:  Okay.

8              PROSPECTIVE JUROR NO. 2685:  Both on the Senate

9    and on the House side, and a number of our co-workers had

10   either significant others or family members who were working

11   on the Hill that day as well.

12             THE COURT:  Okay.  Have you spoken with any of

13   those folks about what happened to them that day?

14             PROSPECTIVE JUROR NO. 2685:  Yes.

15             THE COURT:  And were any of them sort of

16   traumatized or affected more than any -- more so than

17   anyone who would ordinarily be affected by being there?

18             PROSPECTIVE JUROR NO. 2685:  No.  They weren't

19   physically harmed.  I think -- I haven't spoken to them

20   extensively about the traumas, at least not recently, and as

21   far as I know, they've continued to have concern about going

22   to work and just generalized anxiety about going to that

23   building.

24             THE COURT:  Okay.  But despite that, you did not

25   answer yes to the question about is there something about

1      the nature of the charges that would make you not be fair.

2                  PROSPECTIVE JUROR NO. 2685:  Yes.

3                  THE COURT:  So you think you could put those

4      relationships aside and decide the evidence straight up?

5                  PROSPECTIVE JUROR NO. 2685:  Yes.

6                  THE COURT:  Okay.  You followed coverage of the

7      events as well as the House hearings; is that right?

8                  PROSPECTIVE JUROR NO. 2685:  Yes.

9                  THE COURT:  How closely?

10                 PROSPECTIVE JUROR NO. 2685:  I followed the events

11     that day starting around 3:00, 3:30 in the afternoon.

12     Again, mostly since friends and co-workers, family members,

13     were in the building as far as we knew.

14                 We continued to follow it into the evening.

15                 I also, through neighborhood list serves, was told

16     to stay indoors.  We were told that it seemed as if some of

17     the individuals that were there, there was an assumption

18     that they were staying at Airbnbs or other rental properties

19     nearby.  There were a lot of out-of-state license plates in

20     the area, which is not normal.

21                 THE COURT:  In which part of the city do you live?

22                 PROSPECTIVE JUROR NO. 2685:  Adams Morgan.

23                 And then in terms of following the hearings, I did

24     that partially through work to be aware of what was

25     happening, but also general concern.

1          So I wouldn't say I watched it actively every day

2     because I had to work, but passively was aware of it.

3          THE COURT:  Okay.  But same question.  You know,

4     lots of people came to D.C. that day.  People did different

5     things, did not do different things, were motivated for

6     different reasons.  You know, we're here because of one

7     person's conduct.

8          Do you think that you would be able to set

9     aside what you may have seen in the coverage or observed in

10    the House hearings and assess the evidence for or against

11    Ms. Niemela independently?

12         PROSPECTIVE JUROR NO. 2685:  Yes, I do.

13         THE COURT:  Okay.  Someone close to you or you

14    have been the victim of or witness to a crime?

15         PROSPECTIVE JUROR NO. 2685:  Yes.

16         THE COURT:  Okay.  Who is that?

17         PROSPECTIVE JUROR NO. 2685:  My father was part of

18    an armed robbery for our small business.

19         THE COURT:  Okay.  And where was that, and how

20    long ago?

21         PROSPECTIVE JUROR NO. 2685:  It was in New York,

22    and it was in 2007.

23         THE COURT:  Okay.  Is there anything about how

24    that case was handled, either by the police or the

25    prosecutors or -- that would affect your ability to get

1    involved in a criminal case like this?

2              PROSPECTIVE JUROR NO. 2685:  No.

3              THE COURT:  You know folks who work in the legal

4    field.

5              PROSPECTIVE JUROR NO. 2685:  Yes.  My nephew is a

6    police officer.

7              THE COURT:  Okay.

8              PROSPECTIVE JUROR NO. 2685:  And a number of my

9    friends are attorneys; but primarily on the civil side, not

10   on the criminal side.

11             THE COURT:  Do you ever talk to -- your nephew is

12   the police officer; is that right?

13             PROSPECTIVE JUROR NO. 2685:  Yes.

14             THE COURT:  Did you ever talk to him about January

15   6th?

16             PROSPECTIVE JUROR NO. 2685:  Not specifically

17   January 6th, more broadly about his safety in general.

18             THE COURT:  Okay.  So I asked the question.

19   You're going to hear, if you were on the jury, from law

20   enforcement witnesses.  Given that your nephew is a law

21   enforcement officer, would you be able to give the testimony

22   the same weight as any other witness who may not be a law

23   enforcement officer?

24             PROSPECTIVE JUROR NO. 2685:  Yes.

25             THE COURT:  Counsel.

```
1              MR. GORDON:  Nothing from the government.

2              MR. GARRITY:  Good afternoon.

3              PROSPECTIVE JUROR NO. 2685:  Good afternoon.

4              MR. GARRITY:  Just really briefly.  You said you

5    watched the news pretty much for most of the afternoon and

6    evening on January 6th.

7              PROSPECTIVE JUROR NO. 2685:  Yes, starting around

8    3:00, 3:30 p.m.

9              MR. GARRITY:  And then you followed the news

10   events related to the January 6th Committee hearings; is

11   that right?

12             PROSPECTIVE JUROR NO. 2685:  Yes.  Not actively

13   because I had to work, so I can't watch TV and be on calls

14   at the same time.

15             MR. GARRITY:  Right.

16             PROSPECTIVE JUROR NO. 2685:  But yes.

17             MR. GARRITY:  On January 6th watching the news,

18   did you form any opinion one way or the other about the

19   events of January 6th?

20             PROSPECTIVE JUROR NO. 2685:  Other than anxiety

21   about my safety and the safety of others and concern about

22   what we should or should not be doing while we're in our

23   homes, that was mostly my primary concern on that day and

24   making sure that I was aware of what I was supposed to be

25   doing or should not be doing.  Most of that was stay home
```

1    and don't go out, if you don't have to.

2              MR. GARRITY:  And just watching -- looking at the

3    news related to the January 6th Committee hearings, did it

4    cause you to form any sort of negative viewpoints with

5    respect to people who may support Former President Trump?

6              PROSPECTIVE JUROR NO. 2685:  I don't think it

7    caused me to have any negative opinions.  I think it just

8    caused me some fear or anxiety generalized, not directly

9    related.

10             MR. GARRITY:  Okay.  Thank you very much.

11             PROSPECTIVE JUROR NO. 2685:  Thank you.

12             THE COURT:  Thank you, ma'am.  You can go back to

13   the big courtroom.

14             MR. GORDON:  No challenge from the government.

15             THE COURT:  Counsel?

16             MR. GARRITY:  No challenge, Your Honor.

17             THE COURT:  Okay.  2685 is qualified.

18             THE COURTROOM DEPUTY:  Your Honor, Juror No. 1357.

19             THE COURT:  Good afternoon, sir.

20             PROSPECTIVE JUROR NO. 1357:  Good afternoon.

21             THE COURT:  You're Mr. Haines, sir?

22             PROSPECTIVE JUROR NO. 1357:  Yes, sir.

23             THE COURT:  Okay.  You can remove your mask.  You

24   work at the State Department, U.S. foreign service officer?

25             PROSPECTIVE JUROR NO. 1357:  Currently on a

 1    fellowship to Senator Hagerty, Bill Hagerty's office.

 2            THE COURT:  Where is Senator Hagerty from?

 3            PROSPECTIVE JUROR NO. 1357:  Republican from

 4    Tennessee.

 5            THE COURT:  You have a Tennessee background?

 6            PROSPECTIVE JUROR NO. 1357:  Yes, sir.  I'm from

 7    Franklin.

 8            THE COURT:  All right.  Let's start with 41, which

 9    was my catch-all question.  Why did you answer yes to that

10    question?

11            PROSPECTIVE JUROR NO. 1357:  Just because I'm

12    currently in a U.S. senator's office.  A number of my

13    colleagues were on the Hill on January 6th, so I just, out

14    of abundance of caution, didn't know if that impacted the

15    Court's decision.

16            THE COURT:  Okay.  Let's talk about that.

17            Were you on detail then?  What was your job on

18    January 6th?

19            PROSPECTIVE JUROR NO. 1357:  I was still working

20    at the State Department.

21            THE COURT:  But were you detailed to Senator

22    Hagerty then?

23            PROSPECTIVE JUROR NO. 1357:  No, sir.  I just

24    started earlier this year.

25            THE COURT:  So you weren't working on the Hill

1    yourself?

2              PROSPECTIVE JUROR NO. 1357:  No, sir.

3              THE COURT:  Okay.  But some colleagues, current

4    colleagues, were there on --

5              PROSPECTIVE JUROR NO. 1357:  Just about everyone,

6    yes, sir.

7              THE COURT:  Okay.  Were they physically present?

8              PROSPECTIVE JUROR NO. 1357:  Physically present,

9    yes, sir.

10             THE COURT:  Have you spoken to them about it, your

11   experiences?

12             PROSPECTIVE JUROR NO. 1357:  Not directly, but

13   just there's always talk about everything that's going on,

14   past, present, future, on the Hill and that type of topic

15   has been brought up a few times.

16             THE COURT:  Other than it just being brought up in

17   passing, has anyone sort of described what happened to them

18   that day?

19             PROSPECTIVE JUROR NO. 1357:  No, sir, not

20   described what happened to them directly.

21             THE COURT:  Okay.  And to your knowledge, were any

22   of your colleagues, you know, affected or traumatized in a

23   way that would, you know -- more than others who were there

24   that day?

25             PROSPECTIVE JUROR NO. 1357:  No, sir.

```
 1              THE COURT:  Okay.  So, you know, you tell me,
 2    right?  We ask that question because if there are any
 3    relationships that people have with folks who were
 4    personally affected, you know, the issue is whether they
 5    would be able to set those aside and not be unduly
 6    influenced by those relationships, but rather to listen to
 7    the evidence in a particular criminal case about one
 8    particular defendant and follow the judge's instructions and
 9    apply those instructions to the evidence in the case fairly
10    without regard to what their colleagues' experiences might
11    have been that day.
12              Do you think you could do that, or do you think
13    you would have a hard time doing that?
14              PROSPECTIVE JUROR NO. 1357:  Yes, sir, I could do
15    that.
16              THE COURT:  Okay.
17              All right.  You followed coverage of the events.
18    Did you watch realtime that day?
19              PROSPECTIVE JUROR NO. 1357:  I watched probably
20    about an hour realtime that day.
21              THE COURT:  Okay.  And how closely have you
22    followed it since?
23              PROSPECTIVE JUROR NO. 1357:  Just when it comes up
24    in the news feed, so it seems over the past year it's been
25    pretty often.
```

1          THE COURT:  Okay.  And same questions for the

2    House hearings.  How closely have you followed those?

3          PROSPECTIVE JUROR NO. 1357:  Not closely.  In the

4    same manner that I followed the actual day of as well.

5          THE COURT:  Okay.  And based on what you have seen

6    in the hearings, have you drawn any conclusions about the

7    events generally?

8          PROSPECTIVE JUROR NO. 1357:  No, sir, not one way

9    or the other.

10          THE COURT:  Okay.  And you know folks who have

11    worked in law enforcement?

12          PROSPECTIVE JUROR NO. 1357:  Yes.  My sister's a

13    former police officer.

14          THE COURT:  Okay.  Have you talked with your

15    sister about the events of January 6th?

16          PROSPECTIVE JUROR NO. 1357:  No, sir.

17          THE COURT:  As I said in the big group, there will

18    be testimony by law enforcement officers, and I will

19    instruct the jury not to give that testimony any more or any

20    less weight than any other civilian witness.  Is there

21    anything about your sister's occupation that would make it

22    hard for you to follow that instruction?

23          PROSPECTIVE JUROR NO. 1357:  No, sir.

24          THE COURT:  And do you have a significant other?

25          PROSPECTIVE JUROR NO. 1357:  I do.  I have a wife.

```
1              THE COURT:  And what does she do?

2              PROSPECTIVE JUROR NO. 1357:  She works in

3       philanthropy.

4              THE COURT:  For a particular organization?

5              PROSPECTIVE JUROR NO. 1357:  It's a 501(c)(3)

6       based in D.C. called the Philanthropy Round Table.

7              THE COURT:  All right.  Counsel?

8              MR. GORDON:  Good afternoon, Mr. Haines.

9              PROSPECTIVE JUROR NO. 1357:  Good afternoon.

10             MR. GORDON:  How did you end up either electing to

11      go on the detail to Senator Hagerty's office or being chosen

12      for it, however that happened?

13             PROSPECTIVE JUROR NO. 1357:  It was a little bit

14      of both.  I had a friend, a former State Department

15      colleague, who was on detail there for two years prior to

16      reaching out to me.  He reached out, asked if I would be

17      interested in working on the Hill.  I had expressed interest

18      to him before, say probably like a year prior, saying that,

19      you know, a Republican from Tennessee who works on China

20      policy and had always wanted to serve a home state senator

21      in that capacity.

22             And so he had encouraged me to apply for the

23      fellowship that I'm currently in.  It's called the Brookings

24      LEGIS Fellowship.  And once I was accepted in that

25      fellowship, he connected me with the current national
```

1    security advisor and chief of staff, and it went on from

2    there.

3              MR. GORDON:  You mumbled a little bit at the

4    beginning so I want to make sure I understood.  Were you

5    describing yourself as the Republican from Tennessee, or you

6    were describing your friend as the Republican --

7              PROSPECTIVE JUROR NO. 1357:  I was describing

8    myself.

9              MR. GORDON:  And you're specifically working on

10   foreign policy advising for the senator?

11             PROSPECTIVE JUROR NO. 1357:  That's correct.  So

12   I'm working for his national security advisor specifically

13   on Indo-Pacific issues, China issues specifically.

14             MR. GORDON:  Okay.  Thank you, Your Honor.

15             MR. MONTEITH:  No questions.

16             THE COURT:  Okay.  Thank you very much.  You can

17   go back to the other courtroom.

18             All right.  Any challenge?

19             MR. GORDON:  No, Your Honor.

20             MR. MONTEITH:  No.

21             THE COURT:  1375 is qualified.

22             THE COURTROOM DEPUTY:  Your Honor, Juror No. 2072.

23             THE COURT:  Good afternoon, sir.  You're

24   Mr. Holmes?

25             PROSPECTIVE JUROR NO. 2027:  Yes.

```
1              THE COURT:  You can slip your mask off, if you'd
2     like.  You are an interpreter at Gallaudet?
3              PROSPECTIVE JUROR NO. 2072:  Correct.
4              THE COURT:  Do you have a significant other?
5              PROSPECTIVE JUROR NO. 2072:  I am married, yes.
6              THE COURT:  And what does he or she do?
7              PROSPECTIVE JUROR NO. 2072:  She is also a sign
8     language interpreter.
9              THE COURT:  All right.  You answered yes to a
10     couple of questions.  You followed coverage of January 6th
11     just at the time, or have you followed over the last couple
12     of years?
13              PROSPECTIVE JUROR NO. 2072:  Since it happened.  I
14     see it in the media occasionally.
15              THE COURT:  Okay.  How closely would you say
16     you've followed the coverage?
17              PROSPECTIVE JUROR NO. 2072:  Not very.
18              THE COURT:  Okay.  Have you seen any of the
19     hearings of the House committee?
20              PROSPECTIVE JUROR NO. 2072:  No, Your Honor.
21              THE COURT:  Okay.  You also answered yes to 35.
22     You have prior jury experience.
23              PROSPECTIVE JUROR NO. 2072:  Yes.
24              THE COURT:  Tell me about.  How many times?
25              PROSPECTIVE JUROR NO. 2072:  I served twice.  I
```

1    grew up in Pittsburgh, so I served twice.  Once on a

2    criminal case in D.C., and once on a civil case in

3    Pittsburgh.

4              THE COURT:  Okay.  On the criminal case, what kind

5    of a case was it?

6              PROSPECTIVE JUROR NO. 2072:  It was a murder trial

7    here in the District.

8              THE COURT:  And did the jury reach a verdict?

9              PROSPECTIVE JUROR NO. 2072:  We did.

10             THE COURT:  What was the verdict?

11             PROSPECTIVE JUROR NO. 2072:  We found the

12   defendant guilty.

13             THE COURT:  Were you the foreperson by any chance?

14             PROSPECTIVE JUROR NO. 2072:  No.

15             THE COURT:  And the civil case?

16             PROSPECTIVE JUROR NO. 2072:  It was a trip-and-

17   fall elevator case.

18             THE COURT:  Okay.

19             PROSPECTIVE JUROR NO. 2072:  And we did reach a

20   verdict and found in favor of -- I don't remember.  I think

21   it was in favor of the complainant.

22             THE COURT:  Okay.  Anything about those two

23   experiences make you anxious or hesitant to serve on a jury

24   again?

25             PROSPECTIVE JUROR NO. 2072:  No, Your Honor.

```
 1                THE COURT:  Okay.  Counsel?

 2                MR. GORDON:  Nothing from the government.

 3                MR. GARRITY:  No questions, Your Honor.  Thank

 4     you.

 5                THE COURT:  All right, sir.  Thank you very much.

 6     You can go back to the big room.

 7                Any challenge?

 8                MR. GORDON:  Not from the United States.

 9                MR. GARRITY:  No, Your Honor.  Thank you.

10                THE COURT:  Okay.  2072 is qualified.

11                Ms. Jenkins, I need new cards, I believe.

12                THE COURTROOM DEPUTY:  Your Honor, this is Juror

13     No. 1881.

14                THE COURT:  Okay.  You're Mr. Howell; is that

15     right?

16                PROSPECTIVE JUROR NO. 1881:  Correct.

17                THE COURT:  Okay.  You're a senior vice president

18     for finance at The Urban Institute; is that right?

19                PROSPECTIVE JUROR NO. 1881:  Correct.  The full

20     title is --

21                THE COURT:  You can slip your mask off, if you'd

22     like.

23                PROSPECTIVE JUROR NO. 1881:  -- senior vice

24     president for operations, finance, business strategy, and

25     treasurer.
```

1              THE COURT:  Now, I know what The Urban Institute

2      is, but why don't you tell these good folks what it is.

3              PROSPECTIVE JUROR NO. 1881:  The Urban Institute

4      is a think tank based in Washington, D.C.

5              THE COURT:  And what issues do you focus on?

6              PROSPECTIVE JUROR NO. 1881:  We focus on issues of

7      tax policy, justice, and others in the policy space here.

8              THE COURT:  Okay.  Do you have a significant

9      other?

10             PROSPECTIVE JUROR NO. 1881:  I do.

11             THE COURT:  And what do they do?

12             PROSPECTIVE JUROR NO. 1881:  She works for the

13     Cystic Fibrosis Foundation.

14             THE COURT:  All right.  You answered yes to 18 and

15     19.  You have followed coverage of January 6th as well as

16     the House hearings; is that right?

17             PROSPECTIVE JUROR NO. 1881:  Correct.

18             THE COURT:  And how closely have you followed the

19     coverage of the events over the last couple of years?

20             PROSPECTIVE JUROR NO. 1881:  Well, I watch the

21     news every night, and I read the papers every day.

22             THE COURT:  Okay.  What news outlets do you get

23     your news from?

24             PROSPECTIVE JUROR NO. 1881:  Well, most of the

25     major news outlets, including CNN, Fox, MSNBC, *New York*

1     *Times*, *Washington Post*, *Economist*.

2             THE COURT:  Okay.  And are you a junky, or do you

3     sort of follow casually?

4             PROSPECTIVE JUROR NO. 1881:  I follow casually in

5     the evenings when I come home when I'm fussing around doing

6     other stuff.

7             THE COURT:  All right.  What about the House

8     hearings?  How many of the hearings have you watched?

9             PROSPECTIVE JUROR NO. 1881:  Maybe one or two.

10    And I haven't watched them from start to finish.  It's in

11    pieces.

12            THE COURT:  Any conclusions or takeaways from what

13    parts you have watched?

14            PROSPECTIVE JUROR NO. 1881:  No, sir.

15            THE COURT:  Okay.  Counsel?

16            MR. GORDON:  Not from the United States.

17            MR. MONTEITH:  Nothing, Your Honor.

18            THE COURT:  Okay.  Sir, thank you very much.  You

19    can go back to the big courtroom.

20            PROSPECTIVE JUROR NO. 1881:  Thank you.

21            THE COURT:  And, Ms. Jenkins, should we let the

22    folks that we have questioned go get some lunch?

23            THE COURTROOM DEPUTY:  I have been.

24            THE COURT:  You've been doing that?

25            THE COURTROOM DEPUTY:  Yes.

```
1                THE COURT:  You're a step ahead of me.

2                Counsel, any challenge?

3                MR. GORDON:  None.

4                MR. MONTEITH:  No, Your Honor.

5                THE COURT:  1881 is qualified.

6                It's about quarter to 1:00.  Can we do a few more

7      then take our lunch break?  Would you rather take an early

8      lunch break or work on it a little bit?

9                MR. GARRITY:  I think we'll do whatever the Court

10     prefers.

11               THE COURT:  I shouldn't have to make all the

12     decisions.

13               All right.  Let's do, let's say, three or four

14     more.  Okay?

15               THE COURTROOM DEPUTY:  Okay.  Your Honor, Juror

16     No. 0649.

17               THE COURT:  Good afternoon, ma'am.  How are you?

18               PROSPECTIVE JUROR NO. 0649:  I'm all right.  Good.

19               THE COURT:  All right.  Have a seat.

20               You're Ms. Thomas; is that correct?

21               PROSPECTIVE JUROR NO. 0649:  Yes.

22               THE COURT:  Thank you very much for your service.

23     So I don't have an occupation for you.  Are you working

24     currently?

25               PROSPECTIVE JUROR NO. 0649:  No.
```

```
 1              THE COURT:  If you can move a little bit closer so
 2      I can hear your voice.
 3              PROSPECTIVE JUROR NO. 0649:  No, sir.  No, sir.
 4              THE COURT:  And when was the last time you worked?
 5              PROSPECTIVE JUROR NO. 0649:  About six years ago.
 6              THE COURT:  And what did you do then?
 7              PROSPECTIVE JUROR NO. 0649:  Cashier.
 8              THE COURT:  Cashier.  Where about?
 9              PROSPECTIVE JUROR NO. 0649:  Burger King.
10              THE COURT:  Burger King.
11              All right.  So you followed a little bit of the
12      coverage about January 6th, the news -- seen it on the news?
13              PROSPECTIVE JUROR NO. 0649:  Yes, sir, yes.
14              THE COURT:  Okay.  Was that just back when it
15      happened, or have you followed it since then?
16              PROSPECTIVE JUROR NO. 0649:  Just when it
17      happened.
18              THE COURT:  Okay.
19              PROSPECTIVE JUROR NO. 0649:  I wasn't really
20      following it.
21              THE COURT:  And you say those -- you saw some of
22      those congressional hearings.
23              PROSPECTIVE JUROR NO. 0649:  Yes.
24              THE COURT:  On the TV?
25              PROSPECTIVE JUROR NO. 0649:  Yes.
```

```
1              THE COURT:  How closely did you follow those?

2              PROSPECTIVE JUROR NO. 0649:  Not real close.

3              THE COURT:  What did you think about those?

4              PROSPECTIVE JUROR NO. 0649:  Well, I don't know

5    too much about it so I couldn't, you know...

6              THE COURT:  Right.  So when we were -- when you

7    were sitting out there today, and I told you that this case

8    was about someone that may have been involved in January

9    6th, what's the first thing that came to mind?

10             PROSPECTIVE JUROR NO. 0649:  Just be what it is.

11   I've just got to be honest about it.

12             THE COURT:  So you wouldn't have any trouble --

13             PROSPECTIVE JUROR NO. 0649:  Oh, no.

14             THE COURT:  -- serving on a jury?

15             PROSPECTIVE JUROR NO. 0649:  No.

16             THE COURT:  Okay.  You've been a juror before?

17             PROSPECTIVE JUROR NO. 0649:  Yes.

18             THE COURT:  How many times?

19             PROSPECTIVE JUROR NO. 0649:  Twice.

20             THE COURT:  Do you remember those cases?

21             PROSPECTIVE JUROR NO. 0649:  One of them was a --

22   it's been so long.

23             THE COURT:  You've got to speak up, ma'am.

24             PROSPECTIVE JUROR NO. 0649:  It's been so long.

25   One case was about a burglar, burglary.
```

```
1              And I forgot about the other one.  I forgot the

2        other one.

3              THE COURT:  Okay.  That burglary case, did you all

4        reach a verdict?

5              PROSPECTIVE JUROR NO. 0649:  Yes, we reached a

6        verdict.  Guilty.

7              THE COURT:  And were you the foreperson, by any

8        chance?

9              PROSPECTIVE JUROR NO. 0649:  No.

10             THE COURT:  And it says that you or someone you

11       know has been the victim or witness to a crime.

12             PROSPECTIVE JUROR NO. 0649:  Well, I have.  I seen

13       my grandson get killed.

14             THE COURT:  Your grandson got killed.  I'm sorry

15       to hear that.

16             Any complaints about how that case was handled?

17             PROSPECTIVE JUROR NO. 0649:  No.  He still -- it's

18       still going on really.  I don't know what they're doing.

19             THE COURT:  Okay.  Counsel?

20             MR. GORDON:  Nothing from the United States.

21             MR. GARRITY:  No questions, Your Honor.  Thank

22       you.

23             THE COURT:  All right.  Ms. Thomas, you can step

24       down and go back to the other courtroom.  Thank you.

25             Any challenge?
```

```
1              MR. GORDON:  No, Your Honor.

2              MR. GARRITY:  No challenge, Your Honor.  Thank

3    you.

4              THE COURT:  649 is qualified.

5              THE COURTROOM DEPUTY:  Your Honor, this is Juror

6    No. 2798.

7              THE COURT:  Okay.  Step right up, sir.  Please

8    have a seat, and you can remove your mask.

9              PROSPECTIVE JUROR NO. 2798:  Thank you.

10             THE COURT:  Okay.  You're Mr. Betts?

11             PROSPECTIVE JUROR NO. 2798:  Yes.

12             THE COURT:  And you're a retired foreign services

13   officer; is that correct?

14             PROSPECTIVE JUROR NO. 2798:  That's correct.

15             THE COURT:  Where were you posted?  A number of

16   places probably.

17             PROSPECTIVE JUROR NO. 2798:  A number of places:

18   Japan, Australia, Hungary, Turkey, and Saudi Arabia.

19             THE COURT:  Got it.  Do you have a significant

20   other?

21             PROSPECTIVE JUROR NO. 2798:  I do.

22             THE COURT:  And what does he or she do?

23             PROSPECTIVE JUROR NO. 2798:  She's a copy editor.

24             THE COURT:  A...?

25             PROSPECTIVE JUROR NO. 2798:  Copy editor.
```

```
1              THE COURT:  Copy editor.  For a paper?

2              PROSPECTIVE JUROR NO. 2798:  Used to be a paper.

3    Now she does websites.

4              THE COURT:  Okay.  What paper did she work for?

5              PROSPECTIVE JUROR NO. 2798:  Today Sabah.  It was

6    in Turkey.

7              THE COURT:  All right.  You answered yes to a few

8    of my questions.  No. 3, you or someone close to you live or

9    work on Capitol Hill?

10             PROSPECTIVE JUROR NO. 2798:  I live on Capitol

11   Hill.

12             THE COURT:  Okay.  Were you at home on January

13   6th?

14             PROSPECTIVE JUROR NO. 2798:  Yes.

15             THE COURT:  And did you observe personally any of

16   the events that took place?

17             PROSPECTIVE JUROR NO. 2798:  Not on the 6th.  Only

18   what happened after that.

19             THE COURT:  Afterwards?

20             PROSPECTIVE JUROR NO. 2798:  Yes.

21             THE COURT:  Okay.  They put up all the fences and

22   whatnot?

23             PROSPECTIVE JUROR NO. 2798:  The National Guard,

24   when they came, sort of staged at Lincoln Park, which is a

25   block from my house.
```

```
 1                 THE COURT:  All right.  Did you suffer any
 2     property damage on the 6th?
 3                 PROSPECTIVE JUROR NO. 2798:  No.
 4                 THE COURT:  You've followed the coverage of
 5     January 6th?
 6                 PROSPECTIVE JUROR NO. 2798:  I have.
 7                 THE COURT:  Both at the time and since?
 8                 PROSPECTIVE JUROR NO. 2798:  Yes.
 9                 THE COURT:  And how closely would you say you've
10     followed it?
11                 PROSPECTIVE JUROR NO. 2798:  I haven't searched it
12     out, but I've paid attention when it was on.
13                 THE COURT:  Okay.  And same for the House
14     hearings?  How closely did you follow those?
15                 PROSPECTIVE JUROR NO. 2798:  I saw a couple of the
16     hearings that were televised in the evening and saw news
17     coverage of the rest.
18                 THE COURT:  And did you come away with any
19     conclusions after having watched those hearings?
20                 PROSPECTIVE JUROR NO. 2798:  As a result of the
21     hearings, no.
22                 THE COURT:  Okay.  Well, what about otherwise?
23                 PROSPECTIVE JUROR NO. 2798:  I believe that
24     January 6th was an act of violence against our democratic
25     system.
```

1          THE COURT:  So obviously lots of people

2     participated.  Lots of people came to Washington, D.C., and

3     did and did not do various things.  Some people may have

4     engaged in violence.  Other people may not have.

5          Given that we are here to assess the culpability

6     of one person based on the evidence of what she may have

7     done or did not do, do you think you could give her a fair

8     shot notwithstanding what you think about the sort of event

9     generally?

10          PROSPECTIVE JUROR NO. 2798:  I do.

11          THE COURT:  Okay.

12          PROSPECTIVE JUROR NO. 2798:  Obviously there were

13     multiple events on January 6th, and a lot of people came.

14     Some to exercise their First Amendment rights peacefully and

15     did, and they weren't involved in the activities that

16     resulted in damage to the Capitol and threatened lawmakers.

17          THE COURT:  And you know someone who works for the

18     legislative branch?

19          PROSPECTIVE JUROR NO. 2798:  Who worked.

20          THE COURT:  Worked.  And who is that?

21          PROSPECTIVE JUROR NO. 2798:  It's a close friend

22     who worked for a congressman from Texas who is no longer in

23     Congress --

24          THE COURT:  Okay.

25          PROSPECTIVE JUROR NO. 2798:  -- and was not in

1    Congress on January 6th.

2            THE COURT:  Very well, okay.

3            Counsel?

4            MR. GORDON:  Hi, Mr. Betts.

5            PROSPECTIVE JUROR NO. 2798:  Hi.

6            MR. GORDON:  During your various postings have you

7    ever been present for political violence of any kind?

8            PROSPECTIVE JUROR NO. 2798:  Yes.

9            MR. GORDON:  Like what?  Can you describe some?

10           PROSPECTIVE JUROR NO. 2798:  There were protests

11   in Hungary.  I was there when they were rewriting their

12   constitution, and we'd go to observe and report on what was

13   happening.

14           Also in Turkey -- I served there several times,

15   and there were numerous occasions where there were protests,

16   including outside our embassy.

17           MR. GORDON:  Did any of those affect you

18   personally?

19           PROSPECTIVE JUROR NO. 2798:  Affect me personally?

20   I mean, I went to some of them to observe them, but I was

21   never attacked or involved with law enforcement.

22           MR. GORDON:  You were able to sort of observe and

23   document kind of at a safe distance or arms length from what

24   was happening?

25           PROSPECTIVE JUROR NO. 2798:  In most cases.  In

1    some cases I was closer to the crowd.  But, again, there was

2    no -- there was -- once I think I was exposed to tear gas.

3           MR. GORDON:  Did any of those experiences from

4    your professional career influence your understanding or

5    your read or your assessment of what happened on January 6th

6    here?

7           PROSPECTIVE JUROR NO. 2798:  I don't think so.  I

8    mean, people were expressing their views publicly and in

9    large groups, and the same thing happened on January 6th

10   here as well.

11          But I don't think that my experiences overseas

12   impacted my -- the way I viewed January 6th.

13          MR. GORDON:  Okay.  Thank you, Your Honor.

14          MR. MONTEITH:  Good afternoon.

15          PROSPECTIVE JUROR NO. 2798:  Good afternoon.

16          MR. MONTEITH:  In response to Judge Cooper's

17   questions, it appears that you are well-watched or well-

18   versed on the January 6th Committee and what happened on

19   January 6th.  Is that fair to say?

20          PROSPECTIVE JUROR NO. 2798:  I'm aware of -- I

21   mean, I followed the news on January 6th.

22          MR. MONTEITH:  Right.

23          PROSPECTIVE JUROR NO. 2798:  I followed the news

24   about the hearings in the community.

25          MR. MONTEITH:  Maybe that was a bad way.  I mean,

1      you're well-versed.  I meant you're informed about what

2      happened, right?

3                  PROSPECTIVE JUROR NO. 2798:  Sure.

4                  MR. MONTEITH:  Right.  And you've formed opinions

5      about what happened, right?

6                  PROSPECTIVE JUROR NO. 2798:  Yes.

7                  MR. MONTEITH:  And you said you believed it was an

8      attack on our system as one of the opinions that you formed,

9      right?

10                  PROSPECTIVE JUROR NO. 2798:  Some of the events

11     that occurred on January 6th were an attack on our system,

12     yes.

13                  MR. MONTEITH:  Okay.

14                  PROSPECTIVE JUROR NO. 2798:  That's my view.

15                  MR. MONTEITH:  And that's an opinion that you have

16     prior to coming in here today without hearing any evidence

17     in the case, right?

18                  PROSPECTIVE JUROR NO. 2798:  Yes.

19                  MR. MONTEITH:  And that opinion is based on what

20     you know of it, right?

21                  PROSPECTIVE JUROR NO. 2798:  Yes.

22                  MR. MONTEITH:  And you seem to be a type of person

23     that -- you hold opinions.  You stick to your opinions.  And

24     like anybody else, they color your decisions in matters.  Is

25     that fair to say?

1              PROSPECTIVE JUROR NO. 2798:  I'm not sure I

2      understand the question.

3              MR. MONTEITH:  I'm kind of asking it weird.

4              Based upon the opinions you've already formed,

5      right?  That may have an effect on the decisions you make in

6      this case?

7              PROSPECTIVE JUROR NO. 2798:  Well, I didn't answer

8      that way because I don't believe that's the case.  I mean,

9      while I believe that laws were broken on January 6th, I

10     don't know -- I mean, I don't have a list of people who

11     broke the laws.

12             MR. MONTEITH:  Right.

13             PROSPECTIVE JUROR NO. 2798:  So I believe there

14     were people that were in Washington on January 6th that

15     didn't break the law.

16             MR. MONTEITH:  Okay.  And can you explain that a

17     little bit more?  So have you distinguished really like

18     who's guilty and who's not guilty?

19             By that, I mean, if somebody had gone into the

20     Capitol, are they guilty?  And if somebody had stayed out,

21     they're not guilty?

22             PROSPECTIVE JUROR NO. 2798:  I mean, clearly

23     people that didn't enter the Capitol are not guilty.  People

24     that entered the Capitol, I don't know unless they were

25     involved in acts of violence against either law enforcement

1        or other protesters.

2                    MR. MONTEITH:  All right.  Thank you.

3                    THE COURT:  Okay.  Sir, you can step down.

4                    PROSPECTIVE JUROR NO. 2798:  Sure.

5                    MR. GORDON:  No challenge from the government,

6        Your Honor, but before the next person I do have something I

7        wish to raise.

8                    THE COURT:  Okay.

9                    MR. MONTEITH:  No challenge, Judge.

10                   THE COURT:  Okay.  2798 is qualified.

11                   MR. GORDON:  Your Honor, I'd ask the defense not

12       be questioning potential members of the jury in ways that

13       either require legal conclusions or presume certain facts

14       that are just not true.  For example, there are hundreds of

15       people who have been prosecuted for their conduct on January

16       6th that did not go into the Capitol if they engaged in some

17       sort of felony outside, and there are people who have

18       entered the Capitol -- you know, although they all did

19       violate the law, some of them have not been prosecuted

20       because they haven't been identified, et cetera.

21                   So to suggest to -- I think it poisons the

22       potential jury well to suggest to them at this point that

23       that is some sort of legal distinction that matters and that

24       they should --

25                   THE COURT:  Counsel.

1        MR. MONTEITH:  Judge, I think that line of

2   questioning was really in response to the potential juror's

3   answers to your questions, and I think that we're allowed to

4   explore that a little bit.  I mean, he did say he believed

5   that January 6th was an attack on the system, and I was

6   trying to distinguish what was the attack on our system.

7        So I tried not to go too far.  I didn't have him

8   decide an issue in the case.  But I just wanted to flesh out

9   his feelings on that.

10       And I know it was close.

11       THE COURT:  I'll give you a little leeway, but ask

12   it in an open way so that they can sort of express what they

13   believe as opposed to sort of your putting words into their

14   mouth about, you know, if they didn't go in were they

15   guilty, that kind of thing.

16       MR. MONTEITH:  I understand.

17       THE COURT:  All right.  Let's take our break.  Can

18   we take 45 instead of an hour?

19       All right.  We'll take a 45-minute lunch break.

20   It's 1:00 now.  We'll reconvene at 1:45.

21       (Recess taken)

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2              THE COURT:  Any thoughts about reducing the

3     current peremptories proportionally?

4              MR. GORDON:  We didn't discuss it, Your Honor.

5              THE COURT:  Any thoughts?

6              MR. GORDON:  We haven't really discussed it,

7     Judge.

8              THE COURT:  Okay.  Why don't you think about it,

9     and we'll take it up at the next break, okay?  Obviously no

10    pressure, but it would just simplify things.

11             (Pause)

12             THE COURT:  Also, Counsel, there's a juror who I

13    know and who knows me.  I wouldn't necessarily strike him

14    just because of the relationship, but I may take him out of

15    order.  I suspect that he may be -- he may have

16    qualification issues otherwise.  So I may take him out of

17    order and get him out of here, if possible.

18             MR. GARRITY:  Your Honor, if I could, just one

19    question?

20             THE COURT:  If you could come to the lectern.

21             MR. GARRITY:  Which particular juror is that, Your

22    Honor?

23             THE COURT:  No. 34 on the record.  So Juror No.

24    2743, No. 34 on the list.

25             MR. GARRITY:  Thank you.

```
1                    (Pause)

2               THE COURTROOM DEPUTY:  Your Honor, Juror No. 0481.

3               THE COURT:  Good afternoon, sir.

4               PROSPECTIVE JUROR NO. 0481:  Good afternoon, Your

5     Honor.

6               THE COURT:  Thank you for your patience.  You're

7     Mr. Altman?

8               PROSPECTIVE JUROR NO. 0481:  Yes.

9               THE COURT:  All right.  It says here you are in

10    executive management for ASRC.  Tell us what ASRC is.

11              PROSPECTIVE JUROR NO. 0481:  ASRC is the Arctic

12    Slope Regional Corporation, which is owned by Inupiat

13    natives, one of the 12 regional corporations created when

14    the Alaska Native Claims Act was signed.

15              THE COURT:  Great.

16              PROSPECTIVE JUROR NO. 0481:  And we do work for

17    the federal government, government contracting.

18              THE COURT:  Okay.  Do you have any contracts with

19    any federal law enforcement agency?

20              PROSPECTIVE JUROR NO. 0481:  My group is space

21    related.  My ASRC Federal, another group, has federal

22    contracts.

23              THE COURT:  With any law enforcement agencies?

24              PROSPECTIVE JUROR NO. 0481:  FLETC is the one that

25    does federal law enforcement training.
```

1          THE COURT:  Got it.  And do you have a significant

2     other?

3          PROSPECTIVE JUROR NO. 0481:  I have a wife, yes.

4          THE COURT:  And what does she do?

5          PROSPECTIVE JUROR NO. 0481:  She's retired and is

6     at home taking care of me.

7          THE COURT:  What does she work -- what field did

8     she work in before she retired?

9          POTENTIAL JUROR NO. 0481:  She was in commercial

10    air transportation.  She was a convention planner for

11    Pacific Southwest Airlines.

12         THE COURT:  Okay.  You answered yes to a number of

13    my questions.

14         The first one, 16, you say that the nature of the

15    charges might make it difficult for you to follow the

16    Court's instructions and be a fair and impartial juror.  Why

17    did you answer yes to that question?

18         PROSPECTIVE JUROR NO. 0481:  The nature of what

19    happened on January 6th has impacted me.  I am a retired

20    naval officer.  The rule of law is very, I guess, important

21    to me, and I was just worried that that action seemed so

22    reprehensible I just had a question could I be fair.

23         THE COURT:  Okay.  Well, it's natural to have that

24    question.  Obviously many people have feelings about what

25    happened on January 6th.  Many people have strong feelings

1    about what happened on January 6th.  You know, hundreds, if

2    not thousands, of people came to D.C. that day, and they did

3    or did not do various different things.  They came here for

4    different reasons.  This trial is about one person and why

5    she may have done what she did and what she did or did not

6    do.

7              And, I guess, the question is:  Notwithstanding

8    what you may think about January 6th generally, would you be

9    able to put those feelings aside to give Ms. Niemela a

10   straight shot up and down?

11             PROSPECTIVE JUROR NO. 0481:  I believe so.

12             THE COURT:  Okay.  And how firmly is that belief?

13   How firm is that belief?

14             PROSPECTIVE JUROR NO. 0481:  Well, like I said,

15   the rule of law has always been important to me, and I think

16   it's a pretty strong belief system, so if the facts

17   presented, I would follow that and make a decision based on

18   that.

19             THE COURT:  Okay.  So while you might not think

20   that those that day adhered to the rule of law, the rule of

21   law in this courtroom would be to follow my instructions,

22   and you think that you would be able to do that?  And give

23   me an honest answer.

24             PROSPECTIVE JUROR NO. 0481:  Yes.

25             THE COURT:  Okay.  You followed some of the

1   coverage of January 6th obviously.

2          PROSPECTIVE JUROR NO. 0481:  Not as closely as

3   some people did, but I knew of it and read different

4   articles.

5          THE COURT:  Okay.  And you've watched some of the

6   House committee hearings?

7          PROSPECTIVE JUROR NO. 0481:  More the summary of

8   the hearings than the actual hearings.

9          THE COURT:  Okay.  You answered the question about

10   having views about folks who believed that the election was

11   stolen and views about QAnon that might make you -- might

12   make it difficult to be a fair and impartial juror.  Tell us

13   about that.

14          PROSPECTIVE JUROR NO. 0481:  Well, there's been a

15   lot written about the stolen election, but I believe it's

16   all false claims and have a hard time believing that that

17   could be a valid line of thinking, I guess.

18          THE COURT:  Okay.  Well, we aren't here to

19   relitigate --

20          PROSPECTIVE JUROR NO. 0481:  Right, I understand.

21          THE COURT:  -- the 2020 election obviously.

22   And I guess the same question is, whatever your views about

23   folks who think that the election was stolen, would -- and

24   Ms. Niemela may or may not still share those views -- would

25   that affect your ability to give her a fair trial based on

1    the evidence that you hear?

2              PROSPECTIVE JUROR NO. 0481:  No.  I believe I

3    would still be able to listen and adjudicate fairly.

4              THE COURT:  And the same question as to whether,

5    you know, if the evidence were to show that she adhered to

6    some views espoused by QAnon, same question?

7              PROSPECTIVE JUROR NO. 0481:  No, it would have to

8    be something that produced a rule that she had actually

9    convinced me that the law had been violated.

10             THE COURT:  Okay.  You talked about your former

11   military service.  You also indicate that someone you know

12   has worked for the legislative branch of the government.

13             PROSPECTIVE JUROR NO. 0481:  Yes.  My son was

14   legislative aide to Don Young in Congress, but that was a

15   few -- a couple of years ago.

16             THE COURT:  I'm sorry, he was an aide to...?

17             PROSPECTIVE JUROR NO. 0481:  Don Young, the

18   representative from Alaska.

19             THE COURT:  Yes.  And did he work for

20   Representative Young on January 6, 2021?

21             PROSPECTIVE JUROR NO. 0481:  No, no.

22             THE COURT:  So he was not there that day?

23             PROSPECTIVE JUROR NO. 0481:  He was not there that

24   day at all.

25             THE COURT:  Okay.  Do you know Mr. Young?

```
1            PROSPECTIVE JUROR NO. 0481:  I did prior to his

2     passing, yes.  I met him in his office several times.

3            THE COURT:  Okay.

4            All right.  You know someone who may have been

5     subject to an investigation by a government agency or had a

6     case pending in federal or state court.

7            PROSPECTIVE JUROR NO. 0481:  That one I tried to

8     answer to the best of my ability because I hold a security

9     clearance from the federal government, so I've been

10    investigated by the OMB, and I guess NASA did an

11    investigation as well.

12           THE COURT:  And when you say "investigation," just

13    a background check?

14           PROSPECTIVE JUROR NO. 0481:  Background, yes, to

15    support a clearance.

16           THE COURT:  And have you -- you have prior jury

17    experience?

18           PROSPECTIVE JUROR NO. 0481:  I did serve on a D.C.

19    jury in the past.

20           THE COURT:  How long ago?

21           PROSPECTIVE JUROR NO. 0481:  I would say in excess

22    of five years.

23           THE COURT:  Okay.  Do you remember what kind of

24    case it was?

25           PROSPECTIVE JUROR NO. 0481:  It was a suit brought
```

1    against the city bus drivers for starting up and causing a

2    woman to fall as a part of that.

3            THE COURT:  Okay.  And were you the foreperson of

4    that jury, by any chance?

5            PROSPECTIVE JUROR NO. 0481:  No, I was not the

6    foreperson.

7            THE COURT:  Okay.  Anything about that experience

8    make you hesitate to serve on a jury again?

9            PROSPECTIVE JUROR NO. 0481:  No.

10           THE COURT:  All right.  Counsel?

11           MS. ARCO:  Nothing from the government, Your

12   Honor.

13           MR. GARRITY:  Just a few.

14           Good afternoon, Mr. Altman.

15           PROSPECTIVE JUROR NO. 0481:  Good afternoon.

16           MR. GARRITY:  Just a few questions.

17           You talked about the events of January 6th you

18   thought were reprehensible; is that correct?

19           PROSPECTIVE JUROR NO. 0481:  Yes.

20           MR. GARRITY:  That view of the actions of January

21   6th being reprehensible, did that encompass all people who

22   came to D.C., or did it, in your mind, encompass just those

23   that went onto the Capitol grounds?

24           PROSPECTIVE JUROR NO. 0481:  Yes.  There's nothing

25   wrong with having a rally in D.C. to express your opinions,

1    but when you, you know, go past the boundaries that I've

2    always respected, you know, and try to break into the

3    Capitol, that's the part that I felt was reprehensible.

4            MR. GARRITY:  And if you were to see evidence in

5    this case that Ms. Niemela, perhaps, entered the Capitol,

6    would you include her within the group of reprehensibles?

7            PROSPECTIVE JUROR NO. 0481:  I would have to say,

8    if there was evidence of her entering the Capitol, to me,

9    that's reprehensible behavior when it was clearly noted not

10   to do that.

11           MR. GARRITY:  And would you be able to fairly

12   judge Ms. Niemela and her actions in the context of the

13   judge's instructions?

14           PROSPECTIVE JUROR NO. 0481:  Yes.  I believe

15   that's true, too.

16           MR. GARRITY:  I have no further questions.  Thank

17   you.

18           THE COURT:  Okay.  Sir, what if I were to build on

19   counsel's question and tell you that in certain

20   circumstances there may be defenses for why someone entered

21   the Capitol, including believing that they had lawful

22   authority to do so or that a statute required an intent to

23   do a certain thing by entering the Capitol?  Would you be

24   able to assess those potential defenses?

25           PROSPECTIVE JUROR NO. 0481:  Yes.

```
1            THE COURT:  Okay.  Thank you.  You can step down.

2            PROSPECTIVE JUROR NO. 0481:  Thank you.

3            THE COURT:  Lauren, I'm sorry, could you bring out

4     of order --

5            THE COURTROOM DEPUTY:  One second, sir.

6            THE COURT:  -- 2743.

7            THE COURTROOM DEPUTY:  2743?

8            THE COURT:  2743, Mr. Fitzpatrick.

9            Okay.  Any challenge?

10           MS. ARCO:  No challenge from the government.

11           MR. GARRITY:  Your Honor, we would challenge for

12    cause.  He did say that he encompassed within, I guess, the

13    scope of his reprehensibles those that entered the Capitol.

14    I know what he said in the follow-up questions, but the

15    evidence will be that Ms. Niemela entered the Capitol.  I'm

16    not sure that that viewpoint can be put aside, and that we

17    would challenge for cause.

18           THE COURT:  Okay.  I'll overrule your challenge.

19    I think he indicated pretty clearly that he would follow the

20    rule of law and the Court's instructions and put aside

21    whatever views he has about the participants generally.

22           So 481 is qualified.

23           (Pause)

24           THE COURTROOM DEPUTY:  Your Honor, Juror No. 2743.

25           THE COURT:  Step right up, sir.  How are you?
```

```
 1              PROSPECTIVE JUROR NO. 2743:  Good morning, sir.

 2              THE COURT:  All right.  So I called you out of

 3    order because we know one another; is that correct?

 4              PROSPECTIVE JUROR NO. 2743:  It is correct, Your

 5    Honor.

 6              THE COURT:  All right.  And this is

 7    Mr. Fitzpatrick.

 8              You are the younger brother of one of my close

 9    friends from law school; is that correct?

10              PROSPECTIVE JUROR NO. 2743:  That is correct, Your

11    Honor.

12              THE COURT:  And we worked together at a law firm

13    for a couple of years about 15 years ago or so.  Is that

14    fair?

15              PROSPECTIVE JUROR NO. 2743:  That is correct, Your

16    Honor.

17              THE COURT:  Okay.  We'll get to that in a second.

18              But you answered yes to Question 41, which is the

19    catch-all question.

20              PROSPECTIVE JUROR NO. 2743:  Yes, Your Honor.

21              THE COURT:  Why did you answer yes to that

22    question?

23              PROSPECTIVE JUROR NO. 2743:  I think it's relevant

24    for the Court's consideration that I work at the Department

25    of Justice in the criminal division in the computer crime
```

1    and intellectual property section.  I've been in DOJ for 11

2    years, and I did have some minor involvement in some of the

3    cases arising from January 6th.  Our office was involved in

4    some of the search warrant activity for evidence; not

5    involved with this case.  I have no recollection of the

6    defendant.

7            But obviously, with that kind of background, I

8    thought it was worthwhile bringing it to the Court's and

9    parties' attention.

10           THE COURT:  Okay.  So I know you answered in the

11   negative to all the questions about whether it would be

12   difficult to be fair and impartial, et cetera.  But this is

13   probably a little too close to home, don't you think?

14           PROSPECTIVE JUROR NO. 2743:  Absolutely, Your

15   Honor.  Obviously I would take my responsibilities

16   absolutely seriously, as would anybody in my situation.

17           THE COURT:  Okay.

18           PROSPECTIVE JUROR NO. 2743:  But it's obvious that

19   I work in the same department as the prosecution, so that's

20   a fair point for the Court's consideration.

21           THE COURT:  All right.  You can step down, and

22   we'll release you.  You can go back to work.

23           PROSPECTIVE JUROR NO. 2743:  For the day?

24           THE COURT:  Yes.

25           PROSPECTIVE JUROR NO. 2743:  Thank you, Your

```
 1    Honor.

 2              THE COURT:  Okay.  The Court will strike 2743 for

 3    cause.

 4              THE COURTROOM DEPUTY:  Your Honor, Juror No. 2362.

 5              THE COURT:  Good afternoon, ma'am.  Thank you for

 6    your patience.  You are Ms. Grate?

 7              PROSPECTIVE JUROR NO. 2362:  Yes, that's correct.

 8              THE COURT:  Is that correct?

 9              PROSPECTIVE JUROR NO. 2362:  Yes.

10              THE COURT:  And you do communications for GSA,

11    right?

12              PROSPECTIVE JUROR NO. 2362:  Correct.

13              THE COURT:  How long have you been doing that?

14              PROSPECTIVE JUROR NO. 2362:  Since August of 2021.

15              THE COURT:  All right.  What did you do before

16    that?

17              PROSPECTIVE JUROR NO. 2362:  I worked for a

18    communications firm that did communications for various

19    campaigns and nonprofits.

20              THE COURT:  Okay.  And do you work on a particular

21    portfolio at GSA, or just general sort of agency level

22    matters?

23              PROSPECTIVE JUROR NO. 2362:  General agency level.

24    I'm the communications director, so I'm an appointee.  So

25    all things GSA; buildings, acquisition, technology.
```

1          THE COURT:  Got it.  And correct me if I'm wrong,

2     but GSA does not -- is not involved in the maintenance or

3     upkeep of the Capitol Complex.  That's the Architect of the

4     Capitol, correct?

5          PROSPECTIVE JUROR NO. 2362:  That's correct, yes.

6          THE COURT:  Okay.  Was GSA -- or describe GSA's --

7     describe how January 6th affected GSA's portfolio here in

8     Washington, if at all.

9          PROSPECTIVE JUROR NO. 2362:  That's a good

10    question.  So I wasn't with GSA at the time.

11         THE COURT:  Okay.

12         PROSPECTIVE JUROR NO. 2362:  So I can't speak to

13    that in detail.  For example, I can't really speak whether

14    the region, you know, decided to up security in other

15    facilities or anything like that.  So I can't really speak

16    in detail about that.

17         THE COURT:  Okay.  Do you have a significant

18    other?

19         PROSPECTIVE JUROR NO. 2362:  Yes.

20         THE COURT:  And what does he or she do?

21         PROSPECTIVE JUROR NO. 2362:  He is a residential

22    home inspector.

23         THE COURT:  Okay.

24         All right.  You answered yes to a number of my

25    questions including Question 1; is that right?  That there

1    may be some health issue that might inhibit your ability to

2    be a juror?

3           PROSPECTIVE JUROR NO. 2362:  Yes.  I wasn't sure

4    how to handle this.  Essentially I have a doctor's

5    appointment on Friday that would be very hard to reschedule,

6    and I would strongly prefer not to.

7           THE COURT:  This Friday?  Okay.  What time is your

8    doctor's appointment?

9           PROSPECTIVE JUROR NO. 2362:  9:30.

10           THE COURT:  And how long will it last?

11           PROSPECTIVE JUROR NO. 2362:  Probably an hour and

12    a half.

13           THE COURT:  Okay.  You've followed some of the

14    coverage of January 6th?

15           PROSPECTIVE JUROR NO. 2362:  Correct.

16           THE COURT:  How closely?

17           PROSPECTIVE JUROR NO. 2362:  Pretty closely.

18           THE COURT:  And what about the House hearings?

19           PROSPECTIVE JUROR NO. 2362:  I watched some of

20    them, but not all of them.

21           THE COURT:  Okay.  Any takeaways, conclusions,

22    from what you watched?

23           PROSPECTIVE JUROR NO. 2362:  You know, I think --

24    I guess I've been surprised, even now, seeing the footage

25    how I still -- I still have a very kind of emotional

1    response to it.  I still find it very upsetting to watch.

2         I think the -- I thought the hearings were very

3    informative, and they did a very thorough and thoughtful job

4    in terms of laying out what happened and why.

5         THE COURT:  Okay.  So despite those feelings, you

6    did not answer yes to the question about is there something

7    about the nature of these charges that would make it

8    difficult for you to be a fair and impartial juror.  So I

9    take it that you could put those feelings aside?

10        PROSPECTIVE JUROR NO. 2362:  Yes, I think I did

11   answer maybe a separate question that was related to that

12   one in the affirmative.

13        THE COURT:  Okay.

14        PROSPECTIVE JUROR NO. 2362:  It is kind of hard

15   to, you know, sometimes parse out your strong feelings about

16   an overall circumstance versus an individual.

17        THE COURT:  So you answered yes to 22, which is do

18   you have an opinion about people who believe that the

19   election was stolen or fraudulent that would make it hard

20   for you to serve as a fair and impartial juror?  Why did you

21   answer yes to that one?

22        PROSPECTIVE JUROR NO. 2362:  Yes.  I think for me,

23   again, it's -- I do feel very strongly about what happened,

24   and I would say watching it -- you know, watching the

25   coverage is very difficult to know that it was all of that

1    violence and damage to our democracy for -- all over a lie

2    so...

3            THE COURT:  Right.  So this trial is not about

4    relitigating the 2020 election.

5            PROSPECTIVE JUROR NO. 2362:  I understand.

6            THE COURT:  It's not about whether there were any

7    election integrity issues.  People -- a lot of people came

8    to D.C.; you know, in the thousands.  They came from all

9    parts of the country.  They did and did not do all different

10   things.  They were motivated for different reasons.

11           We're here to assess one person's conduct, and the

12   question is -- and I want you to be honest, and there's no

13   right or wrong answer to this -- you know, would you be able

14   to assess just the evidence against Ms. Niemela and give her

15   a fair shake based on that evidence and put aside what you

16   may think generally about either January 6th or folks who

17   think that the election was fraudulent?

18           PROSPECTIVE JUROR NO. 2362:  I think I could.

19           THE COURT:  Okay.  And how sure are you in that

20   belief?

21           PROSPECTIVE JUROR NO. 2362:  It's a little bit

22   hard not having -- how should I say?  I guess I'm answering

23   that way -- I'm assuming it's going to be fairly -- the

24   instructions that we're going to receive are going to be

25   fairly straightforward in terms of here is what the charge

1   is, here is what the evidence is, and here is the criteria

2   we need to meet beyond a reasonable doubt in order to make a

3   determination.

4          So given that, I think I could be impartial.

5          THE COURT:  Well, here's another question.  If you

6   were on the jury, you're going to see lots of videos.  And

7   you may see some of the same videos that have made you upset

8   or uncomfortable in the past.

9          If you see a video, and it makes you

10  uncomfortable, are you going to be sitting there saying --

11  thinking about how uncomfortable you are as opposed to, you

12  know, what's depicted and whether it constitutes a crime and

13  how it involves the defendant in this particular case?

14         PROSPECTIVE JUROR NO. 2362:  I think -- I think it

15  would be difficult.  I'm just being -- I'm just being

16  honest.

17         THE COURT:  Sure.  Okay.  You can step down and go

18  back to the jury room.

19         PROSPECTIVE JUROR NO. 2362:  Okay.  Thanks.

20         THE COURT:  All right.  I know you would have made

21  a valiant effort, Ms. Arco or Mr. Gordon, but I'm going to

22  strike her for cause.  I just don't think her heart was in

23  it.

24         THE COURTROOM DEPUTY:  Your Honor, Juror No. 0471.

25         THE COURT:  Hi, sir, how are you?

```
 1                    PROSPECTIVE JUROR NO. 0471:  Very good, thank you.

 2               THE COURT:  You're Mr. Glaser?

 3               PROSPECTIVE JUROR NO. 0471:  Yes, sir.

 4               THE COURT:  All right.  So you are a government

 5     affairs person at AAR.  Tell us what AAR is.

 6               PROSPECTIVE JUROR NO. 0471:  AAR is the

 7     Association of American Railroads.  I'm a registered

 8     lobbyist for them.

 9               THE COURT:  Okay.  And so you're on the Hill quite

10     a bit, I would imagine.

11               PROSPECTIVE JUROR NO. 0471:  Yes, sir, pretty much

12     every day.

13               THE COURT:  Pretty much every day.  Were you there

14     on January 6th by any chance?

15               PROSPECTIVE JUROR NO. 0471:  I was not.

16               THE COURT:  But you interact with members and

17     staff who were there?

18               PROSPECTIVE JUROR NO. 0471:  Yes, sir.  I was a

19     former staffer myself.

20               THE COURT:  Okay.  Who did you work for?

21               PROSPECTIVE JUROR NO. 0471:  I worked for the

22     House Transportation Committee and for Congressman Bob

23     Livingston in Louisiana.

24               THE COURT:  So that was obviously before January

25     6th.
```

1          PROSPECTIVE JUROR NO. 0471:  Yes.  This was quite

2     some time ago.

3          THE COURT:  So the first question is, based on

4     your relationships on the Hill, based on the people you know

5     there -- first of all, have you ever spoken with any of

6     those folks about their experiences on the 6th?

7          PROSPECTIVE JUROR NO. 0471:  Yes, sir.

8          THE COURT:  Okay.  And were any of them, you know,

9     affected or traumatized more so than the average person that

10    was there that day?

11         PROSPECTIVE JUROR NO. 0471:  Not that I'm aware

12    of.

13         THE COURT:  Okay.  Is there anything about your

14    relationships on the Hill that would make you uncomfortable

15    serving as a juror on this case or that would make it

16    difficult for you to be fair and impartial?

17         PROSPECTIVE JUROR NO. 0471:  I don't believe so.

18         THE COURT:  Okay.  And you've watched coverage of

19    the events?

20         PROSPECTIVE JUROR NO. 0471:  Yes, sir.

21         THE COURT:  Back at the time, or have you followed

22    it since then?

23         PROSPECTIVE JUROR NO. 0471:  Both.

24         THE COURT:  Okay.  How closely have you followed

25    it?

```
1              PROSPECTIVE JUROR NO. 0471:  Fairly closely.

2              THE COURT:  Have you done any sort of independent

3      research or, you know, analysis, or just followed the news?

4              PROSPECTIVE JUROR NO. 0471:  Just whatever's in

5      the paper or on the news.

6              THE COURT:  Okay.  And you answered yes to 19

7      about the House hearings.  You've watched some of those.

8              PROSPECTIVE JUROR NO. 0471:  Yes, sir.

9              THE COURT:  Any impressions?  Any takeaways?

10             PROSPECTIVE JUROR NO. 0471:  I had them on in my

11     office while they were going on.

12             THE COURT:  I'm sorry?

13             PROSPECTIVE JUROR NO. 0471:  I just had the TV on

14     in my office while they were going on.

15             THE COURT:  Okay.  So you're not a junky?

16             PROSPECTIVE JUROR NO. 0471:  No, sir.

17             THE COURT:  All right.  Someone you were close to

18     served in the military?

19             PROSPECTIVE JUROR NO. 0471:  My father.

20             THE COURT:  Which branch?

21             PROSPECTIVE JUROR NO. 0471:  Air Force.

22             THE COURT:  Retired?

23             PROSPECTIVE JUROR NO. 0471:  He just passed in

24     November actually.

25             THE COURT:  Sorry to hear that.
```

```
1              PROSPECTIVE JUROR NO. 0471:  Yes, sir.

2              THE COURT:  And obviously you know folks who

3     worked in Congress because of your job.

4              PROSPECTIVE JUROR NO. 0471:  Yes, sir.

5              THE COURT:  All right.  Do you have a significant

6     other?

7              PROSPECTIVE JUROR NO. 0471:  Girlfriend, but not

8     married.

9              THE COURT:  Okay.  What does she do?

10             PROSPECTIVE JUROR NO. 0471:  She is a teacher.

11             THE COURT:  Okay.

12             All right, Counsel.

13             MS. ARCO:  Good afternoon, Mr. Glaser.

14             PROSPECTIVE JUROR NO. 0471:  Hi.  How are you?

15             MS. ARCO:  I'm well.  Thanks.

16             So I heard you worked for the House Transportation

17    Committee a while back, and I didn't hear what member.

18             PROSPECTIVE JUROR NO. 0471:  Bob Livingston.

19             MS. ARCO:  Okay.

20             PROSPECTIVE JUROR NO. 0471:  He's retired now.

21    He's from Louisiana.

22             MS. ARCO:  Got it.

23             PROSPECTIVE JUROR NO. 0471:  This was back -- I

24    was on the Hill from '97 to 2001.

25             MS. ARCO:  And you said obviously you were on the
```

```
1    Hill every day.  You have friends and colleagues who worked,

2    you know, at the Capitol on January 6th.

3                PROSPECTIVE JUROR NO. 0471:  Yes, ma'am.

4                MS. ARCO:  How extensively have you discussed that

5    day with those people?

6                PROSPECTIVE JUROR NO. 0471:  I wouldn't say very

7    extensively.  I mean, obviously it's come up in

8    conversation, but it's not been -- when I'm on the Hill,

9    that's not what I'm there to talk about.

10                MS. ARCO:  Understood.  And based on those

11    conversations, did you form any kind of opinion of what

12    happened on that day?

13                PROSPECTIVE JUROR NO. 0471:  Not really.

14                MS. ARCO:  Okay.  Thank you.

15                MR. MONTEITH:  No questions, Your Honor.

16                THE COURT:  Okay.  Thank you, sir.  You can step

17    down.

18                PROSPECTIVE JUROR NO. 0471:  Thank you.

19                THE COURT:  Any challenge?

20                MS. ARCO:  No challenge from the government.

21                MR. MONTEITH:  Nor from the defense.

22                THE COURT:  Okay.  471 is qualified.

23                All right.  Good afternoon, sir.  Thank you for

24    your patience.  You're Mr. Rooney; is that right?

25                PROSPECTIVE JUROR NO. 0240:  That's right.
```

```
1              THE COURT:  And you are an attorney with Rooney

2      Holdings.  Tell us about your practice.

3              PROSPECTIVE JUROR NO. 0240:  Well, it's a lot of

4      different stuff, international.

5              THE COURT:  Generally.

6              PROSPECTIVE JUROR NO. 0240:  General?  It's

7      everything from infrastructure and contracts to HR,

8      corporate regulation, and international stuff.

9              THE COURT:  Okay.  No criminal law?

10             PROSPECTIVE JUROR NO. 0240:  No, sir.

11             THE COURT:  All right.  Do you have a significant

12     other?

13             PROSPECTIVE JUROR NO. 0240:  I do.

14             THE COURT:  And what does he or she do?

15             PROSPECTIVE JUROR NO. 0240:  She's in med school.

16             THE COURT:  Med school.

17             You live on the Hill?

18             PROSPECTIVE JUROR NO. 0240:  No.

19             THE COURT:  You know someone who lives on the

20     Hill?

21             PROSPECTIVE JUROR NO. 0240:  Several people, but

22     my -- I don't know how specific, but a family member worked

23     on the Hill.  My father was a Congressman from 2016 to 2020.

24             THE COURT:  Okay.  Where was he a Congressman

25     from?
```

```
1                    PROSPECTIVE JUROR NO. 0240:  Florida 19.

2                    THE COURT:  Florida 19.  That's northern?

3                    PROSPECTIVE JUROR NO. 0240:  Naples and Fort

4      Myers.

5                    THE COURT:  It's southern, okay.  But he was not

6      serving on January 6th?

7                    PROSPECTIVE JUROR NO. 0240:  No.  His last day was

8      January 3rd.

9                    THE COURT:  Have you talked to him about what

10     happened?

11                   PROSPECTIVE JUROR NO. 0240:  Yes, sir.

12                   THE COURT:  Would the nature of your relationship

13     with your father or your discussions with your father make

14     it tough for you to be a juror on a January 6th case?

15                   PROSPECTIVE JUROR NO. 0240:  I think in some ways,

16     yes.

17                   THE COURT:  Because he could have been there?

18                   PROSPECTIVE JUROR NO. 0240:  Because he could have

19     been there, yes, but also since probably halfway -- since

20     that last year after the impeachment trial started, you

21     know, our family started getting a lot of death threats.

22     Mostly him and my mom, but then my sister also.

23                   THE COURT:  Okay.

24                   PROSPECTIVE JUROR NO. 0240:  And after the

25     election it kind of ramped up, too.
```

```
 1                    THE COURT:  So you think it's a little too close

 2      to home?

 3                    PROSPECTIVE JUROR NO. 0240:  A little bit.

 4                    THE COURT:  Literally speaking.

 5                    PROSPECTIVE JUROR NO. 0240:  Yes, sir.

 6                    THE COURT:  All right.  You can step down.

 7                    PROSPECTIVE JUROR NO. 0240:  Thank you.

 8                    THE COURT:  Okay.  The Court will strike 240 on

 9      its own motion.

10                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 0275.

11                    THE COURT:  Good afternoon, ma'am.  Step right up.

12                    You're Ms. Jackson-Dabney; is that right?

13                    PROSPECTIVE JUROR NO. 0275:  Yes, yes.

14                    THE COURT:  Okay.  And pronounce your first name.

15                    PROSPECTIVE JUROR NO. 0275:  Maurice, just like a

16      boy's name.

17                    THE COURT:  Okay.  I just want to make sure I have

18      it right.

19                    All right, Ms. Jackson-Dabney.  Thank you for your

20      patience.  It says here that you are in card production for

21      UPO.

22                    PROSPECTIVE JUROR NO. 0275:  Yes.

23                    THE COURT:  Tell us what that is.

24                    PROSPECTIVE JUROR NO. 0275:  Okay.  I print EBT

25      cards all day long.
```

```
1              THE COURT:  What are EBT cards?

2              PROSPECTIVE JUROR NO. 0275:  Electronic benefit

3    transfer cards, the food stamp cards.

4              THE COURT:  Food stamp cards, okay.  So the SNAP

5    program?

6              PROSPECTIVE JUROR NO. 0275:  Yes.

7              THE COURT:  And what does "UPO" mean?

8              PROSPECTIVE JUROR NO. 0275:  United Planet

9    Organization.  We're contractors.

10             THE COURT:  Got it.  So that's a contract with the

11   city of D.C.?

12             PROSPECTIVE JUROR NO. 0275:  Yes.

13             THE COURT:  All right.  Do you have a significant

14   other?  Are you married?

15             PROSPECTIVE JUROR NO. 0275:  No.  I'm widowed two

16   years.

17             THE COURT:  Okay.  I'm sorry to hear that.  What

18   did your husband do before he passed?

19             PROSPECTIVE JUROR NO. 0275:  Metrobus driver.

20             THE COURT:  Got it.

21             All right.  You answered yes to a number of

22   questions.  You or someone you know lives on Capitol Hill.

23             PROSPECTIVE JUROR NO. 0275:  No.  I thought you

24   meant by work.

25             THE COURT:  You work on Capitol Hill?
```

```
 1                PROSPECTIVE JUROR NO. 0275:  Yes.

 2                THE COURT:  Okay.  Were you working on Capitol

 3      Hill on the 6th?

 4                PROSPECTIVE JUROR NO. 0275:  No, I didn't work on

 5      Capitol Hill.  My sister works on Capitol Hill.

 6                THE COURT:  Was she affected by the protests at

 7      all?

 8                PROSPECTIVE JUROR NO. 0275:  I have no idea, but I

 9      know she works because she works for the court building

10      right over there by Union Station.

11                THE COURT:  Okay.  You answered yes to Question

12      21.  Do you believe that the 2020 presidential election was

13      stolen, corrupt, or fraudulent?  Did you answer yes to that

14      one?

15                PROSPECTIVE JUROR NO. 0275:  Yes.

16                THE COURT:  And why did you answer yes?

17                Ma'am, and just -- I don't care what you believe,

18      all right.  Just let these good folks know why you answered

19      yes to that.

20                PROSPECTIVE JUROR NO. 0275:  Trump, Donald Trump.

21                THE COURT:  Excuse me?

22                PROSPECTIVE JUROR NO. 0275:  It was because of

23      Donald Trump.

24                THE COURT:  So you think it was stolen or you

25      think it wasn't stolen?
```

1     PROSPECTIVE JUROR NO. 0275:  I'm going to say in a

2  way it was, but in a way it might not have been.  But in a

3  way it was.

4     THE COURT:  You have questions about the integrity

5  of the election?

6     PROSPECTIVE JUROR NO. 0275:  Yes.

7     THE COURT:  And that's because you believe what

8  Mr. Trump was saying?

9     PROSPECTIVE JUROR NO. 0275:  No, because -- I

10  mean -- I don't know because he's always in the news, and he

11  was always -- and just like, oh, God.  Every time I turn

12  around he's on TV, and I'm standing up there actually

13  watching this stuff so...

14     THE COURT:  So I just want to be clear.  Do you

15  think Mr. Trump won that election, or you don't know?

16     PROSPECTIVE JUROR NO. 0275:  I don't know because

17  I'm not a political person.  To be honest, I'm not a

18  political person.

19     THE COURT:  All right.  But you have some

20  questions as to whether --

21     PROSPECTIVE JUROR NO. 0275:  Yes.

22     THE COURT:  -- about who won?

23     PROSPECTIVE JUROR NO. 0275:  Yes.

24     THE COURT:  Okay.  Fair enough.  Fair enough.

25     And either you or someone close to you has been

1    arrested or charged for an offense.

2              PROSPECTIVE JUROR NO. 0275:  Yes.

3              THE COURT:  Was that you, or somebody else?

4              PROSPECTIVE JUROR NO. 0275:  It was my son.

5              THE COURT:  And was he treated fairly?

6              PROSPECTIVE JUROR NO. 0275:  Yes.  I think he was.

7              THE COURT:  Okay.  And can you tell us what he was

8    arrested or charged for?

9              PROSPECTIVE JUROR NO. 0275:  Yes.  Back in 2010 he

10   stole a Metrobus.

11             THE COURT:  He stole a bus?

12             PROSPECTIVE JUROR NO. 0275:  The Metrobus, yes.

13             THE COURT:  The actual bus?

14             PROSPECTIVE JUROR NO. 0275:  He took the bus.

15             THE COURT:  Okay.  Was it your husband's bus?

16             PROSPECTIVE JUROR NO. 0275:  No.  At the time my

17   husband was a station manager.

18             THE COURT:  Okay.

19             PROSPECTIVE JUROR NO. 0275:  But it wasn't his

20   bus, but he -- I mean, it was all in the newspaper and all

21   on the news, and back in 2010 he literally went in the

22   parking lot and took the bus.

23             THE COURT:  All right.  But you think he was

24   treated fairly?

25             PROSPECTIVE JUROR NO. 0275:  Uh-huh.

 1              THE COURT:  All right.  Counsel?

 2              MS. ARCO:  Good afternoon, Ms. Jackson-Dabney.

 3      How are you doing?

 4              PROSPECTIVE JUROR NO. 0275:  I'm fine.

 5              MS. ARCO:  Good.  So just to make sure I

 6      understand you correctly based on what you were telling the

 7      judge, it sounds like, you know, you saw some stuff on the

 8      news based on what President Trump was saying about the

 9      election.  Right?

10              PROSPECTIVE JUROR NO. 0275:  Yes, a whole lot of

11      other stuff.

12              MS. ARCO:  Okay.  And so based on what he was

13      saying, you also had concerns about the integrity of the

14      election?

15              PROSPECTIVE JUROR NO. 0275:  Yes, because I'm not

16      quite sure because with him you never know.

17              MS. ARCO:  Okay.  Does what you saw in the news

18      about the stolen -- about, you know, an election that may

19      have had issues, does that give you any pause about

20      listening to evidence about what this defendant may or may

21      not have believed about that election?

22              PROSPECTIVE JUROR NO. 0275:  I really don't

23      understand the question.

24              THE COURT:  Let me ask it.

25              MS. ARCO:  I'm not being entirely clear.

162

1            THE COURT:  Let me ask it a different way.

2            Ma'am, Ms. Niemela is on trial here for what she

3     did or did not do on January 6th.  Putting aside whether the

4     election was stolen or not, can you give this young lady a

5     fair trial?

6            PROSPECTIVE JUROR NO. 0275:  I have to hear it.

7            THE COURT:  You'd have to hear it.  But once you

8     heard all the evidence, if you thought the evidence, based

9     on my instructions, was that she was guilty or that she was

10    innocent, would you be able to render a verdict?

11           PROSPECTIVE JUROR NO. 0275:  Then I could.  But

12    I've got to literally hear it.

13           THE COURT:  You've got to hear what the evidence

14    is, right?

15           PROSPECTIVE JUROR NO. 0275:  Yes, because I'm the

16    type of person -- this is what I tell people all the time.

17    There's always two sides to every story, and some up the

18    middle.

19           THE COURT:  Okay.

20           MS. ARCO:  That's all.  Thank you.

21           MR. GARRITY:  We have no questions, Your Honor.

22           THE COURT:  Okay.  Thank you very much.  You can

23    step down.

24           Any challenge?

25           MS. ARCO:  No challenge from the government.

1              MR. GARRITY:  No challenge, Your Honor.

2              THE COURT:  All right.  275 is qualified.

3              THE COURTROOM DEPUTY:  Your Honor, Juror No. 0857.

4              THE COURT:  You're Mr. Tanski; is that right?

5              PROSPECTIVE JUROR NO. 0275:  Yes.

6              THE COURT:  All right.  Have a seat.  You can slip

7    your mask off.  And you're an architect with the Gensler

8    firm; is that correct?

9              PROSPECTIVE JUROR NO. 0275:  Yes.

10             THE COURT:  Fine firm.

11             Do you have a significant other?

12             PROSPECTIVE JUROR NO. 0275:  Yes.

13             THE COURT:  And what does he or she do?

14             PROSPECTIVE JUROR NO. 0275:  She works for an

15   education and literacy nonprofit in Washington, D.C.

16             THE COURT:  Okay.  You answered yes to a number of

17   my questions.  No. 3, you live or work on Capitol Hill.

18             PROSPECTIVE JUROR NO. 0275:  I live, yes, nearby.

19             THE COURT:  Okay.  How close to the Capitol?

20             PROSPECTIVE JUROR NO. 0275:  About a mile.

21             THE COURT:  Okay.  Were you home on January 6th?

22             PROSPECTIVE JUROR NO. 0275:  Yes.

23             THE COURT:  Did you observe any of the protests or

24   the law enforcement response to the protests?

25             PROSPECTIVE JUROR NO. 0275:  Some of the response.

1    I was out for a run that afternoon and saw people moving in

2    that direction.  I maybe got as close as 3rd Northeast.

3              THE COURT:  Okay.  There would likely be testimony

4    in trial about, you know, things that went on either at the

5    Capitol or potentially on the grounds of the Capitol.  Would

6    you be able to assess just the videos or the testimony about

7    what went on as opposed to what you may have seen that day

8    in assessing Ms. Niemela's culpability?

9              PROSPECTIVE JUROR NO. 0275:  Yes.

10             THE COURT:  Okay.  You've followed coverage of

11   January 6th?

12             PROSPECTIVE JUROR NO. 0275:  Yes.

13             THE COURT:  How closely?

14             PROSPECTIVE JUROR NO. 0275:  I've read newspaper

15   articles about the report more than following.  I haven't

16   read the full report.

17             THE COURT:  Okay.

18             PROSPECTIVE JUROR NO. 0275:  Some television.

19             THE COURT:  So there were two questions.  About

20   the events generally --

21             PROSPECTIVE JUROR NO. 0275:  Yes.

22             THE COURT:  -- as well as the House Committee

23   hearings.  I think you answered yes to both.

24             Let's just take the events generally first.

25             PROSPECTIVE JUROR NO. 0275:  Sorry, yes.

1          THE COURT:  How closely have you followed, you

2     know, the investigation, different cases, et cetera?

3          PROSPECTIVE JUROR NO. 0275:  I have a general

4     awareness of everything, but I wouldn't say in heavy detail.

5          THE COURT:  Okay.  Would you describe yourself as

6     a junky, a news junky, when it comes to stuff like this?

7          PROSPECTIVE JUROR NO. 0275:  No.  I rarely watch

8     news.  I tend to read the news daily and occasionally listen

9     to NPR.

10          THE COURT:  Okay.  What about the House hearings?

11     How closely have you followed those?

12          PROSPECTIVE JUROR NO. 0275:  Not super closely.  I

13     saw certain clips and read about them.

14          THE COURT:  Okay.  You answered yes to the two

15     questions about folks who might believe that the 2020

16     election was somehow stolen or corrupt and folks who may

17     adhere to some of the views of QAnon.  You said that that

18     might make you a little hesitant to be a fair and impartial

19     juror.

20          Why did you answer yes to those questions?

21          PROSPECTIVE JUROR NO. 0275:  With the QAnon

22     portion, having seen some of the destruction and instances

23     like January 6th and the Comet Ping Pong.  I have friends

24     who were near there during that instance.

25          I think it's personal for people in D.C. who have

1     had some of these people come and enter our city and treat

2     it the way they have based entirely on unfounded theories.

3     So that was the -- and the second was...?

4              THE COURT:  Folks who might believe that the

5     election was stolen.

6              PROSPECTIVE JUROR NO. 0275:  Yes.  Again, no

7     evidence presented.  You know, I think there were 62 court

8     cases that were all dismissed, if that's right, all proving

9     that none of it was true.  So I trust the legal system that

10    they got it right.

11             THE COURT:  Okay.  So, you know, obviously this

12    trial would not be about whether the election was stolen or

13    not.  You mentioned other cases that might deal with that.

14    Nor would it be a referendum on things that folks who

15    ascribe to QAnon might believe.  Right?

16             The question is, could you put aside any feelings

17    for people who fell into one of those categories and assess

18    the evidence against or for Ms. Niemela on its own merits?

19             And I know that's a -- may be a hard question, but

20    I want an honest answer.

21             PROSPECTIVE JUROR NO. 0275:  I would do my best,

22    but I think it would be difficult.

23             THE COURT:  Okay.  And even if I were to instruct

24    you that you were to set aside those personal beliefs and

25    follow my instructions and apply those instructions to only

1     the evidence that you heard, you still think it would be

2     difficult?

3               PROSPECTIVE JUROR NO. 0275:  Again, I would do my

4     best, but speaking truthfully, I think it would be

5     difficult.

6               THE COURT:  Okay.  You can step down.

7               PROSPECTIVE JUROR NO. 0275:  Okay.

8               THE COURT:  All right.  Have a good day.

9               All right.  The Court will strike 857 for cause.

10              All right.  Counsel, we've gone through 23, and by

11    my count we have 17 qualified.  We actually have 50 in the

12    pool.  If we can stay at this rate we would be okay, but

13    we're close.  Actually, I think it's 16.

14              MR. GORDON:  So we're halfway there, Your Honor.

15              THE COURT:  We're halfway there, and less than

16    halfway through.

17              Lauren, I think we will be fine, but it could

18    change.  So let's just keep going.

19              All right.  Do you want to bring in 2764?

20              THE COURTROOM DEPUTY:  Yes.

21              THE COURT:  Come right up here, sir.

22              PROSPECTIVE JUROR NO. 2764:  Hello.

23              THE COURT:  Hi.  How are you?  Thanks for your

24    patience.  You can slip your mask off.

25              You're Mr. Rancatore?

```
 1                 PROSPECTIVE JUROR NO. 2764:  Yes, Your Honor.

 2                 THE COURT:  And you're an AU professor?

 3                 PROSPECTIVE JUROR NO. 2764:  Yes.

 4                 THE COURT:  What do you teach?

 5                 PROSPECTIVE JUROR NO. 2764:  International

 6      relations is my field, so research methods.

 7                 THE COURT:  I'm sorry?

 8                 PROSPECTIVE JUROR NO. 2764:  Research methods,

 9      sorry.

10                 THE COURT:  And do you have a significant other?

11                 PROSPECTIVE JUROR NO. 2764:  I do, yes.

12                 THE COURT:  What do they do?

13                 PROSPECTIVE JUROR NO. 2764:  She's a

14      communications director for an international nonprofit.

15                 THE COURT:  Okay.  You or someone you know lives

16      or work on Capitol Hill?

17                 PROSPECTIVE JUROR NO. 2764:  Yes, my spouse.  In

18      her previous job, she was a communications manager for Union

19      Station Redevelopment Corporation.  She's worked there for

20      about five years.

21                 THE COURT:  Was she working there on January 6th?

22                 PROSPECTIVE JUROR NO. 2764:  No, not on that day.

23                 THE COURT:  And you followed coverage of January

24      6th?

25                 PROSPECTIVE JUROR NO. 2764:  Yes.
```

1          THE COURT:  Just at the time, or have you followed

2     it since then?

3          PROSPECTIVE JUROR NO. 2764:  Whenever there's been

4     a new development or hearing or -- pretty regularly, I would

5     say.

6          THE COURT:  Okay.  And are you sort of a political

7     junky?  Do you follow stuff like that really closely, or

8     just as an informed citizen?

9          PROSPECTIVE JUROR NO. 2764:  Being a part of a

10    political science department, I would -- yes, I do follow

11    politics.

12         THE COURT:  Okay.  Have you discussed with any of

13    your students, either in class or otherwise, sort of the

14    events of January 6th?  And perhaps there are parallels to

15    other places in the world that you teach about.

16         PROSPECTIVE JUROR NO. 2764:  Not as a big part of

17    a course, but certainly, when we talk about contentious

18    politics or other instances where we have democratic

19    backsliding or regime transition or instability.  I haven't

20    talked about it in a whole lot of detail in comparing these

21    things, but it certainly comes up in class.

22         THE COURT:  Okay.  Counsel?

23         MS. ARCO:  Good afternoon, Mr. Rancatore.

24         PROSPECTIVE JUROR NO. 2764:  Hello.

25         MS. ARCO:  So you follow the news regarding what

1    happened on January 6th fairly regularly?

2              PROSPECTIVE JUROR NO. 2764:  Yes.

3              MS. ARCO:  Do you follow news about specific

4    criminal cases, specific defendants, or more just about what

5    happened that day and the politics surrounding it?

6              PROSPECTIVE JUROR NO. 2764:  Not really particular

7    defendants.  There's a couple of -- over at Brookings

8    there's a podcast, and they sort of look at the legal sort

9    of things that are happening, but not particular defendants.

10             MS. ARCO:  Okay.  As part of your job you have to

11   be highly analytical, right?

12             PROSPECTIVE JUROR NO. 2764:  I would say, yes.

13             MS. ARCO:  So what we're concerned about here is

14   that any prior, you know, conclusions or analysis that you

15   might have done as perhaps part of your job about the

16   events of January 6th, that that would infect your view

17   of this case.

18             So the judge is going to give you very specific

19   instructions about four specific charges.  The defendant

20   here is charged with four specific crimes.  The government

21   is required to prove certain elements of those crimes,

22   and then you will hear evidence at trial, either for or

23   against -- supportive of those charges.

24             Do you think that what you've heard about January

25   6th up until today will prevent you from listening to the

1    judge's instructions and applying the law based on the facts

2    that you viewed during trial?

3           PROSPECTIVE JUROR NO. 2764:  I think part of my

4    job as a scholar or researcher, professor, is to be able to

5    look at things as objectively as I can.  You know, that

6    event definitely -- when I think about the day, it affected

7    me.  But for me as a scholar, you know, my sort of frame of

8    mind is always about explaining what happened, figuring out

9    what happened.

10          For me, I hope that I can be as objective as

11   possible in terms of:  Here's the evidence.  Here's the

12   charge.  Do these things match up or not?  I hope so.

13          MS. ARCO:  Do you think that you can put on your

14   professor objective hat as opposed to any kind of emotional

15   response in deciding?

16          PROSPECTIVE JUROR NO. 2764:  I feel like I can.

17   It's definitely something -- students in my class come from

18   a variety of different places in the political spectrum, and

19   I've done as best as I can to be as fair and equitable as

20   possible.  So for me I feel like I can, yeah.

21          MS. ARCO:  And if the judge instructs you to do

22   so, do you think you can do that?

23          PROSPECTIVE JUROR NO. 2764:  Yes, yes.

24          THE COURT:  Okay.

25          MS. ARCO:  Thank you.

```
 1              MR. GARRITY:  Good afternoon.

 2              PROSPECTIVE JUROR NO. 2764:  Hello.

 3              MR. GARRITY:  Just to follow up on some of what

 4    you talked about.  You discuss the events of January 6th in

 5    your classes at school?

 6              PROSPECTIVE JUROR NO. 2764:  It has come up, yes.

 7              MR. GARRITY:  And when you discuss the events of

 8    January 6th, do you espouse any sort of opinion with respect

 9    to what took place on January 6th?

10              PROSPECTIVE JUROR NO. 2764:  In terms of opinion,

11    I frame it as a real tragedy.  I think that's probably as

12    much as I would say in terms of my own perspective on the

13    things.

14              Essentially we just talk about, you know, the

15    assembly, where people were, what happened to the best of

16    our knowledge there, and that legal proceedings are ongoing

17    and investigations are being done and so forth.

18              MR. GARRITY:  And you indicated that the events of

19    January 6th affected you personally.

20              PROSPECTIVE JUROR NO. 2764:  It was -- it was sad

21    to watch.  100 percent I would say that.

22              MR. GARRITY:  And I guess your emotional reaction

23    to the events of January 6th, if you were to see videos and

24    hear evidence with respect to Ms. Niemela in the Capitol,

25    would that emotional response you had back on January 6th
```

1     impact your decision-making ability in this case?

2               PROSPECTIVE JUROR NO. 2764:  I would like to think

3     that I would be able to review these pieces of evidence as

4     evidence.  I would say probably at first sight it would -- I

5     would need to reset my mind and really sort of, okay, we're

6     looking at specific things to determine the relevance of the

7     case or whatever.

8               I believe I'd be able to do that, you know, but it

9     might give me a moment to kind of remember what we're here

10    for.

11              MR. GARRITY:  And I know we're kind of putting you

12    on the spot, but when you say "I believe," are you certain

13    in your own mind that you could give Ms. Niemela a fair

14    shake given your views of January 6th?

15              PROSPECTIVE JUROR NO. 2764:  Sure.  As you phrased

16    it, to give the defendant a fair shake, I would say yes.

17              THE COURT:  Okay.  Thank you, Counsel.

18              MR. GARRITY:  Thank you.

19              THE COURT:  All right.  You can step down.

20              PROSPECTIVE JUROR NO. 2764:  Thank you.

21              THE COURT:  Any challenge?

22              MS. ARCO:  None from the government.

23              MR. GARRITY:  No challenge, Your Honor.

24              THE COURT:  2764 is qualified.

25              THE COURTROOM DEPUTY:  Your Honor, Juror No. 0594.

```
1              THE COURT:  Hello.  You're Ms. Hicks?
2              PROSPECTIVE JUROR NO. 0594:  Yes.
3              THE COURT:  You can slip your mask off.  Thank you
4    for your patience.
5              I don't have an occupation for you.  Are you
6    working at the moment?
7              PROSPECTIVE JUROR NO. 0594:  Yes.
8              THE COURT:  Where do you work?
9              PROSPECTIVE JUROR NO. 0594:  Safeway.
10             THE COURT:  Safeway?
11             PROSPECTIVE JUROR NO. 0594:  Yes.
12             THE COURT:  And do you have a significant other?
13             PROSPECTIVE JUROR NO. 0594:  No.
14             THE COURT:  Which Safeway?
15             PROSPECTIVE JUROR NO. 0594:  It is L Street, but I
16   was trying to transfer to the other Safeway.
17             THE COURT:  Can we go to the phones one second?
18             (The following is a bench conference
19              held outside the hearing of the gallery)
20             THE COURT:  No interstate commerce evidence,
21   right?
22             MR. GORDON:  Correct, Your Honor.  No civil
23   disorder charge, so no element.
24             THE COURT:  No Safeway witnesses?
25             MR. GORDON:  Correct.
```

```
 1                  (This is the end of the bench conference)
 2             THE COURT:  All right.  You answered yes to a few
 3     of my questions.  You work on Capitol Hill now?
 4             PROSPECTIVE JUROR NO. 0594:  Yes.
 5             THE COURT:  Were you --
 6             PROSPECTIVE JUROR NO. 0594:  No, I was working on
 7     Capitol Hill at the moment when this happened, when L
 8     Street --
 9             THE COURT:  Okay.  And how far away is that from
10     the Capitol itself?
11             PROSPECTIVE JUROR NO. 0594:  I'm not sure.
12             THE COURT:  A mile?
13             PROSPECTIVE JUROR NO. 0594:  Probably about a mile
14     and a half, two miles.
15             THE COURT:  Okay.  Were you at work that day?
16             PROSPECTIVE JUROR NO. 0594:  Yes.
17             THE COURT:  Was your work affected that day?
18             PROSPECTIVE JUROR NO. 0594:  Yes.
19             THE COURT:  How so?
20             PROSPECTIVE JUROR NO. 0594:  Well, the traffic
21     coming into work.  The rioters -- well, a couple of people
22     that were coming down from out of state, they were parked
23     across the street from our job.
24             THE COURT:  Okay.
25             PROSPECTIVE JUROR NO. 0594:  They were camping out
```

1    around our job and in the parking lots.

2              THE COURT:  Any property damage?  Any windows

3    broken?  Anything like that?

4              PROSPECTIVE JUROR NO. 0594:  No.

5              THE COURT:  No.  Did you interact personally with

6    any of the folks who came to D.C. to protest that day?

7              PROSPECTIVE JUROR NO. 0594:  No.

8              THE COURT:  Okay.  You followed the events of

9    January 6th on the news?

10             PROSPECTIVE JUROR NO. 0594:  I seen it on the

11   news.

12             THE COURT:  Uh-huh.  How closely have you followed

13   it over the last two years?

14             PROSPECTIVE JUROR NO. 0594:  Just visually seeing

15   it and hearing about it.

16             THE COURT:  And you or someone close to you has

17   been arrested or charged with some offense.  Tell me about

18   that.

19             PROSPECTIVE JUROR NO. 0594:  Not dealing with

20   this, but myself with driving on a suspended license.

21             THE COURT:  I don't need to know about traffic.

22   Anything other than that?

23             PROSPECTIVE JUROR NO. 0594:  No.

24             THE COURT:  Okay.  Counsel?

25             MS. ARCO:  No questions from the government.

```
 1                 THE COURT:  Counsel?

 2                 MR. MONTEITH:  No.

 3                 THE COURT:  No questions?

 4                 Okay.  Thank you very much, ma'am.  You can step

 5      down.

 6                 PROSPECTIVE JUROR NO. 0594:  You're welcome.

 7                 THE COURT:  Any challenge?

 8                 MS. ARCO:  Not from the government.

 9                 MR. MONTEITH:  No challenge.

10                 THE COURT:  594 is qualified.

11                 THE COURTROOM DEPUTY:  Your Honor, Juror No. 0945.

12                 THE COURT:  All right.  Step right up, sir.

13      You're an Eagles fan, huh?

14                 PROSPECTIVE JUROR NO. 0945:  Yes.

15                 THE COURT:  You must be a happy man today.  You

16      can drop your mask, if you'd like.

17                 All right.  You're Mr. Battle?

18                 PROSPECTIVE JUROR NO. 0945:  That's right.

19                 THE COURT:  All right.  And I don't have an

20      occupation for you.  Are you working now, sir?

21                 PROSPECTIVE JUROR NO. 0945:  Yes.  I didn't

22      know -- they didn't ask me to put it.

23                 THE COURT:  No problem.  Where are you working?

24                 PROSPECTIVE JUROR NO. 0945:  Lowe's.

25                 THE COURT:  You work at Lowe's?
```

```
1              PROSPECTIVE JUROR NO. 0945:  Yes.

2              THE COURT:  Do you have a significant other?

3              PROSPECTIVE JUROR NO. 0945:  No.

4              THE COURT:  All right.  How long have you been

5     working at Lowe's?

6              PROSPECTIVE JUROR NO. 0945:  A year and a half.

7              THE COURT:  And you were in school before that?

8              PROSPECTIVE JUROR NO. 0945:  No.

9              THE COURT:  No.  What did you do before Lowe's?

10             PROSPECTIVE JUROR NO. 0945:  Another job.

11             THE COURT:  What job?

12             PROSPECTIVE JUROR NO. 0945:  Another Lowe's.

13             THE COURT:  Another Lowe's, okay?

14             You answered yes to Question 27.  You've --

15    someone you know has served as a witness or been a witness

16    in a trial?

17             PROSPECTIVE JUROR NO. 0945:  Yes.

18             THE COURT:  Tell me about that.

19             PROSPECTIVE JUROR NO. 0945:  Grandmother.

20             THE COURT:  Your grandmother served as a witness?

21             PROSPECTIVE JUROR NO. 0945:  Yes.

22             THE COURT:  Okay.  What kind of trial was that?

23             PROSPECTIVE JUROR NO. 0945:  All I know is she

24    just told me.  It was like a long time ago.

25             THE COURT:  So you don't know any of the details?
```

1          PROSPECTIVE JUROR NO. 0945:  I didn't ask any

2     questions.  So this is why she told me everything that would

3     happen when I get on.  That's the only reason I know about

4     that.

5          THE COURT:  Now, that's the only question you

6     answered yes to.  You understood all the questions, right?

7          PROSPECTIVE JUROR NO. 0945:  Yes, I understood

8     them.

9          THE COURT:  You understood them.

10         PROSPECTIVE JUROR NO. 0945:  I didn't have any

11    kind of --

12         THE COURT:  So when you were sitting out there and

13    I said that this was a case involving January 6th --

14         PROSPECTIVE JUROR NO. 0945:  Uh-huh.

15         THE COURT:  -- did that make any impression?  What

16    was the first thing that came to your mind?

17         PROSPECTIVE JUROR NO. 0945:  Nothing.  I mean, I

18    heard about the incident.  I just -- I don't know much about

19    it.  I just heard about it.

20         THE COURT:  You didn't watch it on TV?

21         PROSPECTIVE JUROR NO. 0945:  No.

22         THE COURT:  All right.  Counsel?

23         MS. ARCO:  Good afternoon, Mr. Battle.

24         PROSPECTIVE JUROR NO. 0945:  How are you doing?

25         MS. ARCO:  I'm good.  How are you?

```
1            PROSPECTIVE JUROR NO. 0945:  I'm all right.

2            MS. ARCO:  Are you from D.C. originally?

3            PROSPECTIVE JUROR NO. 0945:  Yes, born and raised.

4            MS. ARCO:  Born and raised.  What do you like to

5     do for a living?  What do you like to do for fun?

6            PROSPECTIVE JUROR NO. 0945:  I don't have fun.  I

7     work all the time.  Unfortunately, I don't really have that

8     much fun.

9            MS. ARCO:  Okay.  And so you know that January 6th

10    happened.

11           PROSPECTIVE JUROR NO. 0945:  Yes, I know.

12           MS. ARCO:  It was on the news.

13           PROSPECTIVE JUROR NO. 0945:  Right.

14           MS. ARCO:  Did you form any kind of opinion about

15    what happened that day?  If it was good or bad or just don't

16    know enough about it?

17           PROSPECTIVE JUROR NO. 0945:  I don't know much

18    about it, to be honest with you.

19           MS. ARCO:  Okay.  Thank you.

20           PROSPECTIVE JUROR NO. 0945:  All right.

21           MR. GARRITY:  No questions, Your Honor.

22           THE COURT:  All right, sir.  Thank you very much.

23    You can step down.

24           PROSPECTIVE JUROR NO. 0945:  Thank you.

25           THE COURT:  Go back to the big courtroom.
```

```
 1                    Any challenge?

 2                    MS. ARCO:  Not from the government.

 3                    MR. GARRITY:  No challenge, Your Honor.

 4                    THE COURT:  945 is qualified.

 5                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 0373.

 6                    THE COURT:  Good afternoon, sir.

 7                    PROSPECTIVE JUROR NO. 0373:  Good afternoon.

 8                    THE COURT:  Thank you for your patience.  Feel

 9       free to slip your mask off.

10                    PROSPECTIVE JUROR NO. 0373:  Thank you.

11                    THE COURT:  You're Mr. Jacquette?

12                    PROSPECTIVE JUROR NO. 0373:  Yes.

13                    THE COURT:  All right.  It says here you work for

14       the Department of Agriculture.  What do you do for them?

15                    PROSPECTIVE JUROR NO. 0373:  I work for the

16       Foreign Agricultural Service.  We're the international and

17       trade policy of USDA.  My specific position, we work with

18       the industry providing market development grants, promotion

19       of U.S. agriculture.

20                    THE COURT:  Great.  And how long have you been

21       doing that?

22                    PROSPECTIVE JUROR NO. 0373:  In my current job,

23       since 20 -- beginning of 2017, so six years.  But I've been

24       with the Department of Agriculture since '07.

25                    THE COURT:  And do you have a significant other?
```

```
 1                    PROSPECTIVE JUROR NO. 0373:  I am married, yes.

 2                    THE COURT:  And what does your spouse do?

 3                    PROSPECTIVE JUROR NO. 0373:  She works for a

 4     liquor and wine distribution company, Republic National.

 5                    THE COURT:  You answered yes to 3.  You know

 6     someone who lives or works on Capitol Hill?

 7                    PROSPECTIVE JUROR NO. 0373:  What was that?

 8                    I mean, yes.  I live in D.C.  I have some friends

 9     that work for Architect of the Capitol, and I know various

10     people that have had or have worked on the Hill as staff.

11                    THE COURT:  Okay.  Have you spoken to any of those

12     folks about their experiences on January 6th?

13                    PROSPECTIVE JUROR NO. 0373:  No.

14                    THE COURT:  You followed news coverage of January

15     6th?

16                    PROSPECTIVE JUROR NO. 0373:  Yes.  I saw it on the

17     news.

18                    THE COURT:  Okay.  Did you just see it at the

19     time, or have you followed it closely since?

20                    PROSPECTIVE JUROR NO. 0373:  I saw it at the time,

21     and I see it at various times as it's on the news.

22                    THE COURT:  But just as an observer?  A concerned

23     citizen?  Or have you analyzed it at all?

24                    PROSPECTIVE JUROR NO. 0373:  No, I do not -- I

25     have not analyzed it, but as a regular viewer of news and
```

1    such.

2              THE COURT:  Okay.  And you saw some of the House

3    committee hearings?

4              PROSPECTIVE JUROR NO. 0373:  The ones that were

5    live on television that were on prime time and that.

6              THE COURT:  Okay.  Did you come away with any

7    impressions of what you watched?

8              PROSPECTIVE JUROR NO. 0373:  You know, I thought

9    it was political grandstanding, of course, but nothing --

10   nothing beyond what I've thought since, you know --

11             THE COURT:  Okay.

12             PROSPECTIVE JUROR NO. 0373:  It wasn't anything

13   mind-blowing to me.

14             THE COURT:  Okay.  And you have prior jury

15   experience?

16             PROSPECTIVE JUROR NO. 0373:  Yes.  I served on --

17   as a D.C. resident, I'm called to jury service quite a bit,

18   but I have served on one jury.

19             THE COURT:  Do you remember the type of case?

20             PROSPECTIVE JUROR NO. 0373:  It was a civil

21   dispute.  A car accident in D.C. Superior Court.

22             THE COURT:  Okay.  Did you reach a verdict?

23             PROSPECTIVE JUROR NO. 0373:  We found for the

24   defendant, if I remember correctly.

25             THE COURT:  And were you the foreperson, by any

 1   chance?

 2            PROSPECTIVE JUROR NO. 0373:  I was not.

 3            THE COURT:  Okay.  Anything about that experience

 4   make you hesitate to serve on a jury again?

 5            PROSPECTIVE JUROR NO. 0373:  No.

 6            THE COURT:  Okay.  Counsel?

 7            MS. ARCO:  Good afternoon, Mr. Jacquette.

 8            PROSPECTIVE JUROR NO. 0373:  Good afternoon.

 9            MS. ARCO:  So you said you knew people who worked

10   at the Capitol including at the Architect of the Capitol.

11   Do you know if they were there on January 6th?

12            PROSPECTIVE JUROR NO. 0373:  Nobody that I know

13   was -- or at least that I'm aware of.

14            MS. ARCO:  Okay.  And you said you have followed

15   the news regarding the events that happened that day.  What

16   kind of, you know, news sources were you listening to or

17   watching?

18            PROSPECTIVE JUROR NO. 0373:  CNN, ABC, those while

19   reading the *Washington Post*.

20            MS. ARCO:  Okay.

21            PROSPECTIVE JUROR NO. 0373:  That's about it.

22            MS. ARCO:  And you said something earlier about

23   political grandstanding.  I'm sorry, I didn't entirely hear

24   that comment.  Can you explain what you meant by that?

25            PROSPECTIVE JUROR NO. 0373:  Of the congressional

1    hearings?  You know, just congresspeople that use those

2    kinds of things as their -- to get political points across

3    is what I meant by that.

4              MS. ARCO:  So you mean the hearings were political

5    grandstanding?

6              PROSPECTIVE JUROR NO. 0373:  Not the hearings, but

7    maybe some of the things spoken in them.

8              MS. ARCO:  Okay.  Did you think it was like

9    blowing it out of proportion?

10             PROSPECTIVE JUROR NO. 0373:  Not necessarily, no.

11             MS. ARCO:  Okay.  Thank you.

12             THE COURT:  Any questions?

13             MR. MONTEITH:  No questions.

14             THE COURT:  All right.  Thank you very much, sir.

15   You can step down.

16             Any challenge?

17             MS. ARCO:  No challenge from the government.

18             MR. MONTEITH:  No challenge.

19             THE COURT:  373 is qualified.

20             THE COURTROOM DEPUTY:  Your Honor, Juror No. 0577.

21             THE COURT:  Okay.  Step right up, sir.  Feel free

22   to slip your mask off, if you'd like.

23             You're Mr. O'Brien?

24             PROSPECTIVE JUROR NO. 0577:  Yes.

25             THE COURT:  All right.  It says here you are a

1    consultant with something called Coho Climate Advisors.

2    Tell us what that is.

3             PROSPECTIVE JUROR NO. 0577:  Sure.  I help

4    transition large energy to renewable energy.

5             THE COURT:  To...?

6             PROSPECTIVE JUROR NO. 0577:  Renewable energy.

7             THE COURT:  Renewable energy.  And how long have

8    you been doing that?

9             PROSPECTIVE JUROR NO. 0577:  About ten years now.

10            THE COURT:  And do you have an engineering

11   background?

12            PROSPECTIVE JUROR NO. 0577:  No.

13            THE COURT:  No.  What did you do before that?

14            PROSPECTIVE JUROR NO. 0577:  I was the director of

15   sustainability here in D.C. at the American University.

16            THE COURT:  Okay.  And do you have a significant

17   other?

18            PROSPECTIVE JUROR NO. 0577:  I do.

19            THE COURT:  What do they do?

20            PROSPECTIVE JUROR NO. 0577:  She's an accountant.

21            THE COURT:  She's a...?

22            PROSPECTIVE JUROR NO. 0577:  An accountant.

23            THE COURT:  An accountant.

24            All right.  Is she in the private sector or the

25   public sector?

```
1              PROSPECTIVE JUROR NO. 0577:  She's self-employed.

2              THE COURT:  All right.  You know someone who lives

3      or works on Capitol Hill.

4              PROSPECTIVE JUROR NO. 0577:  I don't.

5              THE COURT:  Okay.  You answered yes to No. 3.

6              PROSPECTIVE JUROR NO. 0577:  I don't -- I don't

7      think so.

8              THE COURT:  Oh, I'm sorry.  Wrong card.

9              You followed news coverage of January 6th?

10             PROSPECTIVE JUROR NO. 0577:  Sure.

11             THE COURT:  Just at the time, or have you followed

12     the events over the last two years?

13             PROSPECTIVE JUROR NO. 0577:  Certainly at the time

14     being a resident of D.C., but also the committee hearings

15     recently.

16             THE COURT:  Okay.  And how closely would you say

17     you've followed just the general events?

18             PROSPECTIVE JUROR NO. 0577:  I would say probably

19     a typical amount.

20             THE COURT:  All right.  So are you a news junky?

21     Do you analyze everything?  Or you're just a concerned

22     citizen who watches the news?

23             PROSPECTIVE JUROR NO. 0577:  I think just a normal

24     amount, yeah.

25             THE COURT:  Okay.  And how much of the hearings
```

1    did you see?

2              PROSPECTIVE JUROR NO. 0577:  I think I saw

3    snippets live of two of them.

4              THE COURT:  Did you come away with any

5    impressions?

6              PROSPECTIVE JUROR NO. 0577:  I guess my main

7    impression was that I wondered about Liz Cheney's future in

8    politics.

9              THE COURT:  35, you have prior jury experience?

10             PROSPECTIVE JUROR NO. 0577:  Yeah, once.

11             THE COURT:  Tell me about that.

12             PROSPECTIVE JUROR NO. 0577:  There was a gentleman

13   accused of getting in a fight basically in a club here in

14   D.C.  He was acquitted.

15             THE COURT:  Okay.  Were you the foreperson in that

16   jury, by any chance?

17             PROSPECTIVE JUROR NO. 0577:  No.

18             THE COURT:  Positive experience?  Negative

19   experience?

20             PROSPECTIVE JUROR NO. 0577:  I take jury duty as a

21   civic duty, and I take it very seriously.  You know, I think

22   you summed it up earlier today.  It's inconvenient, but it's

23   a very important thing to do.

24             THE COURT:  Great.  Counsel?

25             MR. GORDON:  Hi, Mr. O'Brien.

1          PROSPECTIVE JUROR NO. 0577:  Good morning, or

2     afternoon.

3          MR. GORDON:  You said that your takeaway from the

4     January 6th Committee hearings was to wonder about Liz

5     Cheney's future in politics.  Can you state what you mean by

6     that?

7          PROSPECTIVE JUROR NO. 0577:  Sure.  I mean, I

8     guess to some degree I thought it was an interesting -- I

9     was witnessing a bipartisan investigation into something

10    that was really important, to the extent to which someone

11    seemed to be willing to give up her own near-term future in

12    politics in order to investigate something that needed to be

13    investigated.

14         MR. GORDON:  Besides the sort of -- and not to

15    take anything away from that point, but with respect to the

16    evidence or revelations or arguments presented during the

17    hearings, regardless of the personalities involved, but in

18    terms of the information, what was your takeaway from that?

19         PROSPECTIVE JUROR NO. 0577:  It seemed to be

20    pretty focused on, you know, putting the spotlight on Former

21    President Donald Trump primarily.

22         MR. GORDON:  Regardless of what you may have taken

23    away from that, could you leave that aside and just consider

24    the evidence in this case as it relates to Kirstyn Niemela,

25    who I don't expect we're going to put forth any evidence to

1      suggest she had any interaction with Former President Trump?

2              Can you do that?  Can you just make this case

3      about her and not just about a former president?

4              PROSPECTIVE JUROR NO. 0577:  Absolutely.  That

5      would be my job.

6              MR. GORDON:  Thank you, Your Honor.

7              THE COURT:  Counsel, questions?

8              MR. GARRITY:  Good afternoon.

9              PROSPECTIVE JUROR NO. 0577:  Good afternoon.

10             MR. GARRITY:  You indicated that you had -- you

11     watched the news coverage on January 6th; is that right?

12             PROSPECTIVE JUROR NO. 0577:  That's right.

13             MR. GARRITY:  And you have followed the committee

14     hearings to some extent since then?

15             PROSPECTIVE JUROR NO. 0577:  Correct.

16             MR. GARRITY:  When you watched the news on January

17     6th, did you form an opinion one way or the other with

18     respect to Former President Trump's supporters?

19             PROSPECTIVE JUROR NO. 0577:  I'll be honest.  My

20     feeling at the time was kind of like witnessing a slow

21     motion train wreck.  It seemed almost unbelievable.

22             MR. GARRITY:  Would that cause you to have a

23     negative viewpoint of somebody that supports Former

24     President Trump?

25             PROSPECTIVE JUROR NO. 0577:  I mean, I would have

1      to weigh the evidence in any particular circumstance.

2                  MR. GARRITY:  I have no further questions.  Thank

3      you.

4                  THE COURT:  All right.  Sir, thank you very much.

5      You can step down.

6                  PROSPECTIVE JUROR NO. 0577:  Thank you.

7                  THE COURT:  Any challenge?

8                  MS. ARCO:  None from the government.

9                  THE COURT:  Counsel?

10                 MR. GARRITY:  I'm sorry, Your Honor, no challenge.

11                 THE COURT:  577 is qualified.

12                 THE COURTROOM DEPUTY:  Your Honor, Juror No. 0502.

13                 THE COURT:  Good afternoon, sir.

14                 PROSPECTIVE JUROR NO. 0502:  Good afternoon, Your

15     Honor.

16                 THE COURT:  Step right up.

17                 Okay.  Feel free to slip your mask off, if you'd

18     like.

19                 PROSPECTIVE JUROR NO. 0502:  Thank you.

20                 THE COURT:  You're Mr. Mitchell?

21                 PROSPECTIVE JUROR NO. 0502:  Yes, Your Honor.

22                 THE COURT:  You may not remember this, but I think

23     we've met.  I was college classmates with your brother Eric.

24                 PROSPECTIVE JUROR NO. 0502:  You're right.

25                 THE COURT:  I have a better memory than he does.

```
 1              PROSPECTIVE JUROR NO. 0502:  No, I do remember
 2     now.   Judge Boasberg's Christmas party?
 3              THE COURT:  Precisely.  Precisely.
 4              PROSPECTIVE JUROR NO. 0502:  Yes.
 5              THE COURT:  But we don't socialize with one
 6     another; is that correct?
 7              PROSPECTIVE JUROR NO. 0502:  Yes, Your Honor.
 8     Thank you for bringing that back to me.
 9              THE COURT:  All right.  And you are -- you're a
10     lawyer at Stein Mitchell; is that right?
11              PROSPECTIVE JUROR NO. 0502:  Yes.
12              THE COURT:  And tell these folks what your
13     practice is.
14              PROSPECTIVE JUROR NO. 0502:  My practice is
15     plaintiff's civil cases, mostly tort cases.  I have a trial
16     two weeks from today in Superior Court involving a
17     pedestrian hit by a car in a crosswalk.  So that's pretty
18     much what I do.
19              THE COURT:  Do you do any criminal defense work?
20              PROSPECTIVE JUROR NO. 0502:  I do not.
21              THE COURT:  Are any of your cases -- do any of
22     your cases involve the events of January 6th?
23              PROSPECTIVE JUROR NO. 0502:  None.  I should
24     mention, for whatever it's worth, that then White House
25     Counsel Pat Cipollone came from my law firm to take that
```

1    job, so he's a good friend of mine.

2         THE COURT:  Have you talked to Mr. Cipollone about

3    the events of January 6th?

4         PROSPECTIVE JUROR NO. 0502:  No, I have not.  We

5    don't really keep up, but I just thought I'd put that

6    connection out there.

7         THE COURT:  Remind me, are you married?

8         PROSPECTIVE JUROR NO. 0502:  I am.

9         THE COURT:  And what does your spouse do?

10        PROSPECTIVE JUROR NO. 0502:  She is a

11   nonpracticing lawyer.  She's a director of communications of

12   marketing at Georgetown Prep School in Rockville.

13        THE COURT:  Okay.  And so her practice is not

14   criminal or was not criminal?

15        PROSPECTIVE JUROR NO. 0502:  She's never practiced

16   law in any traditional sense.  She's always been outside of

17   that.

18        THE COURT:  All right.  You answered yes to a few

19   of my questions.

20        You've obviously followed some coverage of January

21   6th.

22        PROSPECTIVE JUROR NO. 0502:  Just seen it on the

23   news, you know, like everybody else.  You see the films that

24   they keep replaying over and over.

25        THE COURT:  Have you followed the Justice

1    Department's investigation or any particular cases closely?

2              PROSPECTIVE JUROR NO. 0502:  I have not, no.  I'm

3    aware that a couple of people have been convicted.  I'm not

4    aware of any acquittals, although maybe there have been

5    some.  I haven't followed it that closely.

6              THE COURT:  Got it.  And you say you saw at least

7    some of the House Committee hearings; is that right?

8              PROSPECTIVE JUROR NO. 0502:  Now and then it would

9    pop up on the news.  I never watched any part of those

10   proceedings for more than 30 seconds when they would show

11   highlights on the news.

12             THE COURT:  Okay.  Just based on the highlights

13   that you may have seen, have you formed any impressions?

14   Any takeaways from the hearings?

15             PROSPECTIVE JUROR NO. 0502:  I'm not a big fan of

16   it, just in general.  I just --

17             THE COURT:  Of "it" being the hearings or January

18   6th or --

19             PROSPECTIVE JUROR NO. 0502:  The hearings

20   certainly I'm not a big fan of.  I think it's mostly a waste

21   of time.

22             But January 6th, I probably don't know enough

23   about the details of how it all happened to form any

24   judgment about it.  So that's why I feel like I could be

25   open to the evidence.

```
1              THE COURT:  Got it.  And Question 35 I think is
2       prior jury service?
3              PROSPECTIVE JUROR NO. 0502:  Yes.  I was on a jury
4       in Superior Court probably 10, 12 years ago, auto accident
5       case.  I think it was a very small verdict for the
6       plaintiff.
7              THE COURT:  So the jury reached a verdict?
8              PROSPECTIVE JUROR NO. 0502:  The jury did reach a
9       verdict, yes.  I was the foreman, and it was a two-day
10      trial, maybe three days.
11             THE COURT:  You anticipated my next question.  You
12      were the foreperson?
13             PROSPECTIVE JUROR NO. 0502:  Yes.
14             THE COURT:  Anything about that experience make
15      you hesitate to serve on a jury again?
16             PROSPECTIVE JUROR NO. 0502:  None.
17             THE COURT:  All right.  Counsel?
18             MR. GORDON:  Good afternoon, Mr. Mitchell.
19             PROSPECTIVE JUROR NO. 0502:  Good afternoon.
20             MR. GORDON:  Do you only do plaintiff's side work,
21      or do you do defense side as well?
22             PROSPECTIVE JUROR NO. 0502:  Only the plaintiff's
23      side.
24             MR. GORDON:  How long have you been doing that?
25             PROSPECTIVE JUROR NO. 0502:  Since the early
```

1   1990s, so 30 years now.

2           MR. GORDON:  Can you give us a ballpark estimate

3   of the number of trials you've done?

4           PROSPECTIVE JUROR NO. 0502:  It used to be one or

5   two a year.  Since the pandemic I haven't had a trial so

6   next week or two weeks from now is the first one to finally

7   get back to it.

8           MR. GORDON:  So one to two years for -- I'm sorry,

9   how many years did you --

10          PROSPECTIVE JUROR NO. 0502:  For the better part

11  of 25 years.

12          MR. GORDON:  Okay.  So fair to say you've probably

13  done somewhere around 40ish trials?

14          PROSPECTIVE JUROR NO. 0502:  Yes, not all as first

15  chair.  In my early years I would help another partner with

16  the trial.

17          But that's about right.  Maybe on the -- slightly

18  on the high side.

19          MR. GORDON:  Tell us honestly.  I have to imagine

20  that if you were a juror it would be impossible to turn the

21  part of your brain off that is a trial lawyer at heart,

22  right?

23          PROSPECTIVE JUROR NO. 0502:  Probably.

24          MR. GORDON:  Okay.  So fair to say you'd probably

25  spend a fair amount of time trying to -- not trying to --

1    unconsciously even sort of thinking as we're presenting our

2    case:  Hmm, is that how I would do it?  Is that what I would

3    ask that witness?

4              PROSPECTIVE JUROR NO. 0502:  Especially since I

5    have a trial two weeks from today, yes.

6              MR. GORDON:  Right.  And probably even wondering

7    to yourself:  Is that the best way to present that?  Or are

8    they only presenting this because they don't have that?

9              I mean, on the plaintiff's side, you're basically

10   a civil prosecutor.  It's the same basic job, right?  You've

11   got the burden.  You have to prove your case.

12             PROSPECTIVE JUROR NO. 0502:  Yes.

13             MR. GORDON:  Okay.  Did you ask to be foreperson

14   on that jury before, or did you get picked by your peers?

15             PROSPECTIVE JUROR NO. 0502:  I was picked by my

16   peers.

17             MR. GORDON:  Do you have any idea why they picked

18   you?

19             PROSPECTIVE JUROR NO. 0502:  They knew I was a

20   practicing lawyer, and I think that -- I don't know why.

21             MR. GORDON:  Got it.  Now, you said that you think

22   that the January 6th Committee hearings are generally a

23   waste of time.  Can you expand on that a little bit?

24             PROSPECTIVE JUROR NO. 0502:  I think that the

25   make-up of the committee was slanted.  I don't think that

1    represents a fair presentation of the arguments that both

2    sides have to make about the event.  I think -- I mean, I

3    haven't seen much of it, but, you know, all those riots that

4    occurred in the summer of 2020 and then this happens on one

5    day and we're still fighting about it?  It just seems to me

6    to be a misallocation of resources.

7            MR. GORDON:  Do you know anybody who was

8    personally affected by it?

9            PROSPECTIVE JUROR NO. 0502:  Personally affected

10   by it?  No.

11           MR. GORDON:  Okay.  Thank you, Your Honor.

12           MR. MONTEITH:  Good afternoon.

13           PROSPECTIVE JUROR NO. 0502:  Good afternoon.

14           MR. MONTEITH:  Just to be brief though, Attorney

15   Gordon asked you about your civil trial in a couple of

16   weeks.

17           PROSPECTIVE JUROR NO. 0502:  Yes.

18           MR. MONTEITH:  And it's on the top of your mind,

19   and you're thinking about it, right?

20           PROSPECTIVE JUROR NO. 0502:  Yes.  I have a lot to

21   do between now and then, two video depositions in the next

22   three days.

23           MR. MONTEITH:  That aside, you know that jury

24   service is a service, right?

25           PROSPECTIVE JUROR NO. 0502:  Of course.

1          MR. MONTEITH:  And you've done it before.

2          PROSPECTIVE JUROR NO. 0502:  Yes.

3          MR. MONTEITH:  And you can do it again, right?

4          PROSPECTIVE JUROR NO. 0502:  Yes.

5          MR. MONTEITH:  And you can be fair to Ms. Niemela,

6     right?

7          PROSPECTIVE JUROR NO. 0502:  Yes.

8          MR. MONTEITH:  And you can follow the Court's

9     instructions, of course?

10          PROSPECTIVE JUROR NO. 0502:  Yes.

11          MR. MONTEITH:  All right.  Thank you.

12          THE COURT:  All right.  Mr. Mitchell, given your

13     trial, why didn't you answer the hardship question?  You

14     wouldn't have a problem if we -- if you were selected and

15     evidence took until, say, Thursday, and then the jury

16     started deliberating after that?

17          Honest question.  One way or the other?

18          PROSPECTIVE JUROR NO. 0502:  When I got the jury

19     summons, no, that was a different -- I remember submitting a

20     request for relief because I had a trial January 9th that I

21     thought was going to conflict with this term of service,

22     which started January 13th.  I never got a response to that.

23          So now we're past that trial.  That case settled.

24          As far as this case going forward, when Your Honor

25     said that we'd be done Wednesday, Thursday, I thought I

1    could handle that and still get done what I need to do.

2          THE COURT:  Okay.  I guess the next question is,

3    if you were to listen to all the evidence and conclude that

4    Ms. Niemela was guilty based on an application of the

5    instructions that I give you on one or more of the counts

6    against her, do you think you would be tempted to say,

7    "Well, she's guilty but this whole thing is a waste of

8    time?"

9          PROSPECTIVE JUROR NO. 0502:  No, I do not.

10         THE COURT:  Okay.  And the final question is,

11   obviously, as you know, one of the concerns about putting

12   lawyers on a jury, particularly trial lawyers, is that they

13   may sort of dominate the deliberations and that other jurors

14   would unduly defer to their expertise.

15         Would you -- are you the kind of guy that would

16   sit back and make sure that everybody had their fair say

17   back in the jury room, or do you think that concern would

18   apply to you?

19         PROSPECTIVE JUROR NO. 0502:  I don't think that

20   concern would apply to me.  I'm not the type to be dominant

21   in the jury room.  And I would listen to everyone's views,

22   and I'd hope they'd listen to my views.

23         THE COURT:  All right.  Fair enough.  You can step

24   down and go back to the other courtroom.

25         PROSPECTIVE JUROR NO. 0502:  Thank you, Your

```
 1    Honor.

 2                 THE COURT:  All right.

 3                 MR. GORDON:  Well, Your Honor, the government

 4    would move for cause to strike Christopher Mitchell, 0502.

 5                 While, you know, with your final question you were

 6    essentially trying to put your finger exactly on what our

 7    concerns would be and his sort of words said one thing, but

 8    I think the rest of his answers and his behavior indicate

 9    another.  I do not think that Mr. Mitchell would be one

10    juror of 12.  I think he would essentially be the jury for

11    most part.

12                 THE COURT:  Okay.  Counsel?

13                 MR. MONTEITH:  We do think he's qualified.  We

14    think he answered every question appropriately.  He said he

15    could be a fair juror.  He's going to follow the Court's

16    instruction.  He says he's not going to dominate a jury.  In

17    fact, he's sat on a jury before.  And he also said his work

18    issues wouldn't be a problem based upon the schedule of this

19    case.

20                 We think he's imminently qualified to be on this

21    jury.

22                 THE COURT:  Okay.  I'll overrule the government's

23    objection to 502, so he is qualified.

24                 THE COURTROOM DEPUTY:  Your Honor, Juror No. 2159.

25                 THE COURT:  Okay.  Ma'am, step right up.
```

```
 1                  PROSPECTIVE JUROR NO. 2159:  Thank you.

 2                  THE COURT:  Feel free to slip your mask off.

 3                  All right.  You're Ms. Ertman?

 4                  PROSPECTIVE JUROR NO. 2159:  Yes.

 5                  THE COURT:  And you're a law professor at

 6      University of Maryland; is that right?

 7                  PROSPECTIVE JUROR NO. 2159:  Yes.

 8                  THE COURT:  What do you teach?

 9                  PROSPECTIVE JUROR NO. 2159:  Contracts.

10                  THE COURT:  If you could move just a little bit --

11                  PROSPECTIVE JUROR NO. 2159:  Contracts.

12                  THE COURT:  -- closer so the court reporter can

13      pick you up.

14                  PROSPECTIVE JUROR NO. 2159:  Contracts, contract

15      drafting.

16                  THE COURT:  Okay.  Have you ever taught criminal

17      law?

18                  PROSPECTIVE JUROR NO. 2159:  No.

19                  THE COURT:  Okay.  And how long have you been a

20      professor?

21                  PROSPECTIVE JUROR NO. 2159:  About 30 years.

22                  THE COURT:  And do you have a significant other?

23                  PROSPECTIVE JUROR NO. 2159:  Yes.

24                  THE COURT:  And what does he or she do?

25                  PROSPECTIVE JUROR NO. 2159:  She is also a lawyer,
```

1    and she is a consultant who works on access to justice

2    issues.

3             THE COURT:  Okay.  And has she practiced law

4    recently?

5             PROSPECTIVE JUROR NO. 2159:  No.  She was an

6    appointee in the Obama administration and had access to the

7    justice office at the Justice Department.

8             THE COURT:  Okay.

9             All right.  You answered yes to a couple of my

10   questions.  You have followed news coverage of January 6th

11   obviously.

12            PROSPECTIVE JUROR NO. 2159:  Yes, sir.

13            THE COURT:  And just at the time, or have you

14   covered -- have you followed since then?

15            PROSPECTIVE JUROR NO. 2159:  I have followed it

16   since then.  Not obsessively, but in the daily newspaper.

17            THE COURT:  Okay.  Have you followed any

18   particular cases or the Department of Justice's

19   investigation, or just more casually than that?

20            PROSPECTIVE JUROR NO. 2159:  More casually.  Just

21   as a citizen.

22            THE COURT:  Okay.  And you've seen some of the

23   House Committee hearings; is that right?

24            PROSPECTIVE JUROR NO. 2159:  Yes, some of them.

25   Again, not all of them.

```
1              THE COURT:  Have you formed any impressions based
2       on what you've seen of them?
3              PROSPECTIVE JUROR NO. 2159:  Well, I'm a law
4       professor so I'm heartened that the rule of law is getting
5       the attention that it deserves in this proceeding and in
6       those proceedings.
7              THE COURT:  Okay.  And what do you perceive to be
8       the rule of law in that -- in this context?
9              PROSPECTIVE JUROR NO. 2159:  Oh, that's a big
10      question.
11             THE COURT:  In 20 words or less.
12             PROSPECTIVE JUROR NO. 2159:  I'm a law professor.
13             THE COURT:  I know.
14             PROSPECTIVE JUROR NO. 2159:  Proceedings that
15      follow procedures established by government regulation, I
16      guess.
17             THE COURT:  Okay.
18             All right.  You know some --
19             PROSPECTIVE JUROR NO. 2159:  As opposed to bare
20      knuckle politics, I guess.  It's more easy to say what it is
21      as opposed to what it's not.
22             THE COURT:  Got it.
23             You or someone close to you has been the victim of
24      or witness to a crime?
25             PROSPECTIVE JUROR NO. 2159:  Yes.  In February of
```

1    2018 at our house on a Saturday night somebody slashed our

2    tires and threw Molotov cocktails and spilled gasoline on

3    the street in front of our house.

4              THE COURT:  Okay.  That was random or targeted?

5    You don't know.

6              PROSPECTIVE JUROR NO. 2159:  We never figured it

7    out.

8              THE COURT:  Okay.  So that was my next question.

9    Was it solved?

10             PROSPECTIVE JUROR NO. 2159:  Nope, nope.

11             THE COURT:  Do you have any complaints about the

12   way that it was handled by the police or the U.S. Attorney's

13   Office?

14             PROSPECTIVE JUROR NO. 2159:  No, sir.  They came

15   right away.  They were wonderful.

16             THE COURT:  Okay.  And you know folks who work in

17   the legal profession obviously.

18             PROSPECTIVE JUROR NO. 2159:  In my family.

19             THE COURT:  Anyone -- did you answer that question

20   just because of your law school colleagues and your

21   significant other, or are there other folks who work as

22   lawyers?

23             PROSPECTIVE JUROR NO. 2159:  Family members in my

24   extended family.

25             THE COURT:  Okay.  Any of them do criminal law?

1          PROSPECTIVE JUROR NO. 2159:  No.

2          THE COURT:  Okay.  One of the concerns that Courts

3    have about placing lawyers on juries -- and this would also

4    apply to law professors -- is that because of their

5    expertise they might dominate the discussions in

6    deliberations or that other jurors would unduly defer to

7    their views in deliberations based on their expertise.

8          Do you think that that would be a concern for you,

9    or would you be able to allow other jurors the room and

10   space to voice their views?

11         PROSPECTIVE JUROR NO. 2159:  Oh, based on my

12   answer about the rule of law, I'm deeply respectful of the

13   role of jurors, and I also know how little I know about

14   criminal law.

15         THE COURT:  Okay.  Counsel?

16         MS. ARCO:  Good afternoon, Professor.

17         PROSPECTIVE JUROR NO. 2159:  Hi.

18         MS. ARCO:  So you're a professor, a law professor.

19         PROSPECTIVE JUROR NO. 2159:  Uh-huh.

20         MS. ARCO:  You are accustomed to applying facts to

21   law, correct?

22         PROSPECTIVE JUROR NO. 2159:  Of course, yes.

23         MS. ARCO:  It's part of your job.

24         PROSPECTIVE JUROR NO. 2159:  Yes.

25         MS. ARCO:  To different elements of the law, and

1     you teach students to do the same thing, right?

2          PROSPECTIVE JUROR NO. 2159:  Yes.

3          MS. ARCO:  And you understand that this proceeding

4     will require you to do exactly the same thing.  The judge

5     will instruct you as to the law as to four specific crimes,

6     and then you'll see evidence here in court, and you'll have

7     to make a decision, along with your peers, as to whether the

8     government has met its burden in proving that certain facts

9     meet the elements of certain crimes.

10         PROSPECTIVE JUROR NO. 2159:  Yes.

11         MS. ARCO:  Okay.  Do you think that you'd be able

12    to do that objectively in this case?

13         PROSPECTIVE JUROR NO. 2159:  Yes.

14         MS. ARCO:  Okay.  Thank you.

15         MR. GARRITY:  Good afternoon.

16         PROSPECTIVE JUROR NO. 2159:  Hello.

17         MR. GARRITY:  You spoke, when the judge was

18    questioning you, with respect to you were heartened by

19    seeing the rule of law get the edge?

20         PROSPECTIVE JUROR NO. 2159:  Uh-huh.

21         MR. GARRITY:  And then you said -- you compared

22    that to bare knuckle politics?

23         PROSPECTIVE JUROR NO. 2159:  Uh-huh.

24         MR. GARRITY:  And would you consider the events of

25    January 6th to be kind of an extension of the bare knuckle

1    politics that you think do not -- is not -- does not hearten

2    you?

3              PROSPECTIVE JUROR NO. 2159:  Oh, part of what is

4    difficult with any large phrase like "the rule of law" is

5    you could talk about it for -- I mean, it's so abstract.

6    But it strikes me that among the things that are different

7    or outside of the rule of law -- I can't even say that.

8              It is really difficult to talk about rule of law

9    with any precision other than resolution of dispute by words

10   instead of violence.  But even that is not going to fit

11   every situation, of course.

12             MR. GARRITY:  I guess maybe I'll try to narrow it

13   down.

14             If you were to hear evidence that Ms. Niemela,

15   perhaps, went into the Capitol, would you consider that to

16   be among your view of bare knuckle politics?

17             PROSPECTIVE JUROR NO. 2159:  I would listen to the

18   evidence and the elements of the crime -- which, to tell you

19   the truth, I don't know the elements of those crimes -- and

20   I would evaluate whether the evidence matched the elements.

21             I think that "rule of law" is such an amorphous

22   idea that -- it's so much easier to talk about precise legal

23   rules and evidence and burdens of proof.

24             THE COURT:  Okay, Counsel.

25             MR. GARRITY:  Thank you very much.

```
 1                 THE COURT:  Thank you very much.  You can be
 2      excused.
 3                 Any challenge?
 4                 MS. ARCO:  None from the government.
 5                 THE COURT:  Counsel?
 6                 MR. GARRITY:  No challenge, Your Honor.
 7                 THE COURT:  2159 is qualified.
 8                 THE COURTROOM DEPUTY:  This is Juror 0046.
 9                 THE COURT:  All right.  Good afternoon.  Thank you
10      for your patience.  Please take a seat.
11                 Great.  How are you feeling this afternoon?
12                 PROSPECTIVE JUROR NO. 0046:  Doing great.
13                 THE COURT:  All right.  You're Mr. Mendel?
14                 PROSPECTIVE JUROR NO. 0046:  Yes, sir.
15                 THE COURT:  And you're a customer service rep for
16      SkyRun Vacation Rentals.  Tell us about that.
17                 PROSPECTIVE JUROR NO. 0046:  It's a property
18      management company out of Colorado, where I used to live.  I
19      just work remotely for them.
20                 THE COURT:  Okay.  How's the snow this year?
21                 PROSPECTIVE JUROR NO. 0046:  It's been great.
22                 THE COURT:  You guys are busy, huh?  My wife and
23      son just got back from Breckenridge.  They had a great time.
24                 PROSPECTIVE JUROR NO. 0046:  Okay.
25                 THE COURT:  Do you have a significant other?
```

```
 1            PROSPECTIVE JUROR NO. 0046:  My wife, yes.

 2            THE COURT:  And what does she do?

 3            PROSPECTIVE JUROR NO. 0046:  She's an artistic

 4    director of a course here in Washington, D.C.

 5            THE COURT:  Got it.  You answered yes to a few

 6    questions.

 7            You've followed coverage of January 6th?

 8            PROSPECTIVE JUROR NO. 0046:  Yes.

 9            THE COURT:  How closely?

10            PROSPECTIVE JUROR NO. 0046:  I was --

11    unfortunately I was probably glued to the TV for a few days

12    from the 6th, for maybe four or five days.

13            THE COURT:  And then since then?

14            PROSPECTIVE JUROR NO. 0046:  Nothing.  Well, I did

15    watch the -- I don't know what you call it.

16            THE COURT:  The House hearings?

17            PROSPECTIVE JUROR NO. 0046:  Yes.

18            THE COURT:  How closely did you follow those?

19            PROSPECTIVE JUROR NO. 0046:  For maybe two days.

20            THE COURT:  All right.

21            PROSPECTIVE JUROR NO. 0046:  Or two -- two of the

22    four or five sessions or whatever.

23            THE COURT:  Did you come away with any impressions

24    from those hearings?

25            PROSPECTIVE JUROR NO. 0046:  If anything, just
```

```
 1        that there was a lot of people that broke into the Capitol.
 2                 THE COURT:  Other than that?
 3                 PROSPECTIVE JUROR NO. 0046:  No.
 4                 THE COURT:  Okay.  You have prior jury experience?
 5                 PROSPECTIVE JUROR NO. 0046:  Yes, about 20 years
 6        ago in Colorado where I used to live.
 7                 THE COURT:  Do you remember anything about that
 8        case?
 9                 PROSPECTIVE JUROR NO. 0046:  Yeah.  I mean, it was
10        a four- or five-day trial.  A female professor brought a
11        discrimination lawsuit against the college that she wasn't
12        promoted because of her gender.
13                 THE COURT:  And how did the jury come out?
14                 PROSPECTIVE JUROR NO. 0046:  She lost.
15                 THE COURT:  And were you the foreperson of that
16        jury, by any chance?
17                 PROSPECTIVE JUROR NO. 0046:  I was.
18                 THE COURT:  And how were you selected?  Did you
19        volunteer, or did your peers select you?
20                 PROSPECTIVE JUROR NO. 0046:  I honestly forget
21        because it's been 20 years.
22                 THE COURT:  Okay.  Anything about that experience
23        make you hesitate to serve on a jury again?
24                 PROSPECTIVE JUROR NO. 0046:  No.
25                 THE COURT:  Counsel?
```

```
 1              MS. ARCO:  Good afternoon, Mr. Mendel.

 2              PROSPECTIVE JUROR NO. 0046:  Good afternoon.

 3              MS. ARCO:  So you said you were glued to the TV

 4     for a few days after January 6th.

 5              PROSPECTIVE JUROR NO. 0046:  Yes.

 6              MS. ARCO:  Is that based on because you were a

 7     resident of D.C. and you were concerned, or what animated

 8     the interest?

 9              PROSPECTIVE JUROR NO. 0046:  Yes.  My wife and I

10     live on Capitol Hill.  It just -- it was relatively close to

11     home.  I mean, we live a mile and a half from the Capitol.

12     I've walked by the Capitol many times with our dog, so I'm

13     just familiar with the perimeter of the Capitol.

14              It just struck me that something like that could

15     happen in my mind without prior notice.  I didn't know

16     really what was happening until I saw it on TV.

17              MS. ARCO:  Okay.  Did you suffer anything from

18     what happened that day?

19              PROSPECTIVE JUROR NO. 0046:  No.

20              MS. ARCO:  Any property damage?

21              PROSPECTIVE JUROR NO. 0046:  No.

22              MS. ARCO:  Trauma?

23              PROSPECTIVE JUROR NO. 0046:  Nothing.

24              THE COURT:  And I'm sorry, sir, you say you live

25     on Capitol Hill?
```

1      PROSPECTIVE JUROR NO. 0046:  Yes, sir.

2      THE COURT:  Okay.  How far away from the Capitol?

3      PROSPECTIVE JUROR NO. 0046:  I think about 12

4  blocks.  I live at 14th and Pennsylvania Southeast.

5      MS. ARCO:  Did you witness anything that day?

6      PROSPECTIVE JUROR NO. 0046:  No.

7      MS. ARCO:  Just from the television?

8      PROSPECTIVE JUROR NO. 0046:  Yes.

9      MS. ARCO:  Okay.  So what we're concerned about

10  here is that, you know, based on what you may have seen in

11  those couple of days that you were glued to the TV or just,

12  you know, casually reading the news since then will kind of

13  infect your ability to view the evidence impartially in this

14  case.  So the judge is going to give you instructions about

15  the four specific crimes that the defendant is charged with,

16  and you're going to sit here and listen to witnesses and

17  watch the evidence and be asked to apply those facts and see

18  if the government has met its burden.

19      Do you think you'd be able to do that impartially?

20      PROSPECTIVE JUROR NO. 0046:  Definitely.

21      MS. ARCO:  Okay.  So you don't think that those

22  couple of days that you were glued to the screen will have

23  any kind of emotional effect on your ability to view the

24  evidence and decide whether we've met our burden?

25      PROSPECTIVE JUROR NO. 0046:  Correct.  I would

 1   still be able to listen to the evidence and do it

 2   impartially.  My watching the news those couple of days and

 3   then the hearings afterwards won't affect my ability to be a

 4   juror.

 5          MS. ARCO:  Okay.  Thank you.

 6          THE COURT:  Counsel?

 7          MR. MONTEITH:  Good afternoon.

 8          PROSPECTIVE JUROR NO. 0046:  Good afternoon.

 9          MR. MONTEITH:  I just have a couple of questions

10   for you based upon your answers.

11          PROSPECTIVE JUROR NO. 0046:  Sure.

12          MR. MONTEITH:  You said -- if you could explain a

13   little bit more on you said something like that -- how could

14   something like that happen without any forenotice or

15   something like that, forewarning.

16          What do you mean?  What does that "something like

17   that" mean to you?

18          PROSPECTIVE JUROR NO. 0046:  I think what I was

19   trying to say was that the events that happened on January

20   6th had been preplanned by some people, and it grew.  I

21   mean, I think that's my opinion, that it grew during that

22   afternoon into what transpired.

23          MR. MONTEITH:  Okay.  And it's my understanding

24   you live somewhat close.  And how did it affect you though,

25   what had happened on January 6th?

```
 1              PROSPECTIVE JUROR NO. 0046:  Only -- I mean -- I
 2    was just sad that it had happened.  I was more sad after the
 3    fact that maybe five police officers had died for whatever
 4    the reason, suicide due to stress or whatever.
 5              MR. MONTEITH:  Right, okay.  Thank you.
 6              THE COURT:  All right, sir.  You can step down.
 7    Thank you very much.
 8              Sir, you can step down.
 9              PROSPECTIVE JUROR NO. 0046:  Oh, thank you.
10              THE COURT:  Okay.
11              MS. ARCO:  None from the government.
12              MR. MONTEITH:  No challenge.
13              THE COURT:  46 is qualified.
14              THE COURTROOM DEPUTY:  Your Honor, this is Juror
15    2781.
16              THE COURT:  All right, sir.  Step right up.
17              PROSPECTIVE JUROR NO. 2781:  How are you doing?
18              THE COURT:  Thanks for your patience.
19              PROSPECTIVE JUROR NO. 2781:  Uh-huh.
20              THE COURT:  You can slip your mask off, if you'd
21    like.  You are Mr. Cooper?
22              PROSPECTIVE JUROR NO. 2781:  Yes.
23              THE COURT:  No relation, right?
24              PROSPECTIVE JUROR NO. 2781:  No.
25              THE COURT:  You work for Dominion Energy, and
```

1     you're a design supervisor.  Tell us exactly what you do.

2              PROSPECTIVE JUROR NO. 2781:  I head up a design

3     team --

4              THE COURT:  And if you could move a little closer

5     to the mic so that we can hear your voice.

6              PROSPECTIVE JUROR NO. 2781:  Oh, sorry.  I

7     supervise the design team that does all the design

8     infrastructure for large commercial and also residential

9     facilities inside the Beltway in Virginia.

10             THE COURT:  Great, okay.  You answered yes to a

11    lot of my questions.  Let's start with No. 12, which says

12    Ms. Niemela is presumed innocent; therefore, she need not

13    testify or call any witnesses.

14             If she were to make that decision, would that make

15    you think she is more likely guilty?

16             You answered yes to that question.  Why did you

17    answer yes?

18             PROSPECTIVE JUROR NO. 2781:  I just feel like if

19    you're not guilty, you would want to explain yourself.

20             THE COURT:  Okay.  So the reason we ask that is

21    it's the government's burden to prove you guilty.  It's not

22    your burden to prove you're not guilty.  And if Ms. Niemela

23    watches the government's case and at the end of the day she

24    doesn't think they proved their case, she doesn't have to

25    say anything.

1          And the question is, would you still hold that

2     against her?

3          PROSPECTIVE JUROR NO. 2781:  Probably not.

4          THE COURT:  You say "probably."  How sure are you?

5          PROSPECTIVE JUROR NO. 2781:  I think other

6     questions is what I'm thinking of right now, some of the

7     later ones.

8          THE COURT:  All right.  Well, let's go to one of

9     the later ones.

10          You think that there's something about -- because

11    this case is about January 6th, that would make it hard for

12    you to be fair and impartial.  Tell us about that.

13          PROSPECTIVE JUROR NO. 2781:  Yeah, a good friend

14    of mine is a Capitol Police, and, you know, I don't know

15    the -- I don't know anything about this case, but I just

16    feel like anybody who made that walk from the White House

17    down to the Capitol building to do that was, you know -- in

18    my opinion, it was an act of terrorism, and, you know,

19    anybody who was affiliated with that and supported that is

20    just -- they should face penalties.

21          THE COURT:  All right.  Thank you very much.  You

22    can step down.

23          All right.  I assume there's a defense challenge.

24          MR. GARRITY:  Yes, there is, Your Honor.

25          THE COURT:  Okay.  The Court will strike 2743.

```
 1                    I'm sorry, the Court will strike 2781.  The next

 2       juror is 2531.  Thank you.

 3                    THE COURTROOM DEPUTY:  Your Honor, this is Juror

 4       2531.

 5                    THE COURT:  Good afternoon, ma'am.  How are you?

 6                    PROSPECTIVE JUROR NO. 2531:  I'm good.  How are

 7       you?

 8                    THE COURT:  Please, you can slip your mask off and

 9       speak up into the microphone so we can all hear you.

10                    You're Ms. Wight?

11                    PROSPECTIVE JUROR NO. 2531:  Yes.

12                    THE COURT:  And you work in public relations for

13       JPA Health?

14                    PROSPECTIVE JUROR NO. 2531:  Yes.

15                    THE COURT:  What is JPA Health?

16                    PROSPECTIVE JUROR NO. 2531:  A healthcare public

17       relations firm.  They do marketing and advocacy.

18                    THE COURT:  And do you have a significant other?

19                    PROSPECTIVE JUROR NO. 2531:  Yes.

20                    THE COURT:  And what do they do?

21                    PROSPECTIVE JUROR NO. 2531:  I have a husband who

22       works in public affairs for T-Mobile.

23                    THE COURT:  So is he a lobbyist with T-Mobile?

24                    PROSPECTIVE JUROR NO. 2531:  No, but he does work

25       with lobbyists.
```

```
1              THE COURT:  Does he have any contacts with folks
2    on the Hill?  Does he lobby on the Hill?
3              PROSPECTIVE JUROR NO. 2531:  No.  He interned on
4    the Hill.
5              THE COURT:  Who did he intern for?
6              PROSPECTIVE JUROR NO. 2531:  A Democratic
7    congressman.
8              THE COURT:  Do you remember who?
9              PROSPECTIVE JUROR NO. 2531:  I'm forgetting his
10   name.  He was in Florida, from Florida.
11             THE COURT:  And was he interning on January 6th,
12   by any chance?
13             PROSPECTIVE JUROR NO. 2531:  No.
14             THE COURT:  Before that?
15             PROSPECTIVE JUROR NO. 2531:  Years ago.
16             THE COURT:  Okay.
17             All right.  You answered yes to a few questions.
18   You live close to the Capitol.
19             PROSPECTIVE JUROR NO. 2531:  Yes.  I live on H
20   Street Northeast, so it's like walkable.
21             THE COURT:  So walkable.  Were you at home on
22   January 6th?
23             PROSPECTIVE JUROR NO. 2531:  No.  We were actually
24   in Florida.
25             THE COURT:  Did you experience any property damage
```

1    or were you affected in any way directly by the events?

2              PROSPECTIVE JUROR NO. 2531:  No.

3              THE COURT:  All right.  You said that there might

4    be something about the nature of the charges related to

5    January 6th that might make it hard for you to be fair and

6    impartial.  Why did you answer yes to that?

7              PROSPECTIVE JUROR NO. 2531:  Just like my personal

8    opinion about what happened.

9              THE COURT:  Okay.  So obviously lots of people

10   came to Washington that day for different reasons and did

11   different things and were motivated in different ways.

12   Right?

13             Ms. Niemela is on trial just based on what she did

14   or did not do that day.  Would you be able to fairly

15   consider the evidence against her or evidence for her and

16   apply my instructions no matter what you think about the

17   events more generally?  And I want an honest answer to that.

18             PROSPECTIVE JUROR NO. 2531:  I mean, I think I'm a

19   fair person, and -- but I also just have opinions about what

20   happened generally.

21             THE COURT:  Okay.

22             PROSPECTIVE JUROR NO. 2531:  Does that answer --

23             THE COURT:  Everyone -- almost everyone has an

24   opinion about January 6th.

25             PROSPECTIVE JUROR NO. 2531:  Right.

```
 1                THE COURT:  Some people have very strong opinions,

 2        and that doesn't get you off of a jury.

 3                The question is, can you set aside those opinions

 4        and assess the evidence that's presented and apply it fairly

 5        to this young lady and give her a straight-up fair trial?

 6                PROSPECTIVE JUROR NO. 2531:  Yes, uh-huh.

 7                THE COURT:  You think you can?

 8                PROSPECTIVE JUROR NO. 2531:  Yeah.

 9                THE COURT:  Okay.  And you have -- you've followed

10        the coverage of January 6th generally.

11                PROSPECTIVE JUROR NO. 2531:  Yes, but not the

12        trials.

13                THE COURT:  Okay.  And how closely have you

14        followed the coverage since it happened two years ago?

15                PROSPECTIVE JUROR NO. 2531:  Not closely, but I

16        did watch a documentary recently on I think -- actually, I

17        don't think it was Netflix, but it was like a journalist

18        that followed a lot of rallies that culminated with January

19        6th.

20                THE COURT:  So you saw a lot of video footage in

21        that documentary?

22                PROSPECTIVE JUROR NO. 2531:  Uh-huh.

23                THE COURT:  So there's likely to be video footage

24        in this case.  There's likely to be testimony about where

25        Ms. Niemela may have gone and what she may have done on
```

1    January 6th, either outside of the Capitol or inside of the

2    Capitol.  None of that other video footage will be evidence

3    in this case.

4            Do you think you could set aside what you've seen

5    in that documentary and focus only on the video evidence

6    that's introduced at trial?

7            PROSPECTIVE JUROR NO. 2531:  Yeah, I would try my

8    best.

9            THE COURT:  Okay.  And how confident are you that

10   you would be able to?

11           PROSPECTIVE JUROR NO. 2531:  Confident.

12           THE COURT:  You answered yes to questions about

13   folks who believe that the 2020 election was stolen,

14   corrupt, or fraudulent, and folks who may ascribe to some

15   views associated with QAnon.  You said both those things

16   might make it hard for you to be fair and impartial.

17           Tell us more about that.

18           PROSPECTIVE JUROR NO. 2531:  I just think there's

19   like a lot of misinformation that was out there that leads

20   people to believe in things like QAnon.

21           THE COURT:  And the same answer for folks who

22   think the election might have been stolen?

23           PROSPECTIVE JUROR NO. 2531:  (No verbal response)

24           THE COURT:  So this trial is not about

25   relitigating the election.  It's not about whether QAnon

1    beliefs or theories are accurate or not.  It's simply what

2    Ms. Niemela did or did not do that day and why.

3              Do you think you could still give her a fair trial

4    even if you knew that she might subscribe to some QAnon

5    philosophies or believe that the election was stolen?

6              PROSPECTIVE JUROR NO. 2531:  Yes.

7              THE COURT:  Okay.  And you know someone who has

8    worked in law enforcement?

9              PROSPECTIVE JUROR NO. 2531:  Yes, I have a

10   friend -- a good friend.  My college roommate was a

11   prosecutor in Maryland.

12             THE COURT:  And are you -- do you remain close to

13   your roommate?

14             PROSPECTIVE JUROR NO. 2531:  We're friends, but I

15   don't see her all the time.

16             THE COURT:  Have you ever talked to her about

17   January 6th?

18             PROSPECTIVE JUROR NO. 2531:  No.

19             THE COURT:  Have you ever talked to her about

20   criminal justice issues generally?

21             PROSPECTIVE JUROR NO. 2531:  Not really, no.

22             THE COURT:  Okay.  Counsel?

23             MS. ARCO:  Nothing from the government.

24             MR. GARRITY:  No questions, Your Honor.

25             THE COURT:  All right.  Thank you very much.  You

1        can step down.

2                    PROSPECTIVE JUROR NO. 2531:  Thank you.

3                    MS. ARCO:  No challenge from the government.

4                    THE COURT:  All right.

5                    MR. GARRITY:  No challenge, Judge.

6                    THE COURT:  2531 is qualified.

7                    THE COURTROOM DEPUTY:  Your Honor, Juror No. 1084.

8                    THE COURT:  All right.  You're Mr. Phillips?

9                    PROSPECTIVE JUROR NO. 1084:  Yes.

10                    THE COURT:  All right.  You can slip your mask

11        off, if you'd like.  Thank you for your service.

12                    Okay.  And it says here you're an IT engineer with

13        something called Evolver.  Tell us what Evolver is.

14                    PROSPECTIVE JUROR NO. 1084:  Evolver is a

15        contracting company.  IT do -- you know, they do contracts.

16                    THE COURT:  Okay.  And so do you -- are you

17        working on a contract right now?

18                    PROSPECTIVE JUROR NO. 1084:  Yes.

19                    THE COURT:  With what company?

20                    PROSPECTIVE JUROR NO. 1084:  USDA.

21                    THE COURT:  USDA.  And how long have you been on

22        that contract?

23                    PROSPECTIVE JUROR NO. 1084:  Since August 1st.

24                    THE COURT:  And what contract were you on before

25        that?

```
1                   PROSPECTIVE JUROR NO. 1084:  I was with a
2         different company.  I just started with Evolver August 1st.
3                   THE COURT:  Same kind of company though?
4                   PROSPECTIVE JUROR NO. 1084:  Yes.  It was ASRC
5         Federal.
6                   THE COURT:  They're an IT contractor?
7                   PROSPECTIVE JUROR NO. 1084:  They're not a
8         contractor.  They were -- I mean, I was -- I did IT for
9         them.
10                  But they weren't a contractor.  I wasn't a
11        contract --
12                  THE COURT:  And what kind of company was it?
13                  PROSPECTIVE JUROR NO. 1084:  A company based out
14        of Alaska.
15                  I don't know.  I forgot the acronyms, but it
16        was -- ASRC Federal is the name of the company.
17                  THE COURT:  All right.  And did that company
18        interact with the federal government in some way?
19                  PROSPECTIVE JUROR NO. 1084:  Yeah, they do.  They
20        give out contracts, but I wasn't a contractor for them.
21                  THE COURT:  Okay.
22                  PROSPECTIVE JUROR NO. 1084:  I worked directly
23        with that company.
24                  THE COURT:  I see.
25                  PROSPECTIVE JUROR NO. 1084:  I wasn't a
```

```
1    contractor.

2              THE COURT:  So your background is IT?

3              PROSPECTIVE JUROR NO. 1084:  Yes.

4              THE COURT:  All right.  You answered yes to a

5    number of questions.

6              You answered yes to 40, which is the extreme

7    hardship question.  Why did you answer yes to that?

8              PROSPECTIVE JUROR NO. 1084:  Which one?

9              THE COURT:  The one where I asked would it be an

10   extreme hardship for you to serve on the jury.

11             PROSPECTIVE JUROR NO. 1084:  Oh, that was for --

12   you asked if any dates, right?  I believe or something?

13             THE COURT:  Right.

14             PROSPECTIVE JUROR NO. 1084:  Thursday.  Thursday I

15   have a funeral to go to.

16             THE COURT:  What do you have Thursday?

17             PROSPECTIVE JUROR NO. 1084:  A funeral.

18             THE COURT:  Okay.

19             PROSPECTIVE JUROR NO. 1084:  My cousin.

20             THE COURT:  And what time is the funeral?

21             PROSPECTIVE JUROR NO. 1084:  9:00 a.m.

22             THE COURT:  What time will it be over?

23             PROSPECTIVE JUROR NO. 1084:  I have no clue.  It's

24   normally 9:00 until -- you know, after service, you know,

25   they go to the burial.  I don't know, that could take --
```

```
1           THE COURT:  And you want to go to that funeral?
2           PROSPECTIVE JUROR NO. 1084:  Of course.
3           THE COURT:  You can step down.
4           All right.  The Court will strike 1084 for
5    hardship.
6           Good afternoon, ma'am.
7           PROSPECTIVE JUROR NO. 0409:  Good afternoon.
8           THE COURT:  Please feel free to slip your mask
9    off, if you'd like.  You are Ms. Byrd-Richmond?
10          PROSPECTIVE JUROR NO. 0409:  That's correct.
11          THE COURT:  And I see here that you are an office
12   administrator for something called Telecom Development Corp.
13          PROSPECTIVE JUROR NO. 0409:  That's correct.
14          THE COURT:  Tell us what that company is.
15          PROSPECTIVE JUROR NO. 0409:  It's an IT service
16   company.
17          THE COURT:  Okay.  And does it contract with the
18   federal government at all?
19          PROSPECTIVE JUROR NO. 0409:  With D.C. government
20   mostly; some quasi federal government work like D.C. Water,
21   dealing with the Metro system and airports.
22          THE COURT:  Okay.  Do you have a significant
23   other, ma'am?
24          PROSPECTIVE JUROR NO. 0409:  Yes, Roger Richmond.
25          THE COURT:  And what do they do?
```

```
1              PROSPECTIVE JUROR NO. 0409:  He's the owner of the
2    company.
3              THE COURT:  Oh.
4              All right.  You answered yes to a couple of
5    questions.
6              You saw coverage of January 6th at the time.
7              PROSPECTIVE JUROR NO. 0409:  Yes.
8              THE COURT:  And have you followed it closely
9    since?
10             PROSPECTIVE JUROR NO. 0409:  Yes.
11             THE COURT:  Tell us.  What types of coverage have
12   you followed?
13             PROSPECTIVE JUROR NO. 0409:  So I followed the
14   hearings leading up -- watching the videos from the hearings
15   that were talking about it.  I watched it on the news, a lot
16   of it on CNN.
17             THE COURT:  Any impressions from the hearings that
18   you watched?
19             PROSPECTIVE JUROR NO. 0409:  Yes.  I feel that
20   everybody who was there is guilty.  They were trespassing.
21   They were rioters, and I feel that they shouldn't have been
22   there, and I think that they meant to do harm.
23             THE COURT:  Okay.  So I asked Question 16 about
24   whether there was anything about the nature of the charges
25   that would make you feel that you might not be able to be
```

1    fair, and you didn't answer yes to that.  So I guess my

2    follow-up is, given your views, do you think you can still

3    be fair, or no?

4              PROSPECTIVE JUROR NO. 0409:  No.

5              THE COURT:  Or would it be hard?  It would be

6    hard?

7              PROSPECTIVE JUROR NO. 0409:  It would -- yeah.

8              THE COURT:  All right.  I appreciate your honesty.

9    You can step down.

10             PROSPECTIVE JUROR NO. 0409:  Thank you.

11             THE COURT:  All right.  The Court will strike 409.

12             What are we at, Counsel?

13             MR. GORDON:  I believe we're at 25, Your Honor.

14             THE COURT:  Okay.

15             THE COURTROOM DEPUTY:  Your Honor, Juror No. 2784.

16             THE COURT:  Good afternoon, sir.

17             PROSPECTIVE JUROR NO. 2784:  Good afternoon, Your

18   Honor.

19             THE COURT:  Good to meet you.  You can slip your

20   mask off, if you'd like.

21             PROSPECTIVE JUROR NO. 2784:  Sure.

22             THE COURT:  So you're 2784.

23             PROSPECTIVE JUROR NO. 2784:  Yes, Your Honor.

24             THE COURT:  Mr. Tarosky; is that right?

25             PROSPECTIVE JUROR NO. 2784:  That's correct.

```
 1                    THE COURT:  Okay.  And you're a student; is that

 2        right?

 3                    PROSPECTIVE JUROR NO. 2784:  Yes, Your Honor.

 4                    THE COURT:  What are you studying?

 5                    PROSPECTIVE JUROR NO. 2784:  Law.

 6                    THE COURT:  Where about?

 7                    PROSPECTIVE JUROR NO. 2784:  Georgetown.  I'm in

 8        the third year.

 9                    THE COURT:  Third year.  Heavy class load, or not

10        so much?

11                    PROSPECTIVE JUROR NO. 2784:  Heavier than I'd like

12        at times, but not too bad.

13                    THE COURT:  Are you in the day program or the

14        night program?

15                    PROSPECTIVE JUROR NO. 2784:  The day program, Your

16        Honor.

17                    THE COURT:  So you did not answer the hardship

18        program.  You think you could sit on this jury consistent

19        with your class schedule?

20                    PROSPECTIVE JUROR NO. 2784:  Yes, Your Honor.

21                    THE COURT:  Okay.  Do you have a significant

22        other?

23                    PROSPECTIVE JUROR NO. 2784:  Yes, Your Honor.

24                    THE COURT:  And what do they do?

25                    PROSPECTIVE JUROR NO. 2784:  She works in public
```

 1    health consulting for a private boutique firm in Tacoma.

 2                THE COURT:  Tacoma Park or --

 3                PROSPECTIVE JUROR NO. 2784:  Tacoma Park.

 4                THE COURT:  You followed some coverage of January

 5    6th; is that right?

 6                PROSPECTIVE JUROR NO. 2784:  Yes, Your Honor.

 7                THE COURT:  At the time, or have you covered it --

 8    or followed it since?

 9                PROSPECTIVE JUROR NO. 2784:  At the time, and then

10    afterwards I would say just incidentally, like anybody else

11    who watches the news has.

12                THE COURT:  Okay.  And is that the -- the same is

13    true for the House hearings, or have you followed those more

14    closely?

15                PROSPECTIVE JUROR NO. 2784:  I would say I

16    actually haven't followed them more closely.

17                THE COURT:  Okay.  But you've just seen them on

18    TV?

19                PROSPECTIVE JUROR NO. 2784:  Yes.  I know they

20    happened.

21                THE COURT:  Okay.  And you know folks who work in

22    the legal field.  That's you.  Any other family members,

23    lawyers?

24                PROSPECTIVE JUROR NO. 2784:  My brother is an

25    attorney.

1          THE COURT:  Okay.  Does he practice criminal law

2     by any chance?

3          PROSPECTIVE JUROR NO. 2784:  No, he does not.

4          THE COURT:  All right.  Counsel?

5          Well, let me ask this question to sort of truncate

6     things perhaps.

7          You're a law student.  You've had criminal law

8     obviously.  You know one of the concerns about putting

9     lawyers on juries is that they might not -- they might

10    second guess either the presentation of counsel or the

11    Court's instructions and might be -- might dominate the

12    deliberations back in the jury room, and that jurors might

13    unduly defer to their expertise.

14         Should we be concerned with you, if you were to be

15    on this jury, in that regard?

16         PROSPECTIVE JUROR NO. 2784:  I don't think so,

17    Your Honor.  I understand the concern, but I also think in

18    terms of a neutral approach to the rights of the defendant

19    and the state in this case I would be able to act

20    impartially and not unduly influence fellow jurors just by

21    virtue of the fact that I'm a law student.

22         THE COURT:  Okay.  Now, what did you do before you

23    went to law school?

24         PROSPECTIVE JUROR NO. 2784:  Most recently I

25    worked for a research and advisory firm in Arlington,

1    Virginia.

2              THE COURT:  In particular subject areas?

3              PROSPECTIVE JUROR NO. 2784:  We covered a wide

4    range of things, but nothing related to the law or criminal

5    law specifically.

6              THE COURT:  Okay.  Public policy or sort of

7    corporate-type business issues, or generally speaking?

8              PROSPECTIVE JUROR NO. 2784:  Generally speaking,

9    we advised C suite executives at large corporations about

10   business best practices.

11             THE COURT:  Got it, okay.

12             Mr. Gordon.

13             MR. GORDON:  Your Honor, you were on a roll.  I

14   thought you were going to ask all of my questions so I went

15   and sat back down.

16             Mr. Tarosky, just a couple more to follow up.

17   First, do you have somewhere you're going after this, or did

18   you wear a suit for jury duty?

19             PROSPECTIVE JUROR NO. 2784:  Yes.  I should

20   note -- I didn't indicate this on my form for the catch-all

21   question because the question was phrased if I thought it

22   would impair my ability to be fair and impartial, which I

23   don't believe that it does.  However, I would declare, for

24   the record, that I am interning with another judge on this

25   court this semester.  Today was supposed to be my second day

1    in chambers, but I'm here instead.

2              MR. GORDON:  Which judge is that?

3              PROSPECTIVE JUROR NO. 2784:  Randolph Moss.

4              MR. GORDON:  And what kinds of things are you

5    expecting to do in your internship for Judge Moss?

6              PROSPECTIVE JUROR NO. 2784:  I anticipate I'll be

7    working most directly with his law clerks on a variety of

8    tasks from cite-checking opinions to hopefully getting to do

9    some substantive research on matters that are before him.

10             MR. GORDON:  In the course of interviewing for the

11   job -- or sort of the first day of training, I guess, is all

12   you've got so far -- has there been any discussion of the

13   January 6th cases that are pending in the courthouse and

14   specifically with Judge Moss?

15             PROSPECTIVE JUROR NO. 2784:  Yes.  It came up as a

16   topic during my interviews.

17             MR. GORDON:  And how did it come up during your

18   interviews?

19             PROSPECTIVE JUROR NO. 2784:  I believe in response

20   to a question I had asked the clerks just about the nature

21   of cases that they anticipated having in front of Judge Moss

22   this term, and they had said that, you know, this being the

23   district court for D.C. there were a large number of cases

24   related to the January 6th incident before Judge Moss.

25             MR. GORDON:  Okay.  And what did you say in

1    response to that, if anything?

2           PROSPECTIVE JUROR NO. 2784:  Sorry, what was the

3    question?

4           MR. GORDON:  What did you say in response to that,

5    if anything?

6           PROSPECTIVE JUROR NO. 2784:  Sure.  I said, I

7    believe, you know, I'm interested in January 6th as an

8    American citizen and obviously as a student of the law.  I

9    specifically also commented on -- I had read an article that

10   dealt with Judge Moss's sentencing of I think one of the

11   first January 6th defendants in preparation for my interview

12   where he imposed a sentence kind of in the middle ground,

13   and I think it was lesser than what the government was

14   actually asking for.

15          I specifically brought that up as a good example,

16   I thought, of judicial neutrality and the judge, you know,

17   acting as a dispassionate third party in making that

18   determination.

19          MR. GORDON:  Okay.  Thank you.

20          MR. GARRITY:  Good afternoon.

21          PROSPECTIVE JUROR NO. 2784:  Good afternoon.

22          MR. GARRITY:  I know you've said you're starting

23   an internship; is that right?

24          PROSPECTIVE JUROR NO. 2784:  Yes, sir.

25          MR. GARRITY:  Is that internship going to extend

1    beyond law school, or is it just for the remaining semester

2    of law school?

3              PROSPECTIVE JUROR NO. 2784:  It is just through

4    this last semester of law school.

5              MR. GARRITY:  And when you graduate from law

6    school, do you intend to get into criminal defense or

7    prosecution or civil work?

8              PROSPECTIVE JUROR NO. 2784:  I'm going to be

9    working for a large law firm here in D.C. in their

10   commercial litigation practice area.

11             MR. GARRITY:  And at Georgetown, did you do any

12   sort of clinical programs that dealt with criminal defense

13   or prosecution?

14             PROSPECTIVE JUROR NO. 2784:  I was in the clinic

15   last semester as a student attorney, but that was a civil

16   clinic dealing with housing advocacy.

17             The summer between my first and second year of law

18   school I did intern with the U.S. Attorney's Office for the

19   District.

20             MR. GARRITY:  The District?

21             PROSPECTIVE JUROR NO. 2784:  The District of

22   Columbia.

23             MR. GARRITY:  And did you have any interaction

24   with these particular U.S. Attorneys?

25             PROSPECTIVE JUROR NO. 2784:  No, I do not know

1     them.

2              MR. GARRITY:  And that internship with the U.S.

3     Attorney's Office, did that impact your view one way or the

4     other of criminal defense or criminal defendants?

5              PROSPECTIVE JUROR NO. 2784:  I would say it

6     deepened my education about the way the system functions and

7     the way parties in the system -- the roles they play and the

8     way they interact with each other.

9              I would not say that it in any way biased me for

10    or against the government or the defense as the case may be.

11             MR. GARRITY:  Thank you.

12             THE COURT:  Okay.  So just to be clear, when were

13    you an intern in the U.S. Attorney's Office?

14             PROSPECTIVE JUROR NO. 2784:  It was the summer of

15    2021, Your Honor.

16             THE COURT:  Okay.  And did you apply for a

17    permanent position, or do you plan to apply for a permanent

18    position at any point in the immediate future?

19             PROSPECTIVE JUROR NO. 2784:  No, Your Honor.  I'm

20    going to private practice.

21             THE COURT:  If you were a juror on this case,

22    would -- and if you had to decide the defendant's guilt,

23    would what Judge Moss or Judge Moss's law clerks thought of

24    that verdict influence you in any way?  Or the perception of

25    your verdict either by him or anybody else for that matter,

```
1     would that affect your ability to be fair?

2               PROSPECTIVE JUROR NO. 2784:  No, Your Honor.

3               THE COURT:  Are you sure about that?

4               PROSPECTIVE JUROR NO. 2784:  Yes, Your Honor, I

5     am.

6               THE COURT:  Okay.  Thanks.  You can step down.

7               PROSPECTIVE JUROR NO. 2784:  Thank you.

8               THE COURT:  All right.  Any challenge?

9               MS. ARCO:  Not from the government.

10              MR. GARRITY:  Not from the defense either, Your

11    Honor.

12              THE COURT:  Okay.  2784 is qualified.

13              THE COURTROOM DEPUTY:  Your Honor, Juror No. 0222.

14              THE COURT:  All right.  Good afternoon, ma'am.

15    You're Ms. Chomer; is that correct?

16              PROSPECTIVE JUROR NO. 0222:  Yes.

17              THE COURT:  Please have a seat and try not to

18    scrape the mic.  And feel free to slip your mask offer.

19              PROSPECTIVE JUROR NO. 0222:  Oh, thanks.

20              THE COURT:  All right.

21              Okay.  I don't have an occupation for you.  Are

22    you working now?

23              PROSPECTIVE JUROR NO. 0222:  I'm a freelance

24    contractor.

25              THE COURT:  In what area?  What field?
```

1      PROSPECTIVE JUROR NO. 0222:  I do marketing and

2   communications.  I work for the Consumer Financial

3   Protection Bureau.

4      THE COURT:  Okay.  You answered yes to a number of

5   questions, including 40, which is the extreme hardship

6   question.  Why did you answer yes to that?

7      PROSPECTIVE JUROR NO. 0222:  Because I'm an hourly

8   employee or an hourly contractor, so going for a full week

9   without work would be significant for my income.

10      THE COURT:  Okay.  So as I said, jury service is

11   inconvenient for a lot of people.  A lot of self-employed

12   folks are also in the pool.  Is there any other reason why

13   it would be an extreme hardship?

14      PROSPECTIVE JUROR NO. 0222:  No, sir.

15      THE COURT:  Okay.  Do you have a significant

16   other?

17      PROSPECTIVE JUROR NO. 0222:  I do.

18      THE COURT:  And what does he or she do?

19      PROSPECTIVE JUROR NO. 0222:  He's a lobbyist.

20      THE COURT:  Okay.  Are you married?

21      PROSPECTIVE JUROR NO. 0222:  Yes.

22      THE COURT:  All right.  Is he on his own as well,

23   or does he work for a firm?

24      PROSPECTIVE JUROR NO. 0222:  No, he works for an

25   association.

```
 1                    THE COURT:  Okay.  And does he lobby directly on

 2       the Hill?

 3                    PROSPECTIVE JUROR NO. 0222:  He does.

 4                    THE COURT:  And does he have relationships with

 5       folks -- with members and staff members?

 6                    PROSPECTIVE JUROR NO. 0222:  He does.

 7                    THE COURT:  Has he spoken to you at all about

 8       anything that any of those folks have conveyed about their

 9       experiences on January 6th?

10                    PROSPECTIVE JUROR NO. 0222:  No.

11                    THE COURT:  Okay.

12                    All right.  You say you live or work or you know

13       someone who lives or works on Capitol Hill.  Is that your

14       spouse?

15                    PROSPECTIVE JUROR NO. 0222:  He does live -- I'm

16       sorry, he works close to Capitol Hill, yeah.

17                    THE COURT:  Okay.  Anyone else?

18                    PROSPECTIVE JUROR NO. 0222:  No.  I live two miles

19       from the Capitol, but in Northeast.

20                    THE COURT:  Okay.  You have followed coverage of

21       January 6th and also the House hearings; is that right?

22                    PROSPECTIVE JUROR NO. 0222:  Uh-huh.

23                    THE COURT:  How closely have you followed that

24       coverage?

25                    PROSPECTIVE JUROR NO. 0222:  I think moderately.
```

```
1    Similar to other people.  Listening to the radio.

2              THE COURT:  Okay.  Have you listened to any of the

3    hearings themselves?

4              PROSPECTIVE JUROR NO. 0222:  Early on.

5              THE COURT:  Did you come away with any

6    impressions?

7              PROSPECTIVE JUROR NO. 0222:  I mean, I think it

8    was a scary time for all of us.

9              THE COURT:  You know folks who have worked for the

10   legislative branch?

11             PROSPECTIVE JUROR NO. 0222:  Yes.

12             THE COURT:  Tell us about that.

13             PROSPECTIVE JUROR NO. 0222:  Our neighbor, our

14   next-door neighbor, works for the House Financial Services

15   Committee and was there on the 6th.

16             THE COURT:  Okay.  And have you spoken to your

17   neighbor about their experiences?

18             PROSPECTIVE JUROR NO. 0222:  Only early on.  He

19   was there to get his COVID shot, and he was --

20             THE COURT:  Getting his...?

21             PROSPECTIVE JUROR NO. 0222:  COVID shot.

22             THE COURT:  Okay.

23             PROSPECTIVE JUROR NO. 0222:  But he was safe and

24   able to get out.

25             THE COURT:  Okay.  Was he, you know, affected or
```

1    traumatized any more than anybody else who was up there, to

2    your knowledge?

3            PROSPECTIVE JUROR NO. 0222:  Not to my knowledge.

4            THE COURT:  Okay.  And you have prior jury

5    experience?

6            PROSPECTIVE JUROR NO. 0222:  Yes, just for a civil

7    case.

8            THE COURT:  Was that in D.C.?

9            PROSPECTIVE JUROR NO. 0222:  No.  It was in

10   Oakland, California.

11           THE COURT:  And did the jury reach a verdict in

12   that case?

13           PROSPECTIVE JUROR NO. 0222:  Yes, I believe so.

14           THE COURT:  Do you remember what the case was

15   about?

16           PROSPECTIVE JUROR NO. 0222:  It was a car

17   accident.  A woman who had -- was seeking money for being in

18   a car accident.

19           THE COURT:  Okay.  Were you the foreperson of that

20   jury by any chance?

21           PROSPECTIVE JUROR NO. 0222:  No.

22           THE COURT:  All right.  Counsel?

23           MS. ARCO:  Good afternoon, Ms. Chomer.

24           PROSPECTIVE JUROR NO. 0222:  Hi.

25           MS. ARCO:  So you have a neighbor who was on the

1     Hill or at the Capitol on January 6th, correct?

2          PROSPECTIVE JUROR NO. 0222:  Yes.

3          MS. ARCO:  And you said you've talked about it a

4     little bit, but it doesn't seem like your neighbor was

5     traumatized or physically harmed.  Correct?

6          PROSPECTIVE JUROR NO. 0222:  No, not that I'm

7     aware of, and we haven't spoken about it since the 6th.

8          MS. ARCO:  Okay.  And your husband is also on the

9     Hill frequently --

10          PROSPECTIVE JUROR NO. 0222:  Uh-huh.

11          MS. ARCO:  -- for his job?

12          Have any of your conversations with either your

13     neighbor or your husband or anyone in your social circle

14     given you any strong feelings about what happened on January

15     6th?

16          PROSPECTIVE JUROR NO. 0222:  Not through those

17     conversations, no.

18          MS. ARCO:  Okay.  And based on what you've heard

19     on the radio and just following the news, do you think that

20     you'd be able to set that aside and only focus on the

21     evidence presented to you over the course of this trial?

22          PROSPECTIVE JUROR NO. 0222:  I do.

23          MS. ARCO:  Okay.  And so what we're concerned with

24     is that, you know, the experiences you've had and the news

25     that you've followed will basically infect your view of this

```
 1    case and prevent you from being able to be objective and

 2    just listen to the judge's instructions about the four

 3    specific crimes that the defendant is charged with, and then

 4    applying, you know, the evidence that you see and seeing if

 5    the government has met its burden.

 6              Do you think you'd be able to follow the judge's

 7    instructions?

 8              PROSPECTIVE JUROR NO. 0222:  Yes.

 9              MS. ARCO:  Thank you.

10              MR. MONTEITH:  No questions.

11              THE COURT:  All right, ma'am.  Thank you very

12    much.  You can step down.

13              PROSPECTIVE JUROR NO. 0222:  Sure.

14              THE COURT:  All right.  Any challenge?

15              MS. ARCO:  Not from the government.

16              MR. MONTEITH:  Nor the defense.

17              THE COURT:  Okay.  222 is qualified.  We're

18    closing in.

19              You're going to keep all of your peremptories,

20    Counsel?

21              MR. GARRITY:  We haven't discussed it, but I think

22    we will keep all the peremptories.

23              THE COURT:  We may be able to finish today.  Let's

24    hope, okay?  So let's keep it moving.

25              THE COURTROOM DEPUTY:  Your Honor, Juror No. 1085.
```

```
1              THE COURT:  Okay.  Good afternoon, sir.

2              PROSPECTIVE JUROR NO. 1085:  Good afternoon, Your

3    Honor.

4              THE COURT:  How are you?

5              PROSPECTIVE JUROR NO. 1085:  Good.  How are you?

6              THE COURT:  You're Mr. Jacobs, correct?

7              PROSPECTIVE JUROR NO. 1085:  I am, yes.

8              THE COURT:  And you're with Crowell & Moring?

9              PROSPECTIVE JUROR NO. 1085:  I am.

10             THE COURT:  And what's your practice?

11             PROSPECTIVE JUROR NO. 1085:  I do intellectual

12   property law generally.

13             THE COURT:  So no criminal work?

14             PROSPECTIVE JUROR NO. 1085:  No.

15             THE COURT:  You hesitated.  Ever done any criminal

16   work?

17             PROSPECTIVE JUROR NO. 1085:  I was trying to

18   think.  I've done some, like, appeal work in pro bono cases,

19   but my daily practice is intellectual property law.

20             THE COURT:  Got it.

21             All right.  You know someone who lives or works on

22   Capitol Hill?

23             PROSPECTIVE JUROR NO. 1085:  When you asked the

24   question -- Your Honor, originally, was that Question No. 3?

25             THE COURT:  Yes.
```

```
 1                PROSPECTIVE JUROR NO. 1085:  At the end of the

 2      question it said "or you had been in the area."  I lived on

 3      Capitol Hill when I went to law school.

 4                THE COURT:  But not on January 6th?

 5                PROSPECTIVE JUROR NO. 1085:  Not currently.  No,

 6      Your Honor.

 7                THE COURT:  You think you may know someone in the

 8      jury pool?

 9                PROSPECTIVE JUROR NO. 0222:  Yes.  One of the

10      jurors I vaguely recognize as -- he might have been married

11      to one of my children's school teachers many years ago.  I

12      don't -- that's it.

13                THE COURT:  But not someone who would influence

14      you or whom you would influence if you were both --

15                PROSPECTIVE JUROR NO. 1085:  I'm not even sure if

16      I remember his name.

17                THE COURT:  Let me finish so we don't talk over

18      each other.

19                PROSPECTIVE JUROR NO. 1085:  Sorry, Your Honor.

20                THE COURT:  You've obviously followed some

21      coverage of January 6th.

22                PROSPECTIVE JUROR NO. 1085:  Yes, Your Honor.

23                THE COURT:  How closely?

24                PROSPECTIVE JUROR NO. 1085:  I've read a lot.

25                THE COURT:  Okay.  And including -- you followed
```

1    some of the hearings, the House hearings?

2            PROSPECTIVE JUROR NO. 1085:  I have, Your Honor,

3    yes.

4            THE COURT:  Did you watch the hearings themselves

5    or just reports?

6            PROSPECTIVE JUROR NO. 1085:  I don't think, Your

7    Honor, I watched any of them live, but I did watch some

8    video excerpts.  I may have watched parts of one or two of

9    them live.  I don't recall exactly.

10            THE COURT:  Okay.  And did you come away with any

11    impressions one way or the other?

12            PROSPECTIVE JUROR NO. 1085:  I'm not sure what --

13    I'm not sure what you're getting at, Your Honor.

14            THE COURT:  You can interpret it any way you'd

15    like.

16            I mean, obviously we want folks who have not --

17    who don't have preconceptions about the events that they

18    could not put aside and be fair in this case.  So having

19    watched the coverage of the hearings, do you have any -- you

20    know, have you drawn any conclusions about the events

21    themselves that you'd like to share?  And we can discuss

22    whether that would make it difficult for you to be fair in

23    this individual case.

24            PROSPECTIVE JUROR NO. 1085:  Okay.  I think many

25    of the things that happened were very disturbing and very

1    upsetting.

2              THE COURT:  Yes.  But apart from that?

3              PROSPECTIVE JUROR NO. 1085:  Alarming.  Alarming

4    that those things could happen in our country, in our

5    Capitol, in my hometown.

6              THE COURT:  Got it.  You have prior jury service?

7              PROSPECTIVE JUROR NO. 1085:  I do, Your Honor, at

8    the Superior Court.

9              THE COURT:  Okay.  Do you remember that case?  How

10   many times?

11             PROSPECTIVE JUROR NO. 1085:  I was on a jury

12   twice, Your Honor.  One time was probably over 20 years ago.

13   It was a drug possession or drug trading case of some sort.

14   It's probably more than 20 years ago.  It was a hung jury.

15             And then in 2005, maybe, I was on another jury,

16   also again in Superior Court.  It was a handgun possession

17   case.  And I ended up being named an alternate, so I was

18   not -- I learned later there was a guilty verdict, but I was

19   not -- I was not part of the deliberations.

20             THE COURT:  Okay.  That first one where you did

21   deliberate, were you the foreperson, by any chance?

22             PROSPECTIVE JUROR NO. 1085:  No, Your Honor.

23             THE COURT:  Anything about either of those

24   experiences make you hesitate to be on a jury again?

25             PROSPECTIVE JUROR NO. 1085:  No, Your Honor.

1          THE COURT:  Okay.  Counsel?

2          No questions?

3          MS. ARCO:  Oh, yes, sorry.

4          Good afternoon, Mr. Jacobs.

5          PROSPECTIVE JUROR NO. 1085:  Hi there.

6          MS. ARCO:  Hi.  So you said you followed the news

7    regarding January 6th pretty closely?

8          PROSPECTIVE JUROR NO. 1085:  Yes.

9          MS. ARCO:  Okay.  And have you developed strong

10   feelings, like emotionally based feelings, about what

11   happened that day?

12         PROSPECTIVE JUROR NO. 1085:  As I answered to His

13   Honor's questions, I mean, some of what I saw was very, very

14   disturbing, very upsetting.

15         MS. ARCO:  Okay.  But do you think that you'd be

16   able to set those feelings aside and listen to the evidence

17   that's presented to you in this case and listen to the

18   instructions from the judge as to the elements of the crimes

19   that Ms. Niemela's charged with and apply the facts and the

20   evidence to those elements?

21         PROSPECTIVE JUROR NO. 1085:  I believe so because

22   I know nothing about the -- I know nothing about what the

23   defendant's been charged with other than I'm here today.

24         MS. ARCO:  Okay.  And do you consider yourself a

25   trial lawyer, or you do more like the initial stage of

1    patent work?

2              PROSPECTIVE JUROR NO. 1085:  I have been at trial

3    before, but I would say I'm more of a -- more of a litigator

4    than a trial lawyer.  And I do counsel -- I do a lot of

5    counseling work, too.

6              MS. ARCO:  Okay.

7              PROSPECTIVE JUROR NO. 1085:  But I don't spend my

8    days in the courtroom like you do.

9              MS. ARCO:  Okay.  Thank you.  I haven't had much

10   either, but...

11             THE COURT:  Briefly.

12             MR. GARRITY:  Good afternoon, sir.

13             PROSPECTIVE JUROR NO. 1085:  Hi.

14             MR. GARRITY:  Just on the alarming, upsetting,

15   disturbing nature of what you watched, could you expound

16   briefly on what you thought to be alarming, disturbing, and

17   upsetting.

18             PROSPECTIVE JUROR NO. 1085:  Seeing the behavior

19   of a lot of the people; seeing police officers attacked;

20   seeing the destruction of property.  A lot of people were

21   physically hurt.  A lot of people, emotional injuries.

22             So a lot of it was disturbing.

23             MR. GARRITY:  And you followed the January 6th

24   hearings after as well.  Did I understand that?

25             PROSPECTIVE JUROR NO. 1085:  As I answered the

1   judge's questions, I don't recall if I watched any of

2   them -- any of it live.  Maybe I did a little bit.  I

3   watched news reports of them.  I watched some clips online.

4   I don't remember how much of it I watched.

5            I didn't sit and watch -- I didn't watch it all

6   the way through or watch it every day.

7            MR. GARRITY:  Watching the events of January 6th

8   and the January 6th Committee hearings subsequently, did

9   that cause you to view the supporters of Former President

10  Trump in a negative view, in a negative light?

11           PROSPECTIVE JUROR NO. 1085:  Some of them, not all

12  of them.  I have -- I have friends who unquestionably voted

13  for him, and they're still -- and they're still my friends.

14           MR. GARRITY:  Same with me.

15           But I guess my question is more focused on the

16  supporters that may have been on the Capitol grounds.  Would

17  that -- what you've seen in the coverage and the Committee

18  hearings, would that cause you to form a negative view of

19  those supporters?

20           PROSPECTIVE JUROR NO. 1085:  A negative view?  It

21  wouldn't have been something I would have done.  It wouldn't

22  have been something I would have been happy if someone in my

23  family had done.

24           So are you asking do I have any moral judgment

25  about what those folks did?

```
1            MR. GARRITY:  I guess I'll just cut to the chase
2    and then I'll be done.
3            PROSPECTIVE JUROR NO. 1085:  Okay.
4            MR. GARRITY:  If you hear that Ms. Niemela perhaps
5    was on the Capitol grounds on January 6th and may have
6    entered the Capitol on January 6th, would that cause you to
7    have, I guess, an emotional or visceral reaction to your
8    view of the evidence?
9            PROSPECTIVE JUROR NO. 1085:  I don't -- I don't
10   think so.
11           MR. GARRITY:  You can give her a fair trial?
12           PROSPECTIVE JUROR NO. 1085:  If I'm selected, I
13   believe so.
14           MR. GARRITY:  Thank you.
15           THE COURT:  All right.
16           Okay, sir.  Thank you very much.  You can step
17   down.
18           PROSPECTIVE JUROR NO. 1085:  Thank you, Your
19   Honor.  And I'm sorry for speaking over you earlier.
20           THE COURT:  No, no, no, no, no.  Happens all the
21   time.
22           MS. ARCO:  No challenge from the government.
23           MR. GARRITY:  No challenge, Your Honor.
24           THE COURT:  All right.  1085 is qualified.
25           THE COURTROOM DEPUTY:  Your Honor, Juror No. 1042.
```

1          THE COURT:  Good afternoon, ma'am.  Thank you for

2      your patience.  You're Ms. Schwab?

3          PROSPECTIVE JUROR NO. 1042:  Yes.

4          THE COURT:  Okay.  You can slip your mask off, if

5      you'd like.

6          PROSPECTIVE JUROR NO. 1042:  Thank you.

7          THE COURT:  And you're a photographer; is that

8      right?

9          PROSPECTIVE JUROR NO. 1042:  Yes.

10          THE COURT:  What kind of photographer?

11          PROSPECTIVE JUROR NO. 1042:  I take family

12      pictures.  Mostly part time.

13          I was working full time in hospital -- or part

14      time in a hospital for about a year taking baby pictures.  I

15      stopped that last May because it conflicted with family

16      travel responsibilities.

17          THE COURT:  Okay.  Have you ever worked as a photo

18      journalist?

19          PROSPECTIVE JUROR NO. 1042:  No.

20          THE COURT:  No, okay.  And do you have a

21      significant other?

22          PROSPECTIVE JUROR NO. 1042:  Yes.

23          THE COURT:  And what does he or she do?

24          PROSPECTIVE JUROR NO. 1042:  So my husband is a

25      lawyer.  He is -- he currently has his own practice doing

1       environmental energy and administrative law.

2               Before that -- he began that about three years ago

3       for -- from 2017 to 2019 he was deputy general counsel for

4       the EPA in the Trump administration.

5               THE COURT:  But no criminal law, to your

6       knowledge?

7               PROSPECTIVE JUROR NO. 1042:  No, no criminal law.

8               THE COURT:  You answered yes to a couple of

9       questions.

10              You know some folks who may have lived or worked

11      on Capitol Hill during January 6th.

12              PROSPECTIVE JUROR NO. 1042:  Yes.  We have a

13      friend who was a congressional staffer.  I don't know if he

14      was actually working on the Hill on January 6th, but I know

15      that he was disturbed by the events of the day.

16              THE COURT:  How much have you talked to him

17      about --

18              PROSPECTIVE JUROR NO. 1042:  I haven't talked to

19      him directly about it.  I've seen his social media posts

20      about it.

21              THE COURT:  Okay.  Got it.

22              You've followed news coverage regarding January

23      6th?

24              PROSPECTIVE JUROR NO. 1042:  Yes.  Not really very

25      much.  I was -- I was traveling the day that it happened so

1    I didn't see any of it live.

2           THE COURT:  Okay.  Going back to your friend whose

3    social media posts you've read.  You know, obviously this

4    case is about January 6th.  Do you think that you would be

5    able to put aside your consideration of his experiences that

6    day in giving the defendant a fair trial based on the

7    evidence as to what she did or did not do?

8           PROSPECTIVE JUROR NO. 1042:  I believe so, Your

9    Honor.

10          THE COURT:  Okay.  And you know folks in the legal

11   field.  That's your husband?

12          Any other folks who've worked in sort of the

13   criminal realm?

14          PROSPECTIVE JUROR NO. 1042:  Not in criminal

15   directly.  We have another friend who does personal injury

16   law.

17          THE COURT:  Okay.  And finally, you know someone

18   who has been involved in a dispute with an agency of the

19   United States or had an interest in such agency.

20          PROSPECTIVE JUROR NO. 1042:  I didn't know how to

21   answer that question because my husband had worked for the

22   EPA so --

23          THE COURT:  But he's never been sued by the

24   government or sued the government?

25          PROSPECTIVE JUROR NO. 1042:  No.

1          THE COURT:  Okay.  Counsel?

2          MS. ARCO:  Good afternoon, Ms. Schwab.

3          PROSPECTIVE JUROR NO. 1042:  Good afternoon.

4          MS. ARCO:  Is your husband -- when he worked for

5     the EPA, was he a political appointee or --

6          PROSPECTIVE JUROR NO. 1042:  Yes, he was.

7          MS. ARCO:  Okay.  And based on what you have seen

8     in the news regarding January 6th and your friend's Facebook

9     or social media posts, have you formed an opinion of what

10    happened that day?

11         PROSPECTIVE JUROR NO. 1042:  My opinion?  It

12    caused me some personal inconvenience, and it is not

13    something that I would have participated in in any respect,

14    but I think -- as for whether an individual committed a

15    crime, I think I could judge impartially on that.

16         MS. ARCO:  Okay.  And what do you mean by it was a

17    personal inconvenience?

18         PROSPECTIVE JUROR NO. 1042:  So on that day -- our

19    family had been in Seattle for a few weeks visiting my

20    father and sister, and my husband was driving back across

21    the country with his brothers because they like road trips.

22    They flew out to meet up with him, and I was flying back

23    with our kids.

24         And we got back -- I think we landed about 4:00 in

25    the afternoon.  The curfew began at 6:00.  We had no food in

1    the house.  So I had to figure out how to get them dinner,

2    and that was --

3                MS. ARCO:  Understood.  So the judge is going to

4    provide you instructions on what the elements are of the

5    four charges that Ms. Niemela's charged with, and you will

6    see evidence during this trial, and you'll be called upon to

7    apply the judge's instruction to the evidence that you've

8    seen.  Do you think that you'd be able to follow those

9    instructions and do that impartially?

10               PROSPECTIVE JUROR NO. 1042:  I think so, yes.

11               MS. ARCO:  Thank you.

12               THE COURT:  Any questions?

13               MR. MONTEITH:  No questions.

14               THE COURT:  All right.  Thank you very much.  You

15   can step down.

16               PROSPECTIVE JUROR NO. 1042:  Thank you.

17               THE COURT:  Any challenge?

18               MS. ARCO:  Sorry, Your Honor, no challenge.

19               THE COURT:  Counsel?

20               MR. MONTEITH:  Nor here.

21               THE COURT:  1042 is qualified.

22               Good afternoon, sir.  Thank you for your patience.

23   Have a seat.  You can take your mask off.

24               You're Mr. Brodey?

25               PROSPECTIVE JUROR NO. 1420:  Yes.  Yes, sir.

```
 1                THE COURT:  And you're a reporter for The Daily
 2     Beast; is that right?
 3                PROSPECTIVE JUROR NO. 1420:  That's correct.
 4                THE COURT:  What do you cover?
 5                PROSPECTIVE JUROR NO. 1420:  I cover Congress.
 6                THE COURT:  You cover Congress.  So would this be
 7     a little too close to home, you think?
 8                PROSPECTIVE JUROR NO. 1420:  I can see that
 9     argument being made.
10                THE COURT:  Excuse me?
11                PROSPECTIVE JUROR NO. 1420:  I can see that
12     argument being made, yes.
13                THE COURT:  Well, what do you think?
14                PROSPECTIVE JUROR NO. 1420:  Well, I was not at
15     the Capitol --
16                THE COURT:  Well, let me back up.  Did you cover
17     January 6th?
18                PROSPECTIVE JUROR NO. 1420:  I was not physically
19     there, but I did cover it.
20                THE COURT:  I think that's probably a little too
21     close to home.  Thank you very much for your service.  You
22     can step down.
23                Okay.  The Court will strike Mr. Brodey because of
24     his occupation.
25                All right, sir, step right up.  Remove your mask.
```

```
 1                   How are you today?  Thanks for your patience.  You
 2       are Mr. Rettammel?
 3                   PROSPECTIVE JUROR NO. 1073:  Rettammel, yes.
 4                   THE COURT:  All right.  And you are a lawyer with
 5       the Court of Appeals for Veterans Claims; is that right?
 6                   PROSPECTIVE JUROR NO. 1073:  Yes.  I'm actually
 7       just finishing a clerkship there this month.
 8                   THE COURT:  Who did you clerk for?
 9                   PROSPECTIVE JUROR NO. 1073:  Judge Scott Laurer.
10                   THE COURT:  On that court?
11                   PROSPECTIVE JUROR NO. 1073:  Yes, sir.
12                   THE COURT:  Okay.  And what did you do before
13       that?
14                   PROSPECTIVE JUROR NO. 1073:  I was an appellate
15       litigator with the U.S. Department of Veterans Affairs,
16       Office of General Counsel.
17                   THE COURT:  Got it.
18                   I take it you haven't been exposed to any cases
19       during your clerkship involving January 6th.
20                   PROSPECTIVE JUROR NO. 1073:  No, I have not, Your
21       Honor.
22                   THE COURT:  Okay.  Do you have a significant
23       other?
24                   PROSPECTIVE JUROR NO. 1073:  I do.
25                   THE COURT:  What do they do?
```

```
 1                    PROSPECTIVE JUROR NO. 1073:  She is a civil trial
 2       attorney with the Department of Justice.
 3                    THE COURT:  Which section?
 4                    PROSPECTIVE JUROR NO. 1073:  Department of
 5       Aviation & Admiralty Litigation.
 6                    THE COURT:  Okay.  Obviously DOJ is prosecuting
 7       this case; not through the civil division.  But would her
 8       affiliation with DOJ give you any concern about your ability
 9       to be fair?
10                    PROSPECTIVE JUROR NO. 1073:  No, Your Honor.
11                    THE COURT:  Would you be influenced by how folks
12       who work with your wife at DOJ might be -- might perceive
13       your verdict if you were to deliver a not guilty verdict in
14       this case?
15                    PROSPECTIVE JUROR NO. 1073:  No, I would not.
16                    THE COURT:  Okay.  You answered yes to a number of
17       questions.  No. 3, you know someone who lives or works near
18       Capitol Hill?
19                    PROSPECTIVE JUROR NO. 1073:  I have several
20       friends who live in the general area.
21                    I'm also an avid runner.  Working at various
22       offices throughout the District, I've spent a lot of time
23       just sort of running through the area.
24                    THE COURT:  Got it.
25                    PROSPECTIVE JUROR NO. 1073:  I'm just highly
```

1    familiar with it.

2              THE COURT:  Do you know if any of your friends who

3    lived on the Hill suffered any property damage as a result

4    of January 6eth?

5              PROSPECTIVE JUROR NO. 1073:  No, none did.

6              THE COURT:  Have you talked to them about their

7    personal experiences that day?

8              PROSPECTIVE JUROR NO. 1073:  Not beyond casual

9    conversation, no.

10             THE COURT:  You or someone you know has a direct

11   or indirect connection to the events of January 6th?

12             PROSPECTIVE JUROR NO. 1073:  Yes.  I apologize.

13   This will bleed into several subsequent questions.

14             THE COURT:  Sure.

15             PROSPECTIVE JUROR NO. 1073:  Prior to my career as

16   an attorney, I was an officer with the Metropolitan Police

17   Department in Washington, D.C.  One of my old friends and an

18   academy classmate was one of the first responding D.C.

19   police officers that day, and another friend and former co-

20   worker from my patrol time was injured in the response later

21   in the day.

22             THE COURT:  Do you think that's a little too close

23   to home, to serve as an impartial juror on this case?

24             PROSPECTIVE JUROR NO. 1073:  I do not, Your Honor.

25             THE COURT:  Why do you say that?

1          PROSPECTIVE JUROR NO. 1073:  And I apologize.

2     This goes to another question as well.  I used to be a

3     public defender with the Maryland Office of the Public

4     Defender.  I strongly believe in the right to a trial by an

5     impartial jury.  I take the oath of the jury very seriously

6     as a citizen and as an officer of the Court.  I just believe

7     that I would be capable of viewing only the evidence

8     presented and the jury instructions as presented.

9          THE COURT:  Have you spoken to either of your

10    former colleagues about their experiences?

11         PROSPECTIVE JUROR NO. 1073:  I have.

12         THE COURT:  And you'd still answer the same way?

13         PROSPECTIVE JUROR NO. 1073:  Yes, Your Honor.  I

14    believe that.

15         THE COURT:  Have you followed coverage of January

16    6th and the January 6th hearings to some extent?

17         PROSPECTIVE JUROR NO. 1073:  Not to a particularly

18    serious extent, but at least casually.  I've seen some of

19    the coverage, read articles, things of that nature.

20         THE COURT:  Someone close to you has been the

21    victim of or witness to a crime?

22         PROSPECTIVE JUROR NO. 1073:  I split these into

23    two categories, whatever was asked in voir dire.  One being

24    myself as an officer, sort of line of duty issues, versus as

25    a private citizen.

```
 1              As a private citizen, mostly minor things.  I've
 2     had a couple of vehicles stolen, hit and run, property
 3     damage, things like that.
 4              THE COURT:  Okay.  So as a former public defender
 5     and having been on the other side of the government, do you
 6     think you could hear the government's evidence fairly, and
 7     if you came to the conclusion that it satisfied the elements
 8     of the offense that I would instruct you on, you wouldn't
 9     have a problem returning a guilty verdict?
10              PROSPECTIVE JUROR NO. 1073:  No, I would not.
11              THE COURT:  Okay.
12              All right, Counsel?
13              MR. GORDON:  Good afternoon, Mr. Rettammel?  Am I
14     saying that correctly?
15              PROSPECTIVE JUROR NO. 1073:  Rettammel.
16              MR. GORDON:  Well, you have an unusual background
17     to say the least.
18              PROSPECTIVE JUROR NO. 1073:  I do, yes.
19              MR. GORDON:  Can you sort of briefly just walk us
20     through kind of the steps in your professional life, how you
21     got from MPD officer to public defender to appellate
22     litigator and maybe there's even some steps in between?
23              PROSPECTIVE JUROR NO. 1073:  Yes.  I've done this
24     at every interview ever, so I'm familiar with having to run
25     through it.
```

1          I attended law school straight after college.

2     After law school, I was actually a contract employee with

3     the U.S. Attorney's Office in D.C.  They brought in a bunch

4     of unbarred attorneys who had graduated to essentially

5     produce work product; so I worked on primarily Title 3

6     wiretaps for the Violent Crimes & Narcotics Trafficking

7     Section in the D.C. office.

8          From there I just sort of became interested in law

9     enforcement.

10         I worked with a lot of federal agents as part of

11    the Safe Streets Task Force.  They encouraged me to work on

12    local law enforcement first, if I thought I had an interest,

13    so I joined the Metropolitan Police Department.

14         MR. GORDON:  Is it safe to say that you were one

15    of the few lawyers in your academy class at the MPD?

16         PROSPECTIVE JUROR NO. 1073:  In my academy class,

17    but I know three others from the department so it's

18    something about D.C., I suppose.

19         MR. GORDON:  Okay.

20         PROSPECTIVE JUROR NO. 1073:  I ultimately left the

21    career in law enforcement, went back to practicing law; felt

22    that for numerous personal reasons I would be best-suited

23    working in public defense.  I spent --

24         MR. GORDON:  So I'm going to stop you right there

25    for a second because unfortunately this is the entire

1    exercise in jury selection, is the close personal reasons.

2         So what was that?  Because it's sort of at the

3    meat of this.

4         We're here at a criminal trial, and there was

5    something about your experience where you actually were a

6    law enforcement officer -- and not just any law enforcement

7    officer, an officer in one of the very agencies that is

8    going to be at issue in this particular trial -- and

9    something about that experience led you to decide to become

10   a public defender.  What was it?

11        PROSPECTIVE JUROR NO. 1073:  It wasn't so much

12   about my experience with law enforcement.  I think it was

13   more about my experience working with people.  I just saw a

14   lot of people that needed help.

15        Having worked pretty intimately with the

16   prosecution side, there was never really a lack of resources

17   or a lack of people willing to do that job.  There were, in

18   my opinion, I would say, a significant lack of resources and

19   lack of experience of talented folks that really wanted to

20   step up and take the other side.

21        MR. GORDON:  Was there anything about that

22   experience as a police officer that sort of soured you or

23   made you cynical about law enforcement or prosecution?

24        PROSPECTIVE JUROR NO. 1073:  I mean, I have

25   typical sort of nits with the way the law enforcement system

1  is structured, but they're not things that I think would be

2  relevant to a prosecution.  They're more about I guess

3  agency administrative practices, how departments are

4  actually structured, how they promote and move people

5  through ranks and assignments.

6           But I didn't have any particular issue as far

7  as -- I'm trying to think of a more casual way to say it,

8  but I'll just say sort of defund-the-police problems with

9  law enforcement, those aspects.  That was the impetus for

10 me.  Those issues weren't part of that decision-making

11 process.

12          MR. GORDON:  Your Honor, I think I could probably

13 go on for the rest of the afternoon.

14          THE COURT:  I'll give you one more question.

15          MR. GORDON:  The friend of yours who was a first

16 responder.

17          PROSPECTIVE JUROR NO. 1073:  Yes.

18          MR. GORDON:  I assume you've discussed that

19 experience with him?

20          PROSPECTIVE JUROR NO. 1073:  I have only once.

21 I've actually discussed it more with the officers who

22 arrived later in the day and my -- I had a friend who was

23 injured as part of the later like broader response from D.C.

24 police.

25          My academy classmate and friend who was one of the

1    early responders, we've only spoken once about it.

2          MR. GORDON:  Did having that -- does having that

3    inside information from your friend, is that likely to color

4    how you interpret the videos or other evidence that comes in

5    in this case?

6          PROSPECTIVE JUROR NO. 1073:  To be perfectly

7    honest, I wouldn't really consider it inside information.  I

8    don't think that there's anything that I learned from

9    speaking with them that you wouldn't have seen as part of

10   the broader media coverage following that.

11         MR. GORDON:  Thank you, Your Honor.

12         THE COURT:  Briefly, Counsel, anything?

13         MR. GARRITY:  And I agree with Mr. Gordon, your

14   background is highly unique.

15         PROSPECTIVE JUROR NO. 1073:  I apologize.  I know

16   I always pose a strange issue whenever this happens.

17         MR. GARRITY:  Just dealing with your friends who

18   were in the Metropolitan Police force, do you stay in

19   regular contact with them?

20         PROSPECTIVE JUROR NO. 1073:  The officers that are

21   relevant to January 6th, or in general?

22         MR. GARRITY:  January 6th.

23         PROSPECTIVE JUROR NO. 1073:  I wouldn't say

24   regular contact.  They're people that I speak with, you

25   know, a few times a year.

1          We're casually friendly, but they're not the

2     people that I see on a regular basis.

3          MR. GARRITY:  But you do have some close contacts

4     that are still in the Metropolitan Police Department?

5          PROSPECTIVE JUROR NO. 1073:  Yes, but my friends

6     are all either police officers or public defenders.

7          MR. GARRITY:  That's a unique background as well.

8          PROSPECTIVE JUROR NO. 1073:  It is.  We don't get

9     together terribly often as a group.

10          MR. GARRITY:  If you were to return a not guilty

11     verdict in Ms. Niemela's case, do you think you would get

12     any kind of backlash from your friends in the Metropolitan

13     Police Department?

14          PROSPECTIVE JUROR NO. 1073:  Certainly not any of

15     the folks that I consider close friends or see regularly.

16     I'm a little less confident, perhaps, with some of the folks

17     that I referenced as far as January 6th.

18          MR. GARRITY:  Would that give you any sort of

19     hesitancy in coming to a particular verdict one way or the

20     other?

21          PROSPECTIVE JUROR NO. 1073:  No.  Honestly, as a

22     trial attorney and as a former defense attorney, I take that

23     more seriously.

24          MR. GARRITY:  All right.  Thank you.

25          THE COURT:  Thank you.  All right, sir, you can

1    step down.

2              PROSPECTIVE JUROR NO. 1073:  Thank you, Your

3    Honor.

4              THE COURT:  All right.

5              MR. GORDON:  Your Honor, I think this would be the

6    first former defense attorney of my career that I have not

7    sought to challenge for cause.

8              THE COURT:  You just never know.

9              So no challenge from the government.  Any

10   challenge from the defense?

11             MR. GARRITY:  Absolutely no challenge.

12             THE COURT:  1073 is qualified.

13             THE COURTROOM DEPUTY:  Your Honor, Juror No. 1207.

14             THE COURT:  Okay, sir.  Thank you very much.

15   Thank you for your patience.  You can remove your mask.

16             You're Mr. Fitzpatrick; is that correct?

17             You're Mr. Fitzpatrick?

18             PROSPECTIVE JUROR NO. 1207:  Yes.

19             THE COURT:  It says here you're a business analyst

20   for GovCIO.  Tell us what GovCIO is.

21             PROSPECTIVE JUROR NO. 1207:  Correct, it's a

22   government contractor throughout all the different agencies.

23             THE COURT:  Do you have any contracts or does

24   GovCIO have any contracts with federal -- any federal law

25   enforcement agencies?

```
1              PROSPECTIVE JUROR NO. 1207:  Yes, I believe they

2    do.

3              I personally do not though.  I don't work with

4    that.  I work at the U.S. Department of Transportation.

5              THE COURT:  Okay.  Do you know if GovCIO has

6    contracts with the FBI or the Justice Department?

7              PROSPECTIVE JUROR NO. 1207:  I believe so, but I

8    couldn't tell you.  I'm not sure which ones.

9              THE COURT:  Okay.  You know someone who has a

10   direct or indirect connection to the events of January 6th?

11             PROSPECTIVE JUROR NO. 1207:  Yes.  I haven't met

12   him, but my -- one of my close friends, his sister

13   apparently at the time was dating an officer that was

14   severely injured during the events.

15             THE COURT:  Okay.  So -- all right.  Back up.

16   Your friend's sister?

17             PROSPECTIVE JUROR NO. 1207:  My friend's sister's

18   boyfriend was an officer.

19             THE COURT:  Boyfriend.  Do you know your friend's

20   sister?

21             PROSPECTIVE JUROR NO. 1207:  Yes.  I interact with

22   her at friend gatherings, yes.

23             THE COURT:  Okay.  Has she discussed her

24   boyfriend's experiences with you?

25             PROSPECTIVE JUROR NO. 1207:  No.  I have not seen
```

1     her since that time.

2             THE COURT:  Okay.  So you haven't seen her since

3     January 6th?

4             PROSPECTIVE JUROR NO. 1207:  Correct.

5             THE COURT:  You have followed some coverage, both

6     of the events themselves and the January 6th House hearings?

7             PROSPECTIVE JUROR NO. 1207:  Yes.

8             THE COURT:  How closely would you say you've

9     followed the coverage?

10            PROSPECTIVE JUROR NO. 1207:  I've watched all of

11    the hearings on television.

12            THE COURT:  Are you sort of a news junky?

13    Political junky?

14            PROSPECTIVE JUROR NO. 1207:  A bit at the time.  I

15    was very interested in what their findings might be --

16            THE COURT:  Okay.

17            PROSPECTIVE JUROR NO. 1207:  -- and just the

18    investigative nature of the hearings.

19            THE COURT:  Did you draw any conclusions after

20    having watched them?

21            PROSPECTIVE JUROR NO. 1207:  I couldn't say that I

22    did one way or the other.  It didn't sway my opinion.

23            THE COURT:  Okay.  You know folks who work in the

24    legal field or in law enforcement?

25            PROSPECTIVE JUROR NO. 1207:  One of my friends, he

```
1   works for ATF.

2              THE COURT:  Any involvement in January 6th, to

3   your knowledge?

4              PROSPECTIVE JUROR NO. 1207:  No.

5              THE COURT:  Counsel?

6              MS. ARCO:  Good afternoon, Mr. Fitzpatrick.

7              PROSPECTIVE JUROR NO. 1207:  Hello.

8              MS. ARCO:  So you said you watched all of the

9   hearings and that they didn't sway your opinion one way or

10  the other, but based on what you had seen in the news about

11  January 6th, the event generally, had you already formed

12  opinions about the events of that day?

13             PROSPECTIVE JUROR NO. 1207:  Yes, I did.

14             MS. ARCO:  Okay.  And can you share with us a

15  little bit about what those opinions were?

16             PROSPECTIVE JUROR NO. 1207:  I thought it was

17  horrible, the events that occurred.  I was dismayed that

18  such a thing could happen.

19             MS. ARCO:  Okay.  And so what we're trying to get

20  at through this process and what we're concerned about is

21  that your previously made opinions, whatever you saw on the

22  news and how that made you feel, that that would infect this

23  process.

24             PROSPECTIVE JUROR NO. 1207:  Uh-huh.

25             MS. ARCO:  Because you're going to get -- if you
```

1    were chosen as a juror you would get instructions from the

2    judge as to, you know, what the elements are of four

3    specific crimes that Ms. Niemela's charged with, and you'll

4    watch the evidence in court, the witnesses, videos, and

5    you'll have to listen to the judge's instructions and apply,

6    you know, what you saw to the instructions.

7           Do you think you'd be able to do that objectively,

8    or what you saw before will bias you too much?

9           PROSPECTIVE JUROR NO. 1207:  I believe I could.  I

10   take my civic duties very seriously and recognize that

11   everybody is innocent until proven guilty.

12          MS. ARCO:  Okay.  Thank you.

13          THE COURT:  Counsel?

14          MR. MONTEITH:  Good afternoon.  So just to be

15   clear -- I just want to follow up with what Attorney Arco

16   asked.

17          You do have -- and I just want to be -- is it fair

18   to say, strongly held opinions about what occurred on

19   January 6th?  And if I could sum it up, you watched the

20   news.  You followed it.  You formed a strong opinion about

21   it.  Right?

22          PROSPECTIVE JUROR NO. 1207:  I wouldn't say it was

23   necessarily a strong opinion, but, again, I was, again,

24   dismayed at what occurred and what people thought was

25   appropriate.

1          MR. MONTEITH:  All right.  And your conclusion was

2     it was horrendous and horrible and dismayed.  You personally

3     were dismayed by what happened?

4          PROSPECTIVE JUROR NO. 1207:  By some of the

5     actions that I had seen, yes.

6          MR. MONTEITH:  Okay.  Thank you.

7          THE COURT:  All right, sir.  You can step down.

8     Thank you very much.

9          MS. ARCO:  No challenge from the government.

10         MR. MONTEITH:  We do challenge, Your Honor, based

11    on his answers.  I know he said he -- I do know he said he

12    could set aside his opinions, but he did say he was

13    dismayed.  He did say it was a strongly held opinion at one

14    point.

15         I mean, we're here to get her a fair trial, and I

16    think he's just -- it's too much of an opinion to ask him to

17    set it aside.  Thank you.

18         THE COURT:  Okay.  The Court will overrule your

19    objection.  He said he was dismayed about some of the

20    actions he saw, and he also said that he takes his civic

21    duty very seriously.

22         All right.  So 1207 is qualified.

23         We have one more to go.  I may do one extra just

24    in case somebody decides not to come into the courtroom.

25         Ms. Arco, how are you feeling?

```
1              MS. ARCO:  I'm a little thirsty, but okay.

2              THE COURT:  You're Ms. Mansfield?

3              PROSPECTIVE JUROR NO. 0074:  Yes.

4              THE COURT:  All right.  Thank you for your

5    patience.  You work for something called Vena Solutions?

6              PROSPECTIVE JUROR NO. 0074:  Yes.

7              THE COURT:  You can slip your mask off, too.

8              What is Vena Solutions?

9              PROSPECTIVE JUROR NO. 0074:  It's a software

10   company.

11             THE COURT:  Okay.  Do you have contracts with the

12   government?

13             PROSPECTIVE JUROR NO. 0074:  I don't believe so.

14             THE COURT:  Okay.  Do you have a significant

15   other?

16             PROSPECTIVE JUROR NO. 0074:  No.

17             THE COURT:  You answered yes to the first

18   question, which is some health concern that might inhibit

19   you from being a juror in this case based on the schedule.

20             PROSPECTIVE JUROR NO. 0074:  I suffer from

21   migraines, and I can't control when they come on; and so if

22   they do come on, I lose visibility.

23             THE COURT:  Okay.

24             PROSPECTIVE JUROR NO. 0074:  And my logical

25   thought process slows down significantly.
```

1          THE COURT:  How frequently do they come on?

2          PROSPECTIVE JUROR NO. 0074:  A few times a month.

3     So I had one last week, which is why I bring it up today.

4          THE COURT:  Okay.  So honestly, what do you think

5     about the prospects of your serving as a juror?  Are you

6     worried about it, or do you think it will be okay?

7          PROSPECTIVE JUROR NO. 0074:  I think it might be

8     okay.  But like I said, I can't control when it comes on;

9     and so if it does, I can take medicine, but there's no

10    guarantee that that will actually stop it in its tracks.

11         THE COURT:  Okay.  And when you have one, how

12    long -- and you take your medicine and it doesn't work, how

13    long does it take you to recover?

14         PROSPECTIVE JUROR NO. 0074:  In December I was out

15    for a full day of work and super sick the whole day.  I

16    couldn't do anything.

17         THE COURT:  Okay.  I think it's probably safe not

18    to seat you as a juror.

19         PROSPECTIVE JUROR NO. 0074:  Probably, yeah.  I'm

20    sorry.

21         THE COURT:  I'm sorry.  And good luck to you.  It

22    was nice meeting you.

23         PROSPECTIVE JUROR NO. 0074:  Okay.  Thank you.

24         THE COURT:  All right.  The Court will strike 74

25    for health reasons.  I don't think it's worth taking the

1   chance.

2              MS. ARCO:  I also suffer from visual migraines.

3   They're not frequent, but I do.  They're very debilitating.

4              THE COURTROOM DEPUTY:  Your Honor, Juror No. 2691.

5              THE COURT:  Good afternoon, ma'am.  Thank you very

6   much for your patience.  You can slip your mask off, if

7   you'd like.

8              You're Ms. Dieterich?

9              PROSPECTIVE JUROR NO. 2691:  Dieterich.

10             THE COURT:  Dieterich, okay.  And you are a

11   physician assistant at Whitman-Walker; is that right?

12             PROSPECTIVE JUROR NO. 2691:  Yes.

13             THE COURT:  How long have you done that?

14             PROSPECTIVE JUROR NO. 2691:  12 years.

15             THE COURT:  Do you have a significant other?

16             PROSPECTIVE JUROR NO. 2691:  I do.

17             THE COURT:  And what do they do?

18             PROSPECTIVE JUROR NO. 2691:  He's an architect.

19             THE COURT:  All right.  You answered yes to a few

20   questions.  You followed some of the news coverage of

21   January 6th?

22             PROSPECTIVE JUROR NO. 2691:  Sure, yeah.

23             THE COURT:  How closely, would you say?

24             PROSPECTIVE JUROR NO. 2691:  NPR, listening to --

25   I mean, I didn't actively seek out videos, but, you know,

1   they were around.

2           THE COURT:  And you followed some of the hearings?

3           PROSPECTIVE JUROR NO. 2691:  I did.  Again, NPR.

4   And I didn't watch them, no.  I just listened.

5           THE COURT:  Okay.  And you have prior jury

6   experience?

7           PROSPECTIVE JUROR NO. 2691:  I do.  D.C., not

8   federal though.

9           THE COURT:  How long ago?

10          PROSPECTIVE JUROR NO. 2691:  I was trying to think

11   about that today.  I think it was maybe eight years ago.

12          THE COURT:  Do you remember the case?

13          PROSPECTIVE JUROR NO. 2691:  Yes.

14          THE COURT:  What kind of case?

15          PROSPECTIVE JUROR NO. 2691:  It was for possession

16   of PCP ultimately.

17          THE COURT:  Did the jury reach a verdict?

18          PROSPECTIVE JUROR NO. 2691:  It got thrown out

19   before.

20          THE COURT:  So you didn't actually deliberate?

21          PROSPECTIVE JUROR NO. 2691:  Oh, no.  I never

22   deliberated, no.

23          THE COURT:  Okay.  Counsel?

24          MS. ARCO:  No questions, Your Honor.

25          MR. GARRITY:  No questions, Your Honor.

```
 1                    THE COURT:  Okay, ma'am.  You can step down.
 2        Thank you for your patience.
 3                    Okay.  Any challenge to 2691?
 4                    MS. ARCO:  Not from the government.
 5                    MR. GARRITY:  No challenge, Your Honor.
 6                    THE COURT:  Okay.  Let's do one more just to be
 7        safe, okay?  Is that fair?
 8                    THE COURTROOM DEPUTY:  2149.
 9                    THE COURT:  Good afternoon, ma'am.
10                    PROSPECTIVE JUROR NO. 2149:  Good afternoon.
11                    THE COURT:  You're Ms. Parks?
12                    PROSPECTIVE JUROR NO. 2149:  Yes, sir.
13                    THE COURT:  Okay.  And it says here you're in
14        school?
15                    PROSPECTIVE JUROR NO. 2149:  Yes.
16                    THE COURT:  You can slip your mask off.
17                    PROSPECTIVE JUROR NO. 2149:  Yes.
18                    THE COURT:  And what do you study?
19                    PROSPECTIVE JUROR NO. 2149:  Right now?  I'm
20        currently graduated from Virginia State University studying
21        criminal justice.
22                    THE COURT:  You studied criminal justice?
23                    PROSPECTIVE JUROR NO. 2149:  Yes.
24                    THE COURT:  All right.  And are you working?
25        You're not working yet?
```

1        PROSPECTIVE JUROR NO. 2149:  No, not yet.

2        THE COURT:  You answered yes to Question No. 1,

3    which is do you have some health issue that you think might

4    impair you from being a juror in the case?

5        PROSPECTIVE JUROR NO. 2149:  Yes.  I have a little

6    case of social anxiety sometimes.

7        THE COURT:  Social anxiety?

8        PROSPECTIVE JUROR NO. 2149:  Yes.  When I get

9    around unfamiliar places or unfamiliar people, I get

10   uncomfortable.

11       THE COURT:  Well, you tell me.  Would that make it

12   hard for you to just sit here and listen to the evidence

13   and, once you get back in the jury room, to deliberate with

14   13 other people?

15       PROSPECTIVE JUROR NO. 2149:  Yes.

16       THE COURT:  You think it would?

17       PROSPECTIVE JUROR NO. 2149:  Yes.

18       THE COURT:  That would make you anxious?

19       PROSPECTIVE JUROR NO. 2149:  Yes.

20       THE COURT:  All right.  You can step down.

21       The Court will strike 2149 for cause.

22       THE COURTROOM DEPUTY:  Your Honor, Juror No. 1677.

23       THE COURT:  Good afternoon, sir.  Thank you for

24   your patience.

25       PROSPECTIVE JUROR NO. 1677:  Good afternoon.

```
1              THE COURT:  You are Mr. Atkinson; is that right?

2              PROSPECTIVE JUROR NO. 1677:  Correct.

3              THE COURT:  And tell us what NTT DATA Federal

4    Services is.

5              PROSPECTIVE JUROR NO. 1677:  NTT DATA Federal

6    Services is an IT company.

7              THE COURT:  You can slip your mask off.

8              PROSPECTIVE JUROR NO. 1677:  Oh, thank you.  I can

9    breathe easier.

10             NTT DATA Federal Services is an IT company.  It's

11   actually Japanese owned, and we do a lot of government

12   contract work.  So I work with U.S. Customs & Border

13   Protection doing IT program management and biometrics.

14             THE COURT:  Do you have any contracts with the FBI

15   or the Department of Justice or any sort of --

16             PROSPECTIVE JUROR NO. 1677:  We do actually.

17             THE COURT:  And do you work on those accounts?

18             PROSPECTIVE JUROR NO. 1677:  I do not.  Well,

19   actually I work in the practice, but not specifically to

20   DOJ.  It's all DHS Homeland Security.

21             THE COURT:  Okay.  You know someone who lives or

22   works on Capitol Hill?

23             PROSPECTIVE JUROR NO. 1677:  Myself actually, yes.

24   I've lived there 25 years.

25             THE COURT:  How far away from the Capitol do you
```

1    live?

2                    PROSPECTIVE JUROR NO. 1677:  About a mile.

3                    THE COURT:  Were you home that day?

4                    PROSPECTIVE JUROR NO. 1677:  I was home working.

5                    THE COURT:  Did you observe any of the events

6    personally at the Capitol?

7                    PROSPECTIVE JUROR NO. 1677:  No.  In fact, I

8    didn't hear anything so I just caught it on the news after

9    the fact or during the fact.

10                    THE COURT:  And I take it you didn't suffer any

11   property damage?

12                    PROSPECTIVE JUROR NO. 1677:  No.  Thankfully.

13                    THE COURT:  Okay.  You've covered -- you've

14   followed coverage of the hearings?

15                    PROSPECTIVE JUROR NO. 1677:  Absolutely.

16                    THE COURT:  And the hearings and the events

17   generally?

18                    PROSPECTIVE JUROR NO. 1677:  Yes, in general, yes.

19                    THE COURT:  Any takeaways?

20                    PROSPECTIVE JUROR NO. 1677:  Maybe my biggest

21   takeaway is I just never understood the -- kind of the

22   thought process that went into this whole thing and the

23   ability for people to believe in misinformation or fantasies

24   that would lead them to such actions.

25                    THE COURT:  Okay.  So you answered yes to the

1    QAnon question.  Is that the reason you answered yes to

2    that?

3              PROSPECTIVE JUROR NO. 1677:  Exactly, yes.

4              THE COURT:  So obviously we're not here to debate

5    the merits of what QAnon may or may not believe in or to

6    what extent Ms. Niemela believes in it; but on the other

7    hand, we don't want your views of QAnon to affect your

8    ability to be fair to her based on the evidence.  Do you

9    think you could be fair?

10             PROSPECTIVE JUROR NO. 1677:  Yes, I can be fair.

11             THE COURT:  All right.  You know folks who are

12   lawyers?

13             PROSPECTIVE JUROR NO. 1677:  Excuse me?

14             THE COURT:  You know people who are lawyers?

15             PROSPECTIVE JUROR NO. 1677:  Plenty, yes.

16             THE COURT:  Do you have any close friends who

17   practice in the criminal area?

18             PROSPECTIVE JUROR NO. 1677:  Not many actually.

19   Maybe one or two.

20             THE COURT:  And you know folks who worked on the

21   Hill or work on the Hill?

22             PROSPECTIVE JUROR NO. 1677:  Yes.  In fact, my

23   wife used to work on the Hill for the House of

24   Representatives for about 12 years for a number of different

25   congresspeople.  And I have friends today who actually were

1    in the Capitol on January 6th.

2              THE COURT:  Okay.  Have you spoken to them about

3    their experiences?

4              First of all, was your wife -- did she work on the

5    Hill on January 6th?

6              PROSPECTIVE JUROR NO. 1677:  She did not, no.

7              THE COURT:  For your friends, have you spoken with

8    them about it?

9              PROSPECTIVE JUROR NO. 1677:  Yes.  In fact, one

10   friend was in the Senate office building that night, and she

11   had been locked down, and I called to make sure she was okay

12   and could get out.  And finally she did about 7:00 or 8:00.

13             THE COURT:  And we ask that question because, you

14   know, we want to know whether your relationships with folks

15   who may have been personally affected would color your

16   judgment in a case like this or make it hard for you to

17   assess the evidence against a particular defendant.

18             Answer honestly yes or no.

19             PROSPECTIVE JUROR NO. 1677:  No, I don't think so.

20             THE COURT:  Okay.  You're pretty sure about that?

21             PROSPECTIVE JUROR NO. 1677:  Yes, I'm -- I like to

22   look at the evidence and make my own assessment or my own

23   judgment.

24             THE COURT:  Okay.  Very well.

25             And you've had prior jury service?

```
 1                    PROSPECTIVE JUROR NO. 1677:  I have.

 2                    THE COURT:  Do you remember what kind of case?

 3                    PROSPECTIVE JUROR NO. 1677:  It was in D.C.

 4        Superior Court about 15 years ago.  It was a medical

 5        malpractice civil case.

 6                    THE COURT:  Did the jury reach a verdict?

 7                    PROSPECTIVE JUROR NO. 1677:  Yes.

 8                    THE COURT:  And were you the foreperson by any

 9        chance?

10                    PROSPECTIVE JUROR NO. 1677:  I was not.

11                    THE COURT:  Anything about that experience make

12        you hesitate to serve on a jury again?

13                    PROSPECTIVE JUROR NO. 1677:  Not at all.  It was

14        actually a good experience.

15                    THE COURT:  Okay.  Counsel?

16                    MS. ARCO:  No questions from the government.

17                    MR. MONTEITH:  Good afternoon, sir.

18                    PROSPECTIVE JUROR NO. 1677:  How are you?

19                    MR. MONTEITH:  One question is, I think I heard

20        did you actively participate by calling a friend while the

21        January 6th event was going on?

22                    PROSPECTIVE JUROR NO. 1677:  It was around 6:00 or

23        7:00 that evening.

24                    MR. MONTEITH:  Oh, it was later in the evening?

25                    PROSPECTIVE JUROR NO. 1677:  It was later.  It
```

```
 1    wasn't in the afternoon.

 2              MR. MONTEITH:  Okay.  So you -- during that day

 3    you didn't call around?  I'll just use 2:00 p.m.  You

 4    weren't involved in any way, shape, or manner with January

 5    6th?

 6              PROSPECTIVE JUROR NO. 1677:  No.  My recollection

 7    was I received a text message from somebody saying that she

 8    was in lockdown in the building around maybe late afternoon,

 9    5:00, 6:00 perhaps.

10              MR. MONTEITH:  Okay.

11              PROSPECTIVE JUROR NO. 1677:  And then that's when

12    I followed up with the phone call.

13              MR. MONTEITH:  Did that affect you strongly?

14              PROSPECTIVE JUROR NO. 1677:  That specific

15    instance, no.  But after I had seen the news finally,

16    because I was in my basement working, I mean, I was

17    infuriated actually.  I had some meetings that night with my

18    church group that I cancelled immediately because I was

19    frustrated with what had happened that afternoon.

20              MR. MONTEITH:  Thank you.

21              PROSPECTIVE JUROR NO. 1677:  You're welcome.

22              THE COURT:  Okay.  You say you were personally

23    affected.  You had to cancel your church group meetings.

24    You were infuriated.

25              Sitting here today, two years later, do you think
```

1    that those feelings you can put aside, or not?

2              PROSPECTIVE JUROR NO. 1677:  Yes, in the course of

3    time, yes.  But I will remember that day.

4              So how that influences what evidence is presented,

5    I don't know.  I would like to think I would be impartial as

6    that evidence is presented.

7              THE COURT:  And how confident are you that you can

8    do that?

9              PROSPECTIVE JUROR NO. 1677:  90 percent.

10             THE COURT:  All right.  You can step down.

11             All right.

12             MS. ARCO:  Not from the government.

13             MR. GARRITY:  For cause, Judge.

14             THE COURT:  Does 90 percent get him there,

15   Ms. Arco, or Mr. Gordon?

16             MR. GORDON:  It does not.

17             THE COURT:  I don't think so either.  The Court

18   will strike him.

19             THE COURTROOM DEPUTY:  Your Honor, Juror No. 1144.

20             THE COURT:  I don't think I have a card for 11 --

21   oh, yes, I do.

22             Okay.  You're Mr. Gerberg?

23             PROSPECTIVE JUROR NO. 1144:  That's right, yes.

24             THE COURT:  Okay.  So you work for *The Post*.  What

25   do you cover?

1          PROSPECTIVE JUROR NO. 1144:  Yes, sir.  I cover a

2     mix of national and investigative and international news.

3          THE COURT:  Have you covered January 6th?

4          PROSPECTIVE JUROR NO. 1144:  I was not here on

5     January 6th, but I have covered other Stop the Steal rallies

6     and things like that.

7          THE COURT:  Okay.  A little too close to home for

8     you, to --

9          PROSPECTIVE JUROR NO. 1144:  I would imagine so,

10    yes.

11         THE COURT:  You can step down.

12         PROSPECTIVE JUROR NO. 1144:  Thanks.

13         THE COURTROOM DEPUTY:  Your Honor, Juror No. 0410.

14         THE COURT:  Okay.  You are Ms. Dunston; is that

15    correct?

16         PROSPECTIVE JUROR NO. 0410:  Yes.

17         THE COURT:  Thank you for your patience.

18         All right.  You are in real estate for something

19    called Charm City Sanctuary.  Tell us what Charm City

20    Sanctuary is.

21         PROSPECTIVE JUROR NO. 0410:  It's a property

22    business, real estate.  I'm a property manager.  I buy

23    properties.

24         THE COURT:  Residential?  Commercial?

25         PROSPECTIVE JUROR NO. 0410:  Residential.

```
 1                    THE COURT:  Okay.  In D.C.?

 2                    PROSPECTIVE JUROR NO. 0410:  In Baltimore and

 3       elsewhere.

 4                    THE COURT:  Okay.  And do you have a significant

 5       other?

 6                    PROSPECTIVE JUROR NO. 0410:  Yes.

 7                    THE COURT:  What does he or she do?

 8                    PROSPECTIVE JUROR NO. 0410:  He's a doctor.

 9                    THE COURT:  Okay.  You followed coverage of

10       January 6th; is that right?

11                    PROSPECTIVE JUROR NO. 0410:  Yes.

12                    THE COURT:  How closely?

13                    PROSPECTIVE JUROR NO. 0410:  Very close.

14                    THE COURT:  Very close, okay.  And you watched

15       some of those hearings, the House hearings?

16                    PROSPECTIVE JUROR NO. 0410:  All of them.

17                    THE COURT:  Okay.  Any impressions, takeaways,

18       from watching the coverage or the hearings?

19                    PROSPECTIVE JUROR NO. 0410:  It was informative.

20                    THE COURT:  What about the events of January 6th?

21                    PROSPECTIVE JUROR NO. 0410:  It was pretty wild.

22                    THE COURT:  Pretty wild?

23                    PROSPECTIVE JUROR NO. 0410:  Yeah.

24                    THE COURT:  Okay.  You know some lawyers?

25                    PROSPECTIVE JUROR NO. 0410:  Yes.
```

```
1              THE COURT:  Do you have any close friends who are

2     in the area of criminal law?

3              PROSPECTIVE JUROR NO. 0410:  No.

4              THE COURT:  No.  And you have prior jury service?

5              PROSPECTIVE JUROR NO. 0410:  Yes.

6              THE COURT:  What kind of case?

7              PROSPECTIVE JUROR NO. 0410:  About 50 cases on

8     grand jury last year, Superior Court.

9              THE COURT:  Okay.  Was that a positive experience

10    or negative experience or neither?

11             PROSPECTIVE JUROR NO. 0410:  Both.

12             THE COURT:  Anything about that experience make

13    you hesitate to be on a trial jury again?

14             PROSPECTIVE JUROR NO. 0410:  No.

15             THE COURT:  All right.  Counsel?

16             MS. ARCO:  Good afternoon, Ms. Dunston.

17             PROSPECTIVE JUROR NO. 0410:  Hi.

18             MS. ARCO:  So you described January 6th, you know,

19    what you viewed as wild.  Can you expand a little bit on

20    that?  What do you mean by "wild"?

21             PROSPECTIVE JUROR NO. 0410:  Being from the area

22    living in D.C., I've never seen protests like that in my

23    life, if that's what you want to call it.

24             MS. ARCO:  Okay.  And you said you watched all the

25    hearings and followed the news pretty closely?
```

1          PROSPECTIVE JUROR NO. 0410:  Uh-huh.

2          MS. ARCO:  Did you follow specific, like, criminal

3     cases, or just about the events generally?

4          PROSPECTIVE JUROR NO. 0410:  About the events

5     generally.

6          MS. ARCO:  Okay.  And do you think that you'd be

7     able to set aside what you've seen in the hearings and, you

8     know, in the news generally and just focus on the evidence

9     presented in this case?

10          PROSPECTIVE JUROR NO. 0410:  Sure.

11          MS. ARCO:  And to follow the judge's instructions

12     about the specific crimes with which Ms. Niemela is charged?

13          PROSPECTIVE JUROR NO. 0410:  Yes.

14          MS. ARCO:  Okay.  Thank you.

15          MR. GARRITY:  Good afternoon, Ms. Dunston.

16          PROSPECTIVE JUROR NO. 0410:  Hi.

17          MR. GARRITY:  You said you've watched the -- you

18     watched the news coverage closely related to the events of

19     January 6th.

20          PROSPECTIVE JUROR NO. 0410:  Uh-huh.

21          MR. GARRITY:  And you watched all of the January

22     6th Committee hearings?

23          PROSPECTIVE JUROR NO. 0410:  Yes.

24          MR. GARRITY:  And you said what you saw and read

25     about was pretty wild; is that right?

```
1              PROSPECTIVE JUROR NO. 0410:  Yes.

2              MR. GARRITY:  Is it fair to say, pretty wild,

3     "wild" in the negative sense?

4              PROSPECTIVE JUROR NO. 0410:  Overall, yes.

5              MR. GARRITY:  And did you -- after watching the

6     Committee hearings and watching the events of January 6th,

7     do you have an opinion one way or the other with respect to

8     people who may support Former President Trump?

9              PROSPECTIVE JUROR NO. 0410:  No.

10             MR. GARRITY:  If you were presented with evidence

11    that Ms. Niemela may have been on the Capitol grounds and

12    may have gone into the Capitol itself, based on what you

13    observed of the coverage, would that impact or impair your

14    ability to fairly judge Ms. Niemela's conduct?

15             PROSPECTIVE JUROR NO. 0410:  No.

16             MR. GARRITY:  I have no further questions.  Thank

17    you.

18             THE COURT:  Thank you, ma'am.  You can step down.

19             Okay.  Counsel, I know it's late in the day, but I

20    would like to press on and hopefully not bring everybody

21    back in the morning, so I think what we're going to do is --

22    first of all, if we could -- Ms. Arco, do you want to come

23    up and draw the first number out of the bowl, and then

24    defense will draw the second one.  And these will be the two

25    alternate seats.
```

```
1              All right.  Ms. Arco, did you draw?

2              MS. ARCO:  Pardon?  Yes, 10.  I don't know what

3    you're asking.

4              THE COURT:  I'll tell you what, draw another one.

5    And it's not on the record, okay?

6              And, Ms. Jenkins, if you could hand those to me.

7    Get Ms. Arco's, and then get the other one.

8              Go to the phones.

9              (The following is a bench conference held

10              outside the hearing of the gallery)

11             THE COURT:  Alternate Seat No. 1 is 13, and

12   Alternate No. 2 seat is 8.  Okay?

13             (This is the end of the bench conference)

14             THE COURT:  The last juror, I'm told, Ms. Dunston,

15   any challenge to her?

16             MS. ARCO:  Not from the government.

17             MR. GARRITY:  No challenge, Your Honor.

18             THE COURT:  Okay.  So she is qualified, but unless

19   there is an issue, don't strike against her because she's

20   not -- she's No. 33.  Okay?

21             All right.  Let's bring everybody back in,

22   including the one person we did not question in order, and

23   we'll have the first 14 in the box, the rest in order in the

24   gallery.

25             And then once you see them, Counsel, we'll take
```

1     about ten minutes for you to review your notes.  Ms. Jenkins

2     will give you the sheets to fill out.

3               So don't strike initially against the two

4     alternate seats.  Only strike against the regular seats or

5     the gallery.  Got it?

6               (Pause)

7               THE COURT:  All right.  Counsel, Juror No. 2471,

8     who was the first one we qualified this morning --

9               MR. GORDON:  No. 4 in the order.

10              THE COURT:  -- No. 4 in the order is a no show, so

11    that's why we seat an extra.

12              MS. ARCO:  Good call, Judge.

13              MR. GORDON:  That happened last time, Your Honor.

14    We had two.

15              THE COURT:  We had two, I remember.

16              (Pause)

17              THE COURT:  And what we're going to do is we'll

18    seat the first 14 qualified jurors in the box, all right.

19    The others who would have been in the box but have been

20    disqualified, we'll put them in the audience.  I'm going

21    to -- we're going to dismiss all of the nonqualified jurors,

22    so what we'll be left with is 32 qualified jurors in order.

23    We'll do a roll call just so you all can put some names to

24    numbers, and then you'll exercise your strikes.  Okay?  I

25    think.

```
 1                    (Pause)

 2                    (Jury panel enters courtroom)

 3            THE COURT:  All right, ladies and gentlemen, just

 4     bear with us.  We're going to get the rest of the folks, and

 5     we'll finish up this process.  Okay?

 6                    (Pause)

 7            THE COURT:  All right.  Ladies and gentlemen,

 8     thank you very much for your patience.  I know that it is

 9     late in the day, but we wanted to finish this process today

10     if at all possible so that we don't have to call everyone

11     back tomorrow.

12            So with that, the next stage of the jury

13     selection -- these folks are going to do some work, and

14     we're going to give them about five or ten minutes.  Then

15     we're going to change out some of the seats.  I call this

16     part musical chairs.  And then hopefully after that process

17     we will have our jury.  All right?

18                    (Pause)

19            THE COURT:  Do we want to do a roll call, Lauren,

20     of the others that aren't in the box just so that folks can

21     put a face with a number again?

22            THE COURTROOM DEPUTY:  As I call your juror

23     number, please raise your hand.

24            Juror No. 1695, Juror No. 15 -- I'm sorry.  My

25     apologies.
```

1          Juror No. 0275, please raise your hand.

2          2764, 0594, 0945, 0373, 0577, 0502, 2159, 0046,

3     2531, 2784, 0222, 1085, 1042, 1073, 1207, 2691, and 0410.

4     Thank you.

5               (The following is a conference held

6                outside the hearing of the gallery)

7          THE COURT:  All right.  So obviously all of the

8     qualified jurors are either in the box or in the gallery to

9     my right.  The ones to my left should have been all

10    disqualified.  Okay.  We're just going to hold them back and

11    release them at the end.  Okay?

12              So about five minutes.

13         MS. ARCO:  Thank you.

14              (This is the end of the bench conference)

15              (Pause)

16         THE COURT:  All right.  Ladies and gentlemen,

17    let's -- just bear with us a few more minutes.  Okay?

18              (Pause)

19         THE COURT:  Counsel, let's wrap it up.

20         THE COURTROOM DEPUTY:  Ladies and gentlemen, as I

21    call your juror number, please stand and please have a seat

22    in the back row of the gallery.  The next number I will

23    call, if you could take that seat of the juror that they

24    stepped away from.

25              Juror No. 1092.  Juror No. 0594, if you could take

1        that seat.

2                Juror No. 2650, if you can take a seat in the rear

3        of the gallery, please.  Juror No. 0945, if you can take

4        that seat.

5                Juror No. 0503, please stand.  Juror No. 0373, if

6        you could take that seat.

7                Juror No. 1047, if you could please stand.  Juror

8        No. 0577, if you can take that seat.

9                Juror No. 1333, if you can have a seat in the

10       back.  Juror No. 2159, if you can take that seat.

11               Juror No. 0649, please stand.  Ma'am, if you can

12       have a seat in the back.  Juror No. 0046, if you can take

13       that seat.

14               Juror No. 2798, if you can take a seat in the

15       back.  Juror No. 2784, if you could take that seat.

16               Hold on one second.

17               (Pause)

18               THE COURTROOM DEPUTY:  Juror No. 0471, if you

19       could take a seat in the back.  And Juror No. 0222, if you

20       can take that seat.

21               (Pause)

22               THE COURTROOM DEPUTY:  Juror No. 1375, you can

23       take a seat in the gallery.  And Juror No. 1042, you can

24       take that seat.

25               Juror No. 0046, if you can raise your hand.  0046,

```
1       if you can raise your hand.

2                  2784, if you can raise your hand.  2784?  And

3       0222, if you can raise your hand.

4                  Your Honor, this is the panel.

5                  THE COURT:  All set?

6                  Counsel go to the phones.

7                  (The following is a conference held

8                   outside the hearing of the gallery)

9                  THE COURT:  All right.  This is your jury.  Are

10      you happy with it?

11                 MR. GORDON:  It looks like it does for us, yes.

12                 THE COURT:  I mean, not that you're happy with it,

13      but is there anyone that you struck on the 14, or is there

14      anyone that you did not strike that should be in there?

15                 MR. GORDON:  No, Your Honor.

16                 MR. GARRITY:  Can we have one second, Your Honor,

17      very quickly?

18                 (Pause)

19                 MR. GARRITY:  Your Honor, if I could, we meant to

20      strike, rather than 06 --

21                 THE COURT:  Hold on.

22                 Ms. Jenkins, can you get on the phone?

23                 THE COURTROOM DEPUTY:  I don't have one.

24                 THE COURT:  Okay.  Can you follow the transcript?

25                 Okay.  Go ahead, Counsel.
```

1            MR. GARRITY:  Your Honor, we meant to strike 2572

2      rather than 0649.

3            THE COURT:  Okay.  Why did you strike the wrong

4      person?

5            MR. GARRITY:  I initially had it marked down as

6      Juror No. 2572.  I had checked off next to my list No. 8.  I

7      thought that was an alternate.

8            THE COURT:  Okay.  So what juror number is that?

9            MR. GARRITY:  That is 2572, Your Honor.

10           THE COURT:  Along the right-hand side of your form

11      there's a sequential number.  Which number is that?

12           MR. GARRITY:  No. 8.

13           THE COURT:  No. 8 is 2572, Ms. Cromwell?

14           MR. GARRITY:  Yes.

15           THE COURT:  And you meant to strike her, but who

16      is -- and she's impanelled now?

17           MR. GARRITY:  Yes, she is, Your Honor.

18           THE COURT:  In which seat?

19           MR. GARRITY:  She is in -- if I'm looking at from

20      my right.

21           THE COURT:  No, left to right, bottom to top.

22           MR. GORDON:  She's Juror 3, Your Honor.

23           MR. GARRITY:  No. 3.

24           THE COURT:  All right.  Mr. Gordon, can we correct

25      that, or are you going to hold them to their strikes?

1          MR. GORDON:  The only issue is I think it shuffles

2   the other seats that followed that, and then it changes who

3   the alternates are, so there is a ripple effect.

4          I don't have an issue with letting defense have

5   the jury they want, but then we need to go back and have a

6   chance to look and see if it changes our strikes.

7          THE COURT:  Okay.  I'm going to stick with the

8   people you've stricken.  Okay?

9          MR. GARRITY:  Understood.  Thank you.

10         (This is the end of the bench conference)

11         THE COURT:  All right.  Ladies and gentlemen,

12   again, I apologize for the lateness of the evening, but I

13   think that our process has been completed.

14         If you are in the audience, you will be dismissed.

15   Thank you very much for your service.  Again, my apologies

16   for the delay.  This is more of an art, not a science.  If

17   you want to blame anyone, please blame me.  I had another

18   jury who was deliberating today and came in with a verdict

19   this morning, and we had to take some time out of the

20   process to deal with that, and that is the major cause for

21   the lateness of the hour.

22         So, again, with my apologies, thank you very much

23   for your service.  You are all excused, okay?  Have a good

24   evening.

25         (Venire exits courtroom)

```
 1              THE COURT:  All right.  Ladies and gentlemen, as
 2    you may have guessed, you are our jury.  So first thing I'll
 3    need you to do is all stand and raise your right hand to be
 4    sworn in.
 5              (Jury sworn)
 6              THE COURTROOM DEPUTY:  Thank you.  Please be
 7    seated.
 8              THE COURT:  Okay.  Ladies and gentlemen, just real
 9    quickly, now that you have been selected for the jury, I
10    know there's a temptation to go home and to talk to your
11    friends and loved ones about the jury that you've been
12    selected for.  Please resist that urge, okay?  Even though
13    you are now our jury, you cannot talk about the case with
14    anyone, including yourselves, until deliberations begin.
15    Okay?
16              Let's be back here at 9:00 in the morning.  We
17    will try to get started as close to 9:00 as possible.
18    Sometimes there will be some legal issues that I have to
19    deal with with the lawyers before we bring the jury in, but
20    I'll try to do that as efficiently as possible.  We will
21    have breakfast for you all in the jury room starting at --
22    Lauren, about 8:30?
23              THE COURTROOM DEPUTY:  Yes, Your Honor.
24              THE COURT:  So feel free to come in and buzz in to
25    the intercom system, and someone will be available beginning
```

1    at about 8:15 to let you in.  Breakfast will be there at

2    8:30, but try to be here as close to 9:00 as you can, and,

3    again, 15-minute break in the morning, hour, hour and 15-

4    minute lunch break, another break in the afternoon and we'll

5    try to knock off around 4:30/5:00.  All right?

6              So, again, no discussions about the case, no

7    independent research about the case, and we'll see you back

8    here tomorrow morning.  Okay?

9              JUROR:  Can we bring notebooks to take notes?

10             THE COURT:  Yes, you will have -- I will give you

11   some preliminary instructions in the morning about what the

12   trial is going to look like, the stages, note-taking, all

13   those things.  No need to bring your own notes.  We'll have

14   a notebook and a pen here for everybody.

15             JUROR:  Can I ask a stupid question?

16             THE COURT:  No such thing as a stupid question.

17   And feel fry to slide your mask off as well.

18             JUROR:  So like you say 9:00 a.m.  Does that have

19   to be sharp or like because --

20             THE COURT:  What's your conflict?

21             JUROR:  Because I got here -- the thing -- the

22   metal detector takes like, you know, a few minutes so what

23   if that's the hold-up, you know?

24             THE COURT:  Well, try to get here a little early.

25   Okay?  And if you're standing in line, we can deal with

```
 1    that.
 2              JUROR:  Okay.
 3              THE COURT:  Not a stupid question.
 4              And, you know, there's a lot of stuff going on in
 5    the courthouse right now so the lines may be long.  We'll
 6    try to expedite that as much as we can, but you have to be
 7    patient.  Okay?
 8              JUROR:  You said ring the buzzer and --
 9              THE COURT:  She'll let you know.
10              So why don't you all follow Ms. Jenkins.  She'll
11    show you the jury room and how to buzz into the jury room in
12    the morning.  Okay?
13              Have a great night, everybody.
14              (Jury exits courtroom)
15              THE COURT:  All right.  Folks, this is the second
16    trial in a row where there's been confusion about the
17    alternate seats.  How can I explain it any better?
18              MR. GORDON:  It is a bit confusing, Your Honor.
19              So as I understand it now, having gone through it
20    twice barely, is that -- so everybody is seated in their
21    original order.  Right?
22              THE COURT:  Right.
23              MR. GORDON:  And then as sort of people have been
24    removed for strikes, you know, they're called from the
25    audience to fill those seats, and it ends up being just
```

1    whomever sort of by luck of strikes ends up sitting in 8, in

2    this case, and ends up sitting in 13.  Those are the

3    alternates.  Okay?

4              THE COURT:  So that's why we don't call it

5    alternate jurors or alternate juror numbers; we call it

6    alternate seats.  So anyone who is sitting in one of those

7    two seats, when we qualify everybody, those are the

8    alternate seats.  So you don't strike against those seats.

9    You strike against the seats in the second round.

10             And so the seats in this case, you know what they

11   are, those are the alternate seats.

12             MR. GORDON:  It's hard to track, as the switches

13   are happening, who is sitting from the beginning in 8 and

14   13, so what I might recommend is next time just take a brief

15   pause after everybody's seated and just identify over the

16   phones the number of the juror sitting in the alternate

17   seats, so as we're looking down at our papers --

18             THE COURT:  So let's assume that the alternate

19   seat is Seat 1.

20             MR. GORDON:  Then you might say, get on the

21   phones, okay, everyone it's Juror No. 1234 who is sitting in

22   an alternate seat.

23             THE COURT:  Okay.

24             MR. GORDON:  At least that would help me.  I know

25   it seems obvious.

1          THE COURT:  Fair enough.  I will incorporate that.

2          MR. GORDON:  Thank you, Your Honor.

3          MR. GARRITY:  Your Honor, I think our confusion

4     was -- at least on my part came from my notation on the

5     sheet as to the numerical number on the right-hand side.

6          THE COURT:  Okay.

7          MR. GARRITY:  And that's what threw me off.

8          THE COURT:  Okay.  But that numerical number, they

9     might not have been qualified.  Right?

10          MR. GARRITY:  Right, and my mistake for doing

11     that, Judge.

12          THE COURT:  Okay.  Well --

13          MR. GARRITY:  I wasn't familiar with your --

14          THE COURT:  -- we got there.

15          MR. GARRITY:  Thank you.

16          THE COURT:  All right.  See you folks in the

17     morning.  We'll take up pretrial stuff tomorrow.  Anything

18     pressing that we need to put on the record?

19          MR. GORDON:  No, Your Honor.  I would just ask

20     that in your preliminary instructions first thing in the

21     morning that you tell the jurors that we don't talk to them.

22     We don't acknowledge them, et cetera, in the hallways.

23          THE COURT:  Yes, I will do that.

24          Okay.  Have a good night.

25          Openings, less than 20 minutes?

1          MS. ARCO:  Yes, Your Honor.

2          MR. GARRITY:  Yes.

3          THE COURT:  Okay.  Great.

4          All right.  Have a good night.

5          (Whereupon the hearing was

6          adjourned at 6:10 p.m.)

7

8          **CERTIFICATE OF OFFICIAL COURT REPORTER**

9

10          I, LISA A. MOREIRA, RDR, CRR, do hereby

11   certify that the above and foregoing constitutes a true and

12   accurate transcript of my stenographic notes and is a full,

13   true and complete transcript of the proceedings to the best

14   of my ability.

15      Dated this 2nd day of March, 2023.

16

17                              /s/Lisa A. Moreira, RDR, CRR

18                              Official Court Reporter
                                United States Courthouse
19                              Room 6718
                                333 Constitution Avenue, NW
20                              Washington, DC 20001

21

22

23

24

25