```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2   - - - - - - - - - - - - - - - x
     THE UNITED STATES OF AMERICA,
 3                                     Criminal Action No.
                    Plaintiff,         1:21-cr-623-CRC-2
 4                                     Tuesday, January 24, 2023
     vs.                               9:06 a.m.
 5
     KIRSTYN NIEMELA,
 6
                    Defendant.
 7   - - - - - - - - - - - - - - - x
     _____
 8
                      TRANSCRIPT OF JURY TRIAL
 9        HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                    UNITED STATES DISTRICT JUDGE
10   _____
     APPEARANCES:
11   For the United States:      MICHAEL MATTHEW GORDON, ESQ.
                                 DOJ-USAO
12                               400 North Tampa Street, Suite 3200
                                 Tampa, FL 33602
13                               (813) 274-6370

14                               JESSICA ARCO, ESQ.
                                 U.S. DEPARTMENT OF JUSTICE
15                               950 Pennsylvania Avenue NW
                                 Washington, DC 20530
16                               (202) 532-3867

17   For the Defendant:          PAUL GARRITY, ESQ.
                                 LAW OFFICES OF PAUL GARRITY
18                               14 Londonderry Road
                                 Londonderry, NH 03053
19                               (603) 434-4106

20                               RICHARD F. MONTEITH, JR., ESQ.
                                 LAW OFFICES OF RICHARD F. MONTEITH
21                               14 Londonderry Road
                                 Londonderry, NH 03053
22                               (603) 437-2733

23   Court Reporter:             Lisa A. Moreira, RDR, CRR
                                 Official Court Reporter
24                               U.S. Courthouse, Room 6718
                                 333 Constitution Avenue, NW
25                               Washington, DC  20001
                                 (202) 354-3187
```

1                          I N D E X

2

   WITNESSES:                                          PAGE

3

   CAPTAIN TIA SUMMERS

4       (By Mr. Gordon)....................................350
        (By Mr. Monteith).................................417

5

   LIEUTENANT BROOKE DETORIE

6       (By Ms. Arco)......................................429
        (By Mr. Monteith).................................452

7       (By Ms. Arco)......................................458

8  SPECIAL AGENT ELIZABETH GLAVEY
        (By Mr. Gordon)....................................460

9       (By Mr. Garrity)...................................481
        (By Mr. Gordon)....................................487

10

   SPECIAL AGENT MARK HASTBACKA

11      (By Ms. Arco)......................................492

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, we're on the
 3     record for Criminal Case 21-623 -- this is Defendant 2 --
 4     United States of America vs. Kirstyn Niemela.
 5              THE COURT:  Good morning, everybody.
 6              EVERYONE IN UNISON:  Good morning.
 7              THE COURT:  Did you have a nice night?  Where is
 8     A.J. putting you guys up?
 9              MR. GARRITY:  We're staying at the Hyatt.
10              THE COURT:  Make sure he takes care of you, all
11     right?  Let me know if he doesn't.
12              MR. GARRITY:  Okay.
13              THE COURT:  All right.  We have a few stragglers,
14     so why don't we just take care of some -- a few housekeeping
15     matters.
16              There were a number of motions in limine filed,
17     the first one, a government motion to bar evidence regarding
18     specific locations of Capitol Police surveillance cameras.
19     The defense doesn't intend on getting into that, right?
20              MR. GARRITY:  No, Your Honor.
21              THE COURT:  All right.  So that one is denied as
22     moot.
23              Another government motion to preclude defense
24     arguments about law enforcement, entrapment by estoppel
25     defense.  That's not a defense, I take it?
```

```
 1              MR. GARRITY:  It is not, Judge.

 2              THE COURT:  Come to the mic.

 3              MR. GARRITY:  There will be testimony, I expect,

 4      about what Ms. Niemela saw or may have seen with respect to

 5      law enforcement, and what law enforcement, in her viewpoint,

 6      did or did not do.

 7              THE COURT:  Okay.  That's obviously fair game.

 8              Government motion in limine to exclude cross-

 9      examination of Secret Service witnesses regarding Secret

10      Service protocols and the nature of Secret Service

11      protective details.  That's not at issue, correct?

12              MR. GARRITY:  Not an issue, Your Honor.

13              THE COURT:  All right.  So that one is denied as

14      moot as well.

15              I see that you all have agreed to a stipulation

16      or reached a stipulation regarding the authenticity of all

17      the video evidence that's going to come in.  Is that right,

18      Ms. Arco?

19              MS. ARCO:  That's correct, Your Honor.

20              THE COURT:  Okay.  So that motion in limine has

21      been overtaken by events; is that right?

22              MS. ARCO:  That's correct.

23              THE COURT:  All right.  Government motion in

24      limine to preclude cross-examination and evidence related to

25      the shooting of Ms. Babbitt.  There was a reference to an
```

 1    Officer KY, but I didn't see him on the government's list,

 2    so that issue's moot?

 3              MS. ARCO:  I believe so.  I don't know if they

 4    intend on raising it affirmatively in their defense case,

 5    but we will not be eliciting anything towards that.  And

 6    we're not calling Officer Yetter; and Ms. Niemela was not

 7    near that area.  We understand her to be there afterwards.

 8              THE COURT:  Okay.  Mr. Garrity, is that moot?

 9              MR. GARRITY:  Your Honor, the Ashli Babbitt issue

10    is moot.

11              With respect to Officer KY, I guess it's only

12    relevant in terms of what Ms. Niemela may have been able to

13    see at that time.  I believe the government will introduce

14    video that depicts what took place with the officer, and

15    Ms. Niemela is in that video.

16              THE COURT:  So did she observe the shooting?

17              MR. GARRITY:  No.  Judge --

18              THE COURT:  Come to the mic.

19              MR. GARRITY:  Just to, I guess, clarify.  Ashli

20    Babbitt is not an issue from our standpoint.

21              THE COURT:  Okay.  All right.

22              MR. GARRITY:  The issue with the Officer KY,

23    if I understand it correctly, he was pushed or jostled by

24    Mr. Eckerman at one point in time when Ms. Niemela was

25    nearby, and I think the jury's going to see video of that.

1              The only issue with respect to that officer is

2     what Ms. Chiguer could observe.  She's told the FBI she

3     couldn't observe what Mr. Eckerman was doing with that

4     officer, and it may be our contention as well that Ms.

5     Niemela, who is smaller than Ms. Chiguer, had even less of a

6     viewpoint of that interaction.

7              THE COURT:  So this is all just what different

8     people saw --

9              MR. GARRITY:  Right.

10             THE COURT:  -- or observed?

11             MR. GARRITY:  Right, right.

12             THE COURT:  Okay.

13             MR. GARRITY:  It's not a huge issue, Your Honor.

14             MS. ARCO:  And, Your Honor, just to be clear, what

15    he's describing took place far away and earlier in time from

16    the Ashli Babbitt shooting.  So Ms. Niemela was nowhere near

17    the area where Ashli Babbitt was shot at the time that

18    occurred.

19             THE COURT:  All right.  There was a defense motion

20    *in limine* to preclude the government from arguing vicarious

21    criminal liability and a motion *in limine* to exclude

22    evidence concerning conduct by others apart from the

23    defendant.

24             I guess, Ms. Arco, what evidence is the government

25    introducing related to others, and how is it relevant to the

1     defendant's guilt or innocence?

2          MS. ARCO:  Your Honor, Ms. Niemela's charged with

3     various charges related to disorderly conduct and whether or

4     not she understood or knew that she was not lawfully

5     permitted to remain in a restricted area.

6          We will be showing evidence of her time in the

7     Capitol where she's part of a mob, next to people who we

8     would argue are rioters; and, indeed, everyone who was in

9     the building we would argue was a rioter in the way that

10    they entered the building.

11         Your Honor, with respect to her conduct vis-a-vis

12    the others, the others' conduct is relevant because it

13    showed that she knew she wasn't supposed to be there.  It

14    showed that the crowd with which she had joined and was

15    following and indeed moving forward with past various police

16    lines was disruptive.

17         So we're only showing evidence that is relevant to

18    what she was around, participated in, witnessed, saw.  It's

19    not relevant to -- you know, if someone's, you know,

20    breaking a window, and she's nowhere around, we're not

21    showing anything like that.

22         THE COURT:  Are you intending to show the overview

23    montage video?

24         MS. ARCO:  Yes, Your Honor.

25         THE COURT:  Okay.  I have typically instructed the

1    jury after that is shown that, you know, she's not on trial

2    for anyone else's actions.

3            I mean, you can obviously offer evidence of other

4    people's conduct that she may have seen that might inform

5    her intent or whether she was disorderly.  I think that's

6    fair game.  But I've usually instructed that, you know,

7    look, you're going to see a lot of people.  She's only on

8    trial for her conduct and not for anybody else's conduct.

9    All right?

10           MS. ARCO:  Of course, Your Honor.

11           THE COURT:  And there was a motion to transfer

12   venue, which the Court will deny.  And I'll adopt the

13   rulings that I've made in a number of other cases where

14   similar motions have been filed.

15           The way to sort out any jury bias is through voir

16   dire, which I believe that we did successfully yesterday.

17   Okay?

18           MR. GORDON:  Just one issue on the

19   conduct-of-others issue that bleeds into what might be an

20   evidentiary relevance issue later.

21           One of our videos is very brief, but it's a clip

22   from a rally in December here in D.C.  The video's less than

23   a minute long, and it just shows the defendant present at

24   the rally.  She's walking, is all you see her doing in the

25   video.  There are signs and things around.

1          We're introducing it for the point that the

2    defendant was aware of the Stop the Steal movement and

3    invested in it sort of prior to January 6th.

4          In the video you can see that present at that same

5    rally are members of the Proud Boys identifiable by, you

6    know, a black-and-yellow flag and the sort of

7    black-and-yellow clothing they're wearing, and also former

8    National Security Advisor Mike Flynn.

9          To the extent that that raises similar sort of

10   conduct-of-others issues, you know, we would have the same

11   response:  That I think the Court's instruction is fine.  I

12   do think it's -- it will be relevant for the purpose I

13   described.

14         THE COURT:  Okay.  And I guess, again, if she were

15   charged with the obstruction charge, the relevance would be

16   obvious.

17         How is that relevant to -- you know, a rally four

18   weeks prior, relevant to the disorderly conduct?

19         MR. GORDON:  Yes, Your Honor.  Because with the

20   disorderly charge, there is an intent element that requires

21   that she have the specific intent not just to be disorderly,

22   but to have her disorderly conduct interfere with government

23   business or government function.

24         It's our position that the government function at

25   issue is sort of Congress's work generally and the

1    certification specifically.  So that's where it ties in.

2           THE COURT:  The fact that she was aware that there

3    would be a certification to stop -- and that was the steal

4    that needed to be stopped, shows that's why she went in two

5    weeks later?

6           MR. GORDON:  Yes, Your Honor.

7           THE COURT:  Okay.

8           MR. GARRITY:  Your Honor, just a couple of issues

9    with those particular videos.

10          One depicts Michael Flynn.  One depicts the Proud

11   Boys.  Ms. Niemela is in both videos, along with Stefanie

12   Chiguer.

13          One, we just don't think it's relevant whatsoever

14   to what took place on January 6th.

15          Secondly --

16          THE COURT:  Why don't you think it's relevant?

17          MR. GARRITY:  Because there's no indication that

18   Ms. Niemela is supportive of Michael Flynn in the video.

19   It's a very short clip.  She's just in the background behind

20   Michael Flynn, following him.

21          And the same with the Proud Boys.  The Proud Boys

22   are shouting out to people.  Ms. Niemela's in the background

23   I believe on a scooter along with Ms. Chiguer.  Ms. Chiguer

24   is videotaping the event.

25          It doesn't give any indication one way or the

 1     other in terms of whether or not Ms. Niemela knew what

 2     Mr. Michael Flynn was talking about, or the Proud Boys, so

 3     we think it's not relevant to the events of January 6th.

 4              But beyond that, Judge, we had extensive voir dire

 5     of the jurors.  We talked about QAnon.  We talked about

 6     stolen election issues.  What we didn't inquire of the

 7     jurors is what their views of Michael Flynn were and what

 8     their views of the Proud Boys are, maybe more importantly

 9     than Michael Flynn.

10              So not only is it not relevant; we think, given

11     the content of the video, if some of the jurors have an

12     extremely negative view of Michael Flynn or the Proud Boys,

13     it's prejudicial under 403.  But then it rolls into what we

14     did not explore in voir dire, which is what the jurors'

15     views of those individuals are.

16              THE COURT:  Okay.  Well, the extent of her

17     participation or support, that's a matter of fact that you

18     can deal with on cross.

19              I do think it's relevant to some extent for the

20     reasons that Mr. Gordon stated, and if you'd like me to

21     instruct about, you know, there's no evidence that she's a

22     member of the Proud Boys, I'd be happy to do that.  But

23     maybe that draws more attention to it than you want, so you

24     tell me.

25              MR. GARRITY:  I guess we'd rather not have a

 1     curative instruction on that.

 2               THE COURT:  Think about it.

 3               MR. GARRITY:  We'll think about it.

 4               But, Judge -- but beyond, I guess dealing with the

 5     relevancy issue, there's other pieces of evidence that the

 6     government has at their disposal that go to this particular

 7     issue of intent that do not factor in Michael Flynn or the

 8     Proud Boys.

 9               So it's got -- if it has any probative value, I

10     think its probative value, especially when they have other

11     ways of establishing what they mean to prove, other ways to

12     do that that don't bring in the prejudicial nature of

13     Michael Flynn or the Proud Boys.

14               THE COURT:  Regarding that December event or --

15               MR. GARRITY:  Or regarding the issue of intent.

16     They have other pieces of evidence at their disposal that

17     would not bring in --

18               THE COURT:  Right.

19               MR. GARRITY:  -- those issues.

20               THE COURT:  But in every case I've seen the

21     defense is, "No, I did not intend to go in to obstruct or to

22     interfere with some government function.  I was there for a

23     First Amendment protected protest."

24               The fact that someone may have come to Washington,

25     D.C., a second time weeks before to attend a similar event

 1   obviously could undermine that issue.

 2           So I'll allow it, and you let me know whether you

 3   want a curative instruction.  Okay?

 4           MR. GARRITY:  Thank you.

 5           THE COURT:  I saw you all worked out a number of

 6   stipulations.  I appreciate that.  We'll read those at the

 7   end of the government's case.  Is that -- or how do you want

 8   to handle it?

 9           MR. GORDON:  Your Honor, we had -- we can do it

10   that way.  We had sort of scripted it to read each one at

11   various times as the related issue comes up during the case.

12           THE COURT:  That's fine.  However you want to

13   handle it.

14           MR. GORDON:  We'll do that, Your Honor.  We'll

15   take care of reading it.

16           THE COURT:  All right.  Anything else occur to

17   you?

18           MR. GORDON:  Just two things to flag for the

19   Court, Your Honor.

20           We will be asking for the rule against -- or the

21   rule of sequestration to be imposed.

22           THE COURT:  The Court will impose the rule against

23   witnesses.  If you have any witnesses, just make sure

24   they're not in the courtroom during the testimony.

25           MR. GORDON:  We do have one minor concern, Your

1    Honor, about a nonwitness for either side being in the

2    courtroom and then transmitting information about what

3    happened in the courtroom to a witness who is outside.

4    Right?

5         So we anticipate the defense is going to call the

6    boyfriend or former boyfriend of the defendant's mother, but

7    not the mother herself.  So I anticipate the mother is going

8    to be in the courtroom and her boyfriend is going to be

9    outside.  And we want to make sure, if the mother's watching

10   the trial, she's not then communicating what happened inside

11   to the boyfriend who might be testifying.

12        THE COURT:  Hold on.  Okay.  Is this Mr. Leach?

13        MR. GORDON:  Yes, Your Honor.

14        THE COURT:  And so you'd like me to instruct

15   defense counsel to instruct Mr. -- the mother not to discuss

16   the case with Mr. Leach?

17        MR. GORDON:  That would be perfectly -- that

18   would be acceptable, Your Honor.  I don't want to tell you

19   how to -- you can instruct her how --

20        THE COURT:  Counsel, do you want to address that?

21        MR. GARRITY:  I don't think we have an issue with

22   that.  We'll tell Ms. Niemela's mother not to pass on any

23   information that she observes in the courtroom.

24        THE COURT:  Thank you.

25        MR. GORDON:  And, Your Honor, the last thing is

1    something that we hope is a good thing.  Defense counsel and

2    the government have worked out that for the, you know, vast

3    majority of the government's exhibits, there's no objection.

4    So just to speed things along, I'm going to move in at the

5    very start of our case a large number of exhibits by number.

6              THE COURT:  Great.

7              MR. GORDON:  I'll just flag that for you.

8              THE COURT:  Appreciate that.

9              MR. GORDON:  Thank you, Your Honor.

10             MR. GARRITY:  Your Honor, if I could --

11             THE COURT:  And do we have a written list for

12   Ms. Jenkins, or will it be --

13             MR. GORDON:  Yes.  We'll make one.

14             THE COURT:  That will be great.

15             MR. GARRITY:  Along those lines, Your Honor, we do

16   have objections to some exhibits.  Do we take them up now or

17   take them up when the government tries to introduce them?

18             THE COURT:  Well --

19             MR. GARRITY:  I'm just not sure what the Court's

20   preference is.

21             THE COURT:  If we're going to introduce them en

22   masse, then we should take them up before we do that,

23   obviously.

24             MR. GORDON:  The ones I intend to introduce en

25   masse, Your Honor, are only the ones that are not objected

1    to.

2                    THE COURT:  Perfect, okay.

3                    MR. GORDON:  So what's remaining should be 13

4    exhibits -- (to Mr. Garrity) we've got one more -- 13

5    exhibits that are objected to, and we'll obviously -- when

6    those come up at the trial, obviously the defense will

7    object then.

8                    THE COURT:  That's fine.

9                    MR. GORDON:  It will be clear to everyone which

10   ones they are because they're the ones that we'll be having

11   to say out loud "At this time, Your Honor, the government

12   submits" whatever into evidence.

13                   MR. GARRITY:  Okay.  That makes sense.  Thank you.

14                   THE COURT:  Are they all here, Lauren?  Or should

15   we take five minutes?

16                   All right.  Let's take five minutes.  We'll start

17   up at 9:30.

18                   (Recess taken)

19                   THE COURT:  All right.  Please have a seat,

20   everyone.

21                   Good morning.

22                   JURY IN UNISON:  Good morning.

23                   THE COURT:  You all came back?  Good to see you.

24   Hope everyone had a nice restful evening.

25                   Before we get started with opening statements this

 1    morning, I'm just going to give you a few preliminary

 2    instructions about how the trial will work and some of the

 3    legal rules that we'll follow during trial.  This is no

 4    substitute for the more detailed legal instructions that I

 5    will give you at the end of the case.  It's just pretty much

 6    a road map of how things are going to go over the next two

 7    or three days.

 8            The first thing is that you should all have

 9    received a notebook.  Some jurors find it useful to take

10    notes.  Others find it distracting to do so.  It is entirely

11    up to you whether to take notes or not.

12            If you do take notes, feel free to write down

13    anything that you like.  The notes -- the notebooks will be

14    locked in the courtroom or the jury room overnight and will

15    be destroyed after the trial, so no one will ever read what

16    you write down.

17            The second thing is an apology in advance.  You

18    will notice that there are 14 of you, but only 12 of you

19    will ultimately deliberate, and that's because there are two

20    alternate jurors, and those jurors -- or the seats that

21    you're in were picked at random before trial; not based on

22    who you are, but based randomly on what seats you are in.

23            I will not disclose who the alternates are until

24    the end of trial, and only I and the lawyers and the parties

25    know who the alternate seats are.

1      Because any seat could be an alternate seat, I

2 want all of you to devote your full attention to the case

3 and assume that you will be deliberating.

4      As I told you yesterday, this is a criminal trial

5 that began when a grand jury issued an indictment.  In

6 summary, the indictment charges the defendant, Kirstyn

7 Niemela, with four separate crimes arising from her alleged

8 conduct in the United States Capitol on January 6, 2021.

9      You will receive detailed instructions at the end

10 of the case about the law that applies to each one of these

11 crimes, but in brief, the charges are:  First, entering and

12 remaining in a restricted building or grounds; second,

13 disorderly conduct in a restricted building or grounds;

14 third, disorderly conduct in a Capitol building; and fourth,

15 parading, demonstrating, or picketing in a Capitol building.

16      At the end of the trial, you will have to decide

17 whether or not the evidence presented has convinced you

18 beyond a reasonable doubt that the defendant committed any

19 of the offenses with which she is charged in the indictment.

20 To prove the offenses, the government must prove beyond a

21 reasonable doubt each of the elements of the charged

22 offense.

23      Again, I will instruct you on those specific

24 elements of each charge at the end of the presentation of

25 evidence.

1            You should understand that the indictment is not

2    evidence in the case.  It is just a formal way of charging a

3    person with a crime in order to bring a case to trial.  You

4    must not think of the indictment as evidence of the guilt of

5    the defendant just because she has been indicted.  At the

6    end of the trial, you will have to decide whether the

7    government has proven each element of each one of the four

8    charges beyond a reasonable doubt.

9            As I said yesterday, the defendant is presumed to

10   be innocent.  That presumption remains throughout the trial

11   unless she is proven guilty beyond a reasonable doubt.

12           The burden is always on the government.  If the

13   government proves each of an offense -- each one of the

14   offenses beyond a reasonable doubt, it is your duty to find

15   the defendant guilty of that offense.  But if you find the

16   government has not proved one or more elements of a

17   particular offense, you must find the defendant not guilty

18   of that offense.

19           You will refer -- you will hear me refer to each

20   side as either the government or the defense.  "The

21   government" simply means the prosecution team or one of the

22   lawyers.  "The defense" means the defendant or one of her

23   lawyers.

24           The trial will proceed in four stages.  In a

25   minute you will hear opening statements, first the

1    government, and then the defendant.  The defendant could

2    wait until the beginning of its case to present an opening

3    statement, but I believe that the defense will open now.

4              MR. GARRITY:  That's correct, Your Honor.

5              THE COURT:  Okay.  The arguments -- the opening

6    statements of the lawyers and the arguments of the lawyers

7    are not evidence.  They are intended simply to give you a

8    road map of what each side thinks the evidence will show.

9              The second stage of the case is the presentation

10   of the evidence.  We'll begin in the same order.  The

11   government will put on what's called its case-in-chief.  The

12   defense will cross-examine each witness, and there will be a

13   brief redirect by the government.

14             After the government's case, the defendant may,

15   but is not required to, put on its case-in-chief.  If the

16   defendant puts on a case, it will follow the same order.

17   There will be a cross-examination of witnesses by the

18   government, and then a brief redirect by the defense.

19             The government may then choose to put on what's

20   called a rebuttal case after the defense's case.

21             During the presentation of evidence, lawyers will

22   be asking questions of witnesses.  Like their opening

23   statements, the questions are not evidence.  The only

24   evidence is the sworn testimony of witnesses and any

25   exhibits that will be admitted into evidence.

1          The third stage will be the instructions on the

2     law, the detailed legal instructions that I will give you.

3          And then the final stage will be closing arguments

4     in the same order:  the government, the defense, and then a

5     brief rebuttal argument by the government.

6          Again, closing arguments by the lawyers are not

7     evidence.  They are only intended to help you understand

8     from each side's perspective what the evidence showed.

9          And finally, there will be a few closing

10    instructions, and then you will be asked to retire for your

11    deliberations.

12          My responsibilities are to run a fair and

13    efficient trial, to rule on any questions of law, to rule on

14    objections by either side to questions or the introduction

15    of evidence, and to instruct you on the law.

16          It is your duty to follow my instructions as well

17    as to decide the facts in the case.  You and only you are

18    the ultimate decider of the facts in the case.  You will

19    weigh the evidence, and you will judge the credibility and

20    believability of the witnesses that you hear from.

21          You may hear objections to particular questions.

22    If I sustain an objection, that means the question must be

23    withdrawn, and you must not speculate as to what the answer

24    to the question would have been.  If the answer has already

25    been given, and I strike the answer from the record, you are

1      to disregard the answer.  The same is true for any exhibits

2      that I may have stricken.

3            If I overrule an objection, that means that the

4      question stands, the witness may answer it, and you may

5      consider the witness's answer as evidence in the case.

6            As I've said -- as I said yesterday and as I will

7      remind you throughout the trial, please do not discuss the

8      case with anyone, including family members or your -- or the

9      members of the jury panel, until your deliberations begin.

10     When the case is over, you can talk about it with friends

11     and family as much as you like.

12           Also, no social media postings, no blogging, no

13     Facebook posts, no Tweets, anything like that; no

14     independent research about the case.

15           We will all be living in the same courtroom or

16     courthouse over the next few days.  You are likely to run

17     into some of the lawyers or some of the parties or some of

18     my staff.  If someone turns away and doesn't say good

19     morning or good afternoon, they're not being rude, they're

20     just trying to follow my instructions.  Okay?

21           If you happen to see another juror interacting

22     with someone inappropriately contrary to my instructions

23     or anything else that gives you pause, please just let

24     Ms. Jenkins or someone know about it, and we'll deal with it

25     at that point.

```
 1              All right.  I think that is it.

 2              Ms. Moreira will be taking down everything that

 3      takes place in court, but you will not have a transcript of

 4      the proceedings back in the jury room with you, so your

 5      memory will control and any notes you take, if you choose to

 6      take them.  Okay?  But there will be no transcript of the

 7      proceedings back in the jury room.

 8              With that, please pay close attention, and I

 9      believe Ms. Arco will be delivering the government's opening

10      statement.

11              MS. ARCO:  Thank you.  Good morning.

12              Ms. Jenkins, can you please publish from the --

13              THE COURTROOM DEPUTY:  Yes, give me one second.

14              MS. ARCO:  Thank you.

15              THE COURT:  And ladies and gentlemen, if you can't

16      hear, if you need to take a bathroom break, anything, just

17      feel free to raise your hand.  Okay?

18              MS. ARCO:  On January 6, 2021, the defendant,

19      Kirstyn Niemela, stormed the United States Capitol as part

20      of an angry mob, a mob that overran barricades, assaulted

21      numerous police officers, and forced Congress to stop its

22      important work that day.

23              That day Congress was meeting to certify the

24      results of the 2020 presidential election, meeting to carry

25      out the peaceful transition of power that is the bedrock of
```

 1    our democracy.

 2           Dressed in mirrored sunglasses and with an

 3    American flag draped on her back, the defendant had a

 4    purpose.  She had a cause.  She believed that the 2020

 5    presidential election was stolen from the former president.

 6    This is why she came to D.C., to stop the steal.

 7           Indeed, less than a week before the riot on

 8    January 6th, the defendant sent this link to at least five

 9    people providing details about a protest outside the Capitol

10    that she hoped would sway the #DoNotCertify caucus to object

11    to the botched Electoral College and give her preferred

12    candidate a second term.

13           The defendant believed that if the president-elect

14    took office, the country would be destroyed.  She was

15    determined to not let that happen.  She was ready to take

16    the country back, in her words.  So when a mob stormed the

17    Capitol building, she eagerly joined in.

18           The U.S. Capitol Police scrambled to try and

19    contain the rioters and prevent them from reaching sensitive

20    areas of the Capitol building, but they were no match for

21    the mob's numbers.

22           The defendant contributed to those numbers, to the

23    strength and weight of the mob that was able to overwhelm

24    and break through multiple police lines.  The defendant was

25    part of a mob that breached not one, not two, but three

1    separate police lines in the Capitol building; police lines

2    that were guarding the Capitol and the members of Congress

3    as their staff were sheltered in place inside.  Due to the

4    advancing mob, the Secret Service had to evacuate then Vice

5    President Mike Pence, who was presiding over the proceedings

6    that day.

7            The evidence will show that members of the public

8    weren't even allowed at the Capitol on January 6, 2021.

9    There were barriers forming a perimeter around the entire

10   Capitol grounds, including the West Front of the Capitol

11   that you see in that photo.  A perimeter was formed in that

12   area using metal bike rack barricades and green fencing that

13   you see here called snow fencing, and by signs that clearly

14   indicated people weren't supposed to go inside, specifically

15   the sign you see here with "Area Closed" and in capital

16   letters.

17           But those signs, that fencing, and the barricades

18   didn't stop the mob.  The mob disregarded those signs,

19   dismantled the barricades, and forced police on multiple

20   occasions to retreat for their safety.

21           But while the broader context of what happened

22   that day is important, this case is about one person, one

23   member of that mob.  The defendant.

24           After attending the Stop the Steal rally on

25   January 6th and seeing the former president speak, the

1    defendant and her companions marched to the Capitol.

2           Some time after arriving on Capitol grounds, the

3    defendant split off from her group and climbed a tree, where

4    she took pictures, including this one, which show her

5    vantage point on the inside of the restricted area cordoned

6    off with that snow fencing and those "Area Closed" signs,

7    those white signs on that fence.

8           But these signs to keep out did not deter her.

9    Instead, the defendant met up with her two companions on the

10   West Plaza of the Capitol.  The West Plaza looked like a war

11   zone:  smoke and chemical sprays in the air, police

12   everywhere, thousands of people yelling.  Chaos.

13          The defendant saw other rioters taking the very

14   bike racks that police had used to barricade the restricted

15   perimeter and repurpose them as ladders to scale the Capitol

16   walls.  In spite of this chaos, the defendant and her

17   companions went up a set of stairs and approached their way

18   to a set of doors to the Capitol building.

19          As the defendant approached those doors, she could

20   hear the security alarm blaring, beeping.  She saw that the

21   windows next to those doors that she entered had been

22   smashed out.  Glass everywhere.  Rioters were climbing

23   through that broken window.

24          These clear signs of violence and total chaos did

25   not deter her.  She went in.

1          The defendant had no authority to be there.  No

2     member of the public did.  She hadn't been through any metal

3     detectors or screening for an event hosting the vice

4     president, and yet she roamed the halls.

5          The defendant and her companions first walked to

6     an area of the Capitol known as the Crypt where they

7     encountered approximately ten U.S. Capitol Police officers

8     who were attempting to block the rioters from penetrating

9     any further.  It didn't work.  The mob was too big.  Their

10    sheer numbers overwhelmed the officers, so when the mob,

11    which included the defendant, surged forward, the police

12    couldn't hold the line.

13         On the left of this slide is that line of Capitol

14    Police officers.  On the right you see the moment after the

15    mob broke through that police line with the officers back to

16    back in a defensive posture, and the defendant just to the

17    right of them circled in yellow.

18         One of these officers will testify.  She'll tell

19    you how scary it was to face the mob.  You'll hear how

20    helpless she felt in the face of the mob because her and her

21    colleagues were totally outnumbered.  You'll hear how being

22    swept away by that wave of rioters separated her from her

23    colleagues, how rioters grabbed at her equipment, at her

24    radio, her lifeline.  You will hear how she was scared the

25    rioters would try to take her gun.

1     Once past these officer in the Crypt, the

2   defendant kept surging forward along with the mob toward a

3   set of stairs leading to Speaker Pelosi's offices and the

4   House Chamber itself.  There the defendant and her

5   companions wormed their way through the crowd to encounter a

6   second line of U.S. Capitol Police who were trying to hold

7   the mob back.

8     The officers again were outnumbered.  The rioters

9   shouted at them, threatened them.  Some of them were decked

10  out in tactical gear.

11     The officers commanded the rioters to get back.

12  They didn't.  Instead, the mob, including the defendant,

13  forcibly surged past these officers again and broke this

14  line, too.

15     The defendant saw the police getting pushed

16  around.  She saw the space fill up with smoke.  But this did

17  not deter her from penetrating the Capitol further.

18  Although some rioters ran away from the smoke back toward

19  the Crypt, back towards the exit, the defendant stuck around

20  and decided to ascend the stairs that the officers had been

21  trying to protect.

22     From there, the defendant and her companions made

23  their way to a hallway where they encountered a third line

24  of Capitol Police.  On the other side of this police line

25  were the doors to the House Chamber.  You will hear how some

1    members of Congress were unable to be evacuated and were

2    stuck inside the chamber as rioters were trying to force

3    their way in.

4            Again, the defendant and her companions made their

5    way toward the front of the police line, which was guarded

6    by no less than seven Capitol Police officers.  The

7    defendant stood behind that line for over five minutes faced

8    with yet another clear signal she was somewhere she wasn't

9    supposed to be.

10           She didn't turn back.  Instead, she stayed near

11   the front of the police line where rioters tried to convince

12   the police to step aside and let them through into the House

13   Chamber, while others were shouting at them that they were

14   traitors.

15           The power of the mob was its size.  The defendant

16   contributed to that.

17           Vastly outnumbered, the police couldn't hold this

18   line either.  The mob, including the defendant, forcibly

19   broke this police line and surged towards the House Chamber.

20           Here's a clip of that moment.  And that's the

21   defendant circled in yellow.

22           (Video playing)

23           MS. ARCO:  Now, only a set of doors between --

24   stood between the rioters and the House Chamber and the

25   members of Congress stuck inside.  The defendant watched as

1      members of that mob banged on those doors, some with

2      flagpoles, trying to break in.

3              Did the defendant promptly exit after witnessing

4      this scene?  No.

5              Instead, she and her companions entered a

6      conference room where they took a selfie in front of a

7      portrait of George Washington.  This photo.  You can see the

8      defendant with her bandana up and her sunglasses on indoors

9      to shield her face.

10             When they left the conference room, the defendant

11     and her companions joined the mob down yet another hallway.

12     They walked right past a clear exit to the outside where the

13     doors were already open.  But instead of promptly exiting

14     those doors, the defendant followed the mob for another two

15     minutes as rioters kicked doors and shouted "Break it down"

16     and "Open the door."  Then finally you'll see her circle

17     back to those doors and exit the Capitol.

18             During this trial -- or excuse me, through her

19     actions, the defendant temporarily achieved her goal.  She

20     had stopped Congress in its tracks and delayed the

21     certification of the next President of the United States.

22             Ultimately Congress did reconvene and finished the

23     job and certified the proceedings, but only when the mob had

24     been cleared out and it was safe to get back to business.

25             During this trial, you'll see messages and posts

1    by the defendant that will make clear what her intent and

2    motive were for storming the Capitol that day.  Messages in

3    posts like these.

4              "We all better be ready to fight this war."

5              "It's our Capitol.  This is the PEOPLE'S America,

6    and we will take it back one way or another."

7              "If it ain't fixed we're going back locked and

8    loaded.  We will take back OUR country."

9              Members of the jury, the evidence is going to show

10   you beyond a reasonable doubt that the defendant committed

11   the four crimes that she is charged with and that the judge

12   just alluded to.

13             You will get exact instructions from the judge at

14   the end of the case about the exact definitions and the

15   elements that we're required to prove and are for you to

16   decide; these are the four charges that she is charged with.

17             So, Members of the Jury, the evidence is going to

18   be very straightforward.  You're going to hear and see the

19   vast majority of the defendant's conduct with your own eyes

20   and ears.

21             The evidence will show the defendant stormed the

22   Capitol with a purpose.  She wanted Congress not to certify

23   the results of the election because she believed it was

24   stolen.

25             Over the next couple of days the evidence will

1    show you that the defendant breached the Capitol knowingly,

2    and that she remained there unlawfully and in spite of the

3    violence and chaos she was witnessing.

4           We will show you that her activities as part of

5    that mob on January 6th violated at least four laws.

6           So at the end of the trial, my co-counsel,

7    Mr. Gordon, is going to ask you to find the only verdict

8    that the evidence supports:  Guilty on all charges.

9           Thank you for your time.

10          THE COURT:  Thank you, Ms. Arco.

11          All right.  Mr. Garrity, do you need a couple of

12   minutes, or are you ready to go?

13          MR. GARRITY:  I'm ready to go, Judge.  I think I

14   need the -- do I need the lapel?

15          (Pause)

16          MR. GARRITY:  As you'll find out during the course

17   of this trial, I'm not the most technologically adept

18   person.

19          So good morning.  I just want to reintroduce

20   myself and Attorney Rick Monteith.  As you heard yesterday

21   from Attorney Monteith, we're both from New Hampshire.  Our

22   offices are in Londonderry, New Hampshire.  And Ms. Niemela,

23   as you'll hear during the course of the trial, is from

24   Hudson, New Hampshire.

25          If any of you are not familiar with the geography

 1    of New Hampshire, Hudson abuts Londonderry.  And Hudson, New

 2    Hampshire, is where Ms. Niemela departed on January 5th of

 3    2021, to come down to the rally that was going to take place

 4    on The Ellipse on January 6th of 2021.

 5          She left New Hampshire in a car owned by

 6    Ms. Stefanie Chiguer, her friend.  And along with

 7    Ms. Niemela and Ms. Chiguer, an individual by the name of

 8    Mark Leach, a friend of both Ms. Chiguer and Ms. Niemela,

 9    came along.  Mr. Leach had decided to join the trip about a

10    week prior, and he was asked to come to keep an eye on

11    Kirstyn by Kirstyn's mother.

12          So they all came down to Washington, D.C., on

13    January 5th, and they checked -- when they checked into a

14    hotel that they were going to stay at on the night of

15    January 5th and January 6th, they met a couple of other

16    individuals.  You're going to hear about them during

17    the course of this trial.  One is Mike Eckerman and his

18    niece Candace Eckerman.  And they also met a woman by

19    the name of Crystal Herman.  And you're going to hear

20    that those individuals were with Ms. Niemela, Mr. Leach, and

21    Ms. Chiguer on January 6th.

22          So they met at the hotel on January 5th.  They

23    were all staying on the same floor in the same hotel.  They

24    decided they would all meet up on the morning of January 6th

25    and go to watch the speech.

1          So they met up in the lobby of the hotel on the

2     morning of January 6th.  They took an Uber down to the

3     speech.  They arrived very early in the morning.  I believe

4     you'll hear testimony that they arrived around 6:00 a.m.

5     They stood in the same part for the most part watching the

6     rally.  They watched -- eventually watched Former President

7     Trump speak.

8          And then you'll hear the group began to walk down

9     Pennsylvania Ave.  And contrary to what the government told

10    you, you're not going to hear about marching down

11    Pennsylvania Ave.  You're going to hear what Ms. Niemela did

12    as she walked down Pennsylvania Ave.

13          She didn't rush down to the Capitol grounds, the

14    evidence will show.  She took her time.  It took her about

15    an hour to walk the length of Pennsylvania Ave.  She was

16    taking videos, watching the crowd.

17          And although the government will present evidence

18    about Ms. Niemela's viewpoints and postings -- and there's

19    no doubt she's an enthusiastic supporter of Former President

20    Trump -- she believed the election was stolen, fervently

21    believed that.  She espoused a number of viewpoints along

22    those lines, espoused a number of viewpoints about what she

23    might do.

24          You're going to see that in reality, when she got

25    to the Capitol on January 6th, she really had no bite.  She

1   was a loud dog.  A lot of barking, a lot of noise; no bite.

2           She didn't storm towards the Capitol, the

3   evidence will show.  When she gets to the Capitol grounds

4   with Mr. Leach and Mr. Eckerman, Candace Eckerman, and

5   Ms. Herman, she gets there around 2:00 p.m. outside of the

6   grounds.  Outside of the grounds you're going to hear the

7   viewpoint that Ms. Niemela had in the crowd of people going

8   towards the Capitol grounds.

9           The Capitol grounds, you're going to hear about

10  fencing that went around part of it.  You're going to hear

11  about what Ms. Niemela's viewpoint was within that crowd

12  that was going towards the Capitol.  There's sidewalks or

13  walkways that go from the public sidewalk onto the Capitol

14  grounds.  They form somewhat of a V.  You'll see a photo

15  about that.  You'll see overhead diagrams.  She went on the

16  left-hand side.

17          When she entered onto the Capitol grounds, there

18  were no bike racks, no signs saying don't go in, no officers

19  saying don't go in.

20          You're going to hear testimony during this trial

21  that those bike racks had been taken down by other

22  individuals about an hour prior to Ms. Niemela arriving on

23  the Capitol grounds.  And you're going to hear, especially

24  from an individual as I've talked to you about, Mr. Leach,

25  who was with Ms. Niemela, what their viewpoint was within

1     that crowd.  They were surrounded by a number of people.

2              Mr. Leach is taller than Ms. Niemela.  You're

3     going to see that -- you're going to hear from him what he

4     could see with respect to these signs that the government's

5     told you about, about the fencing.  And what Mr. Leach will

6     tell you is that even he could not, because of the crowd,

7     see the signs.

8              So they walk onto the grounds.  And you're going

9     to hear conduct that I would submit to you speaks volumes

10    about Ms. Niemela's intent, her real intent.  As I say, she

11    had a lot of noise, a lot of barking; no bite.

12             Rather than storm the Capitol, as the government

13    has talked about, she walks over to the left and climbs up

14    on a tree.  You're going to hear she was up there for about

15    15 minutes taking photographs, videos, just watching the

16    events.  You're going to hear that she had no intent to

17    enter the Capitol.

18             But you're going to hear that she had a close

19    relationship with Stefanie Chiguer.  When she's up in the

20    tree -- and you're going to hear Mr. Leach climbed up partly

21    on that tree as well.  As she's up in the tree, she notices

22    that Ms. Chiguer has departed that area, has left.  She's

23    left with Mr. Eckerman.

24             You're going to hear that Ms. Niemela, out of

25    concern for Ms. Chiguer -- Ms. Chiguer was a single mother

1    of two young children -- went to look for Stefanie to keep

2    an eye on her.  You're going to see some video along those

3    lines where Ms. Niemela climbs up on a lamppost to get a

4    better vantage point to see where Ms. Chiguer is.

5            You're going to hear that she finally finds

6    Ms. Chiguer with Mr. Eckerman.  You're going to see in

7    those videos as well, there's no police officers nearby

8    Ms. Niemela.  She doesn't see any fighting.  She doesn't see

9    any bike racks being used as ladders, as the government has

10   told you about.

11           And I believe the Court will tell you during the

12   course of this trial that it's Ms. Niemela's conduct that

13   is at issue here, not others'.  You're certainly going to

14   hear evidence and see exhibits and videos that show there

15   were several bad actors involved in the events of January

16   6th, but we're going to ask you to keep focused on what

17   Ms. Niemela did or did not do.

18           You're going to see that when she finally connects

19   with Ms. Chiguer, that she stays with Chiguer throughout the

20   entirety of the time they're in the Capitol.  And when they

21   finally enter the Capitol, they go through the Senate Wing

22   Doors.  Those doors had been breached about ten minutes

23   before.  They were breached by some individuals around 2:13

24   p.m.

25           You're going to see that Ms. Niemela entered with

1    Ms. Chiguer and Mr. Eckerman around 2:24.  There's no police

2    officers there.  No one's saying, "Don't go in."  In fact,

3    no officer ever addressed Ms. Niemela, you'll see.  No

4    officer told her, "You can't go in there."  There were no

5    signs by the door saying, "Don't enter."

6            You're going to see video that they, the group,

7    after entering the entryway, quickly went down a hallway

8    to the right, and that Ms. Niemela is holding on to

9    Ms. Chiguer.

10            And you're going to hear about the viewpoints that

11   Ms. Niemela had throughout the course of her time in the

12   Capitol.  You're going to hear Ms. Chiguer, who is much

13   taller and bigger than Ms. Niemela, even she could not see

14   what was going on with Mr. Eckerman in the front edge of the

15   group.

16            You're going to hear that Ms. Niemela, when she

17   was inside the Capitol, walked around, didn't say anything,

18   didn't touch any property, didn't touch any officer.

19            I know the government has talked about this

20   forcible use of blowing through lines of police officers.

21   Not Ms. Niemela.  She's sticking with Ms. Chiguer.  Mr.

22   Eckerman's ahead of them.  She's involved in none of the

23   interaction with the officers.

24            And you're going to see the extent of her

25   disorderly conduct will be shown when she's in what's called

 1     Statuary Hall.  There's some -- there's a pathway demarked

 2     by ropes.  She walks within those lines of ropes.

 3               There's an officer you'll see in the video off to

 4     her left as she walks through that line of ropes.  She --

 5     that officer, you're going to hear, didn't say a word to

 6     Ms. Niemela about getting out.  None of the officers told

 7     her to get out.

 8               So I think what you'll see during the course of

 9     this trial is that her actions or, I guess a better way of

10     saying it, her inactions will speak louder than any words

11     she may have espoused in social media posts.  She certainly

12     had strong views.  You're going to see that throughout the

13     course of that trial.  You're going to see that even after

14     leaving on January 6th -- even after leaving D.C. on the

15     morning of January 7th, she was putting forward social media

16     posts that espoused strong views.  One of them is what the

17     government just put up for you, coming back locked and

18     loaded.  That never happened.

19               She talked a lot, talked quite a bit.  And you're

20     going to see she espoused these very, very strong opinions

21     with respect to Trump and the stolen election, but never

22     acted on them.

23               Again, I will ask you to look at what she did --

24     what she did -- rather than others once she got to the

25     Capitol.

```
 1              And at the end of this trial we submit to you that

 2    the evidence will show that she did not trespass, that she

 3    was not -- never told "You can't go in" or "You can't

 4    remain," and that she didn't engage in any disorderly

 5    conduct.  In fact, you'll see that she just walked through

 6    the Capitol, and that she didn't parade, picket, or

 7    demonstrate.  The videos will show she really didn't say

 8    anything.

 9              At the end of this case, as a result, we're going

10    to ask you to find Ms. Niemela not guilty because that's the

11    only just and fair result after you've seen and heard all of

12    the evidence and witnesses.  Thank you very much.

13              THE COURT:  All right.  Thank you, Mr. Garrity.

14              Mr. Gordon, would you like to call your first

15    witness?

16              MR. GORDON:  I would, Your Honor.  The United

17    States calls Captain Tia Summers.  We just need a moment to

18    get her.

19              THE COURT:  All right.  Take your time.

20              (Pause)

21              THE COURT:  All right.  Good morning, ma'am.

22              THE WITNESS:  Good morning, sir.

23              THE COURT:  Step right up.  You can remain

24    standing and raise your right hand to be sworn in by the

25    courtroom deputy.
```

1          (Witness sworn)

2          MR. GORDON:  All right.  Thank you, Your Honor.

3          Before I begin questions, we do have a few things.

4          So first, United States moves into evidence the

5    following exhibits --

6          THE COURTROOM DEPUTY:  One second.

7          MR. GORDON:  -- which I understand have no

8    objection from the defense.  So first Government Exhibits 1

9    and 2, 101 through 105, 107 through 113, 201 through 212,

10   301 through 305, 403 through 415, 501 through 506, 702

11   through 703, 804 through 808, 813, 816 through 818, 820, 822

12   through 824, 826 through 828, 830 through 832, 836 through

13   838, 842 through 846, 907 through 913, 918 through 920, 928

14   through 931, 1001 through 1002, 1001 -- I'm sorry, 1101

15   through 1110.

16         THE COURT:  All right.  Any objection, Counsel?

17         MR. GARRITY:  No objection, Your Honor.

18         THE COURT:  So moved.

19         MR. GORDON:  In addition, Your Honor, before I

20   begin questions, the parties have reached a number of

21   stipulations.  I'm going to read two of those into evidence

22   now, but I'd ask the Court to explain to the jury what a

23   stipulation is.

24         THE COURT:  Okay.  Ladies and gentlemen,

25   Mr. Gordon is about to read what's called a stipulation.  A

1    stipulation is simply an agreement to certain facts by both

2    sides of the case.  And you may consider the stipulation as

3    evidence in the case.  And we will send back to the jury a

4    written version of all of the stipulations that the parties

5    have entered into.  Is that clear?

6         Okay.  Please proceed.

7         MR. GORDON:  All right.  First is Stipulation 3.

8         On January 6, 2021, officers from the United

9    States Capitol Police, or USCP, on the U.S. Capitol Grounds

10   and in the U.S. Capitol building were engaged in their

11   official duties as officers or employees of the United

12   States or of any agency in any branch of the United States

13   Government as those terms are used in Title 18 United States

14   Code Section 1114.

15        On January 6, 2021, officers from the Washington,

16   D.C., Metropolitan Police Department, or MPD, on the U.S.

17   Capitol Grounds and in the U.S. Capitol building were

18   assisting officers from the USCP, who were engaged in their

19   official duties as described above.

20        Now Stipulation No. 1:  By law, the United States

21   Capitol, which is located at First Street, Southeast, in

22   Washington, D.C., is secured 24 hours a day by the U.S.

23   Capitol Police.  Restrictions around the Capitol include

24   permanent and temporary security barriers and posts manned

25   by USCP.  Only authorized people with appropriate

1    identification are allowed access inside the Capitol.  At

2    the U.S. Capitol, the building itself has 540 rooms covering

3    175,170 square feet of ground, roughly four acres.  The

4    building is 751 feet long, roughly 228 meters, from north to

5    south; and 350 feet wide, 106 meters, at its widest point.

6         The U.S. Capitol Visitor Center is 580,000 square

7    feet and is located underground on the east side of the

8    Capitol.

9         On the west side of the Capitol is the West Front,

10   which includes a variety of open concrete spaces, a fountain

11   surrounded by a walkway, two broad staircases, and multiple

12   terraces at each floor.  On January 6, 2021, the inaugural

13   stage scaffolding was on the West Front of the Capitol

14   building.

15        On the East Front are three staircases, porticos

16   on both the House and Senate side, and two large skylights

17   into the Visitor's Center surrounded by a concrete parkway.

18        On January 6, 2021, the exterior plaza of the U.S.

19   Capitol was closed to members of the public.  These security

20   barriers included bike racks that were positioned to the

21   north of the Capitol along Constitution Avenue, to the south

22   of the Capitol along Independence, to the west of the

23   Capitol along First Street on the eastern side of that

24   street, and on the east side of the Capitol, between the

25   Capitol Plaza on the East Front and the grassy areas located

 1    between the Plaza and First Street.

 2             Within the West Front of the restricted area,

 3    there were additional temporary barriers due to preparations

 4    and ongoing construction for the inauguration, which was

 5    scheduled for January 20, 2021, including green snow fencing

 6    and signs stating "Area Closed By Order of the United States

 7    Capitol Police Board."

 8             On January 6, 2021, the restricted area described

 9    above and depicted in Government's Exhibit 202 was a posted,

10    cordoned off, or otherwise restricted area where the vice

11    president and members of his immediate family were and would

12    be temporarily visiting.

13             Thank you, Your Honor.

14             THE COURT:  Thank you, Mr. Gordon.

15             And, again, the jury may consider those facts as

16    evidence in the case.  The parties reach these stipulations

17    for the purpose of avoiding wasting your time to prove

18    relevant facts that are not meaningfully in dispute.  Okay?

19             Go ahead.

20             MR. GORDON:  Thank you Your Honor.

21                    CAPTAIN TIA SUMMERS, Sworn

22                       DIRECT EXAMINATION

23    BY MR. GORDON:

24    Q.  All right.  Good morning, Captain Summers.

25    A.  Good morning.

```
1    Q.  Can you introduce yourself to the jury, please.

2    A.  Hello, everyone.  My name is Captain Tia Summers, and I

3    work for United States Capitol Police.

4    Q.  Captain Summers, what do you do for the Capitol Police?

5    What's your job?

6    A.  I'm a captain, and right now I am assigned as the acting

7    division commander for our coordination bureau.

8    Q.  Okay.  So a lot of words there that a layperson might

9    not understand, so let's take them one at a time.

10   A.  So right now --

11   Q.  Let me stop you so I can direct you.

12   A.  Okay.

13   Q.  Starting with the rank.  For someone who is not familiar

14   with how those kinds of ranks work, can you explain what it

15   means to be a captain?

16   A.  Captains are usually, I would say, middle management, if

17   that makes any sense.  And we are normally in charge of

18   several -- let's see, several sections under one command, if

19   that makes any sense.  It's kind of hard to explain.

20   Q.  Now, back on -- how long have you worked for the Capitol

21   Police?

22   A.  In total, 23 years.

23   Q.  And how long have you been a captain?

24   A.  And I've been a captain for about two years now.

25   Q.  Were you a captain on January 6, 2021?
```

1    A.   No.  On January 6, 2021, I was a lieutenant at the time.

2    Q.   And can you explain what a lieutenant is as compared to

3    a captain.

4    A.   So lieutenants are usually commanders of one section,

5    where a captain will have multiple sections under their

6    supervision.

7    Q.   Is it fair to say you got promoted?

8    A.   Yes.

9    Q.   Okay.  And then you sort of further explained your job

10   by listing a lot of terms of the suborganization within the

11   Capitol Police.  What's that?

12   A.   One more time?

13   Q.   What is your role?  What are you a captain of?

14   A.   Right now I am the commander of our command center.  And

15   the command center is, like, I would guess the nerve center

16   or hub of all activities within the United States Capitol

17   Police.

18          In this area, if there is an event or something

19   that may be going on, this is where all of our chiefs and

20   command staff would come so that they could come together

21   and make decisions as to how we would proceed for certain

22   events or things that may happen.

23          I also have command of our court liaison unit, and

24   they are the officers in charge of making sure that our

25   officers come to court on time, make sure summons are taken

1    care of.  If the lawyers ask for evidence and things from

2    our recordings or cameras, this is where they will request

3    it through.

4              I'm also over our reports processing section,

5    which is where all of our police reports are housed and

6    taken care of.  So I have those three sections.

7              I also -- at the moment, my boss retired on me in

8    May of 2022, so I've been doing her job as well, so I also

9    have communications under my -- our communications section

10   under my purview until I get a new boss.  And our

11   communications section is where our dispatchers are housed,

12   where they talk to the officers on the radio.  And it also

13   houses our duress system, which is our alarm system for the

14   Hill.

15   Q.  Did you work in the command center back on January 6,

16   2021?

17   A.  No.  On that day I was in communications.

18   Q.  Is communications based somewhere other than in the

19   command center?

20   A.  Yes.  The communications section is in the Southwest

21   sector of the city, so it's on the opposite side of where

22   our command center is.  Our command center is in the

23   Northeast, and we are in the Southwest.

24   Q.  Okay.  Is the communications center where you really

25   started the day on January 6th --

1    A.   Yes.

2    Q.   -- is that on Capitol grounds?

3    A.   Adjacent to.

4    Q.   All right.  Now, first I'm going to publish what's

5    already in evidence now as Government's Exhibit 201.

6              All right.  Can you explain what we're looking at

7    in Government's 201?

8    A.   Yes.  We're looking at an overview of the U.S. Capitol.

9    Q.   And can you orient us with directions.  Where is north?

10   A.   It's at the top of the screen.

11             MR. GORDON:  Let the record reflect that I drew an

12   N on the top center of the screen.

13   Q.   All right.  So making the bottom of the screen, south;

14   the left, west; and the right, east.  Correct?

15   A.   Correct.

16   Q.   All right.  What is this area that I'm circling now on

17   the western side?  What is that referred to as?

18   A.   We call that the West Front.

19   Q.   And what about the area on the east side that I'm

20   circling now?

21   A.   The East Front.

22   Q.   Now, within the Capitol I want to sort of divide it into

23   three sections.  So let's start here.  I've circled the top

24   sort of building or roof.

25             What does that section of the building contain?

1    A.   Okay.   That is the Senate Wing, and that contains the

2    Senate Chamber.

3    Q.   All right.   Now, I'm circling the sort of like similar

4    building in the bottom -- towards the bottom of the screen

5    or the south.   What is that?

6    A.   That's the House wing, and that contains the House

7    Chamber.

8    Q.   All right.   And then how about the center section that

9    I've circled now?

10   A.   That's the center of the building, and right under the

11   dome is the Rotunda.

12   Q.   Okay.   If I walked from the Capitol and just started

13   walking due west, and just kept on walking and kept on

14   walking, would I eventually run into any monuments?

15   A.   Sure.

16   Q.   What would I --

17   A.   You would eventually run into the Washington Monument.

18   If you go a little further, you're going to run into, I

19   believe, the Lincoln.

20   Q.   Let's stop at the Washington Monument.

21   A.   Okay.

22   Q.   Are you familiar with a place in D.C. called The

23   Ellipse?

24   A.   Yes.

25   Q.   What is The Ellipse?

1   A.  It's a -- I don't know how to describe it.  I'd almost

2   kind of describe it as a park close to the White House.

3   Q.  And where is the White House in relation to the

4   Washington Monument?

5   A.  Not very far.  Not very far.  I'm trying to --

6   Q.  Basically, is it fair to say a couple of blocks away?

7   A.  Yes.

8   Q.  And right in front of it, essentially?

9   A.  Everything -- like in D.C., when you're standing, you

10  can kind of see everything at once.

11          But, yes, it's in very close proximity.  Maybe

12  like three blocks maybe.

13  Q.  And just in terms of the map, if I was to -- so if I'm

14  going to walk straight to the Capitol, I'm going to hit the

15  Washington Monument, right?

16  A.  Uh-huh.

17  Q.  And you said the White House is a few blocks away.  In

18  what direction?

19  A.  To your right.

20  Q.  To my right?

21  A.  Uh-huh.  Pennsylvania Avenue is on that side, on the

22  right side.

23  Q.  To the north?

24  A.  Yes.

25  Q.  So fair to say the Capitol to the monument to the White

1    House kind of makes an L?

2    A.  That's a good description.

3    Q.  Okay.

4              MR. GORDON:  All right.  Now, Ms. Jones, can we

5    please have 208.  And can we zoom in a little bit on

6    essentially this section.

7    Q.  All right.  What are we looking at in 208?

8    A.  It's another map of the Capitol, Capitol grounds.

9    Q.  Now, on January 6th, was there anything unusual about

10   kind of this area of the Capitol that I've circled,

11   basically the circle between what's labeled 208 as the West

12   Plaza barricade and where it says Upper West Terrace?

13   A.  Yes.  That's the inaugural stage.

14   Q.  What is the inaugural stage?

15   A.  During a presidential year -- we have inauguration every

16   four years, and they construct a stage on the West Front so

17   they can hold the ceremony.

18   Q.  Okay.  How long does it take to build that stage?

19   A.  It usually -- construction usually starts in the late

20   summer/early fall.  So September/Octoberish is when they

21   close the West Front to start the construction.

22   Q.  All right.  So you anticipated my next question.

23             So in order to do that -- you said they have to

24   close the West Front?

25   A.  Yes.

1   Q.  And they close that starting in September or October?

2   A.  Yes.

3   Q.  What does closing the West Front involve doing?

4   A.  Basically they put barriers in place, bike racks, snow

5   fencing, and signs to keep visitors out of the construction

6   area so that no one gets hurt.

7   Q.  That kind of sort of construction site fencing, was that

8   in place in October of 2020?

9   A.  Yes.

10  Q.  And was it in place in November of 2020?

11  A.  Yes.

12  Q.  And December of 2020?

13  A.  Yes.

14  Q.  And was it still in place on January 6, 2021?

15  A.  Yes.

16  Q.  In addition to that construction fencing you just

17  described, were there any adjustments to the Capitol in

18  place due to COVID?

19  A.  Yes.  Due to COVID, the Capitol was closed to visitors,

20  so we hadn't had -- once I would say the world shut down,

21  the Capitol closed, and we weren't having any visitors, no

22  tours or anything inside of the building.

23  Q.  Going all the way back to, say, March 2020?

24  A.  Yes.  I'm trying to -- we were closed for so long, but

25  yeah, that sounds about right.  Whenever -- when the -- when

1    the CDC mandated that things just close down.

2    Q.  How would a member of the public know that the Capitol

3    was closed to visitors due to COVID?

4    A.  It was on U.S. Capitol's website.  The Visitor's Center

5    has an official website, and that information was on that

6    website.

7              I heard it on the news several times.  So it was

8    common knowledge.

9    Q.  Let's say in pre-COVID times, okay, I'm a tourist, and

10   I've come to D.C., and I just on a whim decide, you know

11   what, I'd like to walk into the United States Capitol.  I'd

12   like to go see that building.  Can I just -- pre-COVID and

13   not an inauguration year, right?  None of that took place.

14             Could I just walk up the steps and knock on the

15   front door; or not knock, just walk in?

16   A.  Not quite.  We have security procedures that are in

17   place.

18             If you wanted to come and visit, you would enter

19   on the west side through our Capitol Visitor's Center.  You

20   would come in.  You would go through security screening.

21   And security screening involves going through a walk-through

22   magnetometer, divesting your personal items for

23   administration screening through x-ray and hand check.  If

24   you were to walk through our walk-through magnetometer and

25   make an alarm, you would be subject to a hand-held

1    magnetometer as well as a pat down by police personnel

2    before you could proceed.

3    Q.  So was it possible, even in pre-COVID times, for a

4    member of the public to enter the Capitol through a door

5    other than through the Visitor's Center?  Could you go in

6    some other way?

7    A.  We do have a couple of ways, depending on if you are an

8    official business visitor, you would enter through one of

9    the wing doors where the Senate appointment's desk or the

10   House appointment's desk is there to receive you once you

11   have cleared security so you could get a visitor's badge to

12   go to your destination for your meeting.

13   Q.  In that situation you said clear security.  So if

14   somebody has an official appointment, what is the security

15   procedure they have to go through?

16   A.  The exact same as if you were a visitor coming for a

17   tour.

18   Q.  You've got to go through the magnetometer?

19   A.  Walk-through magnetometer, divest your items for x-ray

20   and hand check, and subject your person to the walk-through

21   magnetometer, hand-held or pat down.

22   Q.  Any other way to get in?

23          So a regular visitor goes to the Visitor's Center,

24   a person with an appointment goes to the wing with the

25   appointment.  Is there a third possibility?

1    A.  No, that's it.

2    Q.  What if my best friend is a congressperson and says,

3    "Hey, come on by.  I'll give you a tour"?

4    A.  That's a little different.  If a person is actually with

5    a member of Congress, the member of Congress can vouch for

6    them, and they can go in any door that they choose.  But

7    only if they are with a member of Congress.

8    Q.  And do they have to go through the magnetometer if they

9    are with a member of Congress?

10   A.  It depends.  It depends on the member.

11   Q.  Got it.  Why would it depend on the member?

12   A.  Depending on the member.  Sometimes members coming in

13   with large groups will subject their larger groups to

14   security -- through security.  But if a member -- just say

15   you're the best friend of the member, and you decide to go

16   in, the members are not subject to security checks.

17   Q.  What if I am not with the member, but I'm with a member

18   of the staff?

19   A.  Staff is subjected to security screening as well, the

20   same security screening that visitors are subjected to.

21   Q.  So what if I'm with Nancy -- Speaker of the House or

22   then Speaker of the House Nancy Pelosi's No. 2, her

23   right-hand person?

24   A.  You're going to go through security.

25   Q.  Every time?

1    A.   Every time.

2    Q.   And the staff goes through security every time?

3    A.   Yes, sir.

4    Q.   So is there ever a scenario where a member of the public

5    can just walk in the door without going through security?

6    A.   No.

7              MR. GORDON:   All right.   We can take down --

8    actually, let's get out of the callout box for 208 and show

9    the whole thing.

10   Q.   Okay.   Now, I had asked you previously about what would

11   happen if I walked, you know, due west.   I've circled an

12   area here on the left side of the screen, and then I've

13   drawn a line on a street.

14             So, first, can you tell us what line or what

15   street I've indicated with a line going down the diagonal of

16   the screen from the southwest corner going northeast towards

17   the Capitol?

18   A.   Okay.   So right above the circle where you have your

19   line, you are on the Pennsylvania Avenue walkway.

20             The circle encompasses Peace Circle.

21             And the line below the circle is Pennsylvania

22   Avenue.

23   Q.   So if I -- so if somebody was, say, walking from The

24   Ellipse to the Capitol via Pennsylvania Ave., is this the

25   path they would walk?

1    A.  Yes.

2    Q.  Now, do you see on this map sort of some dots or sort of

3    other lines near the Peace Circle?

4    A.  Yes.

5    Q.  What are those indicating?

6    A.  I believe those are bike rack.  That indicates where

7    bike rack is.

8    Q.  So those were barricades?

9    A.  Yes.

10   Q.  Were they present on January 6th?

11   A.  Yes.

12   Q.  Okay.

13            MR. GORDON:  All right.  And just to orient

14   everyone, can we have Government's 211, please.

15   Q.  Have you seen this before?

16   A.  Yes.

17   Q.  Is this a 3D model of the Capitol?

18   A.  Yes, sir.

19   Q.  I've written an "S" in the building on the left and an

20   "H" in the building on the right.

21            Do those fairly and accurately represent the

22   locations of the Senate and House respectively?

23   A.  Yes.

24   Q.  Now, were you aware of an entry to the Capitol referred

25   to as the Senate Wing Door?

1    A.   Yes.

2    Q.   Using your finger, can you draw an arrow on this screen

3    indicating where the Senate Wing Door is?

4    A.   (Witness complies)

5    Q.   Was that door significant on January 6, 2021?

6    A.   Yes.

7    Q.   Can you explain why?

8    A.   This was one of the first breach points of the building

9    from the rioters.

10   Q.   Now, does this 3D model show where the inaugural

11   scaffolding was?

12   A.   Yes.

13   Q.   Can you draw a circle or a square around it with your

14   finger to indicate it.

15   A.   (Witness complies)

16           MR. GORDON:   Okay.   Let's let the record reflect

17   that Captain Summers drew an arrow underneath the Rotunda on

18   the bottom center of the screen.

19   Q.   Now I'm drawing an arrow on the left side of that

20   inaugural staging.

21           The arrow I've drawn, is that in the location that

22   was significant on January 6, 2021?

23   A.   Yes.

24   Q.   Can you explain why?

25   A.   On that side, exactly where the line is, there's a

 1     staircase right there, and you would -- that's how you get

 2     to the Upper West Terrace.

 3     Q.  Did rioters use that staircase to access the Upper West

 4     Terrace on January 6th?

 5     A.  Yes.

 6     Q.  Is that one of the first places that was breached?

 7     A.  To get up to the Upper West Terrace, yes.

 8     Q.  So now I've drawn an arrow from that staircase to the

 9     Senate Wing Door.

10          In your work as part of the Capitol Police and

11     also for this trial, have you reviewed video?

12     A.  Yes.

13     Q.  Does the Capitol have surveillance cameras of its own?

14     A.  Yes.

15     Q.  And have you reviewed those?

16     A.  Yes.

17     Q.  And from reviewing that surveillance video, is this path

18     that I've drawn significant?

19     A.  Yes.

20     Q.  Can you explain why?

21     A.  Once the rioters got past the stage, they started going

22     up the staircase.  This is where they started looking for

23     avenues, I guess, to get inside of the building.  And,

24     again, the very first breach point they found was the Senate

25     Wing Door.

1    Q.  Is that the only place rioters breached the Capitol?

2    A.  No.

3    Q.  All right.  Can you use your finger to draw other places

4    where rioters breached?

5    A.  Recollection, it was kind of everywhere, but this was a

6    significant one here.

7              MR. GORDON:  So just let the record reflect the

8    witness drew a circle around an entryway sort of at the top

9    of the inaugural staging.

10   Q.  And what is that area called?

11   A.  It's been known to be called the tunnel since this

12   incident occurred; but to us, meaning the USCP, it's the

13   Lower West Terrace Door.

14   Q.  Can you explain what the significance was of the tunnel

15   or the Lower West Terrace Door?

16   A.  That door leads right into the basement of the Capitol.

17   Metropolitan Police did a very good job of keeping rioters

18   from entering the building through that door.  It was a

19   pretty brutal struggle.

20   Q.  What do you mean when you say "pretty brutal struggle"?

21   A.  This is where Officer Fanone was injured, at that door.

22   Q.  The jurors may not be familiar with what you're

23   describing.  Can you explain?

24   A.  Officer Fanone is a Metropolitan Police officer.  He is

25   the one we see a lot on the news, the one that was pulled

1    into the crowd and hit with stun guns several times until he

2    went into cardiac arrest.

3    Q.   Okay.  Now, were there other breach points besides those

4    two?

5    A.   There were some significant ones on the east side of the

6    building, but I don't remember exactly what they were in

7    what order.  But I do know that they -- we had a breach

8    point at the Rotunda door, which is in the center on the

9    east side.

10   Q.   Can you draw a line indicating where that is.

11   A.   Yes.  It's like over here (indicating) like in the

12   center.  The dome's in the way, so it's a little hard to

13   tell, yes.

14   Q.   So fair to say that some rioters entered -- and I've

15   drawn an arrow pointing down from the top center of the

16   screen?

17   A.   Yes.

18   Q.   Now, let's sort of zoom out and back up.

19            On January 6th, were you working that day?

20   A.   Yes.

21   Q.   Prior to January 6th, whether it be January 5th or

22   earlier, were you anticipating anything being different or

23   unusual about January 6th?

24   A.   Yes, absolutely.

25   Q.   Can you explain to the jury what that was.

1   A.  So on January 6th, it was the day Congress was going to

2   certify the Electoral College votes for the presidential

3   election, so we were prepared for that for the day.

4   Q.  From the Capitol Police's perspective, what does it mean

5   to prepare for the -- "for that for the day"?

6   A.  So we had extra officers coming in for our civil

7   disturbance unit.  We had extra personnel in the

8   communications center where I worked.  We had our command

9   center fully staffed as well as our alternate command center

10  fully staffed, and everybody that was able to work was at

11  work that day.

12  Q.  What is the civil disturbance unit you referenced?

13  A.  The civil disturbance unit is a group of officers who

14  have special training dealing with crowds or demonstrations.

15  So we have -- oh, gosh we have a lot.

16          We have quite a few officers that are trained for

17  civil disturbance, and we had a platoon come in for just in

18  case.

19  Q.  Were you anticipating a particular need for civil

20  disturbance officers on January 6th?

21  A.  Not really.  I do know that there were a couple of

22  permitted demonstrations that were allowed kind of adjacent

23  to the grounds, so we knew that they were going to be there

24  for the day.

25          But any time we have an event, we always make sure

```
 1    that we have a civil disturbance unit on standby for just in

 2    case.

 3    Q.  Have there been First Amendment permitted protests on

 4    Capitol grounds previously?

 5    A.  All the time.

 6    Q.  Were there other ones in 2020?

 7    A.  Yes, all the time.

 8    Q.  And 2021 as well?

 9    A.  Yeah, yup.

10    Q.  Okay.  Before January 6th, had any of them ever turned

11    into a mob?

12    A.  That's the worst I've ever seen it.  We -- it's not

13    unusual for us to make arrests during First Amendment

14    activity, but I've never seen it like January 6th.

15              THE COURT:  Mr. Gordon, is this a good time for

16    our morning break?

17              MR. GORDON:  Sure, Your Honor.

18              THE COURT:  All right.  Ladies and gentlemen,

19    we're going to take our morning 15-minute break.  It is ten

20    to 11:00.  Let's reconvene at 11:05.  All right?

21              No discussions about the case.  No research about

22    the case.

23              (Jury exits courtroom)

24              THE COURT:  All right, ma'am, you can step down.

25              (Recess taken)
```

```
1              THE COURT:  Okay.  Welcome back, ladies and

2    gentlemen.

3              Mr. Gordon.

4              MR. GORDON:  Thank you, Your Honor.

5    BY MR. GORDON:

6    Q.  So Captain Summers, when we broke, we were talking about

7    the Capitol Police's preparations for January 6th.

8    A.  Yes.

9    Q.  In addition to sort of the members of Congress and their

10   staffs, was there going to be anybody else present on

11   January 6th that required security arrangements by the

12   Capitol Police?

13   A.  Yes.  The Vice President of the United States was going

14   to be there that day, so the Secret Service came with him.

15   Q.  Is that the only time the vice president comes to

16   Congress?

17   A.  No.  He comes on other occasions.  If they need a tie

18   broke -- a tie vote to be broken in the Senate, he would

19   come to break that vote.

20   Q.  So when the vice president is coming, whether for

21   January 6th or other days, are there changes the Capitol

22   Police make to your security protocols or other security

23   arrangements for that?

24   A.  Yes.  We put out a VIP notice so that everyone's aware

25   that he's coming.  We make preparations on the avenues for
```

1   his motorcade.  We make preparations in the building for

2   whatever route that he is going to take to get to whatever

3   destination he has to make.

4   Q.  Do you put any restrictions on the grounds of the

5   Capitol for the public on those occasions?

6   A.  Yes.  Wherever his motorcade is going to go, wherever

7   he's going to go as a person, those areas are closed to the

8   public.

9   Q.  And is that the way it was on January 6th as well?

10  A.  Yes.

11          MR. GORDON:  All right.  Ms. Jones, can we please

12  have Government's Exhibit 202.

13  Q.  All right.  Captain Summers, have you seen this diagram

14  before, or this photo?

15  A.  Yes.

16  Q.  What's the red line indicating?

17  A.  The red line indicates our perimeter that we had in

18  place on January 6th.

19  Q.  And what do you mean by a perimeter?

20  A.  So we set up a perimeter of bike racks, snow fencing,

21  and officers in various locations to close off the Capitol

22  square.

23  Q.  So was there a continuous -- just to understand this red

24  line.  Was there a continuous sort of fence comprised of

25  bike racks and snow fencing on that entire red line, or not?

1   A.  Pretty much, except there's a few openings where they

2   would have officers stationed for vehicular traffic, if

3   needed.

4   Q.  And in addition to the fencing, were those signs marked

5   in any way?

6   A.  Yes.  On the bike racks and snow fencing, we had "Area

7   Closed" signs.

8            MR. GORDON:  All right.  Can we have government's

9   207, please, Ms. Jones.

10  Q.  All right.  What are we looking at in 207?

11  A.  This is a picture of the West Front, the inaugural

12  stage, and some snow fencing.

13  Q.  Where is -- can you use your finger and show us where

14  the snow fencing is?

15  A.  (Witness complies)  This is snow fencing, and this is

16  snow fencing here.

17  Q.  Why do you call it snow fencing?

18  A.  I don't know why we call it snow fencing.  I can

19  describe it.  It's plastic mesh -- it's a plastic mesh, and

20  it comes in a big roll.  And it's a quick way to put a

21  barrier in.

22            And then every so many feet there's a metal pole

23  holding it up.

24  Q.  And in the second row where you've indicated the line

25  about, you know, a fifth of the way up from the bottom of

 1    the photograph, there are all these white squares every few

 2    feet.  What are those white squares?

 3    A.  Those are the "Area Closed" signs.

 4             MR. GORDON:  All right.  Can we have 203, please,

 5    Ms. Jones.  203.

 6    Q.  Is that snow fencing that we see here in the middle of

 7    203?

 8    A.  Yes.

 9    Q.  And when you said those are the "Area Closed" signs, are

10    these what we're looking at in 203?  Is that an example of

11    the "Area Closed" signs?

12    A.  Yes.

13    Q.  Do you see the three people on the other side of this

14    fence in the grass?

15    A.  Yes, sir.

16    Q.  Who are those three people?

17    A.  Capitol police officers.

18    Q.  And were Capitol police officers stationed like that,

19    sort of, you know, in a variety of places around the

20    Capitol?

21    A.  Yes.

22    Q.  Why are they standing in the middle of the grass?

23    A.  One, time and distance -- I mean, distance is always

24    your friend, but they were within the perimeter just to make

25    sure that they had enough time to react if something were to

1    happen.

2    Q.  Such as someone breaching the perimeter?

3    A.  Yes.

4            MR. GORDON:  Can we have 204, please, Ms. Jones.

5    Q.  Now, what are we looking at in 204?

6    A.  This is another view of the West Front, and we're

7    looking at at that time the protesters on the outside of the

8    perimeter.

9    Q.  And is 204 kind of representative of what the exterior

10   around the Capitol looked like on January 6th?

11   A.  Yes.

12           MR. GORDON:  Can we have 205, please.

13   Q.  What are we looking at in 205?

14   A.  This is bike fencing with an "Area Closed" sign

15   attached, or bike rack.

16   Q.  And then do you see what I've circled behind the

17   bike-rack fencing about in the middle of the screen toward

18   the very top of the photograph?

19   A.  Yes, snow fencing.

20   Q.  Okay.  So snow fencing even behind the bike racks?

21   A.  Yes.

22           MR. GORDON:  And now can we have 206, please.

23   Q.  What are we looking at in 206?

24   A.  We're looking at rioters pressing up against the bike

25   rack, and there are officers on the other side trying to

1    hold the line.

2    Q.  Did rioters breach this bike-rack barricade?

3    A.  Yes.

4    Q.  What path or street is this on the other side of the

5    bike-rack barricade in the center of the screen on 206?

6    What are we looking at?

7    A.  This looks like the -- I think it's the Pennsylvania

8    Avenue walkway.  It's a little hard to tell.

9          But it's one of the walkways.  We have two on

10   either side.  One is Pennsylvania.  One is Maryland.

11   Q.  We're looking at the orientation of the Capitol building

12   in the photograph behind.  Can you tell --

13   A.  I would say Pennsylvania Avenue.

14   Q.  So earlier when we were talking about somebody

15   approaching along Pennsylvania Avenue from The Ellipse, is

16   this what they would have encountered?

17   A.  Yes.

18   Q.  Now, at some point during January 6th this was breached,

19   you said?

20   A.  Yes.

21   Q.  Do you know what happened to the bike racks themselves

22   or the snow fencing after this breach occurred?

23   A.  The bike rack was strewn about in different places.

24   There were officers that were hit with bike rack on the --

25   bike rack was used as weapons.  Bike rack was used as

1    ladders.  That was something new that I had never seen.

2    Q.  How were they used as ladders?

3    A.  Yes.

4    Q.  How?

5    A.  They would take the bike rack and lean it up against

6    various areas on the building and use them to climb.

7    Q.  Turning it --

8    A.  Sideways, yes.

9           MR. GORDON:  All right.  Can we now have

10   Government's Exhibit 823, please.

11          And we'll scroll down to, I think it's Page 3, but

12   let's check.  It's not Page 1.

13          Keep going.

14          Nope, next page.

15          And one more.

16          Okay.  That's the one I want.

17   Q.  So we are on Page 5 of Government's Exhibit 823.

18          Now, first of all, Captain Summers, do you

19   recognize the person in this photograph in the forefront?

20   A.  No.

21   Q.  I've underlined the sort of fence area behind her.  Can

22   you tell us the significance or what are we looking at with

23   that area that I've indicated?

24   A.  That is bike fencing, part of the perimeter that we had

25   up for the closing of the West Front for the construction of

1      the stage.

2      Q.   What are these white circles, or what are these white

3      squares that I've circled?

4      A.   Those are the "Area Closed" signs.

5      Q.   Can you see writing on those signs?

6      A.   No.

7      Q.   Why not?

8      A.   Because the writing is on the other side so that people

9      that are in the area that would have been open could see

10     that you shouldn't go on the other side of that fence.

11     Q.   So I've circled the people in the top of the photograph.

12     Those people would have been on the other side of the fence

13     then?

14     A.   Of the fencing that we had in place for the construction

15     of the stage; however, a good portion are within the

16     perimeter that we had in place for January 6th.

17     Q.   All right.

18             MR. GORDON:  Can we go back to 202 please.

19     Q.   So can you use your finger to indicate where,

20     approximately, that photograph that we were just looking at,

21     where approximately that was taken?

22     A.   Approximately this area here (indicating).

23             MR. GORDON:  All right.  And just for the record,

24     on 202 we are in the northwest corner within the red

25     restricted area on the grass.

1          Your Honor, I'm now going to read Stipulation No.

2     2.

3          On January 6, 2021, a Joint Session of the United

4     States Congress convened at the U.S. Capitol.  During the

5     Joint Session, elected members of the United States House of

6     Representatives and the United States Senate were meeting in

7     both the House and Senate chambers of the Capitol to certify

8     the vote count of the Electoral College of the 2020

9     Presidential Election, which had taken place on Tuesday,

10    November 3, 2020.

11         On January 6, 2021, The House of Representatives

12    began its session at approximately 12:00 p.m.; the Senate

13    began its session at approximately 12:30; and the two Houses

14    met together at approximately 1:00 p.m. in the House of

15    Representatives chamber to begin the Joint Session.  Vice

16    President Mike Pence was in the Capitol building and

17    presiding over the Joint Session.  At approximately 1:15

18    p.m., the House and Senate adjourned to their separate

19    chambers for up to two hours to resolve a particular

20    objection.

21         At approximately 2:12 p.m., Vice President Pence

22    evacuated the Senate Chamber, and approximately one minute

23    later the senator who had become the presiding officer in

24    Vice President Pence's absence declared that the Senate

25    would stand in recess.  Senators evacuated the Senate

1    chamber.

2              At approximately 2:15 p.m., Speaker Nancy Pelosi,

3    who was presiding over the House of Representatives,

4    evacuated the House chamber, and approximately 15 minutes

5    later the representative who had become the presiding

6    officer in her absence declared that the House would stand

7    in recess.  Representatives evacuated the House chamber.

8              The Joint Session was suspended.

9              The Senate and House resumed meeting at

10   approximately 8:06 p.m. and 9:02 p.m. respectively.

11   Congress's Joint Session continued until approximately 3:44

12   a.m. on January 7, 2021, when it completed the certification

13   of the Electoral College vote.

14   BY MR. GORDON:

15   Q.  Now, Captain Summers, were you present on the Capitol

16   grounds and in the Capitol building during that time span I

17   just described, 12:00 p.m., when the House began meeting, to

18   3:44 a.m., when Congress finally finished the certification?

19   A.  No.

20   Q.  Were you there for any point during the day?

21   A.  No, not in the Capitol building itself.

22   Q.  All right.  Are you nonetheless aware of what happened

23   at the Capitol both on the grounds and inside the building

24   on January 6th?

25   A.  Yes.

1    Q.  And how did you become aware of that?

2    A.  On January 6th I was assigned to our communications

3    section.  Again, that's where our dispatchers -- that's

4    where our dispatchers are held, and they talk back and forth

5    with the officers on the radio.

6           I was in the radio room at the time of the

7    president's speech.  I was able to hear all of the radio

8    traffic that occurred during the incident.

9           We also have closed-circuit television screens in

10   that radio room, so I was able to see everything in real

11   time.

12   Q.  So when you say "the president's speech," what speech

13   are you referring to?

14   A.  President Trump was giving a speech, I believe, on The

15   Ellipse earlier in the day.

16   Q.  Was that part of a First Amendment demonstration?

17   A.  Yes.  For them, yes.

18   Q.  Were you aware of the theme or sort of mantra, motto,

19   behind that particular demonstration or speech?

20   A.  Yes, because I was watching it on the news because we

21   also had the news -- various news stations playing in that

22   room also, so we were watching it.

23   Q.  And what was the overarching topic or theme of that

24   speech?

25   A.  To stop the stealing of the election.

```
 1    Q.  And with any particular method or any particular
 2    direction?
 3    A.  To go down and tell Congress to stop the steal,
 4    basically.
 5            By that time we were kind of putting things in
 6    motion when we realized the group was making its way down to
 7    the Capitol.
 8    Q.  Now, you said that you have CCTV?
 9    A.  Yes.
10    Q.  What is CCTV?
11    A.  Closed-circuit television.  It's basically the Capitol
12    buildings, the office buildings, and all around Capitol
13    grounds, there are cameras; and we are able to see the
14    footage of all those cameras.
15    Q.  From the command center?
16    A.  From the command center and from communications.
17    Q.  And then you also mentioned you were listening to the
18    radio?
19    A.  Yes.
20    Q.  Do you mean Top 40 best songs of the day?
21    A.  No.  When I'm talking about "radio," I'm talking about
22    the police radio.
23    Q.  And what is coming in on the police radio?  What is it
24    tuned into?
25    A.  So basically what I'm listening to is officers in the
```

1    field communicating with the dispatcher giving information.

2    And that could be anything from if they need service to what

3    may be going on in real time.

4          So since I was sitting in the radio room, I was

5    able to hear officers in the field communicate over the

6    radio to the dispatcher that we had a large group coming

7    down Pennsylvania Avenue, and then at a certain point that

8    they had started to breach our perimeter.

9    Q.   In addition to everything that you saw on video that day

10   and that you heard on the radio traffic that day, have you

11   since January 6th gone back and listened to more recorded

12   radio traffic?

13   A.   Yes.

14   Q.   Same question for video.  In addition to what you saw

15   that day, have you since January 6th gone and watched other

16   video?

17   A.   Yes.

18   Q.   Have you become familiar with the entirety of the riot

19   or what occurred on January 6th at the Capitol through that?

20   A.   I would say yes.

21          MR. GORDON:  One more stipulation, Your Honor,

22   then we'll get to the videos.  This is Stipulation No. 4.

23          The United States Capitol Police operate and

24   maintain closed-circuit video monitoring and recording

25   equipment that captures locations inside and outside of the

 1    U.S. Capitol building and on the Capitol grounds.  The video

 2    equipment time-stamps each recording with the date and time

 3    at which the footage is captured.  The USCP-controlled video

 4    equipment was in good working order on January 6, 2021, and

 5    video footage recovered from the cameras and equipment with

 6    the time-stamp of January 6, 2021, is footage from January

 7    6, 2021.  The events depicted in the video footage --

 8    including Government's Exhibits 001, and 101 through 113 --

 9    are fair and accurate depictions of the events at the

10    Capitol on January 6, 2021.  The time-stamps on the

11    recordings are accurate, and the video footage was not

12    altered or edited in any way.  The video footage, including

13    the footage contained in these exhibits, is authentic in

14    that it is what it purports to be.

15              All right.  Ms. Jones, can we please call up

16    Government's Exhibit 1, or it might be in your files 001.

17              It's a video, Ms. Jones, so you may have it saved

18    separately.  Do you need to play it from mine?

19              One moment, please, everybody.

20              Ms. Jenkins, I'm going to get this set up, but

21    will you be able to allow me to play from the podium?

22              THE COURTROOM DEPUTY:  Yes.  Let me know when

23    you're ready.

24              MR. GORDON:  Okay.  I am ready.  We can publish

25    that.

```
1              Let me just say in advance that we haven't tested
2      the audio yet.  I know it's going to work.  I don't know how
3      loud it's going to be.  If it's too loud, I will turn it
4      down immediately, but there might be a blast to start.
5              Do we have that displayed, Ms. Jenkins?
6              THE COURTROOM DEPUTY:  The screen is.
7              MR. GORDON:  Never mind.  It looks like we've got
8      it from counsel table after all.
9              (Pause)
10             MR. GORDON:  I apologize, everyone.  Let's get
11     this fixed.
12             (Pause)
13             MR. GORDON:  All right.  Ms. Jenkins, it looks
14     like we now have it from counsel's table.
15             THE COURTROOM DEPUTY:  Okay.  Is this it?
16             MR. GORDON:  Yes, that's it.
17     BY MR. GORDON:
18     Q.  All right.  Captain Summers, I'm going to play a montage
19     video, and I'm going to stop it periodically and ask you to
20     describe to all of us what we're looking at.
21     A.  Okay.
22     Q.  Now, let's pause here.
23             MR. GORDON:  Ms. Jenkins, let's pause -- I'm
24     sorry, Ms. Jones let's pause.
25     Q.  All right.  Just to orient us, what are we looking at
```

```
 1    now?
 2    A.  This is an overview of the Capitol square.
 3              MR. GORDON:  All right.  Let's go ahead and play,
 4    Ms. Jones.
 5              (Video playing)
 6              MR. GORDON:  Pause.
 7    Q.  All right.  When you described the Peace Circle, do you
 8    see the label "Peace Circle"?
 9    A.  Yes.
10    Q.  And is that this sort of traffic-circle-looking thing
11    that we have here on the left side of the screen?
12    A.  Yes.
13              MR. GORDON:  All right.  Let's go ahead and let's
14    play.
15              (Video playing)
16              MR. GORDON:  All right.  Can you pause here.
17    Q.  So at 12:51 p.m., what are we looking at?
18    A.  This is at this time the demonstrators, they are in --
19    they're on First Street by the Peace Circle monument.
20    Q.  So if you're looking, you know, to the northeast on this
21    screen where the line of officers is, which direction is
22    that looking?
23    A.  Toward the Capitol.
24    Q.  Towards -- so the Capitol is in the upper right or so of
25    the screen?
```

 1    A.  Yes.  It's in the background.

 2    Q.  And then is that bike-rack fencing between the sort of

 3    crowd and the officers?

 4    A.  Yes.

 5          THE COURT:  Counsel, if I could just interject for

 6    a moment?

 7          You're going to obviously see a lot of people

 8    in the video that Mr. Gordon is about to play doing

 9    different things.  The Court has allowed the admission of

10    this montage video as background and as context for the

11    conduct of Ms. Niemela here.  But I will remind you of what

12    Mr. Garrity pointed out in his opening statement, which is

13    that we are here only to assess the conduct of Ms. Niemela,

14    and she should not be -- or you should not consider the

15    conduct of others in assessing what she did or did not do

16    that day.  All right?

17          MR. GORDON:  And, Your Honor, can I just approach

18    the witness's screen just to check something?

19          THE COURT:  Sure.

20          MR. GORDON:  All right.  Ms. Jones, can we press

21    "play," please.

22          (Video playing)

23          MR. GORDON:  Pause.

24    Q.  So we just -- so three minutes have elapsed.  What are

25    we now seeing at 12:54?

1    A.  Now we're seeing the group has now breached the outside

2    perimeter.

3              (Video playing)

4    Q.  Three minutes later, 12:57.

5              (Video playing)

6              MR. GORDON:  All right.  Ms. Jones, can you pause,

7    please.

8    Q.  All right.  Can you orient us again?  Where is the

9    Capitol?

10   A.  It's -- the people are walking toward it, so it's like

11   behind the screen here.

12   Q.  And the white sort of thing that we see in the center of

13   the screen, is that the Peace Circle monument?

14   A.  Yes.

15   Q.  And so the people walking in the center here, are those

16   the people who essentially -- is that the same path of the

17   people we just saw breach would have been walking?

18   A.  Yes.

19             MR. GORDON:  Okay.  Go ahead and press "play."

20             (Video playing)

21             MR. GORDON:  Pause, please.

22   Q.  Can you orient us again?  What are we looking at?

23   A.  Now we're looking at a view of the -- what we call the

24   Lower West Terrace, but in the bottom portion of the screen

25   is the inaugural stage.

```
 1    Q.  What's this tower in the center?

 2    A.  That's the media tower.

 3    Q.  Who are the people in sort of yellow jackets that we can

 4    see in the center?

 5    A.  That's Capitol Police.  They're in rain jackets.

 6    Q.  And how about on the sort of right side of the screen

 7    even with them also standing on the open part of the plaza?

 8    A.  Same thing, Capitol Police.  Our jackets are yellow on

 9    one side and black on the other side.  They just had their

10    jackets inside out.

11    Q.  Is there anything separating the Capitol Police from the

12    crowd?

13    A.  Yes, bike rack.

14            MR. GORDON:  Go ahead and press "play," please.

15            (Video playing)

16            MR. GORDON:  Pause, please.

17    Q.  Now, before I get into this part, I want to ask you

18    about the -- like the quantity of Capitol Police that were

19    there.  Was there a sufficient number of Capitol Police on

20    scene to deal with the size of this crowd?

21    A.  No.

22    Q.  Why not?

23    A.  There just weren't.  We just didn't have enough.  We had

24    everybody that was available to work that day, but the crowd

25    was just too big.
```

1    Q.  Was there any anticipation that a crowd of this size was

2    going to try to go past the fence line and enter the

3    Capitol?

4    A.  Not that I was aware of, no.

5    Q.  Does the Capitol Police work with the Metropolitan

6    Police Department?

7    A.  Yes.

8    Q.  And what is the Metropolitan Police Department?

9    A.  Metropolitan Police is the police department that has

10   main jurisdiction in Washington, D.C.

11   Q.  Essentially the local police force?

12   A.  Yes.

13   Q.  And how does that relationship work?

14   A.  I mean, it goes hand in hand.  They assist us if we need

15   it.  We assist them if they need us, because we have certain

16   things that they don't have, and we've been able to assist

17   them, and vice versa.  It's a well-working relationship.

18   Q.  On January 6th, did you call -- did the Capitol Police

19   call for their help?

20   A.  Yes.

21   Q.  And why did Capitol Police call for their help?

22   A.  Because we were outnumbered, and the crowd was taking

23   over.  The building was being breached.  We were just

24   overwhelmed, and we needed help.

25              MR. GORDON:  Now, we've paused the overview video

1      at 1:15 of the video, which is at 2:09:48 in real time.

2      Q.  Describe what we're looking at here.

3      A.  Now we have -- the rioters are now going up the stairs

4      going up to the Upper West Terrace.

5      Q.  Do you remember at the beginning of your testimony, when

6      we put the 3D map up, and I asked you to draw or asked you

7      about that path to the side of the inaugural stage?

8      A.  Yes.

9      Q.  Is this that same stairway?

10     A.  Yes.

11     Q.  Is this the first place where rioters were able to

12     breach to reach the second level of the Capitol?

13     A.  Yes.

14              MR. GORDON:  Let's go ahead and press "play,"

15     please.

16              (Video playing)

17              MR. GORDON:  Pause, please.

18              I've paused the video at 1:37 as a time-stamp in

19     the video.

20     Q.  What are we looking at at this moment?

21     A.  We're on the Upper West Terrace.  In the background

22     there is the Senate Wing Door.

23     Q.  Is that the door that you testified to before the break

24     as the first place rioters breached?

25     A.  Yes.

1    Q.  Okay.  That stairway we were just looking at a few

2    seconds before in the previous camera --

3    A.  Yes.

4    Q.  -- if you climb up that stairway, is this where you end

5    up?

6    A.  Yes.

7    Q.  Okay.

8              MR. GORDON:  Can we press "play," please.

9              (Video playing)

10   Q.  Do you see -- I'm at the one-minute-57 mark at the

11   video.  Do you see some members of the crowd sort of peeling

12   off and running towards the Senate Wing Doors?

13   A.  Yes.

14   Q.  Is that the first group of rioters who breached?

15   A.  Yes.

16             MR. GORDON:  Let's press "play," please.

17             (Video playing)

18   Q.  All right.  At two minutes and 14 seconds, do you see

19   how the videos have changed its appearance?

20   A.  Yes.

21   Q.  What do we see now kind of overlaid on top of the

22   Capitol?

23   A.  It's like an interior view of the layout of the

24   building.

25   Q.  Like a floor plan?

1    A.  Yes.  Thank you.  Good word.

2              MR. GORDON:  All right.  Let's press "play,"

3    please.

4              (Video playing)

5              MR. GORDON:  Pause it right here, 2:21.

6    Q.  All right.  So we see that it says at 2:12, and in red

7    it's circled "First Floor Senate Wing Doors, Northwest

8    Alcove."

9              Is this the floor plan view of the area you've

10   identified previously?

11   A.  Yes.

12             MR. GORDON:  All right.  Let's go ahead.

13             (Video playing)

14             MR. GORDON:  Let's pause here.

15   Q.  Do you see the rioters banging on the doors?

16   A.  Yes.

17   Q.  What safety mechanisms or security mechanisms are

18   attached or in use with these doors?

19   A.  These doors have a mag lock on top to keep it locked;

20   however, it is used or can be used as an emergency egress

21   door.  So if there's a major emergency inside of the

22   building, if you go up to that door, hold the bar for 30

23   seconds, a countdown will start, and the mag lock will

24   release so that you may exit the building in an emergency.

25   Q.  So if you're inside, you have to hold it down for 30

1   seconds before you can get out?

2   A.  Yes.

3   Q.  Is there any kind of alarm attached to that?

4   A.  Yes.  An alarm will go off once that door, the mag lock,

5   releases.

6   Q.  And that alarm, what does it sound like?

7   A.  Annoying.  It's a piercing, consistent, high-pitched

8   noise that it gives off.

9   Q.  Will it stay on the entire time the door is open, or

10   does it shut off after a few --

11   A.  As far as I know, because I'm not physical security, it

12   stays on until it's resecured.

13           MR. GORDON:  All right.  Let's go ahead -- I'm

14   sorry.  I've paused at 2:31.

15   Q.  Do you see the cracking of the glass on the far right

16   side of the video?

17   A.  Yes.

18   Q.  Have you ever seen that glass broken before January 6th?

19   A.  No.

20           MR. GORDON:  Go ahead and press "play."

21           (Video playing)

22   Q.  Is there any way to open those center Senate Wing Doors

23   from the outside, if they're locked with the mag lock?

24   A.  No, no.

25           (Video playing)

1    Q.  Okay.  At 2:56 did you see something fall out of the

2    left side of the screen?

3    A.  Yes.

4    Q.  What was that?

5    A.  Glass from the window.

6    Q.  And how did it -- what would cause the glass from the

7    window to fall on the ground?

8    A.  The people on the outside pushed it until it came loose

9    and fell to the floor.

10                (Video playing)

11                MR. GORDON:  Pause, please.

12   Q.  Do you see the officer who just entered at the three-

13   minute-and-10-second mark of the video?

14   A.  Yes.

15   Q.  Okay.  Do you see the two people in the hallway?

16   A.  Yes.

17   Q.  Are those also officers?

18   A.  Yes.

19   Q.  All right.  Do you know what agency they're with?

20   A.  Capitol Police.

21   Q.  Can you tell from looking at that officer what he or she

22   is doing?

23   A.  Reaching on his or her belt for whatever they're getting

24   ready to use.  I would say probably pepper spray.

25   Q.  What kinds of things are Capitol Police officers

1    equipped with, such as pepper spray?

2    A.   They have pepper spray.   They have an expandable baton.

3    They also have, of course, their firearm.   They have extra

4    magazines for their firearm.   We have -- some of us are

5    trained and have a trauma kit attached to our belt

6    flashlight.

7              MR. GORDON:   All right.   Let's continue, please.

8              (Video playing)

9              MR. GORDON:   Pause, please.

10   Q.   So 3:14, do you see the officer extend his or her arm?

11   A.   Yes.

12   Q.   From that motion, can you tell what the officer is

13   doing?

14   A.   Pepper spray.

15   Q.   That pepper spray, do you know approximately how many

16   uses one of -- a can contains?

17   A.   I'm not sure.   Depending on how much you dispense when

18   you use it.

19   Q.   Do you have a ballpark estimate?

20   A.   No, I'm not sure.

21   Q.   Okay.   Do officers typically carry multiple cans of

22   pepper spray, or just one?

23   A.   No, just one.   We're all given one.

24             MR. GORDON:   All right.   Press "play," please.

25             (Video playing)

1    Q.  All right.  At 3:29 do you see the man in the center at

2    the door?

3    A.  Yes.

4    Q.  Okay.  Do you see him struggling to open it?

5    A.  Yes.

6    Q.  Is that because of the mag lock you have been

7    describing?

8    A.  Yes, the mag lock at the top.

9              (Video playing)

10   Q.  Okay.  Do you see the man kick the door open?

11   A.  Yes.

12   Q.  And do you see the window on the right side being

13   broken?

14   A.  Yes.

15   Q.  All right.  So we're at 3:52.

16             MR. GORDON:  Go ahead, Ms. Jones.

17             (Video playing)

18             MR. GORDON:  Okay.  Stop.

19   Q.  All right.  At the 4:19 mark, which is at 2:42:11 p.m.,

20   do you see the four people in black who ran to the door?

21   A.  Yes.

22   Q.  Okay.  Who are they?

23   A.  Capitol Police officers.

24   Q.  Can you tell from watching the video what they're doing

25   or trying to do?

1    A.  Trying to stop another breach in another -- we call all

2    those doors a Senate Wing Door because they're on the Senate

3    Wing.

4    Q.  This one, based on the video, is it also known as the

5    parliamentarian's door?

6    A.  Yes.

7    Q.  Now, is that door also equipped with an alarm?

8    A.  Yes.

9    Q.  Is it also equipped with the magnet lock that you

10   described?

11   A.  Yes.

12           MR. GORDON:  All right.  Continue, please,

13   Ms. Jones.

14           (Video playing)

15           MR. GORDON:  Now, stop.

16   Q.  That man who ran in at 4:28, is he with the Capitol

17   Police?

18   A.  I don't know.  I don't think so.

19           MR. GORDON:  Okay.  Continue, please.

20           (Video playing)

21   Q.  Was that door ultimately breached?

22   A.  Yes.

23           (Video playing)

24           MR. GORDON:  Now, let me stop here for a second.

25   Q.  Is this floor that the rioters are on currently, would

1    you consider that the Capitol's first floor?  Its second

2    floor?  Something else?

3    A.  It's the first floor.

4    Q.  Is it ground level?

5    A.  On the west -- I mean, on the east side, it is.  But on

6    the west side, it is not.

7    Q.  So if you stayed on this level and walked out the door

8    on the east, where would you go?

9    A.  You would be on ground level.  You would be on the

10   plaza.

11   Q.  All right.  And can you tell us what we're looking at at

12   the 4:47 mark, which is 2:48:12 p.m.?

13   A.  We have a Capitol police officer trying to stop the flow

14   of rioters from coming in that door.

15   Q.  Are these officers wearing different equipment than the

16   officers we saw before?

17   A.  Some of them, yes.  They have on civil disturbance unit

18   helmets.

19   Q.  All right.  Is that commonly referred to as riot gear?

20   A.  Yes.

21             MR. GORDON:  All right.  Continue, please.

22             (Video playing)

23             MR. GORDON:  I'll stop at 4:53.

24   Q.  What's this clear item that's being held above some of

25   the officers?

```
1    A.  A riot shield.
2              MR. GORDON:  All right.  Continue, please.
3              (Video playing)
4              MR. GORDON:  Okay.  Stop.
5    Q.  Now, did you see the officers essentially lose control
6    of that door?
7    A.  Yes.
8    Q.  How did that happen?
9    A.  There's too many people on the outside pushing in.
10   There just wasn't enough Capitol Police to stop the flow of
11   people from coming in.
12   Q.  Okay.  Did you see any rioter use violence?
13   A.  No.
14   Q.  Did you see any rioter punch any officer?
15   A.  There's a lot going on in this.  I may have missed it,
16   but there was a lot going on in this video.
17              They did a lot of pushing to make their way in.
18   Q.  The point being, did they have to fire a gun to get
19   entry?
20   A.  No.
21   Q.  Do they have to, you know, use some other weapon?
22   A.  No.  They just used sheer force to get in the door.
23              MR. GORDON:  Okay.  Continue, please.
24              (Video playing)
25   Q.  That pattern of rioters using sheer force or numbers,
```

1     did that repeat itself throughout the Capitol?

2     A.  Yes.

3              (Video playing)

4              MR. GORDON:  Stop at the 6:07 mark.

5     Q.  What are we looking at in 6:07?

6     A.  We're looking at the Upper West Terrace, rioters.  And

7     also by this time Metropolitan Police has arrived.

8     Q.  Okay.

9              (Video playing)

10             MR. GORDON:  Okay.  We can stop here, and we can

11    take that down, Ms. Jones.

12    Q.  And were the Capitol Police and Metropolitan Police

13    Department ultimately able to expel the rioters from the

14    Capitol?

15    A.  Yes.  It took a while, but yes, they were.

16    Q.  Ballpark, how long do you think it took?

17    A.  Several hours.

18    Q.  Now, I want you to give us -- so that video didn't have

19    any audio --

20    A.  No.

21    Q.  -- right?

22             And it focused on the entries and exits.

23             Can you describe for us what was happening

24    throughout the day?  For example, let's start with the West

25    Plaza.  Do you feel like that video captured the sense of

1    what it was like that day, or not?

2    A.  Yes.  Pretty chaotic.  People just everywhere.  Officers

3    on the radio trying to give out as much information as

4    possible so that we knew where the most -- where the major

5    breaches were so that we could send officers to help.

6    Q.  Were any officers injured that day?

7    A.  Yes.

8    Q.  Give us a ballpark estimate of how many.

9    A.  Oh, 30-plus.  I mean, it was quite a few.

10          We had multiple calls for D.C. Fire to assist with

11    our injured officers.

12   Q.  Without going officer by officer, can you sort of

13   summarize, how was it that officers are getting injured?

14   Did they stub their toes along the way?

15   A.  No.  People had head injuries.  They were sprayed with

16   bear spray, which is kind of a step up from pepper spray.

17   They were hit with bike rack.  They were hit with poles.

18   Pushed, shoved.

19          I mean, the injuries -- hand injuries, foot

20   injuries, concussions.  There was a bevy of injuries.

21   Q.  Now, have you also become familiar with the experience

22   of congresspeople and their staff who were inside the

23   Capitol while this was happening?

24   A.  Yes.

25   Q.  And how did you become familiar with that?

1    A.  So also in communications we have the alarm system and

2    the duress system.  So throughout the course of the event,

3    we were getting multiple duress alarms from multiple

4    locations.  And in each office there's a little box that's

5    underneath the desk, and if a staffer or someone needs

6    assistance, they pull that.  We get the alarm, and we

7    respond.

8             We were getting so many of those from members of

9    staff.  We were getting phone calls in the communications,

10   you know, asking for help.  It was just -- it was such chaos

11   that day.

12   Q.  What is the mission of the Capitol Police?  What are you

13   charged with doing?

14   A.  Protecting Congress, the visitors, staff that come onto

15   the Capitol square.

16   Q.  Is it your job to keep those people physically safe?

17   A.  Yes.

18   Q.  Did you and other Capitol Police consider members of

19   Congress and their staffs to be in physical danger on

20   January 6th?

21   A.  Yeah, once everything kind of went south, yes.  And it

22   was -- again, the calls for service or the calls for help

23   were 20, 30 at once.

24             MR. GORDON:  Can we have Government's 415, please.

25   Q.  All right.  What are we looking at in Government's 415?

1    A.  This is the House Chamber, and it's from -- it's video

2    feed from C-SPAN.

3    Q.  How do you know this is the House Chamber?

4    A.  I recognize it from the chairs.  I've been there several

5    times.

6    Q.  Okay.  Do you see the doorway in the sort of center of

7    the screen?

8    A.  Yes.

9    Q.  Can you tell from the video where it's paused whether

10   that doorway is in its sort of normal state or if something

11   is different about how the furniture is in the room on that

12   day?

13   A.  We have officers and members placing furniture against

14   the door trying to barricade the door.

15   Q.  And why was that necessary?

16   A.  Trying to make sure that no one got in, make sure any of

17   the rioters got in.

18   Q.  Were there congresspeople still in the House Chamber at

19   this time when rioters were inside the building?

20   A.  Yes.

21   Q.  Okay.  They weren't all evacuated?

22   A.  No.  It took a little bit before we evacuated everybody.

23   Q.  Why is that?

24   A.  It just did.  I don't know exactly why.  It just took us

25   some time to coordinate to make sure that we could get the

 1    members to safety.

 2    Q.  Is it fair to say that at the point we paused this

 3    video, some of the members had been evacuated and their

 4    staffs, but many were still in the House Chamber?

 5    A.  Correct.

 6    Q.  Did some of the members have physical disabilities that

 7    prevented them from being evacuated quickly?

 8    A.  I do believe we have a member in a wheelchair.

 9            MR. GORDON:  All right.  Can we please press

10    "play."

11            (Video playing)

12            MR. GORDON:  Pause, please.

13    Q.  Do you see the person in the center of the screen with

14    one hand near his ear and the other arm extended?

15    A.  Yes.  It's kind of blurry.  It's a little hard to see,

16    but yes.

17    Q.  Do you know what that person is doing?

18    A.  Probably, if they have their hand up to their ear,

19    they're probably talking on the radio.

20            MR. GORDON:  Let's press "play" and see if you

21    recognize this scene.

22            (Video playing)

23            MR. GORDON:  Pause, please.

24    Q.  Are you familiar with this moment in time?

25    A.  I have seen this before, yes.

1   Q.  And what occurred at this moment in time?

2   A.  Officers were preparing themselves for a breach at this

3   point.

4   Q.  Meaning what?

5   A.  Putting themselves in position with their weapons in

6   case we had a breach.

7   Q.  In other words, officers have their guns drawn at this

8   moment?

9   A.  Yes.

10  Q.  Where were rioters?

11  A.  I don't know how far away exactly they were from that

12  door, but in close proximity.

13          MR. GORDON:  Can you continue by pressing "play."

14          (Video playing)

15  Q.  Now, did rioters successfully enter the House Chamber?

16  A.  Eventually, yes.

17  Q.  By the time the rioters entered, had Capitol Police and

18  other security staff managed to get all the members out?

19  A.  Yes.

20          MR. GORDON:  All right.  Can we have Government's

21  212, please.

22  Q.  Are you familiar with the term "time lapse"?

23  A.  Yes.

24  Q.  What is a time lapse?

25  A.  It's like, I'll say, a bunch of video kind of compressed

1    to go quickly.

2    Q.  Okay.  So I've put up Government's 212.  Remind us, what

3    are we looking at, what area?

4    A.  This is the West Front again, and at the bottom is the

5    inaugural stage.

6              MR. GORDON:  Press "play," please.

7              (Video playing)

8    Q.  As the video's playing, can you just describe what we're

9    looking at?

10   A.  This is after the initial breach of the first perimeter,

11   we have the rioters on the Lower West Terrace.

12   Q.  Okay.  And we're at about the 22-second mark of the

13   video, about 1:11 p.m.

14             At this point how would you characterize the

15   situation between the police and the rioters?

16   A.  Still greatly outnumbered.  Even though it looks like

17   we have some Metropolitan out there at this point, it's

18   still -- it's still way more rioters than police.

19   Q.  Would you characterize them as contained at this point

20   however?

21   A.  No.

22   Q.  Why not?

23   A.  Because they're -- again, they're still within our

24   perimeter, so it's -- the situation is not contained at all.

25   Q.  But they haven't breached yet, correct?  Not breached

```
 1    the building yet, right?

 2    A.  I don't think so.  It's kind of hard to tell.

 3              MR. GORDON:  Press "play," please.

 4              (Video playing)

 5    Q.  Do you see occasional clouds or puffs in the air?

 6    A.  Yes.

 7    Q.  What are those?

 8    A.  Tear gas.

 9    Q.  Were the police deploying tear gas?

10    A.  The police were deploying tear gas that day, and I got

11    reports that so was the crowd.

12              (Video playing)

13    Q.  Fair to say -- would you say the situation was stable

14    for --

15              MR. GORDON:  Let's pause and stop there.

16    Q.  Okay.  So I've paused at two minutes and 20 seconds into

17    the video.

18              Do you see a change at that moment?

19    A.  Yes.

20    Q.  Okay.  What happened?

21    A.  The police line was breached.

22    Q.  In only one place?

23    A.  Oh, everywhere.  The entire line.

24    Q.  Okay.  Prior to that, would you describe the situation

25    as stable, or no?
```

1    A.  No, still not.

2    Q.  Why not?

3    A.  Because they were still within the perimeter.

4    Q.  What happened to cause the police line to fail like

5    that?

6    A.  It's just the sheer amount of protesters that were out

7    there.  The police were outnumbered.

8              MR. GORDON:  Press "play," please.

9              (Video playing)

10   Q.  Now, all these officers we see --

11             MR. GORDON:  Pause it.

12   Q.  -- are they working together in a coordinated effort

13   according to a Capitol Police tactical plan where everybody

14   knows exactly what to do?

15   A.  No.  I wouldn't say it was that kind of a plan.  But I

16   would say civil disturbance training is kind of the same

17   over multiple police departments, and everybody was using

18   their particular training from their particular department

19   at that time.

20   Q.  Let me ask you another way.

21             Did platoons stay intact, or not?

22   A.  No, they didn't.  They broke down because they were

23   trying to keep police lines to keep the crowd back, but it

24   eventually just broke down.

25   Q.  Okay.  The groups of officers we see, were they being

1    led by a commander they knew and directing them for specific

2    action?

3    A.  Yes.

4    Q.  Was that consistent all the way through, or were there

5    breakdowns there as well?

6    A.  Oh, breakdowns there as well.  Because at that point

7    everybody was just kind of fighting for their lives.

8              MR. GORDON:  Continue, please.

9              (Video playing)

10   Q.  Now, you said that eventually the police were able to

11   regain control of the Capitol.

12   A.  Yes.

13   Q.  Okay.  Once the Capitol was clear of rioters, was

14   Congress able to start right back up?

15   A.  No.  It took a while.

16             Once we got all of the rioters out, we still had

17   to go throughout the building and make sure that the

18   building was safe.  So that included going through every

19   nook and cranny to make sure that there were not any

20   explosive devices left, any weapons that may have been left,

21   checking every bathroom, every alcove to make sure no one

22   was hiding out.  So it took a while.

23   Q.  Could you have started that process when there was even

24   one rioter still in the building?

25   A.  No.

1    Q.  All right.  I'm now going to show you a series of video

2    clips very briefly and ask you to identify just the place

3    that we're looking at.

4             MR. GORDON:  Let's start with Government's 101,

5    and if you pause 15 seconds in.

6             (Video playing)

7             MR. GORDON:  Let's play it for 15 seconds and then

8    pause.

9             (Video playing)

10            MR. GORDON:  Actually, pause right now.  Actually

11   one more second.  Now.

12   Q.  Okay.  Do you see the -- I'm going to have to rewind it

13   so you can focus again, but there's -- suddenly I'm not able

14   to draw anymore.  But there's a man with a gray sweatshirt

15   and gray pants standing on the railing.

16   A.  Yes.

17   Q.  First of all, where is this location?

18   A.  These are the stairs on the West Front that lead up to

19   the Upper West Terrace.

20   Q.  And I've paused.  It's a little blurry, so we're going

21   to rewind and play it again.  But do you -- I'm going to ask

22   you if you recognize the person on the screen just to his

23   right, the right of his sort of right leg shin?

24            We'll back up a couple of seconds and play again.

25   I just want to ask you if you know that person or recognize

1    that person.

2            MR. GORDON:  Ms. Jones, can you rewind to the ten-

3    second mark and play it again.  You can just drag it in

4    blue.

5            Go ahead and press "play."

6            (Video playing)

7    Q.  And the person in the sunglasses, did you recognize that

8    person?

9    A.  No.

10           MR. GORDON:  Let's move on to Government's 102.

11   Q.  Is this the Senate Wing Door again?

12   A.  Yes.

13   Q.  All right.

14           MR. GORDON:  We're going to pause at the 23-second

15   mark, and a yellow arrow is going to appear.  I want you to

16   tell me if you know the person indicated by the yellow

17   arrow.

18           (Video playing)

19           MR. GORDON:  It's okay.  Keep going.  There you

20   go.

21   Q.  Do you know the person indicated by the yellow arrow?

22   A.  No.

23   Q.  Okay.  Is this, again, the Senate Wing Door, though?  Is

24   that what you said?

25   A.  Yes.

```
 1              MR. GORDON:  All right.  Can we have 103, please.
 2    Q.  All right.  What are we looking at?  What's the view in
 3    103?
 4    A.  We're in the Crypt.
 5    Q.  What is the Crypt?
 6    A.  The Crypt is in the center of the building right below
 7    the Rotunda.
 8    Q.  And what is the Rotunda?
 9    A.  That is the room that is directly below the dome.
10    Q.  How would you describe the Rotunda visually?
11    A.  A big round room with lots of art, pictures -- I mean,
12    portraits.  Very ornate.
13              MR. GORDON:  Okay.  104, please.
14    Q.  What are we looking at in 104?
15              MR. GORDON:  Oh, not yet.  You can't see it.
16    Sorry.
17    Q.  What are we looking at in 104?
18    A.  Another view of the Crypt.
19              MR. GORDON:  Okay.  Let's go to 105.
20    A.  This is the alcove right outside the Crypt.
21    Q.  Okay.  So if you walk out of the Crypt, you'd arrive
22    here?
23    A.  Yes.
24              MR. GORDON:  Okay.  Can we fast forward to the 53/
25    54-second mark, and maybe a little bit further.
```

```
1              No, we can pause.
2    Q.  In the center of the screen next -- the center bottom,
3    you can see an American flag, and then a person just to the
4    left wearing a red hat, and a person sort of above the flag
5    with another red hat, and there's a person with a black hood
6    between the two of them.
7              Do you know that person?
8    A.  No.
9    Q.  Okay.
10             MR. GORDON:  Can we have 107, please.
11   Q.  What's 107?
12   A.  This is Statuary Hall.
13   Q.  And what is Statuary Hall?
14   A.  It's on the second floor of the Capitol building; and
15   this is, just as it says, a room full of statues.
16   Q.  Okay.  How do you get from the area we were just looking
17   at before, that alcove outside the Crypt, how do you get to
18   this area, Statuary Hall?
19   A.  Stairs.  There's a stairway there.  You can take the
20   stairs up.
21   Q.  Is it right there, or do you have to go somewhere else?
22   A.  It's down a little bit, but there's a stairway right
23   there that comes right up.
24   Q.  All right.
25             MR. GORDON:  Can we now have 108.
```

1    Q.  All right.  What are we looking at in 108?

2    A.  This is a hallway outside of Statuary Hall.

3    Q.  Okay.  So if you walk through Statuary Hall, you'd

4    arrive here?

5    A.  Yes.  It's like a connecting corridor before you get to

6    the House Chamber.

7              MR. GORDON:  109, please.

8              (Video playing)

9    Q.  Okay.  What are we looking at in 109?

10   A.  This is the hallway right outside of the House Chamber.

11   Q.  Okay.  So is this where you would get to if you walked

12   through the hallway we were looking at in the previous

13   video?

14   A.  Yes.

15             MR. GORDON:  Can we have 110, please.

16             (Video playing)

17   Q.  And what's 110?

18   A.  Again, hallway outside of the House Chamber.

19   Q.  Okay.  Is this where you would get if you walked down

20   the hallway we were just looking at in 109?

21   A.  Yes.

22             MR. GORDON:  Can we fast forward to the 32-second

23   mark.

24             (Video playing)

25   Q.  Do you know that person in the sunglasses facing the

```
 1    camera?
 2    A.   No.
 3              MR. GORDON:   All right.   Can we have 111, please.
 4              (Video playing)
 5    Q.   Okay.   What are we looking at in 111?
 6    A.   Second floor again outside of the House Chamber.
 7    Q.   Is this the same area we were just looking at, just from
 8    a different angle?
 9    A.   Yes.
10              MR. GORDON:   All right.   Let's have 112, please.
11              (Video playing)
12    Q.   All right.   What are we looking at in 112?
13    A.   Again, still second floor outside of the House Chamber,
14    but now we're looking at the door that leads out to the East
15    Front.
16    Q.   Okay.   And is this one of the magnetometers you were
17    describing previously?
18    A.   Yes.
19    Q.   Is there one of those at every exit and entrance?
20    A.   Yes.
21              MR. GORDON:   All right.   Can we have 113, please.
22              (Video playing)
23    Q.   All right.   What are we looking at in 113?
24    A.   This is an outside view of that same door that leads out
25    to the East Front.
```

1    Q.  Okay.  Do you recognize the person that we've paused at

2    the bottom of the screen nine seconds in --

3    A.  No.

4    Q.  -- the one with the American flag draped around the

5    person's shoulders?

6    A.  I don't know who that is.

7    Q.  Okay.  Captain Summers --

8            MR. GORDON:  You can take all that down,

9    Ms. Jones.

10   Q.  -- did any of the rioters have permission to be inside

11   the Capitol?

12   A.  No.

13   Q.  Why didn't the Capitol Police just lock the doors and

14   arrest everybody inside?

15   A.  There wasn't enough police officers for that.  There

16   just weren't enough.

17   Q.  Can you expand on what you mean by that?

18   A.  There just wasn't -- it's kind of when you're doing

19   that, it's a one-on-one thing, you would have an officer

20   arrest a person; and there just wasn't enough to do that.

21           The only thing you had to do first was get control

22   of the situation, get control of the building before you

23   could do that.  And we were just way outnumbered before we

24   could do even -- even think about making arrests.

25           MR. GORDON:  All right.  Your Honor, one moment,

```
 1    please.
 2                 (Pause)
 3                 MR. GORDON:  Thank you, Your Honor.  No further
 4    questions.
 5                 THE COURT:  Mr. Garrity, Mr. Monteith.
 6                         CROSS-EXAMINATION
 7    BY MR. MONTEITH:
 8    Q.  Good afternoon.
 9    A.  Good afternoon.
10    Q.  Excuse me, I've been sitting for a while.
11               Attorney Gordon, during direct examination, asked
12    you a couple of questions towards summarizing what happened
13    to some Capitol Police officers.
14               Do you recall that question?
15    A.  Yes.
16    Q.  And some have been hurt in different ways, right?
17    A.  Yes.
18    Q.  And some had been hit by bear spray?
19    A.  Yes.
20    Q.  And you elaborated a little bit about that, right?
21    A.  Yes.
22    Q.  Certainly you are not alleging or inferring at all that
23    Ms. Niemela touched a police officer?
24    A.  No.
25    Q.  Shoved a police officer?
```

1  A.  No.

2  Q.  Yelled at a police officer?

3  A.  No.

4  Q.  Used bear spray?

5  A.  No.

6  Q.  Vandalized any property?

7  A.  No.

8  Q.  No evidence whatsoever of that, right?

9  A.  No.

10  Q.  And no -- you're not even inferring that she did that.

11  A.  No, sir.

12  Q.  Okay.  In fact, you can't identify her, right?

13  A.  No, sir.

14  Q.  This is the first time you've ever seen her?

15  A.  Yes.

16  Q.  Okay.  Thank you.

17         It appears to me that you are a very dedicated

18  captain now, and you've given a lot of your life to the U.S.

19  Capitol Police.  Right?

20  A.  Yes, sir.

21  Q.  You are -- did you say 23 years on?

22  A.  Yes, sir.

23  Q.  Okay.  And you moved -- it sounds like you worked your

24  way up the ranks.

25  A.  Yes, sir.

1    Q.  That being said, you've been to the Capitol thousands of

2    times.

3    A.  I could say that, yes.

4    Q.  All right.  You are infinitely -- I mean intimately

5    familiar with the Capitol building?

6    A.  Yes.

7    Q.  Right?

8         And when -- and you're also intimately familiar

9    with the grounds of the Capitol, right?

10   A.  Yes.

11   Q.  You've been there thousands of times?

12   A.  Yes.

13   Q.  And it's your job to know that, right?

14   A.  Yes.

15   Q.  Okay.  So -- and this is just a very basic question --

16   when you're on the west lawn of the Capitol on any day,

17   right?

18   A.  Yes, sir.

19   Q.  We won't use January 6th as an example, but any day.

20   And you are -- just say you're walking towards the

21   stairwell.  Do you follow where we're at?

22   A.  Which stairway, sir?

23   Q.  Okay.  So we'll call it the one that's on the Senate

24   Wing Doors to the left.

25   A.  Okay.

1    Q.  Okay.  So walking towards the Capitol steps on the West

2    Plaza, and you look up, right?

3    A.  Yes, sir.

4    Q.  There's a big wall, right?

5    A.  Yes, sir.

6    Q.  Right?  It's perhaps higher than the ceiling here?

7    A.  Possibly.

8    Q.  Okay.  And when you look up, there's a terrace.

9    A.  Yes, sir.

10   Q.  Okay.  And behind the terrace, as we've seen in the

11   government's exhibits, to the left there's sort of an

12   entranceway, right, to the Senate Memorial Doors?

13   A.  The Senate Memorial Doors.  I'm not familiar with the

14   Senate -- are you talking about the Senate Wing Doors?

15   Q.  My bad.  Senate Wing Doors.

16   A.  Yes, sir.

17   Q.  Right?  In fact, we were shown videos of somebody

18   kicking those doors from the inside?

19   A.  Yes, sir.

20   Q.  Okay.  So backing up a little bit, when you're on that

21   lawn, and you're looking up, right?

22   A.  Yes, sir.

23   Q.  All right.  You cannot see the Senate Wing Doors?

24   A.  No, sir.

25   Q.  There is first the wall.  There's a terrace.  Right?

1   A.  Yes.

2   Q.  A distance to the doors?

3   A.  Yes.

4   Q.  And sort of like a small corridor, for lack of a better

5   term?

6   A.  Yes.  That's a good way to describe it.

7   Q.  Okay.  But point being, nobody can see what's happening

8   if they're on the west lawn and they're looking up in that

9   direction at the Senate Wing Doors, right?

10  A.  Correct.

11  Q.  Okay.  Now, we were shown during direct examination some

12  videos.  And I'd like to ask you a couple of questions about

13  them, but I don't think we have to go through them again.

14  The jury has them in evidence.

15           You would agree with me that the first breach

16  occurred -- of the red perimeter -- at 12:54?

17  A.  Approximate.

18  Q.  Okay.  And you testified to that in the Fitzsimons

19  trial, right?

20  A.  Yes.

21  Q.  All right.  And when you testified at that Fitzsimons

22  trial, you told the truth, right?

23  A.  Yes.

24  Q.  And you swore to tell the truth, right?

25  A.  Yes.

1   Q.  And in that trial you said, I believe, it was 12:57,

2   12:58.  Is that fair?

3   A.  I don't remember everything that I said during that

4   trial.

5   Q.  Okay.

6   A.  It's been a long time.

7   Q.  Well, the video that we were shown today was 12:54.

8   A.  Okay.

9   Q.  My point being, you would agree with me that that red

10  perimeter was breached before 1:00 on January 6th?

11  A.  Yes.

12  Q.  Okay.  And can you tell us where Ms. Niemela was before

13  1:00?

14  A.  No.

15  Q.  Okay.  Now, when you say "breached," there are bike

16  racks, right?

17  A.  Yes, sir.

18  Q.  Those bike racks were removed, right?

19  A.  Yes, sir.

20  Q.  When -- and it isn't until an hour and -- I'll just

21  round it a little bit -- but an hour and 15 minutes later

22  the Senate Wing Doors are breached, right?

23  A.  Yes.

24  Q.  So from 1:00 the bike racks are gone, right?

25  A.  Yes, sir.

```
1    Q.  There are thousands of people walking towards the

2    Capitol, right?

3    A.  Yes, sir.

4    Q.  Okay.  You don't know when Ms. Niemela got to -- I guess

5    we'll call it the Peace Monument?

6    A.  No, sir.

7    Q.  All right.  And then you don't know when she was in that

8    tree, right?

9    A.  No, sir.

10   Q.  Okay.  Then we were shown a video that began at 2:09,

11   right?  And Attorney Gordon stopped you.  That was when

12   people were going upstairs, right?

13   A.  Yes, sir.

14   Q.  Certainly you're not telling us Ms. Niemela is going up

15   the stairs at 2:09, right?

16   A.  I do not know if she was or not.

17   Q.  And you're not telling the jury that she was, right?

18   A.  No, sir.

19   Q.  Okay.  And at 2:11 we were shown a video of the Upper

20   West Terrace, right?

21   A.  Yes, sir.

22   Q.  And you're not saying that Ms. Niemela was in that

23   video, right?

24   A.  No, sir.

25   Q.  And that's just the flat level after you go up the
```

1    stairs, right?

2    A.  Yes, sir.

3    Q.  Okay.  And at 2:13 we watched the video with somebody

4    breaking the window, right?

5    A.  Yes, sir.

6    Q.  Jumping through the window, right?

7    A.  Yes, sir.

8    Q.  Several people going through?

9    A.  Yes, sir.

10   Q.  And I believe like two people kicking the door, right?

11   A.  Yes, sir.

12   Q.  You're not saying or inferring at any point Ms. Niemela

13   was there?

14   A.  No, sir.

15   Q.  Okay.  At 2:48 there was another door that was breached,

16   right?

17   A.  Yes, sir.

18   Q.  And that's not the Senate Wing Door, right?

19   A.  I think we were talking about the parliamentarian door.

20   Is that the door that you were talking about at that time?

21          We still call it a Senate Wing Door because it's

22   on the Senate Wing, but yes, that door was breached.

23   Q.  Ms. Niemela is not there?

24   A.  No, sir, not that I could see.

25   Q.  You're not inferring that she was there?

 1   A.  No, sir.

 2   Q.  Okay.  The time lapse video, right?

 3   A.  Yes, sir.

 4   Q.  Well, let me back up a little bit.

 5          Do you know what stairs Ms. Niemela allegedly went

 6   up to get to the terrace?

 7   A.  No, sir.

 8   Q.  All right.  Would you disagree with me if I told you

 9   that that video that the government showed the jury had

10   nothing to do with the area that Ms. Niemela walked up?

11   A.  I would not disagree.

12   Q.  Okay.  Would you agree with me that the timing on

13   that -- in the time lapse on that video is inaccurate and

14   not correct?

15   A.  As far as...?

16   Q.  The time, as in it shows a breach at -- that line being

17   breached at 14:30.

18   A.  Okay.

19   Q.  Okay?

20   A.  Yes, sir.

21   Q.  14:30 is military time for 2:30, correct?

22   A.  Yes, sir.

23   Q.  And because of the compression and the way -- I guess

24   the way it was compressed, the timing on that video was off.

25   A.  Possibly.

1    Q.   Okay.  In fact, we know that the timing on the breach is

2    correct at 2:13, right?

3    A.   Correct.

4    Q.   Okay.  Do you know why we would -- I don't have a

5    question regarding that.

6              MR. GORDON:  Objection, Your Honor.  Argument.

7    That's why there's no question.

8              THE COURT:  Sustained.

9    Q.   Can you tell us where Ms. Niemela was when the snow

10   fences were removed?

11   A.   No, sir.

12   Q.   Can you tell us where she was when the bike racks were

13   removed?

14   A.   No, sir.

15   Q.   Can you tell us when she was present on the lawn?

16   A.   No, sir.

17   Q.   All right.

18             MR. MONTEITH:  I really don't think I have any

19   other questions.  Thank you.

20             THE WITNESS:  Thank you, sir.

21             MR. GORDON:  All right.

22             THE COURT:  Mr. Gordon?

23             MR. GORDON:  No redirect, Your Honor.

24             THE COURT:  Ma'am, you're excused for the day.

25   Thank you very much for your testimony.  Don't discuss your

 1      testimony in this case until this case is over, okay?

 2                    THE WITNESS:  Yes, sir.

 3                    THE COURT:  Have a nice day.

 4                    MS. ARCO:  Your Honor, the government calls

 5      Officer Brooke -- Lieutenant Brooke Detorie.

 6                    THE COURT:  Very well.

 7                    Counsel, should we take our lunch break now, or

 8      should we wait 15 minutes and get started?

 9                    Ladies and gentlemen of the jury, would you prefer

10      to get started with our next witness or take our lunch break

11      now?  I'm seeing a couple of these (indicating) which means

12      lunch.

13                    We're going to take our lunch break now.  It's

14      12:30.  Why don't we reconvene at about 1:40.  Okay?  So an

15      hour and ten minutes.

16                    No discussions about the case.  No research about

17      the case.

18                    And, ladies and gentlemen, before you leave, I

19      probably should have mentioned this this morning, but you're

20      obviously all wearing masks.  As your first sort of test

21      deliberation, if you all decide unanimously that you would

22      like not to wear masks, I will allow that.  But if -- we're

23      now a collective.  We're not just individuals.  And if one

24      of your members would prefer to keep their masks on, then

25      everyone should remain masked.

1           So I will allow you all to discuss that in any way

2    that you'd like over the lunch break.  Okay?

3           (Jury exits courtroom)

4           THE COURT:  All right.  See you at 1:40.

5           (Lunch recess taken)

```
 1                    A F T E R N O O N   S E S S I O N

 2            THE COURT:  All right.  Please be seated.  Welcome

 3    back, everybody.

 4            Did you have a nice lunch?  Good.

 5            All right.  Mr. Gordon, would you like to call the

 6    government's next witness?

 7            MR. GORDON:  Yes, Your Honor.  The United States

 8    calls Lieutenant Brooke Detorie.  And Ms. Arco will be

 9    questioning her.

10            THE COURT:  Ms. Detorie, if you could stand and

11    raise your right hand to be sworn by the courtroom deputy.

12                LIEUTENANT BROOKE DETORIE, Sworn

13                        DIRECT EXAMINATION

14    BY MS. ARCO:

15    Q.  Good afternoon, Lieutenant.

16    A.  Good afternoon.

17    Q.  Would you please state and spell your name for the

18    record.

19    A.  Of course.  It's Brooke Detorie; B-R-O-O-K-E, last name

20    is D-E-T-O-R-I-E.

21    Q.  And what do you do for a living?

22    A.  I'm a lieutenant for the United States Capitol Police.

23    Q.  And how long have you been with the Capitol Police?

24    A.  Coming up on my twentieth year.

25    Q.  Wow.  What kind of training have you had for this job?
```

1   A.  We begin first with basic training down in Glynco,

2   Georgia, for a period of 12 to 13 weeks; and then we come

3   back up to Cheltenham, Maryland, and we go through Capitol

4   Police-specific training for about the same period of time.

5   So about six months of training.

6   Q.  Okay.  And how many demonstrations or protests have you

7   worked in your time with the Capitol Police?

8   A.  It would be difficult to give a number, but it's been a

9   great deal of them.

10   Q.  Ten?  Dozens?  Hundreds?

11   A.  Hundreds.

12   Q.  Okay.

13   A.  Yes.

14   Q.  Directing your attention to the day of January 6, 2021,

15   were you scheduled to work for U.S. Capitol Police on that

16   date?

17   A.  Yes.

18   Q.  What was your scheduled shift?

19   A.  0700 was my start that day.

20   Q.  Okay.  That's 7:00 a.m.?

21   A.  7:00 a.m.

22   Q.  What was your assignment for the day?

23   A.  At the time I was a sergeant assigned to the House

24   division, which is a different part of the Capitol campus.

25   So I did not have an assignment at the Capitol building that

1    day but rather in the House congressional buildings.  And I

2    oversaw a group of probably -- there were probably 100

3    officers on duty that day.  I was responsible for about 40

4    of them at the time.

5    Q.  Okay.  And you said House congressional buildings.

6    Could you explain where those are in relation to the Capitol

7    building?

8    A.  So they're going to be south of the Capitol building,

9    and they're the Cannon House Office Building, the Longworth

10   House Office Building, the Rayburn.  And then there's two

11   buildings on the southwest side that are the O'Neill and

12   Ford, and that handles most of the administrative stuff.

13   Q.  And those set of buildings, are those all part of the

14   Capitol Complex?

15   A.  Yes.  We refer to Capitol Hill as the campus or Capitol

16   Hill.  And then we're narrowed down into smaller manageable

17   areas of responsibility.  So that day I was responsible for

18   the House side.

19   Q.  Okay.  Were you in any particular building on the House

20   side, or...?

21   A.  No.  Mostly I had just an assignment up to the officers,

22   so just those buildings, not in any one in particular.

23   Q.  Okay.  Did you witness any violence on January 6, 2021?

24   A.  I did.

25   Q.  Okay.  Describe to us the first violent scene you

1    encountered that day.

2    A.  So I first responded to the Upper West Terrace of the

3    Capitol building responsive to the radio calls for help, and

4    that's when we encountered injured officers and -- so from

5    there, I'm at a much higher point in the Capitol, so you can

6    see out onto the West Front.  And you can see people coming

7    as far -- as far as my eyesight could see, I could see the

8    crowds coming.

9    Q.  Okay.  I'm going to show you Government Exhibit 208,

10   please, which has already been admitted into evidence.

11            MS. ARCO:  And can you please publish from

12   counsel's table?  Thank you.

13   Q.  Can you show the jury -- I know it's a little small,

14   maybe we can zoom in.

15            MS. ARCO:  Perfect.  Thank you so much.

16   Q.  Can you show the jury where the Upper West Terrace is?

17   And you can just make a mark on your screen.

18   A.  Of course.  So it's in here (indicating).

19   Q.  And so you were describing radio traffic.  What specific

20   radio traffic were you responding to?

21   A.  So there were numerous calls for assistance, and then

22   for us we refer to it at 10-33s.  That's going to be an

23   officer in trouble.  So that's when somebody is calling

24   saying that no matter what you're doing, drop it, respond, I

25   need your help.

1    Q.   Okay.  Describe for us the scene when you got to the

2    Upper West Terrace.

3    A.   So responding, I was responding from the interior of the

4    building.  The House division is connected by tunnels.  So I

5    responded from underground and into the -- that point.  And

6    the air had already filled with like the smoke from the mace

7    and the pepper balls and the smoke rings they were trying to

8    deploy to get the crowds to push back.  So that was already

9    sort of filtered into the building because they were opening

10   the door to bring officers who needed assistance in at the

11   time.

12   Q.   Okay.  And so you said they were deploying.  Who were

13   you referring to?

14   A.   The Capitol Police.  We have a less lethal team, a few

15   officers assigned that day whose responsibility was only to

16   engage if a demonstration or riot required them to use the

17   weapons that they're trained on to push crowds back.

18   Q.   Okay.  And those included what you described.  Mace?

19   A.   Yes.

20   Q.   Pepper balls?  Smoke canisters?

21   A.   Yes.

22           THE COURT:  Lieutenant, if you could just wait

23   until she finishes her question, because the court reporter

24   can't pick up both at the same time.

25           MS. ARCO:  Thank you, Your Honor.

1    Q.  How prevalent was the smoke from where you were

2    standing?

3    A.  It was nearly impossible -- it was shocking that the

4    group wasn't -- the rioters weren't being pushed back

5    because it was hard to, like, continue because you were

6    immediately overcome by it.

7    Q.  Okay.  So from where you were standing, you felt it

8    personally?

9    A.  Yes.

10   Q.  Okay.  And how did that feel?  What kind of effects were

11   you experiencing?

12   A.  Your eyes will begin to water.  Your nose will begin to

13   run.  Coughing.  You want to close your eyes.  You want to

14   rub your eyes.  You want to dump water on your face.

15   Q.  Okay.  And, again, just to orient the jury, you were on

16   the Upper West Terrace.  And where are the rioters in

17   relation to you from what you can see?

18   A.  So it's tiered.  They are ground level.  And I would say

19   that I was several stories up at that point.

20   Q.  Okay.

21   A.  So -- and there's also a blind spot there.  So if they

22   had made it up to our Lower West Terrace, I wouldn't have

23   known that at the time.

24   Q.  Okay.  But is it safe to say that the less lethal stuff,

25   you know, the gas canisters, et cetera, were being deployed

1    below you?

2    A.  Yes.

3    Q.  And not exactly where you were?

4    A.  Yes.  So they -- it was all blowback.

5    Q.  Okay.  So you were feeling it from several stories above

6    where it was being deployed?

7    A.  Yes.

8    Q.  Okay.  So at the point when you're on the Upper West

9    Terrace, what are you doing there?

10   A.  So without a -- you know, without ever having

11   experienced something like that before, you just took over

12   with what needed to be done in that moment.  So the first

13   thing that I did was there was a severely injured

14   Metropolitan Police officer who was -- had an eye injury,

15   and there -- we didn't at that moment have a way to get him

16   medical treatment, you know, at a higher level than like the

17   first aid that we have.  So I took him over to -- on the

18   House side, in the Longworth building, they have an office

19   of attending physician to get him additional medical

20   assistance.

21   Q.  Okay.

22   A.  So that took me away from the Capitol back over to the

23   House side underground.

24   Q.  So did you personally witness any violence between the

25   rioters and police while you were on the Upper West Terrace?

1    Personally did you witness?

2    A.  No.

3    Q.  Okay.  Based on what you were witnessing from there,

4    your experience with that injured officer, et cetera, was

5    what you were witnessing, did it seem like a peaceful

6    protest based on your experience in the past?

7    A.  No.

8    Q.  Why?

9    A.  So typically what I would consider a peaceful protest

10   would be a First Amendment demonstration.  Every

11   demonstration up until that point, they've been compliant

12   with police direction.  Our less lethal team has never had

13   to deploy, since I've been on the department that I can

14   recall, any of the munitions that they used that day because

15   we've been able, through police presence and through verbal

16   commands, to gain the control of the group.

17          That didn't occur on January 6th.

18   Q.  Okay.  Did you or your fellow officers ever have to

19   retreat due to the actions of the rioters that day?

20   A.  Numerous times.

21   Q.  Okay.  Were you receiving directions as all this was

22   going on, or were you -- was it more like an

23   all-hands-on-deck situation, or what end of the spectrum?

24   A.  It was -- we were not getting directions.  There was

25   little direction to give because anyone involved was

1    responding from different areas of responsibility.  So there

2    wasn't any one place to form up and give direction.  You

3    just had to react based on what was occurring right in front

4    of you.

5    Q.  Okay.  After assisting colleagues and MPD officers on

6    the Upper West Terrace, where did you go from there?

7    A.  So at that point I was back in the Longworth building,

8    and I came back to the U.S. Capitol building.

9    Q.  Okay.  So you went from Upper West Terrace to the

10   Longworth building?

11   A.  Uh-huh.

12   Q.  And Longworth is one of those House buildings that you

13   were describing earlier?

14   A.  Yes.

15   Q.  Okay.  And then you went back to the Capitol, you said?

16   A.  Yes.

17   Q.  Okay.  Did you take anyone with you?

18   A.  Yes.

19   Q.  Approximately how many people?

20   A.  Out of 14 -- I had 14 volunteers to go with me, and I

21   took ten.

22   Q.  Okay.  And volunteers, you mean fellow officers?

23   A.  Fellow officers that wanted to go.

24   Q.  Okay.  Can you generally describe your activities over

25   the next two hours?

1   A.  Yes.  So we -- not having a clear picture, what we first

2   thought the ten of us would be able to do would be to

3   apprehend anyone in the building, place them under arrest,

4   take them to our headquarters, and process them.

5          It's hard in hindsight to understand that we don't

6   have a full picture.  We're over here.  We don't have

7   cameras or we can't see what's going on.  So we're just

8   responding.

9          So the first people we encountered, I directed my

10  officers to place them under arrest, to search them, and

11  then pass any weapons or paraphernalia they found back to me

12  to maintain chain of custody.

13  Q.  Were any paraphernalia or weapons recovered from anyone

14  you arrested?

15  A.  Yes.

16  Q.  Describe.

17  A.  Three -- at least three knives, a magazine filled with

18  ammunition, a taser.  And then shortly thereafter somebody

19  behind the group sprayed the officers and myself down with

20  what was later found to be brake fluid.  So that was also

21  grabbed from their hands, but it had already impacted all of

22  the officers who were responding at that time.

23  Q.  Okay.  At some point during those two hours did you make

24  it to the Crypt area of the Capitol?

25  A.  Yes.

1    Q.  Okay.

2              MS. ARCO:  If you could pull up Government Exhibit

3    209, and if you could publish.

4    Q.  Can you show the jury -- or what are we looking at?

5    A.  This is a blueprint of the U.S. Capitol building.

6    Q.  Okay.  And can you show the jury where the Crypt is?

7    You can mark the screen.

8    A.  Yes.  (Witness complies)

9    Q.  Okay.  So right in the dead center of the Capitol

10   building?

11   A.  Yes.

12   Q.  Okay.  And is this on the first floor?  Second floor?

13   Third floor?

14   A.  I don't know.

15   Q.  Okay.

16   A.  The Capitol is subterranean in some levels, so I'm

17   sorry, I just don't know.

18   Q.  Okay.  Do you know if it's toward the top?  Toward the

19   bottom?

20   A.  It's in the middle, so like Rotunda and then Crypt.

21   Q.  Okay.  So the Rotunda's above the Crypt?

22   A.  Yes.

23   Q.  Okay.  Thank you.

24              What did you observe when you got to the Crypt?

25   A.  It looked like, when I got there, that we -- there were

1    officers attempting to form what we would call a police line

2    to try to stop the group from advancing further into the

3    building.  Nobody was directing this, but it was just sort

4    of instinctual:  Like, how can we stop this?  So the few

5    that were there did attempt that just to form a police line

6    and stop the group from advancing.

7    Q.  Okay.

8            MS. ARCO:  I'm going to show you Government

9    Exhibit 103.  And I think I'll man it from here.  Thank you.

10           So if we could publish -- which has already been

11   admitted into evidence, and if we may publish from the

12   podium here?

13           I appear to be plugged in.  Do you know?

14           Can you pull Exhibit 103?  Thank you.

15           THE COURT:  Lieutenant, if you hit the green

16   arrow, it will clear the legend.  Thank you.

17           MS. ARCO:  Okay.  And you can pause right at the

18   beginning.

19   Q.  Okay.  Lieutenant, what are we looking at here?

20   A.  This is security footage from the Capitol building, the

21   Crypt area.

22   Q.  Okay.  Can you please read -- oh, I think it's zoomed in

23   so you won't be able to.

24           Do you --

25           MS. ARCO:  Can you please play until second ten,

```
1    Ms. Jones.
2              (Video playing)
3    Q.  Okay.  Do you see yourself in this footage?
4    A.  I do.
5    Q.  Okay.  Could you please circle yourself.
6    A.  (Witness complies)
7    Q.  Thank you.
8              Are there any other Capitol Police officers
9    visible in this scene?
10   A.  Yes.
11   Q.  Okay.  Approximately how many?
12   A.  Between six and eight.
13   Q.  Okay.  And what are you all doing in this moment?
14   A.  This is where we're attempting to form that police line.
15   Q.  Okay.  And you can X out.  You can clear that.  Thank
16   you.
17             To your knowledge, were you the only female
18   officer present in this space at this time?
19   A.  To my knowledge, yes.
20   Q.  Okay.  And approximately how many rioters were in this
21   space at this time?
22   A.  Hundreds.
23   Q.  Okay.  How did you feel in this moment?
24   A.  I was transitioned -- like my brain was transitioning to
25   the different tactics I thought we could use.  It seemed
```

1    that each one I kept coming up with, oh, that's not going to

2    work, or -- so I was, you know, fearful that this group was

3    going to cause harm to each of the officers and myself.

4    Q.  Okay.  And why were you fearful?

5    A.  Because we're greatly outnumbered here.  So this is -- I

6    mean, I probably put these numbers close to 200.  I don't

7    know what they actually were.  And there's eight of us.  I

8    think we do get reinforcements later in the video, but it's

9    not enough.

10   Q.  Okay.  And so you said you were attempting to form a

11   police line.  Why were you doing that again?

12   A.  To stop them from advancing any further into the

13   building.

14   Q.  Okay.  And do you recall in this moment when you're

15   manning that police line what the rioters were doing in that

16   moment?

17   A.  Yes.  They were yelling at us that we were traitors,

18   things like we should be on their side, cursing at us.

19   Q.  Okay.  How would you describe the vibe of this crowd?

20   A.  Hostile.

21   Q.  "Hostile," you said?

22   A.  Yes.

23          MS. ARCO:  Okay.  If you could skip to the three-

24   minute-17-second mark, please.

25          Okay.  And if you can -- can you please clear the

```
1    circle.  Thank you.
2            And if you could please play and pause at the
3    three-minute-38-second mark.
4            (Video playing)
5    Q.  Okay.  Lieutenant, can you please read the time-stamp at
6    the top-left corner of the screen?
7    A.  Wednesday, January 6, 2021, 2:24:58 p.m.
8    Q.  Okay.  And based on what you just saw, does the line
9    that you and your colleagues formed still appear to be
10   intact?
11   A.  No.
12   Q.  Okay.
13           MS. ARCO:  Okay.  Can you play again and pause at
14   the four-minute-ten-second mark.
15           (Video playing)
16   Q.  Okay.  And can you please read the time-stamp now.
17   A.  Wednesday, January 6, 2021, 2:25:30 p.m.
18   Q.  Okay.  And what did we just witness?
19   A.  The crowd overtakes the police line.
20   Q.  Okay.
21           MS. ARCO:  And if you could please pull up
22   Government Exhibit 502, which has already been admitted into
23   evidence.
24           And if we could publish from counsel's table.
25           Hold -- pause.
```

1          I will bring this over here so the jury can hear

2     better from the speaker.

3          And if you could move to second 41 of the clip,

4     please.

5     Q.  Okay.  Lieutenant, do you see yourself in this still

6     shot?

7     A.  Yes.

8     Q.  Okay.  Where are you?

9          Yes, please, if you could mark it.

10    A.  (Witness complies)

11    Q.  Thank you.  You can clear it.

12         And do you recognize anyone else in this still

13    shot?  I know it's hard to see.

14    A.  I recognize one of the sergeants behind me, and then a

15    captain further back.

16    Q.  Okay.  Were any of these individuals part of the group

17    of officers you took with you?

18    A.  No.

19    Q.  So just other people responding to the same area?

20    A.  Yes.

21    Q.  Okay.

22         MS. ARCO:  All right.  And we're going to play the

23    clip and pause at minute 1:28, please.  But let me just --

24    I'm going to man the volume in case it's too loud.

25         (Video playing)

1    Q.  Okay.  What did we just witness in this clip?

2    A.  The crowds are getting larger, and they're becoming more

3    vocal and agitated.  In a moment, you could sense that we

4    were going to get overtaken soon.  So the discussion is:

5    What else can we do?

6    Q.  Okay.  And is this the police line you were forming that

7    you were describing earlier?

8    A.  Yes.

9    Q.  So this video's depicting the same moment just from a

10   different footage, different angle?

11   A.  Yes.

12   Q.  Okay.

13           MS. ARCO:  If you could play to the one-minute-50-

14   second mark, please.

15           (Video playing)

16   Q.  What did we just witness?

17   A.  This is when what I just described we think is going to

18   occur does occur.  The crowd breaks through past our police

19   line.  So we're -- the officers are all separated at this

20   point, and now we're forced to decide how to exit safely,

21   which, in that moment, I considered transitioning to my

22   handgun because this group is -- they're -- with our use of

23   force, I would have been authorized.  Our use of force

24   policy, if I'm in fear of grave bodily injury or death, I

25   can use deadly force.

1      That wasn't an option to me at that moment because

2   weapon retention comes into play.  The gun, if I were to

3   pull it out, could become a weapon against me or gunshots in

4   that area could add a different level of response for my

5   fellow officers with us not knowing where we are in the

6   crowd.  It's just -- it was a dangerous force option in that

7   moment.

8      So it was just fighting with your hands to get

9   out, kicking.

10  Q.  So you felt physically threatened in that moment?

11  A.  Yes.

12  Q.  Okay.  Do you see yourself on the screen right now?

13  A.  Yes.

14  Q.  Okay.  Can you circle yourself, please.

15  A.  (Witness complies)

16  Q.  And you can clear it.

17  A.  (Witness complies)

18  Q.  What's going on with you in this moment?

19  A.  I'm just trying to make sure I don't get injured or

20  killed.

21  Q.  Okay.  Was anyone putting their hands on you?

22  A.  Yes.  They were reaching for equipment, trying to take

23  my radio, calling "traitors," you know.

24  Q.  Okay.  Did you try to defend yourself at all?

25  A.  Of course.  Yes, I did.

1    Q.  Okay.  How so?

2    A.  The rioter who reached for my equipment I kicked in his

3    groin area, which caused him to yell loudly that he was

4    kicked in the balls, which got the group more frenzied

5    against me in that moment.

6              It's difficult to recall everything that occurred

7    in that moment because you're in fight-or-flight mode.  So

8    that's the one thing I do remember, was in that moment I was

9    like maybe I should have done something a little bit

10   different considering the effects of a woman kicking a man

11   in the groin.  Maybe a different approach would have been

12   better, but it was hard to come up with something to get out

13   of there.

14   Q.  Okay.  So how were you feeling in this moment?

15   A.  Fearful of injury.

16   Q.  Okay.  And if you could please try to keep an eye on

17   yourself as we continue to play the clip to minute 2:08.

18              MS. ARCO:  If you can pause there, please.

19              (Video playing)

20   Q.  Okay.  What did we just witness?

21   A.  So the group collapses in.  The rioters are now --

22   there's almost no space to operate.  They over -- most of

23   them are taller than me.  Most of them are larger than me.

24   It's becoming more distressing by the second.

25   Q.  Okay.  And do you see yourself right there?

1    A.  I recognize my hair.

2    Q.  Okay.  Can you circle your hair?

3    A.  I can.  (Witness complies)

4    Q.  And you can clear that, please.

5    A.  Of course.  (Witness complies)

6    Q.  Did you have your service -- did you have your service

7    weapon on you at this time?

8    A.  Yes.

9    Q.  Okay.  And you said earlier that you were considering

10   drawing it.

11   A.  Correct.

12   Q.  But ultimately why did you decide not to?

13   A.  As you can see, I'm absolutely surrounded, so there's --

14   the opportunity to draw it and maintain it is -- seems like

15   it won't happen.  Like if I were to pull it out, I would

16   lose it.

17        So I elected not to go that route and just -- we

18   fought our way out of the crowd using hands and feet.

19        MS. ARCO:  If you could continue to play the clip

20   until the three-minute-five-second mark.

21        And, again, please keep an eye on yourself.

22        (Video playing)

23        MS. ARCO:  Can you press the "Clear" button.

24        THE WITNESS:  Oh, of course.

25        MS. ARCO:  Or the arrow, sorry.

```
1              THE WITNESS:  (Witness complies)

2    Q.  Were the rioters saying anything to you around this

3    particular time that you recall?

4    A.  The theme sort of remained the same.  We were traitors.

5    "Let us through."  They were screaming lots of things.

6    Q.  Okay.  Do you recall any specific individuals from

7    around the time that we just witnessed?

8    A.  No.

9    Q.  Okay.  What about any female rioters?  Do you remember

10   any of them specifically?

11   A.  No.

12   Q.  Okay.  Do you recognize the defendant in this case,

13   Ms. Niemela?

14   A.  No.

15             MS. ARCO:  If you could play the clip again and

16   pause it at the three-minute-13-second mark.

17             (Video playing)

18             MS. ARCO:  It's paused at the three-minute-15-

19   second mark.

20   Q.  What are you and your colleagues doing in this moment?

21   A.  So we instinctually, without any planning, are going

22   back to back to make it so that we can evacuate out of the

23   group.

24   Q.  Okay.

25             MS. ARCO:  And if you could play the clip and stop
```

 1    at the three-minute-30-second mark, please.

 2                 (Video playing)

 3                 MS. ARCO:  Okay.  Thank you.

 4                 And if you could please pull up Government's

 5    Exhibit 506, which has been admitted into evidence, and if

 6    you could pause from the beginning.

 7    Q.   I'm going to play it actually the whole way through and

 8    then ask you about it.  Okay?

 9                 (Video playing)

10    Q.   Lieutenant, what did we just witness?

11    A.   This is a closer look of that same video -- it looks

12    like a cell phone video -- of when that group surges.  And I

13    believe it captures when they were attempting to take the

14    radio off of me.  And that's when I kicked the individual to

15    get him off my equipment.  I think that's what that's being

16    captured right there, if I had to guess.

17                 There was the yelling and screaming.  It was hard

18    to discern if that was the rioters or if that was officers.

19    Q.   Okay.  But you heard discussion of a radio?

20    A.   Yes.

21    Q.   Did any of your colleagues get hurt that day?

22    A.   Of the ten officers that I took over with me, three.

23    Q.   Okay.  Were any of them under your supervision?

24    A.   Yes.

25    Q.   I'm sorry.  Do you need a tissue?

 1    A.  No, that's okay.

 2    Q.  I see you're growing emotional.  What's going through

 3    your mind right now?

 4    A.  I just felt responsible for them in that moment, and I

 5    don't -- I don't like the fact that somebody under my

 6    supervision that day was injured.  You want everybody to go

 7    home --

 8    Q.  Okay.

 9    A.  -- safe and sound.

10    Q.  So two years later, having reflected on this, do you

11    still feel like it was your responsibility?

12    A.  Yes.

13    Q.  Okay.  Anyone else's responsibility?

14    A.  I think all of our -- I think as supervisors, it's our

15    responsibility to keep our officers safe.  But ultimately

16    the people who -- the rioters who entered the building on

17    January 6th are the ones who are responsible.

18    Q.  Thank you for sharing that with us.

19    A.  Yes.

20    Q.  In your career with the Capitol Police, have you ever

21    witnessed something like what you witnessed on January 6th?

22    A.  No.

23    Q.  What was different about this day?

24    A.  You could feel it in the air.  I mean, it was visceral.

25    I mean, the group was -- the numbers were overwhelming.

1    Everything that occurred from that -- from the start of the

2    day to the end of the day I hoped to never encounter, and I

3    haven't encountered in 19 years on the department.

4    Q.  Okay.  And -- okay.

5           MS. ARCO:  No further questions.  Thank you.

6                    CROSS-EXAMINATION

7    BY MR. MONTEITH:

8    Q.  Good afternoon.

9    A.  Good afternoon.

10   Q.  So I want to first ask you a couple of questions about

11   the Lower West Terrace, right?  That -- and that was your

12   first, according to your direct examination, your first, I

13   guess, contact with the demonstrations on January 6th.

14   A.  So a little bit higher, the Upper West Terrace.

15   Q.  Yes, okay.  I apologize.

16           So one thing that you didn't tell this jury is you

17   went from, I believe it's the Longworth building, over to

18   the Upper West Terrace, correct?

19   A.  Yes.

20   Q.  And you didn't tell us what time that was specifically.

21   A.  I don't know.  I'm sorry.

22   Q.  Okay.  But there what you witnessed from the Upper West

23   Terrace was a crowd below, right, and tear gas, right?

24   A.  It was in the air, yes.

25   Q.  In the air.

1    A.  Uh-huh.

2    Q.  But you witnessed it in the air, right?

3    A.  Yes.

4    Q.  Is it fair to say it was tear gas from the USCP that had

5    blown back?  Is that fair to say?

6    A.  Yes.

7    Q.  Okay.  You certainly didn't see Ms. Niemela there,

8    right?

9    A.  No.

10   Q.  Now, without -- you don't know what time you left the

11   Upper West Terrace.

12   A.  No.

13   Q.  Okay.  You went back to the Longworth building --

14   A.  Yes.

15   Q.  -- with another officer; is that right?

16   A.  The Metropolitan officer, yes.

17   Q.  Metropolitan, okay.

18           And then took a, for a lack of a better term --

19   it's probably the right term, but you took a team over to

20   inside the Capitol?

21   A.  Yes.

22   Q.  All right.  And that was the Crypt area that we just

23   watched the videos on?

24   A.  Correct.

25   Q.  All right.  And I think you said prior to that you had

1    confiscated some weapons from other individuals?

2    A.  Yes, the first people my team encountered when we headed

3    over.

4    Q.  Right, okay.

5            And that was bear spray?

6    A.  Brake fluid.

7    Q.  Brake fluid, I apologize.

8    A.  In a spray form.

9    Q.  In a spray form, okay.

10           And then focusing on that, weapons, certainly none

11   of that was taken from Ms. Niemela.

12   A.  No.

13   Q.  Right?  Nor a knife?

14   A.  No.

15   Q.  A billy club?

16   A.  No.

17   Q.  A pole?

18   A.  No.

19   Q.  Nothing, right?

20   A.  No.

21   Q.  As far as you know, not one weapon or implement was

22   taken from her, right?

23   A.  Not that I'm aware.

24   Q.  Okay.  So let me back up just a little bit.

25           You were interviewed by Agent Hastbacka about this

```
 1    case?

 2    A.  Yes.

 3    Q.  And that, I believe, was December 15th of 2022, right?

 4    A.  I have no reason to doubt you.

 5    Q.  Does that sound about right?

 6    A.  It does sound right, yes.

 7    Q.  All right.  And when you spoke with him, you told him

 8    the truth, right?

 9    A.  Yes.

10    Q.  And you were, of course, careful to tell him the truth,

11    right?

12    A.  Yes.

13    Q.  And you wanted to help in the investigation, right?

14    A.  Yes.

15    Q.  And so you relayed to him what you knew and what you

16    felt was important as what occurred on the 6th, right?

17    A.  Yes.

18    Q.  Okay.  So he showed you four videos, right?

19    A.  Yes.

20    Q.  And those were the videos that the jury got to see

21    today, right?

22    A.  Yes.

23    Q.  Right.  And he asked you questions about those videos,

24    right?

25    A.  Yes.
```

1    Q.  Okay.  He honed in on what you -- what did you see any

2    females do, right?  That was one line of his inquiry,

3    right?

4    A.  Not his inquiry, no.  I think that was Ms. Arco's.

5    Q.  Okay.  No, no, no, back in December of 2022, in the

6    interview with --

7    A.  If you have something to refresh my memory, but I can't

8    recall --

9    Q.  All right.

10   A.  -- in a conversation with him.

11   Q.  Okay.  I can go about it in a different way.

12   A.  Okay.

13   Q.  You watched the videos, and you were asked if you saw

14   any females do anything.  Right?

15   A.  Yes.

16   Q.  And according to the first video, you don't recall any

17   female protester?

18   A.  That's correct, I don't recall any females.

19   Q.  All right.  The second video, same thing.  Right?

20   A.  Yes.

21   Q.  No recollection of any female rioters, right?

22   A.  That's correct.

23   Q.  Same thing with the third, right?

24   A.  Correct.

25   Q.  Okay.  Fair to say it was very loud in the Crypt area,

1    right?

2    A.   Yes.

3    Q.   You didn't hear any female voices, right?

4    A.   No.

5    Q.   All right.  Point being you never saw Ms. Niemela?

6    A.   No.

7    Q.   Right?

8             She didn't touch you.

9    A.   No.

10   Q.   Right?

11            She didn't touch any other officers, right?

12   A.   I can't say that's true.

13   Q.   Okay.  Do you have any evidence of that?

14   A.   I don't have any evidence of that.

15   Q.   Okay.  You have no evidence of her touching any other

16   officer, correct?

17   A.   I don't have any evidence of that, no.

18   Q.   Okay.  You have -- you never heard her chant, right?

19   A.   No.

20   Q.   All right.  You never saw her demonstrate, right?

21   A.   No.

22   Q.   She didn't wave a flag, right?

23   A.   Right.

24   Q.   She didn't damage any property, right?

25   A.   That I saw, no.

1   Q.  Okay.  Do you know of any other officer that saw her do

2   any of those things?

3   A.  None that I'm aware of.

4   Q.  Okay.

5           MR. MONTEITH:  I really don't have any other

6   questions for you.  Thank you.

7           THE WITNESS:  Okay.  Thanks.

8                       REDIRECT EXAMINATION

9   BY MS. ARCO:

10  Q.  Lieutenant, were you looking at your watch that day?

11  A.  Not at all.

12  Q.  And do you remember any specific individual that you

13  interacted with that day of the rioters?

14  A.  No.  It literally became a faceless crowd.  If you

15  haven't been involved in something like that before, it's

16  hard to describe how your body responds, but you try to

17  focus on only the most important details.

18          So even the person that, you know, I remember

19  directly engaging, I couldn't have picked him out of a line-

20  up that day.

21  Q.  So the one that you kicked --

22  A.  Yes.

23  Q.  -- because he was grabbing at you --

24  A.  Yes.

25  Q.  -- you don't even remember?

1    A.   No.   If you asked me to describe him, I would describe

2    every single person the same way, wearing the same clothing,

3    even though they're not.   That's what my memory is.

4              MS. ARCO:   Okay.   No further questions.

5              THE COURT:   Okay.   Lieutenant Detorie, thank you

6    very much for your testimony.   You're excused.   Please don't

7    discuss your testimony with anyone in this case until the

8    case is over.   Thanks.

9              MR. GORDON:   All right.   Your Honor, the United

10   States calls Special Agent Elizabeth Glavey.

11             THE COURT:   All right.

12             How's everybody doing, okay?

13             Juror 2, how are you feeling?

14             JUROR NO. 2:   All right.

15             THE COURT:   You're doing all right?   All right.

16             Juror 7, you're closest to me.   How are you doing?

17             JUROR NO. 7:   Oh, I'm well, thank you.

18             THE COURT:   And Juror 1, I can barely see you back

19   there.

20             (To Special Agent Glavey) Hello, ma'am.

21             THE WITNESS:   Hello, Your Honor.

22             THE COURT:   How are you?

23             THE WITNESS:   Good.   How are you, sir?

24             THE COURT:   Okay.   Remain standing and raise your

25   right hand.

460

```
 1                 SPECIAL AGENT ELIZABETH GLAVEY, Sworn

 2                         DIRECT EXAMINATION

 3      BY MR. GORDON:

 4      Q.  All right.  Good afternoon, Special Agent Glavey.

 5      A.  Good afternoon, sir.

 6      Q.  Can you please introduce yourself to the jury.

 7      A.  I'm Elizabeth Glavey with the Secret Service.

 8      Q.  And what do you do for the Secret Service?

 9      A.  I'm a special agent.

10      Q.  What does that mean for those of us who aren't versed in

11      those terms?

12      A.  I'm a federal agent with the Secret Service.  I

13      currently work as an instructor at our training facility.

14      Q.  How long have you been a Secret Service agent?

15      A.  13 years.

16      Q.  Were you working for the Secret Service back on January

17      6, 2021?

18      A.  Yes, I was.

19      Q.  Did you have the same role that day that you have now as

20      an instructor?

21      A.  No, I did not.

22      Q.  What was your role back then?

23      A.  I was an agent on the vice president's detail.

24      Q.  Can you explain to the jury what's entailed in that job.

25      A.  With that job, we're in charge of protecting the vice
```

1    president and his family, and we do that physically.  And

2    then we also do advance work where we design a security plan

3    for any venues that the vice president would visit.

4    Q.  When you say "protect the vice president physically,"

5    what do you mean?

6    A.  We're his bodyguards in a sense.

7    Q.  Is it true what they show us in the movies, that a

8    Secret Service agent is trained to dive in front of a

9    bullet, if necessary, for the vice president?

10   A.  Yes, we would.

11   Q.  Have you ever had to do that?

12   A.  No.

13   Q.  What's the closest you ever came to having to do

14   something to physically defend the vice president in your

15   career?

16   A.  It would have been January 6th.

17   Q.  Now, before we get into that, you also mentioned that

18   you do advance work.  Can you explain what advance work is?

19   A.  Advance work is when the vice president would visit a

20   city or a venue that we have not been to before and we are

21   not responsible for.  We go out to that venue, and we design

22   a security plan that would keep the vice president safe, as

23   well as anyone who would be attending the event.

24   Q.  Now, without giving us the actual address, where does

25   the vice president live?  Where does he sleep usually?

1    A.   The Naval Observatory.

2    Q.   And what's his primary work space or working location?

3    A.   The White House Complex.

4    Q.   Okay.  Does the White House Complex include any other

5    large buildings besides the White House itself?

6    A.   Yes.

7    Q.   What is that?

8    A.   The Executive Office Building and the Treasury Building.

9    Q.   Okay.  Now, other than -- so those four places you just

10   named, so the Naval Observatory, and then those three

11   buildings on the White House campus.

12         What if the vice president is going to go

13   somewhere else in D.C., whether it be Congress or another

14   federal agency?  If he's going to do that kind of travel, do

15   you do advance work for that?

16   A.   We may or may not, depending on the facility.

17         If there's a security element that is in charge of

18   that building, we would work in conjunction with them with

19   their security plan.

20   Q.   So let's focus on the Capitol specifically and January

21   6th even more specifically.

22   A.   Okay.

23   Q.   Now, was there a plan for the vice president to be at

24   the Capitol on January 6th?

25   A.   Yes, there was.

1    Q.  And why is that?

2    A.  He was going to certify the vote or the election.

3    Q.  And what was he required to do that day?

4         When you say he's there "to certify the vote,"

5    what was your understanding as a Secret Service agent what

6    the day was going to look like?

7    A.  It was going to be a long day where they just went

8    through the procedures of certifying the vote; and any time

9    a state would object to the vote, they would return to their

10   respective sides, deliberate, and then continue on with the

11   vote.

12   Q.  And in order to plan for that, is the Secret Service

13   responsible for the Capitol Complex?

14   A.  No.

15   Q.  Who is usually?

16   A.  The Capitol Police.

17   Q.  So what, if anything, does the Secret Service or did the

18   Secret Service do in advance of January 6th planning for

19   that day?

20   A.  For the Capitol, we have a liaison division that is

21   familiar with the operations at the Capitol and the Capitol

22   security plan.  So for a trip to the Capitol, I would simply

23   have a brief coordination period with our liaison agent and

24   do a quick walk-through and just a rough advance the day of

25   the visit.

1   Q.  What does the term "security perimeter" mean to you?

2   A.  It means a perimeter for what we would deem our secure

3   area where we would control access coming into and out of a

4   facility that one of our protectees would visit.

5   Q.  Got it.  Was there a secure perimeter in place on

6   January 6th?

7   A.  There was.

8           MR. GORDON:  Okay.  Can we have Government's 202,

9   please.

10          And, Ms. Jenkins, it's from counsel table, when

11  you have a moment.

12          Sorry, Ms. Jenkins, when you have a moment from

13  counsel table, please.  It looks like our cords are in, but

14  nothing was on the screen.

15          The wonders of modern technology, right?

16  Q.  All right.  While we're working on that, Special Agent

17  Glavey, is this the first time you've testified in a January

18  6th related trial?

19  A.  No.

20  Q.  Have you seen a map with a red outline on it?

21  A.  Yes.

22  Q.  All right.  Now, what's the significance of the map with

23  the red outline?

24  A.  It shows the perimeter that the Capitol Police enforced

25  for the Capitol Complex.

1   Q.  And was that the same perimeter that the Secret Service

2   was using as the security perimeter for the vice president?

3   A.  Yes.

4   Q.  Okay.  And so what was the Secret Service's

5   understanding or plan with respect to that area?  What were

6   you -- what restrictions did you understand to be in place

7   for that sort of red outline?

8   A.  That the Capitol Police would enforce the perimeter and

9   only allow those that were authorized to go into the Capitol

10  that day.

11  Q.  Okay.  And were members of the general public authorized

12  to go?

13  A.  No.  It was closed that day.

14  Q.  Now, if you are setting up this kind of secure

15  perimeter, what kind of parameters or protections do you put

16  in place for the vice president on this or any day?

17  A.  It typically -- it could consist of many things, whether

18  it's bike rack, police vehicles, marked police vehicles, and

19  just vehicle checkpoints.

20  Q.  Do you let a person walk into the same room or area as

21  the vice president without, say, going through a

22  magnetometer?

23  A.  No.

24  Q.  Why not?

25  A.  Because we always want to screen individuals for any

1    kind of weapons that could harm the vice president.

2    Q.  Okay.  Now, walk us through your day on January 6th.

3    Where did you sort of start your day?

4    A.  I started my day at the Naval Observatory, which was the

5    vice president's residence.

6    Q.  Okay.  And where did you travel after that?  Where did

7    you go?

8    A.  I went to the Capitol.

9    Q.  And who did you go with?

10   A.  One of my co-workers dropped me off, and then I met with

11   my liaison counterpart to conduct a walk-through.

12   Q.  And what did that walk-through consist of?

13   A.  It consisted of going through the movements that the

14   vice president was expected to make that day.  The

15   certification of the vote had a procedure to it, so we went

16   through the procedures and the formal processions that would

17   take place.

18   Q.  And was the vice president with you while you're doing

19   this walk-through?

20   A.  No.

21   Q.  As part of your walk-through, do you create contingency

22   plans for sort of what if an emergency happens?

23   A.  Yes.

24   Q.  Can you explain what you do with that?

25   A.  So we always have in place an emergency plan in the

1    event that something were to happen, a safe place that we

2    could take the vice president, as well as just knowing the

3    facility as far as any additional rooms that they may go to

4    unplanned.

5    Q.  Now, if there was a physical danger to the vice

6    president where he would need to be evacuated, without

7    telling us anything that would compromise any future event,

8    what was the plan in place?  What were you going to do if an

9    emergency arose at the Capitol?

10   A.  We would either hold in place, if that was the best

11   decision, or we would relocate him to a secure area where we

12   would be safe.  And then as, you know, a last resort, have a

13   plan if we needed to leave the building completely.

14   Q.  Had you identified a place at the Capitol where you

15   could evacuate the vice president to, if necessary?

16   A.  Yes.

17   Q.  And, again, without compromising any security, was that

18   location still on the Capitol grounds somewhere?

19   A.  Yes, it was.

20   Q.  After completing the walk-through, what did you do next?

21   A.  After I completed the walk-through, I then spoke with my

22   supervisors over the telephone and gave them just a quick

23   briefing of how the day would proceed, and to also reiterate

24   our emergency plan.

25   Q.  Okay.  Then what did you do?

1      A.   Then I just went to the office and did a few, you know,

2      administrative things, and was just standing by waiting for

3      the vice president's arrival.

4      Q.   So you were waiting where for the vice president's

5      arrival?

6      A.   When I waited for his arrival, I waited at the Senate

7      carriage entrance.

8      Q.   And is that out on Capitol grounds?

9      A.   Yes, on the exterior.

10     Q.   All right.

11             MR. GORDON:   Ms. Jenkins, let's see if we can do

12     this from the podium.  Can you give me that?  Let's see if

13     it will pull up.

14             All right.  Well, I'll keep working on this while

15     we're --

16             THE COURT:   Take your time.  Why don't we take --

17     just take two minutes and queue it up.

18             MR. GORDON:   Thank you, Your Honor.  I appreciate

19     it.

20             THE COURT:   Yes.

21             (Pause)

22             MR. GORDON:   All right.  Success.  All right.

23     I'll just do this from the podium.

24     Q.   All right.  Special Agent Glavey --

25             MR. GORDON:   Is this up for everybody?  I think it

```
 1    is.

 2    Q.  Do you see what's already in evidence as Government's

 3    Exhibit 302?

 4    A.  Yes.

 5    Q.  You've seen 302 before?

 6    A.  Yes, I have.

 7    Q.  Can you explain what a head of state worksheet is?

 8    A.  It's a notification for the Capitol Police of a head of

 9    state, a visitor to their complex.

10    Q.  And who was the visitor on January 6th?

11    A.  Vice President Michael Pence, Mrs. Pence, and Charlotte

12    Pence.

13    Q.  Who is Charlotte Pence?

14    A.  The vice president's daughter.

15    Q.  Are the vice president's wife and daughter also Secret

16    Service protectees?

17    A.  Yes.

18    Q.  You're also required to take a bullet for them?

19    A.  Yes.

20    Q.  Now, scrolling down to the section here marked

21    "Itinerary."  Can you explain what we're looking at here?

22    A.  This was the estimated itinerary for the vice president

23    that day.  It shows his potential arrival time and the

24    places he would go throughout the Capitol that day.

25    Q.  So when we see in the second column that at 12:30 he was
```

1    expected to arrive via M/C to Senate carriage, what does

2    "M/C" mean?

3    A.   Motorcade.

4    Q.   He's going to be greeted by somebody who's named as the

5    SSAA.   Do you know who that is?

6    A.   Sergeant of arms, I believe that stands for.

7    Q.   Okay.   And what is S-214 as a designation?   What's that

8    mean?

9    A.   That's the vice president's office.

10   Q.   Within the Capitol?

11   A.   Within the Capitol.

12   Q.   What does "function, hold" mean?

13   A.   It just means that the vice president would hold in his

14   office for a few minutes.

15   Q.   Meaning you're going to stay put and hang out for a bit?

16   A.   Yes.

17   Q.   When it says "departure via foot en route to the House

18   Chamber, depart time 12:45," is it fair to say that if we

19   were to sort of read this row together, it's vice

20   president's motorcade is going to drop him off at the Senate

21   carriage, he's going to walk to his office, he's going to

22   hang out there for 15 minutes, and then he's going to walk

23   to the House Chamber?

24   A.   That's correct.

25   Q.   And then I see that in the column for arrival time after

1    12:55, they all say "TBD."  And on the depart time on the

2    other side after 12:45, they all say "TBD."

3              And if we look at the arrival location, we see

4    House Chamber, back to his office, back to the House

5    Chamber.

6              Can you explain sort of just in summary what this

7    itinerary is sort of telling the reader?

8    A.  So, again, it's just telling the reader that there will

9    be multiple processions back and forth between the Senate

10   and House Chambers.

11             Again, any time that a state would object to the

12   vote, they would have to proceed back to the Senate side for

13   deliberation.

14             So they would have several hours to deliberate, so

15   all the times at that point would have to be estimated once

16   the objection started.

17   Q.  Why are you creating this level of sort of granular

18   detail of we're going to walk from this room to that room

19   and maybe we might have to walk over to this room at some

20   point, and then maybe we might have to walk over to this

21   other room at some point, and we might have to walk back and

22   forth?

23             Why go through that level of detail, if you don't

24   know the times?

25   A.  For security reasons, we always have to know where the

1    vice president is at all times.  It's important in the event

2    of an emergency that we would know whether he was on the

3    House side, Senate side, first floor versus second floor.

4    We always need to know his location.

5    Q.   Okay.  Now, on January 6th did this go according to

6    plan?  For example, was he dropped off via motorcade at the

7    Senate carriage at 12:30?

8    A.   Yes, he was.

9    Q.   Did he go to his office like planned?

10   A.   Yes, he did.

11   Q.   All right.  At some point in the day did things go

12   sideways and the plan had to be thrown out the window?

13   A.   Yes, it did.

14   Q.   All right.  Can you describe what happened?

15   A.   We went and did the -- we started the electoral

16   certification, and then I believe Arizona might have

17   objected.  It was very quickly that there was an objection.

18           So then we proceeded back to the Senate side, and

19   they began to deliberate.  And while we were on that side,

20   the crowd started coming towards the Capitol.

21           So at that point, with the crowds coming to the

22   Capitol, it was determined to relocate our motorcade.

23   Q.   Now, let's start with that.  What do you mean, relocate

24   the motorcade?

25   A.   The motorcade for a standard trip to the visit, after

1   the vice president is dropped off from the carriage

2   entrance, the motorcade will relocate to the plaza, and it

3   will remain in there until it's time for departure.

4           So when the crowd started coming, it was

5   determined to relocate the motorcade to a secure area so

6   that, if we needed to use it, it was available.

7   Q.  Just connect the dots for us.  Why?  What was the

8   problem with where the crowd was versus where the motorcade

9   was?

10  A.  The crowd was approaching the inner perimeter of the

11  Capitol, and our vehicles were there.  And once you have

12  people around it, it's difficult to safely move the vehicles

13  around the public as well as we certainly want to --

14  wouldn't want to bring the vice president out to the cars

15  again where the public are.

16  Q.  Okay.  So did you move them to another location on the

17  Capitol grounds?

18  A.  Yes.

19  Q.  Where were you while this is happening?

20  A.  I was on the second floor outside the Senate Chamber.

21  And then I was told to walk our route in the event of an

22  emergency, so --

23  Q.  I'm going to stop you there for a second.

24          So when you say you were outside the Senate

25  Chamber, were you able to look out the window and see what

 1   was happening with the crowd?  Were you learning about this

 2   from other agents?

 3   A.  At one point I walked over to the window, and I was able

 4   to see the crowds.

 5   Q.  And what did you see?

 6   A.  I saw large crowds that were walking towards the

 7   Capitol, and it was very noisy.  You could hear the yelling.

 8   Q.  Did you see any violence?

 9   A.  No.

10   Q.  Did you see any, you know, tear gas deployed or anything

11   else that you regarded as dangerous?

12   A.  No.  They were too far away at that point.

13   Q.  Okay.  Now, were you in communication with other agents?

14   A.  Yes.

15   Q.  How?

16   A.  Just verbally, face to face, as well as over the radio,

17   the hand-held radio.

18   Q.  And did you have an earpiece in so you could hear

19   others?

20   A.  I did.

21   Q.  And those radio communications, were they recorded

22   ultimately?

23   A.  Yes.

24   Q.  Now, you said you were instructed to walk the route.

25   What's that mean?

1    A.  So I was instructed to walk the route that we would

2    take -- ultimately take the vice president, if we needed to

3    relocate.

4           So I walked the route to ensure that I knew the

5    route without fail, as well as to make sure that the route

6    was clear for us to use.

7    Q.  Okay.  And what did you see when you did that?  Was the

8    route clear?

9    A.  The route was clear.

10          And then, when I returned to get back to the

11   detail, when I was returning to the first floor, I heard

12   glass smash, and when I -- shortly after hearing the glass

13   smash, I saw the protesters entering the building.

14   Q.  Would you consider the route still clear at that point?

15   A.  Not really.  Not -- with the public in view, I would not

16   have brought the vice president down.

17   Q.  So what did you do at that point?

18   A.  At that point I went to the staircase that would lead to

19   the vice president's office.  And when I got to the bottom

20   of the stairwell, I was in eyesight of one of the

21   supervisors.  And at that point I just communicated to him

22   directly that -- what I saw, and, you know, just proceeded

23   from that point on telling him what I was seeing, whether it

24   was clear to bring the vice president down or whether it was

25   not clear to bring the vice president down.

1    Q.   Okay.  Did there come a time when you were saying, "It's

2    not clear; we can't do it"?

3    A.   Yes.

4    Q.   Why was that?

5    A.   Because through a doorway the protesters were entering a

6    building that was in close proximity to where we needed to

7    go to get to our route.

8    Q.   Did you find an opportunity at some point when the route

9    was clear for a moment?

10   A.   Yes.

11   Q.   Okay.  And what did you do then?

12   A.   We went back and forth several times telling him it was

13   not clear, and then it was clear.

14              Ultimately I let them know that the protesters had

15   reached the second floor, so at that point time was of the

16   essence.

17              And shortly after, when I told them it was clear,

18   they decided to make the move, and they proceeded to bring

19   the vice president down the stairwell, and I led the way.

20   Q.   And, again, can you just make that sort of -- connect

21   the last dots for us.  Why was the rioters reaching the

22   second floor of the Capitol significant to you?

23   A.   Because the vice president's office was on the second

24   floor.  That's where he was being held.

25              So once they reached the second floor, we were

1    losing the opportunity to safely bring him down without

2    seeing any of the protesters.

3    Q.  If you hadn't been able to extract him, right, if they

4    had gotten -- if the rioters had moved faster or you had

5    moved slower, what would you have done?

6    A.  We would have just secured him where he was.  He was in

7    a secure spot where he was.

8    Q.  How many agents did you have with you?

9    A.  I'd say there were maybe ten of us.

10   Q.  Okay.  You had a gun with you that day?

11   A.  Yes.

12   Q.  How many rounds does your gun carry?

13   A.  I had a different gun.  15.

14   Q.  Did you have any spare clips with you?

15   A.  I did.

16   Q.  How many spare clips did you have?

17   A.  Two.

18   Q.  So 45 rounds, approximately, on you?

19   A.  Approximately.

20   Q.  Were there other -- was there other ammunition in the

21   room where you were sheltering?

22   A.  Just the other agents' weapons.

23   Q.  Other than what other agents --

24   A.  No.

25   Q.  -- had with them, was there a cache of ammunition?

1   A.  No, not with us on the second floor.

2   Q.  So each agent was limited to the rounds in their gun and

3   any spare clips they had with them?

4   A.  That's correct.

5   Q.  Okay.

6           MR. GORDON:  All right.  Ms. Jenkins, can we

7   please have the podium again?

8   Q.  All right.  Special Agent Glavey, have you seen the

9   video that I've pulled up as Government's Exhibit 305?

10  A.  Yes.

11  Q.  All right.  And, again, we'll hope the sound works.

12          (Video playing)

13          MR. GORDON:  Sorry, we're going to try this with

14  the audio cord and see if it's louder.

15          All right.  I apologize if this blasts everyone's

16  ears off, and we will quickly reduce.

17          (Video playing)

18  Q.  Special Agent Glavey, did you hear your own voice on

19  that video?

20  A.  Yes.

21  Q.  And were you the one female voice?

22  A.  Yes.

23  Q.  Now, for somebody who's not involved in this, do you

24  feel like that video sufficiently captures what that

25  experience was like for you?

```
1              Does it sufficiently capture the emotion and the
2      feeling and the stress of that moment?
3      A.  Yes.  It shows more than, you know, I would see.  I had
4      an archway doorway that I was looking through.
5      Q.  Were you able to successfully move the vice president
6      through that path?
7      A.  Yes, we were.
8              MR. GORDON:  I'm now playing what's in evidence as
9      Government's 304.
10     Q.  Is this video showing the moment when the vice president
11     was evacuated?
12     A.  Yes, it is.
13             MR. GORDON:  And pausing at the 13-second mark.
14     Q.  Do you see the gray-haired man who just exited the door?
15     A.  Yes.
16     Q.  Do you recognize him?
17     A.  I do.
18     Q.  Who is that?
19     A.  Vice President Michael Pence.
20     Q.  Do you see the woman in the plaid clothing in front of
21     him?
22     A.  Yes.
23     Q.  Who is that?
24     A.  Charlotte Pence.
25     Q.  Is that his wife?
```

480

1    A.  His daughter.

2    Q.  Okay, I'm sorry.  And do you see the woman standing in

3    front of her?

4    A.  Yes.

5    Q.  Who is that?

6    A.  Karen Pence.

7    Q.  Is that his wife?

8    A.  That is his wife.

9    Q.  Thank you.

10             Now, after you extricated the vice president, did

11   you take him to that secure location on Capitol grounds you

12   referenced earlier?

13   A.  Yes, we did.

14   Q.  Did you stay with him?

15   A.  Yes, I did.

16   Q.  How long did you stay there?

17   A.  Several hours.

18   Q.  Okay.  Can you give us a ballpark of when you left?

19   A.  I think we went back around 8:00.

20   Q.  P.M.?

21   A.  P.M.

22   Q.  Okay.  And then did you at that point leave the Capitol

23   grounds, or did you stay there?

24   A.  We stayed there.

25   Q.  Why?

1    A.  Because we continued the certification of the vote.

2    Q.  Okay.  When did the vice president leave Capitol

3    grounds?

4    A.  Between 3:00, 4:00 a.m. on the 7th.

5    Q.  Was he on the Capitol grounds the entirety of the time

6    between, you know, 1:00 p.m. and almost, you know, say 3:00

7    a.m. the next morning?

8    A.  Yes, he was.

9    Q.  Now, you said earlier that you considered this the most

10   dangerous situation that you've been in in your career.  Why

11   is that?

12   A.  It was the first time I had to ever evacuate a protectee

13   to a secure location.

14             MR. GORDON:  One moment please, Your Honor.

15             (Pause)

16             MR. GORDON:  All right.  Nothing further, Your

17   Honor.

18                       CROSS-EXAMINATION

19   BY MR. GARRITY:

20   Q.  Good afternoon, Special Agent.

21   A.  Good afternoon, sir.

22   Q.  I just have a few questions for you.

23   A.  Certainly.

24   Q.  So you started your workday around 8:00 a.m.; is that

25   correct?

1   A.   That's correct, at the Naval Observatory.

2   Q.   And then you went to the U.S. Capitol?

3   A.   To the Capitol, correct.

4   Q.   And when you went to the -- and you got there around

5   10:00 a.m.?

6   A.   Estimating, yes.

7   Q.   And when you got to the U.S. Capitol around 10:00 a.m.,

8   you got a chance to see the outside perimeter; is that

9   right?

10   A.   Just a segment of it that I passed through in order to

11   enter the Capitol grounds.

12   Q.   When you went to the Capitol grounds at 10:00 a.m., did

13   you enter through the west side or the east side?

14   A.   I honestly don't recall which side I went in.  I just

15   stopped at a checkpoint with a Capitol officer, and he let

16   us proceed through bike rack.

17   Q.   But when you looked at the perimeter, there was an outer

18   perimeter; is that right?

19   A.   Correct.

20   Q.   And then there were bike racks inside that perimeter; is

21   that right?

22   A.   There is bike rack on the inner perimeter.

23   Q.   And is there an area in the Capitol that you considered

24   to be the courtyard?

25   A.   Yes.

1    Q.  And where is that located on the Capitol grounds?

2    A.  The -- is it east side?

3    Q.  It's on the east side?

4    A.  I'm trying to remember, sir.  I'm sorry.  But...

5    Q.  Well, let me ask you this:  When you saw --

6    A.  The carriage entrance side.

7    Q.  But there were bike racks within the outer perimeter,

8    right?

9    A.  Bike rack on the outer perimeter, and then there's --

10   there was some bike rack right alongside the plaza.

11   Q.  And those bike racks did not have any sort of signage on

12   them; is that right?

13   A.  I don't believe they have signage.

14   Q.  And, in fact, that's -- you were interviewed -- you've

15   been interviewed a number of times with respect to this

16   event, right?

17   A.  Yes, sir.

18   Q.  Do you recall being interviewed back on May 9th of 2022

19   by a few U.S. Attorneys and some special agents?  Do you

20   recall that?

21   A.  It's been several times, so likely, yes.

22   Q.  Do you recall talking to those people about seeing these

23   bike racks inside the outer perimeter that did not have

24   signage on them?

25   A.  Yes.  I know that -- I don't recall about the signage,

1    but I don't believe there's any signs on the bike rack.

2    Q.  And after going to the Capitol at 10:00 a.m., you

3    eventually greeted Vice President Pence's motorcade when it

4    arrived at the Capitol?

5    A.  Yes, that's correct.

6    Q.  And you stayed with Vice President Pence throughout the

7    time he was at the Capitol; is that correct?

8    A.  Yes, with the exception of when I walked the route; I

9    was not with him at that time.

10   Q.  And at some point in time after Arizona lodged its

11   objection, you went -- you went from the House side back to

12   the Senate side; is that right?

13   A.  That's correct.

14   Q.  And you heard a crowd outside?

15   A.  Yes.

16   Q.  And you looked out the window; is that right?

17   A.  I looked out a set of windows because I could hear the

18   crowd, so I walked over to the window to see what it was.

19   Q.  And do you recall whether you were looking -- when you

20   looked out the window, were you looking out the east side or

21   the west side, if you recall?

22   A.  I don't recall if it was east or west.

23   Q.  But you saw a crowd outside?

24   A.  I did, sir.

25   Q.  Coming towards the Capitol?

1    A.  Yes.

2    Q.  Were they on the Capitol grounds or just approaching the

3    grounds?

4    A.  They were approaching the grounds at that time.

5    Q.  And fair to say you could not see who was approaching

6    individually?

7    A.  That's correct.

8    Q.  And at some point in time a decision was made to move

9    Vice President Pence; is that correct?

10   A.  Yes.

11   Q.  And you went -- you walked the route that he would be

12   evacuated down?

13   A.  That's correct.

14   Q.  And you walked down a set of stairs; is that right?

15   A.  I did.

16   Q.  And when you were downstairs or I guess coming back up

17   from walking the route on the first floor, you heard glass

18   smash; is that correct?

19   A.  Yes, that's correct.

20   Q.  And after hearing the glass smash, you saw some

21   protesters inside the building?

22   A.  Yes.  So I was -- I heard the glass smash, and I was

23   proceeding towards the staircase leading up to the second

24   floor.  And as I was proceeding to the staircase, that's

25   when I saw through the archway door the protesters inside

1     the building.

2     Q.  And do you recall roughly how many you saw inside the

3     building?

4     A.  It just varied, because they would come in, and then

5     they would stop.  I wouldn't see anyone, and then I would

6     see more.  But more than a dozen at one point.

7     Q.  Fair to say that Ms. Niemela was not among the

8     individuals you saw through the archway?

9     A.  I don't recall seeing her, no.

10    Q.  And did you stay in that spot until Vice President Pence

11    was walked down from the Senate Chamber to where he was

12    eventually relocated?

13    A.  I stayed in that vicinity on the first floor.

14    Q.  And while you're there, did you see other protesters

15    enter the building?

16    A.  Yes.

17    Q.  And, again, can you tell us whether or not you observed

18    Ms. Niemela being one of those protesters that you saw in

19    the building?

20    A.  No, sir.

21    Q.  And you talked about -- well, I guess you were showed a

22    video and replayed some radio dispatches with respect to

23    smoke in the air and people on the second floor.

24    A.  That's correct.

25    Q.  Fair to say that you can't say that Ms. Niemela was one

1    of the ones that dispatched the smoke?  Is that right?

2    A.  Correct.

3    Q.  You can't say that she was one of the people up on the

4    second floor?

5    A.  Correct.

6         MR. GARRITY:  I have no further questions.  Thank

7    you very much.

8                    REDIRECT EXAMINATION

9    BY MR. GORDON:

10   Q.  Special Agent Glavey, why did you stay in that secure

11   location with the vice president for so many hours?  Why

12   were you there all the way -- from when you evacuated him

13   all the way until 8:00?

14   A.  Because it took time for the building to be cleared of

15   people.  They had to call in additional law enforcement to

16   assist with clearing out all the protesters from the

17   building.  And then after all the people were cleared out,

18   they had to do a security sweep of the building.

19   Q.  Which involved what?

20   A.  It involved doing an EOD, an explosives sweep, and a

21   sweep for any people that might have been left behind.

22   Q.  As the lead agent on the vice president's detail --

23   A.  Uh-huh.

24   Q.  -- would you have considered the Capitol secure if there

25   was still even one rioter inside?

1    A.  No.

2    Q.  Why not?

3    A.  Because they could have any kind of weapon or explosive

4    device on them.

5    Q.  What if they were just sitting in the middle of the

6    Rotunda in a yoga pose singing "Kumbaya"?  Would you have

7    considered it secure then?

8    A.  No.

9    Q.  Why not?

10   A.  Because, again, part of our process was proceeding back

11   and forth between the House and Senate side where we could

12   walk through and be in the vicinity of a firearm or an

13   explosive device.

14           MR. GORDON:  Okay.  Nothing further, Your Honor.

15           THE COURT:  Okay.  Agent Glavey, thank you very

16   much for your testimony.  Have a good day.

17           THE WITNESS:  You as well.

18           THE COURT:  Don't discuss your testimony in this

19   case until this case is over.  Okay?

20           THE WITNESS:  Thank you.

21           THE COURT:  Take care.

22           MS. ARCO:  Your Honor, if we could take a brief

23   break?  I think Mr. Kramer is going to help come with tech

24   issues.

25           THE COURT:  We're going to take our 15-minute

```
1    afternoon break.  It's 3:10.  So let's see you back here at
2    3:25.
3              No research about the case.  No discussions about
4    the case.
5              (Jury exits courtroom)
6              (Recess taken)
7              MR. GORDON:  Just a question for you on timing;
8    not really a question, just a heads up.
9              THE COURT:  Yes.
10             MR. GORDON:  We expect this next witness to last
11   longer than an hour.
12             THE COURT:  Yes.
13             MR. GORDON:  So if you're hoping to break at 4:30
14   today, we might have to look for a spot in the testimony to
15   do it.  If you want to go longer...
16             THE COURT:  Why don't we aim for 4:30, or whenever
17   you get to a good spot.  Will that work?
18             MR. GORDON:  Thank you.
19             THE COURT:  Okay.  So, Agent Hastbacka, you can
20   come on up.
21             (Jury enters courtroom)
22             THE COURT:  Welcome back, everyone.  Please be
23   seated.
24             Ms. Arco, please call your next witness.
25             MS. ARCO:  Thank you, Your Honor.  The government
```

 1    calls Special Agent Mark Hastbacka to the stand.

 2              THE COURT:  Can you raise your right hand, please.

 3              (Witness sworn)

 4              MS. ARCO:  The government will first play

 5    Government Exhibit 002, which has already been admitted into

 6    evidence.

 7              If you could switch it to the podium, please.

 8              And quickly, before I do, I'd like to read

 9    Stipulation No. 6 into the record from Exhibit 1201

10    regarding this video exhibit we're about to observe.

11              On January 6, 2021, most of the proceedings taking

12    place on the Senate and House floors were contemporaneously

13    recorded by the Senate Recording Studio and the House

14    Recording Studio respectively.  The Senate Recording

15    Studio's purpose is to serve the Senate.  The House

16    Recording Studio's purpose is to serve the House.  Cameras

17    on the Senate and House floors record activity occurring

18    there.  This footage is also broadcast through the

19    Cable-Satellite Public Affairs Network (C-SPAN).  The video

20    footage contained in Government Exhibit 002 is a fair and

21    accurate depiction of the events of the Senate and House

22    floors on January 6, 2021, the time-stamps on the recordings

23    are accurate, and the video footage was not altered or

24    edited in any way.  The video footage is authentic in that

25    it is what it purports to be.

```
 1            Thank you.  I'll play from the beginning.
 2            (Video playing)
 3            MS. ARCO:  Thank you for your patience.
 4            I will quickly read through a few other
 5    exhibits -- stipulations -- that are a part of Government
 6    Exhibit 1201, which have already been admitted.  That would
 7    be Stipulation 7, which reads as follows:
 8            The events depicted in the video footage from
 9    Government Exhibits 403 through 413, labeled under the
10    category "Open Source Videos and Images," are a fair and
11    accurate depiction of the events at the U.S. Capitol
12    building and grounds on January 6, 2021, and the video
13    footage and photographs were not altered or edited in any
14    way.  The video footage and photographs are authentic in
15    that they are what they purport to be.
16            Stipulation 8:  Videos Recovered From Known
17    Individuals.
18            The events depicted in the video footage from
19    Government Exhibits 501 through 506, labeled under the
20    category "Videos Recovered From Known Individuals," are a
21    fair and accurate depiction of the events at the U.S.
22    Capitol building and grounds on January 6, 2021, and the
23    video footage was not altered or edited in any way.  The
24    video footage is authentic in that it is what it purports to
25    be.
```

1          Government Exhibits 804 through 842 are fair and

2     accurate copies of the contents of the Facebook accounts

3     described above.

4          And we will put into evidence a Stipulation 10

5     shortly as well.

6               SPECIAL AGENT MARK HASTBACKA, Sworn

7                     DIRECT EXAMINATION

8     BY MS. ARCO:

9     Q.  Good afternoon.

10    A.  Good afternoon.

11    Q.  Can you please state and spell your name for the record.

12    A.  My first name is Mark, M-A-R-K.  The last name is

13    Hastbacka.  It's spelled H-A-S-T-B-A-C-K-A.

14    Q.  And what do you do for a living?

15    A.  I am a special agent with the FBI.

16    Q.  Okay.  And how long have you been with the FBI?

17    A.  I am in my 26th year.

18    Q.  What kind of cases have you worked over the years?

19    A.  I started off working violent crime in Miami;

20    transferred over to national security crime; and since 1991,

21    I've worked primarily national securities cases up and down

22    the East Coast; and now I am in New Hampshire.

23               We're a very small office, and I have to work a

24    variety of all cases because our office is so small.

25    Q.  Are you involved in this case against Ms. Niemela?

1    A.  I am.

2    Q.  And how did you become involved in her case?

3    A.  I received a communication from FBI headquarters

4    indicating --

5            MR. GARRITY:  Objection; hearsay.

6            THE COURT:  Overruled.

7    A.  I received a communication from FBI headquarters setting

8    a lead for me to investigate Ms. Niemela, a reporting that

9    we received of her going into the Capitol on January 6th.

10   Q.  Okay.  So what did you do after receiving that lead?

11   A.  I did some background information on her, open-source

12   information.  I interviewed -- I was able to locate the two

13   people, two independent people that had contacted the FBI

14   providing tips on Ms. Niemela.  I took statements from them.

15           I took a statement from another co-defendant.  I

16   did a search warrant for her Facebook accounts.

17   Q.  For whose Facebook accounts?

18   A.  For Kirstyn Niemela's Facebook accounts.  And from

19   there, we're here today.

20   Q.  Okay.  How many interviews did you perform

21   approximately?

22   A.  In the grand scheme of things, not that many.  Under ten

23   total.

24   Q.  10?  12?  Not many?

25   A.  Not many compared to some other cases.

1    Q.  Okay.  Did you gather any video evidence?

2    A.  I did.  Some from the two initial tipsters that called

3    in pro -- one provided information, videos.  One of the

4    co-defendants provided me videos directly after speaking to

5    her, and then public-source videos.

6    Q.  Okay.  Did you do any surveillance of Ms. Niemela?

7    A.  I did just to try to locate where she was living and

8    find a pattern of life.

9    Q.  Can you explain what "pattern of life" means?

10   A.  Just trying to find out what vehicle she's driving, what

11   time of day she leaves the house, comes home from work,

12   where she's working, who she's associating with, so that

13   when the time comes to locate and hopefully arrest her, I'm

14   not just going in blind.

15   Q.  Did you execute any search warrants in this case?

16   A.  I did.  On the day she was arrested, I had a search

17   warrant for her cell phone.

18   Q.  Okay.  And you mentioned Facebook before.  Did you

19   search those accounts?

20   A.  I did.  That was prior to her arrest.  That was sometime

21   in November, I believe it was, of 2021.  I did a search

22   warrant, which was electronically sent to Facebook.

23          And then sometime thereafter, shortly thereafter,

24   they sent me the results on a disk.

25   Q.  Okay.  And that was pursuant to a search warrant?

1    A.   It was.

2    Q.   Okay.  What about location data?  Did your investigation

3    uncover any location data with respect to Ms. Niemela?

4    A.   I did not do the search warrant for this particular

5    thing.  The overall arching search warrant was done here in

6    Washington, D.C., by agents here doing a geofence for Google

7    and Verizon trying to identify everyone within a very

8    specific geographical location on a very specific date and

9    time.  So Washington did that in a larger case, and they

10   provided me very specific results as it pertained to Ms.

11   Niemela.

12   Q.   Can you explain a little bit about what a geofence is

13   and what it shows?

14   A.   So geofence is -- most everyone has a cell phone, and

15   you have apps on the cell phone.  One of those apps will be

16   Google.  Everybody Googles everything, right?  Well, Google

17   is always in touch with -- your apps are always in touch

18   with the servers or their databases, typically through

19   satellite signals and/or closed cell phones or WiFi, and we

20   give them very specific locations.

21           You can't be very -- you can't be broad.  We can't

22   just blindly ask for something from Google.  We have to go

23   get a search warrant -- apply for a search warrant.  A judge

24   has to approve it.  But you have to give very specific

25   parameters, longitude and latitude, and then a very specific

1    date and time, and then they will provide you the results of

2    every communication device that was within that parameter

3    during that given date and time.

4    Q.  And roughly what was the physical, you know, parameters

5    and date and time given for the geofence search warrant in

6    relation to the January 6th investigation?

7    A.  It was specific to the U.S. Capitol.

8    Q.  Okay.  And date and time approximately?

9    A.  It was January 6th, and it was for the time frame of

10   that afternoon.

11   Q.  Okay.  I want to show you Government's Exhibit 703,

12   which has already been admitted into evidence.

13            MS. ARCO:  And if we can publish from counsel's

14   table, please.

15   Q.  Special Agent, what are we looking at?

16   A.  So the red line -- you're looking at an above view of

17   the U.S. Capitol.  On the left-hand side right here is the

18   west side.  Here is the east.  This is the north.  This

19   would be the south.  And this red line out here is the

20   secure perimeter of the Capitol on that date and time.

21   Q.  On January 6th, 2021?

22   A.  On January 6th.

23   Q.  And this specific document, I mean, what kind of data is

24   it reflecting?

25   A.  So the results provided to FBI headquarters then sent

1   down the line to me specific to Ms. Niemela's cell phone

2   indicates it was in this specific area and in this specific

3   area when it was within the geofence.

4   Q.  Does that mean that Ms. Niemela, whatever device she was

5   using, was only in these two locations?

6   A.  No.  That's when it was picked up by the signals

7   relaying the Google apps to the satellite or whatever device

8   was connecting to their system.

9   Q.  Okay.  Thank you.

10          MS. ARCO:  You can take that down.

11          Thank you, Ms. Jenkins.

12   Q.  I'm going to identify a phone number for you, (603)

13   288-7169.  Was this number relevant to your investigation?

14   A.  It was.  That was Ms. Niemela's.

15   Q.  Okay.  And how do you know?

16   A.  I know that from the witnesses I spoke to.  They

17   provided me with --

18          MR. GARRITY:  Objection; hearsay.

19          MS. ARCO:  I can rephrase, Your Honor.

20          THE COURT:  Rephrase.

21   Q.  Apart from anything anyone told you, do you know how

22   this is Ms. Niemela's number, other sources of that

23   information?

24   A.  I do.

25   Q.  Can you explain?

1    A.  From my Facebook search warrant, that was the phone

2    number connected to her Facebook account.

3    Q.  Okay.  Thank you.

4            MS. ARCO:  I'm going to read Stipulation No. 10

5    from Government Exhibit 1201, which has already been

6    admitted into evidence.  And that reads:

7            The following cellular telephone number, social

8    media accounts, and email accounts were associated with the

9    defendant during the date ranges listed:

10           Verizon phone number (603) 288-7169 from January

11   1, 2021, through January 17, 2021;

12           Google account, email account

13   kirstyn.niemela@gmail.com from the date of its creation

14   through the present;

15           Google email account kniemela88@gmail.com from the

16   date of its creation through the present;

17           Facebook account 100063753853831, bearing vanity

18   name "Kirstyn Niemela" from the date of its creation through

19   the present;

20           Facebook account 100049724228048, bearing vanity

21   name "Kirst Niem" from the date of its creation through the

22   present;

23           And Facebook account 100063753853831 bearing

24   vanity name "Kirst Ashley" from the date of its creation

25   through the present.

```
1    BY MS. ARCO:

2    Q.  You said earlier you executed a search warrant on

3    certain Facebook accounts pertaining to Ms. Niemela.

4              MS. ARCO:  If you could please pull up

5    Government's Exhibit 804, which has already been admitted

6    into evidence, from counsel's table, please.  Thank you.

7    BY MS. ARCO:

8    Q.  What is this?

9    A.  It's Facebook records I received from the search

10   warrant.

11   Q.  Okay.  With respect to Ms. Niemela?

12   A.  From Ms. Niemela, her name -- right in the middle here

13   is her name, first name and last name -- associated with

14   this gmail account.

15   Q.  Okay.  Thank you.

16             MS. ARCO:  And if you could please show Government

17   Exhibit 806.

18   Q.  What is this?

19   A.  Facebook search warrant results.

20   Q.  Okay.

21   A.  And it indicates the registered name is Kirst Ashley

22   associated with this email address.

23   Q.  And can you read that email address for us, please.

24   A.  wwg1wga6@gmail.com.

25   Q.  Based on your investigation, do you know what WWG1WGA
```

1   means or signifies?

2   A.  I don't know the specifics.  I know it is a phrase used

3   by some within the QAnon community.

4   Q.  Thank you.

5           I'm going to show you Government Exhibit 807.

6   What is this?

7   A.  This is Facebook results giving the IP addresses for

8   January 6th.  And you can see the times.  It starts on the

9   bottom.

10          For the 12th -- I don't know about that one --

11  right there up to there, showing the IP addresses between

12  1:59 p.m. and 11:39 p.m.

13  Q.  Okay.  And just to be clear, these are IP addresses

14  from -- connect -- that were issued through her -- connected

15  to her Facebook account?

16  A.  Correct.

17  Q.  Okay.  I'm going to show you Government Exhibit 808.

18          MS. ARCO:  And if you could scroll down to Page 4.

19  Q.  And what are we looking at?

20  A.  These are Facebook results as well.

21  Q.  Okay.  And what is -- can you please read the comment at

22  the top of the page?

23  A.  Well, there's no comments here.

24  Q.  Sorry, what it says next to the body.

25  A.  So I have the name Kirstyn Niemela here.  The date.

1    It's kind of inverted here.  The way they do it is it should

2    be January 12, 2021, for most folks.  The key thing here is

3    circling in on the cell phone number associated with Kirstyn

4    Niemela, (603) 288-7169.

5    Q.  Okay.  Thank you.

6             And is this the same phone number we've been

7    discussing?

8    A.  It is.

9             MS. ARCO:  I'm going to read Stipulation No. 5

10   from Government Exhibit 1201 that's already been entered

11   into evidence.  Stipulation 5 is regarding UTC time.

12            During the winter months of December 2020, January

13   2021, and February 2021, Universal Time Coordinated was five

14   hours ahead of Eastern Standard Time.

15   Q.  And, Special Agent, do you see anything saying "UTC" on

16   this exhibits?

17   A.  Yes.  Right here on the times, UTC.  The UTC is also

18   standard for Greenwich Mean Time.

19            THE COURT:  Can everyone see their screens okay?

20            MS. ARCO:  Thank you.

21   Q.  And so if it says that particular time in UTC, what does

22   that mean in Eastern Standard Time?

23   A.  It's approximately five hours ahead of Eastern Standard

24   Time.

25   Q.  Okay.

```
1    A.  It depends on the daylight savings or not.
2              THE COURT:  And, ladies and gentlemen, you'll
3    notice on this exhibit that there is some material that has
4    been redacted.  There may be other redacted exhibits as
5    well.  We do the redactions because the information is
6    either irrelevant or not otherwise admissible in this case,
7    and you should not speculate what may be behind the
8    redactions.  Okay?
9              MS. ARCO:  Thank you, Your Honor.
10             If you could please bring up -- this has not been
11   admitted yet, so if you could please take it down.
12             I was just making sure because I could still see
13   it.
14             Your Honor, the government moves Government
15   Exhibit 847 into evidence.
16             THE COURT:  I'm sorry, so is this -- can you put
17   it on the screen first just for us?
18             Okay.  Any objection, Counsel?
19             MR. GARRITY:  Judge, we object to this -- this
20   document.
21             THE COURT:  Do you want to go to the phones?
22             (The following is a bench conference
23              held outside the hearing of the jury)
24             THE COURT:  What's the objection?  I can't hear
25   you.
```

```
1              MR. GARRITY:  Can you hear me now, Your Honor?

2              THE COURT:  Yes.

3              MR. GARRITY:  We object on relevancy grounds and

4    403 grounds.  This document is dated, if I understand it

5    correctly, in early November of 2020.  And primarily the

6    conversation involves Renae Michelle and Ms. Niemela.  But

7    we would submit it's not relevant to what's going on here

8    with respect to January 6th and what the charged offenses

9    are.

10             THE COURT:  Ms. Arco?

11             MS. ARCO:  Your Honor, we submit that it is

12   relevant.  It's from November 10, 2020, which is shortly

13   after the November 2020 presidential election.  It shows

14   how infuriated she was about the election.  It calls on

15   other Trump supporters to sign a petition.

16             THE COURT:  So, I'm sorry, the "this" she's

17   referring to is a petition that's attached?

18             MS. ARCO:  Yes.  It's continued onto the second

19   page of the exhibit.  It talks more about what their

20   specific requests and gripes are.  But it talks about the

21   dissent.  And it just goes to her motive and her intent for

22   going to D.C. on January 6th, not once, but twice, and what

23   was motivating her and animated her actions on January 6th.

24             THE COURT:  Okay.  I'll allow it.  The objection's

25   overruled.
```

1          (This is the end of the bench conference)

2          MS. ARCO:  Thank you.

3          If you could please publish.

4          THE COURTROOM DEPUTY:  It's already published.

5          You can just look behind you.

6          MS. ARCO:  Oh, thank you.  Great tip.

7     Q.   Special Agent, what are we looking at?

8     A.   Facebook records that I obtained pursuant to the search

9     warrant.

10          MS. ARCO:  And could you please highlight that

11     bottom comment, Ms. Jones, or blow it up, rather.

12    Q.   Okay.  Can you please read the date of this comment?

13    A.   This would have been on November 10, 2020.

14    Q.   Okay.  And do you know when the 2020 presidential

15    election occurred?

16    A.   Approximately a week before that.

17    Q.   Okay.  And the comment reads:  "Send this to everyone

18    you know that is infuriated about this dishonest election!

19          "*Important* Send this to Republicans only and

20    people who voted for Trump (via messenger, email, text, not

21    posting to everyone) This is not a joke, look up the Supreme

22    Court website yourself and you will see this link is legit!

23          "Subject:  'WE THE PEOPLE' have a voice and it

24    needs to be heard!!"

25          MS. ARCO:  Can you continue onto the next page,

1    and just highlight the top of the page, call it out.  Thank

2    you.

3    Q.  "Send a comment that you voted for Trump/Pence and you

4    demand a full investigation of this election!

5              "This takes 2 seconds.  Let's infiltrate the email

6    inbox of the Supreme Court and let them know we are not

7    standing by the dishonest media, corrupt liberal Democrats,

8    and any illegal votes!"

9              And then it posts the link.

10             What is the significance of this Facebook message

11   to your investigation?

12   A.  To me it indicated that the author did not accept the

13   results of the election.

14   Q.  Okay.  And the author of this message is, again?

15   A.  Kirstyn Niemela.

16   Q.  Thank you.

17             MS. ARCO:  You can take that down.

18             The government moves to admit Government Exhibit

19   809.

20             THE COURT:  Any objection?

21             MR. GARRITY:  Your Honor, can we have one second?

22             THE COURT:  Sure.

23             (Pause)

24             MR. GARRITY:  Your Honor, at this time we have no

25   objection.

1          THE COURT:  So moved.

2          MS. ARCO:  Okay.

3     Q.  Special Agent, what are we looking at?

4     A.  Facebook records I received pursuant to the search

5     warrant.

6     Q.  Okay.

7          MS. ARCO:  And can you call out the top, please.

8     Q.  Can you please read the date?

9     A.  November 24, 2020.

10    Q.  Okay.  And what does it say next to when it says "Body"?

11    A.  "You sent 2 photographs."

12    Q.  Okay.  And what is your understanding of who the "you"

13    is referring to?

14    A.  The author, Kirstyn Niemela.

15    Q.  Okay.  When a Facebook return says a user sent

16    something, what does that mean?

17    A.  It's sending to either an individual or private group

18    not to be seen.  Typically, you know, if you posted it for

19    everybody to view, it will say "posted."  But if you're

20    sending it, you're sending it to a very closed community.

21    Q.  Okay.  And so a Facebook return would distinguish

22    between when someone sends something privately or posts

23    something publicly, it will make that verbal distinction?

24    A.  It will.

25    Q.  Okay.  Thank you.

1          MS. ARCO:  If you could scroll to the second page,

2     please.

3     Q.  What are we looking at?

4     A.  Some article about Pennsylvania, Arizona, Michigan to

5     hold public hearings on the 2020 election.

6     Q.  Okay.  And can you give us a rough summary of what it

7     says?

8     A.  Obviously some folks in Pennsylvania, Arizona, and

9     Michigan were raising issues with the validity of the

10    election.  They were going to have some sort of hearings.

11    Q.  Okay.

12          MS. ARCO:  And can you please scroll to the second

13    photo that's on Page 4.

14    Q.  Special Agent, can you please read the second quote at

15    the top of the page beginning with, "There were serious

16    irregularities."

17    A.  Sure.  "There were serious irregularities, we have proof

18    of fraud in a number of states, and it is important for all

19    Americans to have faith in our electoral process.  All we

20    have wanted from the outset is to count every legal vote and

21    discount every illegal vote."

22          MS. ARCO:  You can cut the callout, please.

23    Q.  And who's the author of that statement based on the

24    immediately preceding sentence?

25    A.  Jenna Ellis, who is, according to this article, senior

1    campaign -- senior legal advisor and personal attorney for

2    President Donald Trump.

3    Q.  Thank you.

4            MS. ARCO:  You can take that down.

5            We move to admit Government Exhibit 812.

6            MR. GARRITY:  No objection, Your Honor.

7            THE COURT:  So moved.

8            MS. ARCO:  Please publish.  Thank you.

9    Q.  What is this?

10   A.  Facebook records I received pursuant to the search

11   warrant.

12           MS. ARCO:  Can you please call out the last

13   comment.

14   Q.  Can you please read the date.

15   A.  It is December 21, 2020.

16   Q.  Okay.  And what does it say next to the body, the

17   comment?

18   A.  "You sent 2 photographs."  "You" meaning Kirstyn

19   Niemela.

20           MS. ARCO:  Okay.  And can you please scroll to the

21   bottom half of the second page.

22           Can you please call out the bottom half of the

23   page.

24   Q.  Can you please read the bracketed area.

25   A.  "Remember, it is always darkest before the dawn.  Do not

1    believe the MSM" -- which I interpret to be mainstream media

2    -- "over the next week.  Do not for a single minute give

3    them any credence.  We have legally won this election and

4    what comes next is the greatest mop up job in the history of

5    the world.

6              "Patriots, we thank you.  We could not have gotten

7    here without you.  Now is our time.  Hold the line."

8    Q.  What is the significance of this comment to your

9    investigation?

10   A.  It goes to, for me, mindset of not accepting the

11   election still and contesting it.

12   Q.  Okay.  Thank you.

13             I'm going to show you Government Exhibit 813,

14   which has already been admitted into evidence.

15             What is this?

16   A.  Facebook records that I received pursuant to the search

17   warrant.

18   Q.  Okay.

19             MS. ARCO:  And can you please blow up the first

20   comment, Ms. Jones.

21   Q.  Who is the author?

22   A.  Kirstyn Niemela.

23   Q.  Okay.  What's the date?

24   A.  December 31, 2020.

25   Q.  Okay.  And if you could please read both the body and

1     the summary of this comment.

2     A.   Sure.  The body has a link, it looks like to something

3     called wildprotest.com.

4          The summary says, "OFFICIAL HOME OF JANUARY 6

5     PROTEST AT CONGRESS.  Click for event details about the

6     protest happening outside of Congress where the

7     #DoNotCertify caucus will object to the botched Electoral

8     College.  Stop the Steal!"

9     Q.   Thank you.

10         MS. ARCO:  And if you could please pull up

11    Government Exhibit 843 -- oh, pardon.

12    Q.   Before we move from this exhibit, based on looking at

13    the whole page, can you tell to whom Ms. Niemela is sending

14    this link?

15    A.   Someone I know through my investigation to be Renae

16    Sevigny.

17    Q.   Okay.  And who is Renae Sevigny to Ms. Niemela, if you

18    know?

19    A.   Renae Sevigny is a friend of Ms. Niemela's, and I've

20    spoken to her in person.

21    Q.   Okay.  Thank you.

22         MS. ARCO:  If you could please pull up Government

23    Exhibit 843, which has already been admitted into evidence.

24         If you could please highlight that top area of

25    the -- yes, thank you.

1     Q.  Can you please read the date.

2     A.  December 31, 2020.

3     Q.  Okay.  And does this appear to be the same link, the

4     same content shared in the previous exhibit?

5     A.  It does.

6     Q.  Okay.

7          MS. ARCO:  And you can come out of the callout,

8     please.

9     Q.  And to whom does she appear to be sending this link?

10    A.  Stefanie Nicole right here is who I know to be Stefanie

11    Chiguer.

12    Q.  Okay.  And what is Ms. Chiguer's relation to

13    Ms. Niemela?

14    A.  Currently nothing.  In the past, they were girlfriends.

15    Q.  And by "girlfriends," do you mean friends who happen to

16    be female or something more than friends?

17    A.  They had a romantic relationship.

18    Q.  Thank you.

19          MS. ARCO:  If you could please pull up Government

20    Exhibit 844.  And please call out the middle of the page.

21    Thank you.

22    Q.  And could you please read the date.

23    A.  The date is December 31, 2020.

24    Q.  And is this the same link we've just seen?

25    A.  It is.

1    Q.  And to whom does Ms. Niemela appear to be sending this?

2    A.  There seems to be two people sending this, Valerie Holt

3    sent it, according to this, at 14:45 UTC.

4            And then Ms. Niemela sent it at 14:45:33, like

5    seconds later -- not even seconds.

6            MS. ARCO:  Thank you.  Can you please pull up

7    Government Exhibit 845.

8            Thank you.  And can you please highlight the same

9    portion in the middle toward the bottom of the page.

10           Thank you.

11   Q.  Can you please read the date.

12   A.  December 31, 2020.

13   Q.  Okay.  Is this the same link we've been looking at?

14   A.  It is.

15   Q.  And to whom does she appear to be sending this link?

16   A.  Mark Leach.

17   Q.  Okay.  And who do you understand to be Mark Leach in

18   relation to Ms. Niemela?

19   A.  Mark Leach I've met twice.  Mark Leach is friends with

20   Ms. Niemela and is dating or has had a relationship with her

21   mother in the past.

22   Q.  Okay.  Does Ms. Niemela have any other connection to

23   Ms. Niemela?  Personal?  Professional?

24   A.  Miss Kirstyn Niemela works for Mr. Leach.  Mr. Leach is

25   an electrician, and at times Kirstyn works for him helping

1   him out.

2   Q.  Thank you.

3           MS. ARCO:  And if you could please call up

4   Government Exhibit 846.

5           Please call out the middle of the page.

6           We're having some technical difficulties.  Sorry.

7   We're frozen.

8           We can move on and maybe come back to it.

9   Q.  Are you aware of whether Ms. Niemela came to D.C.

10  between the election in November 2020 and January 6, 2021?

11  A.  She did.

12  Q.  How do you know?

13  A.  Through my investigation and finding open-source

14  photographs of her in Washington, D.C.

15  Q.  Okay.  What about through your search warrants?

16  A.  My search warrants had some Facebook returns showing

17  pictures of her in Washington, D.C., during that time frame

18  on a scooter.

19  Q.  Okay.  And based on your investigation, what appeared to

20  be the purpose of her travel to D.C. at that time?

21  A.  She came on or about I believe it's December 13th for a

22  Stop the Steal rally in Washington, D.C.

23  Q.  Okay.  December 13, 2020?

24  A.  December 13, 2020.

25  Q.  Okay.  Have you spent time face to face with Ms. Niemela

1    before entering this courtroom today and yesterday?

2    A.  I have.

3    Q.  And how many interactions out of court have you had with

4    her?

5    A.  Two that I can recall.

6    Q.  Okay.  And what were -- what was the reason or purpose

7    of those interactions?

8    A.  One interaction was the day I arrested her, and the

9    second time was when I met with her and her attorneys.

10   Q.  Okay.  And based on your interactions with her, are you

11   familiar with what she looks like?

12   A.  Very.

13   Q.  Do you see her in the courtroom today?

14   A.  Yes.  She's sitting at the defense table between the two

15   gentlemen.  She's wearing some sort of a suit, I can't see

16   with the monitor on, with short hair, Caucasian female.

17          MS. ARCO:  Will the record please reflect the

18   identification of the defendant?

19          THE COURT:  It may.

20          MS. ARCO:  Thank you.

21          THE COURT:  Ms. Arco, is this a good stopping

22   point?

23          MS. ARCO:  Sounds like a fantastic stopping point.

24          THE COURT:  I thought you might say that.

25          All right.  Ladies and gentlemen, we're going to

 1    break for the day.  We've had a productive day.  I think we

 2    are pretty much on schedule, so we're going to let you go.

 3              Please, no discussions about the case.  No

 4    research about the case.

 5              We'll see you back here at 9:00 in the morning.

 6    Okay?  Have a good night.

 7              (Jury exits courtroom)

 8              THE COURT:  All right.  Sir, you're excused.

 9    Please don't discuss your testimony with anyone overnight.

10    Okay?

11              THE WITNESS:  Thank you, Your Honor.

12              MR. GORDON:  Your Honor, do you think there's a

13    strong possibility we may be closing tomorrow?  Do you want

14    to set aside time for a charge conference at some point?

15              THE COURT:  So we have Ms. Chiguer --

16              MR. GORDON:  We currently, Your Honor, do not

17    intend to call her in our case-in-chief.  Special Agent

18    Hastbacka is going to be the final witness for our case-in-

19    chief.

20              THE COURT:  All right.

21              MR. GORDON:  We may call Ms. Chiguer as a rebuttal

22    witness depending on if the defense puts on a case, and, if

23    so, the content of that case.

24              THE COURT:  Okay.  Counsel, what about your case?

25    Same line-up?

1          MR. GARRITY:  It may be -- it may be just one

2     witness, but we have to consult with another whether or not

3     we're going to call a second one.

4          THE COURT:  Okay.  Why don't we finish up, and

5     then we'll do our charge -- instead of doing it in the

6     morning, let's get started in the morning, finish up, and

7     then we may take a 30-minute break on one side of lunch or

8     the other, depending on where we are, and do the charge

9     conference then.  Does that make sense?

10          MR. GORDON:  Yes.

11          THE COURT:  I don't think there are a lot of

12     disputes.  Okay?

13          All right.  See you in the morning.

14          MR. GORDON:  Thank you, Your Honor.

15          MR. GARRITY:  Thank you, Your Honor.

16          MS. ARCO:  Thank you, Your Honor.

17               (Whereupon the hearing was

18                concluded at 4:23 p.m.)

19

20

21

22

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 28th day of February, 2023.

9

10                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
13                              Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'WE** [1] - 504:23

**/**

**/s/Lisa** - 517:10

**0**

**001** [2] - 383:8, 383:16
**002** [2] - 490:5, 490:20
**03053** [2] - 307:18, 307:21
**0700** [1] - 430:19

**1**

**1** [6] - 347:8, 348:20, 376:12, 383:16, 459:18, 498:11
**10** [5] - 492:4, 493:24, 498:4, 503:12, 504:13
**10-33s** [1] - 432:22
**100** [1] - 431:2
**100049724228048** [1] - 498:20
**100063753853831** [2] - 498:17, 498:23
**1001** [2] - 347:14
**1002** [1] - 347:14
**101** [3] - 347:9, 383:8, 410:4
**102** [1] - 411:10
**103** [4] - 412:1, 412:3, 440:9, 440:14
**104** [3] - 412:13, 412:14, 412:17
**105** [2] - 347:9, 412:19
**106** [1] - 349:5
**107** [3] - 347:9, 413:10, 413:11
**108** [2] - 413:25, 414:1
**109** [3] - 414:7, 414:9, 414:20
**10:00** [4] - 482:5, 482:7, 482:12, 484:2
**110** [2] - 414:15, 414:17
**1101** [1] - 347:14
**111** [2] - 415:3, 415:5
**1110** [1] - 347:15
**1114** [1] - 348:14
**112** [2] - 415:10, 415:12
**113** [4] - 347:9, 383:8, 415:21, 415:23
**11:00** [1] - 369:20
**11:05** [1] - 369:20
**11:39** [1] - 500:12

**12** [4] - 323:18, 430:2, 493:24, 501:2
**1201** [4] - 490:9, 491:6, 498:5, 501:10
**12:00** [2] - 378:12, 379:17
**12:30** [4] - 378:13, 427:14, 469:25, 472:7
**12:45** [2] - 470:18, 471:2
**12:51** [1] - 385:17
**12:54** [3] - 386:25, 421:16, 422:7
**12:55** [1] - 471:1
**12:57** [2] - 387:4, 422:1
**12:58** [1] - 422:2
**12th** [1] - 500:10
**13** [6] - 322:3, 322:4, 430:2, 460:15, 513:23, 513:24
**13-second** [1] - 479:13
**13th** [1] - 513:21
**14** [6] - 307:18, 307:21, 323:18, 391:18, 437:20
**14:30** [2] - 425:17, 425:21
**14:45** [1] - 512:3
**14:45:33** [1] - 512:4
**15** [8] - 342:15, 379:4, 410:5, 410:7, 422:21, 427:8, 470:22, 477:13
**15-minute** [2] - 369:19, 488:25
**15th** [1] - 455:3
**17** [1] - 498:11
**175,170** [1] - 349:3
**18** [1] - 348:13
**19** [1] - 452:3
**1991** [1] - 492:20
**1:00** [5] - 378:14, 422:10, 422:13, 422:24, 481:6
**1:11** [1] - 406:13
**1:15** [2] - 378:17, 390:1
**1:21-cr-623-CRC-2** [1] - 307:3
**1:28** [1] - 444:23
**1:37** [1] - 390:18
**1:40** [2] - 427:14, 428:4
**1:59** [1] - 500:12

**2**

**2** [9] - 309:3, 347:9,

**361**:22, 378:2, 459:13, 459:14, 505:5, 506:11, 508:18
**20** [3] - 350:5, 402:23, 407:16
**200** [1] - 442:6
**20001** [2] - 307:25, 517:13
**201** [3] - 347:9, 354:5, 354:7
**202** [7] - 307:16, 307:25, 350:9, 371:12, 377:18, 377:24, 464:8
**2020** [25] - 329:24, 330:4, 358:8, 358:10, 358:12, 358:23, 369:6, 378:8, 378:10, 501:12, 503:5, 503:12, 503:13, 504:13, 504:14, 506:9, 507:5, 508:15, 509:24, 511:2, 511:23, 512:12, 513:10, 513:23, 513:24
**2021** [42] - 324:8, 329:18, 331:8, 339:3, 339:4, 348:8, 348:15, 349:12, 349:18, 350:5, 350:8, 351:25, 352:1, 353:16, 358:14, 364:5, 364:22, 369:8, 378:3, 378:11, 379:12, 383:4, 383:6, 383:7, 383:10, 430:14, 431:23, 443:7, 443:17, 460:17, 490:11, 490:22, 491:12, 491:22, 494:21, 496:21, 498:11, 501:2, 501:13, 513:10
**2022** [4] - 353:8, 455:3, 456:5, 483:18
**2023** [2] - 307:4, 517:8
**203** [4] - 373:4, 373:5, 373:7, 373:10
**204** [3] - 374:4, 374:5, 374:9
**205** [2] - 374:12, 374:13
**20530** [1] - 307:15
**206** [3] - 374:22, 374:23, 375:5

**207** [2] - 372:9, 372:10
**208** [5] - 357:5, 357:7, 357:11, 362:8, 432:9
**209** [1] - 439:3
**21** [1] - 508:15
**21-623** [1] - 309:3
**211** [1] - 363:14
**212** [3] - 347:9, 405:21, 406:2
**22-second** [1] - 406:12
**228** [1] - 349:4
**23** [2] - 351:22, 418:21
**23-second** [1] - 411:14
**24** [3] - 307:4, 348:22, 506:9
**26th** [1] - 492:17
**274-6370** [1] - 307:13
**288-7169** [3] - 497:13, 498:10, 501:4
**28th** [1] - 517:8
**2:00** [1] - 341:5
**2:08** [1] - 447:17
**2:09** [2] - 423:10, 423:15
**2:09:48** [1] - 390:1
**2:11** [1] - 423:19
**2:12** [2] - 378:21, 392:6
**2:13** [3] - 343:23, 424:3, 426:2
**2:15** [1] - 379:2
**2:21** [1] - 392:5
**2:24** [1] - 344:1
**2:24:58** [1] - 443:7
**2:25:30** [1] - 443:17
**2:30** [1] - 425:21
**2:31** [1] - 393:14
**2:42:11** [1] - 396:19
**2:48** [1] - 424:15
**2:48:12** [1] - 398:12
**2:56** [1] - 394:1

**3**

**3** [3] - 348:7, 376:11, 378:10
**30** [3] - 392:22, 392:25, 402:23
**30-minute** [1] - 516:7
**30-plus** [1] - 401:9
**301** [1] - 347:10
**302** [2] - 469:3, 469:5
**304** [1] - 479:9
**305** [2] - 347:10, 478:9
**31** [4] - 509:24, 511:2, 511:23, 512:12
**32-second** [1] - 414:22
**3200** [1] - 307:12
**333** [2] - 307:24, 517:12

**33602** [1] - 307:12
**350** [1] - 349:5
**354-3187** [1] - 307:25
**3:00** [2] - 481:4, 481:6
**3:10** [1] - 489:1
**3:14** [1] - 395:10
**3:25** [1] - 489:2
**3:29** [1] - 396:1
**3:44** [2] - 379:11, 379:18
**3:52** [1] - 396:15
**3D** [3] - 363:17, 364:10, 390:6

**4**

**4** [3] - 382:22, 500:18, 507:13
**40** [2] - 381:20, 431:3
**400** [1] - 307:12
**403** [4] - 317:13, 347:10, 491:9, 503:4
**41** [1] - 444:3
**413** [1] - 491:9
**415** [3] - 347:10, 402:24, 402:25
**434-4106** [1] - 307:19
**437-2733** [1] - 307:22
**45** [1] - 477:18
**4:00** [1] - 481:4
**4:19** [1] - 396:19
**4:23** [1] - 516:18
**4:28** [1] - 397:16
**4:30** [2] - 489:13, 489:16
**4:47** [1] - 398:12
**4:53** [1] - 398:23

**5**

**5** [3] - 376:17, 501:9, 501:11
**501** [2] - 347:10, 491:19
**502** [1] - 443:22
**506** [3] - 347:10, 450:5, 491:19
**53** [1] - 412:24
**532-3867** [1] - 307:16
**54-second** [1] - 412:25
**540** [1] - 349:2
**580,000** [1] - 349:6
**5th** [5] - 339:2, 339:13, 339:15, 339:22, 367:21

**6**

**6** [32] - 324:8, 329:18, 331:8, 348:8, 348:15, 349:12,

349:18, 350:8,
351:25, 352:1,
353:15, 358:14,
364:5, 364:22,
378:3, 378:11,
383:4, 383:6, 383:7,
383:10, 430:14,
431:23, 443:7,
443:17, 460:17,
490:9, 490:11,
490:22, 491:12,
491:22, 510:4,
513:10
**603** [5] - 307:19,
307:22, 497:12,
498:10, 501:4
**6718** [2] - 307:24,
517:12
**6:00** [1] - 340:4
**6:07** [2] - 400:4, 400:5
**6th** [66] - 315:3,
316:14, 317:3,
330:8, 331:25,
338:5, 339:4,
339:15, 339:21,
339:24, 340:2,
340:25, 343:16,
345:14, 353:25,
357:9, 363:10,
365:4, 367:19,
367:21, 367:23,
368:1, 368:20,
369:10, 369:14,
370:7, 370:11,
370:21, 371:9,
371:18, 374:10,
375:18, 377:16,
379:24, 380:2,
382:11, 382:15,
382:19, 389:18,
393:18, 402:20,
419:19, 422:10,
436:17, 451:17,
451:21, 452:13,
455:16, 461:16,
462:21, 462:24,
463:18, 464:6,
464:18, 466:2,
469:10, 472:5,
493:9, 496:6, 496:9,
496:21, 496:22,
500:8, 503:8,
503:22, 503:23

## 7

**7** [4] - 379:12, 459:16,
459:17, 491:7
**702** [1] - 347:10
**703** [2] - 347:11,
496:11

**751** [1] - 349:4
**7:00** [2] - 430:20,
430:21
**7th** [2] - 345:15, 481:4

## 8

**8** [1] - 491:16
**804** [3] - 347:11,
492:1, 499:5
**806** [1] - 499:17
**807** [1] - 500:5
**808** [2] - 347:11,
500:17
**809** [1] - 505:19
**812** [1] - 508:5
**813** [3] - 307:13,
347:11, 509:13
**816** [1] - 347:11
**818** [1] - 347:11
**820** [1] - 347:11
**822** [1] - 347:11
**823** [2] - 376:10,
376:17
**824** [1] - 347:12
**826** [1] - 347:12
**828** [1] - 347:12
**830** [1] - 347:12
**832** [1] - 347:12
**836** [1] - 347:12
**838** [1] - 347:13
**842** [2] - 347:13, 492:1
**843** [2] - 510:11,
510:23
**844** [1] - 511:20
**845** [1] - 512:7
**846** [2] - 347:13, 513:4
**847** [1] - 502:15
**8:00** [3] - 480:19,
481:24, 487:13
**8:06** [1] - 379:10

## 9

**907** [1] - 347:13
**913** [1] - 347:13
**918** [1] - 347:13
**920** [1] - 347:13
**928** [1] - 347:13
**931** [1] - 347:14
**950** [1] - 307:15
**9:00** [1] - 515:5
**9:02** [1] - 379:10
**9:06** [1] - 307:4
**9:30** [1] - 322:17
**9th** [1] - 483:18

## A

**A.J** [1] - 309:8

**a.m** [13] - 307:4, 340:4,
379:12, 379:18,
430:20, 430:21,
481:4, 481:7,
481:24, 482:5,
482:7, 482:12, 484:2
**ability** [1] - 517:7
**able** [22] - 311:12,
330:23, 368:10,
380:7, 380:10,
381:13, 382:5,
383:21, 389:16,
390:11, 400:13,
409:10, 409:14,
410:13, 436:15,
438:2, 440:23,
473:25, 474:3,
477:3, 479:5, 493:12
**absence** [2] - 378:24,
379:6
**absolutely** [2] -
367:24, 448:13
**abuts** [1] - 339:1
**accept** [1] - 505:12
**acceptable** [1] -
320:18
**accepting** [1] - 509:10
**access** [3] - 349:1,
365:3, 464:3
**according** [6] -
408:13, 452:12,
456:16, 472:5,
507:25, 512:3
**account** [9] - 498:2,
498:12, 498:15,
498:17, 498:20,
498:23, 499:14,
500:15
**accounts** [8] - 492:2,
493:16, 493:17,
493:18, 494:19,
498:8, 499:3
**accurate** [8] - 383:9,
383:11, 490:21,
490:23, 491:11,
491:21, 492:2, 517:5
**accurately** [1] - 363:21
**achieved** [1] - 336:19
**acres** [1] - 349:3
**acted** [1] - 345:22
**acting** [1] - 351:6
**Action** [1] - 307:3
**action** [1] - 409:2
**actions** [5] - 314:2,
336:19, 345:9,
436:19, 503:23
**activities** [3] - 338:4,
352:16, 437:24
**activity** [2] - 369:14,
490:17

**actors** [1] - 343:15
**actual** [1] - 461:24
**add** [1] - 446:4
**addition** [6] - 347:19,
358:16, 370:9,
372:4, 382:9, 382:14
**additional** [4] - 350:3,
435:19, 467:3,
487:15
**address** [4] - 320:20,
461:24, 499:22,
499:23
**addressed** [1] - 344:3
**addresses** [3] - 500:7,
500:11, 500:13
**adept** [1] - 338:17
**adjacent** [2] - 354:3,
368:22
**adjourned** [1] - 378:18
**adjustments** [1] -
358:17
**administration** [1] -
359:23
**administrative** [2] -
431:12, 468:2
**admissible** [1] - 502:6
**admission** [1] - 386:9
**admit** [2] - 505:18,
508:5
**admitted** [13] - 326:25,
432:10, 440:11,
443:22, 450:5,
490:5, 491:6,
496:12, 498:6,
499:5, 502:11,
509:14, 510:23
**adopt** [1] - 314:12
**advance** [9] - 323:17,
384:1, 461:2,
461:18, 461:19,
462:15, 463:18,
463:24
**advancing** [4] - 331:4,
440:2, 440:6, 442:12
**advisor** [1] - 508:1
**Advisor** [1] - 315:8
**Affairs** [1] - 490:19
**affirmatively** [1] -
311:4
**afternoon** [15] -
328:19, 417:8,
417:9, 429:15,
429:16, 452:8,
452:9, 460:4, 460:5,
481:20, 481:21,
489:1, 492:9,
492:10, 496:10
**afterwards** [1] - 311:7
**agency** [3] - 348:12,
394:19, 462:14

**Agent** [18] - 454:25,
459:10, 459:20,
460:4, 464:16,
468:24, 478:8,
478:18, 481:20,
487:10, 489:19,
490:1, 496:15,
501:15, 504:7,
506:3, 507:14,
515:17
**AGENT** [4] - 308:8,
308:10, 460:1, 492:6
**agent** [11] - 460:9,
460:12, 460:14,
460:23, 461:8,
463:5, 463:23,
478:2, 487:22,
488:15, 492:15
**agents** [6] - 474:2,
474:13, 477:8,
477:23, 483:19,
495:6
**agents'** [1] - 477:22
**agitated** [1] - 445:3
**agree** [3] - 421:15,
422:9, 425:12
**agreed** [1] - 310:15
**agreement** [1] - 348:1
**ahead** [14] - 344:22,
350:19, 385:3,
385:13, 387:19,
388:14, 390:14,
392:12, 393:13,
393:20, 396:16,
411:5, 501:14,
501:23
**aid** [1] - 435:17
**aim** [1] - 489:16
**ain't** [1] - 337:7
**air** [8] - 332:11, 407:5,
433:6, 451:24,
452:24, 452:25,
453:2, 486:23
**alarm** [7] - 332:20,
353:13, 359:25,
393:3, 393:4, 393:6,
397:7, 402:1, 402:6
**alarms** [1] - 402:3
**alcove** [3] - 409:21,
412:20, 413:17
**Alcove** [1] - 392:8
**all-hands-on-deck** [1]
- 436:23
**alleged** [1] - 324:7
**allegedly** [1] - 425:5
**alleging** [1] - 417:22
**allow** [6] - 319:2,
383:21, 427:22,
428:1, 465:9, 503:24
**allowed** [4] - 331:8,

520

349:1, 368:22, 386:9
**alluded** [1] - 337:12
**almost** [3] - 356:1,
447:22, 481:6
**alongside** [1] - 483:10
**altered** [4] - 383:12,
490:23, 491:13,
491:23
**alternate** [4] - 323:20,
323:25, 324:1, 368:9
**alternates** [1] - 323:23
**Amendment** [5] -
318:23, 369:3,
369:13, 380:16,
436:10
**America** [2] - 309:4,
337:5
**AMERICA** [1] - 307:2
**American** [3] - 330:3,
413:3, 416:4
**Americans** [1] -
507:19
**ammunition** [3] -
438:18, 477:20,
477:25
**amount** [1] - 408:6
**angle** [2] - 415:8,
445:10
**angry** [1] - 329:20
**animated** [1] - 503:23
**annoying** [1] - 393:7
**answer** [6] - 327:23,
327:24, 327:25,
328:1, 328:4, 328:5
**anticipate** [2] - 320:5,
320:7
**anticipated** [1] -
357:22
**anticipating** [2] -
367:22, 368:19
**anticipation** [1] -
389:1
**apart** [2] - 312:22,
497:21
**apologize** [4] - 384:10,
452:15, 454:7,
478:15
**apology** [1] - 323:17
**appear** [7] - 411:15,
440:13, 443:9,
511:3, 511:9, 512:1,
512:15
**appearance** [1] -
391:19
**APPEARANCES** [1] -
307:10
**appeared** [1] - 513:19
**applies** [1] - 324:10
**apply** [1] - 495:23
**appointment** [3] -

360:14, 360:24,
360:25
**appointment's** [2] -
360:9, 360:10
**appreciate** [3] - 319:6,
321:8, 468:18
**apprehend** [1] - 438:3
**approach** [2] - 386:17,
447:11
**approached** [2] -
332:17, 332:19
**approaching** [5] -
375:15, 473:10,
485:2, 485:4, 485:5
**appropriate** [1] -
348:25
**approve** [1] - 495:24
**approximate** [1] -
421:17
**apps** [4] - 495:15,
495:17, 497:7
**arching** [1] - 495:5
**archway** [3] - 479:4,
485:25, 486:8
**ARCO** [81] - 307:14,
310:19, 310:22,
311:3, 312:14,
313:2, 313:24,
314:10, 329:11,
329:14, 329:18,
335:23, 427:4,
429:14, 432:11,
432:15, 433:25,
439:2, 440:8,
440:17, 440:25,
442:23, 443:13,
443:21, 444:22,
445:13, 447:18,
448:19, 448:23,
448:25, 449:15,
449:18, 449:25,
450:3, 452:5, 458:9,
459:4, 488:22,
489:25, 490:4,
491:3, 492:8,
496:13, 497:10,
497:19, 498:4,
499:1, 499:4, 499:7,
499:16, 500:18,
501:9, 501:20,
502:9, 503:11,
503:18, 504:2,
504:6, 504:10,
504:25, 505:17,
506:2, 506:7, 507:1,
507:12, 507:22,
508:4, 508:8,
508:12, 508:20,
509:19, 510:10,
510:22, 511:7,

511:19, 512:6,
513:3, 514:17,
514:20, 514:23,
516:16
**Arco** [8] - 310:18,
312:24, 329:9,
338:10, 429:8,
489:24, 503:10,
514:21
**Arco's** [1] - 456:4
**Arco)......................**
**............429** [1] -
308:6
**Arco)......................**
**............458** [1] -
308:7
**arco)......................**
**............492** [1] -
308:11
**area** [47] - 311:7,
312:17, 313:5,
331:12, 332:5,
333:6, 342:22,
350:2, 350:8,
350:10, 352:18,
354:16, 354:19,
357:10, 358:6,
362:12, 366:10,
374:14, 376:21,
376:23, 377:4,
377:9, 377:22,
377:25, 392:9,
406:3, 413:16,
413:18, 415:7,
425:10, 438:24,
440:21, 444:19,
446:4, 447:3,
453:22, 456:25,
464:3, 465:5,
465:20, 467:11,
473:5, 482:23,
497:2, 497:3,
508:24, 510:24
**Area** [7] - 331:15,
332:6, 350:6, 372:6,
373:3, 373:9, 373:11
**areas** [6] - 330:20,
349:25, 371:7,
376:6, 431:17, 437:1
**argue** [2] - 313:8,
313:9
**arguing** [1] - 312:20
**argument** [2] - 327:5,
426:6
**arguments** [2] -
309:24, 326:5,
326:6, 327:3, 327:6
**arising** [1] - 324:7
**Arizona** [4] - 472:16,
484:10, 507:4, 507:8

**arm** [2] - 395:10,
404:14
**arms** [1] - 470:6
**arose** [1] - 467:9
**arrangements** [2] -
370:11, 370:23
**arrest** [7] - 367:2,
416:14, 416:20,
438:3, 438:10,
494:13, 494:20
**arrested** [3] - 438:14,
494:16, 514:8
**arrests** [2] - 369:13,
416:24
**arrival** [6] - 468:3,
468:5, 468:6,
469:23, 470:25,
471:3
**arrive** [3] - 412:21,
414:4, 470:1
**arrived** [4] - 340:3,
340:4, 400:7, 484:4
**arriving** [2] - 332:2,
341:22
**arrow** [11] - 364:2,
364:17, 364:19,
364:21, 365:8,
367:15, 411:15,
411:17, 411:21,
440:16, 448:25
**art** [1] - 412:11
**article** [2] - 507:4,
507:25
**as..** [1] - 425:15
**ascend** [1] - 334:20
**Ashley** [2] - 498:24,
499:21
**Ashli** [4] - 311:9,
311:19, 312:16,
312:17
**aside** [2] - 335:12,
515:14
**assaulted** [1] - 329:20
**assess** [1] - 386:13
**assessing** [1] - 386:15
**assigned** [4] - 351:6,
380:2, 430:23,
433:15
**assignment** [3] -
430:22, 430:25,
431:21
**assist** [5] - 389:14,
389:15, 389:16,
401:10, 487:16
**assistance** [4] - 402:6,
432:21, 433:10,
435:20
**assisting** [2] - 348:18,
437:5
**associated** [4] - 498:8,

499:13, 499:22,
501:3
**associating** [1] -
494:12
**assume** [1] - 324:3
**AT** [1] - 510:5
**attached** [4] - 374:15,
392:18, 393:3,
395:5, 503:17
**attempt** [1] - 440:5
**attempting** [5] - 333:8,
440:1, 441:14,
442:10, 450:13
**attend** [1] - 318:25
**attending** [3] - 331:24,
435:19, 461:23
**attention** [4] - 317:23,
324:2, 329:8, 430:14
**attorney** [2] - 417:11,
508:1
**Attorney** [2] - 338:20,
338:21, 423:11
**Attorneys** [1] - 483:19
**attorneys** [1] - 514:9
**audio** [3] - 384:2,
400:19, 478:14
**authentic** [4] - 383:13,
490:24, 491:14,
491:24
**authenticity** [1] -
310:16
**author** [5] - 505:12,
505:14, 506:14,
507:23, 509:21
**authority** [1] - 333:1
**authorized** [4] -
348:25, 445:23,
465:9, 465:11
**available** [2] - 388:24,
473:6
**Ave** [5] - 340:9,
340:11, 340:12,
340:15, 362:24
**Avenue** [11] - 307:15,
307:24, 349:21,
356:21, 362:19,
362:22, 375:8,
375:13, 375:15,
382:7, 517:12
**avenues** [2] - 365:23,
370:25
**avoiding** [1] - 350:17
**aware** [14] - 315:2,
316:2, 363:24,
370:24, 379:22,
380:1, 380:18,
389:4, 454:23,
458:3, 513:9

# B

**Babbitt** [5] - 310:25, 311:9, 311:20, 312:16, 312:17
**background** [6] - 316:19, 316:22, 386:1, 386:10, 390:21, 493:11
**backing** [1] - 420:20
**bad** [2] - 343:15, 420:15
**badge** [1] - 360:11
**ballpark** [4] - 395:19, 400:16, 401:8, 480:18
**balls** [3] - 433:7, 433:20, 447:4
**bandana** [1] - 336:8
**banged** [1] - 336:1
**banging** [1] - 392:15
**bar** [2] - 309:17, 392:22
**barely** [1] - 459:18
**barking** [2] - 341:1, 342:11
**barricade** [5] - 332:14, 357:12, 375:2, 375:5, 403:14
**barricades** [5] - 329:20, 331:12, 331:17, 331:19, 363:8
**barrier** [1] - 372:21
**barriers** [5] - 331:9, 348:24, 349:20, 350:3, 358:4
**based** [13] - 323:21, 323:22, 353:18, 397:4, 436:3, 436:6, 437:3, 443:8, 499:25, 507:23, 510:12, 513:19, 514:10
**basement** [1] - 366:16
**basic** [2] - 419:15, 430:1
**bathroom** [2] - 329:16, 409:21
**baton** [1] - 395:2
**bear** [4] - 401:16, 417:18, 418:4, 454:5
**bearing** [3] - 498:17, 498:20, 498:23
**became** [1] - 458:14
**become** [8] - 378:23, 379:5, 380:1, 382:18, 401:21, 401:25, 446:3, 493:2
**becoming** [2] - 445:2,

447:24
**bedrock** [1] - 329:25
**beeping** [1] - 332:20
**BEFORE** [1] - 307:9
**began** [7] - 324:5, 340:8, 378:12, 378:13, 379:17, 423:10, 472:19
**begin** [8] - 326:10, 328:9, 347:3, 347:20, 378:15, 430:1, 434:12
**beginning** [6] - 326:2, 390:5, 440:18, 450:6, 491:1, 507:15
**behind** [14] - 316:19, 335:7, 374:16, 374:20, 375:12, 376:21, 380:19, 387:11, 420:10, 438:19, 444:14, 487:21, 502:7, 504:5
**believability** [1] - 327:20
**below** [5] - 362:21, 412:6, 412:9, 435:1, 452:23
**belt** [2] - 394:23, 395:5
**bench** [2] - 502:22, 504:1
**best** [5] - 361:2, 361:15, 381:20, 467:10, 517:6
**better** [7] - 337:4, 343:4, 345:9, 421:4, 444:2, 447:12, 453:18
**between** [18] - 335:23, 335:24, 349:24, 350:1, 357:11, 386:2, 406:15, 413:6, 435:24, 441:12, 471:9, 481:4, 481:6, 488:11, 500:11, 506:22, 513:10, 514:14
**bevy** [1] - 401:20
**beyond** [8] - 317:4, 318:4, 324:18, 324:20, 325:8, 325:11, 325:14, 337:10
**bias** [1] - 314:15
**big** [5] - 333:9, 372:20, 388:25, 412:11, 420:4
**bigger** [1] - 344:13
**bike** [43] - 331:12, 332:14, 341:18,

341:21, 343:9, 349:20, 358:4, 363:6, 363:7, 371:20, 371:25, 372:6, 374:14, 374:15, 374:17, 374:20, 374:24, 375:2, 375:5, 375:21, 375:23, 375:24, 375:25, 376:5, 376:24, 386:2, 388:13, 401:17, 422:15, 422:18, 422:24, 426:12, 465:18, 482:16, 482:20, 482:22, 483:7, 483:9, 483:10, 483:11, 483:23, 484:1
**bike-rack** [4] - 374:17, 375:2, 375:5, 386:2
**billy** [1] - 454:15
**bit** [14] - 345:19, 357:5, 403:22, 412:25, 413:22, 417:20, 420:20, 422:21, 425:4, 447:9, 452:14, 454:24, 470:15, 495:12
**bite** [3] - 340:25, 341:1, 342:11
**black** [5] - 315:6, 315:7, 388:9, 396:20, 413:5
**black-and-yellow** [2] - 315:6, 315:7
**blaring** [1] - 332:20
**blast** [1] - 384:4
**blasts** [1] - 478:15
**bleeds** [1] - 314:19
**blind** [2] - 434:21, 494:14
**blindly** [1] - 495:22
**block** [1] - 333:8
**blocks** [3] - 356:6, 356:12, 356:17
**blogging** [1] - 328:12
**blow** [2] - 504:11, 509:19
**blowback** [1] - 435:4
**blowing** [1] - 344:20
**blown** [1] - 453:5
**blue** [1] - 411:4
**blueprint** [1] - 439:5
**blurry** [2] - 404:15, 410:20
**Board** [1] - 350:7
**bodily** [1] - 445:24

**Body** [1] - 506:10
**body** [5] - 458:16, 500:24, 508:16, 509:25, 510:2
**bodyguards** [1] - 461:6
**boss** [2] - 353:7, 353:10
**botched** [2] - 330:11, 510:7
**bottom** [16] - 354:13, 355:4, 364:18, 372:25, 387:24, 406:4, 413:2, 416:2, 439:19, 475:19, 500:9, 504:11, 508:21, 508:22, 512:9
**box** [2] - 362:8, 402:4
**boyfriend** [4] - 320:6, 320:8, 320:11
**Boys** [10] - 315:5, 316:11, 316:21, 317:2, 317:8, 317:12, 317:22, 318:8, 318:13
**bracketed** [1] - 508:24
**brain** [1] - 441:24
**brake** [3] - 438:20, 454:6, 454:7
**branch** [1] - 348:12
**breach** [16] - 364:8, 365:24, 367:3, 367:7, 375:2, 375:22, 382:8, 387:17, 390:12, 397:1, 405:2, 405:6, 406:10, 421:15, 425:16, 426:1
**breached** [22] - 330:25, 338:1, 343:22, 343:23, 365:6, 366:1, 366:4, 375:18, 387:1, 389:23, 390:24, 391:14, 397:21, 406:25, 407:21, 422:10, 422:15, 422:22, 424:15, 424:22, 425:17
**breaches** [1] - 401:5
**breaching** [1] - 374:2
**Break** [1] - 336:15
**break** [16] - 329:16, 330:24, 336:2, 369:16, 369:19, 370:19, 390:23, 427:7, 427:10, 427:13, 428:2, 488:23, 489:1,

489:13, 515:1, 516:7
**breakdowns** [2] - 409:5, 409:6
**breaking** [2] - 313:20, 424:4
**breaks** [1] - 445:18
**brief** [7] - 314:21, 324:11, 326:13, 326:18, 327:5, 463:23, 488:22
**briefing** [1] - 467:23
**briefly** [1] - 410:2
**bring** [1] - 318:12, 318:17, 325:3, 433:10, 444:1, 473:14, 475:24, 475:25, 476:18, 477:1, 502:10
**broad** [2] - 349:11, 495:21
**broadcast** [1] - 490:18
**broader** [1] - 331:21
**broke** [7] - 333:15, 334:13, 335:19, 370:6, 370:18, 408:22, 408:24
**broken** [4] - 332:23, 370:18, 393:18, 396:13
**Brooke** [4] - 427:5, 429:8, 429:19
**BROOKE** [3] - 308:5, 429:12, 429:19
**brought** [1] - 475:16
**brutal** [2] - 366:19, 366:20
**build** [1] - 357:18
**Building** [4] - 431:9, 431:10, 462:8
**building** [82] - 313:9, 313:10, 324:12, 324:13, 324:14, 324:15, 330:17, 330:20, 331:1, 332:18, 348:10, 348:17, 349:2, 349:4, 349:14, 354:24, 354:25, 355:4, 355:10, 358:22, 359:12, 363:19, 363:20, 364:8, 365:23, 366:18, 367:6, 371:1, 375:11, 376:6, 378:16, 379:16, 379:21, 379:23, 383:1, 389:23, 391:24, 392:22, 392:24, 403:19, 407:1,

409:17, 409:18,
409:24, 412:6,
413:14, 416:22,
419:5, 430:25,
431:7, 431:8,
431:19, 432:3,
433:4, 433:9,
435:18, 437:7,
437:8, 437:10,
438:3, 439:5,
439:10, 440:3,
440:20, 442:13,
451:16, 452:17,
453:13, 462:18,
467:13, 475:13,
476:6, 485:21,
486:1, 486:3,
486:15, 486:19,
487:14, 487:17,
487:18, 491:12,
491:22
**buildings** [10] -
381:12, 431:1,
431:5, 431:11,
431:13, 431:22,
437:12, 462:5,
462:11
**bullet** [2] - 461:9,
469:18
**bunch** [1] - 405:25
**burden** [1] - 325:12
**bureau** [1] - 351:7
**business** [3] - 315:23,
336:24, 360:8
**but..** [1] - 483:4
**button** [1] - 448:23
**BY** [14] - 350:23,
370:5, 379:14,
384:17, 417:7,
429:14, 452:7,
458:9, 460:3,
481:19, 487:9,
492:8, 499:1, 499:7

**C**

**C-SPAN** [1] - 403:2
**C-SPAN** [1] - 490:19
**Cable** [1] - 490:19
**Cable-Satellite** [1] -
490:19
**cache** [1] - 477:25
**callout** [3] - 362:8,
507:22, 511:7
**camera** [2] - 391:2,
415:1
**cameras** [8] - 309:18,
353:2, 365:13,
381:13, 381:14,
383:5, 438:7, 490:16

**campaign** [1] - 508:1
**campus** [3] - 430:24,
431:15, 462:11
**Candace** [2] - 339:18,
341:4
**candidate** [1] - 330:12
**canisters** [2] - 433:20,
434:25
**Cannon** [1] - 431:9
**cannot** [1] - 420:23
**cans** [1] - 395:21
**capital** [1] - 331:15
**Capitol** [247] - 309:18,
313:7, 324:8,
324:14, 324:15,
329:19, 330:9,
330:17, 330:18,
330:20, 331:1,
331:2, 331:8,
331:10, 332:1,
332:2, 332:10,
332:15, 332:18,
333:6, 333:7,
333:13, 334:6,
334:17, 334:24,
335:6, 336:17,
337:2, 337:5,
337:22, 338:1,
340:13, 340:25,
341:2, 341:3, 341:8,
341:9, 341:12,
341:13, 341:17,
341:23, 342:12,
342:17, 343:20,
343:21, 344:12,
344:17, 345:25,
346:6, 348:9,
348:10, 348:17,
348:21, 348:23,
349:1, 349:2, 349:6,
349:8, 349:9,
349:13, 349:19,
349:21, 349:22,
349:23, 349:24,
349:25, 350:7,
351:3, 351:4,
351:20, 352:11,
352:16, 354:2,
354:8, 354:22,
355:12, 356:14,
356:25, 357:8,
357:10, 358:17,
358:19, 358:21,
359:2, 359:11,
359:19, 360:4,
362:17, 362:24,
363:17, 363:24,
365:10, 365:13,
366:1, 366:16,
368:4, 369:4, 370:7,

370:12, 370:21,
371:5, 371:21,
373:17, 373:18,
373:20, 374:10,
375:11, 378:4,
378:7, 378:16,
379:15, 379:16,
379:21, 379:23,
381:7, 381:11,
381:12, 382:19,
382:23, 383:1,
383:10, 385:2,
385:23, 385:24,
387:9, 388:5, 388:8,
388:11, 388:18,
388:19, 389:3,
389:5, 389:18,
389:21, 390:12,
391:22, 394:20,
394:25, 396:23,
397:16, 398:13,
399:10, 400:1,
400:12, 400:14,
401:23, 402:12,
402:15, 402:18,
405:17, 408:13,
409:11, 409:13,
413:14, 416:11,
416:13, 417:13,
418:19, 419:1,
419:5, 419:9,
419:16, 420:1,
423:2, 429:22,
429:23, 430:3,
430:7, 430:15,
430:24, 430:25,
431:6, 431:8,
431:14, 431:15,
432:3, 432:5,
433:14, 435:22,
437:8, 437:15,
438:24, 439:5,
439:9, 439:16,
440:20, 441:8,
451:20, 453:20,
462:20, 462:24,
463:13, 463:16,
463:20, 463:21,
463:22, 464:24,
464:25, 465:8,
465:9, 466:8, 467:9,
467:14, 467:18,
468:8, 469:8,
469:24, 470:10,
470:11, 472:20,
472:22, 473:11,
473:17, 474:7,
476:22, 480:11,
480:22, 481:2,
481:5, 482:2, 482:3,
482:7, 482:11,

482:12, 482:15,
482:23, 483:1,
484:2, 484:4, 484:7,
484:25, 485:2,
487:24, 491:11,
491:22, 493:9,
496:7, 496:17,
496:20
**Capitol's** [2] - 359:4,
398:1
**captain** [10] - 351:6,
351:15, 351:23,
351:24, 351:25,
352:3, 352:5,
352:13, 418:18,
444:15
**CAPTAIN** [2] - 308:3,
350:21
**Captain** [11] - 346:17,
350:24, 351:2,
351:4, 364:17,
370:6, 371:13,
376:18, 379:15,
384:18, 416:7
**captains** [1] - 351:16
**capture** [1] - 479:1
**captured** [3] - 383:3,
400:25, 450:16
**captures** [3] - 382:25,
450:13, 478:24
**car** [1] - 339:5
**cardiac** [1] - 367:2
**care** [6] - 309:10,
309:14, 319:15,
353:1, 353:6, 488:21
**career** [3] - 451:20,
461:15, 481:10
**careful** [1] - 455:10
**carriage** [6] - 468:7,
470:1, 470:21,
472:7, 473:1, 483:6
**carry** [3] - 329:24,
395:21, 477:12
**cars** [1] - 473:14
**case** [61] - 311:4,
318:20, 319:7,
319:11, 320:16,
321:5, 323:5, 324:2,
324:10, 325:2,
325:3, 326:2, 326:9,
326:11, 326:14,
326:15, 326:16,
326:20, 327:17,
327:18, 328:5,
328:8, 328:10,
328:14, 331:22,
337:14, 346:9,
348:2, 348:3,
350:16, 368:18,
369:2, 369:21,

369:22, 405:6,
427:1, 427:16,
427:17, 444:24,
449:12, 455:1,
459:7, 459:8,
488:19, 489:3,
489:4, 492:25,
493:2, 494:15,
495:9, 502:6, 515:3,
515:4, 515:17,
515:18, 515:22,
515:23, 515:24
**Case** [1] - 309:3
**case-in** [1] - 515:18
**case-in-chief** [3] -
326:11, 326:15,
515:17
**cases** [5] - 314:13,
492:18, 492:21,
492:24, 493:25
**category** [2] - 491:10,
491:20
**Caucasian** [1] -
514:16
**caucus** [2] - 330:10,
510:7
**caused** [1] - 447:3
**CCTV** [2] - 381:8,
381:10
**CDC** [1] - 359:1
**ceiling** [1] - 420:6
**cell** [7] - 450:12,
494:17, 495:14,
495:15, 495:19,
497:1, 501:3
**cellular** [1] - 498:7
**Center** [6] - 349:6,
349:17, 359:4,
359:19, 360:5,
360:23
**center** [33] - 352:14,
352:15, 353:15,
353:19, 353:22,
353:24, 354:12,
355:8, 355:10,
364:18, 367:8,
367:12, 367:15,
368:8, 368:9, 375:5,
381:15, 381:16,
387:12, 387:15,
388:1, 388:4,
393:22, 396:1,
403:6, 404:13,
412:6, 413:2, 439:9
**ceremony** [1] - 357:17
**certain** [5] - 348:1,
352:21, 382:7,
389:15, 499:3
**certainly** [8] - 343:13,
345:11, 417:22,

423:14, 453:7, 454:10, 473:13, 481:23
**CERTIFICATE** [1] - 517:1
**certification** [8] - 316:1, 316:3, 336:21, 379:12, 379:18, 466:15, 472:16, 481:1
**certified** [1] - 336:23
**certify** [7] - 329:23, 337:22, 368:2, 378:7, 463:2, 463:4, 517:4
**certifying** [1] - 463:8
**cetera** [2] - 434:25, 436:4
**chain** [1] - 438:12
**chairs** [1] - 403:4
**Chamber** [25] - 334:4, 334:25, 335:13, 335:19, 335:24, 355:2, 355:7, 378:22, 403:1, 403:3, 403:18, 404:4, 405:15, 414:6, 414:10, 414:18, 415:6, 415:13, 470:18, 470:23, 471:4, 471:5, 473:20, 473:25, 486:11
**chamber** [5] - 335:2, 378:15, 379:1, 379:4, 379:7
**chambers** [2] - 378:7, 378:19
**Chambers** [1] - 471:10
**chance** [1] - 482:8
**change** [1] - 407:18
**changed** [1] - 391:19
**changes** [1] - 370:21
**chant** [1] - 457:18
**chaos** [5] - 332:12, 332:16, 332:24, 338:3, 402:10
**chaotic** [1] - 401:2
**characterize** [2] - 406:14, 406:19
**charge** [10] - 315:15, 315:20, 324:24, 351:17, 352:24, 460:25, 462:17, 515:14, 516:5, 516:8
**charged** [8] - 313:2, 315:15, 324:19, 324:21, 337:11, 337:16, 402:13, 503:8

**charges** [6] - 313:3, 324:6, 324:11, 325:8, 337:16, 338:8
**charging** [1] - 325:2
**Charlotte** [3] - 469:11, 469:13, 479:24
**check** [4] - 359:23, 360:20, 376:12, 386:18
**checked** [2] - 339:13
**checking** [1] - 409:21
**checkpoint** [1] - 482:15
**checkpoints** [1] - 465:19
**checks** [1] - 361:16
**Cheltenham** [1] - 430:3
**chemical** [1] - 332:11
**chief** [4] - 326:11, 326:15, 515:17, 515:19
**chiefs** [1] - 352:19
**Chiguer** [24] - 312:2, 312:5, 316:12, 316:23, 339:6, 339:7, 339:8, 339:21, 342:19, 342:22, 342:25, 343:4, 343:6, 343:19, 344:1, 344:9, 344:12, 344:21, 511:11, 515:15, 515:21
**Chiguer's** [1] - 511:12
**children** [1] - 343:1
**choose** [3] - 326:19, 329:5, 361:6
**CHRISTOPHER** [1] - 307:9
**circle** [12] - 336:16, 357:11, 362:18, 362:20, 362:21, 364:13, 366:8, 385:10, 441:5, 443:1, 446:14, 448:2
**Circle** [6] - 362:20, 363:3, 385:7, 385:8, 385:19, 387:13
**circled** [1] - 333:17, 335:21, 354:23, 355:9, 357:10, 362:11, 374:16, 377:3, 377:11, 392:7
**circles** [1] - 377:2
**circling** [4] - 354:16, 354:20, 355:3, 501:3
**circuit** [3] - 380:9, 381:11, 382:24
**city** [2] - 353:21,

461:20
**civil** [8] - 368:6, 368:12, 368:13, 368:17, 368:19, 369:1, 398:17, 408:16
**clarify** [1] - 311:19
**clear** [29] - 312:14, 322:9, 332:24, 335:8, 336:12, 337:1, 348:5, 360:13, 398:24, 409:13, 438:1, 440:16, 441:15, 442:25, 444:11, 446:16, 448:4, 475:6, 475:8, 475:9, 475:14, 475:24, 475:25, 476:2, 476:9, 476:13, 476:17, 500:13
**Clear** [1] - 448:23
**cleared** [4] - 336:24, 360:11, 487:14, 487:17
**clearing** [1] - 487:16
**clearly** [1] - 331:13
**click** [1] - 510:5
**climb** [2] - 376:6, 391:4
**climbed** [2] - 332:3, 342:20
**climbing** [1] - 332:22
**climbs** [2] - 342:13, 343:3
**clip** [10] - 314:21, 316:19, 335:20, 444:3, 444:23, 445:1, 447:17, 448:19, 449:15, 449:25
**clips** [4] - 410:2, 477:14, 477:16, 478:3
**close** [13] - 329:8, 342:18, 356:2, 356:11, 357:21, 357:24, 358:1, 359:1, 371:21, 405:12, 434:13, 442:6, 476:6
**closed** [14] - 349:19, 358:19, 358:21, 358:24, 359:3, 371:7, 374:14, 377:4, 380:9, 381:11, 382:24, 465:13, 495:19, 506:20
**Closed** [7] - 331:15,

332:6, 350:6, 372:7, 373:3, 373:9, 373:11
**closed-circuit** [3] - 380:9, 381:11, 382:24
**closer** [1] - 450:11
**closest** [2] - 459:16, 461:13
**closing** [6] - 327:3, 327:6, 327:9, 358:3, 376:25, 515:13
**clothing** [3] - 315:7, 459:2, 479:20
**clouds** [1] - 407:5
**club** [1] - 454:15
**co** [4] - 338:6, 466:10, 493:15, 494:4
**co-counsel** [1] - 338:6
**co-defendant** [1] - 493:15
**co-defendants** [1] - 494:4
**co-workers** [1] - 466:10
**Coast** [1] - 492:22
**Code** [1] - 348:14
**collapses** [1] - 447:21
**colleagues** [6] - 333:21, 333:23, 437:5, 443:9, 449:20, 450:21
**collective** [1] - 427:23
**College** [5] - 330:11, 368:2, 378:8, 379:13, 510:8
**COLUMBIA** [1] - 307:1
**column** [2] - 469:25, 470:25
**coming** [20] - 345:17, 360:16, 361:12, 368:6, 370:20, 370:25, 381:23, 382:6, 398:14, 399:11, 429:24, 432:6, 432:8, 442:1, 464:3, 472:20, 472:21, 473:4, 484:25, 485:16
**command** [13] - 351:18, 352:14, 352:15, 352:20, 352:23, 353:15, 353:19, 353:22, 368:8, 368:9, 381:15, 381:16
**commanded** [1] - 334:11
**commander** [3] - 351:7, 352:14, 409:1
**commanders** [1] -

352:4
**commands** [1] - 436:16
**comment** [10] - 500:21, 504:11, 504:12, 504:17, 505:3, 508:13, 508:17, 509:8, 509:20, 510:1
**comments** [1] - 500:23
**committed** [2] - 324:18, 337:10
**common** [1] - 359:8
**commonly** [1] - 398:19
**communicate** [1] - 382:5
**communicated** [1] - 475:21
**communicating** [2] - 320:10, 382:1
**communication** [4] - 474:13, 493:3, 493:7, 496:2
**communications** [13] - 353:9, 353:11, 353:17, 353:18, 353:20, 353:24, 368:8, 380:2, 381:16, 402:1, 402:9, 474:21
**community** [2] - 500:3, 506:20
**companions** [9] - 332:1, 332:9, 332:17, 333:5, 334:5, 334:22, 335:4, 336:5, 336:11
**compared** [2] - 352:2, 493:25
**complete** [1] - 517:6
**completed** [2] - 379:12, 467:21
**completely** [1] - 467:13
**completing** [1] - 467:20
**Complex** [5] - 431:14, 462:3, 462:4, 463:13, 464:25
**complex** [1] - 469:9
**compliant** [1] - 436:11
**complies** [11] - 364:4, 364:15, 372:15, 439:8, 441:6, 444:10, 446:15, 446:17, 448:3, 448:5, 449:1
**compressed** [2] -

405:25, 425:24
**compression** [1] -
425:23
**comprised** [1] -
371:24
**compromise** [1] -
467:7
**compromising** [1] -
467:17
**concern** [2] - 319:25,
342:25
**concerning** [1] -
312:22
**concluded** [1] -
516:18
**concrete** [2] - 349:10,
349:17
**concussions** [1] -
401:20
**conduct** [23] - 312:22,
313:3, 313:11,
313:12, 314:4,
314:8, 314:19,
315:10, 315:18,
315:22, 324:8,
324:13, 324:14,
337:19, 342:9,
343:12, 344:25,
346:5, 386:11,
386:13, 386:15,
466:11
**conduct-of-others** [2]
- 314:19, 315:10
**conference** [6] -
336:6, 336:10,
502:22, 504:1,
515:14, 516:9
**confiscated** [1] -
454:1
**Congress** [23] -
329:21, 329:23,
331:2, 335:1,
335:25, 336:20,
336:22, 337:22,
361:5, 361:7, 361:9,
368:1, 370:9,
370:16, 378:4,
379:18, 381:3,
402:14, 402:19,
409:14, 462:13,
510:6
**CONGRESS** [1] -
510:5
**Congress's** [2] -
315:25, 379:11
**congressional** [2] -
431:1, 431:5
**congresspeople** [2] -
401:22, 403:18
**congressperson** [1] -

361:2
**conjunction** [1] -
462:18
**connect** [3] - 473:7,
476:20, 500:14
**connected** [3] - 433:4,
498:2, 500:14
**connecting** [2] -
414:5, 497:8
**connection** [1] -
512:22
**connects** [1] - 343:18
**consider** [8] - 328:5,
348:2, 350:15,
386:14, 398:1,
402:18, 436:9,
475:14
**considered** [5] -
445:21, 481:9,
482:23, 487:24,
488:7
**considering** [2] -
447:10, 448:9
**consist** [2] - 465:17,
466:12
**consisted** [1] - 466:13
**consistent** [2] - 393:7,
409:4
**constitutes** [1] - 517:4
**Constitution** [3] -
307:24, 349:21,
517:12
**construct** [1] - 357:16
**construction** [8] -
350:4, 357:19,
357:21, 358:5,
358:7, 358:16,
376:25, 377:14
**consult** [1] - 516:2
**contact** [1] - 452:13
**contacted** [1] - 493:13
**contain** [2] - 330:19,
354:25
**contained** [4] -
383:13, 406:19,
406:24, 490:20
**contains** [3] - 355:1,
355:6, 395:16
**contemporaneously**
[1] - 490:12
**content** [3] - 317:11,
511:4, 515:23
**contention** [1] - 312:4
**contents** [1] - 492:2
**contesting** [1] -
509:11
**context** [2] - 331:21,
386:10
**contingency** [1] -
466:21

**continue** [13] - 395:7,
397:12, 397:19,
398:21, 399:2,
399:23, 405:13,
409:8, 434:5,
447:17, 448:19,
463:10, 504:25
**continued** [3] -
379:11, 481:1,
503:18
**continuous** [2] -
371:23, 371:24
**contrary** [2] - 328:22,
340:9
**contributed** [2] -
330:22, 335:16
**control** [7] - 329:5,
399:5, 409:11,
416:21, 416:22,
436:16, 464:3
**controlled** [1] - 383:3
**convened** [1] - 378:4
**conversation** [2] -
456:10, 503:6
**convince** [1] - 335:11
**convinced** [1] - 324:17
**COOPER** [1] - 307:9
**coordinate** [1] -
403:25
**Coordinated** [1] -
501:13
**coordinated** [1] -
408:12
**coordination** [2] -
351:7, 463:23
**copies** [1] - 492:2
**cord** [1] - 478:14
**cordoned** [2] - 332:5,
350:10
**cords** [1] - 464:13
**corner** [3] - 362:16,
377:24, 443:6
**correct** [38] - 310:11,
310:19, 310:22,
326:4, 354:14,
354:15, 404:5,
406:25, 421:10,
425:14, 425:21,
426:2, 426:3,
448:11, 452:18,
453:24, 456:18,
456:22, 456:24,
457:16, 470:24,
478:4, 481:25,
482:1, 482:3,
482:19, 484:5,
484:7, 484:13,
485:7, 485:9,
485:13, 485:18,
485:19, 486:24,

487:2, 487:5, 500:16
**correctly** [2] - 311:23,
503:5
**corridor** [2] - 414:5,
421:4
**corrupt** [1] - 505:7
**coughing** [1] - 434:13
**counsel** [10] - 320:15,
320:20, 321:1,
338:6, 384:8, 386:5,
427:7, 464:10,
464:13, 515:24
**Counsel** [2] - 347:16,
502:18
**counsel's** [5] - 384:14,
432:12, 443:24,
496:13, 499:6
**count** [2] - 378:8,
507:20
**countdown** [1] -
392:23
**counterpart** [1] -
466:11
**country** [3] - 330:14,
330:16, 337:8
**couple** [12] - 316:8,
337:25, 338:11,
339:15, 356:6,
360:7, 368:21,
410:24, 417:12,
421:12, 427:11,
452:10
**course** [16] - 314:10,
338:16, 338:23,
339:17, 343:12,
344:11, 345:8,
345:13, 395:3,
402:2, 429:19,
432:18, 446:25,
448:5, 448:24,
455:10
**COURT** [121] - 307:1,
309:5, 309:7,
309:10, 309:13,
309:21, 310:2,
310:7, 310:13,
310:20, 310:23,
311:8, 311:16,
311:18, 311:21,
312:7, 312:10,
312:12, 312:19,
313:22, 313:25,
314:11, 315:14,
316:2, 316:7,
316:16, 317:16,
318:2, 318:14,
318:18, 318:20,
319:5, 319:12,
319:16, 319:22,
320:12, 320:14,

320:20, 320:24,
321:6, 321:8,
321:11, 321:14,
321:18, 321:21,
322:2, 322:8,
322:14, 322:19,
322:23, 326:5,
329:15, 338:10,
346:13, 346:19,
346:21, 346:23,
347:16, 347:18,
347:24, 350:14,
369:15, 369:18,
369:24, 370:1,
386:5, 386:19,
417:5, 426:8,
426:22, 426:24,
427:3, 427:6, 428:4,
429:2, 429:10,
433:22, 440:15,
459:5, 459:11,
459:15, 459:18,
459:22, 459:24,
468:16, 468:20,
488:15, 488:18,
488:21, 488:25,
489:9, 489:12,
489:16, 489:19,
489:22, 490:2,
493:6, 497:20,
501:19, 502:2,
502:16, 502:21,
502:24, 503:2,
503:10, 503:16,
503:24, 505:20,
505:22, 506:1,
508:7, 514:19,
514:21, 514:24,
515:8, 515:15,
515:20, 515:24,
516:4, 516:11, 517:1
**Court** [11] - 307:23,
307:23, 314:12,
319:19, 319:22,
343:11, 347:22,
386:9, 504:22,
505:6, 517:11
**court** [5] - 329:3,
352:23, 352:25,
433:23, 514:3
**Court's** [2] - 315:11,
321:19
**courthouse** [1] -
328:16
**Courthouse** [2] -
307:24, 517:11
**courtroom** [16] -
319:24, 320:2,
320:3, 320:8,
320:23, 323:14,

328:15, 346:25,
369:23, 428:3,
429:11, 489:5,
489:21, 514:1,
514:13, 515:7
**COURTROOM** [7] -
309:2, 329:13,
347:6, 383:22,
384:6, 384:15, 504:4
**courtyard** [1] - 482:24
**covering** [1] - 349:2
**COVID** [6] - 358:18,
358:19, 359:3,
359:9, 359:12, 360:3
**cracking** [1] - 393:15
**cranny** [1] - 409:19
**create** [1] - 466:21
**creating** [1] - 471:17
**creation** [5] - 498:13,
498:16, 498:18,
498:21, 498:24
**credence** [1] - 509:3
**credibility** [1] - 327:19
**crime** [3] - 325:3,
492:19, 492:20
**crimes** [3] - 324:7,
324:11, 337:11
**criminal** [2] - 312:21,
324:4
**Criminal** [2] - 307:3,
309:3
**cross** [5] - 310:8,
310:24, 317:18,
326:12, 326:17
**CROSS** [3] - 417:6,
452:6, 481:18
**cross-examination** [2]
- 310:24, 326:17
**CROSS-**
**EXAMINATION** [3] -
417:6, 452:6, 481:18
**cross-examine** [1] -
326:12
**crowd** [32] - 313:14,
334:5, 340:16,
341:7, 341:11,
342:1, 342:6, 367:1,
386:3, 388:12,
388:20, 388:24,
389:1, 389:22,
391:11, 407:11,
408:23, 442:19,
443:19, 445:18,
446:6, 448:18,
452:23, 458:14,
472:20, 473:4,
473:8, 473:10,
474:1, 484:14,
484:18, 484:23
**crowds** [8] - 368:14,

432:8, 433:8,
433:17, 445:2,
472:21, 474:4, 474:6
**CRR** [3] - 307:23,
517:3, 517:10
**Crypt** [18] - 333:6,
334:1, 334:19,
412:4, 412:5, 412:6,
412:18, 412:20,
412:21, 413:17,
438:24, 439:6,
439:20, 439:21,
439:24, 440:21,
453:22, 456:25
**Crystal** [2] - 339:19
**curative** [2] - 318:1,
319:3
**cursing** [1] - 442:18
**custody** [1] - 438:12
**cut** [1] - 507:22

## D

**D-E-T-O-R-I-E** [1] -
429:20
**D.C** [20] - 314:22,
318:25, 330:6,
339:12, 345:14,
348:16, 348:22,
355:22, 356:9,
359:10, 389:10,
401:10, 462:13,
495:6, 503:22,
513:9, 513:14,
513:17, 513:20,
513:22
**damage** [1] - 457:24
**danger** [2] - 402:19,
467:5
**dangerous** [3] - 446:6,
474:11, 481:10
**darkest** [1] - 508:25
**data** [3] - 495:2, 495:3,
496:23
**databases** [1] - 495:18
**date** [23] - 383:2,
430:16, 495:8,
496:1, 496:3, 496:5,
496:8, 496:20,
498:9, 498:13,
498:16, 498:18,
498:21, 498:24,
500:25, 504:12,
506:8, 508:14,
509:23, 511:1,
511:22, 511:23,
512:11
**dated** [1] - 503:4
**Dated** [1] - 517:8
**dating** [1] - 512:20

**daughter** [3] - 469:14,
469:15, 480:1
**dawn** [1] - 508:25
**daylight** [1] - 502:1
**days** [4] - 323:7,
328:16, 337:25,
370:21
**DC** [3] - 307:15,
307:25, 517:13
**dead** [1] - 439:9
**deadly** [1] - 445:25
**deal** [4] - 317:18,
328:24, 388:20,
430:9
**dealing** [2] - 318:4,
368:14
**death** [1] - 445:24
**December** [14] -
314:22, 318:14,
358:12, 455:3,
456:5, 501:12,
508:15, 509:24,
511:2, 511:23,
512:12, 513:21,
513:23, 513:24
**decide** [9] - 324:16,
325:6, 327:17,
337:16, 359:10,
361:15, 427:21,
445:20, 448:12
**decided** [4] - 334:20,
339:9, 339:24,
476:18
**decider** [1] - 327:18
**decision** [2] - 467:11,
485:8
**decisions** [1] - 352:21
**deck** [1] - 436:23
**decked** [1] - 334:9
**declared** [2] - 378:24,
379:6
**dedicated** [1] - 418:17
**deem** [1] - 464:2
**defend** [2] - 446:24,
461:14
**defendant** [56] -
312:23, 314:23,
315:2, 324:6,
324:18, 325:5,
325:9, 325:15,
325:17, 325:22,
326:1, 326:14,
326:16, 329:18,
330:3, 330:8,
330:13, 330:22,
330:24, 331:23,
332:1, 332:3, 332:9,
332:13, 332:16,
332:19, 333:1,
333:5, 333:11,

333:16, 334:2,
334:4, 334:12,
334:15, 334:19,
334:22, 335:4,
335:7, 335:15,
335:18, 335:21,
335:25, 336:3,
336:8, 336:10,
336:14, 336:19,
337:1, 337:10,
337:21, 338:1,
449:12, 493:15,
498:9, 514:18
**Defendant** [3] - 307:6,
307:17, 309:3
**defendant's** [3] -
313:1, 320:6, 337:19
**defendants** [1] - 494:4
**defense** [20] - 309:19,
309:23, 309:25,
311:4, 312:19,
318:21, 320:5,
320:15, 321:1,
322:6, 325:20,
325:22, 326:3,
326:12, 326:18,
327:4, 347:8,
514:14, 515:22
**defense's** [1] - 326:20
**defensive** [1] - 333:16
**definitions** [1] -
337:14
**delayed** [1] - 336:20
**deliberate** [4] -
323:19, 463:10,
471:14, 472:19
**deliberating** [1] -
324:3
**deliberation** [2] -
427:21, 471:13
**deliberations** [2] -
327:11, 328:9
**delivering** [1] - 329:9
**demand** [1] - 505:4
**demarked** [1] - 345:1
**democracy** [1] - 330:1
**Democrats** [1] - 505:7
**demonstrate** [2] -
346:7, 457:20
**demonstrating** [1] -
324:15
**demonstration** [5] -
380:16, 380:19,
433:16, 436:10,
436:11
**demonstrations** [4] -
368:14, 368:22,
430:6, 452:13
**demonstrators** [1] -
385:18

**denied** [2] - 309:21,
310:13
**deny** [1] - 314:12
**depart** [2] - 470:18,
471:1
**departed** [2] - 339:2,
342:22
**Department** [4] -
348:16, 389:6,
389:8, 400:13
**department** [4] -
389:9, 408:18,
436:13, 452:3
**DEPARTMENT** [1] -
307:14
**departments** [1] -
408:17
**departure** [2] - 470:17,
473:3
**depicted** [4] - 350:9,
383:7, 491:8, 491:18
**depicting** [1] - 445:9
**depiction** [3] - 490:21,
491:11, 491:21
**depictions** [1] - 383:9
**depicts** [3] - 311:14,
316:10
**deploy** [2] - 433:8,
436:13
**deployed** [3] - 434:25,
435:6, 474:10
**deploying** [3] - 407:9,
407:10, 433:12
**deputy** [2] - 346:25,
429:11
**DEPUTY** [7] - 309:2,
329:13, 347:6,
383:22, 384:6,
384:15, 504:4
**describe** [19] - 356:1,
356:2, 372:19,
384:20, 390:2,
400:23, 406:8,
407:24, 412:10,
421:6, 431:25,
433:1, 437:24,
438:16, 442:19,
458:16, 459:1,
472:14
**described** [10] -
315:13, 348:19,
350:8, 358:17,
379:17, 385:7,
397:10, 433:18,
445:17, 492:3
**describing** [7] -
312:15, 366:23,
396:7, 415:17,
432:19, 437:13,
445:7

**description** [1] - 357:2
**design** [2] - 461:2, 461:21
**designation** [1] - 470:7
**desk** [3] - 360:9, 360:10, 402:5
**destination** [2] - 360:12, 371:3
**destroyed** [2] - 323:15, 330:14
**detail** [5] - 460:23, 471:18, 471:23, 475:11, 487:22
**detailed** [3] - 323:4, 324:9, 327:2
**details** [4] - 310:11, 330:9, 458:17, 510:5
**detectors** [1] - 333:3
**deter** [3] - 332:8, 332:25, 334:17
**determined** [3] - 330:15, 472:22, 473:5
**Detorie** [5] - 427:5, 429:8, 429:10, 429:19, 459:5
**DETORIE** [2] - 308:5, 429:12
**device** [5] - 488:4, 488:13, 496:2, 497:4, 497:7
**devices** [1] - 409:20
**devote** [1] - 324:2
**diagonal** [1] - 362:15
**diagram** [1] - 371:13
**diagrams** [1] - 341:15
**different** [20] - 312:7, 361:4, 367:22, 375:23, 386:9, 398:15, 403:11, 415:8, 417:16, 430:24, 437:1, 441:25, 445:10, 446:4, 447:10, 447:11, 451:23, 456:11, 477:13
**difficult** [3] - 430:8, 447:6, 473:12
**difficulties** [1] - 513:6
**dire** [3] - 314:16, 317:4, 317:14
**DIRECT** [4] - 350:22, 429:13, 460:2, 492:7
**direct** [4] - 351:11, 417:11, 421:11, 452:12
**directed** [1] - 438:9
**directing** [3] - 409:1, 430:14, 440:3

**direction** [7] - 356:18, 381:2, 385:21, 421:9, 436:12, 436:25, 437:2
**directions** [3] - 354:9, 436:21, 436:24
**directly** [4] - 412:9, 458:19, 475:22, 494:4
**disabilities** [1] - 404:6
**disagree** [2] - 425:8, 425:11
**discern** [1] - 450:18
**disclose** [1] - 323:23
**discount** [1] - 507:21
**discuss** [7] - 320:15, 328:7, 426:25, 428:1, 459:7, 488:18, 515:9
**discussing** [1] - 501:7
**discussion** [2] - 445:4, 450:19
**discussions** [4] - 369:21, 427:16, 489:3, 515:3
**dishonest** [2] - 504:18, 505:7
**disk** [1] - 494:24
**dismantled** [1] - 331:19
**disorderly** [10] - 313:3, 314:5, 315:18, 315:20, 315:21, 315:22, 324:13, 324:14, 344:25, 346:4
**dispatched** [1] - 487:1
**dispatcher** [2] - 382:1, 382:6
**dispatchers** [3] - 353:11, 380:3, 380:4
**dispatches** [1] - 486:22
**dispense** [1] - 395:17
**displayed** [1] - 384:5
**disposal** [2] - 318:6, 318:16
**dispute** [1] - 350:18
**disputes** [1] - 516:12
**disregard** [1] - 328:1
**disregarded** [1] - 331:18
**disruptive** [1] - 313:16
**dissent** [1] - 503:21
**distance** [3] - 373:23, 421:2
**distinction** [1] - 506:23
**distinguish** [1] - 506:21

**distracting** [1] - 323:10
**distressing** [1] - 447:24
**DISTRICT** [3] - 307:1, 307:1, 307:9
**disturbance** [8] - 368:7, 368:12, 368:13, 368:17, 368:20, 369:1, 398:17, 408:16
**dive** [1] - 461:8
**divest** [1] - 360:19
**divesting** [1] - 359:22
**divide** [1] - 354:22
**division** [4] - 351:7, 430:24, 433:4, 463:20
**document** [3] - 496:23, 502:20, 503:4
**dog** [1] - 341:1
**DOJ** [1] - 307:11
**DOJ-USAO** [1] - 307:11
**dome** [2] - 355:11, 412:9
**dome's** [1] - 367:12
**Donald** [1] - 508:2
**done** [4] - 435:12, 447:9, 477:5, 495:5
**DoNotCertify** [2] - 330:10, 510:7
**door** [39] - 336:16, 344:5, 359:15, 360:4, 361:6, 362:5, 364:5, 366:16, 366:18, 366:21, 367:8, 390:23, 392:21, 392:22, 393:4, 393:9, 396:2, 396:10, 396:20, 397:5, 397:7, 397:21, 398:7, 398:14, 399:6, 399:22, 403:14, 405:12, 415:14, 415:24, 424:10, 424:15, 424:19, 424:20, 424:22, 433:10, 479:14, 485:25
**Door** [12] - 363:25, 364:3, 365:9, 365:25, 366:13, 366:15, 390:22, 397:2, 411:11, 411:23, 424:18, 424:21
**doors** [19] - 332:18,

332:19, 332:21, 334:25, 335:23, 336:1, 336:13, 336:14, 336:15, 336:17, 343:22, 360:9, 392:15, 392:18, 392:19, 397:2, 416:13, 420:18, 421:2
**Doors** [12] - 343:22, 391:12, 392:7, 393:22, 419:24, 420:12, 420:13, 420:14, 420:15, 420:23, 421:9, 422:22
**doorway** [1] - 403:6, 403:10, 476:5, 479:4
**dots** [3] - 363:2, 473:7, 476:21
**doubt** [8] - 324:18, 324:21, 325:8, 325:11, 325:14, 337:10, 340:19, 455:4
**down** [53] - 323:12, 323:16, 329:2, 336:11, 336:15, 339:3, 339:12, 340:2, 340:8, 340:10, 340:12, 340:13, 341:21, 344:7, 358:20, 359:1, 360:1, 360:21, 362:7, 362:15, 367:15, 369:24, 376:11, 381:3, 381:6, 382:7, 384:4, 392:25, 400:11, 408:22, 408:24, 413:22, 414:19, 416:8, 430:1, 431:16, 438:19, 469:20, 475:16, 475:24, 475:25, 476:19, 477:1, 485:12, 485:14, 486:11, 492:21, 497:1, 497:10, 500:18, 502:11, 505:17, 508:4
**downstairs** [1] - 485:16
**dozen** [1] - 486:6
**dozens** [1] - 430:10
**drag** [1] - 411:3
**draped** [2] - 330:3, 416:4
**draw** [7] - 364:2,

364:13, 366:3, 367:10, 390:6, 410:14, 448:14
**drawing** [2] - 364:19, 448:10
**drawn** [6] - 362:13, 364:21, 365:8, 365:18, 367:15, 405:7
**draws** [1] - 317:23
**dressed** [1] - 330:2
**drew** [3] - 354:11, 364:17, 366:8
**driving** [1] - 494:10
**drop** [2] - 432:24, 470:20
**dropped** [3] - 466:10, 472:6, 473:1
**due** [8] - 331:3, 350:3, 355:13, 358:18, 358:19, 359:3, 362:11, 436:19
**dump** [1] - 434:14
**duress** [3] - 353:13, 402:2, 402:3
**during** [27] - 319:11, 319:24, 323:3, 326:21, 336:18, 336:25, 338:16, 338:23, 339:16, 341:20, 343:11, 345:8, 357:15, 369:13, 375:18, 378:4, 379:16, 379:20, 380:8, 417:11, 421:11, 422:3, 438:23, 496:3, 498:9, 501:12, 513:17
**duties** [2] - 348:11, 348:19
**duty** [3] - 325:14, 327:16, 431:3

**E**

**eagerly** [1] - 330:17
**ear** [2] - 404:14, 404:18
**early** [2] - 340:3, 503:5
**earpiece** [1] - 474:18
**ears** [2] - 337:20, 478:16
**East** [6] - 349:15, 349:25, 354:21, 415:14, 415:25, 492:22
**east** [14] - 349:7, 349:24, 354:14, 354:19, 367:5,

367:9, 398:5, 398:8,
482:13, 483:2,
483:3, 484:20,
484:22, 496:18
**Eastern** [3] - 501:14,
501:22, 501:23
**eastern** [1] - 349:23
**Eckerman** [10] -
311:24, 312:3,
339:17, 339:18,
341:4, 342:23,
343:6, 344:1, 344:14
**Eckerman's** [1] -
344:22
**edge** [1] - 344:14
**edited** [4] - 383:12,
490:24, 491:13,
491:23
**effects** [2] - 434:10,
447:10
**efficient** [1] - 327:13
**effort** [1] - 408:12
**egress** [1] - 392:20
**eight** [2] - 441:12,
442:7
**either** [8] - 320:1,
325:20, 327:14,
335:18, 375:10,
467:10, 502:6,
506:17
**elaborated** [1] -
417:20
**elapsed** [1] - 386:24
**elect** [1] - 330:13
**elected** [2] - 378:5,
448:17
**election** [20] - 317:6,
329:24, 330:5,
337:23, 340:20,
345:21, 368:3,
380:25, 463:2,
503:13, 503:14,
504:15, 504:18,
505:4, 505:13,
507:5, 507:10,
509:3, 509:11,
513:10
**Election** [1] - 378:9
**electoral** [2] - 472:15,
507:19
**Electoral** [5] - 330:11,
368:2, 378:8,
379:13, 510:7
**electrician** [1] - 512:25
**electronically** [1] -
494:22
**element** [3] - 315:20,
325:7, 462:17
**elements** [4] - 324:21,
324:24, 325:16,

337:15
**eliciting** [1] - 311:5
**Elizabeth** [2] - 459:10,
460:7
**ELIZABETH** [2] -
308:8, 460:1
**Ellipse** [6] - 339:4,
355:23, 355:25,
362:24, 375:15,
380:15
**Ellis** [1] - 507:25
**email** [7] - 498:8,
498:12, 498:15,
499:22, 499:23,
504:20, 505:5
**emergency** [9] -
392:20, 392:21,
392:24, 466:22,
466:25, 467:9,
467:24, 472:2,
473:22
**emotion** [1] - 479:1
**emotional** [1] - 451:2
**employees** [1] -
348:11
**en** [3] - 321:21,
321:24, 470:17
**encompasses** [1] -
362:20
**encounter** [2] - 334:5,
452:2
**encountered** [8] -
333:7, 334:23,
375:16, 432:1,
432:4, 438:9, 452:3,
454:2
**end** [15] - 319:7,
323:5, 323:24,
324:9, 324:16,
324:24, 325:6,
337:14, 338:6,
346:1, 346:9, 391:4,
436:23, 452:2, 504:1
**enforce** [1] - 465:8
**enforced** [1] - 464:24
**enforcement** [4] -
309:24, 310:5,
487:15
**engage** [2] - 346:4,
433:16
**engaged** [2] - 348:10,
348:18
**engaging** [1] - 458:19
**ensure** [1] - 475:4
**entailed** [1] - 460:24
**enter** [11] - 342:17,
343:21, 344:5,
359:18, 360:4,
360:8, 389:2,
405:15, 482:11,

482:13, 486:15
**entered** [11] - 313:10,
332:21, 336:5,
341:17, 343:25,
348:5, 367:14,
394:12, 405:17,
451:16, 501:10
**entering** [6] - 324:11,
344:7, 366:18,
475:13, 476:5, 514:1
**enters** [1] - 489:21
**enthusiastic** [1] -
340:19
**entire** [4] - 331:9,
371:25, 393:9,
407:23
**entirely** [1] - 323:10
**entirety** [3] - 343:20,
382:18, 481:5
**entrance** [4] - 415:19,
468:7, 473:2, 483:6
**entranceway** [1] -
420:12
**entrapment** [1] -
309:24
**entries** [1] - 400:22
**entry** [2] - 363:24,
399:19
**entryway** [2] - 344:7,
366:8
**EOD** [1] - 487:20
**equipment** [9] -
333:23, 382:25,
383:2, 383:4, 383:5,
398:15, 446:22,
447:2, 450:15
**equipped** [3] - 395:1,
397:7, 397:9
**especially** [2] -
318:10, 341:23
**espoused** [5] - 340:21,
340:22, 345:11,
345:16, 345:20
**ESQ** [4] - 307:11,
307:14, 307:17,
307:20
**essence** [1] - 476:16
**essentially** [5] - 356:8,
357:6, 387:16,
389:11, 399:5
**establishing** [1] -
318:11
**estimate** [2] - 395:19,
401:8
**estimated** [2] - 469:22,
471:15
**estimating** [1] - 482:6
**estoppel** [1] - 309:24
**et** [2] - 434:25, 436:4
**evacuate** [4] - 331:4,

449:22, 467:15,
481:12
**evacuated** [13] -
335:1, 378:22,
378:25, 379:4,
379:7, 403:21,
403:22, 404:3,
404:7, 467:6,
479:11, 485:12,
487:12
**evening** [1] - 322:24
**event** [14] - 316:24,
318:14, 318:25,
333:3, 352:18,
368:25, 402:2,
461:23, 467:1,
467:7, 472:1,
473:21, 483:16,
510:5
**events** [12] - 310:21,
317:3, 342:16,
343:15, 352:22,
383:7, 383:9,
390:21, 491:8,
491:11, 491:18,
491:21
**eventually** [8] - 340:6,
355:14, 355:17,
405:16, 408:24,
409:10, 484:3,
486:12
**EVERYONE** [1] -
309:6
**everywhere** [5] -
332:12, 332:22,
366:5, 401:2, 407:23
**evidence** [68] - 309:17,
310:17, 310:24,
312:22, 312:24,
313:6, 313:17,
314:3, 317:21,
318:5, 318:16,
322:12, 324:17,
324:25, 325:2,
325:4, 326:7, 326:8,
326:10, 326:21,
326:23, 326:24,
326:25, 327:7,
327:8, 327:15,
327:19, 328:5,
331:7, 337:9,
337:17, 337:21,
337:25, 338:8,
340:14, 340:17,
341:3, 343:14,
346:2, 346:12,
347:4, 347:21,
348:3, 350:16,
353:1, 354:5, 418:8,
421:14, 432:10,

440:11, 443:23,
450:5, 457:13,
457:14, 457:15,
457:17, 469:2,
479:8, 490:6, 492:4,
494:1, 496:12,
498:6, 499:6,
501:11, 502:15,
509:14, 510:23
**evidentiary** [1] -
314:20
**exact** [3] - 337:13,
337:14, 360:16
**exactly** [6] - 364:25,
367:6, 403:24,
405:11, 408:14,
435:3
**EXAMINATION** [9] -
350:22, 417:6,
429:13, 452:6,
458:8, 460:2,
481:18, 487:8, 492:7
**examination** [6] -
310:9, 310:24,
326:17, 417:11,
421:11, 452:12
**examine** [1] - 326:12
**example** [4] - 373:10,
400:24, 419:19,
472:6
**except** [1] - 372:1
**exception** [1] - 484:8
**exclude** [2] - 310:8,
312:21
**excuse** [2] - 336:18,
417:10
**excused** [3] - 426:24,
459:6, 515:8
**execute** [1] - 494:15
**executed** [1] - 499:2
**Executive** [1] - 462:8
**exhibit** [5] - 490:10,
502:3, 503:19,
510:12, 511:4
**Exhibit** [34] - 350:9,
354:5, 371:12,
376:10, 376:17,
383:16, 432:9,
439:2, 440:9,
440:14, 443:22,
450:5, 469:3, 478:9,
490:5, 490:9,
490:20, 491:6,
496:11, 498:5,
499:5, 499:17,
500:5, 500:17,
501:10, 502:15,
505:18, 508:5,
509:13, 510:11,
510:23, 511:20,

512:7, 513:4
**exhibits** [14] - 321:3,
321:5, 321:16,
322:4, 322:5,
326:25, 328:1,
343:14, 347:5,
383:13, 420:11,
491:5, 501:16, 502:4
**Exhibits** [5] - 347:8,
383:8, 491:9,
491:19, 492:1
**exit** [7] - 334:19,
336:3, 336:12,
336:17, 392:24,
415:19, 445:20
**exited** [1] - 479:14
**exiting** [1] - 336:13
**exits** [5] - 369:23,
400:22, 428:3,
489:5, 515:7
**expand** [1] - 416:17
**expandable** [1] - 395:2
**expect** [2] - 310:3,
489:10
**expected** [2] - 466:14,
470:1
**expel** [1] - 400:13
**experience** [4] -
401:21, 436:4,
436:6, 478:25
**experienced** [1] -
435:11
**experiencing** [1] -
434:11
**explain** [21] - 347:22,
351:14, 351:19,
352:2, 354:6, 364:7,
364:24, 365:20,
366:14, 366:23,
367:25, 431:6,
460:24, 461:18,
466:24, 469:7,
469:21, 471:6,
494:9, 495:12,
497:25
**explained** [1] - 352:9
**explore** [1] - 317:14
**explosive** [2] - 409:20,
488:3, 488:13
**explosives** [1] -
487:20
**extend** [1] - 395:10
**extended** [1] - 404:14
**extensive** [1] - 317:4
**extent** [4] - 315:9,
317:16, 317:19,
344:24
**exterior** [3] - 349:18,
374:9, 468:9
**extra** [3] - 368:6,

368:7, 395:3
**extract** [1] - 477:3
**extremely** [1] - 317:12
**extricated** [1] - 480:10
**eye** [5] - 339:10,
343:2, 435:14,
447:16, 448:21
**eyes** [4] - 337:19,
434:12, 434:13,
434:14
**eyesight** [2] - 432:7,
475:20

## F

**face** [8] - 333:19,
333:20, 336:9,
434:14, 474:16,
513:25
**Facebook** [26] -
328:13, 492:2,
493:16, 493:17,
493:18, 494:18,
494:22, 498:1,
498:2, 498:17,
498:20, 498:23,
499:3, 499:9,
499:19, 500:7,
500:15, 500:20,
504:8, 505:10,
506:4, 506:15,
506:21, 508:10,
509:16, 513:16
**faced** [1] - 335:7
**faceless** [1] - 458:14
**facility** [4] - 460:13,
462:16, 464:4, 467:3
**facing** [1] - 414:25
**fact** [10] - 316:2,
317:17, 318:24,
344:2, 346:5,
418:12, 420:17,
426:1, 451:5, 483:14
**factor** [1] - 318:7
**facts** [5] - 327:17,
327:18, 348:1,
350:15, 350:18
**fail** [2] - 408:4, 475:5
**fair** [23] - 310:7, 314:6,
327:12, 346:11,
352:7, 356:6,
356:25, 367:14,
383:9, 404:2,
407:13, 422:2,
453:4, 453:5,
456:25, 470:18,
485:5, 486:7,
486:25, 490:20,
491:10, 491:21,
492:1

**fairly** [1] - 363:21
**faith** [1] - 507:19
**fall** [3] - 357:20, 394:1,
394:7
**familiar** [14] - 338:25,
351:13, 355:22,
366:22, 382:18,
401:21, 401:25,
404:24, 405:22,
419:5, 419:8,
420:13, 463:21,
514:11
**family** [4] - 328:8,
328:11, 350:11,
461:1
**Fanone** [2] - 366:21,
366:24
**fantastic** [1] - 514:23
**far** [12] - 312:15,
356:5, 393:11,
393:15, 405:11,
425:15, 432:7,
454:21, 467:3,
474:12
**fast** [2] - 412:24,
414:22
**faster** [1] - 477:4
**FBI** [7] - 312:2, 492:15,
492:16, 493:3,
493:7, 493:13,
496:25
**fear** [1] - 445:24
**fearful** [3] - 442:2,
442:4, 447:15
**February** [2] - 501:13,
517:8
**federal** [2] - 460:12,
462:14
**feed** [1] - 403:2
**feet** [7] - 349:3, 349:4,
349:5, 349:7,
372:22, 373:2,
448:18
**fell** [1] - 394:9
**fellow** [4] - 436:18,
437:22, 437:23,
446:5
**felt** [5] - 333:20, 434:7,
446:10, 451:4,
455:16
**female** [8] - 441:17,
449:9, 456:17,
456:21, 457:3,
478:21, 511:16,
514:16
**females** [3] - 456:2,
456:14, 456:18
**fence** [7] - 332:7,
371:24, 373:14,
376:21, 377:10,

377:12, 389:2
**fences** [1] - 426:10
**fencing** [29] - 331:12,
331:13, 331:17,
332:6, 341:10,
342:5, 350:5, 358:5,
358:7, 358:16,
371:20, 371:25,
372:4, 372:6,
372:12, 372:14,
372:15, 372:16,
372:17, 372:18,
373:6, 374:14,
374:17, 374:19,
374:20, 375:22,
376:24, 377:14,
386:2
**fervently** [1] - 340:20
**few** [20] - 309:13,
309:14, 323:1,
327:9, 328:16,
347:3, 356:17,
368:16, 372:1,
373:1, 391:1,
393:10, 401:9,
433:14, 440:4,
468:1, 470:14,
481:22, 483:19,
491:4
**field** [2] - 382:1, 382:5
**fifth** [1] - 372:25
**fight** [2] - 337:4, 447:7
**fight-or-flight** [1] -
447:7
**fighting** [3] - 343:8,
409:7, 446:8
**filed** [2] - 309:16,
314:14
**files** [1] - 383:16
**fill** [1] - 334:16
**filled** [2] - 433:6,
438:17
**filtered** [1] - 433:9
**final** [2] - 327:3,
515:18
**finally** [6] - 327:9,
336:16, 343:5,
343:18, 343:21,
379:18
**fine** [3] - 315:11,
319:12, 322:8
**finger** [5] - 364:2,
364:14, 366:3,
372:13, 377:19
**finish** [2] - 516:4,
516:6
**finished** [2] - 336:22,
379:18
**finishes** [1] - 433:23
**fire** [1] - 399:18

**Fire** [1] - 401:10
**firearm** [3] - 395:3,
395:4, 488:12
**first** [51] - 309:17,
323:8, 324:11,
325:25, 333:5,
346:14, 347:4,
347:8, 348:7, 354:4,
362:14, 364:8,
365:6, 365:24,
376:18, 390:11,
390:24, 391:14,
398:1, 398:3,
406:10, 410:17,
416:21, 418:14,
420:25, 421:15,
427:20, 430:1,
431:25, 432:2,
435:12, 435:17,
438:1, 438:9,
439:12, 452:10,
452:12, 454:2,
456:16, 464:17,
472:3, 475:11,
481:12, 485:17,
486:13, 490:4,
492:12, 499:13,
502:17, 509:19
**First** [10] - 318:23,
348:21, 349:23,
350:1, 369:3,
369:13, 380:16,
385:19, 392:7,
436:10
**Fitzsimons** [2] -
421:18, 421:21
**five** [7] - 322:15,
322:16, 330:8,
335:7, 448:20,
501:13, 501:23
**fixed** [2] - 337:7,
384:11
**FL** [1] - 307:12
**flag** [8] - 315:6,
319:18, 321:7,
330:3, 413:3, 413:4,
416:4, 457:22
**flagpoles** [1] - 336:2
**flashlight** [1] - 395:6
**flat** [1] - 423:25
**flight** [1] - 447:7
**Floor** [1] - 392:7
**floor** [20] - 339:23,
349:12, 391:25,
392:9, 394:9,
397:25, 398:1,
398:2, 398:3,
413:14, 415:6,
415:13, 439:12,
439:13, 472:3,

473:20, 475:11, 476:15, 476:22, 476:24, 476:25, 478:1, 485:17, 485:24, 486:13, 486:23, 487:4
**floors** [3] - 490:12, 490:17, 490:22
**flow** [2] - 398:13, 399:10
**fluid** [3] - 438:20, 454:6, 454:7
**Flynn** [10] - 315:8, 316:10, 316:18, 316:20, 317:2, 317:7, 317:9, 317:12, 318:7, 318:13
**focus** [3] - 410:13, 458:17, 462:20
**focused** [2] - 343:16, 400:22
**focusing** [1] - 454:10
**folks** [2] - 501:2, 507:8
**follow** [5] - 323:3, 326:16, 327:16, 328:20, 419:21
**followed** [1] - 336:14
**following** [5] - 313:15, 316:20, 347:5, 498:7, 502:22
**follows** [1] - 491:7
**foot** [2] - 401:19, 470:17
**footage** [21] - 381:14, 383:3, 383:5, 383:6, 383:7, 383:11, 383:12, 383:13, 440:20, 441:3, 445:10, 490:18, 490:20, 490:23, 490:24, 491:8, 491:13, 491:14, 491:18, 491:23, 491:24
**FOR** [1] - 307:1
**force** [8] - 335:2, 389:11, 399:22, 399:25, 445:23, 445:25, 446:6
**forced** [3] - 329:21, 331:19, 445:20
**forcible** [1] - 344:20
**forcibly** [2] - 334:13, 335:18
**Ford** [1] - 431:12
**forefront** [1] - 376:19
**foregoing** [1] - 517:4
**form** [8] - 341:14, 437:2, 440:1, 440:5,

441:14, 442:10, 454:8, 454:9
**formal** [2] - 325:2, 466:16
**formed** [2] - 331:11, 443:9
**former** [4] - 315:7, 320:6, 330:5, 331:25
**Former** [2] - 340:6, 340:19
**forming** [2] - 331:9, 445:6
**forth** [5] - 380:4, 471:9, 471:22, 476:12, 488:11
**forward** [6] - 313:15, 333:11, 334:2, 345:15, 412:24, 414:22
**fought** [1] - 448:18
**fountain** [1] - 349:10
**four** [13] - 315:17, 324:7, 325:7, 325:24, 337:11, 337:16, 338:5, 349:3, 357:16, 396:20, 443:14, 455:18, 462:9
**four-minute-ten-second** [1] - 443:14
**fourth** [1] - 324:14
**frame** [2] - 496:9, 513:17
**fraud** [1] - 507:18
**free** [2] - 323:12, 329:17
**frenzied** [1] - 447:4
**friend** [6] - 339:6, 339:8, 361:2, 361:15, 373:24, 510:19
**friends** [4] - 328:10, 511:15, 511:16, 512:19
**front** [10] - 335:5, 335:11, 336:6, 344:14, 356:8, 359:15, 437:3, 461:8, 479:20, 480:3
**Front** [20] - 331:10, 349:9, 349:13, 349:15, 349:25, 350:2, 354:18, 354:21, 357:16, 357:21, 357:24, 358:3, 372:11, 374:6, 376:25, 406:4, 410:18, 415:15, 415:25, 432:6

**frozen** [1] - 513:7
**full** [5] - 324:2, 413:15, 438:6, 505:4, 517:5
**fully** [2] - 368:9, 368:10
**function** [4] - 315:23, 315:24, 318:22, 470:12
**furniture** [2] - 403:11, 403:13
**future** [1] - 467:7

### G

**gain** [1] - 436:16
**game** [2] - 310:7, 314:6
**Garrity** [6] - 311:8, 322:4, 338:11, 346:13, 386:12, 417:5
**GARRITY** [43] - 307:17, 307:17, 309:9, 309:12, 309:20, 310:1, 310:3, 310:12, 311:9, 311:17, 311:19, 311:22, 312:9, 312:11, 312:13, 316:8, 316:17, 317:25, 318:3, 318:15, 318:19, 319:4, 320:21, 321:10, 321:15, 321:19, 322:13, 326:4, 338:13, 338:16, 347:17, 481:19, 487:6, 493:5, 497:18, 502:19, 503:1, 503:3, 505:21, 505:24, 508:6, 516:1, 516:15
**Garrity)......................
............481** [1] - 308:9
**gas** [7] - 407:8, 407:9, 407:10, 434:25, 452:23, 453:4, 474:10
**gather** [1] - 494:1
**gear** [2] - 334:10, 398:19
**general** [1] - 465:11
**generally** [2] - 315:25, 437:24
**gentlemen** [9] - 329:15, 347:24, 369:18, 370:2, 427:9, 427:18,

502:2, 514:15, 514:25
**geofence** [5] - 495:6, 495:12, 495:14, 496:5, 497:3
**geographical** [1] - 495:8
**geography** [1] - 338:25
**George** [1] - 336:7
**Georgia** [1] - 430:2
**girlfriends** [2] - 511:14, 511:15
**given** [6] - 317:10, 327:25, 395:23, 418:18, 496:3, 496:5
**glass** [10] - 332:22, 393:15, 393:18, 394:5, 394:6, 475:12, 485:17, 485:20, 485:22
**Glavey** [10] - 459:10, 459:20, 460:4, 460:7, 464:17, 468:24, 478:8, 478:18, 487:10, 488:15
**GLAVEY** [2] - 308:8, 460:1
**Glynco** [1] - 430:1
**gmail** [1] - 499:14
**goal** [1] - 336:19
**Google** [7] - 495:6, 495:16, 495:22, 497:7, 498:12, 498:15
**Googles** [1] - 495:16
**GORDON** [155] - 307:11, 314:18, 315:19, 316:6, 319:9, 319:14, 319:18, 319:25, 320:13, 320:17, 320:25, 321:7, 321:9, 321:13, 321:24, 322:3, 322:9, 346:16, 347:2, 347:7, 347:19, 348:7, 350:20, 350:23, 354:11, 357:4, 362:7, 363:13, 364:16, 366:7, 369:17, 370:4, 370:5, 371:11, 372:8, 373:4, 374:4, 374:12, 374:22, 376:9, 377:18, 377:23, 379:14, 382:21, 383:24,

384:7, 384:10, 384:13, 384:16, 384:17, 384:23, 385:3, 385:6, 385:13, 385:16, 386:17, 386:20, 386:23, 387:6, 387:19, 387:21, 388:14, 388:16, 389:25, 390:14, 390:17, 391:8, 391:16, 392:2, 392:5, 392:12, 392:14, 393:13, 393:20, 394:11, 395:7, 395:9, 395:24, 396:16, 396:18, 397:12, 397:15, 397:19, 397:24, 398:21, 398:23, 399:2, 399:4, 399:23, 400:4, 400:10, 402:24, 404:9, 404:12, 404:20, 404:23, 405:13, 405:20, 406:6, 407:3, 407:15, 408:8, 408:11, 409:8, 410:4, 410:7, 410:10, 411:2, 411:10, 411:14, 411:19, 412:1, 412:13, 412:15, 412:19, 412:24, 413:10, 413:25, 414:7, 414:15, 414:22, 415:3, 415:10, 415:21, 416:8, 416:25, 417:3, 426:6, 426:21, 426:23, 429:7, 459:9, 460:3, 464:8, 468:11, 468:18, 468:22, 468:25, 478:6, 478:13, 479:8, 479:13, 481:14, 481:16, 487:9, 488:14, 489:7, 489:10, 489:13, 489:18, 515:12, 515:16, 515:21, 516:10, 516:14
**Gordon** [12] - 317:20, 338:7, 346:14, 347:25, 350:14, 369:15, 370:3, 386:8, 417:11, 423:11, 426:22, 429:5

Gordon).....................
............350 [1] -
308:4
Gordon).....................
............460 [1] -
308:8
Gordon).....................
............487 [1] -
308:9
gosh [1] - 368:15
Government [26] -
347:8, 348:13,
432:9, 439:2, 440:8,
443:22, 490:5,
490:20, 491:5,
491:9, 491:19,
492:1, 498:5,
499:16, 500:5,
500:17, 501:10,
502:14, 505:18,
508:5, 509:13,
510:11, 510:22,
511:19, 512:7, 513:4
government [41] -
309:17, 309:23,
310:8, 310:23,
311:13, 312:20,
312:24, 315:22,
315:23, 315:24,
318:6, 318:22,
321:2, 321:17,
322:11, 324:20,
325:7, 325:12,
325:13, 325:16,
325:20, 325:21,
326:1, 326:11,
326:13, 326:18,
326:19, 327:4,
327:5, 340:9,
340:17, 342:12,
343:9, 344:19,
345:17, 425:9,
427:4, 489:25,
490:4, 502:14,
505:18
Government's [22] -
350:9, 354:5, 354:7,
363:14, 371:12,
376:10, 376:17,
383:8, 383:16,
402:24, 402:25,
405:20, 406:2,
410:4, 411:10,
450:4, 464:8, 469:2,
478:9, 479:9,
496:11, 499:5
government's [9] -
311:1, 319:7, 321:3,
326:14, 329:9,
342:4, 372:8,

420:11, 429:6
grabbed [2] - 333:23,
438:21
grabbing [1] - 458:23
grand [2] - 324:5,
493:22
granular [1] - 471:17
grass [3] - 373:14,
373:22, 377:25
grassy [1] - 349:25
grave [1] - 445:24
gray [3] - 410:14,
410:15, 479:14
gray-haired [1] -
479:14
great [4] - 321:6,
321:14, 430:9, 504:6
greatest [1] - 509:4
greatly [2] - 406:16,
442:5
green [3] - 331:12,
350:5, 440:15
Greenwich [1] -
501:18
greeted [2] - 470:4,
484:3
gripes [1] - 503:20
groin [2] - 447:3,
447:11
ground [5] - 349:3,
394:7, 398:4, 398:9,
434:18
grounds [41] - 324:12,
324:13, 331:10,
332:2, 340:13,
341:3, 341:6, 341:8,
341:9, 341:14,
341:17, 341:23,
342:8, 354:2, 357:8,
368:23, 369:4,
371:4, 379:16,
379:23, 381:13,
383:1, 419:9,
467:18, 468:8,
473:17, 480:11,
480:23, 481:3,
481:5, 482:11,
482:12, 483:1,
485:2, 485:3, 485:4,
491:12, 491:22,
503:3, 503:4
Grounds [2] - 348:9,
348:17
group [24] - 332:3,
340:8, 344:6,
344:15, 368:13,
381:6, 382:6, 387:1,
391:14, 431:2,
434:4, 436:16,
438:19, 440:2,

440:6, 442:2,
444:16, 445:22,
447:4, 447:21,
449:23, 450:12,
451:25, 506:17
groups [3] - 361:13,
408:25
growing [1] - 451:2
guarded [1] - 335:5
guarding [1] - 331:2
guess [15] - 311:11,
311:19, 312:24,
315:14, 317:25,
318:4, 345:9,
352:15, 365:23,
423:4, 425:23,
450:16, 452:13,
485:6, 486:21
guilt [2] - 313:1, 325:4
guilty [5] - 325:11,
325:15, 325:17,
338:8, 346:10
gun [7] - 333:25,
399:18, 446:2,
477:10, 477:12,
477:13, 478:2
guns [2] - 367:1, 405:7
gunshots [1] - 446:3
guys [1] - 309:8

# H

H-A-S-T-B-A-C-K-A [1]
- 492:13
hair [3] - 448:1, 448:2,
514:16
haired [1] - 479:14
half [2] - 508:21,
508:22
Hall [6] - 345:1,
413:12, 413:13,
413:18, 414:2, 414:3
halls [1] - 333:4
hallway [9] - 334:23,
336:11, 344:7,
394:15, 414:2,
414:10, 414:12,
414:18, 414:20
Hampshire [7] -
338:21, 338:22,
338:24, 339:1,
339:2, 339:5, 492:22
hand [18] - 329:17,
341:16, 346:24,
359:23, 359:25,
360:20, 360:21,
361:23, 389:14,
401:19, 404:14,
404:18, 429:11,
459:25, 474:17,

490:2, 496:17
hand-held [3] -
359:25, 360:21,
474:17
handgun [1] - 445:22
handle [2] - 319:8,
319:13
handles [1] - 431:12
hands [5] - 436:23,
438:21, 446:8,
446:21, 448:18
hang [2] - 470:15,
470:22
happy [1] - 317:22
hard [11] - 351:19,
367:12, 375:8,
404:15, 407:2,
434:5, 438:5,
444:13, 447:12,
450:17, 458:16
harm [2] - 442:3, 466:1
HASTBACKA [2] -
308:10, 492:6
Hastbacka [5] -
454:25, 489:19,
490:1, 492:13,
515:18
hat [2] - 413:4, 413:5
head [3] - 401:15,
469:7, 469:8
headed [1] - 454:2
headquarters [4] -
438:4, 493:3, 493:7,
496:25
heads [1] - 489:8
hear [46] - 325:19,
325:25, 327:20,
327:21, 329:16,
332:20, 333:19,
333:21, 333:24,
334:25, 337:18,
338:23, 339:16,
339:19, 340:4,
340:8, 340:10,
340:11, 341:6,
341:9, 341:10,
341:20, 341:23,
342:3, 342:9,
342:14, 342:16,
342:18, 342:20,
342:24, 343:5,
343:14, 344:10,
344:12, 344:16,
345:5, 380:7, 382:5,
444:1, 457:3, 474:7,
474:18, 478:18,
484:17, 502:24,
503:1
heard [11] - 338:20,
346:11, 359:7,

382:10, 450:19,
457:18, 475:11,
484:14, 485:17,
485:22, 504:24
hearing [4] - 475:12,
485:20, 502:23,
516:17
hearings [2] - 507:5,
507:10
hearsay [2] - 493:5,
497:18
HELD [1] - 307:9
held [7] - 359:25,
360:21, 380:4,
398:24, 474:17,
476:24, 502:23
hello [2] - 351:2,
459:21
Hello [1] - 459:20
helmets [1] - 398:18
help [11] - 327:7,
389:19, 389:21,
389:24, 401:5,
402:10, 402:22,
432:3, 432:25,
455:13, 488:23
helping [1] - 512:25
helpless [1] - 333:20
hereby [1] - 517:3
Herman [2] - 339:19,
341:5
herself [1] - 320:7
hiding [1] - 409:22
high [1] - 393:7
high-pitched [1] -
393:7
higher [4] - 420:6,
432:5, 435:16,
452:14
highlight [4] - 504:10,
505:1, 510:24, 512:8
Hill [3] - 353:14,
431:15, 431:16
hindsight [1] - 438:5
history [1] - 509:4
hit [7] - 356:14, 367:1,
375:24, 401:17,
417:18, 440:15
hold [14] - 320:12,
333:12, 334:6,
335:17, 357:17,
375:1, 392:22,
392:25, 443:25,
467:10, 470:12,
470:13, 507:5, 509:7
holding [2] - 344:8,
372:23
Holt [1] - 512:2
home [1] - 451:7,
494:11

**HOME** [1] - 510:4
**honed** [1] - 456:1
**honestly** [1] - 482:14
**Honor** [67] - 309:2,
309:20, 310:12,
310:19, 311:9,
312:13, 312:14,
313:2, 313:11,
313:24, 314:10,
315:19, 316:6,
316:8, 319:9,
319:14, 319:19,
320:1, 320:13,
320:18, 320:25,
321:9, 321:10,
321:15, 321:25,
322:11, 326:4,
346:16, 347:2,
347:17, 347:19,
350:13, 350:20,
369:17, 370:4,
378:1, 382:21,
386:17, 416:25,
417:3, 426:6,
426:23, 427:4,
429:7, 433:25,
459:9, 459:21,
468:18, 481:14,
481:17, 488:14,
488:22, 489:25,
497:19, 502:9,
502:14, 503:1,
503:11, 505:21,
505:24, 508:6,
515:11, 515:12,
515:16, 516:14,
516:15, 516:16
**HONORABLE** [1] -
307:9
**hood** [1] - 413:5
**hope** [3] - 321:1,
322:24, 478:11
**hoped** [2] - 330:10,
452:2
**hopefully** [1] - 494:13
**hoping** [1] - 489:13
**hostile** [2] - 442:20,
442:21
**hosting** [1] - 333:3
**hotel** [4] - 339:14,
339:22, 339:23,
340:1
**hour** [6] - 340:15,
341:22, 422:20,
422:21, 427:15,
489:11
**hours** [10] - 348:22,
378:19, 400:17,
437:25, 438:23,
471:14, 480:17,

487:11, 501:14,
501:23
**house** [1] - 494:11
**House** [66] - 334:4,
334:25, 335:12,
335:19, 335:24,
349:16, 355:6,
356:2, 356:3,
356:17, 357:1,
360:10, 361:21,
361:22, 363:22,
378:5, 378:7,
378:11, 378:14,
378:18, 379:3,
379:4, 379:6, 379:7,
379:9, 379:17,
403:1, 403:3,
403:18, 404:4,
405:15, 414:6,
414:10, 414:18,
415:6, 415:13,
430:23, 431:1,
431:5, 431:9,
431:10, 431:18,
431:19, 433:4,
435:18, 435:23,
437:12, 462:3,
462:4, 462:5,
462:11, 470:17,
470:23, 471:4,
471:10, 472:3,
484:11, 488:11,
490:12, 490:13,
490:15, 490:16,
490:17, 490:21
**housed** [2] - 353:5,
353:11
**housekeeping** [1] -
309:14
**Houses** [1] - 378:13
**houses** [1] - 353:13
**hub** [1] - 352:16
**Hudson** [3] - 338:24,
339:1
**huge** [1] - 312:13
**hundreds** [3] - 430:10,
430:11, 441:22
**hurt** [3] - 313:8,
417:16, 450:21
**Hyatt** [1] - 309:9

**I**

**identifiable** [1] - 315:5
**identification** [2] -
349:1, 514:18
**identified** [2] - 392:10,
467:14
**identify** [4] - 410:2,
418:12, 495:7,
497:12

**illegal** [2] - 505:8,
507:21
**Images** [1] - 491:10
**immediate** [1] - 350:11
**immediately** [3] -
384:4, 434:6, 507:24
**impacted** [1] - 438:21
**implement** [1] -
454:21
**important** [6] - 329:22,
331:22, 455:16,
458:17, 472:1,
507:18
**Important** [1] - 504:19
**importantly** [1] - 317:8
**impose** [1] - 319:22
**imposed** [1] - 319:21
**impossible** [1] - 434:3
**IN** [3] - 307:1, 309:6,
322:22
**inaccurate** [1] -
425:13
**inactions** [1] - 345:10
**inappropriately** [1] -
328:22
**inaugural** [10] -
349:12, 357:13,
357:14, 364:10,
364:20, 366:9,
372:11, 387:25,
390:7, 406:5
**inauguration** [3] -
350:4, 357:15,
359:13
**inbox** [1] - 505:6
**incident** [2] - 366:12,
380:8
**include** [2] - 348:23,
462:4
**included** [4] - 333:11,
349:20, 409:18,
433:18
**includes** [1] - 349:10
**including** [8] - 328:8,
331:10, 332:4,
334:12, 335:18,
350:5, 383:8, 383:12
**indeed** [3] - 313:8,
313:15, 330:7
**Independence** [1] -
349:22
**independent** [2] -
328:14, 493:13
**indicate** [2] - 364:14,
377:19
**indicated** [7] - 331:14,
362:15, 372:24,
376:23, 411:16,
411:21, 505:12
**indicates** [4] - 363:6,

371:17, 497:2,
499:21
**indicating** [7] - 363:5,
364:3, 367:10,
367:11, 371:16,
427:11, 493:4
**indicating)** [2] -
377:22, 432:18
**indication** [2] -
316:17, 316:25
**indicted** [1] - 325:5
**indictment** [5] - 324:5,
324:6, 324:19,
325:1, 325:4
**individual** [5] - 339:7,
341:24, 450:14,
458:12, 506:17
**individually** [1] - 485:6
**Individuals** [2] -
491:17, 491:20
**individuals** [11] -
317:15, 339:16,
339:20, 341:22,
343:23, 427:23,
444:16, 449:6,
454:1, 465:25, 486:8
**indoors** [1] - 336:8
**inferring** [4] - 417:22,
418:10, 424:12,
424:25
**infiltrate** [1] - 505:5
**infinitely** [1] - 419:4
**inform** [1] - 314:4
**information** [10] -
320:2, 320:23,
359:5, 382:1, 401:3,
493:11, 493:12,
494:3, 497:23, 502:5
**infuriated** [2] - 503:14,
504:18
**initial** [2] - 406:10,
494:2
**injured** [9] - 366:21,
401:6, 401:11,
401:13, 432:4,
435:13, 436:4,
446:19, 451:6
**injuries** [5] - 401:15,
401:19, 401:20
**injury** [3] - 435:14,
445:24, 447:15
**inner** [2] - 473:10,
482:22
**innocence** [1] - 313:1
**innocent** [1] - 325:10
**inquire** [1] - 317:6
**inquiry** [2] - 456:2,
456:4
**inside** [27] - 320:10,
331:3, 331:14,

332:5, 335:2,
335:25, 344:17,
349:1, 358:22,
365:23, 379:23,
382:25, 388:10,
392:21, 392:25,
401:22, 403:19,
416:10, 416:14,
420:18, 453:20,
482:20, 483:23,
485:21, 485:25,
486:2, 487:25
**instead** [6] - 332:9,
334:12, 335:10,
336:5, 336:13, 516:5
**instinctual** [1] - 440:4
**instinctually** [1] -
449:21
**instruct** [6] - 317:21,
320:14, 320:15,
320:19, 324:23,
327:15
**instructed** [4] -
313:25, 314:6,
474:24, 475:1
**instruction** [3] -
315:11, 318:1, 319:3
**instructions** [10] -
323:2, 323:4, 324:9,
327:1, 327:2,
327:10, 327:16,
328:20, 328:22,
337:13
**instructor** [2] - 460:13,
460:20
**intact** [2] - 408:21,
443:10
**intend** [5] - 309:19,
311:4, 318:21,
321:24, 515:17
**intended** [2] - 326:7,
327:7
**intending** [1] - 313:22
**intent** [10] - 314:5,
315:20, 315:21,
318:7, 318:15,
337:1, 342:10,
342:16, 503:21
**interacted** [1] - 458:13
**interacting** [1] -
328:21
**interaction** [3] - 312:6,
344:23, 514:8
**interactions** [3] -
514:3, 514:7, 514:10
**interfere** [2] - 315:22,
318:22
**interior** [2] - 391:23,
433:3
**interject** [1] - 386:5

532

**interpret** [1] - 509:1
**interview** [1] - 456:6
**interviewed** [5] -
454:25, 483:14,
483:15, 483:18,
493:12
**interviews** [1] - 493:20
**intimately** [2] - 419:4,
419:8
**introduce** [6] - 311:13,
321:17, 321:21,
321:24, 351:1, 460:6
**introducing** [2] -
312:25, 315:1
**introduction** [1] -
327:14
**inverted** [1] - 501:1
**invested** [1] - 315:3
**investigate** [1] - 493:8
**investigation** [11] -
455:13, 495:2,
496:6, 497:13,
499:25, 505:4,
505:11, 509:9,
510:15, 513:13,
513:19
**involve** [1] - 358:3
**involved** [9] - 343:15,
344:22, 436:25,
458:15, 478:23,
487:19, 487:20,
492:25, 493:2
**involves** [2] - 359:21,
503:6
**IP** [3] - 500:7, 500:11,
500:13
**irregularities** [2] -
507:16, 507:17
**irrelevant** [1] - 502:6
**issue** [18] - 310:11,
310:12, 311:9,
311:20, 311:22,
312:1, 312:13,
314:18, 314:19,
314:20, 315:25,
318:5, 318:7,
318:15, 319:1,
319:11, 320:21,
343:13
**issue's** [1] - 311:2
**issued** [2] - 324:5,
500:14
**issues** [6] - 315:10,
316:8, 317:6,
318:19, 488:24,
507:9
**item** [1] - 398:24
**items** [2] - 359:22,
360:19
**itinerary** [3] - 469:21,

469:22, 471:7
**itself** [5] - 334:4,
349:2, 379:21,
400:1, 462:5

### J

**jackets** [4] - 388:3,
388:5, 388:8, 388:10
**January** [108] - 307:4,
315:3, 316:14,
317:3, 324:8,
329:18, 330:8,
331:8, 331:25,
338:5, 339:2, 339:4,
339:13, 339:15,
339:21, 339:22,
339:24, 340:2,
340:25, 343:15,
345:14, 345:15,
348:8, 348:15,
349:12, 349:18,
350:5, 350:8,
351:25, 352:1,
353:15, 353:25,
357:9, 358:14,
363:10, 364:5,
364:22, 365:4,
367:19, 367:21,
367:23, 368:1,
368:20, 369:10,
369:14, 370:7,
370:11, 370:21,
371:9, 371:18,
374:10, 375:18,
377:16, 378:3,
378:11, 379:12,
379:24, 380:2,
382:11, 382:15,
382:19, 383:4,
383:6, 383:10,
389:18, 393:18,
402:20, 419:19,
422:10, 430:14,
431:23, 436:17,
443:7, 443:17,
451:17, 451:21,
452:13, 460:16,
461:16, 462:20,
462:24, 463:18,
464:6, 464:17,
466:2, 469:10,
472:5, 490:11,
490:22, 491:12,
491:22, 493:9,
496:6, 496:9,
496:21, 496:22,
498:10, 498:11,
500:8, 501:2,
501:12, 503:8,
503:22, 503:23,

513:10
**JANUARY** [1] - 510:4
**Jenkins** [12] - 321:12,
328:24, 329:12,
383:20, 384:5,
384:13, 384:23,
464:10, 464:12,
468:11, 478:6,
497:11
**Jenna** [1] - 507:25
**JESSICA** [1] - 307:14
**job** [11] - 336:23,
351:5, 352:9, 353:8,
366:17, 402:16,
419:13, 429:25,
460:24, 460:25,
509:4
**join** [1] - 339:9
**joined** [3] - 313:14,
330:17, 336:11
**joint** [6] - 378:3, 378:5,
378:15, 378:17,
379:8, 379:11
**joke** [1] - 504:21
**Jones** [19] - 357:4,
371:11, 372:9,
373:5, 374:4,
383:15, 383:17,
384:24, 385:4,
386:20, 387:6,
396:16, 397:13,
400:11, 411:2,
416:9, 441:1,
504:11, 509:20
**jostled** [1] - 311:23
**JR** [1] - 307:20
**JUDGE** [1] - 307:9
**Judge** [4] - 310:1,
317:4, 318:4, 338:13
**judge** [6] - 311:17,
327:19, 337:11,
337:13, 495:23,
502:19
**jumping** [1] - 424:6
**jurisdiction** [1] -
389:10
**JUROR** [2] - 459:14,
459:17
**juror** [3] - 328:21,
459:13, 459:16
**Juror** [1] - 459:18
**jurors** [7] - 317:5,
317:7, 317:11,
323:9, 323:20,
366:22
**jurors'** [1] - 317:14
**jury** [33] - 314:1,
314:15, 323:14,
324:5, 328:9, 329:4,
329:7, 337:9,

347:22, 348:3,
350:15, 351:1,
367:25, 369:23,
421:14, 423:17,
425:9, 427:9, 428:3,
432:13, 432:16,
434:15, 439:4,
439:6, 444:1,
452:16, 455:20,
460:6, 460:24,
489:5, 489:21,
502:23, 515:7
**Jury** [1] - 337:17
**JURY** [2] - 307:8,
322:22
**jury's** [1] - 311:25
**JUSTICE** [1] - 307:14

### K

**Karen** [1] - 480:6
**keep** [17] - 332:8,
339:10, 343:1,
343:16, 358:5,
376:13, 392:19,
402:16, 408:23,
411:19, 427:24,
447:16, 448:21,
451:15, 461:22,
468:14
**keeping** [1] - 366:17
**kept** [4] - 334:2,
355:13, 442:1
**key** [1] - 501:2
**kick** [1] - 396:10
**kicked** [5] - 336:15,
447:2, 447:4,
450:14, 458:21
**kicking** [4] - 420:18,
424:10, 446:9,
447:10
**killed** [1] - 446:20
**kind** [31] - 351:19,
356:2, 356:10,
357:1, 357:10,
358:7, 366:5,
368:22, 374:9,
381:5, 391:21,
393:3, 401:16,
402:21, 404:15,
405:25, 407:2,
408:15, 408:16,
409:7, 416:18,
429:25, 434:10,
462:14, 465:14,
465:15, 466:1,
488:3, 492:18,
496:23, 501:1
**kinds** [2] - 351:14,
394:25
**Kirst** [3] - 498:21,

498:24, 499:21
**Kirstyn** [14] - 309:4,
324:6, 329:19,
339:11, 493:18,
498:18, 500:25,
501:3, 505:15,
506:14, 508:18,
509:22, 512:24,
512:25
**KIRSTYN** [1] - 307:5
**Kirstyn's** [1] - 339:11
**kirstyn.niemela@
gmail.com** [1] -
498:13
**kit** [1] - 395:5
**kniemela88@gmail.
com** [1] - 498:15
**knife** [1] - 454:13
**knives** [1] - 438:17
**knock** [2] - 359:14,
359:15
**knowing** [2] - 446:5,
467:2
**knowingly** [1] - 338:1
**knowledge** [3] - 359:8,
441:17, 441:19
**known** [4] - 333:6,
366:11, 397:4,
434:23
**Known** [2] - 491:16,
491:20
**knows** [1] - 408:14
**Kramer** [1] - 488:23
**Kumbaya** [1] - 488:6
**KY** [3] - 311:1, 311:11,
311:22

### L

**label** [1] - 385:8
**labeled** [3] - 357:11,
491:9, 491:19
**lack** [2] - 421:4,
453:18
**ladders** [4] - 332:15,
343:9, 376:1, 376:2
**ladies** [8] - 329:15,
347:24, 369:18,
370:1, 427:9,
427:18, 502:2,
514:25
**lamppost** [1] - 343:3
**lapel** [1] - 338:14
**lapse** [4] - 405:22,
405:24, 425:2,
425:13
**large** [6] - 321:5,
349:16, 361:13,
382:6, 462:5, 474:6
**larger** [4] - 361:13,

533

445:2, 447:23, 495:9
**last** [8] - 320:25,
429:19, 467:12,
476:21, 489:10,
492:12, 499:13,
508:12
**late** [1] - 357:19
**latitude** [1] - 495:25
**Lauren** [1] - 322:14
**LAW** [2] - 307:17,
307:20
**law** [9] - 309:24, 310:5,
324:10, 327:2,
327:13, 327:15,
348:20, 487:15
**lawfully** [1] - 313:4
**lawn** [4] - 419:16,
420:21, 421:8,
426:15
**laws** [1] - 338:5
**lawyers** [9] - 323:24,
325:22, 325:23,
326:6, 326:21,
327:6, 328:17, 353:1
**layout** [1] - 391:23
**layperson** [1] - 351:8
**Leach** [16] - 320:12,
320:16, 339:8,
339:9, 339:20,
341:4, 341:24,
342:2, 342:5,
342:20, 512:16,
512:17, 512:19,
512:24
**lead** [5] - 410:18,
475:18, 487:22,
493:8, 493:10
**leading** [2] - 334:3,
485:23
**leads** [3] - 366:16,
415:14, 415:24
**lean** [1] - 376:5
**learning** [1] - 474:1
**least** [3] - 330:8,
338:5, 438:17
**leave** [4] - 427:18,
467:13, 480:22,
481:2
**leaves** [1] - 494:11
**leaving** [2] - 345:14
**led** [2] - 409:1, 476:19
**left** [24] - 333:13,
336:10, 339:5,
341:16, 342:13,
342:22, 342:23,
345:4, 354:14,
362:12, 363:19,
364:19, 385:11,
394:2, 409:20,
413:4, 419:24,

420:11, 443:6,
453:10, 480:18,
487:21, 496:17
**left-hand** [2] - 341:16,
496:17
**leg** [1] - 410:23
**legal** [5] - 323:3,
323:4, 327:2,
507:20, 508:1
**legally** [1] - 509:3
**legend** [1] - 440:16
**legit** [1] - 504:22
**length** [1] - 340:15
**less** [7] - 312:5,
314:22, 330:7,
335:6, 433:14,
434:24, 436:12
**lethal** [3] - 433:14,
434:24, 436:12
**letters** [1] - 331:16
**level** [10] - 390:12,
398:4, 398:7, 398:9,
423:25, 434:18,
435:16, 446:4,
471:17, 471:23
**levels** [1] - 439:16
**liability** [1] - 312:21
**liaison** [4] - 352:23,
463:20, 463:23,
466:11
**liberal** [1] - 505:7
**Lieutenant** [11] -
427:5, 429:8,
429:15, 433:22,
440:15, 440:19,
443:5, 444:5,
450:10, 458:10,
459:5
**lieutenant** [3] - 352:1,
352:2, 429:22
**LIEUTENANT** [2] -
308:5, 429:12
**lieutenants** [1] - 352:4
**life** [3] - 418:18, 494:8,
494:9
**lifeline** [1] - 333:24
**likely** [2] - 328:16,
483:21
**limine** [6] - 309:16,
310:8, 310:20,
310:24, 312:20,
312:21
**limited** [1] - 478:2
**Lincoln** [1] - 355:19
**line** [48] - 333:12,
333:13, 333:15,
334:6, 334:14,
334:23, 334:24,
335:5, 335:7,
335:11, 335:18,

335:19, 345:4,
362:13, 362:14,
362:15, 362:19,
362:21, 364:25,
367:10, 371:16,
371:17, 371:24,
371:25, 372:24,
375:1, 385:21,
389:2, 407:21,
407:23, 408:4,
425:16, 440:1,
440:5, 441:14,
442:11, 442:15,
443:8, 443:19,
445:6, 445:19,
456:2, 458:19,
496:16, 496:19,
497:1, 509:7, 515:25
**line-up** [1] - 515:25
**lines** [11] - 313:16,
321:15, 330:24,
331:1, 340:22,
343:3, 344:20,
345:2, 363:3, 408:23
**link** [10] - 330:8,
504:22, 505:9,
510:2, 510:14,
511:3, 511:9,
511:24, 512:13,
512:15
**Lisa** [1] - 307:23
**LISA** [1] - 517:3
**list** [2] - 311:1, 321:11
**listed** [1] - 498:9
**listened** [1] - 382:11
**listening** [1] - 381:17,
381:25
**listing** [1] - 352:10
**literally** [1] - 458:14
**live** [1] - 461:25
**lives** [1] - 409:7
**living** [4] - 328:15,
429:21, 492:14,
494:7
**loaded** [2] - 337:8,
345:18
**lobby** [1] - 340:1
**local** [1] - 389:11
**locate** [3] - 493:12,
494:7, 494:13
**located** [4] - 348:21,
349:7, 349:25, 483:1
**location** [13] - 364:21,
410:17, 462:2,
467:18, 471:3,
472:4, 473:16,
480:11, 481:13,
487:11, 495:2,
495:3, 495:8
**locations** [7] - 309:18,

363:22, 371:21,
382:25, 402:4,
495:20, 497:5
**lock** [8] - 392:19,
392:23, 393:4,
393:23, 396:6,
396:8, 397:9, 416:13
**locked** [5] - 323:14,
337:7, 345:17,
392:19, 393:23
**lodged** [1] - 484:10
**Londonderry** [6] -
307:18, 307:18,
307:21, 307:21,
338:22, 339:1
**longer..** [1] - 489:15
**longitude** [1] - 495:25
**Longworth** [7] - 431:9,
435:18, 437:7,
437:10, 437:12,
452:17, 453:13
**look** [12] - 314:7,
343:1, 345:23,
420:2, 420:8,
450:11, 463:6,
471:3, 473:25,
489:14, 504:5,
504:21
**looked** [7] - 332:10,
374:10, 439:25,
482:17, 484:16,
484:17, 484:20
**looking** [64] - 354:6,
354:8, 357:7,
365:22, 372:10,
373:10, 374:5,
374:7, 374:13,
374:23, 374:24,
375:6, 375:11,
376:22, 377:20,
384:20, 384:25,
385:10, 385:17,
385:20, 385:22,
387:22, 387:23,
390:2, 390:20,
391:1, 394:21,
398:11, 400:5,
400:6, 402:25,
406:3, 406:9, 410:3,
412:2, 412:14,
412:17, 413:16,
414:1, 414:9,
414:12, 414:20,
415:5, 415:7,
415:12, 415:14,
415:23, 420:21,
421:8, 439:4,
440:19, 458:10,
469:21, 479:4,
484:19, 484:20,

496:15, 496:16,
500:19, 504:7,
506:3, 507:3,
510:12, 512:13
**looks** [8] - 375:7,
384:7, 384:13,
406:16, 450:11,
464:13, 510:2,
514:11
**loose** [1] - 394:8
**lose** [2] - 399:5,
448:16
**losing** [1] - 477:1
**loud** [6] - 322:11,
341:1, 384:3,
444:24, 456:25
**louder** [2] - 345:10,
478:14
**loudly** [1] - 447:3
**Lower** [6] - 366:13,
366:15, 387:24,
406:11, 434:22,
452:11
**lunch** [7] - 427:7,
427:10, 427:12,
427:13, 428:2,
429:4, 516:7
**Lunch** [1] - 428:5

## M

**M-A-R-K** [1] - 492:12
**M/C** [2] - 470:1, 470:2
**ma'am** [4] - 346:21,
369:24, 426:24,
459:20
**mace** [2] - 433:6,
433:18
**mag** [6] - 392:19,
392:23, 393:4,
393:23, 396:6, 396:8
**magazine** [1] - 438:17
**magazines** [1] - 395:4
**magnet** [1] - 397:9
**magnetometer** [8] -
359:22, 359:24,
360:1, 360:18,
360:19, 360:21,
361:8, 465:22
**magnetometers** [1] -
415:16
**main** [1] - 389:10
**mainstream** [1] -
509:1
**maintain** [3] - 382:24,
438:12, 448:14
**major** [2] - 392:21,
401:4
**majority** [2] - 321:3,
337:19

**man** [8] - 396:1, 396:10, 397:16, 410:14, 440:9, 444:24, 447:10, 479:14

**manageable** [1] - 431:16

**managed** [1] - 405:18

**management** [1] - 351:16

**mandated** [1] - 359:1

**manned** [1] - 348:24

**manning** [1] - 442:15

**mantra** [1] - 380:18

**map** [8] - 323:6, 326:8, 356:13, 357:8, 363:2, 390:6, 464:20, 464:22

**March** [1] - 358:23

**marched** [1] - 332:1

**marching** [1] - 340:10

**mark** [22] - 391:10, 394:13, 396:19, 398:12, 400:4, 406:12, 411:3, 411:15, 412:25, 414:23, 432:17, 439:7, 442:24, 443:3, 443:14, 444:9, 445:14, 448:20, 449:16, 449:19, 450:1, 479:13

**MARK** [2] - 308:10, 492:6

**Mark** [7] - 339:8, 490:1, 492:12, 512:16, 512:17, 512:19

**marked** [3] - 372:4, 465:18, 469:20

**Maryland** [2] - 375:10, 430:3

**masked** [1] - 427:25

**masks** [3] - 427:20, 427:22, 427:24

**masse** [2] - 321:22, 321:25

**match** [1] - 330:20

**material** [1] - 502:3

**matter** [2] - 317:17, 432:24

**matters** [1] - 309:15

**MATTHEW** [1] - 307:11

**Mean** [1] - 501:18

**mean** [31] - 314:3, 318:11, 366:20, 368:4, 371:19, 373:23, 381:20,

389:14, 398:5, 401:9, 401:19, 412:11, 416:17, 419:4, 437:22, 442:6, 451:24, 451:25, 460:10, 461:5, 464:1, 470:2, 470:8, 470:12, 472:23, 474:25, 496:23, 497:4, 501:22, 506:16, 511:15

**meaning** [4] - 366:12, 405:4, 470:15, 508:18

**meaningfully** [1] - 350:18

**means** [10] - 325:21, 325:22, 327:22, 328:3, 351:15, 427:11, 464:2, 470:13, 494:9, 500:1

**mechanisms** [2] - 392:17

**media** [7] - 328:12, 345:11, 345:15, 388:2, 498:8, 505:7, 509:1

**medical** [2] - 435:16, 435:19

**meet** [1] - 339:24

**meeting** [6] - 329:23, 329:24, 360:12, 378:6, 379:9, 379:17

**member** [18] - 317:22, 331:23, 333:2, 359:2, 360:4, 361:5, 361:7, 361:9, 361:10, 361:11, 361:12, 361:14, 361:15, 361:17, 362:4, 404:8

**members** [25] - 315:5, 328:8, 328:9, 331:2, 331:7, 335:1, 335:25, 336:1, 337:9, 349:19, 350:11, 361:12, 361:16, 370:9, 378:5, 391:11, 402:8, 402:18, 403:13, 404:1, 404:3, 404:6, 405:18, 427:24, 465:11

**Members** [1] - 337:17

**Memorial** [2] - 420:12, 420:13

**memory** [3] - 329:5, 456:7, 459:3

**mentioned** [4] - 381:17, 427:19, 461:17, 494:18

**mesh** [2] - 372:19

**message** [2] - 505:10, 505:14

**messages** [2] - 336:25, 337:2

**messenger** [1] - 504:20

**met** [9] - 332:9, 339:15, 339:18, 339:22, 340:1, 378:14, 466:10, 512:19, 514:9

**metal** [3] - 331:12, 333:2, 372:22

**meters** [2] - 349:4, 349:5

**method** [1] - 381:1

**metropolitan** [1] - 453:17

**Metropolitan** [11] - 348:16, 366:17, 366:24, 389:5, 389:8, 389:9, 400:7, 400:12, 406:17, 435:14, 453:16

**Miami** [1] - 492:19

**mic** [2] - 310:2, 311:18

**Michael** [11] - 316:10, 316:18, 316:20, 317:2, 317:7, 317:9, 317:12, 318:7, 318:13, 469:11, 479:19

**MICHAEL** [1] - 307:11

**Michelle** [1] - 503:6

**Michigan** [2] - 507:4, 507:9

**middle** [10] - 351:16, 373:6, 373:22, 374:17, 439:20, 488:5, 499:12, 511:20, 512:9, 513:5

**might** [14] - 314:4, 314:19, 320:11, 340:23, 351:8, 383:16, 384:4, 471:19, 471:20, 471:21, 472:16, 487:21, 489:14, 514:24

**Mike** [4] - 315:8, 331:5, 339:17, 378:16

**military** [1] - 425:21

**mind** [2] - 384:7, 451:3

**mindset** [1] - 509:10

**mine** [1] - 383:18

**minor** [1] - 319:25

**minute** [8] - 314:23, 325:25, 378:22, 443:14, 444:23, 447:17, 448:20, 509:2

**minute-17-second** [1] - 442:24

**minute-and-10-second** [1] - 394:13

**minutes** [18] - 322:15, 322:16, 335:7, 336:15, 338:12, 342:15, 343:22, 379:4, 386:24, 387:4, 391:18, 407:16, 422:21, 427:8, 427:15, 468:17, 470:14, 470:22

**mirrored** [1] - 330:2

**miss** [1] - 512:24

**missed** [1] - 399:15

**mission** [1] - 402:12

**mob** [26] - 313:7, 329:20, 330:16, 330:23, 330:25, 331:4, 331:18, 331:23, 333:9, 333:10, 333:15, 333:19, 333:20, 334:2, 334:7, 334:12, 335:15, 335:18, 336:1, 336:11, 336:14, 336:23, 338:5, 369:11

**mob's** [1] - 330:21

**mode** [1] - 447:7

**model** [2] - 363:17, 364:10

**modern** [1] - 464:15

**moment** [37] - 333:14, 335:20, 346:17, 353:7, 383:19, 386:6, 390:20, 404:24, 405:1, 405:8, 407:18, 416:25, 435:12, 435:15, 441:13, 441:23, 442:14, 442:16, 445:3, 445:9, 445:21, 446:1, 446:7, 446:10, 446:18, 447:5, 447:7, 447:8, 447:14, 449:20, 451:4, 464:11, 464:12, 476:9, 479:2, 479:10,

481:14

**monitor** [1] - 514:16

**monitoring** [1] - 382:24

**montage** [3] - 313:23, 384:18, 386:10

**MONTEITH** [6] - 307:20, 307:20, 417:7, 426:18, 452:7, 458:5

**Monteith** [3] - 338:20, 338:21, 417:5

**Monteith).................... ...............417** [1] - 308:4

**Monteith).................... ...............452** [1] - 308:6

**months** [2] - 430:5, 501:12

**Monument** [5] - 355:17, 355:20, 356:4, 356:15, 423:5

**monument** [3] - 356:25, 385:19, 387:13

**monuments** [1] - 355:14

**moot** [5] - 309:22, 310:14, 311:2, 311:8, 311:10

**mop** [1] - 509:4

**MOREIRA** [1] - 517:3

**Moreira** [3] - 307:23, 329:2, 517:10

**morning** [24] - 309:5, 309:6, 322:21, 322:22, 323:1, 328:19, 329:11, 338:19, 339:24, 340:2, 340:3, 345:15, 346:21, 346:22, 350:24, 350:25, 369:16, 369:19, 427:19, 481:7, 515:5, 516:6, 516:13

**most** [11] - 338:17, 340:5, 401:4, 431:12, 447:22, 447:23, 458:17, 481:9, 490:11, 495:14, 501:2

**mostly** [1] - 431:21

**mother** [8] - 320:6, 320:7, 320:15, 320:22, 339:11, 342:25, 512:21

**mother's** [1] - 320:9

**motion** [10] - 309:17,

309:23, 310:8,
310:20, 310:23,
312:19, 312:21,
314:11, 381:6,
395:12
**motions** [2] - 309:16,
314:14
**motivating** [1] -
503:23
**motive** [2] - 337:2,
503:21
**motorcade** [12] -
371:1, 371:6, 470:3,
470:20, 472:6,
472:22, 472:24,
472:25, 473:2,
473:5, 473:8, 484:3
**motto** [1] - 380:18
**move** [11] - 321:4,
411:10, 444:3,
473:12, 473:16,
476:18, 479:5,
485:8, 508:5,
510:12, 513:8
**moved** [6] - 347:18,
418:23, 477:4,
477:5, 506:1, 508:7
**movement** [1] - 315:2
**movements** [1] -
466:13
**moves** [3] - 347:4,
502:14, 505:18
**movies** [1] - 461:7
**moving** [1] - 313:15
**MPD** [2] - 348:16,
437:5
**MR** [199] - 309:9,
309:12, 309:20,
310:1, 310:3,
310:12, 311:9,
311:17, 311:19,
311:22, 312:9,
312:11, 312:13,
314:18, 315:19,
316:6, 316:8,
316:17, 317:25,
318:3, 318:15,
318:19, 319:4,
319:9, 319:14,
319:18, 319:25,
320:13, 320:17,
320:21, 320:25,
321:7, 321:9,
321:10, 321:13,
321:15, 321:19,
321:24, 322:3,
322:9, 322:13,
326:4, 338:13,
338:16, 346:16,
347:2, 347:7,

347:17, 347:19,
348:7, 350:20,
350:23, 354:11,
357:4, 362:7,
363:13, 364:16,
366:7, 369:17,
370:4, 370:5,
371:11, 372:8,
373:4, 374:4,
374:12, 374:22,
376:9, 377:18,
377:23, 379:14,
382:21, 383:24,
384:7, 384:10,
384:13, 384:16,
384:17, 384:23,
385:3, 385:6,
385:13, 385:16,
386:17, 386:20,
386:23, 387:6,
387:19, 387:21,
388:14, 388:16,
389:25, 390:14,
390:17, 391:8,
391:16, 392:2,
392:5, 392:12,
392:14, 393:13,
393:20, 394:11,
395:7, 395:9,
395:24, 396:16,
396:18, 397:12,
397:15, 397:19,
397:24, 398:21,
398:23, 399:2,
399:4, 399:23,
400:4, 400:10,
402:24, 404:9,
404:12, 404:20,
404:23, 405:13,
405:20, 406:6,
407:3, 407:15,
408:8, 408:11,
409:8, 410:4, 410:7,
410:10, 411:2,
411:10, 411:14,
411:19, 412:1,
412:13, 412:15,
412:19, 412:24,
413:10, 413:25,
414:7, 414:15,
414:22, 415:3,
415:10, 415:21,
416:8, 416:25,
417:3, 417:7, 426:6,
426:18, 426:21,
426:23, 429:7,
452:7, 458:5, 459:9,
460:3, 464:8,
468:11, 468:18,
468:22, 468:25,
478:6, 478:13,

479:8, 479:13,
481:14, 481:16,
481:19, 487:6,
487:9, 488:14,
489:7, 489:10,
489:13, 489:18,
493:5, 497:18,
502:19, 503:1,
503:3, 505:21,
505:24, 508:6,
515:12, 515:16,
515:21, 516:1,
516:10, 516:14,
516:15
**MS** [79] - 310:19,
310:22, 311:3,
312:14, 313:2,
313:24, 314:10,
329:11, 329:14,
329:18, 335:23,
427:4, 429:14,
432:11, 432:15,
433:25, 439:2,
440:8, 440:17,
440:25, 442:23,
443:13, 443:21,
444:22, 445:13,
447:18, 448:19,
448:23, 448:25,
449:15, 449:18,
449:25, 450:3,
452:5, 458:9, 459:4,
488:22, 489:25,
490:4, 491:3, 492:8,
496:13, 497:10,
497:19, 498:4,
499:1, 499:4, 499:7,
499:16, 500:18,
501:20, 502:9,
503:11, 503:18,
504:2, 504:6,
504:10, 504:25,
505:17, 506:2,
506:7, 507:1,
507:12, 507:22,
508:4, 508:8,
508:12, 508:20,
509:19, 510:10,
510:22, 511:7,
511:19, 512:6,
513:3, 514:17,
514:20, 514:23,
516:16
**MSM** [1] - 509:1
**multiple** [10] - 330:24,
331:19, 349:11,
352:5, 395:21,
401:10, 402:3,
408:17, 471:9
**munitions** [1] - 436:14

**must** [5] - 324:20,
325:4, 325:17,
327:22, 327:23

# N

**name** [17] - 339:7,
339:19, 351:2,
429:17, 429:19,
492:11, 492:12,
498:18, 498:21,
498:24, 499:12,
499:13, 499:21,
500:25
**named** [2] - 462:10,
470:4
**Nancy** [3] - 361:21,
361:22, 379:2
**narrowed** [1] - 431:16
**national** [2] - 492:20,
492:21
**National** [1] - 315:8
**nature** [2] - 310:10,
318:12
**Naval** [4] - 462:1,
462:10, 466:4, 482:1
**near** [5] - 311:7,
312:16, 335:10,
363:3, 404:14
**nearby** [2] - 311:25,
343:7
**nearly** [1] - 434:3
**necessary** [3] -
403:15, 461:9,
467:15
**need** [15] - 329:16,
338:11, 338:14,
346:17, 368:19,
370:17, 382:2,
383:18, 389:14,
389:15, 432:25,
450:25, 467:6, 472:4
**needed** [9] - 316:4,
372:3, 389:24,
433:10, 435:12,
467:13, 473:6,
475:2, 476:6
**needs** [2] - 402:5,
504:24
**negative** [1] - 317:12
**nerve** [1] - 352:15
**Network** [1] - 490:19
**never** [11] - 345:18,
345:21, 346:3,
369:14, 376:1,
384:7, 436:12,
452:2, 457:5,
457:18, 457:20
**New** [7] - 338:21,
338:22, 338:24,

339:1, 339:5, 492:22
**new** [2] - 353:10,
376:1
**news** [5] - 359:7,
366:25, 380:20,
380:21
**next** [22] - 313:7,
323:6, 328:16,
332:21, 336:21,
337:25, 357:22,
376:14, 413:2,
427:10, 429:6,
437:25, 467:20,
481:7, 489:10,
489:24, 500:24,
504:25, 506:10,
508:16, 509:2, 509:4
**NH** [2] - 307:18,
307:21
**nice** [4] - 309:7,
322:24, 427:3, 429:4
**Nicole** [1] - 511:10
**niece** [1] - 339:18
**Niem** [1] - 498:21
**Niemela** [85] - 309:4,
310:4, 311:6,
311:12, 311:15,
311:24, 312:5,
312:16, 316:11,
316:18, 317:1,
324:7, 329:19,
338:22, 339:2,
339:7, 339:8,
339:20, 340:11,
341:7, 341:22,
341:25, 342:2,
342:24, 343:3,
343:8, 343:17,
343:25, 344:3,
344:8, 344:11,
344:13, 344:16,
344:21, 345:6,
346:10, 386:11,
386:13, 417:23,
422:12, 423:4,
423:14, 423:22,
424:12, 424:23,
425:5, 425:10,
426:9, 449:13,
453:7, 454:11,
457:5, 486:7,
486:18, 486:25,
492:25, 493:8,
493:14, 494:6,
495:3, 495:11,
497:4, 498:18,
499:3, 499:11,
499:12, 500:25,
501:4, 503:6,
505:15, 506:14,

508:19, 509:22,
510:13, 510:17,
511:13, 512:1,
512:4, 512:18,
512:20, 512:22,
512:23, 512:24,
513:9, 513:25
**NIEMELA** [1] - 307:5
**Niemela's** [12] - 313:2,
316:22, 320:22,
340:18, 341:11,
342:10, 343:12,
493:18, 497:1,
497:14, 497:22,
510:19
**night** [3] - 309:7,
339:14, 515:6
**nine** [1] - 416:2
**NO** [2] - 459:14,
459:17
**nobody** [2] - 421:7,
440:3
**noise** [3] - 341:1,
342:11, 393:8
**noisy** [1] - 474:7
**none** [5] - 344:22,
345:6, 359:13,
454:10, 458:3
**nonetheless** [1] -
379:22
**nonwitness** [1] - 320:1
**nook** [1] - 409:19
**normal** [1] - 403:10
**normally** [1] - 351:17
**North** [1] - 307:12
**north** [5] - 349:4,
349:21, 354:9,
356:23, 496:18
**northeast** [2] - 362:16,
385:20
**Northeast** [1] - 353:23
**Northwest** [1] - 392:7
**northwest** [1] - 377:24
**nose** [1] - 434:12
**notebook** [1] - 323:9
**notebooks** [1] -
323:13
**notes** [6] - 323:10,
323:11, 323:12,
323:13, 329:5, 517:5
**nothing** [6] - 425:10,
454:19, 464:14,
481:16, 488:14,
511:14
**notice** [3] - 323:18,
370:24, 502:3
**notices** [1] - 342:21
**notification** [1] - 469:8
**November** [9] -
358:10, 378:10,

494:21, 503:5,
503:12, 503:13,
504:13, 506:9,
513:10
**nowhere** [2] - 312:16,
313:20
**number** [21] - 309:16,
314:13, 319:5,
321:5, 340:21,
340:22, 342:1,
347:20, 388:19,
430:8, 483:15,
497:12, 497:13,
497:22, 498:2,
498:7, 498:10,
501:3, 501:6, 507:18
**numbers** [6] - 330:21,
330:22, 333:10,
399:25, 442:6,
451:25
**numerous** [3] -
329:21, 432:21,
436:20
**NW** [3] - 307:15,
307:24, 517:12

## O

**O'Neill** [1] - 431:11
**object** [7] - 322:7,
330:10, 463:9,
471:11, 502:19,
503:3, 510:7
**objected** [3] - 321:25,
322:5, 472:17
**objection** [18] - 321:3,
327:22, 328:3,
347:8, 347:16,
347:17, 378:20,
426:6, 471:16,
472:17, 484:11,
493:5, 497:18,
502:18, 502:24,
505:20, 505:25,
508:6
**objection's** [1] -
503:24
**objections** [3] -
321:16, 327:14,
327:21
**Observatory** [4] -
462:1, 462:10,
466:4, 482:1
**observe** [5] - 311:16,
312:2, 312:3,
439:24, 490:10
**observed** [2] - 312:10,
486:17
**observes** [1] - 320:23
**obstruct** [1] - 318:21
**obstruction** [1] -

315:15
**obtained** [1] - 504:8
**obvious** [1] - 315:16
**obviously** [9] - 310:7,
314:3, 319:1,
321:23, 322:5,
322:6, 386:7,
427:20, 507:8
**occasional** [1] - 407:5
**occasions** [3] -
331:20, 370:17,
371:5
**occur** [4] - 319:16,
436:17, 445:18
**occurred** [11] - 312:18,
366:12, 375:22,
380:8, 382:19,
405:1, 421:16,
447:6, 452:1,
455:16, 504:15
**occurring** [2] - 437:3,
490:17
**October** [2] - 358:1,
358:8
**OF** [8] - 307:1, 307:2,
307:8, 307:14,
307:17, 307:20,
510:4, 517:1
**offense** [5] - 324:22,
325:13, 325:15,
325:17, 325:18
**offenses** [4] - 324:19,
324:20, 325:14,
503:8
**offer** [1] - 314:3
**office** [14] - 330:14,
381:12, 402:4,
435:18, 468:1,
470:9, 470:14,
470:21, 471:4,
472:9, 475:19,
476:23, 492:23,
492:24
**Office** [3] - 431:9,
431:10, 462:8
**Officer** [7] - 311:1,
311:6, 311:11,
311:22, 366:21,
366:24, 427:5
**officer** [33] - 311:14,
312:1, 312:4, 334:1,
344:3, 344:4,
344:18, 345:3,
345:5, 366:24,
378:23, 379:6,
394:12, 394:21,
395:10, 395:12,
398:13, 399:14,
401:12, 416:19,
417:23, 417:25,

418:2, 432:23,
435:14, 436:4,
441:18, 453:15,
453:16, 457:16,
458:1, 482:15
**officers** [81] - 329:21,
333:7, 333:10,
333:14, 333:15,
333:18, 334:8,
334:11, 334:13,
334:20, 335:6,
341:18, 343:7,
344:2, 344:20,
344:23, 345:6,
348:8, 348:11,
348:15, 348:18,
352:24, 352:25,
353:12, 368:6,
368:13, 368:16,
368:20, 371:21,
372:2, 373:17,
373:18, 374:25,
375:24, 380:5,
381:25, 382:5,
385:21, 386:3,
394:17, 394:25,
395:21, 396:23,
398:15, 398:16,
398:25, 399:5,
401:2, 401:5, 401:6,
401:11, 401:13,
403:13, 405:2,
405:7, 408:10,
408:25, 416:15,
417:13, 431:3,
431:21, 432:4,
433:10, 433:15,
436:18, 437:5,
437:22, 437:23,
438:10, 438:19,
438:22, 440:1,
441:8, 442:3,
444:17, 445:19,
446:5, 450:18,
450:22, 451:15,
457:11
**OFFICES** [2] - 307:17,
307:20
**offices** [2] - 334:3,
338:22
**official** [6] - 348:11,
348:19, 359:5,
360:8, 360:14,
517:11
**OFFICIAL** [2] - 510:4,
517:1
**Official** [1] - 307:23
**once** [15] - 334:1,
345:24, 356:10,
358:20, 360:10,

365:21, 393:4,
402:21, 402:23,
409:13, 409:16,
471:15, 473:11,
476:25, 503:22
**one** [101] - 309:17,
309:21, 310:13,
311:24, 314:18,
314:21, 316:10,
316:13, 316:25,
319:10, 319:25,
321:13, 322:4,
323:15, 324:10,
325:7, 325:13,
325:16, 325:21,
325:22, 329:13,
330:25, 331:22,
332:4, 333:18,
337:6, 339:17,
345:16, 347:6,
351:9, 351:18,
352:4, 352:12,
358:6, 360:8, 364:8,
365:6, 366:6,
366:25, 373:23,
375:9, 375:10,
376:15, 376:16,
378:22, 382:21,
383:19, 388:9,
395:16, 395:22,
395:23, 397:4,
403:16, 404:14,
407:22, 409:21,
409:24, 410:11,
415:16, 415:19,
416:4, 416:19,
416:25, 419:23,
427:23, 431:22,
437:2, 437:12,
442:1, 444:14,
447:8, 452:16,
454:21, 456:2,
458:21, 464:4,
466:10, 474:3,
475:20, 478:21,
481:14, 486:6,
486:18, 486:25,
487:3, 487:25,
494:3, 495:15,
500:10, 505:21,
514:8, 516:1, 516:3,
516:7
**one's** [1] - 344:2
**one-minute-50** [1] -
445:13
**one-minute-57** [1] -
391:10
**one-on-one** [1] -
416:19
**ones** [8] - 321:24,

321:25, 322:10,
367:5, 369:6,
451:17, 487:1
**ongoing** [1] - 350:4
**Open** [2] - 336:16,
491:10
**open** [11] - 326:3,
336:13, 349:10,
377:9, 388:7, 393:9,
393:22, 396:4,
396:10, 493:11,
513:13
**open-source** [2] -
493:11, 513:13
**opening** [8] - 322:25,
325:25, 326:2,
326:5, 326:22,
329:9, 386:12, 433:9
**openings** [1] - 372:1
**operate** [2] - 382:23,
447:22
**operations** [1] -
463:21
**opinions** [1] - 345:20
**opportunity** [3] -
448:14, 476:8, 477:1
**opposite** [1] - 353:21
**option** [2] - 446:1,
446:6
**or..** [1] - 431:20
**Order** [1] - 350:6
**order** [9] - 325:3,
326:10, 326:16,
327:4, 357:23,
367:7, 383:4,
463:12, 482:10
**orient** [6] - 354:9,
363:13, 384:25,
387:8, 387:22,
434:15
**orientation** [1] -
375:11
**ornate** [1] - 412:12
**others'** [2] - 313:12,
343:13
**otherwise** [2] - 350:10,
502:6
**OUR** [1] - 337:8
**outer** [4] - 482:17,
483:7, 483:9, 483:23
**outline** [3] - 464:20,
464:23, 465:7
**outnumbered** [8] -
333:21, 334:8,
335:17, 389:22,
406:16, 408:7,
416:23, 442:5
**outset** [1] - 507:20
**outside** [27] - 320:3,
320:9, 330:9,

336:12, 341:5,
341:6, 374:7,
382:25, 387:1,
393:23, 394:8,
399:9, 412:20,
413:17, 414:2,
414:10, 414:18,
415:6, 415:13,
415:24, 473:20,
473:24, 482:8,
484:14, 484:23,
502:23, 510:6
**overall** [1] - 495:5
**overarching** [1] -
380:23
**overcome** [1] - 434:6
**overhead** [1] - 341:15
**overlaid** [1] - 391:21
**overnight** [2] - 323:14,
515:9
**overran** [1] - 329:20
**overrule** [1] - 328:3
**overruled** [2] - 493:6,
503:25
**oversaw** [1] - 431:2
**overtaken** [2] -
310:21, 445:4
**overtakes** [1] - 443:19
**overview** [4] - 313:22,
354:8, 385:2, 389:25
**overwhelm** [1] -
330:23
**overwhelmed** [2] -
333:10, 389:24
**overwhelming** [1] -
451:25
**own** [3] - 337:19,
365:13, 478:18
**owned** [1] - 339:5

## P

**P.M** [2] - 480:20,
480:21
**p.m** [20] - 341:5,
343:24, 378:12,
378:14, 378:18,
378:21, 379:2,
379:10, 379:17,
385:17, 396:19,
398:12, 406:13,
443:7, 443:17,
481:6, 500:12,
516:18
**Page** [5] - 376:11,
376:12, 376:17,
500:18, 507:13
**page** [14] - 308:2,
376:14, 500:22,
503:19, 504:25,

505:1, 507:1,
507:15, 508:21,
508:23, 510:13,
511:20, 512:9, 513:5
**panel** [1] - 328:9
**pants** [1] - 410:15
**parade** [1] - 346:6
**parading** [1] - 324:15
**parameter** [1] - 496:2
**parameters** [3] -
465:15, 495:25,
496:4
**paraphernalia** [2] -
438:11, 438:13
**pardon** [1] - 510:11
**park** [1] - 356:2
**parkway** [1] - 349:17
**parliamentarian** [1] -
424:19
**parliamentarian's** [1] -
397:5
**part** [18] - 313:7,
329:19, 330:25,
338:4, 340:5,
341:10, 365:10,
376:24, 380:16,
388:7, 388:17,
430:24, 431:13,
444:16, 466:21,
488:10, 491:5
**participated** [1] -
313:18
**participation** [1] -
317:17
**particular** [16] - 316:9,
318:6, 325:17,
327:21, 368:19,
378:19, 380:19,
381:1, 408:18,
431:19, 431:22,
449:3, 495:4, 501:21
**parties** [5] - 323:24,
328:17, 347:20,
348:4, 350:16
**partly** [1] - 342:20
**pass** [2] - 320:22,
438:11
**passed** [1] - 482:10
**past** [10] - 313:15,
334:1, 334:13,
336:12, 365:21,
389:2, 436:6,
445:18, 511:14,
512:21
**pat** [2] - 360:1, 360:21
**path** [6] - 362:25,
365:17, 375:4,
387:16, 390:7, 479:6
**pathway** [1] - 345:1
**patience** [1] - 491:3

**Patriots** [1] - 509:6
**pattern** [3] - 399:25,
494:8, 494:9
**PAUL** [2] - 307:17,
307:17
**Pause** [8] - 338:15,
346:20, 384:9,
384:12, 417:2,
468:21, 481:15,
505:23
**pause** [32] - 328:23,
384:22, 384:23,
384:24, 385:6,
385:16, 386:23,
387:6, 387:21,
388:16, 390:17,
392:5, 392:14,
394:11, 395:9,
404:12, 404:23,
407:15, 408:11,
410:5, 410:8,
410:10, 411:14,
413:1, 440:17,
443:2, 443:13,
443:25, 444:23,
447:18, 449:16,
450:6
**paused** [9] - 389:25,
390:18, 393:14,
403:9, 404:2,
407:16, 410:20,
416:1, 449:18
**pausing** [1] - 479:13
**pay** [1] - 329:8
**Peace** [7] - 362:20,
363:3, 385:7, 385:8,
385:19, 387:13,
423:5
**peaceful** [3] - 329:25,
436:5, 436:9
**peeling** [1] - 391:11
**Pelosi** [1] - 379:2
**Pelosi's** [2] - 334:3,
361:22
**Pence** [13] - 331:5,
378:16, 378:21,
469:11, 469:12,
469:13, 479:19,
479:24, 480:6,
484:6, 485:9, 486:10
**Pence's** [2] - 378:24,
484:3
**penetrating** [2] -
333:8, 334:17
**Pennsylvania** [16] -
307:15, 340:9,
340:11, 340:12,
340:15, 356:21,
362:19, 362:21,
362:24, 375:7,

375:10, 375:13,
375:15, 382:7,
507:4, 507:8
**people** [50] - 312:8,
313:7, 314:7,
316:22, 330:9,
331:14, 332:12,
341:7, 342:1,
348:25, 373:13,
373:16, 377:8,
377:11, 377:12,
386:7, 387:10,
387:15, 387:16,
387:17, 388:3,
394:8, 394:15,
396:20, 399:9,
399:11, 401:2,
401:15, 402:16,
423:1, 423:12,
424:8, 424:10,
432:6, 437:19,
438:9, 444:19,
451:16, 454:2,
473:12, 483:22,
486:23, 487:3,
487:15, 487:17,
487:21, 493:13,
504:20, 512:2
**PEOPLE'** [1] - 504:23
**people's** [1] - 314:4
**PEOPLE'S** [1] - 337:5
**pepper** [9] - 394:24,
395:1, 395:2,
395:14, 395:15,
395:22, 401:16,
433:7, 433:20
**perfect** [2] - 322:2,
432:15
**perfectly** [1] - 320:17
**perform** [1] - 493:20
**perhaps** [1] - 420:6
**perimeter** [36] - 331:9,
331:11, 332:15,
371:17, 371:19,
371:20, 373:24,
374:2, 374:8,
376:24, 377:16,
382:8, 387:2,
406:10, 406:24,
408:3, 421:16,
422:10, 464:1,
464:2, 464:5,
464:24, 465:1,
465:2, 465:8,
465:15, 473:10,
482:8, 482:17,
482:18, 482:20,
482:22, 483:7,
483:9, 483:23,
496:20

**period** [3] - 430:2, 430:4, 463:23
**periodically** [1] - 384:19
**permanent** [1] - 348:24
**permission** [1] - 416:10
**permitted** [3] - 313:5, 368:22, 369:3
**person** [29] - 325:3, 331:22, 338:18, 360:20, 360:24, 361:4, 361:23, 371:7, 376:19, 404:13, 404:17, 410:22, 410:25, 411:1, 411:7, 411:8, 411:16, 411:21, 413:3, 413:4, 413:5, 413:7, 414:25, 416:1, 416:20, 458:18, 459:2, 465:20, 510:20
**person's** [1] - 416:5
**personal** [3] - 359:22, 508:1, 512:23
**personally** [2] - 434:8, 435:24, 436:1
**personnel** [2] - 360:1, 368:7
**perspective** [2] - 327:8, 368:4
**pertained** [1] - 495:10
**pertaining** [1] - 499:3
**petition** [2] - 503:15, 503:17
**phone** [11] - 402:9, 450:12, 494:17, 495:14, 495:15, 497:1, 497:12, 498:1, 498:10, 501:3, 501:6
**phones** [2] - 495:19, 502:21
**photo** [5] - 331:11, 336:7, 341:14, 371:14, 507:13
**photograph** [6] - 373:1, 374:18, 375:12, 376:19, 377:11, 377:20
**photographs** [6] - 342:15, 491:13, 491:14, 506:11, 508:18, 513:14
**phrase** [1] - 500:2
**physical** [5] - 393:11, 402:19, 404:6, 467:5, 496:4

**physically** [5] - 402:16, 446:10, 461:1, 461:4, 461:14
**physician** [1] - 435:19
**pick** [1] - 433:24
**picked** [3] - 323:21, 458:19, 497:6
**picket** [1] - 346:6
**picketing** [1] - 324:15
**picture** [3] - 372:11, 438:1, 438:6
**pictures** [3] - 332:4, 412:11, 513:17
**pieces** [2] - 318:5, 318:16
**piercing** [1] - 393:7
**pitched** [1] - 393:7
**place** [36] - 311:14, 312:15, 316:14, 329:3, 331:3, 339:3, 355:22, 358:4, 358:8, 358:10, 358:14, 358:18, 359:13, 359:17, 366:1, 371:18, 377:14, 377:16, 378:9, 390:11, 390:24, 407:22, 410:2, 437:2, 438:3, 438:10, 464:5, 465:6, 465:16, 466:17, 466:25, 467:1, 467:8, 467:10, 467:14, 490:12
**places** [6] - 365:6, 366:3, 373:19, 375:23, 462:9, 469:24
**placing** [1] - 403:13
**plaid** [1] - 479:20
**Plaintiff** [1] - 307:3
**plan** [17] - 391:25, 392:9, 408:13, 408:15, 461:2, 461:22, 462:19, 462:23, 463:12, 463:22, 465:5, 466:25, 467:8, 467:13, 467:24, 472:6, 472:12
**planned** [1] - 472:9
**planning** [2] - 449:21, 463:18
**plans** [1] - 466:22
**plastic** [2] - 372:19
**platoon** [1] - 368:17
**platoons** [1] - 408:21
**play** [39] - 383:18, 383:21, 384:18,

385:3, 385:14, 386:8, 386:21, 387:19, 388:14, 390:14, 391:8, 391:16, 392:2, 393:20, 395:24, 404:10, 404:20, 405:13, 406:6, 407:3, 408:8, 410:7, 410:21, 410:24, 411:3, 411:5, 440:25, 443:2, 443:13, 444:22, 445:13, 446:2, 447:17, 448:19, 449:15, 449:25, 450:7, 490:4, 491:1
**playing** [62] - 335:22, 380:21, 385:5, 385:15, 386:22, 387:3, 387:5, 387:20, 388:15, 390:16, 391:9, 391:17, 392:4, 392:13, 393:21, 393:25, 394:10, 395:8, 395:25, 396:9, 396:17, 397:14, 397:20, 397:23, 398:22, 399:3, 399:24, 400:3, 400:9, 404:11, 404:22, 405:14, 406:7, 407:12, 408:9, 409:9, 410:6, 410:9, 411:6, 411:18, 414:8, 414:16, 414:24, 415:4, 415:11, 415:22, 441:2, 443:4, 443:15, 444:25, 445:15, 447:19, 448:22, 449:17, 450:2, 450:9, 478:12, 478:17, 479:8, 491:2
**plaza** [6] - 349:18, 350:1, 388:7, 398:10, 473:2, 483:10
**Plaza** [6] - 332:10, 349:25, 357:12, 400:25, 420:2
**plugged** [1] - 440:13
**podium** [4] - 383:21, 440:12, 468:12, 468:23, 478:7, 490:7
**point** [51] - 311:24,

315:1, 328:25, 332:5, 343:4, 349:5, 365:24, 367:8, 375:18, 379:20, 382:7, 399:18, 404:2, 405:3, 406:14, 406:17, 406:19, 409:6, 421:7, 422:9, 424:12, 432:5, 433:5, 434:19, 435:8, 436:11, 437:7, 438:23, 445:20, 457:5, 471:15, 471:20, 471:21, 472:11, 472:21, 474:3, 474:12, 475:14, 475:17, 475:18, 475:21, 475:23, 476:8, 476:15, 480:22, 484:10, 485:8, 486:6, 514:22, 514:23, 515:14
**pointed** [1] - 386:12
**pointing** [1] - 367:15
**points** [2] - 364:8, 367:3
**pole** [2] - 372:22, 454:17
**poles** [1] - 401:17
**police** [56] - 313:15, 329:21, 330:24, 331:1, 331:19, 332:11, 332:14, 333:11, 333:15, 334:15, 334:24, 335:5, 335:11, 335:12, 335:17, 335:19, 343:7, 344:1, 344:20, 353:5, 360:1, 373:17, 373:18, 381:22, 381:23, 389:9, 389:11, 398:13, 406:15, 406:18, 407:9, 407:10, 407:21, 408:4, 408:7, 408:17, 408:23, 409:10, 416:15, 417:23, 417:25, 418:2, 435:25, 436:12, 436:15, 440:1, 440:5, 441:14, 442:11, 442:15, 443:19, 445:6, 445:18, 465:18

**Police** [61] - 309:18, 330:18, 333:7, 333:14, 334:6, 334:24, 335:6, 348:9, 348:16, 348:23, 350:7, 351:3, 351:4, 351:21, 352:11, 352:17, 365:10, 366:17, 366:24, 370:12, 370:22, 382:23, 388:5, 388:8, 388:11, 388:18, 388:19, 389:5, 389:6, 389:8, 389:9, 389:18, 389:21, 394:20, 394:25, 396:23, 397:17, 399:10, 400:7, 400:12, 402:12, 402:18, 405:17, 408:13, 416:13, 417:13, 418:19, 429:22, 429:23, 430:4, 430:7, 430:15, 433:14, 435:14, 441:8, 451:20, 463:16, 464:24, 465:8, 469:8
**Police's** [2] - 368:4, 370:7
**Police-specific** [1] - 430:4
**policy** [1] - 445:24
**porticos** [1] - 349:15
**portion** [3] - 377:15, 387:24, 512:9
**portrait** [1] - 336:7
**portraits** [1] - 412:12
**pose** [1] - 488:6
**position** [2] - 315:24, 405:5
**positioned** [1] - 349:20
**possibility** [2] - 360:25, 515:13
**possible** [2] - 360:3, 401:4
**possibly** [2] - 420:7, 425:25
**posted** [3] - 350:9, 506:18, 506:19
**posting** [1] - 504:21
**postings** [2] - 328:12, 340:18
**posts** [8] - 328:13, 336:25, 337:3, 345:11, 345:16, 348:24, 505:9,

506:22
**posture** [1] - 333:16
**potential** [1] - 469:23
**power** [2] - 329:25, 335:15
**pre** [3] - 359:9, 359:12, 360:3
**pre-COVID** [3] - 359:9, 359:12, 360:3
**preceding** [1] - 507:24
**preclude** [3] - 309:23, 310:24, 312:20
**prefer** [2] - 427:9, 427:24
**preference** [1] - 321:20
**preferred** [1] - 330:11
**prejudicial** [2] - 317:13, 318:12
**preliminary** [1] - 323:1
**preparations** [4] - 350:3, 370:7, 370:25, 371:1
**prepare** [1] - 368:5
**prepared** [1] - 368:3
**preparing** [1] - 405:2
**presence** [1] - 436:15
**present** [14] - 314:23, 315:4, 326:2, 340:17, 363:10, 370:10, 379:15, 426:15, 441:18, 498:14, 498:16, 498:19, 498:22, 498:25
**presentation** [3] - 324:24, 326:9, 326:21
**presented** [1] - 324:17
**president** [43] - 330:5, 330:13, 331:25, 333:4, 336:21, 350:11, 370:13, 370:15, 370:20, 461:1, 461:3, 461:4, 461:9, 461:14, 461:19, 461:22, 461:25, 462:12, 462:23, 465:2, 465:16, 465:21, 466:1, 466:14, 466:18, 467:2, 467:6, 467:15, 469:22, 470:13, 472:1, 473:1, 473:14, 475:2, 475:16, 475:24, 475:25, 476:19, 479:5, 479:10, 480:10, 481:2,

487:11
**President** [14] - 331:5, 340:6, 340:19, 378:16, 378:21, 378:24, 380:14, 469:11, 479:19, 484:3, 484:6, 485:9, 486:10, 508:2
**president's** [13] - 380:7, 380:12, 460:23, 466:5, 468:3, 468:4, 469:14, 469:15, 470:9, 470:20, 475:19, 476:23, 487:22
**president-elect** [1] - 330:13
**Presidential** [1] - 378:9
**presidential** [6] - 329:24, 330:5, 357:15, 368:2, 503:13, 504:14
**presiding** [5] - 331:5, 378:17, 378:23, 379:3, 379:5
**press** [16] - 386:20, 387:19, 388:14, 390:14, 391:8, 391:16, 392:2, 393:20, 395:24, 404:9, 404:20, 406:6, 407:3, 408:8, 411:5, 448:23
**pressing** [2] - 374:24, 405:13
**presumed** [1] - 325:9
**presumption** [1] - 325:10
**pretty** [6] - 323:5, 366:19, 366:20, 372:1, 401:2, 515:2
**prevalent** [1] - 434:1
**prevent** [1] - 330:19
**prevented** [1] - 404:7
**previous** [3] - 391:2, 414:12, 511:4
**previously** [4] - 362:10, 369:4, 392:10, 415:17
**primarily** [2] - 492:21, 503:5
**primary** [1] - 462:2
**private** [1] - 506:17
**privately** [1] - 506:22
**pro** [1] - 494:3
**probative** [2] - 318:9, 318:10
**problem** [1] - 473:8

**procedure** [2] - 360:15, 466:15
**procedures** [3] - 359:16, 463:8, 466:16
**proceed** [7] - 325:24, 348:6, 352:21, 360:2, 467:23, 471:12, 482:16
**proceeded** [3] - 472:18, 475:22, 476:18
**proceeding** [3] - 485:23, 485:24, 488:10
**proceedings** [6] - 329:4, 329:7, 331:5, 336:23, 490:11, 517:6
**process** [4] - 409:23, 438:4, 488:10, 507:19
**processing** [1] - 353:4
**processions** [2] - 466:16, 471:9
**productive** [1] - 515:1
**professional** [1] - 512:23
**promoted** [1] - 352:7
**promptly** [2] - 336:3, 336:13
**proof** [1] - 507:17
**property** [3] - 344:18, 418:6, 457:24
**prosecution** [1] - 325:21
**protect** [2] - 334:21, 461:4
**protected** [1] - 318:23
**protectee** [1] - 481:12
**protectees** [2] - 464:4, 469:16
**protecting** [2] - 402:14, 460:25
**protections** [1] - 465:15
**protective** [1] - 310:11
**protest** [5] - 318:23, 330:9, 436:6, 436:9, 510:6
**PROTEST** [1] - 510:5
**protester** [1] - 456:17
**protesters** [11] - 374:7, 408:6, 475:13, 476:5, 476:14, 477:2, 485:21, 485:25, 486:14, 486:18, 487:16
**protests** [2] - 369:3,

430:6
**protocols** [2] - 310:10, 370:22
**Proud** [10] - 315:5, 316:10, 316:21, 317:2, 317:8, 317:12, 317:22, 318:8, 318:13
**prove** [5] - 318:11, 324:20, 337:15, 350:17
**proved** [1] - 325:16
**proven** [2] - 325:7, 325:11
**proves** [1] - 325:13
**provide** [1] - 496:1
**provided** [5] - 494:3, 494:4, 495:10, 496:25, 497:17
**providing** [2] - 330:9, 493:14
**proximity** [3] - 356:11, 405:12, 476:6
**Public** [1] - 490:19
**public** [15] - 331:7, 333:2, 341:13, 349:19, 359:2, 360:4, 362:4, 371:5, 371:8, 465:11, 473:13, 473:15, 475:15, 494:5, 507:5
**public-source** [1] - 494:5
**publicly** [1] - 506:23
**publish** [11] - 329:12, 354:4, 383:24, 432:11, 439:3, 440:10, 440:11, 443:24, 496:13, 504:3, 508:8
**published** [1] - 504:4
**puffs** [1] - 407:5
**pull** [13] - 402:6, 439:2, 440:14, 443:21, 446:3, 448:15, 450:4, 468:13, 499:4, 510:10, 510:22, 511:19, 512:6
**pulled** [2] - 366:25, 478:9
**punch** [1] - 399:14
**purport** [1] - 491:15
**purports** [3] - 383:14, 490:25, 491:24
**purpose** [8] - 315:12, 330:4, 337:22, 350:17, 490:15, 490:16, 513:20, 514:6

**pursuant** [5] - 494:25, 504:8, 506:4, 508:10, 509:16
**purview** [1] - 353:10
**push** [2] - 433:8, 433:17
**pushed** [5] - 311:23, 334:15, 394:8, 401:18, 434:4
**pushing** [2] - 399:9, 399:17
**put** [15] - 326:11, 326:15, 326:19, 345:17, 358:4, 370:24, 371:4, 372:20, 390:6, 406:2, 442:6, 465:15, 470:15, 492:4, 502:16
**puts** [2] - 326:16, 515:22
**putting** [5] - 309:8, 345:15, 381:5, 405:5, 446:21

**Q**

**QAnon** [2] - 317:5, 500:3
**quantity** [1] - 388:18
**questioning** [1] - 429:9
**questions** [18] - 326:22, 326:23, 327:13, 327:14, 327:21, 347:3, 347:20, 417:4, 417:12, 421:12, 426:19, 452:5, 452:10, 455:23, 458:6, 459:4, 481:22, 487:6
**queue** [1] - 468:17
**quick** [1] - 372:20, 463:24, 467:22
**quickly** [7] - 344:7, 404:7, 406:1, 472:17, 478:16, 490:8, 491:4
**quite** [4] - 345:19, 359:16, 368:16, 401:9
**quote** [1] - 507:14

**R**

**rack** [22] - 331:12, 363:6, 363:7, 374:15, 374:17, 374:25, 375:2, 375:5, 375:23,

375:24, 375:25, 376:5, 386:2, 388:13, 401:17, 465:18, 482:16, 482:22, 483:9, 483:10, 484:1

**racks** [19] - 332:14, 341:18, 341:21, 343:9, 349:20, 358:4, 371:20, 371:25, 372:6, 374:20, 375:21, 422:16, 422:18, 422:24, 426:12, 482:20, 483:7, 483:11, 483:23

**radio** [26] - 333:24, 353:12, 380:5, 380:6, 380:7, 380:10, 381:18, 381:21, 381:22, 381:23, 382:4, 382:6, 382:10, 382:12, 401:3, 404:19, 432:3, 432:19, 432:20, 446:23, 450:14, 450:19, 474:16, 474:17, 474:21, 486:22

**railing** [1] - 410:15
**rain** [1] - 388:5
**raise** [5] - 329:17, 346:24, 429:11, 459:24, 490:2
**raises** [1] - 315:9
**raising** [2] - 311:4, 507:9
**rally** [8] - 314:22, 314:24, 315:5, 315:17, 331:24, 339:3, 340:6, 513:22
**ran** [3] - 334:18, 396:20, 397:16
**random** [1] - 323:21
**randomly** [1] - 323:22
**ranges** [1] - 498:9
**rank** [1] - 351:13
**ranks** [2] - 351:14, 418:24
**rather** [5] - 317:25, 342:12, 345:24, 431:1, 504:11
**ray** [2] - 359:23, 360:19
**Rayburn** [1] - 431:10
**RDR** [3] - 307:23, 517:3, 517:10
**reach** [2] - 350:16, 390:12

**reached** [5] - 310:16, 347:20, 447:2, 476:15, 476:25
**reaching** [4] - 330:19, 394:23, 446:22, 476:21
**react** [2] - 373:25, 437:3
**read** [25] - 319:6, 319:10, 323:15, 347:21, 347:25, 378:1, 440:22, 443:5, 443:16, 470:19, 490:8, 491:4, 498:4, 499:23, 500:21, 501:9, 504:12, 506:8, 507:14, 508:14, 508:24, 509:25, 511:1, 511:22, 512:11
**reader** [2] - 471:7, 471:8
**reading** [1] - 319:15
**reads** [3] - 491:7, 498:6, 504:17
**ready** [7] - 330:15, 337:4, 338:12, 338:13, 383:23, 383:24, 394:24
**real** [4] - 342:10, 380:10, 382:3, 390:1
**reality** [1] - 340:24
**realized** [1] - 381:6
**really** [8] - 340:25, 346:7, 353:24, 368:21, 426:18, 458:5, 475:15, 489:8
**reason** [2] - 455:4, 514:6
**reasonable** [6] - 324:18, 324:21, 325:8, 325:11, 325:14, 337:10
**reasons** [2] - 317:20, 471:25
**rebuttal** [3] - 326:20, 327:5, 515:21
**receive** [2] - 324:9, 360:10
**received** [8] - 323:9, 493:3, 493:7, 493:9, 499:9, 506:4, 508:10, 509:16
**receiving** [2] - 436:21, 493:10
**Recess** [3] - 322:18, 369:25, 489:6
**recess** [3] - 378:25, 379:7, 428:5

**recognize** [12] - 376:19, 403:4, 404:21, 410:22, 410:25, 411:7, 416:1, 444:12, 444:14, 448:1, 449:12, 479:16
**recollection** [2] - 366:5, 456:21
**reconvene** [3] - 336:22, 369:20, 427:14
**record** [11] - 309:3, 327:25, 354:11, 364:16, 366:7, 377:23, 429:18, 490:9, 490:17, 492:11, 514:17
**recorded** [3] - 382:11, 474:21, 490:13
**Recording** [4] - 490:13, 490:14, 490:16
**recording** [2] - 382:24, 383:2
**recordings** [3] - 353:2, 383:11, 490:22
**records** [5] - 499:9, 504:8, 506:4, 508:10, 509:16
**Recovered** [2] - 491:16, 491:20
**recovered** [2] - 383:5, 438:13
**red** [15] - 371:16, 371:17, 371:23, 371:25, 377:24, 392:6, 413:4, 413:5, 421:16, 422:9, 464:20, 464:23, 465:7, 496:16, 496:19
**redacted** [2] - 502:4
**redactions** [2] - 502:5, 502:8
**REDIRECT** [2] - 458:8, 487:8
**redirect** [3] - 326:13, 326:18, 426:23
**reduce** [1] - 478:16
**refer** [4] - 325:19, 431:15, 432:22
**reference** [1] - 310:25
**referenced** [2] - 368:12, 480:12
**referred** [3] - 354:17, 363:24, 398:19
**referring** [4] - 380:13, 433:13, 503:17, 506:13

**reflect** [4] - 354:11, 364:16, 366:7, 514:17
**reflected** [1] - 451:10
**reflecting** [1] - 496:24
**refresh** [1] - 456:7
**regain** [1] - 409:11
**regarded** [1] - 474:11
**regarding** [8] - 309:17, 310:9, 310:16, 318:14, 318:15, 426:5, 490:10, 501:11
**registered** [1] - 499:21
**regular** [1] - 360:23
**reinforcements** [1] - 442:8
**reintroduce** [1] - 338:19
**reiterate** [1] - 467:23
**related** [3] - 310:24, 312:25, 313:3, 319:11, 464:18
**relation** [6] - 356:3, 431:6, 434:17, 496:6, 511:12, 512:18
**relationship** [5] - 342:19, 389:13, 389:17, 511:17, 512:20
**relayed** [1] - 455:15
**relaying** [1] - 497:7
**release** [1] - 392:24
**releases** [1] - 393:5
**relevance** [2] - 314:20, 315:15
**relevancy** [2] - 318:5, 503:3
**relevant** [17] - 311:12, 312:25, 313:12, 313:17, 313:19, 315:12, 315:17, 315:18, 316:13, 316:16, 317:3, 317:10, 317:19, 350:18, 497:13, 503:7, 503:12
**relocate** [6] - 467:11, 472:22, 472:23, 473:2, 473:5, 475:3
**relocated** [1] - 486:12
**remain** [6] - 313:5, 346:4, 346:23, 427:25, 459:24, 473:3
**remained** [2] - 338:2, 449:4
**remaining** [2] - 322:3, 324:12

**remains** [1] - 325:10
**remember** [10] - 367:6, 390:5, 422:3, 447:8, 449:9, 458:12, 458:18, 458:25, 483:4, 508:25
**remind** [2] - 328:7, 386:11, 406:2
**removed** [3] - 422:18, 426:10, 426:13
**Renae** [4] - 503:6, 510:15, 510:17, 510:19
**repeat** [1] - 400:1
**rephrase** [2] - 497:19, 497:20
**replayed** [1] - 486:22
**reporter** [1] - 433:23
**REPORTER** [1] - 517:1
**Reporter** [2] - 307:23, 307:23, 517:11
**reporting** [1] - 493:8
**reports** [3] - 353:4, 353:5, 407:11
**represent** [1] - 363:21
**representative** [2] - 374:9, 379:5
**Representatives** [4] - 378:6, 378:11, 378:15, 379:3
**representatives** [1] - 379:7
**Republicans** [1] - 504:19
**repurpose** [1] - 332:15
**request** [1] - 353:2
**requests** [1] - 503:20
**required** [6] - 326:15, 337:15, 370:11, 433:16, 463:3, 469:18
**requires** [1] - 315:20
**research** [5] - 328:14, 369:21, 427:16, 489:3, 515:4
**resecured** [1] - 393:12
**residence** [1] - 466:5
**resolve** [1] - 378:19
**resort** [1] - 467:12
**respect** [12] - 310:4, 311:11, 312:1, 313:11, 342:4, 345:21, 465:5, 483:15, 486:22, 495:3, 499:11, 503:8
**respective** [1] - 463:10
**respectively** [3] - 363:22, 379:10, 490:14

**respond** [2] - 402:7, 432:24
**responded** [2] - 432:2, 433:5
**responding** [7] - 432:20, 433:3, 437:1, 438:8, 438:22, 444:19
**responds** [1] - 458:16
**response** [2] - 315:11, 446:4
**responsibilities** [1] - 327:12
**responsibility** [6] - 431:17, 433:15, 437:1, 451:11, 451:13, 451:15
**responsible** [6] - 431:3, 431:17, 451:4, 451:17, 461:21, 463:13
**responsive** [1] - 432:3
**restful** [1] - 322:24
**restricted** [9] - 313:5, 324:12, 324:13, 332:5, 332:14, 350:2, 350:8, 350:10, 377:25
**restrictions** [3] - 348:23, 371:4, 465:6
**result** [2] - 346:9, 346:11
**results** [10] - 329:24, 337:23, 494:24, 495:10, 496:1, 496:25, 499:19, 500:7, 500:20, 505:13
**resumed** [1] - 379:9
**retention** [1] - 446:2
**retire** [1] - 327:10
**retired** [1] - 353:7
**retreat** [2] - 331:20, 436:19
**return** [3] - 463:9, 506:15, 506:21
**returned** [1] - 475:10
**returning** [1] - 475:11
**returns** [1] - 513:16
**reviewed** [2] - 365:11, 365:15
**reviewing** [1] - 365:17
**rewind** [3] - 410:12, 410:21, 411:2
**RICHARD** [2] - 307:20, 307:20
**Rick** [1] - 338:20
**right-hand** [1] - 361:23
**rings** [1] - 433:7
**riot** [5] - 330:7, 382:18,

398:19, 399:1, 433:16
**rioter** [6] - 313:9, 399:12, 399:14, 409:24, 447:2, 487:25
**rioters** [60] - 313:8, 330:19, 332:13, 332:22, 333:8, 333:22, 333:23, 333:25, 334:8, 334:11, 334:18, 335:2, 335:11, 335:24, 336:15, 364:9, 365:3, 365:21, 366:1, 366:4, 366:17, 367:14, 374:24, 375:2, 390:3, 390:11, 390:24, 391:14, 392:15, 397:25, 398:14, 399:25, 400:6, 400:13, 403:17, 403:19, 405:10, 405:15, 405:17, 406:11, 406:15, 406:18, 409:13, 409:16, 416:10, 434:4, 434:16, 435:25, 436:19, 441:20, 442:15, 447:21, 449:2, 449:9, 450:18, 451:16, 456:21, 458:13, 476:21, 477:4
**road** [2] - 323:6, 326:8
**Road** [2] - 307:18, 307:21
**roamed** [1] - 333:4
**role** [3] - 352:13, 460:19, 460:22
**roll** [1] - 372:20
**rolls** [1] - 317:13
**romantic** [1] - 511:17
**roof** [1] - 354:24
**room** [19] - 323:14, 329:4, 329:7, 336:6, 336:10, 380:6, 380:10, 380:22, 382:4, 403:11, 412:9, 412:11, 413:15, 465:20, 471:18, 471:19, 471:21, 477:21
**Room** [2] - 307:24, 517:12
**rooms** [2] - 349:2, 467:3

**ropes** [3] - 345:2, 345:4
**Rotunda** [8] - 355:11, 364:17, 367:8, 412:7, 412:8, 412:10, 439:20, 488:6
**Rotunda's** [1] - 439:21
**rough** [2] - 463:24, 507:6
**roughly** [4] - 349:3, 349:4, 486:2, 496:4
**round** [2] - 412:11, 422:21
**rounds** [3] - 477:12, 477:18, 478:2
**route** [17] - 371:2, 448:17, 470:17, 473:21, 474:24, 475:1, 475:4, 475:5, 475:8, 475:9, 475:14, 476:7, 476:8, 484:8, 485:11, 485:17
**row** [2] - 372:24, 470:19
**rub** [1] - 434:14
**rude** [1] - 328:19
**rule** [5] - 319:20, 319:21, 319:22, 327:13
**rules** [1] - 323:3
**rulings** [1] - 314:13
**run** [6] - 327:12, 328:16, 355:14, 355:17, 355:18, 434:13
**running** [1] - 391:12
**rush** [1] - 340:13

## S

**S-214** [1] - 470:7
**safe** [9] - 336:24, 402:16, 409:18, 434:24, 451:9, 451:15, 461:22, 467:1, 467:12
**safely** [3] - 445:20, 473:12, 477:1
**safety** [3] - 331:20, 392:17, 404:1
**satellite** [2] - 495:19, 497:7
**Satellite** [1] - 490:19
**saved** [1] - 383:17
**savings** [1] - 502:1
**saw** [28] - 310:4, 312:8, 313:18, 319:5, 332:13,

332:20, 334:15, 334:16, 382:9, 382:14, 387:17, 398:16, 443:8, 456:13, 457:5, 457:20, 457:25, 458:1, 474:6, 475:13, 475:22, 483:5, 484:23, 485:20, 485:25, 486:2, 486:8, 486:18
**scaffolding** [2] - 349:13, 364:11
**scale** [1] - 332:15
**scared** [1] - 333:24
**scary** [1] - 333:19
**scenario** [1] - 362:4
**scene** [6] - 336:4, 388:20, 404:21, 431:25, 433:1, 441:9
**schedule** [1] - 515:2
**scheduled** [3] - 350:5, 430:15, 430:18
**scheme** [1] - 493:22
**scooter** [2] - 316:23, 513:18
**scrambled** [1] - 330:18
**screaming** [2] - 449:5, 450:17
**screen** [33] - 354:10, 354:12, 354:13, 355:4, 362:12, 362:16, 362:2, 364:18, 367:16, 374:17, 375:5, 384:6, 385:11, 385:21, 385:25, 386:18, 387:11, 387:13, 387:24, 388:6, 394:2, 403:7, 404:13, 410:22, 413:2, 416:2, 432:17, 439:7, 443:6, 446:12, 464:14, 465:25, 502:17
**screening** [6] - 333:3, 359:20, 359:21, 359:23, 361:19, 361:20
**screens** [2] - 380:9, 501:19
**scripted** [1] - 319:10
**scroll** [5] - 376:11, 500:18, 507:1, 507:12, 508:20
**scrolling** [1] - 469:20
**search** [22] - 438:10, 493:16, 494:15,

494:16, 494:19, 494:21, 494:25, 495:4, 495:5, 495:23, 496:5, 498:1, 499:2, 499:9, 499:19, 504:8, 506:4, 508:10, 509:16, 513:15, 513:16
**seat** [3] - 322:19, 324:1
**seated** [2] - 429:2, 489:23
**seats** [3] - 323:20, 323:22, 323:25
**second** [46] - 318:25, 323:17, 324:12, 326:9, 329:13, 330:12, 334:6, 347:6, 372:24, 390:12, 397:24, 398:1, 410:11, 411:3, 413:14, 415:6, 415:13, 439:12, 440:25, 443:14, 444:3, 445:14, 447:24, 448:20, 449:19, 456:19, 469:25, 472:3, 473:20, 473:23, 476:15, 476:22, 476:23, 476:25, 478:1, 485:23, 486:23, 487:4, 503:18, 505:21, 507:1, 507:12, 507:14, 508:21, 514:9, 516:3
**secondly** [1] - 316:15
**seconds** [12] - 391:2, 391:18, 392:23, 393:1, 407:16, 410:5, 410:7, 410:24, 416:2, 505:5, 512:5
**Secret** [18] - 310:9, 310:10, 331:4, 370:14, 460:7, 460:8, 460:12, 460:14, 460:16, 461:8, 463:5, 463:12, 463:17, 463:18, 465:1, 465:4, 469:15
**section** [10] - 352:4, 353:4, 353:9, 353:11, 353:20, 354:25, 355:8, 357:6, 380:3, 469:20
**Section** [1] - 348:14

**sections** [4] - 351:18, 352:5, 353:6, 354:23
**sector** [1] - 353:21
**secure** [12] - 464:2, 464:5, 465:14, 467:11, 473:5, 477:7, 480:11, 481:13, 487:10, 487:24, 488:7, 496:20
**secured** [2] - 348:22, 477:6
**securities** [1] - 492:21
**Security** [1] - 315:8
**security** [35] - 332:20, 348:24, 349:19, 359:16, 359:20, 359:21, 360:11, 360:13, 360:14, 361:14, 361:16, 361:19, 361:20, 361:24, 362:2, 362:5, 370:11, 370:22, 392:17, 393:11, 405:18, 440:20, 461:2, 461:22, 462:17, 462:19, 463:22, 464:1, 465:2, 467:17, 471:25, 487:18, 492:20
**see** [141] - 310:15, 311:1, 311:13, 311:25, 314:7, 314:24, 315:4, 322:23, 328:21, 331:11, 331:13, 331:15, 333:14, 336:7, 336:16, 336:25, 337:18, 340:24, 341:14, 341:15, 342:3, 342:4, 342:7, 343:2, 343:4, 343:6, 343:8, 343:14, 343:18, 343:25, 344:3, 344:6, 344:13, 344:24, 345:3, 345:8, 345:12, 345:13, 345:20, 346:5, 351:18, 356:10, 359:12, 363:2, 366:25, 373:6, 373:13, 374:16, 377:5, 377:9, 380:10, 381:13, 385:8, 386:7, 387:12, 388:4, 391:10, 391:11, 391:18,

391:21, 392:6, 392:15, 393:15, 394:1, 394:12, 394:15, 395:10, 396:1, 396:4, 396:10, 396:12, 396:20, 399:5, 399:12, 399:14, 403:6, 404:13, 404:15, 404:20, 407:5, 407:18, 408:10, 408:25, 410:12, 412:15, 413:3, 420:23, 421:7, 424:24, 428:4, 432:6, 432:7, 434:17, 438:7, 441:3, 444:5, 444:13, 446:12, 447:25, 448:13, 451:2, 453:7, 455:20, 456:1, 459:18, 468:11, 468:12, 469:2, 469:25, 470:25, 471:3, 473:25, 474:4, 474:5, 474:8, 474:10, 475:7, 478:14, 479:3, 479:14, 479:20, 480:2, 482:8, 484:18, 485:5, 486:5, 486:6, 486:14, 489:1, 500:8, 501:15, 501:19, 502:12, 504:22, 514:13, 514:15, 515:5, 516:13
**seeing** [8] - 331:25, 386:25, 387:1, 427:11, 475:23, 477:2, 483:22, 486:9
**seem** [1] - 436:5
**segment** [1] - 482:10
**selfie** [1] - 336:6
**Senate** [58] - 343:21, 349:16, 355:1, 355:2, 360:9, 363:22, 363:25, 364:3, 365:9, 365:24, 370:18, 378:6, 378:7, 378:12, 378:18, 378:22, 378:24, 378:25, 379:9, 390:22, 391:12, 392:7, 393:22, 397:2, 411:11, 411:23, 419:23,

420:12, 420:13, 420:14, 420:15, 420:23, 421:9, 422:22, 424:18, 424:21, 424:22, 468:6, 470:1, 470:20, 471:9, 471:12, 472:3, 472:7, 472:18, 473:20, 473:24, 484:12, 486:11, 488:11, 490:12, 490:13, 490:14, 490:15, 490:17, 490:21
**senator** [1] - 378:23
**senators** [1] - 378:25
**Send** [1] - 504:19
**send** [4] - 348:3, 401:5, 504:17, 505:3
**sending** [8] - 506:17, 506:20, 510:13, 511:9, 512:1, 512:2, 512:15
**sends** [1] - 506:22
**senior** [2] - 507:25, 508:1
**sense** [7] - 322:13, 351:17, 351:19, 400:25, 445:3, 461:6, 516:9
**sensitive** [1] - 330:19
**sent** [9] - 330:8, 494:22, 494:24, 496:25, 506:11, 506:15, 508:18, 512:3, 512:4
**sentence** [1] - 507:24
**separate** [3] - 324:7, 331:1, 378:18
**separated** [2] - 333:22, 445:19
**separately** [1] - 383:18
**separating** [1] - 388:11
**September** [1] - 358:1
**September/Octoberish** [1] - 357:20
**sequestration** [1] - 319:21
**sergeant** [2] - 430:23, 470:6
**sergeants** [1] - 444:14
**series** [1] - 410:1
**serious** [2] - 507:15, 507:17
**serve** [2] - 490:15, 490:16
**servers** [1] - 495:18

**Service** [17] - 310:9, 310:10, 331:4, 370:14, 460:7, 460:8, 460:12, 460:14, 460:16, 461:8, 463:5, 463:12, 463:17, 463:18, 465:1, 469:16
**service** [4] - 382:2, 402:22, 448:6
**Service's** [1] - 465:4
**session** [8] - 378:3, 378:5, 378:12, 378:13, 378:15, 378:17, 379:8, 379:11
**set** [10] - 332:17, 332:18, 334:3, 335:23, 371:20, 383:20, 431:13, 484:17, 485:14, 515:14
**setting** [2] - 465:14, 493:7
**seven** [1] - 335:6
**several** [14] - 343:15, 351:18, 359:7, 367:1, 400:17, 403:4, 424:8, 434:19, 435:5, 471:14, 476:12, 480:17, 483:21
**severely** [1] - 435:13
**Sevigny** [3] - 510:16, 510:17, 510:19
**shared** [1] - 511:4
**sharing** [1] - 451:18
**sheer** [4] - 333:10, 399:22, 399:25, 408:6
**sheltered** [1] - 331:3
**sheltering** [1] - 477:21
**shield** [2] - 336:9, 399:1
**shift** [1] - 430:18
**shin** [1] - 410:23
**shocking** [1] - 434:3
**shooting** [3] - 310:25, 311:16, 312:16
**short** [2] - 316:19, 514:16
**shortly** [6] - 438:18, 475:12, 476:17, 492:5, 494:23, 503:12
**shot** [3] - 312:17, 444:6, 444:13
**shoulders** [1] - 416:5
**shouted** [2] - 334:9,

336:15
**shouting** [2] - 316:22, 335:13
**shoved** [2] - 401:18, 417:25
**show** [29] - 313:22, 326:8, 331:7, 332:4, 337:9, 337:21, 338:1, 338:4, 340:14, 341:3, 343:14, 346:2, 346:7, 362:8, 364:10, 372:13, 410:1, 432:9, 432:13, 432:16, 439:4, 439:6, 440:8, 461:7, 496:11, 499:16, 500:5, 500:17, 509:13
**showed** [6] - 313:13, 313:14, 327:8, 425:9, 455:18, 486:21
**showing** [6] - 313:6, 313:17, 313:21, 479:10, 500:11, 513:16
**shown** [7] - 314:1, 344:25, 420:17, 421:11, 422:7, 423:10, 423:19
**shows** [8] - 314:23, 316:4, 425:16, 464:24, 469:23, 479:3, 495:13, 503:13
**shut** [2] - 358:20, 393:10
**side** [65] - 320:1, 325:20, 326:8, 327:14, 334:24, 341:16, 349:7, 349:9, 349:16, 349:23, 349:24, 353:21, 354:17, 354:19, 356:21, 356:22, 359:19, 362:12, 364:19, 364:25, 367:5, 367:9, 373:13, 374:25, 375:4, 375:10, 377:8, 377:10, 377:12, 385:11, 388:6, 388:9, 390:7, 393:16, 394:2, 396:12, 398:5, 398:6, 431:11, 431:18, 431:20, 435:18, 435:23,

543

442:18, 471:2,
471:12, 472:3,
472:18, 472:19,
482:13, 482:14,
483:2, 483:3, 483:6,
484:11, 484:12,
484:20, 484:21,
488:11, 496:17,
496:18, 516:7
**side's** [1] - 327:8
**sides** [2] - 348:2,
463:10
**sidewalk** [1] - 341:13
**sidewalks** [1] - 341:12
**sideways** [2] - 376:8,
472:12
**sign** [3] - 331:15,
374:14, 503:15
**signage** [4] - 483:11,
483:13, 483:24,
483:25
**signal** [1] - 335:8
**signals** [2] - 495:19,
497:6
**significance** [5] -
366:14, 376:22,
464:22, 505:10,
509:8
**significant** [6] - 364:5,
364:22, 365:18,
366:6, 367:5, 476:22
**signifies** [1] - 500:1
**signs** [22] - 314:25,
331:13, 331:17,
331:18, 332:6,
332:7, 332:8,
332:24, 341:18,
342:4, 342:7, 344:5,
350:6, 358:5, 372:4,
372:7, 373:3, 373:9,
373:11, 377:4,
377:5, 484:1
**similar** [4] - 314:14,
315:9, 318:25, 355:3
**simply** [4] - 325:21,
326:7, 348:1, 463:22
**singing** [1] - 488:6
**single** [3] - 342:25,
459:2, 509:2
**site** [1] - 358:7
**sitting** [4] - 382:4,
417:10, 488:5,
514:14
**situation** [8] - 360:13,
406:15, 406:24,
407:13, 407:24,
416:22, 436:23,
481:10
**six** [2] - 430:5, 441:12
**size** [3] - 335:15,

388:20, 389:1
**skip** [1] - 442:23
**skylights** [1] - 349:16
**sleep** [1] - 461:25
**slide** [1] - 333:13
**slower** [1] - 477:5
**small** [4] - 421:4,
432:13, 492:23,
492:24
**smaller** [2] - 312:5,
431:16
**smash** [5] - 475:12,
475:13, 485:18,
485:20, 485:22
**smashed** [1] - 332:22
**smoke** [9] - 332:11,
334:16, 334:18,
433:6, 433:7,
433:20, 434:1,
486:23, 487:1
**snow** [18] - 331:13,
332:6, 350:5, 358:4,
371:20, 371:25,
372:6, 372:12,
372:14, 372:15,
372:16, 372:17,
372:18, 373:6,
374:19, 374:20,
375:22, 426:9
**social** [4] - 328:12,
345:11, 345:15,
498:7
**someone** [9] - 318:24,
328:18, 328:22,
328:24, 351:13,
374:2, 402:5,
506:22, 510:15
**sometime** [2] - 494:20,
494:23
**sometimes** [1] -
361:12
**somewhat** [1] - 341:14
**somewhere** [5] -
335:8, 353:18,
413:21, 462:13,
467:18
**songs** [1] - 381:20
**soon** [1] - 445:4
**sorry** [16] - 347:14,
384:24, 393:14,
412:16, 439:17,
448:25, 450:25,
452:21, 464:12,
478:13, 480:2,
483:4, 500:24,
502:16, 503:16,
513:6
**sort** [48] - 314:15,
315:3, 315:6, 315:9,
315:25, 319:10,

352:9, 354:22,
354:24, 355:3,
358:7, 363:2, 366:8,
367:18, 370:9,
371:24, 373:19,
376:21, 380:18,
385:10, 386:2,
387:12, 388:3,
388:6, 391:11,
401:12, 403:6,
403:10, 410:23,
413:4, 420:11,
421:4, 427:20,
433:9, 440:3, 449:4,
465:7, 466:3,
466:22, 470:19,
471:6, 471:7,
471:17, 476:20,
483:11, 507:10,
514:15
**sound** [5] - 393:6,
451:9, 455:5, 455:6,
478:11
**sounds** [3] - 358:25,
418:23, 514:23
**Source** [1] - 491:10
**source** [3] - 493:11,
494:5, 513:13
**sources** [1] - 497:22
**south** [7] - 349:5,
349:21, 354:13,
355:5, 402:21,
431:8, 496:19
**Southeast** [1] - 348:21
**southwest** [2] -
362:16, 431:11
**Southwest** [2] -
353:20, 353:23
**space** [5] - 334:16,
441:18, 441:21,
447:22, 462:2
**spaces** [1] - 349:10
**SPAN** [1] - 403:2
**span** [1] - 379:16
**SPAN)** [1] - 490:19
**spare** [3] - 477:14,
477:16, 478:3
**Speaker** [4] - 334:3,
361:21, 361:22,
379:2
**speaker** [1] - 444:2
**speaking** [1] - 494:4
**speaks** [1] - 342:9
**special** [8] - 368:14,
460:9, 483:19,
492:15, 496:15,
504:7, 506:3, 507:14
**Special** [12] - 459:10,
459:20, 460:4,
464:16, 468:24,

478:8, 478:18,
481:20, 487:10,
490:1, 501:15,
515:17
**SPECIAL** [4] - 308:8,
308:10, 460:1, 492:6
**specific** [20] - 309:18,
315:21, 324:23,
409:1, 430:4,
432:19, 449:6,
458:12, 495:8,
495:10, 495:20,
495:24, 495:25,
496:7, 496:23,
497:1, 497:2, 503:20
**specifically** [6] -
316:1, 331:14,
449:10, 452:20,
462:20, 462:21
**specifics** [1] - 500:2
**spectrum** [1] - 436:23
**speculate** [2] - 327:23,
502:7
**speech** [8] - 339:25,
340:3, 380:7,
380:12, 380:14,
380:19, 380:24
**speed** [1] - 321:4
**spell** [2] - 429:17,
492:11
**spelled** [1] - 492:13
**spent** [1] - 513:25
**spite** [2] - 332:16,
338:2
**split** [1] - 332:3
**spoken** [1] - 510:20
**spot** [5] - 434:21,
477:7, 486:10,
489:14, 489:17
**spray** [13] - 394:24,
395:1, 395:2,
395:14, 395:15,
395:22, 401:16,
417:18, 418:4,
454:5, 454:8, 454:9
**sprayed** [2] - 401:15,
438:19
**sprays** [1] - 332:11
**square** [6] - 349:3,
349:6, 364:13,
371:22, 385:2,
402:15
**squares** [3] - 373:1,
373:2, 377:3
**SSAA** [1] - 470:5
**stable** [2] - 407:13,
407:25
**staff** [10] - 328:18,
331:3, 352:20,
361:18, 361:19,

362:2, 401:22,
402:9, 402:14,
405:18
**staffed** [2] - 368:9,
368:10
**staffer** [1] - 402:5
**staffs** [3] - 370:10,
402:19, 404:4
**stage** [15] - 326:9,
327:1, 327:3,
349:13, 357:13,
357:14, 357:16,
357:18, 365:21,
372:12, 377:1,
377:15, 387:25,
390:7, 406:5
**stages** [1] - 325:24
**staging** [2] - 364:20,
366:9
**staircase** [7] - 365:1,
365:3, 365:8,
365:22, 475:18,
485:23, 485:24
**staircases** [2] -
349:11, 349:15
**stairs** [11] - 332:17,
334:3, 334:20,
390:3, 410:18,
413:19, 413:20,
423:15, 424:1,
425:5, 485:14
**stairway** [6] - 390:9,
391:1, 391:4,
413:19, 413:22,
419:22
**stairwell** [3] - 419:21,
475:20, 476:19
**stamp** [4] - 383:6,
390:18, 443:5,
443:16
**stamps** [3] - 383:2,
383:10, 490:22
**stand** [4] - 378:25,
379:6, 429:10, 490:1
**Standard** [3] - 501:14,
501:22, 501:23
**standard** [2] - 472:25,
501:18
**standby** [1] - 369:1
**standing** [11] - 346:24,
356:9, 373:22,
388:7, 410:15,
434:2, 434:7,
459:24, 468:2,
480:2, 505:7
**standpoint** [1] -
311:20
**stands** [2] - 328:4,
470:6
**start** [13] - 321:5,

322:16, 354:23,
357:21, 384:4,
392:23, 400:24,
409:14, 410:4,
430:19, 452:1,
466:3, 472:23
**started** [17] - 322:25,
353:25, 355:12,
365:21, 365:22,
382:8, 409:23,
427:8, 427:10,
466:4, 471:16,
472:15, 472:20,
473:4, 481:24,
492:19, 516:6
**starting** [2] - 351:13,
358:1
**starts** [2] - 357:19,
500:8
**state** [7] - 403:10,
429:17, 463:9,
469:7, 469:9,
471:11, 492:11
**statement** [5] - 326:3,
329:10, 386:12,
493:15, 507:23
**statements** [5] -
322:25, 325:25,
326:6, 326:23,
493:14
**STATES** [3] - 307:1,
307:2, 307:9
**states** [1] - 507:18
**States** [25] - 307:11,
309:4, 324:8,
329:19, 336:21,
346:17, 347:4,
348:9, 348:12,
348:13, 348:20,
350:6, 351:3,
352:16, 359:11,
370:13, 378:4,
378:5, 378:6,
382:23, 429:7,
429:22, 459:10,
517:11
**stating** [1] - 350:6
**stationed** [2] - 372:2,
373:18
**stations** [1] - 380:21
**Statuary** [6] - 345:1,
413:12, 413:13,
413:18, 414:2, 414:3
**statues** [1] - 413:15
**stay** [9] - 339:14,
393:9, 408:21,
470:15, 480:14,
480:16, 480:23,
486:10, 487:10
**stayed** [5] - 335:10,

398:7, 480:24,
484:6, 486:13
**staying** [2] - 309:9,
339:23
**stays** [2] - 343:19,
393:12
**Steal** [4] - 315:2,
331:24, 510:8,
513:22
**steal** [3] - 316:3,
330:6, 381:3
**stealing** [1] - 380:25
**Stefanie** [6] - 316:11,
339:6, 342:16,
343:1, 511:10
**stenographic** [1] -
517:5
**step** [4] - 335:12,
346:23, 369:24,
401:16
**steps** [2] - 359:14,
420:1
**sticking** [1] - 344:21
**still** [22] - 358:14,
403:18, 404:4,
406:16, 406:18,
406:23, 408:1,
408:3, 409:16,
409:24, 415:13,
424:21, 443:9,
444:5, 444:12,
451:11, 467:18,
475:14, 487:25,
502:12, 509:11
**stipulation** [9] -
310:15, 310:16,
347:23, 347:25,
348:1, 348:2,
382:21, 491:16,
501:11
**Stipulation** [9] - 348:7,
348:20, 378:1,
382:22, 490:9,
491:7, 492:4, 498:4,
501:9
**stipulations** [5] -
319:6, 347:21,
348:4, 350:16, 491:5
**stolen** [5] - 317:6,
330:5, 337:24,
340:20, 345:21
**stood** [3] - 335:7,
335:24, 340:5
**Stop** [4] - 315:2,
331:24, 510:8,
513:22
**stop** [27] - 316:3,
329:21, 330:6,
331:18, 351:11,
355:20, 380:25,

381:3, 384:19,
396:18, 397:1,
397:15, 397:24,
398:13, 398:23,
399:4, 399:10,
400:4, 400:10,
407:15, 440:2,
440:4, 440:6,
442:12, 449:25,
473:23, 486:5
**stopped** [4] - 316:4,
336:20, 423:11,
482:15
**stopping** [2] - 514:21,
514:23
**stories** [2] - 434:19,
435:5
**storm** [2] - 341:2,
342:12
**stormed** [3] - 329:19,
330:16, 337:21
**storming** [1] - 337:2
**stragglers** [1] - 309:13
**straight** [1] - 356:14
**straightforward** [1] -
337:18
**street** [4] - 349:24,
362:13, 362:15,
375:4
**Street** [5] - 307:12,
348:21, 349:23,
350:1, 385:19
**strength** [1] - 330:23
**stress** [1] - 479:2
**strewn** [1] - 375:23
**stricken** [1] - 328:2
**strike** [1] - 327:25
**strong** [4] - 345:12,
345:16, 345:20,
515:13
**struggle** [2] - 366:19,
366:20
**struggling** [1] - 396:4
**stub** [1] - 401:14
**stuck** [3] - 334:19,
335:2, 335:25
**Studio** [2] - 490:13,
490:14
**Studio's** [2] - 490:15,
490:16
**stuff** [2] - 431:12,
434:24
**stun** [1] - 367:1
**subject** [5] - 359:25,
360:20, 361:13,
361:16, 504:23
**subjected** [2] - 361:19,
361:20
**submit** [4] - 342:9,
346:1, 503:7, 503:11

**submits** [1] - 322:12
**suborganization** [1] -
352:10
**substitute** [1] - 323:4
**subterranean** [1] -
439:16
**success** [1] - 468:22
**successfully** [3] -
314:16, 405:15,
479:5
**suddenly** [1] - 410:13
**sufficient** [1] - 388:19
**sufficiently** [2] -
478:24, 479:1
**suit** [1] - 514:15
**Suite** [1] - 307:12
**summarize** [1] -
401:13
**summarizing** [1] -
417:12
**summary** [5] - 324:6,
471:6, 507:6, 510:1,
510:4
**summer/early** [1] -
357:20
**SUMMERS** [2] - 308:3,
350:21
**Summers** [11] -
346:17, 350:24,
351:2, 351:4,
364:17, 370:6,
371:13, 376:18,
379:15, 384:18,
416:7
**summons** [1] - 352:25
**sunglasses** [4] -
330:2, 336:8, 411:7,
414:25
**supervision** [3] -
352:6, 450:23, 451:6
**supervisors** [3] -
451:14, 467:22,
475:21
**support** [1] - 317:17
**supporter** [1] - 340:19
**supporters** [1] -
503:15
**supportive** [1] -
316:18
**supports** [1] - 338:8
**supposed** [3] -
313:13, 331:14,
335:9
**Supreme** [2] - 504:21,
505:6
**surged** [3] - 333:11,
334:13, 335:19
**surges** [1] - 450:12
**surging** [1] - 334:2
**surrounded** [4] -

342:1, 349:11,
349:17, 448:13
**surveillance** [4] -
309:18, 365:13,
365:17, 494:6
**suspended** [1] - 379:8
**sustain** [1] - 327:22
**sustained** [1] - 426:8
**sway** [1] - 330:10
**sweatshirt** [1] - 410:14
**sweep** [5] - 487:18,
487:20, 487:21
**swept** [1] - 333:22
**switch** [1] - 490:7
**swore** [1] - 421:24
**Sworn** [5] - 350:21,
429:12, 460:1, 492:6
**sworn** [5] - 326:24,
346:24, 347:1,
429:11, 490:3
**system** [5] - 353:13,
402:1, 402:2, 497:8

## T

**table** [9] - 384:8,
384:14, 432:12,
443:24, 464:10,
464:13, 496:14,
499:6, 514:14
**tactical** [2] - 334:10,
408:13
**tactics** [1] - 441:25
**talks** [2] - 503:19,
503:20
**taller** [3] - 342:2,
344:13, 447:23
**Tampa** [2] - 307:12,
307:12
**taser** [1] - 438:18
**TBD** [2] - 471:1, 471:2
**team** [5] - 325:21,
433:14, 436:12,
453:19, 454:2
**tear** [6] - 407:8, 407:9,
407:10, 452:23,
453:4, 474:10
**tech** [1] - 488:23
**technical** [2] - 513:6
**technologically** [1] -
338:17
**technology** [1] -
464:15
**telephone** [2] -
467:22, 498:7
**television** [2] - 380:9,
381:11
**temporarily** [2] -
336:19, 350:12
**temporary** [2] -

348:24, 350:3
**ten** [13] - 333:7,
343:22, 369:19,
411:2, 427:15,
430:10, 437:21,
438:2, 440:25,
443:14, 450:22,
477:9, 493:22
**term** [6] - 330:12,
405:22, 421:5,
453:18, 453:19,
464:1
**terms** [6] - 311:12,
317:1, 348:13,
352:10, 356:13,
460:11
**Terrace** [27] - 357:12,
365:2, 366:4, 365:7,
366:13, 366:15,
387:24, 390:4,
390:21, 400:6,
406:11, 410:19,
423:20, 432:2,
432:16, 433:2,
434:16, 434:22,
435:9, 435:25,
437:6, 437:9,
452:11, 452:14,
452:18, 452:23,
453:11
**terrace** [4] - 420:8,
420:10, 420:25,
425:6
**terraces** [1] - 349:12
**test** [1] - 427:20
**tested** [1] - 384:1
**testified** [4] - 390:23,
421:18, 421:21,
464:17
**testify** [1] - 333:18
**testifying** [1] - 320:11
**testimony** [14] - 310:3,
319:24, 326:24,
340:4, 341:20,
390:5, 426:25,
427:1, 459:6, 459:7,
488:16, 488:18,
489:14, 515:9
**text** [1] - 504:20
**THE** [141] - 307:1,
307:1, 307:9, 309:2,
309:5, 309:7,
309:10, 309:13,
309:21, 310:2,
310:7, 310:13,
310:20, 310:23,
311:8, 311:16,
311:18, 311:21,
312:7, 312:10,
312:12, 312:19,

313:22, 313:25,
314:11, 315:14,
316:2, 316:7,
316:16, 317:16,
318:2, 318:14,
318:18, 318:20,
319:5, 319:12,
319:16, 319:22,
320:12, 320:14,
320:20, 320:24,
321:6, 321:8,
321:11, 321:14,
321:18, 321:21,
322:2, 322:8,
322:14, 322:19,
322:23, 326:5,
329:13, 329:15,
338:10, 346:13,
346:19, 346:21,
346:22, 346:23,
347:6, 347:16,
347:18, 347:24,
350:14, 369:15,
369:18, 369:24,
370:1, 383:22,
384:6, 384:15,
386:5, 386:19,
417:5, 426:8,
426:20, 426:22,
426:24, 427:2,
427:3, 427:6, 428:4,
429:2, 429:10,
433:22, 440:15,
448:24, 449:1,
458:7, 459:5,
459:11, 459:15,
459:18, 459:21,
459:22, 459:23,
459:24, 468:16,
468:20, 488:15,
488:17, 488:18,
488:20, 488:21,
488:25, 489:9,
489:12, 489:16,
489:19, 489:22,
490:2, 493:6,
497:20, 501:19,
502:2, 502:16,
502:21, 502:24,
503:2, 503:10,
503:16, 503:24,
504:4, 504:23,
505:20, 505:22,
506:1, 508:7,
514:19, 514:21,
514:24, 515:8,
515:11, 515:15,
515:20, 515:24,
516:4, 516:11
**theme** [3] - 380:18,
380:23, 449:4

**themselves** [3] -
375:21, 405:2, 405:5
**thereafter** [3] - 438:18,
494:23
**they've** [1] - 436:11
**thinks** [1] - 326:8
**third** [6] - 324:14,
327:1, 334:23,
360:25, 439:13,
456:23
**thousands** [4] -
332:12, 419:1,
419:11, 423:1
**threatened** [2] - 334:9,
446:10
**three** [17] - 323:7,
330:25, 349:15,
353:6, 354:23,
356:12, 373:13,
373:16, 386:24,
387:4, 394:12,
438:17, 442:23,
448:20, 450:22,
462:10
**three-minute-13-
second** [1] - 449:16
**three-minute-15** [1] -
449:18
**three-minute-30-
second** [1] - 450:1
**three-minute-38-
second** [1] - 443:3
**three-minute-five-
second** [1] - 448:20
**throughout** [11] -
325:10, 328:7,
343:19, 344:11,
345:12, 400:1,
400:24, 402:2,
409:17, 469:24,
484:6
**thrown** [1] - 472:12
**Tia** [2] - 346:17, 351:2
**TIA** [2] - 308:3, 350:21
**tie** [2] - 370:17, 370:18
**tiered** [1] - 434:18
**ties** [1] - 316:1
**time-stamp** [4] -
383:6, 390:18,
443:5, 443:16
**time-stamps** [3] -
383:2, 383:10,
490:22
**timing** [4] - 425:12,
425:24, 426:1, 489:7
**tip** [1] - 504:6
**tips** [1] - 493:14
**tipsters** [1] - 494:2
**tissue** [1] - 450:25
**Title** [1] - 348:13

**today** [6] - 422:7,
455:21, 489:14,
493:19, 514:1,
514:13
**toes** [1] - 401:14
**together** [4] - 352:20,
378:14, 408:12,
470:19
**tomorrow** [1] - 515:13
**took** [27] - 311:14,
312:15, 316:14,
330:14, 332:4,
336:6, 340:2,
340:14, 359:13,
400:15, 400:16,
403:22, 403:24,
409:15, 409:22,
435:11, 435:17,
435:22, 437:21,
444:17, 450:22,
453:18, 453:19,
487:14, 493:14,
493:15
**Top** [1] - 381:20
**top** [17] - 354:10,
354:12, 354:23,
366:8, 367:15,
378:14, 377:11,
391:21, 392:19,
396:8, 439:18,
443:6, 500:22,
505:1, 506:7,
507:15, 510:24
**top-left** [1] - 443:6
**topic** [1] - 380:23
**total** [3] - 332:24,
351:22, 493:23
**totally** [1] - 333:21
**touch** [6] - 344:18,
457:8, 457:11,
495:17
**touched** [1] - 417:23
**touching** [1] - 457:15
**tour** [2] - 360:17,
361:3
**tourist** [1] - 359:9
**tours** [1] - 358:22
**toward** [9] - 334:2,
334:18, 335:5,
374:17, 385:23,
387:10, 439:18,
512:9
**towards** [18] - 311:5,
334:19, 335:19,
341:2, 341:8,
341:12, 355:4,
362:16, 385:24,
391:12, 417:12,
419:20, 420:1,
423:1, 472:20,

474:6, 484:25,
485:23
**tower** [2] - 388:1,
388:2
**tracks** [1] - 336:20
**traffic** [7] - 372:2,
380:8, 382:10,
382:12, 385:10,
432:19, 432:20
**traffic-circle-looking**
[1] - 385:10
**trained** [4] - 368:16,
395:5, 433:17, 461:8
**training** [8] - 368:14,
408:16, 408:18,
429:25, 430:1,
430:4, 430:5, 460:13
**traitors** [4] - 335:14,
442:17, 446:23,
449:4
**TRANSCRIPT** [1] -
307:8
**transcript** [4] - 329:3,
329:6, 517:5, 517:6
**transfer** [1] - 314:11
**transferred** [1] -
492:20
**transition** [1] - 329:25
**transitioned** [1] -
441:24
**transitioning** [2] -
441:24, 445:21
**transmitting** [1] -
320:2
**trauma** [1] - 395:5
**travel** [3] - 462:14,
466:6, 513:20
**Treasury** [1] - 462:8
**treatment** [1] - 435:16
**tree** [6] - 332:3,
342:14, 342:20,
342:21, 423:8
**trespass** [1] - 346:2
**TRIAL** [1] - 307:8
**trial** [34] - 314:1,
314:8, 320:10,
322:6, 323:2, 323:3,
323:15, 323:21,
323:24, 324:4,
324:16, 325:3,
325:6, 325:10,
325:24, 327:13,
328:7, 336:18,
336:25, 338:6,
338:17, 338:23,
339:17, 341:20,
343:12, 345:9,
345:13, 346:1,
365:11, 421:19,
421:22, 422:1,

422:4, 464:18
**tried** [1] - 335:11
**tries** [1] - 321:17
**trip** [3] - 339:9, 463:22, 472:25
**trouble** [1] - 432:23
**true** [5] - 328:1, 457:12, 461:7, 517:4, 517:6
**Trump** [7] - 340:7, 340:20, 345:21, 380:14, 503:15, 504:20, 508:2
**Trump/Pence** [1] - 505:3
**truth** [4] - 421:22, 421:24, 455:8, 455:10
**try** [9] - 330:18, 333:25, 389:2, 440:2, 446:24, 447:16, 458:16, 478:13, 494:7
**trying** [21] - 328:20, 334:6, 334:21, 335:2, 336:2, 356:5, 358:24, 374:25, 396:25, 397:1, 398:13, 401:3, 403:14, 403:16, 408:23, 433:7, 446:19, 446:22, 483:4, 494:10, 495:7
**Tuesday** [1] - 378:9
**tuesday** [1] - 307:4
**tuned** [1] - 381:24
**tunnel** [2] - 366:11, 366:14
**tunnels** [1] - 433:4
**turn** [2] - 335:10, 384:3
**turned** [1] - 369:10
**turning** [1] - 376:7
**turns** [1] - 328:18
**Tweets** [1] - 328:13
**twentieth** [1] - 429:24
**twice** [2] - 503:22, 512:19
**two** [34] - 316:4, 319:18, 323:6, 323:19, 330:25, 332:9, 336:14, 343:1, 347:21, 349:11, 349:16, 351:24, 367:4, 375:9, 378:13, 378:19, 391:18, 394:15, 407:16, 413:6, 424:10, 431:10, 437:25,

438:23, 451:10, 468:17, 477:17, 493:12, 493:13, 494:2, 497:5, 512:2, 514:5, 514:14
**typically** [6] - 313:25, 395:21, 436:9, 465:17, 495:18, 506:18

## U

**U.S** [28] - 307:14, 307:24, 330:18, 333:7, 334:6, 348:9, 348:10, 348:16, 348:17, 348:22, 349:2, 349:6, 349:18, 354:8, 359:4, 378:4, 383:1, 418:18, 430:15, 437:8, 439:5, 482:2, 482:7, 483:19, 491:11, 491:21, 496:7, 496:17
**Uber** [1] - 340:2
**ultimate** [1] - 327:18
**ultimately** [9] - 323:19, 336:22, 397:21, 400:13, 448:12, 451:15, 474:22, 475:2, 476:14
**unable** [1] - 335:1
**unanimously** [1] - 427:21
**uncover** [1] - 495:3
**under** [13] - 317:13, 351:18, 352:5, 353:9, 353:10, 355:10, 438:3, 438:10, 450:23, 451:5, 491:9, 491:19, 493:22
**underground** [3] - 349:7, 433:5, 435:23
**underlined** [1] - 376:21
**undermine** [1] - 319:1
**underneath** [2] - 364:17, 402:5
**understood** [1] - 313:4
**UNISON** [2] - 309:6, 322:22
**unit** [6] - 352:23, 368:7, 368:12, 368:13, 369:1, 398:17
**UNITED** [3] - 307:1, 307:2, 307:9
**United** [25] - 307:11,

309:4, 324:8, 329:19, 336:21, 346:16, 347:4, 348:8, 348:11, 348:12, 348:13, 348:20, 350:6, 351:3, 352:16, 359:11, 370:13, 378:3, 378:5, 378:6, 382:23, 429:7, 429:22, 459:9, 517:11
**Universal** [1] - 501:13
**unlawfully** [1] - 338:2
**unless** [1] - 325:11
**unplanned** [1] - 467:4
**unusual** [3] - 357:9, 367:23, 369:13
**up** [102] - 309:8, 319:11, 321:16, 321:17, 321:22, 322:6, 322:17, 323:11, 332:9, 332:17, 334:16, 336:8, 339:24, 340:1, 342:13, 342:14, 342:19, 342:20, 342:21, 343:3, 345:17, 346:23, 359:14, 365:7, 365:22, 367:18, 371:20, 372:23, 372:25, 374:24, 376:5, 376:25, 378:19, 383:15, 383:20, 390:3, 390:4, 390:6, 391:4, 391:5, 392:22, 401:16, 404:18, 406:2, 409:14, 410:18, 410:24, 413:20, 413:23, 418:24, 420:2, 420:8, 420:20, 420:21, 421:8, 423:14, 423:25, 425:4, 425:6, 425:10, 429:24, 430:3, 431:21, 433:24, 434:19, 434:22, 436:11, 437:2, 439:2, 442:1, 443:21, 447:12, 450:4, 454:24, 458:20, 465:14, 468:13, 468:17, 468:25, 478:9, 485:16, 485:23, 487:3, 489:8,

489:20, 492:21, 497:6, 499:4, 500:11, 502:10, 504:11, 504:21, 509:4, 509:19, 510:10, 510:22, 511:19, 512:6, 513:3, 515:25, 516:4, 516:6
**upper** [1] - 385:24
**Upper** [21] - 357:12, 365:2, 365:3, 365:7, 390:4, 390:21, 400:6, 410:19, 423:19, 432:2, 432:16, 433:2, 434:16, 435:8, 435:25, 437:6, 437:9, 452:14, 452:18, 452:22, 453:11
**upstairs** [1] - 423:12
**USAO** [1] - 307:11
**USCP** [6] - 348:9, 348:18, 348:25, 366:12, 383:3, 453:4
**USCP-controlled** [1] - 383:3
**useful** [1] - 323:9
**user** [1] - 506:15
**uses** [1] - 395:16
**UTC** [6] - 501:11, 501:15, 501:17, 501:21, 512:3

## V

**Valerie** [1] - 512:2
**validity** [1] - 507:9
**value** [2] - 318:9, 318:10
**vandalized** [1] - 418:6
**vanity** [3] - 498:17, 498:20, 498:24
**vantage** [2] - 332:5, 343:4
**varied** [1] - 486:4
**variety** [3] - 349:10, 373:19, 492:24
**various** [6] - 313:3, 313:15, 319:11, 371:21, 376:6, 380:21
**vast** [2] - 321:2, 337:19
**vastly** [1] - 335:17
**vehicle** [2] - 465:19, 494:10
**vehicles** [4] - 465:18, 473:11, 473:12

**vehicular** [1] - 372:2
**venue** [3] - 314:12, 461:20, 461:21
**venues** [1] - 461:3
**verbal** [2] - 436:15, 506:23
**verbally** [1] - 474:16
**verdict** [1] - 338:7
**Verizon** [2] - 495:7, 498:10
**versa** [1] - 389:17
**versed** [1] - 460:17
**version** [1] - 348:4
**versus** [2] - 472:3, 473:8
**via** [5] - 362:24, 470:1, 470:17, 472:6, 504:20
**vibe** [1] - 442:19
**vicarious** [1] - 312:20
**vice** [53] - 333:3, 350:10, 370:13, 370:15, 370:20, 389:17, 460:23, 460:25, 461:3, 461:4, 461:9, 461:14, 461:19, 461:22, 461:25, 462:12, 462:23, 465:2, 465:16, 465:21, 466:1, 466:5, 466:14, 466:18, 467:2, 467:5, 467:15, 468:3, 468:4, 469:11, 469:14, 469:15, 469:22, 470:9, 470:13, 470:19, 472:1, 473:1, 473:14, 475:2, 475:16, 475:19, 475:24, 475:25, 476:19, 476:23, 479:5, 479:10, 479:19, 480:10, 481:2, 487:11, 487:22
**Vice** [8] - 331:4, 378:15, 378:21, 378:24, 484:3, 484:6, 485:9, 486:10
**vicinity** [2] - 486:13, 488:12
**Video** [59] - 335:22, 385:5, 385:15, 386:22, 387:3, 387:5, 387:20, 388:15, 390:16, 391:9, 391:17, 392:4, 392:13,

393:21, 393:25,
394:10, 395:8,
395:25, 396:9,
396:17, 397:14,
397:20, 397:23,
398:22, 399:3,
399:24, 400:3,
400:9, 404:11,
404:22, 405:14,
406:7, 407:4,
407:12, 408:9,
409:9, 410:6, 410:9,
411:6, 411:18,
414:8, 414:16,
414:24, 415:4,
415:11, 415:22,
441:2, 443:4,
443:15, 444:25,
445:15, 447:19,
448:22, 449:17,
450:2, 450:9,
478:12, 478:17,
491:2

**video** [78] - 310:17,
311:14, 311:15,
311:25, 313:23,
314:25, 315:4,
316:18, 317:11,
343:2, 344:6, 345:3,
365:11, 365:17,
382:9, 382:14,
382:16, 382:24,
383:1, 383:3, 383:5,
383:7, 383:11,
383:12, 383:17,
384:19, 386:8,
386:10, 389:25,
390:1, 390:18,
390:19, 391:11,
393:16, 394:13,
396:24, 397:4,
399:16, 400:18,
400:25, 403:1,
403:9, 404:3,
405:25, 406:13,
407:17, 410:1,
414:13, 422:7,
423:10, 423:19,
423:23, 424:3,
425:2, 425:9,
425:13, 425:24,
442:8, 450:11,
450:12, 456:16,
456:19, 478:9,
478:19, 478:24,
479:10, 486:22,
490:10, 490:19,
490:23, 490:24,
491:8, 491:12,
491:14, 491:18,
491:23, 491:24,

494:1
**video's** [3] - 314:22,
406:8, 445:9
**Videos** [2] - 491:10,
491:20
**videos** [21] - 314:21,
316:9, 316:11,
340:16, 342:15,
343:7, 343:14,
346:7, 382:22,
391:19, 420:17,
421:12, 453:23,
455:18, 455:20,
455:23, 456:13,
491:16, 494:3,
494:4, 494:5
**videotaping** [1] -
316:24
**view** [11] - 317:12,
374:6, 387:23,
391:23, 392:9,
412:2, 412:18,
415:24, 475:15,
496:16, 506:19
**viewpoint** [5] - 310:5,
312:6, 341:7,
341:11, 341:25
**viewpoints** [4] -
340:18, 340:21,
340:22, 344:10
**views** [5] - 317:7,
317:8, 317:15,
345:12, 345:16
**violated** [1] - 338:5
**violence** [6] - 332:24,
338:3, 399:12,
431:23, 435:24,
474:8
**violent** [2] - 431:25,
492:19
**VIP** [1] - 370:24
**vis** [2] - 313:11
**vis-a-vis** [1] - 313:11
**visceral** [1] - 451:24
**visible** [1] - 441:9
**visit** [6] - 359:18,
461:3, 461:19,
463:25, 464:4,
472:25
**visiting** [1] - 350:12
**Visitor** [1] - 349:6
**visitor** [5] - 360:8,
360:16, 360:23,
469:9, 469:10
**Visitor's** [5] - 349:17,
359:4, 359:19,
360:5, 360:23
**visitor's** [1] - 360:11
**visitors** [6] - 358:5,
358:19, 358:21,

359:3, 361:20,
402:14
**visually** [1] - 412:10
**vocal** [1] - 445:3
**voice** [3] - 478:18,
478:21, 504:23
**voices** [1] - 457:3
**voir** [3] - 314:15,
317:4, 317:14
**volume** [1] - 444:24
**volumes** [1] - 342:9
**volunteers** [2] -
437:20, 437:22
**vote** [14] - 370:18,
370:19, 378:8,
379:13, 463:2,
463:4, 463:8, 463:9,
463:11, 466:15,
471:12, 481:1,
507:20, 507:21
**voted** [2] - 504:20,
505:3
**votes** [2] - 368:2,
505:8
**vouch** [1] - 361:5
**vs** [2] - 307:4, 309:4

## W

**wait** [3] - 326:2, 427:8,
433:22
**waited** [2] - 468:6
**waiting** [2] - 468:2,
468:4
**walk** [35] - 340:8,
340:15, 342:8,
356:14, 359:11,
359:14, 359:15,
359:21, 359:24,
360:19, 360:20,
362:5, 362:25,
412:21, 414:3,
463:24, 465:20,
466:2, 466:11,
466:12, 466:19,
466:21, 467:20,
467:21, 470:21,
470:22, 471:18,
471:19, 471:20,
471:21, 473:21,
474:24, 475:1,
488:12
**walk-through** [11] -
359:21, 359:24,
360:19, 360:20,
463:24, 466:11,
466:12, 466:19,
466:21, 467:20,
467:21
**walked** [18] - 333:5,

336:12, 340:12,
344:17, 346:5,
355:12, 362:11,
398:7, 414:11,
414:19, 425:10,
474:3, 475:4, 484:8,
484:18, 485:11,
485:14, 486:11
**walking** [13] - 314:24,
355:13, 355:14,
362:23, 387:10,
387:15, 387:17,
419:20, 420:1,
423:1, 474:6, 485:17
**walks** [3] - 342:13,
345:2, 345:4
**walkway** [3] - 349:11,
362:19, 375:8
**walkways** [2] - 341:13,
375:9
**wall** [2] - 420:4, 420:25
**walls** [1] - 332:16
**war** [2] - 332:10, 337:4
**warrant** [17] - 493:16,
494:17, 494:22,
494:25, 495:4,
495:5, 495:23,
496:5, 498:1, 499:2,
499:10, 499:19,
504:9, 506:5,
508:11, 509:17
**warrants** [3] - 494:15,
513:15, 513:16
**Washington** [18] -
307:15, 307:25,
318:24, 336:7,
339:12, 348:15,
348:22, 355:17,
355:20, 356:4,
356:15, 389:10,
495:6, 495:9,
513:14, 513:17,
513:22, 517:13
**wasting** [1] - 350:17
**watch** [2] - 339:25,
458:10
**watched** [7] - 335:25,
340:6, 382:15,
424:3, 453:23,
456:13
**watching** [7] - 320:9,
340:5, 340:16,
342:15, 380:20,
380:22, 396:24
**water** [2] - 434:12,
434:14
**wave** [2] - 333:22,
457:22
**ways** [4] - 318:11,
360:7, 417:16

**weapon** [6] - 399:21,
446:2, 446:3, 448:7,
454:21, 488:3
**weapons** [10] -
375:25, 405:5,
409:20, 433:17,
438:11, 438:13,
454:1, 454:10,
466:1, 477:22
**wear** [1] - 427:22
**wearing** [6] - 315:7,
398:15, 413:4,
427:20, 459:2,
514:15
**website** [4] - 359:4,
359:5, 359:6, 504:22
**Wednesday** [2] -
443:7, 443:17
**week** [4] - 330:7,
339:10, 504:16,
509:2
**weeks** [4] - 315:18,
316:5, 318:25, 430:2
**weigh** [1] - 327:19
**weight** [1] - 330:23
**welcome** [3] - 370:1,
429:2, 489:22
**well-working** [1] -
389:17
**west** [14] - 349:9,
349:22, 354:14,
355:13, 359:19,
362:11, 398:5,
398:6, 419:16,
421:8, 482:13,
484:21, 484:22,
496:18
**West** [47] - 331:10,
332:10, 349:9,
349:13, 350:2,
354:18, 357:11,
357:12, 357:16,
357:21, 357:24,
358:3, 365:2, 365:3,
365:7, 366:13,
366:15, 372:11,
374:6, 376:25,
387:24, 390:4,
390:21, 400:6,
400:24, 406:4,
406:11, 410:18,
410:19, 420:1,
423:20, 432:2,
432:6, 432:16,
433:2, 434:16,
434:22, 435:8,
435:25, 437:6,
437:9, 452:11,
452:14, 452:18,
452:22, 453:11

**western** [1] - 354:17
**whatsoever** [2] -
   316:13, 418:8
**wheelchair** [1] - 404:8
**whim** [1] - 359:10
**white** [6] - 332:7,
   373:1, 373:2, 377:2,
   387:12
**White** [8] - 356:2,
   356:3, 356:17,
   356:25, 462:3,
   462:4, 462:5, 462:11
**whole** [3] - 362:9,
   450:7, 510:13
**wide** [1] - 349:5
**widest** [1] - 349:5
**wife** [4] - 469:15,
   479:25, 480:7, 480:8
**WiFi** [1] - 495:19
**wildprotest.com** [1] -
   510:3
**window** [13] - 313:20,
   332:23, 394:5,
   394:7, 396:12,
   424:4, 424:6,
   472:12, 473:25,
   474:3, 484:16,
   484:18, 484:20
**windows** [2] - 332:21,
   484:17
**Wing** [23] - 343:21,
   355:1, 363:25,
   364:3, 365:9,
   365:25, 390:22,
   391:12, 392:7,
   393:22, 397:2,
   397:3, 411:11,
   411:23, 419:24,
   420:14, 420:15,
   420:23, 421:9,
   422:22, 424:18,
   424:21, 424:22
**wing** [3] - 355:6,
   360:9, 360:24
**winter** [1] - 501:12
**withdrawn** [1] -
   327:23
**witness** [23] - 320:3,
   326:12, 328:4,
   346:15, 364:15,
   366:8, 372:15,
   427:10, 429:6,
   431:23, 435:24,
   436:1, 443:18,
   445:1, 445:16,
   447:20, 450:10,
   489:10, 489:24,
   490:3, 515:18,
   515:22, 516:2
**WITNESS** [11] -

346:22, 426:20,
   427:2, 448:24,
   449:1, 458:7,
   459:21, 459:23,
   488:17, 488:20,
   515:11
**Witness** [10] - 347:1,
   364:4, 439:8, 441:6,
   444:10, 446:15,
   446:17, 448:3,
   448:5, 449:1
**witness's** [2] - 328:5,
   386:18
**witnessed** [6] -
   313:18, 449:7,
   451:21, 452:22,
   453:2
**WITNESSES** [1] -
   308:2
**witnesses** [9] - 310:9,
   319:23, 326:17,
   326:22, 326:24,
   327:20, 346:12,
   497:16
**witnessing** [4] - 336:3,
   338:3, 436:3, 436:5
**woman** [4] - 339:18,
   447:10, 479:20,
   480:2
**won** [1] - 509:3
**wonders** [1] - 464:15
**word** [2] - 345:5, 392:1
**words** [4] - 330:16,
   345:10, 351:8, 405:7
**workday** [1] - 481:24
**workers** [1] - 466:10
**works** [3] - 478:11,
   512:24, 512:25
**worksheet** [1] - 469:7
**world** [2] - 358:20,
   509:5
**wormed** [1] - 334:5
**worst** [1] - 369:12
**wow** [1] - 429:25
**write** [2] - 323:12,
   323:16
**writing** [2] - 377:5,
   377:8
**written** [3] - 321:11,
   348:4, 363:19
**WWG1WGA** [1] -
   499:25
**wwg1wga6@gmail.
com** [1] - 499:24

## X

**x-ray** [2] - 359:23,
   360:19

## Y

**year** [4] - 357:15,
   359:13, 429:24,
   492:17
**years** [8] - 351:22,
   351:24, 357:16,
   418:21, 451:10,
   452:3, 460:15,
   492:18
**yell** [1] - 447:3
**yelled** [1] - 418:2
**yelling** [4] - 332:12,
   442:17, 450:17,
   474:7
**yellow** [9] - 315:6,
   315:7, 333:17,
   335:21, 388:3,
   388:8, 411:15,
   411:16, 411:21
**yesterday** [6] - 314:16,
   324:4, 325:9, 328:6,
   338:20, 514:1
**Yetter** [1] - 311:6
**yoga** [1] - 488:6
**young** [1] - 343:1
**yourself** [12] - 351:1,
   441:3, 441:5, 444:5,
   446:12, 446:14,
   446:24, 447:17,
   447:25, 448:21,
   460:6, 504:22
**yup** [1] - 369:9

## Z

**zone** [1] - 332:11
**zoom** [3] - 357:5,
   367:18, 432:14
**zoomed** [1] - 440:22