```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2    - - - - - - - - - - - - - - - x
     THE UNITED STATES OF AMERICA,
3                                     Criminal Action No.
                   Plaintiff,         1:21-cr-623-CRC-2
4                                     Thursday, January 26, 2023
     vs.                              9:06 a.m.
5
     KIRSTYN NIEMELA,
6
                   Defendant.
7    - - - - - - - - - - - - - - - x
     _____
8
                    TRANSCRIPT OF JURY TRIAL
9        HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                 UNITED STATES DISTRICT JUDGE
10   _____
     APPEARANCES:
11   For the United States:    MICHAEL MATTHEW GORDON, ESQ.
                               DOJ-USAO
12                             400 North Tampa Street, Suite 3200
                               Tampa, FL 33602
13                             (813) 274-6370

14                             JESSICA ARCO, ESQ.
                               U.S. DEPARTMENT OF JUSTICE
15                             950 Pennsylvania Avenue NW
                               Washington, DC 20530
16                             (202) 532-3867

17   For the Defendant:        PAUL GARRITY, ESQ.
                               LAW OFFICES OF PAUL GARRITY
18                             14 Londonderry Road
                               Londonderry, NH 03053
19                             (603) 434-4106

20                             RICHARD F. MONTEITH, JR., ESQ.
                               LAW OFFICES OF RICHARD F. MONTEITH
21                             14 Londonderry Road
                               Londonderry, NH 03053
22                             (603) 437-2733

23   Court Reporter:           Lisa A. Moreira, RDR, CRR
                               Official Court Reporter
24                             U.S. Courthouse, Room 6718
                               333 Constitution Avenue, NW
25                             Washington, DC  20001
                               (202) 354-3187
```

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, we're on the
 3   record for Criminal Case 21-623 -- this is Defendant 2 --
 4   United States of America vs. Kirstyn Niemela.
 5            THE COURT:  All right.  Good morning, everybody.
 6            EVERYONE IN UNISON:  Good morning.
 7            THE COURT:  All right.  So this is our charge
 8   conference.  So we distributed the draft final instructions
 9   yesterday, and, Mr. Garrity, do you want to -- you or
10   Mr. Monteith -- address the one that we at least tentatively
11   did not adopt your proposals?
12            MR. GARRITY:  Yes, Your Honor.  Just briefly.
13            With respect to the count charging disorderly
14   conduct in a Capitol building, we would ask that the Court
15   provide to the jury our proposed definition of "willfully."
16   We submit that it gives, I guess, more meat to the bone,
17   describes it more fully to the jury so they know the
18   distinction in terms of "willfully" as opposed to
19   "knowingly."
20            THE COURT:  So what is the source of the
21   formulation that you proposed?  Has that been used before?
22   Where does it come from?
23            MR. GARRITY:  I can't give the Court a particular
24   case cite or case that it came from, but I think it -- we
25   think it describes to the jury more fully that it's not only
```

1    that she's acting knowingly, but she that has to know that

2    she's disobeying a law without -- she doesn't have to know

3    the specific law, but that she knows that she's

4    intentionally and purposely disobeying a law.

5            THE COURT:  Okay.  So the instruction that we have

6    says, "A person acts willfully if she acts with the intent

7    to do something that the law forbids; that is, to disobey or

8    disregard the law."

9            I think it captures precisely that concept.

10           MR. GARRITY:  I understand, Judge.  We would ask

11   the Court -- and I understand the Court's viewpoint.  We

12   would ask the Court to provide the definition that we've

13   outlined in our proposed instruction, but I won't -- I'm not

14   going to belabor the point.

15           THE COURT:  Okay.  Well, your objection's noted

16   and denied.

17           MR. GARRITY:  And, Judge, one further request.

18   And we have not put this forward in our proposed

19   instructions, but after consideration, we've discussed it.

20   We would ask that the Court consider providing an

21   instruction on mere presence.

22           I think some of the testimony and the video which

23   supports that proposed instruction of merely being present

24   in the Capitol is something that the jury should consider

25   when they're conducting their deliberations.

1            THE COURT:  Okay.  Where would that go?  And what,

2     precisely, would it say?

3            MR. GARRITY:  It terms of where it would go, let's

4     look at the draft instructions, Your Honor.

5            Perhaps before you go into the counts themselves,

6     I guess it would be -- we would ask it to be in Instruction

7     18.  And we can formulate the exact word -- verbiage for the

8     Court.

9            THE COURT:  So Count 18, I mean, that's all about

10    mere presence.  I mean, I think she could violate it just by

11    being present, right?  If she entered or remained without

12    lawful authority and knew that she didn't have lawful

13    authority, her mere presence would violate the statute.  But

14    I don't think that would be a correct instruction with

15    respect to that count.

16            MR. GARRITY:  With respect to that count, I don't

17    disagree.

18            With respect to the counts charging disorderly

19    conduct, I think it's -- mere presence is a relevant

20    instruction for those two counts.

21            THE COURT:  Hold on.

22            (Pause)

23            THE COURT:  So just in doing some research, we

24    found an instruction by Judge Kollar-Kotelly which actually

25    says the opposite for the disorderly charge.  "Even mere

1   presence in an unlawful mob or riot is disorderly in the

2   sense that it furthers the mob's disturbing of the public

3   peace."

4            I'm not sure I would give that instruction, but

5   I'm not sure that simply mere presence cannot, in some way,

6   disturb.

7            Mr. Gordon.

8            MR. GORDON:  Thank you, Your Honor.

9            I agree with the Court, and I think that the

10  concern highlighted by the defense is already covered by the

11  elements of the crime.

12           So for the disorderly conduct charges, there's an

13  explicit requirement -- in fact, it's the very first element

14  -- that she has done something that can be deemed by the

15  jury to have been disorderly or disruptive.  And the Court

16  defines it, even gives an example for disorderly conduct.

17  You know, "disorderly involves," et cetera, et cetera,

18  "being unreasonably loud and disruptive, interfering with

19  another person by jostling against or unnecessarily

20  crowding," or for "disruptive conduct," "a disturbance that

21  interrupts an activity in the normal course or process."

22           So the jury's already being instructed that

23  essentially if what Ms. Niemela had done was nothing more

24  than stand in a corner away from everybody else, perhaps

25  that might not have been disorderly or disruptive, and they

```
 1    have to evaluate that.

 2              THE COURT:  Do you agree, as a matter of law, that

 3    mere presence without doing anything would not satisfy the

 4    first element?

 5              MR. GORDON:  I think I do because -- well, no,

 6    actually -- I don't actually, now that I think about it.  I

 7    think about the testimony --

 8              THE COURT:  Give me a hypo.

 9              MR. GORDON:  Yes, Your Honor.

10              THE COURT:  Give me an example of how mere

11    presence could be disorderly.

12              MR. GORDON:  Yes, Your Honor.

13              So right here we have, in the definition of

14    "disruptive conduct," "a disturbance that interrupts an

15    activity in the normal course or process."

16              Here the certification was interrupted.  And we

17    had testimony from multiple law enforcement witnesses that

18    said the proceeding could not resume until every last rioter

19    was removed.

20              And I even asked Special Agent Glavey, I posed her

21    the hypo:  What if we had somebody who had come in and was

22    sitting in the middle of the Rotunda in a yoga pose singing

23    "Kumbaya" -- that was my question -- would you then have

24    brought the vice president back in and resumed anyway?  And

25    she said no.  So I think that that gets to the concern
```

```
 1    raised.
 2              THE COURT:  Okay.  Your objection's noted.  You
 3    can obviously argue that she was just there; she didn't do
 4    any of the things that the instruction tells you that she
 5    needed to have done.  But I'm not going to give the mere
 6    presence instruction.  Okay?
 7              MR. GARRITY:  Thank you, Your Honor.
 8              THE COURT:  And just to note a couple of the other
 9    proposals.  You all wanted me to instruct in the conjunctive
10    on the disorderly or disruptive, but I think the language --
11    the statute is written in the disjunctive, so we're going to
12    go with the statute.
13              I think that about covers it.  So we will finalize
14    these with the typos that you all pointed out yesterday and
15    bring them in.  Okay?
16              MR. GORDON:  Thank you, Your Honor.
17              THE COURT:  Just give us five minutes.
18              (Recess taken)
19              MS. ARCO:  Your Honor, I just wanted to raise one
20    issue.  When Mr. Gordon and I were leaving the courthouse
21    yesterday, we ran into one of the jurors.  I believe it's
22    Juror No. 3, a gentleman.  We were standing by, you know,
23    outside the magnetometers right by the circular exit.  And
24    when he saw us, he got kind of excited and said, "Oh, it's
25    you."  And Mr. Gordon quickly said, "Sorry, can't talk to
```

1    you."  And he seemed -- I got the sense he got a little

2    offended, but -- and then he proceeded to exit.

3         And so we would request that perhaps you renew the

4    instruction that we're not being rude.  We're just doing

5    what we're supposed to be doing.  Not call him out

6    specifically, obviously, but we would request that you renew

7    that over the course of deliberations we may run into them,

8    and we're not trying to be rude.

9         THE COURT:  All right.

10        MS. ARCO:  Thank you.

11        MR. GARRITY:  We do not oppose that, Your Honor.

12        (Jury enters courtroom)

13        THE COURT:  All right.  Please be seated.  Good

14   morning, everybody.  Everybody have a good night?

15        All right.  So we are ready to get started with

16   jury instructions.  The law requires that I read these

17   instructions to you.  It should take about 20 minutes or so.

18   But you will each have a copy of the instructions in the

19   jury room when you start your deliberations.  Okay?

20        All right.  I'm going to start with some general

21   rules of law and then talk about the specific charges

22   alleged in this case and some of the specific issues in the

23   case.  Some of these rules will repeat what I told you in my

24   preliminary instructions.

25        As I said, you will each have a copy of the

1    instructions during your deliberations.  You may, if you

2    wish, refer to them.  While you may refer to any particular

3    portion of the instructions, you are to consider the

4    instructions as a whole, and you may not follow some and

5    ignore others.  If you have any questions about the

6    instructions, you should feel free to send me a note.

7    Please leave your instructions in the jury room when you

8    conclude your deliberations.

9          As I said at the outset, my function is to conduct

10   this trial in an orderly, fair, and efficient manner; to

11   rule on questions of law; and to instruct you on the law

12   that applies in the case.  It is your duty to accept the law

13   as I instruct you.  Again, you should consider all the

14   instructions as a whole.  You may not ignore or refuse to

15   follow any of them.

16         Your function as the jury is to determine what the

17   facts are in this case.  You are the sole judges of the

18   facts.  While it is my responsibility to decide what is

19   admitted as evidence during the trial, you alone decide what

20   weight, if any, to give to that evidence.  You alone decide

21   the credibility or believability of the witnesses.

22         You should determine the facts without prejudice,

23   fear, sympathy, or favoritism.  You should not be improperly

24   influenced by anyone's race, ethnic origin, or gender.

25   Decide the case solely from a fair consideration of the

1    evidence.

2          You may not take anything I may have said or done

3    during the trial as indicating how I think you should decide

4    this case.  If you believe that I have expressed or

5    indicated any such opinion, you should ignore it.  The

6    verdict in this case is your responsibility alone.

7          If I or the others have referenced any evidence in

8    a way that is different from the way that you remember the

9    evidence, it is your memory that should control your

10   deliberations.

11         During the trial, I have permitted you to take

12   notes, if you wished to do so.  You may take your notebooks

13   with you to the jury room and use them during your

14   deliberations, if you wish.  As I told you at the beginning

15   of trial, your notes are only to be used as an aid to your

16   memory.  They are not evidence in the case, and they should

17   not replace your own memory of the evidence.  Those jurors

18   who have not taken notes should rely on their own memories

19   of the evidence.  The notes are intended to be for the

20   notetaker's own personal use.

21         You may consider only the evidence properly

22   admitted at the trial.  The evidence in this case consists

23   of the sworn testimony of the witnesses, the exhibits that

24   were admitted into evidence, and the facts and testimony

25   stipulated or agreed to by the parties.

1          During the trial, you were told that the parties

2    had stipulated to certain facts.  You should consider any

3    stipulation of fact to be undisputed evidence.

4          When you consider the evidence, you are permitted

5    to draw from the facts that you find have been proven any

6    reasonable inferences that you feel are justified in light

7    of your experience.  You should give any evidence the weight

8    that you think it is fairly entitled to receive.

9          The statements and arguments of the lawyers are

10   not evidence.  They are only intended to assist you in

11   understanding the evidence.  Likewise, the questions of the

12   lawyers are not evidence.

13         As I've explained, the defendant was charged in

14   this case through an indictment.  An indictment is merely

15   the formal way of accusing a person of a crime.  You must

16   not consider the indictment as evidence of any kind.  You

17   may not consider it as any evidence of Ms. Niemela's guilt

18   or draw any inference of guilt from it.

19         Every defendant in a criminal case is presumed to

20   be innocent.  This presumption of innocence remains with the

21   defendant throughout the trial unless and until the

22   government has proven she is guilty beyond a reasonable

23   doubt.  The burden never shifts throughout the trial.  The

24   law does not require Ms. Niemela to prove her innocence or

25   to produce any evidence at all.

1          If you find that the government has proven beyond

2     a reasonable doubt every element of an offense with which

3     Ms. Niemela is charged, then it is your duty to find her

4     guilty of that offense.  On the other hand, if you find the

5     government has failed to prove any element of an offense

6     beyond a reasonable doubt, you must find Ms. Niemela not

7     guilty of that offense.

8          The government has the burden of proving

9     Ms. Niemela guilty beyond a reasonable doubt.  Some of you

10    may have served as jurors in civil cases, where it is only

11    necessary to prove that a fact is more likely true than not

12    or, in some cases, that its truth is highly probable.  In

13    criminal cases like this one, the government's proof must be

14    more powerful than that.  It must be beyond a reasonable

15    doubt.

16         Reasonable doubt, as the name implies, is a doubt

17    based on reason; a doubt for which you have a reason based

18    on the evidence or lack of evidence in the case.

19         If, after careful, honest, and impartial

20    consideration of all the evidence, you cannot say that you

21    are firmly convinced of the defendant's guilt, then you have

22    a reasonable doubt.

23         Reasonable doubt is the kind of doubt that would

24    cause a reasonable person, after careful and thoughtful

25    reflection, to hesitate to act in the graver or more

1    important matters in life.  However, it is not an imaginary

2    doubt, nor a doubt based on speculation or guesswork; it is

3    a doubt based on reason.  The government is not required to

4    prove guilt beyond all doubt or to a mathematical or

5    scientific certainty.  The burden is to prove guilt beyond a

6    reasonable doubt.

7            There are two types of evidence from which you may

8    determine what the facts are in this case:  direct evidence

9    and circumstantial evidence.

10           When a witness, such as an eyewitness, asserts

11   actual knowledge of a fact, that witness's testimony is

12   direct evidence.

13           On the other hand, evidence of facts and

14   circumstances from which reasonable inferences may be drawn

15   is circumstantial evidence.

16           So assume you looked out a window and saw snow

17   falling.  If you later testified in court that you saw snow

18   falling, it would be direct evidence that it snowed.  But if

19   you looked out a window and saw no snow on the ground before

20   you went to sleep, and then saw snow on the ground the next

21   morning, your testimony about what you saw would be

22   circumstantial evidence that it had snowed overnight.

23           Both direct and circumstantial evidence are

24   acceptable means of proving a fact.  The law does not favor

25   one form over the other.  You should consider all the

1    evidence, and it is up to you to decide how much weight to

2    give any particular evidence, whether direct or

3    circumstantial.

4         One of the questions you were asked when we were

5    selecting this jury was whether the nature of the charges

6    themselves would affect your ability to reach a fair and

7    impartial verdict.  I asked you that question because you

8    must not allow the nature of the charge to affect your

9    verdict.  You must consider only the evidence that has been

10   presented in the case in reaching a fair and impartial

11   verdict.

12        The weight of the evidence is not necessarily

13   determined by the number of witnesses testifying on each

14   side.  Rather, you should consider all the facts and

15   circumstances in evidence to determine which of the

16   witnesses you believe.  You may find that the testimony of a

17   smaller number of witnesses on one side is more believable

18   than the testimony of a greater number of witnesses on the

19   other, or you might find the opposite.

20        In determining whether the government has proved

21   the charges against the defendant beyond a reasonable doubt,

22   you must consider the testimony of all the witnesses who

23   have testified.

24        You are the sole judges of the credibility of the

25   witnesses.  You alone determine whether to believe any

1    witness and the extent to which a witness should be

2    believed.

3           Judging a witness's credibility means evaluating

4    whether the witness has testified truthfully, and also

5    whether the witness accurately observed, recalled, and

6    described the matters about which he or she testified.

7           You may consider anything that in your judgment

8    affects the credibility of any witness.  For example, you

9    may consider the witness's demeanor and behavior on the

10   witness stand, the witness's manner of testifying, whether

11   the witness impresses you as a truthful person, whether the

12   witness impresses you as having an accurate memory and

13   recollection, whether the witness has any motive for not

14   telling the truth, whether the witness had a full

15   opportunity to observe the matters about which he or she has

16   testified, whether the witness has any interest in the

17   outcome of the case or any friendship or hostility toward

18   any other people involved in the case.

19          In evaluating the accuracy of a witness's memory,

20   you may consider the circumstances surrounding the event,

21   including any circumstances that would impair or improve the

22   witness's ability to remember the event, the time that

23   elapsed between the event and any later recollections, and

24   the circumstances under which the witness was asked to

25   recall the details of the event.

1           Inconsistencies or disparities in the testimony of

2    a witness, or between the testimony of different witnesses,

3    may or may not cause you to discredit such testimony.  Two

4    or more persons witnessing an incident or transaction may

5    see it or hear it differently.  An innocent misrecollection,

6    like a failure of recollection, is not an uncommon

7    experience.  In weighing the effects of inconsistency or

8    discrepancy, always consider whether it pertains to a matter

9    of important or unimportant detail, and whether the

10   inconsistency or discrepancy results from innocent error or

11   intentional falsehood.

12          You may consider the reasonableness or

13   unreasonableness, the probability or improbability of the

14   testimony of a witness in determining whether -- in

15   determining whether to accept it as true and accurate.  You

16   may consider whether the witness has been contradicted or

17   supported by other evidence that you credit.

18          If you believe that any witness has shown himself

19   or herself to be biased or prejudiced for or against either

20   side, you may consider and determine whether such bias or

21   prejudice has colored the testimony of the witness so as to

22   affect the desire and capability of that witness to tell the

23   truth.

24          You should give the testimony of each witness such

25   weight as in your judgment it is fairly entitled to receive.

1          You have heard testimony from officers of the

2     United States Capitol Police, the Federal Bureau of

3     Investigation, and the United States Secret Service.  A law

4     enforcement officer's testimony should be evaluated by you

5     just as any other evidence in the case.  In evaluating the

6     officer's credibility, you should use the same guidelines

7     that you apply to the testimony of any witness.  In no event

8     should you give either greater or lesser weight to the

9     testimony of any witness merely because he or she is a law

10    enforcement officer.

11         The lawyers sometimes objected when the other side

12    asked a question, made an argument, or offered evidence that

13    the objecting lawyer believed was not proper.  You must not

14    hold such objections against the lawyer who made them or the

15    party that he or she represents.  It is the lawyers'

16    responsibility to object to evidence that they believe is

17    not admissible.

18         If, during the course of the trial, I sustained an

19    objection to a lawyer's question, you should ignore the

20    question, and you must not speculate as to what the answer

21    would have been.  If, after the witness answered a question,

22    I ruled that the answer should be stricken, you should

23    ignore both the question and the answer, and they should

24    play no part in your deliberations.

25         Every defendant in a criminal case has an absolute

1   right not to testify.  Ms. Niemela has chosen to exercise

2   this right at trial.  You must not hold this decision

3   against her; and it would be improper for you to speculate

4   as to the reason or reasons for her decision.  You may not

5   draw any inference of guilt from her decision not to

6   testify.

7          Okay.  I will now instruct you on the specific

8   offenses charged in the indictment.  As I said, the

9   indictment contains four counts.

10          Count 1 charges the defendant with entering or

11  remaining in a restricted building or grounds.

12          In order to find the defendant guilty of that

13  charge, you must find that the government has proved each of

14  the following elements beyond a reasonable doubt:

15          First, that the defendant entered or remained in a

16  restricted building without lawful authority to do so;

17          And, second, that she did so knowingly.

18          The term "restricted building" means any posted,

19  cordoned off, or otherwise restricted area of a building

20  where a person protected by the Secret Service is or will be

21  temporarily visiting.

22          The term "protected person by the Secret Service"

23  includes the vice president of the United States and his or

24  her immediate family.

25          A person acts knowingly if she realizes what she

is doing and is aware of the nature of her conduct and does

not act through ignorance, mistake, or accident.

In deciding whether the defendant knowingly

entered or remained in a restricted building, you may

consider all of the evidence, including what the defendant

did or said.

A person who enters or remains in a restricted

building or in a restricted area with a good-faith belief

that she is entering or remaining with lawful authority is

not guilty of the offense.  Thus, you cannot find the

defendant guilty of Count 1 unless you are convinced beyond

a reasonable doubt that she did not have a good-faith belief

of her lawful authority to enter or remain in this

restricted building.

The parties have stipulated to certain facts with

respect to the definition of "Capitol Building and Grounds,"

which are in evidence in the case.  And, again, that written

stipulation will be sent back with you as part of the

evidence in the case.

Count 2 of the indictment charges the defendant

with disorderly or disruptive conduct in a restricted

building or grounds.

In order to find the defendant guilty of that

offense, you must find that the government proved each of

the following elements beyond a reasonable doubt:

1        First, that she engaged in disorderly or

2  disruptive conduct in, or in proximity to, any restricted

3  building;

4        Second, that she did so knowingly and with the

5  intent to impede or disrupt the orderly conduct of

6  government business or official functions;

7        And, third, that her conduct in fact impeded or

8  disrupted the orderly conduct of government business or

9  official functions.

10       Disorderly conduct occurs when a person is

11  unreasonably loud and disruptive under the circumstances or

12  interferes with another person by jostling against or

13  unnecessarily crowding that person.

14       Disruptive conduct is a disturbance that

15  interrupts an event, activity, or the normal course of a

16  process.

17       The term "restricted building" has the same

18  meaning as described in Count 1.

19       And the term "knowingly" has the same meaning as

20  described in the instruction for Count 1.

21       And the same stipulation I referred to in Count 1

22  with respect to "Capitol Building and Grounds" also applies

23  to Count 2.

24       Count 3 of the indictment charges the defendant

25  with disorderly or disruptive conduct in a Capitol building,

1    which is a violation of federal law.

2              In order to find the defendant guilty of this

3    offense, you must find that the government has proved each

4    of the following elements beyond a reasonable doubt:

5              First, that the defendant engaged in disorderly or

6    disruptive conduct in any of the United States Capitol

7    buildings;

8              Second, that she did so with the intent to impede,

9    disrupt, or disturb the orderly conduct of a session of

10   Congress or either house of Congress;

11             Third, that the defendant acted willfully and

12   knowingly.

13             The term "United States Capitol Buildings"

14   includes the United States Capitol located at First Street,

15   Southeast, in Washington, D.C.

16             The term "disorderly or disruptive conduct" has

17   the same meaning described in the instructions for Count 2

18   defining those terms.

19             A person acts willfully if she acts with the

20   intent to do something that the law forbids; that is, to

21   disobey or disregard the law.  "Willfully" does not,

22   however, require proof that the defendant be aware of the

23   specific law or rule that her conduct may be violating.

24             The term "knowingly" has the same meaning as that

25   described in the instruction for Count 1.

1          Finally, Count 4 of the indictment charges the

2    defendant with parading, demonstrating, or picketing in a

3    Capitol building.

4          In order to find the defendant guilty of this

5    offense, you must find that the government proved each of

6    the following two elements beyond a reasonable doubt:

7          First, that she paraded, demonstrated, or picketed

8    in any of the United States Capitol buildings;

9          And, second, that she acted willfully and

10   knowingly.

11         The terms "parade" and "picket" have their

12   ordinary meanings.

13         The term "demonstrate" refers to conduct that

14   would disrupt the orderly business of Congress by, for

15   example, impeding or obstructing passageways, hearings, or

16   meetings, but it does not include activities such as quiet

17   praying.

18         The term "United States Capitol Building" has the

19   same meaning as in the instruction for Count 1 defining

20   "United States Capitol Buildings" -- I'm sorry, as the

21   instruction for Count 3 defines "United States Capitol

22   Buildings."

23         The term "knowingly" has the same meaning as that

24   described in the instruction for Count 1.

25         And the term "willfully" has the same meaning as

1    that described in the instruction for Count 3.

2         Okay.  With respect to all of the counts,

3    someone's intent or knowledge ordinarily cannot be proved

4    directly because there is no way of knowing what a person is

5    actually thinking.  But you may infer someone's intent or

6    knowledge from the surrounding circumstances.  You may

7    consider any statement made or acts done by the defendant

8    and all other facts and circumstances received in evidence

9    which indicate her intent or knowledge.

10        You may infer, but you are not required to infer,

11   that a person intends the natural and probable consequences

12   of acts she intentionally did or intentionally did not do.

13   It is entirely up to you, however, to decide what facts to

14   find from the evidence received during the trial.

15        You should consider all the circumstances in

16   evidence that you think are relevant in determining whether

17   the government has proved beyond a reasonable doubt that the

18   defendant acted with the necessary state of mind.

19        Each count of the indictment charges a separate

20   offense.  You should consider each offense, and the evidence

21   which applies to it, separately; and you should return

22   separate verdicts as to each count.  The fact that you may

23   find the defendant guilty or not guilty on any one count of

24   the indictment should not influence your verdict with

25   respect to any other count of the indictment.

1           All right.  Before you begin your deliberations, I

2    will have some closing instructions about how you might

3    structure your deliberations, how you might go about them,

4    and some of the rules for delivering the verdict.  But at

5    this point we will pause and receive the closing arguments

6    from first the government, then the defense, and then a

7    brief rebuttal argument by the government.

8           So are we ready, Mr. Gordon?

9           MR. GORDON:  Yes, Your Honor.  I just need a

10   moment to get hooked up.

11          THE COURT:  Sure.  Take your time, and then the

12   floor is yours.

13          MR. GORDON:  Ladies and gentlemen, some cases are

14   complicated.  Imagine a computer hacker living in another

15   country known only by an alias uses his computer to access

16   the records of your favorite store's customer database,

17   steals the identity of everybody there, uses those stolen

18   identities to open credit cards, uses those credit cards to

19   buy gift cards, cashes the gift cards for bitcoin, and

20   escapes with the money.  That case is complicated.

21          This is not that case.  This case is very simple.

22   And over the next 30, 40 minutes, I'm going to take all the

23   evidence that you have heard over the last couple of days

24   and put it together like puzzle pieces for you and lay it

25   out in sort of a chronological manner that fits with the

1    various crimes with which this defendant has been charged

2    and the elements of those crimes.  I'm doing that to make

3    your job as easy as possible when you go back to the jury

4    room to analyze whether or not the government has proven

5    those charges.

6           Now, when you go back there, you're going to have

7    with you the judge's instructions, all those things he just

8    read to you where he laid out what the elements of the

9    crimes were, a sort of checklist you have to find to find

10   her guilty.  You're going to have that in paper, so you

11   don't need to memorize that.

12          And you're going to have all the exhibits.  If you

13   want to go back and look at a video or look at a document,

14   you'll have that and the ability to do it.

15          What you won't have is the PowerPoint that I'm

16   giving you now, so throughout the PowerPoint I've included

17   little yellow rectangular squares with every exhibit that

18   indicates where that came from.  So you don't have to worry

19   about scribbling down everything I'm writing, but if there's

20   something that you think you might want to go back and look

21   at in the jury room, you might want to write down the

22   exhibit number so you can find it more easily.

23          All right.  Let's talk about what actually

24   happened, because January 6, 2021, was one of the darkest

25   days in our country's history.  No one disputes that.  The

1    Capitol was invaded.  Thousands of people stormed it.

2    Congresspeople, and even the vice president, had to

3    evacuate, take shelter, be in fear of physical safety, have

4    the government essentially suspended for an unknown period

5    of time.

6            Luckily, although they were outnumbered by you

7    heard 10-to-15 to 1 at various times, the Capitol Police and

8    Metropolitan Police Department were able to eventually expel

9    the rioters, and the government was able to resume

10   operation.  No one disputes that.

11           You've seen, during the course of this case, some

12   of those photographs.  You've seen what it looked like on

13   the West Front before the police line was breached.  You've

14   seen that at least at 2:15 thousands had invaded the Capitol

15   grounds but had not breached beyond that.

16           You saw evidence that the officers were engaged in

17   hand-to-hand combat throughout the Capitol Complex with

18   violent rioters trying to overcome them.  You saw evidence

19   that as late as 2:48 officers were still vastly outnumbered,

20   fighting, putting their bodies on the line, to try to stop

21   more rioters from joining the hundreds that were already

22   inside the building.

23           I picked those last two times because they bracket

24   the time this defendant was inside the Capitol herself.

25           You know at this point the defendant entered

1   through that same door, the Senate Wing Door, at 2:24 p.m.,

2   and you know that she moved throughout the Capitol as part

3   of three separate surges, mob pushes, breaching police

4   lines; and then eventually, at 2:45, she exited.  Really

5   none of that is in dispute.

6           What's at issue in this case is whether she knew

7   she wasn't allowed to be there.  Right?  No one disputes

8   that she was in.  Whether she knew she wasn't allowed to be,

9   and whether her conduct was disorderly or disruptive --

10  hers -- that's really what's at issue.  That's what this

11  case boils down to.

12          So she's been charged with four specific crimes:

13  entering or remaining in a restricted area; disorderly

14  conduct in a restricted area; disorderly conduct in the

15  Capitol building itself; and then parading, demonstrating,

16  or picketing in the Capitol building.

17          Know what she's not charged with?  She is not

18  charged with assault or possession of a weapon or conspiracy

19  or civil disorder or any one of the many other charges that

20  some January 6th defendants are charged with.  If we had

21  evidence she had done those things, she'd be charged with

22  them.

23          But the fact that she didn't do any of those

24  things doesn't make her not guilty of the things she is

25  charged with.  The fact that she didn't assault anyone

1    doesn't mean that her conduct wasn't disorderly.  Assaulting

2    someone is just an even more disorderly kind of action than

3    what she did.  The fact that she didn't possess a weapon

4    doesn't mean that she was any less unlawfully inside the

5    Capitol.

6              So focus on what she did and what she's been

7    charged with, not the distraction of what she didn't do and

8    wasn't charged with.

9              So let's talk about those charges one by one,

10   starting with Count 1.

11             You heard from Judge Cooper that Count 1 has two

12   elements.  First, the defendant entered or remained in a

13   restricted building or grounds without lawful authority; and

14   second, she did that knowingly.

15             Well, that first element has a lot of embedded

16   pieces to it, so I'm going to take those one by one.

17             First, was the Capitol Complex a restricted

18   building or grounds on January 6th?  That's not really in

19   dispute.  Right?

20             You saw this slide, this photograph, indicating

21   that the Capitol -- the entire Capitol Complex -- not just

22   the building itself, but the lawn around it, all those

23   grounds were a restricted area.  Nobody was allowed there.

24             You saw that at the start of the day on January

25   6th, that there was fencing, and there were police officers

1    standing in the grass, you know, 100 feet away.  Nobody was

2    allowed there.  That was a restricted area.  And you heard

3    that that was for January 6th because of the importance of

4    the certification.

5         But then for the building itself, the Capitol

6    building, you heard that there were two further levels of

7    restrictions that day, because you heard that this was in

8    the time of COVID, and so all the way back to March of 2020

9    the regular public had not been allowed in the Capitol --

10   the Capitol building -- for, you know, nine months at that

11   point.  Nobody was allowed inside.  Right?  Other than

12   congresspeople and their staff and people that had to have

13   meetings.  But you could not walk up as a member of the

14   general public and say, "Hey, I'm in D.C.  I'd like to go

15   for a tour today."  If they stopped by the visitor's center;

16   closed down.  Restricted.  Right?  You heard that you could

17   get in with a member of Congress or with an appointment, and

18   that was it.  So it was restricted.

19        On top of that, you heard that the West Front of

20   the Capitol and those stairs were all restricted further

21   because they were getting ready for the inauguration, so it

22   was an active construction zone.

23        So there's three different levels of restricted

24   area in effect here; three different levels that the

25   defendant violated by entering.  It's not really in dispute

1   that this was restricted grounds.

2            It's not in dispute that she entered.  Everybody

3   agrees that she did that, and you've seen it on video.

4            I indicated earlier, you know that she entered

5   through here, what's referred to as the Senate Wing Door.

6   And you know that she remained.  You know that she walked a

7   route through the Capitol and that she exited through the

8   House side east door -- so the other side of the Capitol --

9   at 2:45.  Again, not in dispute.

10           Without lawful authority.  I covered that earlier.

11  Nobody was allowed inside.

12           So when it comes to the first element, right, you

13  can check that off because no one's disputing any of those

14  pieces.

15           What's at issue is the second element, whether or

16  not she entered knowingly, entered knowing that she did not

17  have lawful authority to be there.

18           So how do you know that she knew or should have

19  known, right -- knew or should have known -- that she wasn't

20  allowed to be there?  First, there was fencing up.  There

21  was fencing up, you know, hundreds of feet away from the

22  Capitol itself.  You saw that it covered, you know, the

23  entire -- that entire red line on that map.  You heard

24  testimony that the whole thing was covered with fencing and

25  that every few feet was one of these large "Area Closed"

```
 1        signs, and there are officers in the grass.
 2               But what about the defendant's argument that,
 3        "Hey, I wasn't the first one there.  Lots of people came
 4        before me"?  Right?  "And by the time I got there, there
 5        wasn't any fencing."
 6               You know that's not true, because the defendant
 7        herself took a selfie up in that tree where the fence is
 8        clearly visible with "Area Closed" signs behind it.  And you
 9        know that at least some people knew they couldn't be there
10        because look at the difference between one side of that
11        fence, which is a dense crowd, and where the defendant is.
12        There's nobody on the grass right behind her.
13               People are body to body.  It's like a mosh pit
14        behind that.
15               You'd think that anybody who knew there was a
16        whole open space of grass they could be on where they
17        wouldn't have to be pressed up against everybody else would
18        also be there.
19               But those people saw the "Area Closed" sign, and
20        the fence, and they didn't go in there.  She did.  She's up
21        in the tree, and she unwillingly or unknowingly captured
22        evidence of her own crime and shared it with all her
23        friends.  And then, because law enforcement can get search
24        warrants, we got it.
25               How else do you know that she entered knowingly?
```

1    Well, we know that she walked straight from the president's

2    speech and arrived at the Capitol.  So there was a line of

3    police officers holding back that crowd at that fence on the

4    Capitol grounds as early as 12:58 p.m.  You can watch the

5    time lapse video for yourself.

6              By the time the defendant entered, this is what

7    that scene looked like.  Police had still managed to create

8    a physical barrier, but the mob had grown exponentially.

9              Nevertheless, what did things look like when the

10   defendant entered the Capitol building at 2:24 p.m.?  The

11   windows are broken on either side of -- the door may be

12   open, but the windows are shattered, and people are climbing

13   through.  When you have authority to go into somewhere, you

14   don't have to climb through the windows.

15             A reasonable person walking by anything, an office

16   building, a store, a home, if you see, you know, person

17   after person climbing through the windows to get in, it's a

18   pretty safe bet, a pretty clear indication to a reasonable

19   person:  Huh, that doesn't look like the way you're supposed

20   to go in, particularly for someplace as ornate and important

21   as the United States Capitol.  There is a door five feet

22   away.  If people are climbing through the windows, it's a

23   pretty clear indication you don't have a right or a lawful

24   authority to go in.

25             She ignores that.  She walks in.

1               There is a very loud alarm blaring as she walks

2       in.  It was blaring the entire time those doors were open.

3               Let's see if that will play for us.

4               (Video playing)

5               MR. GORDON:  Now, you can hear that high-pitched

6       sound in the background, and you may hear it better on

7       different technology in the jury room if you want to listen

8       to it again.

9               But so she walks past the broken windows, people

10      climbing through, and there's a high-pitched alarm blaring.

11              All right, fine.  What if you decide:  Eh, I'm

12      going to give her the benefit of the doubt.  Maybe she saw

13      lots of people, and she said, We get to do that.

14              Okay.  Fine.  Because the statute covers "entered

15      or remained," so even if she entered thinking she had lawful

16      authority, ask yourself:  Was there a point while she was

17      inside that a reasonable person would have seen what was

18      going on and concluded:  Huh, I actually don't think we're

19      allowed to be here.

20              And if you see evidence that at some point she --

21      a reasonable person would have come to that conclusion, "I

22      don't think we're allowed here," and she didn't turn -- like

23      immediately leave, she's violated the statute.

24              So let's think back to what her experience was

25      during the time she was inside.  Did she ever encounter

1   anything that indicated to her she was somewhere she was not

2   lawfully allowed to be?  And what did she do in response?

3           So you know this is the path she took.  I've

4   indicated in green on this floor plan all the exits, which

5   as you saw in some of the photographs are marked in the

6   Capitol.  It's not secret.  There is -- you saw signs, all

7   right, on the walls like in a normal building of where the

8   exits are.

9           So she goes in and she turns right, and she walks

10  to the right, and she walks into the area in the center of

11  the Capitol underneath the Rotunda that on that floor is

12  called the Crypt.

13          And then -- and we're going to get to sort of what

14  happened there, but she encountered -- if you remember

15  Lieutenant Detorie's testimony and remember those

16  photographs -- and I will show those to you in a few minutes

17  when we get to a later charge -- that the police had created

18  a line.

19          And so the mob built up in the Crypt.  Right?  For

20  a little while they're stymied by the line of police,

21  including Lieutenant Detorie.

22          And when the defendant sees that, like, "Oh, the

23  officers are blocking us from going any further, police are

24  saying with their bodies, 'no, you can't go there,'" does

25  she then turn around and go back the way she came?  Nope.

1              When the mob manages to breach that police line,

2       what does she do?  She goes forward.  And she doesn't get

3       very far because, as you can see on this floor plan, at

4       basically the next threshold through the Crypt there's

5       another line of officers.  Right?  And it's a smaller space

6       and so the mob gets built up even more densely.

7              And there you saw video that the defendant and her

8       companions wormed their way through that crowd to get to the

9       very front of the line between them and the police and the

10      stairways and doors behind them.  Right?  They were stopped

11      again.

12             And they didn't see that mob and turn back.  No.

13      They pushed through to get to the front.  And then right in

14      front of the defendant, her own travel companion pushes the

15      police officer out of the way so that he and the defendant

16      and the mob can then breach that area and go further.  All

17      right?  Second indication that they're not allowed to be

18      there once they're inside.  She doesn't exit then either.

19             She goes upstairs, walks through Statuary Hall,

20      and then gets to another sort of bottleneck, another point

21      at which a line of police officers have blocked the doorway.

22      And this time it's because the House Chamber is right behind

23      them.  All right?  And you know from other evidence you've

24      seen that at the time there were still many congresspeople

25      trapped inside that chamber, all right, who could not yet be

1    evacuated.  And they were being guarded by officers who had

2    pushed furniture in front of the door and had their guns

3    drawn.  And there are about eight police officers standing

4    in that doorway trying to physically block the mob.

5           And you saw evidence the defendant is in that

6    place for over five minutes.  She's about three rows back

7    from the officer.  She can clearly see this is happening.

8    She can clearly hear everybody shouting.  And then, after a

9    few minutes, the mob breaches through.

10          Then, does the defendant leave?  Nope.  She turns.

11   She walks down a hallway.  She and her friends enter the

12   Rayburn Room, and they take a selfie in front of the George

13   Washington photograph.

14          So even if you felt that at every point up until

15   then it's not quite clear yet they're not allowed to be

16   where they are, certainly that third rush where she's there

17   for five minutes at the front of the line and the mob surges

18   forward -- you saw it from multiple angles.  Breaks through

19   the police.  Surely then.  But no, she remains.  Takes a

20   selfie.  Wants to get the best souvenir she can.

21          This is one angle -- and you have many -- of where

22   the defendant was and just how close she was to the front of

23   that police line.

24          And then, as I said, that's when she turns and

25   finally exits.

1           So did -- you know, the first element we talked

2   about, clearly taken care of.  Did she know that she was

3   either -- or should she have known?  Knew or should have

4   known.  You don't have to sort of get inside her head.  You

5   don't have to know what she knew.  You have to decide what a

6   reasonable person in that situation would have known.

7           Would a reasonable person in that situation have

8   known that we're not allowed to be inside the Capitol?

9   Absolutely.  The first time, let alone the second and the

10  third.  So she's guilty of Count 1.

11          Let's move on to Count 2, disorderly or disruptive

12  conduct in a restricted building or grounds.  So we're going

13  to have to take each of these one at a time.

14          The judge has defined already -- and you'll have

15  the jury instructions with you -- what those words mean.

16  What does it mean to be disorderly?  What does it mean to be

17  disruptive?

18          Well, in the context of the mob on January 6th,

19  you have to think about the concept of an avalanche.  All

20  right?  No individual snowflake is the cause of an

21  avalanche.  No individual snowflake is the thing that knocks

22  over not only skiers and hikers but also houses or shelters

23  or anything else that's there.  Right?  It's the collective.

24  It's all of it together that gives the avalanche its power.

25          This mob strength was its numbers.  The volume.

1    The defendant was part of that volume.  Her own body added

2    to the mob's power and its ability to push through.

3         It doesn't matter how much time any one of these

4    officers spent in the gym lifting weights.  They were not

5    going to be able to repel 10, 20, 100 people determined to

6    push through them.

7         So I've alluded earlier to there being those three

8    breaches.  You saw that in the Crypt.  Right?  There was the

9    line of officers.  And if you look at the photograph on the

10   left, you can see now Lieutenant -- then "officer" --

11   Detorie, you know, in that police line.  You can see that

12   briefly they have the mob contained.

13        But not really, right?  What they have is the mob

14   not yet having decided if they're going to push through.  If

15   the mob decides it's going through them, those six, eight

16   officers standing a few feet from each other aren't going to

17   be able to do anything about it.

18        At that moment their presence is just a deterrent.

19   When the mob decides they're not actually deterred by that,

20   what happens is a breach.  Right?  And what gives the mob

21   its confidence to do that is its force of numbers of which

22   the defendant was part.  Right?  So the mob surges through,

23   breaches the Crypt.

24        Same thing happens at the Memorial Door stairs.

25   Right?  This is what I was alluding to as a narrower

1   bottleneck.  If you go back and look at this, you're going

2   to see there are only four officers.  There's a very small

3   number of them, and a huge number of rioters.

4           And you'll see on this camera, Government's

5   Exhibit 105, you can see the defendant and her companions

6   worm their way through the crowd to get to the front.

7   They're not just passively being there; they're actively

8   doing it.

9           And it's not like the defendant can say, "Oh, I

10  don't know how the mob got through.  I just saw people

11  walking so I followed."  It's nonsense.  It's her own

12  companion, Michael Eckerman.

13          You might remember Ms. Arco going frame by frame

14  by frame, all right, to show even in the crowd that it's

15  Michael Eckerman's hand that shoves Officer Kyle Yetter out

16  of the way right in front of Ms. Niemela.  Right?

17          You heard from the defense that the entire time

18  she's hold -- the defendant is holding on to either Eckerman

19  or her other companion, Stefanie Chiguer, as she's going

20  through.

21          So she's right there, and she sees this happen.

22          And then we talked about the breach in the House

23  Chamber hallway.  And you'll see in Government's Exhibit

24  406, if you want to watch this, that when the defendant gets

25  right to this point, when she turns and shows herself, that

1    right there is a man that says, "We came this far.  What do

2    you say?"

3              Another man says, "Drag them out."

4              And another man says, "Drag them out."

5              There's no sort of mystery about what's going on

6    here or why they're there or what the defendant, by her

7    conduct, is encouraging and strengthening.

8              You see in 414 approximately how many officers are

9    there.  The answer:  Not enough.

10             And then 409 gives you a really good sense of just

11   how close to the front she was.  We'll approach through the

12   officers; and then as the camera turns, there is Eckerman,

13   there's Chiguer, and there's the defendant.

14             Eckerman's in the second row.  Chiguer and the

15   defendant are in the third.  That's how close they are.

16             No possible argument that she didn't know there

17   was a line of police officers blocking their path saying:

18   "No, you can't go forward.  You're not allowed here."

19             (Video playing)

20             MR. GORDON:  And then you can see in 414 the

21   moment the breach actually happens.

22             What's important here?  The officers don't just

23   turn and walk away.  They're digging their heels in and

24   trying to use their hands and bodies to physically push the

25   rioters back.

1          The defendant, there's no way she didn't see that.

2    How does a reasonable person see officers digging their

3    heels in, pushing this way, and think "I'm allowed to be

4    here."

5          Also, this, by definition, is disorderly.  It is

6    disruptive.

7          You heard and will hear and will read the

8    definition that it is disruptive -- the definition of it --

9    if your conduct interrupts or blocks a normal process from

10   happening.  Congress cannot function.  They are sheltering

11   in place while officers guard the door to the room where

12   they work with guns.  It was disruptive.

13         Did she do so knowingly?  What was her intent?

14   Why was she there?  Why was she part of that mob?  Why was

15   she willing to push through?

16         How do we know?  We know from the defendant's own

17   conduct and words prior to January 6th and on January 6th.

18         So we know that back in December the defendant

19   attended another rally in D.C. about the same topic,

20   stopping the steal.  All right?  And you saw video capturing

21   her there.  So she cared about this issue enough.

22         You saw that she's posting about it on Facebook

23   constantly.  She's talking to her friends in a group chat

24   constantly about, you know, the stolen election and how the

25   steal needs to be stopped.  And she cares about it so much

1    she travels to D.C. on another date and goes to another

2    rally where she parades and demonstrates with her flag and

3    her T-shirt.  She tries to recruit others, and she

4    demonstrates that she knows the significance of January 6th.

5          It's not random that she's here that day.  She

6    knows that that's what's going to happen, the certification

7    of the election.  She's trying to recruit others to go to

8    WildProtest.com, official home of January 6th protest at

9    Congress.  Not in Washington, D.C.  Not come to hear

10    President Trump speak on The Ellipse.  The Wild Protest is

11    at Congress.  That is different.  It is distinct.

12          "Click for event details about the protest

13    happening outside of Congress where the #DoNotCertify caucus

14    will object to the botched Electoral College, Stop the

15    Steal."

16          You now know, if you didn't already, that the

17    process on January 6th was that one by one Congress would

18    call a state, announce that the state's votes had gone to

19    this candidate, and congresspeople would have the ability to

20    say, "I object to that state."  And then if somebody

21    objected, the House would stay where they are, the Senate

22    would go back to their chamber.  They would have debate and

23    argument, and they would come back together again.  You know

24    that's the process.

25          Well, defendant knew it, too.  She knew it far in

1    advance.  She knew that there was a Do Not Certify caucus,

2    meaning a group of congresspeople.  She knew that what was

3    happening was the Electoral College.  So she knew.

4         Before January 6th she repeatedly demonstrated

5    extreme hostility to public officials in her Facebook post.

6         January 3rd:  "Everything that we ever thought

7    about life in general is a lie.  I hope they all get what's

8    coming for them and GTMO for all our government."

9         Right?  And you heard from the defendant's own

10   witness, Mark Leach, that essentially their understanding of

11   that was all of the congresspeople who voted to certify the

12   election had, by doing so, committed treason.  The penalty

13   for treason is death.  And those congresspeople should be

14   shipped off to Guantanamo Bay and executed for voting to

15   certify the election.  That's what she believed and how

16   passionately she felt about that issue.  That's why she's

17   coming to D.C.  She believes that our government would --

18   the people in our government should go to Guantanamo Bay for

19   this.

20        January 3rd, she shares a Tweet on Facebook with

21   her friends where another person -- not her, but she shared

22   it; she amplified it; she, by doing so, endorsed it -- says,

23   "I gotta say, if I were a Congressman called to D.C. on

24   January 6 (knowing everyone of the traitors are together at

25   one location) and there were some 1 million pissed off

1     patriots outside, I would be rather nervous as to how I

2     would safely exit the building.  Not a good situation."

3              This is an extremely chilling Tweet.  Take a

4     second and think about what is being said here.

5              First of all, remember the defendant's sweatshirt

6     that she had made especially for this occasion, the pissed-

7     off patriot sweatshirt?  That's not an accident.  Right?

8     That's a choice.

9              And here she's amplifying the idea that

10    congresspeople should be scared to exit the building --

11    meaning the Capitol building -- because there will be pissed

12    off patriots -- i.e., like the defendant as she branded

13    herself in the sweatshirt she had made -- that there will be

14    pissed off patriots outside lying in wait.  That's the

15    message here, that congresspeople should be scared for their

16    lives when they vote on January 6th because people like her

17    will be waiting to hurt them for it.  That's the message.

18    That's what she's amplifying.  That's what she's sending out

19    on January 3rd.

20             January 4th, right?  The helmet with the QAnon

21    logo and "Kill the Deep State."  Another photo that she's

22    amplifying and sending around.

23             January 4th:  "The shit coming out finally is

24    insane.  Let's hang em high."

25             And in the context you heard Special Agent

1    Hastbacka explain to you that the "em," the them, were

2    members of the government.

3           And so now -- brief break -- I want to talk to you

4    about tacos, and I promise it ties in.

5           Intent does not require extensive premeditated

6    planning.  Sometimes it does, but legally intent can be

7    formed in an instant.  All that has to happen -- intent is

8    the opposite of accident.  Intent is I did what I meant to

9    do.  And you can form the intent to do something at any

10   moment right before you do it.

11          So I'll bring you back to when I was in high

12   school.  And I love basketball.  And my dad and I -- I grew

13   up in San Antonio.  My favorite team was the Spurs, and my

14   dad and I went to games whenever we could.

15          When I went to high school, the Spurs had a

16   promotion with a tie-in with a local chain restaurant,

17   Mexican restaurant.  All right?  And the deal was if the

18   Spurs scored over a certain number of points in the game or

19   held the opponent below a certain number of points, you

20   could bring your ticket stub into that restaurant the next

21   day and get half off on tacos.  Okay?

22          So when I would go to a game, I hadn't planned

23   what I was going to have for lunch the next day at school.

24   I certainly hadn't like prepacked my lunch.  I certainly

25   hadn't looked at all the days the Spurs had games, you know,

1    over the course of the year and figured out which ones I

2    might go to, and, you know, marked on the calendar like

3    "Potential Taco Day."  Not at all.

4           But at the end of the game, if the score was high

5    enough or low enough, the big screen would come on and there

6    would be a big flashing animation about like "Taco Day,

7    Bring Your Ticket Stub."  In that moment, you'd better

8    believe that I decided what I was having for lunch the next

9    day.  Right?

10          That intent can be formed like that.  Intent can

11   be formed when the opportunity arises.

12          So this defendant did not have to plan when she

13   was in New Hampshire and going down to D.C. that on the 6th

14   "I'm going to invade the Capitol."  She only had to intend

15   -- or "I'm going to physically disrupt the certification

16   process by joining the mob."  That's not what the intent

17   element requires.

18          When the opportunity presented itself, the

19   defendant grabbed it.  She occupied the building and

20   physically blocked the certification from happening.  She

21   stopped the steal just like she wanted to when the

22   opportunity arose.

23          And you don't just have to take my word for it.

24   Look at what the defendant did.

25          One of her friends posts:  "BREAKING:  Trump

1    supporters have breached the Capitol building, tearing down

2    4 layers of security and are attempting to occupy the

3    building - fighting federal police who are overrun.

4              "This is the craziest thing I've ever seen in my

5    life.  Thousands, police can't stop them."

6              And one minute after the defendant has entered the

7    building -- one minute, 2:25 p.m. -- I know it says 19:25,

8    but as you heard, right, UTC time is five hours forward.

9    That means 1425.  1425 is military time for 2:25.  Right?

10   So this is one minute after she has walked in the door.  She

11   is looking at a Tweet that says Trump supporters have torn

12   down four levels of security.  She didn't know she couldn't

13   be there, right?  Nope.  They are attempting to occupy the

14   building.

15             She sees that and responds to that message by

16   sending a video.  We know she saw it because she responded

17   to it with a video from her own phone.

18             Now, what was the video?  I'd love to know.  I'm

19   sure you'd love to know.  But as you heard from Special

20   Agent Hastbacka, even though we served a search warrant on

21   Facebook, they didn't give us the videos.  We don't know

22   why.  We don't know if they were gone.  We don't know.  We

23   asked for them.  We didn't get them.  So I cannot tell you

24   what that video was.

25             But what I can tell you is it is direct evidence

1    of her intent because this other person says "these

2    protesters," their words -- "rioters," my word -- "are

3    attempting to occupy the building."

4          And her response is some version of:  "Hell, yeah,

5    that's exactly what we're doing."  Right?  And she proceeds

6    to do exactly that.

7          And lest there be any doubt, as she's inside,

8    right after she enters, this is what's happening right in

9    front of her, if it will play.

10         (Video playing)

11         MR. GORDON:  Evidence that you don't necessarily

12   have to be that smart to be a lawyer is that the reason the

13   speaker is not working is because I have failed to plug it

14   in.

15         I'm not going to play that again because you

16   get the gist of what it was.  It's the defendant walking

17   through the hallway as people scream -- the hallway of the

18   Capitol -- "Stop the Steal.  Stop the Steal."

19         So did she knowingly act disorderly and disruptive

20   for the specific intent to impede or disrupt government

21   business?  Yeah.

22         So did she?  That's the next element.  Yes, she

23   might have meant to, but to be guilty of this one her

24   conduct has to actually have done so, and it has to have

25   impeded or disrupted.

1          Well, that isn't reasonably in dispute.  Right?
2     You know that the Capitol Police's ability to protect the
3     Capitol was disrupted by the presence of hundreds, if not a
4     thousand, people inside the building.  You know that the
5     vice president's work was disrupted and impeded because he
6     had to be evacuated.  Right?  And you know that Congress
7     itself was disrupted or impeded, because although they
8     started at 12:00 and 12:30 respectively, the House and
9     Senate weren't able, after evacuating, to resume again until
10    9:02 for the House and 8:06 for the Senate.  So the
11    government was disrupted and impeded.

12          And you heard from Special Agent Liz Glavey, the
13    Secret Service agent, and Capitol Police Captain Tia Summers
14    that they could not resume the work of Congress until every
15    last rioter was evacuated.

16          You might remember me asking Special Agent Glavey:
17    What about if you had one last person in the building, and
18    that one is sitting in a yoga pose in the center of the
19    Rotunda singing "Kumbaya," like then would you have brought
20    the vice president back and resume?

21          And she said no, it still wouldn't be safe.  All
22    right?  Because that person was sitting right in the path
23    where the vice president would walk, and they can't do their
24    sweep for explosives until every last person is gone.  So
25    everyone by their presence, just by being inside the

1    Capitol, disrupted or impeded the proceedings.

2         Which brings us to Count 3.  This one is all the

3    same elements, just sort of remixed of things you've already

4    heard.  What's different about Count 3 is it's just a

5    statute that makes it specific to do those things in the

6    Capitol building as opposed to any restricted area.  It

7    doesn't require -- you don't have to establish first it was

8    restricted.

9         Count 2, any restricted area, which could be any

10   federal building or any other place.  But there's a separate

11   statute just for the Capitol, and so she violated that one,

12   too.  But I don't need to go through the elements again

13   because that would be a waste of your time.  You remember

14   them from 30 seconds earlier.

15        Which brings us to Count 4.  It is unlawful, as

16   you saw from the judge, to parade, demonstrate, or picket in

17   the Capitol building.  You can get a permit to do it

18   outside.  Right?  It's a First Amendment protected activity.

19   There are places designated where you may, as the

20   Constitution allows, petition your government for redress,

21   to get very near Congress.

22        But you're not allowed to do it inside the Capitol

23   building itself.  And that makes a degree of sense.  Right?

24   Like imagine if that was the way -- that was allowed.  You

25   can just any time you want organize a demonstration, a

1    picket, a parade, a protest, say:  "My cause is really

2    important.  I want a parade.  I want to organize a parade

3    that goes down Pennsylvania Avenue right up the stairs of

4    the Capitol, and then we want to parade and march, and we

5    want to have floats, and we want to do it right through the

6    Capitol building."

7            Pretty disruptive to government.  Right?  So

8    there's a rule that says you can't do that.

9            And it's not limited to the Macy's Day Parade.

10   Nobody can parade, demonstrate, or picket inside the

11   Capitol.

12           You can, as you heard the judge explain, and as

13   you see in the jury instructions, you can do something like

14   quiet praying.  That's okay.  But you can't do what the

15   defendant did.

16           You can't put on a flag as a cape, wear a "We the

17   People Are Pissed Off," and then with your friends march

18   through the Capitol, like, for example, through Statuary

19   Hall, with, you know, hundreds of your fellow so-called

20   patriots.  You can't do that.  That's parading.

21           And you heard the judge and will read that the

22   judge defines "demonstrating" as conduct that would disrupt

23   the orderly business of Congress by, for example, impeding

24   or obstructing passageways, hearings, or meetings.

25           Did the defendant do that?  Of course she did.

1    But as you heard, among other things, that the route that

2    the senators and the vice president take during the

3    certification process is they go from the full joint session

4    in the House, and then they go back and forth every time

5    there's an objection to the House to the Senate.  It is a

6    straight shot on the second floor of the Capitol right

7    through the Rotunda, all right, and down through Statuary

8    Hall.

9         So as the defendant is walking with her friends

10   with her cape and her stuff and parading through the

11   Capitol, she is obstructing or impeding the passageways that

12   have to be used for the certification process.  It can't

13   occur while there's anyone in the building at all, and it

14   certainly can't occur when there's a rioter standing right

15   in the path of where the vice president and the senators

16   have to walk.  And it's obvious she is there not because she

17   has an appointment, but because she is there for political

18   purposes.

19        She spent approximately 21 minutes inside the

20   Capitol doing all of these things.  That may not sound like

21   a very long time to you.  She wasn't alone.  Right?  There

22   were thousands of others.

23        In our regular lives, 21 minutes might pass in a

24   blink.  But imagine those 21 minutes from the perspective of

25   Vice President Pence being evacuated with his wife and

1    daughter; from the perspective of Special Agent Glavey,

2    right, the head of the Secret Service detail that day

3    testifying that never in her career has she believed that

4    her protectee was in greater danger than that moment; or the

5    vice president then sheltering at a secure location within

6    the Capitol grounds.

7            Imagine that from the perspective of some of the

8    congresspeople who had disabilities or reasons why they were

9    not evacuated at the very beginning, who were sheltering in

10   place in the gallery within the House Chamber, as they look

11   and they see the police officers have barricaded the door

12   and are holding guns out.

13           Those 21 minutes are an eternity.

14           Or from Lieutenant Detorie's perspective as she's

15   trying to use her body to block rioters that outnumber her

16   10 to 1, and terrified that at any moment a group of them

17   could overpower her and grab her gun.

18           21 minutes in this context is a very long time.

19   And in that time the defendant accomplished quite a lot.

20   Right?  She was a participant, a vital member of three

21   separate breaches of police lines that opened up the

22   floodgates, and for the last two of those three, she was

23   right at the front.

24           Now, is she the one pushing?  No.  We're not

25   accusing her of that.  If she was, there would be other

1    charges for her.  That's not why we're here, and it's not a

2    defense that she was not the one who pushed.

3           Around the world the United States Capitol dome is

4    an iconic, powerful symbol of self-government, of democracy,

5    and it's that -- our success with this model of government

6    is illustrated by the peaceful transfer of power every four

7    years.

8           But not on January 6, 2021.  On that day, chaos

9    reigned for over six hours.  As I said, people sheltered in

10   place, and government ground to a halt.  For many people

11   these events are one of the darkest days in American

12   history.

13          But not for the defendant.  She's proud of what

14   she did that day.  She celebrated it.  You saw in her social

15   media posts that she celebrated it, that she hoped or

16   thought or planned that there might be a repeat on January

17   20th, if necessary, on Inauguration Day.

18          She's proud of what the mob did.  She's proud of

19   what she did.

20          Yes, the defendant was just one person in a mob of

21   hundreds or thousands.  But like the avalanche I referred to

22   earlier, or a tidal wave made up of millions of individual

23   droplets of water, the power comes from the numbers.  That's

24   what overwhelmed law enforcement.

25          The police -- the Metropolitan Police, the Capitol

1    Police -- they could have handled the defendant alone.  But

2    not in a mob.

3          What this defendant did on January 6th was

4    criminal.  It violated four federal statutes.  And the

5    evidence in this case has proven each and every one of

6    those elements.

7          So when you go back to that jury room and you look

8    at that checklist, I believe you will -- that you must -- do

9    the only thing that the combination of the law and the

10   evidence supports, that it demands:  That you find the

11   defendant is guilty of entering or remaining in a restricted

12   building or grounds, guilty of disorderly conduct or

13   disruptive conduct in a restricted area, disorderly or

14   disruptive conduct in a Capitol building, and guilty of

15   parading or demonstrating in the Capitol.  Guilty on all

16   four charges.  Guilty.

17         Thank you.

18         THE COURT:  All right.  Mr. Garrity.

19         Mr. Monteith, we'll give you a couple of minutes

20   to set up.

21         (Pause)

22         MR. MONTEITH:  Good morning.  So it seems like a

23   long time ago, but only two days ago we had opening

24   statements.  That's when the government premised what they

25   were going to show to you in this case.  Didn't they tell

1    you this, that they're going to show you that Ms. Niemela

2    stormed the Capitol, overran barricades, and was complicit

3    in assaulting police officers?  That was their promise to

4    you at the beginning of this case.

5            And now it has changed.  Right?

6            Judge Cooper is going to instruct you about

7    reasonable doubt, or he has already, and you need to be

8    firmly convinced that the government has proven each and

9    every element of the charges here.

10           I like to use analogies.  And was not Ms. Niemela

11   more like a mouse lost in a maze when she went into the

12   Capitol?  Wasn't she swept up in a tidal wave of people?

13   Wasn't she swept up in a landslide?  And let me explain.

14           Let's go back to January 6th in the morning.

15   That's, you know -- we do all agree she arrived the night

16   before, met some people, and then her intent was to go to

17   The Ellipse to watch the Stop the Steal rally.  Completely

18   lawful.

19           She went early in the morning with Michael

20   Eckerman, Stefanie Chiguer, Chiguer -- excuse me --

21   Eckerman's niece, and one other person.  Oh, Mr. Leach.

22   They go down.  They watch the rally.  Importantly, and we

23   learned from Mr. Leach, they watched the final speaker,

24   Former President Trump, finish at about 1:15.

25           What happened after that?

1          Did they go down and storm the Capitol?  No.  They

2     followed the crowd down Pennsylvania Avenue to the Capitol.

3     Right?  Remember, stopping along the way to have a snack for

4     10 or 15 minutes.

5          So they got there around 2:00.

6          The time is important here because we've learned

7     from other witnesses there's no bike racks, and there's no

8     snow fencing and no police officers which would show her

9     that she's not permitted on those grounds.  In fact, there

10    are thousands of people on those grounds.

11         And what does she do?  Does she storm the Capitol?

12    No.  She climbs up in a tree to record the events.  Right?

13    To show -- and she's not afraid.  She thinks she's allowed

14    to be there.  Right?

15         She's up in the tree for let's say approximately

16    five or ten minutes.  And what's important to her?  Here's

17    the intent.  It's not to go into the Capitol building.  It's

18    to find her friend, Ms. Chiguer, who has two small children.

19    She's concerned about her friend.  She's not concerned about

20    stopping the electoral count.  She's looking for her friend.

21         She finds that friend.  Right?  She's swept up in

22    the crowd.  And they go up the stairs of the Capitol on the

23    left-hand side, if you're looking straight at the Capitol.

24         It's important.  There is an exhibit that shows

25    she's on the steps at 2:09.  Right?  She's with Eckerman and

1    Chiguer at this point.  In each and every video and photo

2    shown by the government in this case she is following them.

3    She is not leading at all.

4         Now, we know that the doors -- the Memorial --

5    excuse me, the Senate Wing Doors were opened at 2:13.  It

6    would be impossible for her to see how the doors were

7    opened.  Impossible because she didn't get in there -- she's

8    down on the plaza level, the lawn level.  She didn't get up

9    to the doors until -- 2:24 is when she enters.  Again,

10   following.  Right?

11        In fact, oftentimes she has her hand on her

12   friend's back so that she doesn't lose her.  Right?  That's

13   being a loyal friend.  That's not going in to disrupt

14   Congress.  It's not.  She follows her friends.

15        Yes, the door is open.  Hundreds of people are

16   walking through the door.  No police officer is there to

17   say, "Stop, you can't come in."  Right?

18        It's our position at that point she had a

19   good-faith basis to believe it was okay to walk in.

20        And, again, when she got there, nobody was there

21   to say, "Stop."  Right?

22        An alarm was going off.  What was her state of

23   mind?  Is that a fire alarm?  Did somebody pull a fire

24   alarm?  Or is that a, you know, different type of alarm?

25   Right?  It could have been either.

 1            Now, we can't guess a person guilty, and we can't

 2     guess at least what that means to her because there are two

 3     explanations.

 4            Now, in the Capitol building itself, it's

 5     important, we think, to judge her by her actions and what

 6     she did, which was basically nothing.  Right?  She did not

 7     disrupt, and she was not disorderly whatsoever the entire

 8     time she was in the Capitol.  The photos show that as well

 9     as the videos.

10            So let's go to the Crypt.  What is she really

11     doing in there?  Is she demonstrating?  No.  The government

12     admitted she never paraded.  She didn't picket, right?  Is

13     she demonstrating what?

14            She's following a friend.  She doesn't want to

15     lose sight of her friend.  Right?

16            It's a morass in there.  There's a lot of people

17     in there.  But what did she do?  And if you go back and

18     listen to the video, right, somebody says, "They're letting

19     us in.  They're letting us through."  So doesn't that give

20     you pause to think, "Okay, we're going to go to the next

21     place"?

22            But, again, she's kind of lost in this maze.

23     She's not yelling.  She's not being loud or disruptive.

24     She's following.  Right?

25            There are two other occasions where there are

1    police that had formed the line.  The actions are all the

2    same there.

3              Let's go to the ones at the House doors.  Right?

4    It's -- she -- well, she doesn't worm her way up to the

5    front.  All she does is have her hand on her friend's back.

6    That's it.  She's not pushing anybody.  She just doesn't

7    want to lose her friend and get lost in there.  Right?

8    Isn't that reasonable?

9              Now, other people are yelling, shouting,

10   screaming.  Right?  Somebody says, "Quiet down, quiet down."

11   Right?  "Let's all be peaceful."  And what does she do?

12             And you can only see her bobbing up and down, just

13   little snippets of her face.  Right?  But always she's got

14   the back of Chiguer.  That's it.

15             Now, she doesn't surge at any time through these

16   lines.  If you remember, she comes from the back, and she's

17   pushed through with others.  There's no evidence whatsoever

18   that she pushed anybody.  I mean, she's caught in this

19   landslide.  Right?

20             She's from New Hampshire.  You know, she doesn't

21   know where she is.  She's never been there before.  Right?

22             So what's the rest of her conduct?  It's really --

23   again, I hate this term, but it's a nothing burger.  She

24   walks around, finds an exit, and leaves; but always

25   following, never leading.  She's not disruptive.  She's not

1    disorderly.

2              And what does she do after that?  She goes -- they

3    find Mr. Leach, and they go back to the hotel.

4              Now, Mr. Leach testified -- didn't he have the

5    ring of truth? -- the reasons why they went down.  Right?

6    And what they did when they were there.  He was a little off

7    on maybe where the tree was.  He's never been here before.

8    Right?  He was a little off.

9              He didn't know what door she went in.  But how

10   could he?  He didn't see what door she went in.  He didn't

11   know what door she went out of.  How would he know that?  He

12   didn't see her go out of the door.

13             What was he off by?  Five minutes.  Does that mean

14   he isn't an honest person?  He shouldn't be trusted?

15             I'll say the opposite.  Somebody that is down to

16   the minute -- right? -- they've got a story, and they're

17   going to stick to it.  Not Mr. Leach.  He testified to you

18   truthfully and honestly.

19             Now I'd like to break down some of the

20   government's witnesses here.  I'm going to call them Defense

21   Witness No. 1, and that is Captain Tia Summers.  Here's why.

22   Right?

23             What did she bring to proof of this case.  Right?

24   She told you this, the walls -- from the lawn there's a big

25   wall to the terrace where the Senate Wing Doors are.  When

1    you're down on the lawn, there's no way that you can see

2    what's happening at the doors.  So it was impossible for

3    Ms. Niemela to see that door being opened.  Impossible.

4          She also said, very importantly, and it's in one

5    of the videos, and I suggest that you watch it -- I feel

6    it's important -- but the barricades were down at 12:57.

7    The bike racks were gone at 12:57, or maybe 12:58.  The snow

8    fence is gone at that time.  Right?  So she's still at the

9    Stop the Steal rally.  Right?  She doesn't see them being

10   taken down.

11         And when she gets -- so when she gets to the

12   Capitol, there are thousands of other people milling about

13   all over the place.  She feels it's okay to be there, that

14   she's not trespassing.

15         Now, Captain Summers also said another thing, and

16   this might be troubling because we agree that the time

17   stamps are all correct.  The defense agreed, and so did the

18   government.  Right?  We stipulated to that fact, and really

19   it's an undisputed fact.  So if you look at the time lapse

20   video -- and the government showed you some snapshots of it

21   in his closing right here -- the times that they showed you

22   were like -- one before 2:30, one early, and then 2:30,

23   2:35.  Right?  Ms. Niemela is already in the Capitol

24   building.

25         Why would they show you that?  She didn't see any

1    of that.  Is that to get you inflamed?  Is that to get you

2    angry?  It had nothing to do with what she did.  I suggest

3    you just strike that.  It had no bearing on her state of

4    mind.  Zero.  So that's why Captain Summers is Defense

5    Witness No. 1.

6           Defense Witness No. 2 is Captain Detorie -- excuse

7    me -- Lieutenant Detorie.  What did she say about the Crypt?

8    Or what didn't she say, right?  She never saw Ms. Niemela.

9    She never heard Ms. Niemela.  Can't say she was disruptive;

10   can't say she was disorderly.

11          And it's the government's burden to bring

12   witnesses to you to show you that she -- that somebody there

13   said she was disruptive and disorderly.  And they don't do

14   that because factually she wasn't.

15          And if you remember, she was interviewed by

16   Special Agent Hastbacka.  Right?  And he explicitly asked

17   her about hearing female voices or seeing females that were

18   disruptive, and he showed her four videos.  And each answer

19   to that was no, no, no, and no.  Right?

20          Did the government bring any other police officer

21   to tell you that she was disruptive and disorderly?  No, no,

22   and no.

23          They had plenty of police officers there.  Right?

24   Where are they?  They can't bring them because they don't

25   have that evidence, because she wasn't.

1              Now I'm going to skip to the social media posts.

2       Now, you can say -- what is the term? -- social media

3       warrior.  Somebody that constantly posts things on the

4       Internet, right, and reposts what other people post.  Right?

5       Well, isn't that their right?  Right?  Isn't this America?

6       It's not Communist China where you can't express your

7       opinion -- right? -- and be charged with that.

8              Now I'm going to tell you a little personal story

9       because I think it's relevant.  I hope you think it's

10      relevant.

11             I was raised a bit by an Italian grandmother.  Her

12      name was Filomena Capodalupo.  I mean, really Italian.  And

13      she used to rightfully yell at me all the time:  "I'mma

14      gonna killa you.  I'mma gonna killa you."  Right?  I can see

15      her in my mind.  I kind of love that expression now.  I say

16      it all the time in her memory.

17             But so let's fast forward to 2023.  She emails

18      that, right?  The government seizes it.  "My God, she just

19      committed criminal threatening.  She just committed a

20      crime."  It's just scary that they can do that, where you

21      can post your political feelings and make them part of a

22      criminal case.

23             And if her actions -- well, she's -- so much more

24      bluster, right?  Isn't that what it is?

25             So think about some of the posts that she did.

1    "Hang em all.  Send them to GTMO.  That could be my

2    grandmother."  You know, saying things like this, reposting

3    what other people said.  Right?

4              Did she act out on any one of them?

5              Three options:  come back locked and loaded, kill

6    ourselves, or go off the grid.

7              It's just her thoughts and her opinions.  Right?

8              And, seriously, what did she say that the

9    government is using against her or put?  Attend a rally

10   outside of the Capitol.  Outside of the Capitol.  Right?

11   Not in the Capitol.  Right?

12             And also, sign a petition.  That's what she's

13   reposting that other people have said.  I mean, it's just

14   not right.

15             Now, let's talk about the videos.  Right?  What

16   you see is what you get here.  At 2:24, she walks into the

17   building.

18             Look at the evidence around.  Certainly we're not

19   disputing there are broken windows on the side, but there

20   are hundreds of people walking through that open door.  No

21   police officer is there saying, "Stop, go back."  He's not

22   there.

23             An alarm going off?  Can it be a fire alarm?

24             Is she following or leading?  Is she saying

25   anything?  Is she acting aggressively?  No.  She's attached

 1    to her friend, and she's not leaving her friend.  Right?

 2                 She is now caught up in the wave.  She doesn't

 3    know where she is.  It's all on video in the Crypt.

 4                 The videos, please, I encourage you to rewatch

 5    them.  She is searching and making sure that she doesn't

 6    lose her friend.  And throughout the entire video evidence,

 7    that is all she is doing.

 8                 She's not surging through police officers.  There

 9    is no intent, you'll see in those videos, of her trying to

10    impede anything.  It's stick with your friend and let's see

11    what happens, I suppose.

12                 But they end up doing -- she ends up doing nothing

13    and leaving.  Right?  That's the video evidence.

14                 Excuse me one second.

15                 The Court will instruct you on certain elements,

16    and I suggest that you look at a couple.  I disagree with

17    the government's position on what "knowingly" means.  It's

18    what she knew at the time, not what she should have known.

19    Right?

20                 So think about what she knew at the time when she

21    went into the building.  It's did she at the time have a

22    good-faith belief that it was okay or illegal to go in.

23    Think about the circumstances, the situation, the open door,

24    and hundreds of people going in.

25                 Disorderly.  Was she loud?  It's in the Court's

1    instruction.  Did she impede?  It's not there.  It's really

2    not there.

3              Now, this case, ladies and gentlemen, it's yours.

4    I mean, we can only argue what the evidence is, what we

5    think the evidence isn't.  But ultimately it's your decision

6    here.

7              For some reason I have faith that citizens will

8    get together, hash through this, and come up with what they

9    feel is justice.  And we ask for justice in this case.

10   Justice sometimes is looking at the government, assessing

11   all the evidence, and saying, "No, that's not enough for us.

12   You need to bring more."

13             Justice, in this case, is finding Ms. Niemela not

14   guilty of all four charges.

15             Thank you.

16             THE COURT:  All right.  Ms. Arco --

17             (To the jury) Everyone doing okay?

18             MR. GORDON:  Your Honor, we have something to

19   discuss with Your Honor.  Can we have either a five-minute

20   brief recess --

21             THE COURT:  Why don't we take our morning break.

22   It's 11:00.  We'll reconvene at 11:15.

23             So no discussions about the case.  No research

24   about the case.

25             (Jury exits courtroom)

1           MR. GORDON:  So, Your Honor, one of us is wrong,

2    either Mr. Monteith or me.  But whichever one of us it is,

3    we should correct that with the jury either because if I'm

4    the one who's wrong, then I don't want to create any kind of

5    error by having, you know, misstated the law in that way;

6    and if Mr. Monteith is wrong, then the jury should not be

7    left with that impression.

8           THE COURT:  Fair enough.  So which one is it?

9           Mr. Monteith, do you want to approach?  Is this

10   the "knowingly" instruction?

11          MR. MONTEITH:  Yes.

12          THE COURT:  It seems pretty clear that it's

13   objective, not subjective.

14          MR. MONTEITH:  Right, right.  I was just --

15          THE COURT:  It says, "a person acts knowingly if

16   she realizes what she is doing and she is aware of the

17   nature of her conduct and does not act through ignorance,

18   mistake or accident."  So that sounds like "known" as

19   opposed to "should have known."

20          MR. MONTEITH:  I mean, I agree, and I was

21   repeating -- somewhat repeating the instructions.

22          THE COURT:  Yes.  So, Mr. Gordon, how do you

23   suggest we --

24          MR. GORDON:  So is Your Honor's conclusion, then,

25   that I'm wrong in saying that it was "should have known," "a

1    reasonable person should have known"?

2              THE COURT:  I think you're wrong.

3              Let us noodle and think about that and make a

4    ruling before the rebuttal and instruct the jury somehow.

5              MR. GORDON:  Thank you, Your Honor.

6              THE COURT:  Okay.

7              (Recess taken)

8              THE COURT:  Okay.  I took a look at this, and I

9    misspoke before the break.  I said "objective test," but I

10   think it's pretty clear that it's subjective, meaning from

11   her perspective.

12             If it were "should have known," that would be

13   inconsistent with the good-faith instruction that comes

14   later.  Good faith -- if she has an honest but mistaken

15   belief, then she would not be guilty of knowingly entering

16   the Capitol.

17             So here's what I'd like to do.  I'll read what I

18   intend to propose to the jury or instruct the jury, and give

19   me any reaction.

20             "Before I continue with the concluding

21   instructions, I want to clarify what it means to act

22   knowingly as that word is used in this case.  During closing

23   arguments, you heard counsel disagree about whether you must

24   decide what Ms. Niemela actually knew or what she should

25   have known on January 6th.  As I said before, a person acts

1    knowingly if she realizes what she is doing and is aware of

2    the nature of her conduct and does not act through

3    ignorance, mistake, or accident.  Therefore, what matters is

4    what Ms. Niemela actually knew at the time based on all the

5    surrounding circumstances."

6              MR. GORDON:  Yes, Your Honor.  And I apologize for

7    being wrong and for saying that incorrectly.

8              I would ask, though, that Your Honor separate that

9    out and read it, just that instruction that you just read

10   out loud, that you read that to the jury before rebuttal so

11   that Ms. Arco has an opportunity in rebuttal to speak to

12   that and address it.

13             THE COURT:  Any objection, Counsel?

14             MR. GARRITY:  Your Honor, I guess we would ask

15   that you add in to what you just read out that it's not what

16   she should have known; it's what she knew.

17             THE COURT:  Okay.

18             Okay.  Let's call our jury.

19             Ms. Arco, how much time do you have?

20             MS. ARCO:  It's going to be much more fluid and

21   less scripted so -- I haven't timed it, but I can't see

22   going beyond 15 minutes, Your Honor.

23             THE COURT:  By my clock you have ten.  I'll give

24   you an extra five.  Okay?

25             MS. ARCO:  Thank you.

1              (Jury enters courtroom)

2              THE COURT:  All right.  Please be seated,

3      everyone.  Welcome back.

4              Before Ms. Arco begins with the government's

5      rebuttal argument, I want to clarify what it means to act

6      knowingly, as that word is defined in your instructions.

7              During closing arguments, you heard counsel

8      disagree about whether you must decide what Ms. Niemela

9      actually knew or what she should have known on January 6th.

10              As I instructed you before, a person acts

11      knowingly if she realizes what she is doing and is aware of

12      the nature of her conduct, and does not act through

13      ignorance, mistake, or accident.  Therefore, what matters is

14      what Ms. Niemela actually knew at the time, not what she

15      should have known based on all of the surrounding

16      circumstances.

17              All right?

18              Ms. Arco.

19              MS. ARCO:  Thank you, Your Honor.

20              Good morning, ladies and gentlemen.  Just a

21      reminder of why we're here.

22              We are here because Ms. Niemela stormed the United

23      States Capitol, and because while she was inside, she joined

24      a mob.  We're here because of what she did do, not what she

25      didn't do.  And we're here -- and the judge has now

1    clarified -- because of what she knew.  So I'm going to

2    focus on that.  I'm going to focus on what the evidence

3    shows she clearly knew based on all the surrounding

4    circumstances.

5         Before I get into my little slide deck, I want to

6    respond to a few of the things that defense counsel said,

7    because I know they're fresh in your mind.

8         First, Mr. Leach.  He said that they were on

9    Capitol grounds around 2:00 p.m. approximately.  "Oh, I'm

10   not very sure."  His memory got hazier and hazier as the

11   timeline was discussed.  He didn't know the exact time.

12        We know, based on surveillance footage, when

13   Ms. Niemela was in various parts of the Capitol from the

14   staircase and on.  So focus on that timeline that you can

15   actually know with precision.

16        There was snow fencing up when Ms. Niemela got to

17   the Capitol grounds because there's a picture of it.  So

18   it's not true that all barricades that were forming the

19   perimeter around the Capitol were down.

20        Yes, some bike barricades that formed the main

21   block between, you know, the crowd and the Capitol, yes,

22   those were down at a certain point, but not all of the snow

23   fencing that was around the Capitol.  We know that because

24   Ms. Niemela's in front of it.  Ms. Niemela's on the inside

25   of it.  So that's not true.

1          Kirstyn Niemela is not a mouse.  I think we've

2     seen from the evidence, certainly from her social media,

3     that is not an accurate description of Ms. Niemela.

4          Sure, she's of small stature, of course.  But

5     she's tough.  She can hold her own.  She wasn't swept away,

6     swept up, by anything.

7          Fire alarm.  If you hear a fire alarm going off in

8     a government building, do you go in?  Do you go into a

9     burning building?  Even if that's what she thought, that

10    should have been your first clue you're not supposed to go

11    inside.  You're not supposed to be there.  Not a defense.

12         It's also not a defense in this case to be a

13    follower.  We don't disagree that she followed Mr. Eckerman,

14    that she followed Ms. Chiguer, that they were holding on to

15    each other throughout their time in the Capitol.  It's not a

16    defense.  You're not going to hear any instructions -- you

17    didn't hear any instructions from the judge about being a

18    follower being a defense.  You didn't hear any instructions

19    about duress, that she was somehow under duress and she was

20    forced to go inside.  It's not relevant.

21         And, you know, speaking of following, she found

22    Ms. Chiguer -- you heard from Mr. Leach, you know, that that

23    was her purpose of going into that crowd outside was to find

24    Ms. Chiguer.  She found her.  Outside.  She found her at the

25    foot -- at the bottom of the scaffolding with all the mob

1    surrounding her.  People shouting, chanting.  People going

2    up the scaffolding.  People climbing bike barricades.  We

3    showed lots of video of that scene.

4           But there's one video -- and I'll point it out to

5    you -- where you clearly see Ms. Niemela at the foot of the

6    scaffolding with Ms. Chiguer reunited.  She didn't say,

7    "Hey, it's getting crazy.  Let's get out of there."  There's

8    no evidence of that.  She went up with Ms. Chiguer and Mr.

9    Eckerman, up those stairs.  So not a defense.

10          You heard about Lieutenant Detorie.  I feel like I

11   don't even really have to address this because the point is

12   obvious, but of course she didn't remember her.  She didn't

13   remember anybody.  This was trauma.  This was chaos.

14   Everyone's face was a blur to her.  So the fact that she

15   didn't remember Ms. Niemela specifically or any female

16   rioter or any rioter specifically is irrelevant.

17          You heard about the scene, which I'm sure you

18   remember, by the House Chamber doors where the man with the

19   bullhorn and the gray hoodie is saying -- trying to

20   negotiate with police, trying to get the crowd to calm down.

21   No violence.  And he says, you know:  "Let's go in here and

22   sit down and tell these people we mean business.  But we

23   got -- but there can't be no violence or there can't be any

24   violence."

25          What was the response from the crowd?  "Rah."  Not

1      "yeah."  It was negative.  You heard testimony that it was

2      hostile, and then followed by violence.  Followed by the mob

3      surging against that police line that had been standing

4      there for five minutes, and, again, their heels dug in.

5              Ms. Niemela saw that.  She was two to three rows

6      back.  Feet from that police line.  She saw that.  So that,

7      again, not a defense.

8              Ms. Niemela -- this is a really important point --

9      is not charged for what she said.  She's not charged with

10     any kind of criminal threats.  That's not part of the

11     charges you saw here.

12             What she said on social media, we agree, is First

13     Amendment protected activity under the Constitution of the

14     United States.  She is not charged because of what she said

15     or what she wrote, how she felt.

16             The reason why we showed it to you -- you might be

17     asking yourselves that -- is because it's relevant to what

18     she knew, what she was thinking, how she felt, what she knew

19     about the proceedings on January 6th, what her motive was

20     for joining that mob and storming the Capitol, why she was

21     animated to not turn back when she found her friend, but to

22     go upstairs and to go into that building.

23             So we agree on many things with defense counsel.

24     We agree her general route through the Capitol.  We agree

25     she didn't put her hands on any officers.  We agree she

1    didn't destroy property.  She wasn't armed.  No evidence of

2    that.  And if she was any of those things, there would be

3    charges for it.

4          She was not the worst actor on January 6th.

5    Nobody's saying that.  Nobody.  There were far worse actors

6    on January 6th.  But what she did was unlawful.

7          And, again, she's not on trial for her beliefs.

8    Her First Amendment beliefs are protected.  But they are

9    relevant to getting into her state of mind, and that's why

10   we showed it to you.

11         So say you believe that she didn't see the signs

12   or fencing.  She's still guilty because, in particular, the

13   first charge, entering or remaining in a restricted building

14   or grounds, has that second part, "or remaining."  Even if

15   you believe that she didn't see the signs, that she didn't

16   see the people climbing in through the window, and maybe had

17   a good-faith belief that she could enter with lawful

18   authority, at each point in the Capitol as she's seeing

19   those police lines and moving with the crowd forward past

20   them, that's remaining unlawfully, knowingly remaining

21   without lawful authority.

22         But also she did.  Right?  We know, based on this

23   picture, it's very, very clear there's snow fencing in the

24   background.  There's the signs.  And she even had that

25   comment that she posted on Facebook, you know, "stood behind

1    a little fence with minimal security."  She acknowledged the

2    fence.  She knew there was fencing, and she went in.

3          Mr. Leach.  We submit to you that Mr. Leach is

4    not credible.  He was obviously biased.  He cares about

5    Ms. Niemela.  He's her friend.  He's her boss on and off for

6    three years, one of only three employees Ms. Niemela was for

7    him.  He even dated her mom.

8          He came to D.C. with her just to serve as her

9    chaperone.  I mean, driving seven hours there and back,

10   that's -- you know, that's care.  So he has a vested

11   interest in what happens in this case.  They even wore

12   matching sweatshirts.

13         I mean, he's biased.  By his own admission, his

14   memory is hazy.  He's 62 years old and has -- you know, he

15   went from direct and then to cross-examination by my

16   co-counsel.  His memory got fuzzier and fuzzier, and it was

17   inconsistent.  He testified one way on direct and another

18   way on cross; you know, couldn't remember things.

19         And his timeline was way off.  He said they got

20   there around 2:00.  Again, Ms. Niemela's already on the

21   stairs by 2:20.  There's no way she could have gotten

22   through that enormous crowd on the plaza in 20 minutes, most

23   likely.

24         THE COURT:  About five minutes, Counsel.

25         MS. ARCO:  Okay.  If others breached first,

1    doesn't matter.  That's actually worse because the remnants

2    of it shows she knew she wasn't supposed to enter.  You see

3    people climbing through a window.  Very, very obvious.

4           Didn't touch an officer?  Doesn't matter.  She's

5    not charged with that.

6           You'll see the definition of "disorderly and

7    disruptive" includes unnecessarily crowding a person.  She

8    was two to three feet away from Lieutenant Detorie, part of

9    that mob.

10           No explicit police commands?  It doesn't matter.

11   She's still guilty.  And a police's communicating of a

12   message doesn't have to be verbal.  It can be physical.

13   That (indicating) means get back.  Standing at attention

14   forming a police line for over five minutes, clear

15   indication not to move forward.  And she did.

16           Didn't say anything?  Well, she had a mask on the

17   majority of the time, so we don't really know if she didn't

18   say anything.  But what she did say or what she wrote or

19   what she shared on social media is relevant because it

20   showed she knew about the certification proceedings on

21   January 6th, specifically that they were there to certify --

22   or in her mind hopefully not certify -- the results of the

23   presidential election.  She knew Congress would all be

24   gathered there, including the people that she thought were

25   traitors.

1          Why did she go in?  I think it's pretty obvious.

2     She thought the government was corrupt.  She thought the

3     government was more than corrupt.  And she wanted to send

4     them a message.  GTMO for all our government.  True patriots

5     will stand armed and ready.

6          She joined the true patriots, the pissed off

7     patriots, storming the Capitol, in her mind.  She ignored

8     clear signals she wasn't supposed to be there.  Glass.

9     Rioters through the windows.  Smoke.

10         At no point did you see her turn around.  Faced

11    with all these clear things that she knew, not what she

12    should have known, what she knew was going on.

13         There was a big deal during, I think, cross-

14    examination by defense counsel.  She was just merely

15    present.  Right?  She was just physically present.

16         She was more than physically present.  She was

17    part of a mob.  Her presence, her mere presence, contributed

18    to the weight of that mob, to that avalanche that my

19    co-counsel described.

20         You know, I can't tell you if she was the last

21    snowflake, the second-to-last snowflake, the tenth-to-last

22    snowflake.  She contributed to the weight of the mob that

23    spilled over that broke those police lines.

24         She didn't try to leave.  You saw no evidence of

25    her ever seeking an exit or trying to leave.  She stood

1    around for five minutes after that third breach, watching.

2    She took -- and decided she had time to take -- a selfie.

3              Oh, and her mask.  You talk about knowledge.  Do

4    you wear your mask up to here and sunglasses indoors

5    normally?  No.  She did it because she was trying to hide

6    her identity because she knew what she was doing was wrong.

7              And then she sees this guy on the right kicking in

8    a door.  And then she sees an exit, the light streaming in

9    from outside from that open external door, and she passes

10   it, keeps on parading through the Capitol.

11             And her conduct disrupted Congress.  They had to

12   shelter in place.  They had to evacuate.  And they couldn't

13   finish their work finally until 3:40 in the morning the next

14   day.

15             It's all very clear.

16             So, again, in sum, we're here because she stormed

17   the Capitol, joined a mob inside.  That's what she did do.

18   She was a drop in the bucket, but that bucket, her weight

19   contributing to that bucket, spilled over and resulted in

20   those breaches of the police line.

21             There were consequences, immediate consequences.

22   The certification proceeding was ground to a halt.

23             There were lasting consequences.  Lieutenant

24   Detorie, you saw, is still affected two years later based on

25   what she experienced in that mob.  It sits with her two

1    years later.

2              Actions have consequences.

3              She was not the worst actor on January 6th.  Far

4    from it.  But she's not innocent either.  Her actions have

5    consequences.  She's here because of what she did do and

6    what she did know.

7              So, ladies and gentlemen, we ask that you find the

8    only verdict that the evidence that you have seen supports:

9    guilty on all counts.

10             Thank you.

11             THE COURT:  Okay.  Thank you, Ms. Arco.

12             Okay.  Ladies and gentlemen, just a few concluding

13   instructions before we excuse you to the jury room to begin

14   your deliberations.

15             First, a verdict must represent the considered

16   judgment of each juror, and so in order to return a verdict,

17   each juror must agree on that verdict.  In other words, your

18   verdicts must be unanimous.

19             Second, you will be provided a verdict form for

20   use when you have concluded your deliberations.  The form is

21   very straightforward.  It will list the four charges with a

22   check box for either "Guilty" or "Not Guilty" on each

23   charge.

24             The verdict form is not evidence in this case and

25   nothing in it should be taken to suggest or convey any

1    opinion by me as to what the verdict should be.  Nothing in

2    the form replaces the instructions of law I have already

3    given you, and nothing in it replaces or modifies the

4    instructions about the elements which the government must

5    prove beyond a reasonable doubt.  The form is meant only to

6    assist you in recording your verdict.  Just follow the

7    instructions.

8            We will be sending into the jury room with you the

9    exhibits that have been admitted into evidence.  I believe

10   they will all be loaded on a laptop computer for you to

11   access.  You may examine all -- you may examine any or all

12   of them as you consider your verdict.

13           Please keep in mind that exhibits that were only

14   marked for identification but were not admitted into

15   evidence will not be given to you to examine or to consider

16   in reaching your verdict.

17           During the course of trial a number of exhibits

18   were admitted into evidence.  Sometimes only portions of an

19   exhibit were admitted, such as portions of a longer video,

20   or a document with some words or pictures blacked out or

21   otherwise removed, or a video played without audio.  There

22   are a variety of reasons why only a portion of an exhibit is

23   admitted, including that the other portions are inadmissible

24   or implicate an individual's privacy.  As you examine the

25   exhibits and you see or hear portions where there appear to

1    be omissions, you should consider only the portions that

2    were admitted.  You should not guess as to what has been

3    taken out or why, and you should not hold it against either

4    party that an exhibit is redacted.  You are to decide the

5    facts only from the evidence that is before you.

6         When you return to the jury room, the first thing

7    that you should do is to select a foreperson to preside over

8    your deliberations and to be your spokesperson here in

9    court.  There are no specific rules regarding how you should

10   select a foreperson.  That is up to you.  However, as you go

11   about the task, be mindful of your mission, which is to

12   reach a fair and just verdict based on the evidence.

13   Consider selecting a foreperson who will be able to

14   facilitate your discussions, who can help you organize the

15   evidence, who will encourage civility and mutual respect

16   amongst all of you, who will invite each juror to speak or

17   speak up regarding his or her views about the evidence, and

18   who will promote a full and fair consideration of the

19   evidence.

20        The question of possible punishment of the

21   defendant in the event of a conviction is not a concern of

22   yours and should not enter into or influence your

23   deliberations in any way.  The duty of imposing a sentence

24   in the event of a conviction rests entirely with me.  Your

25   verdict should be based solely on the evidence in the case,

1    and you should not consider the matter of punishment at all.

2           I will remind you again of the instruction that I

3    have given you throughout the trial about not doing any

4    independent research about the case or exposing yourself to

5    any press or social media about the case.  Ms. Niemela

6    obviously is entitled to a verdict based only on the

7    evidence that you have heard and not on any extrinsic

8    factors.

9           During your deliberations, or once you start to

10   deliberate, you can obviously now communicate with each

11   other once all of the evidence is back and the jury

12   instructions are back, but you should still not communicate

13   with anyone who is not on the jury about the case.  That

14   includes the lawyers in the case and the parties throughout

15   the day or for however long you deliberate.  There's a

16   chance that you may bump into them outside or in the

17   hallway.  If they avoid you, again, they're not being rude.

18   They're just following my instructions, so -- and you should

19   avoid any contact with others who are not on the jury at

20   this point.

21          If it becomes necessary during your

22   deliberations to communicate with me, you may send a note

23   through Ms. Jenkins or one of the Marshals who will be

24   posted outside of the deliberation room signed by your

25   foreperson or by one or more members of the jury.  No member

1    of the jury should try to communicate with me about the case

2    except through a signed note, and I will not communicate

3    with any member of the jury on any matter concerning the

4    merits of the case except in writing or orally here in open

5    court.

6          Bear in mind also that you are never, under any

7    circumstances, to indicate to me or to anyone else not on

8    the jury about how you may be coming out on a particular

9    count or on the verdict as a whole.  So don't indicate that

10   you're, you know, split 11 to 1 or 6 to 6 or 2 to 10 on any

11   particular issue.  Okay?

12         The attitude and conduct of jurors at the

13   beginning of their deliberations are matters of considerable

14   importance.  It may not be useful for a juror upon entering

15   the jury room to voice a strong expression of an opinion on

16   the case or to announce a determination to stand for a

17   certain verdict.

18         When one does that at the outset, a sense of pride

19   may cause that juror to hesitate to back away from an

20   announced position after a discussion of the case.  And

21   while it is entirely up to you how to structure your

22   deliberations, many juries find it useful to avoid an

23   initial vote upon retiring to the jury room.  Calmly

24   reviewing and discussing the case at the beginning of

25   deliberations is often a more useful way to proceed.

1    Remember that you are not partisans or advocates in this

2    matter, but you are the judges of the facts.

3         The last thing I must do before I send you back to

4    the jury room is the thing that I apologized for in my

5    preliminary instructions, which is to excuse the two

6    alternates in the case.  Obviously all of you have remained

7    healthy and available for deliberations.

8         At this point I will excuse Juror No. 13 in the

9    upper left-hand corner and Juror No. 8 in the upper

10   left-hand corner.  But please make sure that Ms. Jenkins has

11   your contact information.  In the event that one of the

12   other 12 jurors is unable to complete the deliberations, we

13   would need to call you back to replace that juror.  So it's

14   important that in the meantime, until a verdict is reached,

15   that you continue to adhere to my instruction about not

16   discussing the case or doing any research about the case

17   because, if we need you, we need you back with an open mind.

18   Okay?  So I will thank you for your service.

19        You can stay in your seats for now.  You know, I

20   know that it can be frustrating.  It's like watching a movie

21   but not being able to see the ending, so it's something that

22   I take no joy in doing.

23        For the rest of you, when you have reached your

24   verdict, just send me a note informing me of that fact and

25   have your foreperson sign and date the note.  Do not tell me

1    what the verdict is.  Do not tell Ms. Jenkins what the

2    verdict is.  The foreperson should just fill out the verdict

3    form and sign the verdict form and bring it into the

4    courtroom.  I will examine the note or, excuse me, examine

5    the verdict form, give it back to your foreperson, and then

6    ask your foreperson to deliver the verdict in open court.

7            All right.  So with that, you may retire to begin

8    your deliberations once the laptop with the evidence

9    arrives.  Don't start deliberating until the evidence

10   arrives.  Okay?

11           Thank you very much.

12           (Jury exits courtroom)

13           THE COURT:  Okay.  Congratulations.  Well-tried by

14   both sides.  Stick around.  We may get a note and have to

15   take care of it quickly.

16           I need to leave today about 3:00.  So I didn't

17   tell them that because I don't want them to think they need

18   to rush, but at some point, if I have to go, Ms. Jenkins

19   will let them know.  And I think Judge Boasberg may take the

20   verdict or deal with any notes.  Okay?

21           MR. GARRITY:  Just so we know, in terms of how

22   will we know to come back to the courtroom, will we get a

23   call or an email?

24           THE COURT:  Ms. Jenkins will let you know if

25   there's a note or a verdict.  And if I were here, I would

1    probably bring them back at the end of the day, but since

2    I'm not, we'll probably just release them straight away and

3    have them come back, you know, in the morning, if they don't

4    reach a verdict.  All right?

5              MR. GARRITY:  Okay.  Thank you.

6              THE COURT:  You're welcome.

7              (Lunch recess taken)

1              A F T E R N O O N   S E S S I O N

2              THE COURT:  All right.  Welcome back, ladies and

3       gentlemen.  I understand that the jury has reached a

4       verdict.

5              And No. 10, Mr. Howell, you are our foreperson; is

6       that correct?

7              THE FOREPERSON:  That's correct, Your Honor.

8              THE COURT:  And has the jury reached a verdict?

9              THE FOREPERSON:  We have, Your Honor.

10             THE COURT:  And is your verdict unanimous?

11             THE FOREPERSON:  It is, Your Honor.

12             THE COURT:  If you could give your verdict form to

13      Ms. Jenkins.

14             (Pause)

15             THE COURT:  Okay.  Mr. Howell, I will ask you to

16      stand, and I will read off each count, and I will ask you

17      how the jury finds.  Okay?

18             On Count 1, entering or remaining in a restricted

19      building or grounds, how did the jury find?

20             THE FOREPERSON:  The jury found the defendant

21      guilty.

22             THE COURT:  Count 2, disorderly or disruptive

23      conduct in a restricted building, how did the jury find?

24             THE FOREPERSON:  The jury found the defendant

25      guilty.

1            THE COURT:  Count 3, disorderly conduct in a

2     Capitol building, how does the jury find?

3            THE FOREPERSON:  The jury found the defendant

4     guilty.

5            THE COURT:  And Count 4, parading, demonstrating,

6     or picketing in a Capitol building, how did the jury find?

7            THE FOREPERSON:  The jury finds the defendant

8     guilty.

9            THE COURT:  Okay.  If you could return your note

10    to Ms. Jenkins, your form.

11            Counsel, poll the jury?

12            MR. GARRITY:  Yes, Your Honor.

13            THE COURT:  Okay.  I'm going to ask each one of

14    you if that is your verdict.

15            So Juror No. 1, is that your verdict?

16            JUROR NO. 1:  Yes, Your Honor.

17            THE COURT:  Juror No. 2, is that your verdict?

18            JUROR NO. 2:  Yes, Your Honor.

19            THE COURT:  Juror No. 3, is that your verdict?

20            JUROR NO. 3:  Yes, Your Honor.

21            THE COURT:  Juror No. 4?

22            JUROR NO. 4:  Yes, Your Honor.

23            THE COURT:  Juror No. 5?

24            JUROR NO. 5:  Yes, it is.

25            THE COURT:  Juror No. 6?

```
1              JUROR NO. 6:  Yes, Your Honor.

2              THE COURT:  Juror No. 7?

3              JUROR NO. 7:  Yes, Your Honor.

4              THE COURT:  Juror No. 9, is that your verdict?

5              JUROR NO. 9:  Yes, Your Honor.

6              THE COURT:  Mr. Foreman, is that your verdict?

7              JUROR NO. 10:  Yes, it is, Your Honor.

8              THE COURT:  Juror No. 11, is that your verdict?

9              JUROR NO. 11:  Yes, Your Honor.

10             THE COURT:  Juror No. 12, is that your verdict?

11             JUROR NO. 12:  Yes, Your Honor.

12             THE COURT:  And finally, Juror No. 14, is that

13     your verdict?

14             JUROR NO. 14:  Yes, Your Honor.

15             THE COURT:  I didn't hear you.

16             JUROR NO. 14:  Yes, Your Honor.

17             THE COURT:  The clerk will record the verdict, and

18     the jury is now excused from further service and discharged

19     from its duties.  Thank you very much.

20             I generally like to come back and thank juries

21     personally for their service.  Feel free to stay, if you'd

22     like.  It will only take me a couple of minutes to deal with

23     a few legal issues here, and I'll be right back into the

24     jury room.  Okay?  Thank you very much for your service.

25             (Jury exits courtroom)
```

1          THE COURT:  Okay.  Please be seated.

2          Counsel, post-trial motions by the rules.  Okay?

3          MR. GARRITY:  Thank you.

4          THE COURT:  And you may not have checked your

5     calendars, but sentencing?  It's taking the probation office

6     at least two and a half months to do a presentence

7     investigation report.

8          Ms. Niemela, the next phase will be a probation

9     officer will conduct a presentence investigation.  I will

10    get a full report that goes over not just the facts of this

11    case, but your personal history, your educational

12    background, any criminal history you might have.  They'll

13    seek to interview you.  They'll seek to interview your

14    family members, perhaps.

15         And that report will be the primary thing that I

16    will use to determine what an appropriate sentence is in

17    this case.  So it's very important to be cooperative and

18    forthcoming as best you can with the probation officer.

19         Counsel, April 27th at 10:00 a.m.?

20         MR. GORDON:  One moment, please, Your Honor.  You

21    said April 27th?

22         THE COURT:  Yes.

23         MR. GARRITY:  Can I check with my secretary?

24         THE COURT:  I'll tell you what, why don't we set

25    it then, and if you end up having a conflict, just let us

1    know, and we can extend it.

2                MR. GARRITY:  Thank you.

3                MR. GORDON:  That is fine for the government, Your

4    Honor.

5                THE COURT:  Okay.  The Court will set sentencing

6    in this matter on April 27th at 10:00 a.m.

7                Same conditions?

8                MR. GORDON:  Yes, Your Honor.  The government's

9    not seeking anything additional.

10               THE COURT:  Okay.  Ms. Niemela, you will remain

11   under the same conditions of release that you've complied

12   with thus far.  We will see you back here in April for

13   sentencing.  All right?

14               All right.

15               (Whereupon the hearing was

16                concluded at 2:58 p.m.)

17

18

19

20

21

22

23

24

25

1              **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8        Dated this 28th day of February, 2023.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
13                              Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25