**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. |
| | ) | |
| Complainant | ) | 1:21-cr-00623  (CRC) |
| | ) | |
| v. | ) | 1:22-cr-00025 (APM) |
| | ) | |
| KIRSTYN NIEMELA, | ) | |
| | ) | |
| Defendant | ) | |

_____

**DEFENDANT KIRSTYN NIEMELA's**
**AMENDED SENTENCING MEMORANDUM**

Plaintiff KIRSTYN NIEMELA ("Niemela") by undersigned counsel, hereby submits to the

Court her Sentencing Memorandum.


**I.   INTRODUCTION AND OVERVIEW**

Despite the tendency of the Government of wanting to sentence Defendants based on the

original allegations in the charging documents, not what was proven to be factually true, the facts

proven at trial concerning Ms. Niemela do not support jail time or the punishment as requested by the

Government.

As shown in the Transcript of the first day of the trial on January 24, 2023, attached for the

Court's convenience, Kirstyn Niemela was unconstitutionally and unlawfully convicted of the

behavior of a crowd in complete disregard of any proof of her own individual guilt or innocence.  The

prosecution in violation of the Fifth Amendment to the U.S. Constitution and due process clauses

attempted to infer to Ms. Niemela simply seeing ("guilty viewing") an altercation between Michael

Eckerman and a police officer in which Niemela herself played no role whatsoever.  Of course one

does not become guilty of a crime by seeing a crime occur.  Ms. Niemela's walk through the Capitol was, the Government argued at trial, disorderly and disruptive not because of anything she did but because Mr. Eckerman had a brush with an officer and Ms. Niemela might have seen it happen.  And other people were disorderly or disruptive, so therefore Niemela was as well.  The prosecution similarly convicted Ms. Niemela on the actions of others by claiming she was part of a crowd, which crowd – not Niemela – did various things.

Collectivist punishment is not permitted nor constitutional within U.S. criminal law.  Not only is collective punishment outlawed by the Geneva Convention[1] but it is unconstitutional under due process and the Fifth Amendment.  Despite the persistent arguments of the U.S. Attorney's Office, no person under the U.S. Constitution may be convicted or sentenced for what other people did.

Accordingly, the conviction is invalid and subject to vacation and/or reversal on appeal.

In the transcript, on cross-examination from NIEMELA's attorney Richard F. Montieth, Esq., elicited the following testimony from the Government's witness Captain Tia Summers on cross-examination at pages 417:11 - 418:15 --

```
        Attorney Gordon, during direct examination,
asked you a couple of questions towards
summarizing what happened to some Capitol Police
officers.
Do you recall that question?
A. Yes.
Q. And some have been hurt in different ways,
right?
A. Yes.
Q. And some had been hit by bear spray?
A. Yes.
Q. And you elaborated a little bit about that,
right?
A. Yes.
Q. Certainly you are not alleging or inferring
```

---

[1]     Article 87(3) of the 1949 Geneva Convention III and provides: "Collective punishment for individual acts and cruel punishment are forbidden."

> at all that Ms. Niemela touched a police
> officer?
> A. No.
> Q. Shoved a police officer?
> A. No.
> Q. Yelled at a police officer?
> A. No.
> Q. Used bear spray?
> A. No.
> Q. Vandalized any property?
> A. No.
> Q. No evidence whatsoever of that, right?
> A. No.
> Q. And no -- you're not even inferring that she
> did that.
> A. No, sir.
> Q. Okay. In fact, you can't identify her, right?
> A. No, sir.
> Q. This is the first time you've ever seen her?
> A. Yes.

And on page 426:9-16:

> Q. Can you tell us where Ms. Niemela was when
> the snow fences were removed?
> A. No, sir.
> Q. Can you tell us where she was when the bike
> racks were removed?
> A. No, sir.
> Q. Can you tell us when she was present on the
> lawn?
> A. No, sir.

And the Government's questioning of Lieutenant Brooke Detorie, included at Transcript page

449:6-14 --

> Q. Okay. Do you recall any specific individuals
> from around the time that we just witnessed?
> A. No.
> Q. Okay. What about any female rioters? Do you
> remember any of them specifically?
> A. No.
> Q. Okay. Do you recognize the defendant in this
> case, Ms. Niemela?
> A. No.

And the Government's questioning of Lieutenant Brooke Detorie, included at Transcript page

450:21-25  *(Emphasis added)* –

> Q. Did any of your colleagues get hurt that
> day?
> A. Of the ten officers that I took over with
> me, three.
> Q. Okay. Were any of them under your
> supervision?
> A. Yes.
> Q. I'm sorry. ***Do you need a tissue?***

And Agent Elizabeth Glave of the U.S. Secret Service testified at Transcript pages 473:24 –

474:9 --

> So when you say you were outside the Senate
> Chamber, were you able to look out the window
> and see what was happening with the crowd?
> Were you learning about this from other
> agents?
> A. At one point I walked over to the window,
> and I was able to see the crowds.
> Q. And what did you see?
> A. I saw large crowds that were walking
> towards the Capitol, and it was very noisy.
> You could hear the yelling.
> Q. Did you see any violence?
> A. No.

On cross-examination by Defendant's counsel Mr. Garrity, Agent Elizabeth Glave testified at

Transcript pages 486:7-9 --

> Q. Fair to say that Ms. Niemela was not among
> the individuals you saw through the archway?
> A. I don't recall seeing her, no.

The trial possibly proved a violation of 18 U.S.C. 1752(a)(1) except that the Government has

persistently insisted upon the view that a grounds or building can be restricted even without providing

4

any actual notice to the public that the normal status of the U.S. Capitol as a national museum and national meeting place of U.S. Citizens with their leaders and the U.S. Capitol Grounds as a national park has been temporarily altered.  The Government insists that if they have a paper buried somewhere at the bottom of a filing cabinet, even if the public does not know about it, then an area becomes legally restricted.  Or that Congress which routinely spends trillions of dollars may rely upon 11 inch by 14 inch paper signs run off on a photocopier (even if possibly laminated) not likely to remain visible on easily-movable bike racks throughout the day.  There was argument that if someone had checked the Capitol's website they might have seen notice of restrictions due to COVID.  Thus, the Government actually asserts, it was "common knowledge."  But by whom?  How do they know?  Furthermore, the charge is of violation 18 U.S.C. 1752(a)(1) regarding a Secret Service protectee, not closure for any other reason.  An area closed for COVID is not subject to 18 U.S.C. 1752(a)(1).  The Government further continues its post-McFadden (*USA v. Martin*) claims that if people saw trouble, that means that an area was restricted.  But Defendant is charged under 18 U.S.C. 1752(a)(1), not for noticing problems.  An area does not become legally restricted because people are misbehaving in it, but because it is declared to be restricted to help guard a Secret Service protectee.  If a brawl breaks out among some soccer fans the stadium does not become restricted legally as to the rest of the people watching the soccer match.  It merely means that those who are fighting will be arrested and the soccer match will go on.  An alarm sounding may mean that a trouble-maker pulled an alarm as a malevolent prank.  So, it is dubious that the Government produced sufficient evidence to convict on Count III under 18 U.S.C. 1752(a)(1).

However, it is certain that no evidence was presented at trial to convict Ms. Niemela of Counts IV, VI, or VIII, other than trying to engage in collectivism and crowd guilt.  For example,

The Statement of Facts at Dkt. #1-1 from Criminal Case No. 1:21-cr-00623 and the Statement

of Facts at Magistrate Case No. 1:22-mj-00011-AJ, Dkt. # 1 are the only factual presentations that are available. The Indictment and Superseding Indictment are devoid of any factual allegations.

However, these Statements of Facts address almost entirely co-Defendants Mike Eckerman and Stefanie Nicole Chiguer. Furthermore, the Statements of Fact belabor in great detail the identification process undertaken through social media and informants attempting to identify the three co-Defendants. What's left concerning the events on or about January 6, 2021, is minimal.

The Statements of Fact allege that Niemela posted live videos from the demonstrations at the U.S. Capitol. A tipster claimed that Niemela is a member of the Proud Boys, which is demonstrably false and untrue. The tipster claimed that Niemela broke a window which is demonstrably false and untrue. The tipster alleged that Niemela carries an illegal handgun with her, which is also demonstrably false and untrue. It appears that the tipster was trying to smear Niemela.

The Statements of Fact claim that Niemela posted photos on Facebook of her and another woman outside of the U.S. Capitol. The Statements of Fact then claim that co-Defendant Stefanie Nicole Chiguer was inside the U.S. Capitol that afternoon, but the photographs used to claim that are fuzzy in the extreme and do not establish any such conclusion.

The Statements of Fact also claim that Niemela posted photos on Facebook from inside the Capitol and that a CNN video recording (wondering how CNN can be inside the Capitol without being charged) shows Niemela inside the Capitol. However, again these photos are incredibly fuzzy and poor-quality (because they include so many people at the same time).

The Statement of Facts also claims that – using the same cell phone geolocation technology that Dnesh D'Souza used in 2000 Mules to show that the 2020 presidential election was stolen by fraudulent votes -- a phone number associate with Niemela "was identified as having utilized a cell site [cell tower] consistent with providing service to a geographic area that included the interior of the

United States Capitol building." Obviously, this is incredibly vague and imprecise. Using the same technology as Dnesh D'Souza's expose of the election, the Statements report that "Google reports that its "maps display radius" reflects the actual location of the covered device approximately 68% of the time."

Therefore, the Statements of Fact allege that there was probable cause to allege that Niemela violated 18 U.S.C. § 1752(a)(1). But no other facts were alleged, found, or proven. The FBI agent then goes on to free-associate probable cause of 18 U.S.C. § 1752(a)(2); and 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. 5104(e)(2)(G). However, no facts were presented to support anything other than possibly 18 U.S.C. § 1752(a)(1).

## II.  PROCEDURAL HISTORY AND CHARGES

Defendant Niemela was charged by Superseding Indictment filed April 27, 2022, at Dkt # 24 with the following Counts, intermingled with other Counts brought against Michael Eckerman.

Niemela was tried by jury and was convicted of Counts 3, 4, 6 and 8 on January 26, 2023.

<u>**Count  III**</u>:  Entering and Remaining in a Restricted Building or Grounds

> **18 U.S.C. § 1752(a)(1):**
>           * * *
>  **(a)**  Whoever—
>
>   **(1)** knowingly enters or remains in any restricted building or
>   grounds without lawful authority to do so;
>               * * *
>  *[may be punished with up to one year in jail, fined, etc.]*

<u>**COUNT IV**</u>:  Disorderly and Disruptive Conduct in a Restricted Building

18 U.S.C. § 1752(a)(2) *(emphases added)* requires that:

> **(a)**Whoever—
>               * * *

(**2**) ***knowingly*** and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;or attempts or conspires to do so, shall be punished as provided in subsection (b).

\* \* \*

## **COUNT  IV**:  Disorderly Conduct in a Capitol Building

40 U.S.C. § 5104(e)(2)(D) requires that *(emphases added):*

 (**2**)  An  individual  or  group  of  individuals  may  not willfully and knowingly—

\* \* \*

(**D**)   utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in  the  Grounds  or  in  any  of  the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations  of,  a  committee  of Congress or  either House of Congress;

\* \* \*

## **COUNT VIII**:  Parading, Demonstrating, or Picketing in a Capitol Building

**40 U.S.C. 5104(e)(2)(G)** requires that

\* \* \*

(**2**)  An  individual  or  group  of  individuals  may  not willfully and knowingly—

\* \* \*

(**e**)Capitol Grounds and Buildings Security.—

\* \* \*

**(2)VIOLENT ENTRY AND DISORDERLY CONDUCT.—**
An individual or group of individuals may not willfully and knowingly—
* * *
**(G)** parade, demonstrate, or picket in any of the Capitol Buildings.
* * *

## III.MAXIMUM PENALTY

A. The Maximum Penalty for a violation of 18 U.S.C. § 1752(a)(1) under Count III is set forth at 18 U.S.C. § 1752(a)(b)(2):

"(2) a fine under this title or imprisonment for not more than one year, or both, in any other case."

Pursuant to "18 U.S Code § 3571 - Sentence of fine" the amount of a fine is "(6)  for a Class B or C misdemeanor that does not result in death, not more than $5,000;"

Here, in this case, Defendant Niemela did not commit any act nor was she charged with any crime of causing death or any bodily injury.  Therefore, the maximum fine that can be imposed is $5,000.

Under the U.S. Sentencing Guidelines, <u>COUNT III</u> sounds in trespass and the possible penalty is 0 days in jail up to a maximum of one year in jail and a fine of up to $5,000.   In Niemela's sentencing zone, the Court may (and should) impose alternate penalties such as various periods of probation, community service, and/or home confinement.  Restitution is unavailable and would violate the law since Niemela caused no damage "as a result of [this] offense."

B. The Maximum Penalty for a violation of 18 U.S.C. § 1752(a)(2) under Count IV is set forth at 18 U.S.C. § 1752(a)(b)(2):

"(2) a fine under this title or imprisonment for not more than one year, or both, in any other case."

Pursuant to "18 U.S Code § 3571 - Sentence of fine" the amount of a fine is "(6)  for a Class B or C misdemeanor that does not result in death, not more than $5,000;"

Here, in this case, Defendant Niemela did not commit any act nor was she charged with any crime of causing death or any bodily injury.  Therefore, the maximum fine that can be imposed is $5,000.

Under the U.S. Sentencing Guidelines, <u>COUNT IV</u> sounds in trespass and the possible penalty is 0 days in jail up to a maximum of one year in jail and a fine of up to $5,000.   In Niemela's sentencing zone, the Court may (and should) impose alternate penalties such as various periods of probation, community service, and/or home confinement.  Restitution is unavailable and would violate the law since Niemela caused no damage "as a result of [this] offense."

However, because under the U.S. Sentencing Guidelines Count III and Count IV are essentially the same cause of action, the penalties imposed would overlap.

C.  The Maximum Penalty for a violation of 40 U.S.C. § 5104(e)(2)(D) under Count IV:

for Disorderly Conduct in a Capitol Building, is:

      a. a term of imprisonment not more than 6 months;
      b. a term of probation of not more than 5 years;
      c. a fine not to exceed $5,000; and
      d. a special assessment of $10.

D.  The Maximum Penalty for a violation of 40 U.S.C. 5104(e)(2)(G) under Count VI:

for Parading, Demonstrating, or Picketing in a Capitol Building, is:

      a. a term of imprisonment not more than 6 months;
      b. a term of probation of not more than 5 years;
      c. a fine not to exceed $5,000; and
      d. a special assessment of $10.

However, because under the U.S. Sentencing Guidelines Count IV and Count VIII are essentially the same cause of action, the penalties imposed would overlap.

E.  Restitution Not Available

Defendant and counsel fully understand that courts may frequently engage in a sliding scale between imposing time in jail as opposed to a fine.  Such flexibility can be important to the courts and to the crowding of jails.  Therefore, the unavailability of an order of restitution may be a bit of a distinction without a (financial) difference and the Court may combine jail time with a fine.

However, an order of restitution is not available because the Defendant did not damage any property or cause any other loss:  The statute cited by the Government in its Sentencing

Memorandum **18 U.S. Code § 3663 - Order of restitution** requires (in relevant part):

> **(a)**
>                 * * *
> **(B)**
> **(i)**The court, in determining whether to order restitution under this section, shall consider—
>      **(I)** the amount of the loss sustained by each victim as a result of the offense; and
>              * * *

That is, restitution is only authorized for a "loss" that is "as a result of the offense."   The Court has no legal authority to order this Defendant to pay restitution of lossess that *other people* caused from *other* offenses than those Niemela committed.

There has been no loss suffered by anyone from Niemela's actions.  Therefore, although the Court may be authorized to order restitution, the applicable amount in this case totals $0.00. [2]

## IV. SENTENCING REQUESTED BY DEFENDANT BY ALTERNATIVE MISDEMEANOR TREATMENT UNDER SENTENCING GUIDELINES

As stated by the Presentence Report, "Pursuant to USSG §1B1.9, the US Sentencing Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an information.  Accordingly the US Sentencing Guidelines do not apply to these counts.

Therefore, the Court's sentencing decision and evaluation is not governed by the US Sentencing Guidelines.  Nevertheless, the parties mention the factors that would have been used if they did apply as some guidance that the Court might consider.

Defendant Niemela requests as the Court's resolution of this matter as follows:

1) Niemela has already "served" 1 - 1/2 years of supervised probation successfully

---

[2]     The USAO analyzes for every defendant restitution as if every defendant were guilty of every act committed by anyone else, without regard to actual individual guilt.  Restitution by person A cannot mean paying for harm caused by person B.

and to the satisfaction of the probation officer since her arrest on January 18, 2021.

2) Niemela suggests that her sentence include completing an additional 1-2 years additional probation, which should be precisely defined to avoid further complication, such as meaning without any violation of law (other than traffic infractions or the like or local laws) such as any act of violence or angry confrontation, charged or uncharged, except if committed against her by another. This should not include traffic or administrative infractions or offenses, including minor matters like business licensing, and should be precisely defined to avoid simply postponing proceedings.  That is, vague or over-broad conditions merely invite more burden on the courts uch that the case is almost not really over but simply prolonged.

3) The Court may order community service, and the Defendant offers details of service she has typically engaged in in supporting letters.

4) A fine of $1,000 to $2,000 provided that Defendant Niemela be allowed to pay in installments over two years as her financial situation allows and not due entirely immediately.  The Court can understand that as the Defendant is able to get back into a semi-normal life and be employed she will be in a better position to repay over time.

5) Defendant Niemela requests that penalty especially any confinement or payment of a fine be stayed and suspended during her expected appeal and/or the pendency of any order for a new trial that might occur.

## V.  SENTENCING ANALYSIS UNDER SENTENCING GUIDELINES

The U.S. Sentencing Guidelines do not actually apply to the Class B or C Misdemeanor.

Counsel believes that the Court should analyze the sentencing of the Defendant Niemela as follows:

a) Counts III and IV must be treated together for the purposes of sentencing. Essentially the same facts and occurrences are covered under both laws. Count III and Count IV are different legal versions of trespassing in the U.S. Capitol and Capitol grounds.

b) Counts VI and VIII must be treated together for the purposes of sentencing. Essentially the same facts and occurrences are covered under both laws. Count VI and Count VIII are different legal versions of trespassing in the U.S. Capitol and Capitol grounds.

c) Counsel believes that both Count III and Count IV add up to a combined Base Offense Level of **4 points** sounding in trespass. And Counts VI and VIII are the same.

d) "**Specific Offense Characteristics**" do not apply for any **additional points** because what "certain individuals" or other people did and general circumstances affecting the 10,000 demonstrators around the Capitol on January 6, 2021, are not relevant to this Defendant Niemela as an individual. Nor does it relate to anything that would affect Niemela's limited trespassing actions or events. To the extent that any of the details could be relevant they are merely duplicative and redundant of the +4 point base offense, and adds nothing to justify a point increase. The "Special Offense Characteristics" are merely a restatement of the base offense. No additional points are appropriate.

e) Any other aspect of the "Special Offense Characteristics" applies to what other people did, not what Niemela did.

f) The Court should not transfer to Niemela the actions of other people. The Government's reliance on context is not relevant or appropriate under the U.S. criminal justice system.

g) The Base Offense Level for the trespassing category for Counts III, IV, VI and VIII add

up to a Base Offense Level of **4 points** all sounding in trespass.  Again, "parading, demonstrating or picketing" must be distinctly different from an exercise of First Amendment rights or the charge and prosecution would be unconstitutional.  Since other statutes directly deal with disruption, this charge would be redundant and multiplitious.

h)  The Defendant has only sought to claim her rights to trial by jury and assertion of her constitutional and due process rights, nothing more.  However, the prosecution wants to treat merely going to trial as not taking responsibility, which Defendant and counsel dispute as illogical and contrary to law.  However, a reduction of **0 to 2 points** is possible for acceptance of responsibility.

i)  USSG  **§3B1.2 - Mitigating Role** – There is no indication that Niemela played any role other than allegedly entering restricted grounds and/or the Capitol and simply walk around.  The USSG say:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (a) If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.
> (b) If the defendant was a minor participant in any criminal activity, decrease by **2** levels.
> In cases falling between (a) and (b), decrease by **3** levels.

j)  A reduction of **2 points** is appropriate for Niemela doing nothing but wandering onto the Capitol Grounds and allegedly entering the U.S. Capitol Building.  She was a minor or even minimal participant in any criminal activity, consisting only of trespassing.

k)  A  downward departure is warranted because guidelines fail to consider length of time defendant refrains from commission of first crime.  *U.S. v. Ward*, 814 F.Supp. 23 (E.D.Va. 1993). [Renewed force in light of *United States v. Booker*, 125 S.Ct. 738, 2005 WL 50108

(Jan. 12, 2005)]

l) A downward departure is warranted under U.S.S.G. § 5K2.11 (departure permissible

where "conduct may not cause or threaten the harm or evil sought to be prevented by the

law"); *U.S. v. Bayne* 2004 WL 1488548, 103 Fed. Appx. 710 (4th Cir. 2004)

(unpublished).  Here, a restriction of a building or grounds is issued to assist in the U.S.

Secret Service protecting a Secret Service protectee.  Niemela's peaceful tour around the

grounds and part of the Capitol did not threaten any mar or evil sought to be prevented.

m) A downward departure is warranted for "Prosecutor's Manipulation Of The Charges, Even

If No Bad Faith," where the prosecution has over-charged simple trespass under 18 U.S.C.

1752(a)(1) and charged disorderly and disruptive conduct without foundation.   See

U.S.S.G. Pt. A.4 ("a sentencing court may control any inappropriate manipulation of the

indictment through use of its departure power"); *U.S. v. Gamez*, 1 F.Supp. 2d 176

(E.D.N.Y. 1998) (Weinstein, J.) (departure from level 20 to 15 warranted in money

laundering case because nature of crime more closely resembled structuring crime which

had lower guidelines); *U.S. v. Lieberman*, 971 F.2d 989, 995 (3d Cir. 1992.

n) A total of **0 points** should be awarded for criminal history because under the U.S.

Sentencing Guideline, all incidents of Niemela being convicted early in her life are time-

barred by the passage of time and/or excluded based on topic (such as traffic, vehicle

licensing, vehicle insurance tickets) or both.  The Criminal History Category is in Zone A.

o) Therefore, the correct total of points is **+2 points** overall for sentencing:

> +4 Base Offense
>
> +0 Specific Offense Characteristics (as redundant)
>
> +0  Acceptance of Responsibility and cooperation

+0 All criminal history items are time-barred or excluded by topic (e.g., traffic offenses or vehicle licensing issues), or both.

=   4 sentencing points.

p)   Under the Sentencing Guidelines, sentencing of 0 to 6 months in jail are applicable along with other alternative punishments, such as

q)   Based on a total offense level of 4 and a criminal history category of I, the guideline imprisonment range is zero months to six months.  USSG §5G1.1(a)."

## VI. CRIMINAL HISTORY

Ms. Neimela has just two alleged criminal incidents, not resulting in convictions.

a.   Ms. Niemela received a marijuana arrest in 2009.  However, this is time-barred and not countable under the sentencing guidelines…

b.   Ms. Niemela received a disorderly conduct charge from 2021 for refusal to wear a mask in a hospital as an expression of protest, as a first amendment expression.

c.   Therefore, Ms. Niemela's criminal history score is 0 (zero) for sentencing purposes at this time.

d.   The U.S. Sentencing Guidelines require that:

### §4A1.2.   Definitions and Instructions for Computing Criminal History

#### (a)   Prior Sentence

(1)   The term "prior sentence" means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense.

(2)   If the defendant has multiple prior sentences, determine whether those sentences are counted separately or treated as a

single sentence. Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). If there is no intervening arrest, prior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day. Treat any prior sentence covered by (A) or (B) as a single sentence. See also §4A1.1(e).

For purposes of applying §4A1.1(a), (b), and (c), if prior sentences are treated as a single sentence, use the longest sentence of imprisonment if concurrent sentences were imposed. If consecutive sentences were imposed, use the aggregate sentence of imprisonment.

* * *

(e)     Applicable Time Period

(1)     Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

* * *

Furthermore,

(2)     Any other prior sentence that was imposed within ten years of the defendant's commencement of the instant offense is counted.

(3)     **_Any prior sentence not within the time periods specified above is not counted._** (Emphasis added.)

* * *

## VII.   GOVERNING LAW FOR SENTENCING

Federal law codified at 18 U.S.C. § 3553 "Imposition of a Sentence" authorizes a federal court

to impose a sentence upon the conviction of a defendant for a crime, including by a plea of guilty, in

accordance with that statute's terms and the guidelines promulgated by the U.S. Sentencing Commission under it authority at law.  The sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. 3553(a).

Sometimes sentencing depends upon specific facts which have not been established and/or disputed, even outside the trial or even though the trial or a plea deal are concluded.

The U.S. Sentencing Commission, Guidelines Manual, Annotated 2021 Chapter 6 - Sentencing Procedures, Plea Agreements, And Crime Victims' Rights explains:[3]

Commentary

Although lengthy sentencing hearings seldom should be necessary, *disputes about sentencing factors must be resolved with care*.  When a dispute exists about any factor important to the sentencing determination, *the court must ensure that the parties have an adequate opportunity to present relevant information.*  Written statements of counsel or affidavits of witnesses may be adequate under many circumstances.  See, e.g., United States v. Ibanez, 924 F.2d 427 (2d Cir. 1991).  *An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues.*  See, e.g., United States v. Jimenez Martinez, 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing); United States v. Roberts, 14 F.3d 502, 521(10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination or make requisite findings of fact regarding drug quantity); see also, United States v. Fatico, 603 F.2d 1053, 1057 n.9 (2d Cir. 1979), cert. denied, 444 U.S. 1073 (1980).  The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.

In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial.  See 18 U.S.C. § § 3661; see also United States v. Watts, 519 U.S. 148, 154 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); Witte v. United States, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a

---

[3]     **https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-6**

subsequent prosecution); <u>Nichols v. United States</u>, 511 U.S. 738, 747-48 (1994) (noting that district courts have traditionally considered defendant's prior criminal conduct even when the conduct did not result in a conviction). Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy.  <u>Watts</u>, 519 U.S. at 157; <u>Nichols</u>, 511 U.S. at 748; <u>United States v. Zuleta-Alvarez</u>, 922 F.2d 33 (1st Cir. 1990), <u>cert. denied</u>, 500 U.S. 927 (1991); <u>United States v. Beaulieu</u>, 893 F.2d 1177 (10th Cir.), <u>cert. denied</u>, 497 U.S. 1038 (1990).  Reliable hearsay evidence may be considered.  <u>United States v. Petty</u>, 982 F.2d 1365 (9th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1040 (1994); <u>United States v. Sciarrino</u>, 884 F.2d 95 (3d Cir.), <u>cert. denied</u>, 493 U.S. 997 (1989).  Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means.  <u>United States v. Rogers</u>, 1 F.3d 341 (5th Cir. 1993); <u>see also United States v. Young</u>, 981 F.2d 180 (5th Cir.), <u>cert. denied</u>, 508 U.S. 980 (1993); <u>United States v. Fatico</u>, 579 F.2d 707, 713 (2d Cir. 1978), <u>cert. denied</u>, 444 U.S. 1073 (1980).  Unreliable allegations shall not be considered.  <u>United States v. Ortiz</u>, 993 F.2d 204 (10th Cir. 1993).

*Id. (Bolded and italicized emphases added).*

## A.  POINTS FOR "BASE" OFFENSE

The Government appears to categorize both Counts I and II as "trespassing" for a base offense level of 4 points applying to both together.

Although one charge is for "parading," "demonstrating," or "picketing," there are other parallel statutes which address any sort of actual disruption or damage or violence in the Capitol or any federal building.  Thus we must consider only the kind of "parading," "demonstrating," or "picketing," which is in and of itself *NON-DISRUPTIVE*, non-violent, and not harmful in itself. Again, other statutes address those types of actions, such as 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D);  18 U.S.C. § 1752(a)(4); or 18 U.S.C. § 5104(e)(2)(F).  Furthermore, we may not consider purely First Amendment expression.  So "parading, demonstrating, or picketing" must be very narrowly construed to avoid violations of the First Amendment and redundancy.

## VIII.  CIRCUMSTANCES – MISCHARACTERIZING THE CAPITOL

To set up its sentencing argument, the Government typically seeks to set up the issues to be decided here with misinformation. The Government attempts to present these matters as if the U.S. Capitol is a secret, underground, nuclear missile base, rather than a citadel of democracy – meaning the meeting place between citizens and their elected representatives.

Of course, there is no excuse for political violence, such as witnessed since 1999 and especially from 2014 through 2020, and especially directed against law enforcement. In the 1960s, leftist demonstrators actually set off a bomb inside the U.S. Capitol.

Neither is there any excuse to refuse to distinguish between those who committed violence on January 6 in or near the Capitol **_and those who did not._**

The U.S. Capitol and its massive Grounds – a public, national park – are presumptively and normally open to the public, and have traditionally been the site for well over a century of many small and large public demonstrations exercising the right of free speech and the right to petition the government for the redress of grievances as is the right of all citizens guaranteed by the First Amendment to the U.S. Constitution.

As Federal courts in this District have reasoned in reaching legal conclusions:

> **_The Capitol Grounds_** (excluding such places as the Senate and House floors, committee rooms, etc.) **_have traditionally been open to the public_**; indeed, thousands of people visit them each year. Thus, we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) *(emphases added).*

> The courts in this jurisdiction have long recognized that **_"[t]he United States Capitol is a unique situs for demonstration activity"_** and **_"is a place traditionally open to the public thousands visit each year to which access cannot be denied broadly or absolutely,_** [a fact which must be weighed] against the government's interest in protecting against possible `damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff.'" *Kroll v. United States*, 590 F. Supp. 1282, 1289, 1290 (D.D.C.1983) *(quoting Jeannette Rankin Brigade v. Chief of Capitol Police,*

342 F. Supp. 575, 583-85 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S. Ct. 311,
34 L. Ed. 2d 236 (1972)).

*Wheelock v. United States* 552 A.2d 503, 506 (D.C. 1988) *(emphases added).*

So very public is the Capitol, that built into the physical building from its initial construction are public viewing galleries allowing any member of the public – for no reason other than a desire to watch their Representatives and Senators at work – may sit and watch the House of Representatives and the U.S. Senate while in session. [45]

There is no physical barrier – even to this day – between the Chambers in session and the public watching from the balcony galleries.  If a member of the public wished to – not advisable, of course – toss a candy bar down to her willing U.S. Senator, the physical structure of the Senate chambers would make that possible.

No greater message of the very public nature of the Capitol can be found than the very architecture of the building designed as a meeting place between citizens and their leaders.

The Government persistently diverts attention with its claim that the Capitol is "secured" 24 hours a day, 7 days a week.  However, "secured" does not mean "closed."

The museums of the Smithsonian Institution are "secured 24 hours a day, 7 days a week" yet open to tourists from around the world in the millions, subject to the protection of its Office of Protection Services, during business hours.  Indeed, welcoming the public is their purpose.

Not only are the Capitol Grounds a national park, but the Capitol building is in fact a museum in which hangs some of our nation's most iconic and important historic art, such as the nation's

---

[4]  See:  Large Public Galleries in New Legislative Chambers, Library of Congress exhibit, **https://www.loc.gov/exhibits/uscapitol/s5.html** :  Thomas U. Walter. "Details of Gallery in Hall of Representatives," 1856. Ink and water color on paper. Architect of the Capitol (204)

[5]  This is changed only in the sheer quantity of citizens in our growing nation and the number of persons who want to watch from the viewing galleries, leading to time limits for rationing.  But the public purpose of the U.S. Capitol has been set since the first construction blueprints were drawn.

historic paintings.[6]


## IX. RECOMMENDED SENTENCING UNDER 18 USC 3553(a) FACTORS

The Court will consider the factors under 18 U.S.C. § 3553(a) in crafting a sentence that is clearly at the low end of the sentencing range.  As typically asserted by the USAO, these factors of that statute include:

> (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed—
>
> > (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B)    to afford adequate deterrence to criminal conduct;
> > (C)   to protect the public from further crimes of the defendant; and
> > (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Yet "these offenses."   referred to in 18 U.S.C. § 3553(a) here is 40 U.S.C. 5104(e)(2)(G)  of "Parading, Demonstrating, or Picketing in a Capitol Building," and 18 U.S.C. 1752(a)(1) of entering or remaining in a restricted area, temporarily restricted because of the presence of a Secret Service protectee.  (This is not a permanently restricted location such as a nuclear intercontinental ballistic missile base but only a temporary venue of a protectee.)

The USAO consistently wants to analyze "the nature and circumstances" of offenses which Defendant Niemela did not commit, is not guilty of, and which form no part of what is currently before the Court now.  The USAO wants the Court to sentence *other people* who are not before this Court in this case and smuggle into this case the misconduct of *other people* not before the Court in

---

[6]        **https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/rotunda**

this case.  The USAO consistently argues to sentence any given Defendant as if she had committed

other crimes, that other people committed.

    a.   The "nature … of the offense" concerns these offenses in particular.  of 40 U.S.C.

           5104(e)(2)(G)  "Parading, Demonstrating, or Picketing in a Capitol Building" and 18

           U.S.C. 1752(a)(1), sounding in mere trespass.

    b.   The "circumstance of the offense" concerns these offenses in particular.  of 40 U.S.C.

           5104(e)(2)(G)  "Parading, Demonstrating, or Picketing in a Capitol Building" and 18

           U.S.C. 1752(a)(1), sounding in mere trespass

    c.   The need for the sentence imposed "to reflect the seriousness of the offense" concerns

           these offenses in particular.  of 40 U.S.C. 5104(e)(2)(G)  "Parading, Demonstrating, or

           Picketing in a Capitol Building" and 1752(a)(1), sounding in mere trespass.

    d.   The need for the sentence imposed "to promote respect for the law," concerns these

           offenses in particular.  of 40 U.S.C. 5104(e)(2)(G)  "Parading, Demonstrating, or

           Picketing in a Capitol Building" and 18 U.S.C. 1752(a)(1) 1752(a)(1), sounding in

           mere trespass.

    e.   The need for the sentence imposed "to provide just punishment for the offense,"

           concerns these offenses in particular.  of 40 U.S.C. 5104(e)(2)(G)  "Parading,

           Demonstrating, or Picketing in a Capitol Building" and 1752(a)(1), sounding in mere

           trespass.

    f.   The need for the sentence imposed "to promote respect for the law," concerns these

           offenses in particular.  of 40 U.S.C. 5104(e)(2)(G)  "Parading, Demonstrating, or

           Picketing in a Capitol Building" and 1752(a)(1), sounding in mere trespass.

    g.   The need for the sentence imposed "to afford adequate deterrence to criminal

conduct," concerns these offenses in particular.

    h.   The need for the sentence imposed "to protect the public from further crimes of the defendant," concerns these offenses in particular.  of 40 U.S.C. 5104(e)(2)(G) "Parading, Demonstrating, or Picketing in a Capitol Building" and 18 U.S.C. 1752(a)(1), sounding in mere trespass.

The USAO cannot "smuggle" irrelevant issues into the case, of which the Defendant is not guilty and never will be guilty, until the end of time.

Indeed, to sentence Niemela as if she committed the very serious crimes charged against others of assaulting police officers, damaging federal property, and brawling with police or worse would actually – and actually does in fact – promote disrespect for the law.

Out of 10,000 demonstrators (as estimated by the U.S. Capitol Police), there are people who damaged Federal property.  Niemela, however, did not.

Out of 10,000 demonstrators, some people committed violence.  Niemela, however, did no such thing.

Out of 10,000 demonstrators, there are people who scuffled with police or worse, many even assaulting or battling with police officers.  Niemela, however, did not.

Out of 10,000 demonstrators, there are people who are charged with disrupting the Joint Session of Congress that recessed at 2:13 PM according to the testimony of then-Parliamentarian Wickham in *United States v. Stewart Rhodes, et al.* Case No. 1:22-cr-00015, on October 19, 2022, [7] and 2:00 PM according to the official after-action timeline report of the U.S. Capitol Police).

Niemela, however, did not.  Niemela entered an open door, apparently (given the fanciful

---

[7]      The District of Columbia claims in *District of Columbia vs. Proud Boys International, LLC,* that it received a request from the U.S. Capitol Police at 12:58 PM for additional officers, indicating that the cause for the recess of the Capitol already existed prior to 12:58 PM.

names assigned in Congress) at an unspecified time apparently an hour or more later.

The factors include consideration by the Court of "the Nature and Circumstance of the Offense" -- that is, parading, demonstrating, or picketing – which the Government asserts to include the following:

(1)  Whether, when and how the Defendant entered the Capitol building.

Niemela peacefully and calmly entered an open door long after others

(2)  Whether the Defendant encouraged violence.

No, Niemela did not.

(3)  Whether the Defendant encouraged property destruction.

No, Niemela did not.

(4)  Defendants reaction to acts of violence or destruction.

Niemela rejects that she is required to function as a law enforcement officer.  Niemela is not guilty of "guilty viewing" of other people's action.  The Defendant's reaction is not a valid factor. Moreover, the Government's fixation on people's reaction to what other people did indicates the core problems in these cases. Moreover, the meaning of this is unclear.  Is the Government suggesting that innocent members of the crowd were obligated to join in the melee and try to effect a citizen's arrest of the violent rioters, thus disrupting official law enforcement officers in the conduct of their duties?

(5)  Whether, during or after the riot, the defendant destroyed evidence

No, Niemela did not.

(6) The length of the Defendant's time inside of the building and exactly where the defendant travelled.

      At most, allegedly, Niemela was inside the Capitol for only a short time.  Counsel rejects the idea that "exactly where the defendant travelled" is a factor the Court should consider, but only whether a defendant actually did something that is wrongful.  Merely travelling somewhere – differently from conduct – is not a relevant factor.  Nevertheless Ms. Niemela's alleged pathway was random and shows no pattern or plan or intention but just random meandering.

(7) The defendant's statements in person or on social media.

      The Court would be violating the U.S. Constitution by considering such a factor, just as the Government has already violated the U.S. Constitution by asking the Court to consider it.  The thin line between many aspects of these cases and the First Amendment right to petition the government for redress of grievances and free speech should be a real concern to the Court with potential consequences far worse than anything that happened on January 6, 2021.  Here and in similar arguments and question the USAO tramples that line and endangers the Constitutional Republic far more than a few loud protestors a few of whom tangled with police.  Nevertheless, there is nothing in the Defendant's statements that the prosecution would like to use that are of any concern to sentencing.

(8) Whether the Defendant cooperated with, or ignored commands from police officers.

There is no evidence or indication that Niemela every failed to comply with police officers' directions.

(9) Whether the Defendant demonstrated sincere remorse or contrition.

The Court must evaluate this only in terms of what Niemela actually did.  No one can demonstrate remorse for what they did not do.

## X.  WHAT THE COURT MAY NOT CONSIDER

The Government cannot now ask this Court to sentence her for something(s) entirely different, not what she was found guilty of.  Defendant Niemela cannot be punished for what other people do.

## XI. WHAT THE COURT MAY NOT CONSIDER:  FIRST AMENDMENT CONSTITUTIONALLY PROTECTED ACTIVITY

Defendant Niemela does not stand charged with Thought Crimes, unapproved thoughts, unauthorized political expressions, or socially undesirable political views.  she has not been called before the Orwellian Ministry of Truth.  Yet the Government has routinely asked this Court to punish Defendants for their exercise of free speech guaranteed by the First Amendment to the U.S. Constitution and the right to petition the government for redress of grievances.

It should be no concern of the USAO or the Court what opinions Defendants hold and it would give confidence to the public for the Judiciary to be "as chaste as Caesar's wife" by strenuously ignoring the public statements of any January 6 Defendant.

The Supreme Court's decision in *West Virginia State Board of Education v. Barnette,*  319 U.S. 624 (1943) illustrates the compelled speech doctrine.  In now hallowed language in our national laws, Justice Robert H. Jackson asserted,

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics,

> nationalism, religion, or other matters of opinion or force citizens to
> confess by word or act their faith therein."

Chief Justice John G. Roberts Jr. reiterated the essence of the compelled speech principle in

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006):

> "Some of this Court's leading First Amendment precedents have
> established the principle that freedom of speech prohibits the
> government from telling people what they must say."

The "central meaning" of the First Amendment, Justice William Brennan declared in her

opinion for a unanimous Court, **is the right to criticize government and public officials.**  *New York*

*Times v. Sullivan* 376 U.S. 254 (1964).


## XII.    WHAT THE COURT MAY NOT CONSIDER:  CROWD LIABILITY

Hundreds of people out of the crowd of 10,000 committed violence against people and things,

battled with police, injured about 140 police officers, damaged federal property at the Capitol, and

some even tried to break through the doors to the Senate and House chambers.

However, here, in this case, the security camera video – that is, the Government's own

evidence – shows with unmistakable clarity and precision that most of those who intruded into the

U.S. Capitol building clearly had no plans whatsoever, no sense of direction, no commonality, etc. [8]

Crowds do not do things.  Individuals do things.  Crowds do not.

> This is where things fall apart. Although both Governor DeSantis and Sheriff
> Williams argue that the phrase "willfully participate" is commonly
> understood, neither party offers an actual definition. Is it enough to stand
> passively near violence? What if you continue protesting when violence
> erupts? What if that protest merely involves standing with a sign while others
> fight around you? Does it depend on whether your sign expresses a message

---

[8]      *See,* Capitol Security camera video, produced by USAO as 7029 USCS 02 Rotunda Door
Interior-2021-01-06_15h15min01s000ms.mp4 from USCP OPR Report 21-007, Exhibit 6 CCTV
Recordings, from production DT_DocID: USCP-003-00000167, produced 11/18/2021, in Global
Production DOJCB_008

that is pro- or anti-law enforcement? What about filming the violence? What
if you are in the process of leaving the disturbance and give a rioter a bottle of
water to wash tear gas from their eyes?

The Governor would have this Court pencil in an exception for a person who
merely "attend[s]" a violent demonstration but does not actively engage in
violence or conduct that poses an imminent risk of injury or property damage.
ECF No. 99 at 13. But the Governor offers no explanation or construction that
limits when mere attendance becomes participation, except that a person must
"intend to commit violence." Id. But this ignores the plain text of the statute,
which separates a person from an assembly of three or more persons sharing
that intent. See *infra.*

*See, The Dream Defenders, et al., v. Ron DeSantis, 21-cv-191, ECF No. 137 (N.D. Fla. Sept. 9,
2021), (Mark E. Walker, Chief United States District Judge),* Page 53 *(injunction against anti-riot
law in part because the legislation appeared to criminalize the defendant's protest activities even if
she did not participate in the violent acts of others)*, attached as **Exhibit**.  And continuing:

If this Court does not enjoin the statute's enforcement, ***the lawless actions of
a few rogue individuals could effectively criminalize the protected speech of
hundreds, if not thousands, of law-abiding Floridians***. This violates the First
Amendment. See, e.g., *Bible Believers v. Wayne Cnty.*, Mich., 805 F.3d 228,
252 (6th Cir. 2015). Florida's interest in preventing public violence is beyond
question, but when that interest collides with rights guaranteed by the First
Amendment, the "government may regulate in the area only with narrow
specificity." *Button*, 371 U.S. at 433. Otherwise, those rights, which "are
delicate and vulnerable, as well as supremely precious in our society," may be
suffocated. Id. Section 870.01(2), through its ambiguity, chills speech and
eviscerates that essential breathing space. The law is overbroad.[27]

Accordingly, I conclude that Plaintiffs have established a substantial
likelihood of success on the merits as to their overbreadth claim.

*Id.,* at Page 77 *(emphases added).*

No U.S. citizen can be guilty of the "context" of what other people did.  The careless transfer

of the actions of "crowds" or "others" to specific defendants is an attack upon Due Process and the

burden of proof of proving the elements of a crime beyond a reasonable doubt.


**XIII.   "GUILTY VIEWING" OF THE CRIMES OF OTHERS**

Apparently generated by a misunderstanding of a split decision among Defendants, the

Government has become enamored of accusing January 6 Defendants of what Defendants' counsel will call "guilty viewing" or "guilty watching" of other people committing a crime.  But one does not become guilty by seeing someone else do something criminal.

On April 6, 2022, the Honorable District Court Judge Trevor McFadden provided a very interesting split decision, including in *United States v. Matthew Martin*, Case No. 1:21-cr-00394, in this District.  Judge McFadden found Matthew Martin not guilty because the U.S. Capitol Police had not given notice to the public of a restricted area under 18 U.S.C. 1752(a)(1) (that is, notice that had been posted on flimsy 11 inch by 14 inch paper was no longer visible after efforts by some to remove barricades) and police officers did not express any discouragement of Martin entering the Capitol.

But McFadden found another Defendant had crawled over walls and other obstructions to enter the Capitol.  Thus, Judge McFadden found, the second co-Defendant did not need to see signs posted to realize that she was not supposed to be entering the building, if she had to crawl over walls to do it.  The split decision strongly reveals the legal test that is important.

18 U.S.C. 1752(a)(1) is explicitly conditional upon the requirement of "***knowingly***."  The DoJ seems to want to look away from this word "knowingly" with an intense aversion. led over walls and dodged police to enter the Capitol had sufficient notice that the area was restricted.

Ever since, the Government has been fixated on whether Defendants saw someone committing a crime.  That is not what McFadden decided, however.  McFadden's analysis did not turn on "guilty watching" of others rioting.  It had nothing to do with seeing police.  It had nothing to do with hearing an alarm sounding.  It was about the requirement for trespass to include a warning.  Seeing guilt does not create guilt.

### XIV.   AVOIDING UNDUE DISPARITIES IN SENTENCING:  COMPARISONS:  WHAT ARE NORMAL PUNISHMENTS FOR COMPARABLE BEHAVIOR?

### A.  DISPARITIES WITH 2017 TRUMP INAUGURAL RIOTS

Based upon comparable events in recent memory, to avoid sentencing disparities, the Court should drop all the charges as the DoJ did after the massive insurrection, arson, and riots held on January 19-21, 2017, to protest the inauguration of Donald Trump as President.

In January 2017, across the nation, an estimated 2.6 million Left-wing and anarchist protestors demonstrated their fury at former Democrat Donald Trump.   In the District of Columbia, several thousand of those demonstrators engaged in arson, assaults on police, vandalism, and rioting, including burning hundreds of cars and businesses with Molotov cocktails.



Some stores were boarded up for months afterwards.  Yet the DoJ dropped the charges against these violent rioters and insurrectionists.

### B.  DISPARITIES WITH 2018 ANTI-KAVANAUGH RIOTS

Based upon comparable events in recent memory, the Court should assess a $50 fine upon Defendant Niemela as the DoJ did just recently in September 2018, when anti-Kavanaugh protestors publicly and openly conspired to obstruct the official proceedings of the U.S. Senate Judiciary Committee in an attempt to prevent the confirmation of Brent Kavanaugh to the U.S. Supreme Court. The rioters inside the U.S. Senate Judiciary Committee hearing room and occupying the Hart Senate Office Building were released within hours on a $50 bail bond.  Then the charges were dropped against most of the rioters.

## C.  DISPARITIES WITH 2020 ANTI-TRUMP RIOTS ATTACKING THE WHITE HOUSE

Based upon comparable events in recent memory, the Court should drop the charges and award large financial windfalls to Defendant Niemela, as the DoJ did with the insurrection, arson, riots, and attack on the White House in May and June 2020.  The charges were dropped against most of the rioters, and they were paid large sums in settlement of their lawsuits.

In 2011, similarly, Left-wing rioters entered and physically occupied the Wisconsin State legislature, followed by months of disruptive protests mostly outside but also inside the Capitol building of Wisconsin.[9]  Those who sought to obstruct official proceedings to prevent the passage of legislation they disapproved of were mostly not arrested or given minor fines or probation.

Dated:  May 24, 2023

RESPECTFULLY SUBMITTED
**KIRSTYN NIEMELA,** *By Counsel*


_____/s/__John M. Pierce_____
John M. Pierce, Esq.
John Pierce Law Firm
21550 Oxnard Street
3rd Floor, PMB #172
Woodland Hills, CA 91367
Tel: (213) 400-0725
Email: *jpierce@johnpiercelaw.com*
Attorney for Defendant


## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed on this May 24, 2023, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system, which will send an electronic copy of to the following CM/ECF participants.  From my review of the PACER account for this case the following attorneys are enrolled to receive notice and a copy through the ECF system.

---

[9]     "Thousands storm Capitol as GOP takes action," <u>Wisconsin State Journal</u>, March 10, 2011, updated February 19, 2015, ("Thousands of protesters rushed to the state Capitol Wednesday night, forcing their way through doors, crawling through windows and jamming corridors"), accessible at: **https://madison.com/wsj/news/local/govt-and-politics/thousands-storm-capitol-as-gop-takes-action/article_260247e0-4ac4-11e0-bfa9-001cc4c03286.html**

MICHAEL MATTHEW GORDON, ESQ.
DOJ-USAO
U.S. Department Of Justice
400 North Tampa Street, Suite 3200
Tampa, FL 33602
(813) 274-6370
**michael.gordon3@usdoj.gov**


_____/s/_____
John M. Pierce, Esq.