```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2     - - - - - - - - - - - - - - - - x
       THE UNITED STATES OF AMERICA,
 3                                          Criminal Action No.
                         Plaintiff,         1:21-cr-623-CRC-2
 4                                          Thursday, June 8, 2023
       vs.                                  10:08 a.m.
 5
       KIRSTYN NIEMELA,
 6
                         Defendant.
 7     - - - - - - - - - - - - - - - - x
       _____
 8

 9                  TRANSCRIPT OF SENTENCING HEARING
             HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
10                   UNITED STATES DISTRICT JUDGE
       _____
11     APPEARANCES:
       For the United States:      MICHAEL MATTHEW GORDON, ESQ.
12                                 DOJ-USAO
                                   400 North Tampa Street, Suite 3200
13                                 Tampa, FL 33602
                                   (813) 274-6370
14
                                   JESSICA ARCO, ESQ.
15                                 U.S. DEPARTMENT OF JUSTICE
                                   950 Pennsylvania Avenue NW
16                                 Washington, DC 20530
                                   (202) 532-3867
17
       For the Defendant:          JOHN M. PIERCE, ESQ.
18                                 ROGER ROOTS, ESQ.
                                   JOHN PIERCE LAW P.C.
19                                 21550 Oxnard Street
                                   Suite 3rd Floor OMB #172
20                                 Woodland Hills, CA 91367
                                   (213) 400-0725
21                                 jpierce@johnpiercelaw.com
                                   rroots@johnpiercelaw.com
22
       Court Reporter:             Lisa A. Moreira, RDR, CRR
23                                 Official Court Reporter
                                   U.S. Courthouse, Room 6718
24                                 333 Constitution Avenue, NW
                                   Washington, DC  20001
25                                 (202) 354-3187
```

```
 1                    P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  We're on the record for

 3    Criminal Case 21-6223, this is Defendant 2, United States of

 4    America vs. Kirstyn Niemela.

 5              Counsel please identify yourselves for the record

 6    starting with the government.

 7              MR. GORDON:  Good morning, Your Honor; Mike Gordon

 8    for the United States.

 9              THE COURT:  Good morning, Mr. Gordon.

10              MS. ARCO:  Good morning, Your Honor; Jessica Arco

11    for the United States.

12              THE COURT:  Ms. Arco.

13              MR. PIERCE:  Good morning, Your Honor.  Nice to

14    see you again.  John Pierce on behalf of defendant Kirstyn

15    Niemela, along with my co-counsel, Mr. Roger Roots.

16              I also wanted to say thank you to the Court

17    for accommodating my illness the other week and also

18    Ms. Niemela's work schedule with respect to the

19    videoconference.  So thank you very much for that.

20              THE COURT:  Okay.  Good morning, gentlemen.

21              Ms. Niemela, can you see and hear me?

22              THE DEFENDANT:  I can, Your Honor.

23              THE COURT:  All right.  So let me pick up where

24    Mr. Pierce just left off.

25              We received a waiver from you to -- a waiver of
```

1    your right to appear in person this morning.  We are

2    permitted under Rule 43 of the Federal Rules of Criminal

3    Procedure to do misdemeanor sentences remotely but only with

4    the written consent of the defendant.

5         I read your waiver, and you hand wrote after

6    waving your right to appear in person, "All rights reserved

7    and none waived."

8         Now, that could be interpreted as an ambiguity in

9    your waiver.  I take it you're not waiving any other rights

10   besides your right to appear in person; is that correct?

11        THE DEFENDANT:  Yes, sir.

12        THE COURT:  So do you unambiguously agree to waive

13   your right to appear in person and to appear by Zoom this

14   morning?

15        THE DEFENDANT:  I do, Your Honor.

16        THE COURT:  Okay.  Mr. Gordon, any concerns with

17   that?

18        MR. GORDON:  No, Your Honor.

19        THE COURT:  All right.  The Court has read the

20   submissions.  There have been a number of late-breaking

21   submissions by Mr. Pierce.  I have tried my best to review

22   everything that has been filed over the last day or so.

23   I've read the presentence investigation report, the memos

24   and supplements thereto filed by each side, and the

25   supporting exhibits.

1          I've also received letters on the defendant's

2     behalf from her mother, her sister, numerous of her friends,

3     several clients for whom she has worked, two of her nieces,

4     her brother, and a number of neighbors and other

5     acquaintances, including Mr. Hess, who, I take it, traveled

6     with her to D.C. on the 6th.

7          Any other written materials for the Court's

8     consideration?

9          MR. GORDON:  Your Honor, we did send an email --

10    the government sent an email to your clerk this morning

11    alerting Your Honor to two documents provided by the

12    defendant to government counsel yesterday afternoon.  One of

13    them is styled with the case caption and has a notation at

14    the top that says "Filed 6/7/23" in a manner that looks like

15    it is intended to mimic the markings that the clerk would

16    put on a document after it has been filed.  This is the so-

17    called notice of grievances against Assistant United States

18    Attorneys drafted, apparently, by Ms. Niemela.  By all

19    indication it has not actually been filed, even though it

20    says it has, or submitted to the clerk's office.  It's my

21    understanding that defense counsel is not adopting it or

22    filing it on her behalf.

23         I do think it raises some issues that we need to

24    address before we get into the meat of the sentencing

25    hearing, so I would like to confirm that Your Honor has

 1    received those materials from the government.

 2           THE COURT:  Yes, I've received the materials.

 3    They have not been filed on the docket, but they are fair

 4    game for the Court's consideration for purposes of the

 5    sentencing.  So do you want to be heard on those issues?

 6           MR. GORDON:  Well, I do, Your Honor.

 7           THE COURT:  Or do you want to wait until the

 8    3553(a) factors?

 9           MR. GORDON:  Well, I think they're actually

10    relevant as a preliminary issue and then separately within

11    the 3553(a) factors.  So I'm going to hold off on the

12    3553(a) application, but just addressing some things I think

13    we need to put on the record.

14           So in Ms. Niemela's sort of post-trial interview

15    with a YouTube person, personality, she expressed grievances

16    against the Court, against the jury pool, and against her

17    trial counsel, which she had -- and which she has

18    reiterated.  So to the extent -- I do not believe she has

19    expressed any grievances against sentencing counsel, so I

20    just want to make that perfectly clear for the record, that

21    I do not believe sentencing counsel -- that any of this

22    applies to sentencing counsel.

23           With respect to the notices that were filed, it's

24    my understanding that the D.C. bar does not require notice

25    from a complainant to lawyers that are being complained

1    against; that, in fact, the D.C. bar counsel or the D.C.

2    bar, the way it handles complaints is that it determines

3    whether or not there is a sufficient basis to launch an

4    investigation.  And if there is, at that point the D.C. bar

5    would notify the attorneys under investigation that they are

6    under investigation as a result of a complaint, and at that

7    point the complaint's made public.  There is apparently no

8    requirement that the complainant notify or file any kind of

9    notice.

10          As defense counsel shared via email -- as I shared

11   with the Court via email but now I'm putting on the record,

12   defense counsel has indicated that they did not draft these

13   documents, they did not consult with Ms. Niemela about them

14   before she emailed them to government counsel, and they have

15   not consulted with her about them afterwards.  So to the

16   extent that any of these issues become relevant later, I

17   think it's important to put them on the record.

18          Finally, I do think it's important to identify

19   what her three complaints are against government counsel.

20          The first is that we wrote in our sentencing

21   memorandum that Co-Defendant Stephanie Chiguer, actually in

22   the prior case that remains before Judge Mehta, was

23   scheduled for sentencing tomorrow.  Ms. Niemela asserts that

24   that is a false statement.

25          It is not, though the government does agree that

1    it does not appear on the public docket.  And if the Court

2    would like to go to a breakout room, we're happy to explain

3    why we can say definitively that sentencing is scheduled for

4    tomorrow, but it is not on the public docket.  I'm sure --

5               THE COURT:  That's not necessary.

6               MR. GORDON:  I assume the Court can infer it.

7               Secondly, she asserts that government counsel

8    violated rules of professional conduct when we provided

9    information to the grand jury and trial jury without, quote,

10   competent fact witnesses to testify regarding authenticated

11   evidence.

12              And finally, she cites a Rule of Criminal

13   Procedure and Professional Conduct to say that we should not

14   have filed opposition without good cause to her motion to

15   postpone sentencing.

16              So those are her complaints, Your Honor.  I'm not

17   asking the Court to take any action with respect to them.

18   It's not a matter before this Court.  Nor am I asking the

19   Court to weigh in.  But I think it's important to have made

20   the record of all of those events.

21              THE COURT:  Okay.  Mr. Pierce, I'm not going to

22   resolve the underlying complaint, and obviously it's -- I've

23   got enough to deal with, and this is not within my

24   jurisdiction.  But anything to add to what Mr. Gordon just

25   put on the record?

1          MR. PIERCE:  Yes, Your Honor.  I don't think it's

2     really -- you know, these things are really too relevant

3     here for this morning.  I just want to clarify one -- I just

4     want to make one factual correction to what Mr. Gordon says;

5     and he's not aware of this yet so it's not on him.

6          But subsequent to my email to Mr. Gordon this

7     morning that he references, we have had some attorney-client

8     privileged discussions with Ms. Niemela about this, but at

9     the time that I emailed Mr. Gordon this morning, you know,

10    it was accurate that I had not had any, you know, such

11    discussions.  I just wanted to make sure that was accurate.

12         So I'm not sure if Mr. Roots has anything to add

13    on this, but I agree, Your Honor.  I don't think this is

14    really, you know, terribly relevant for this morning's

15    purposes.

16         THE COURT:  Okay.  Who is handling the sentencing,

17    you or Mr. Roots?

18         MR. PIERCE:  Mr. Roots is, Your Honor.

19         MR. ROOTS:  Yes, I'll be making arguments about

20    the substance of the sentence.

21         I'll just say I agree with Mr. Pierce.  I don't

22    know the relevance.  I guess the government is asserting

23    lack of acceptance of responsibility.  We're not actually

24    seeking the two points for acceptance of responsibility, and

25    we do have -- we argue we've got some good arguments on

1    appeal that Ms. Niemela was not -- was not properly

2    convicted with regard to several of the counts, that there

3    just was insufficient evidence.

4           So to the extent that the prosecution is saying

5    that she's bitter or frustrated, you know, we don't even

6    contest that, and I think it's almost not a relevant -- I

7    would be bitter and frustrated.  I mean, so I don't think

8    that's really a relevant issue for this sentencing hearing.

9           THE COURT:  Okay.  Mr. Roots, you know, I'm happy

10   to allow you to handle the sentencing hearing, but let me

11   make a couple of observations.  Okay?

12          First of all, this is the second case in which

13   you've appeared on behalf of a defendant in my courtroom.  I

14   understand that you are involved in at least one other case

15   in the courthouse.  You know, our local rule permits counsel

16   from other jurisdictions to appear *pro hac*, but we ask the

17   question:  How many *pro hac*s have you filed and have been

18   granted?  Because for lawyers who practice regularly in this

19   court -- and there's no hard-and-fast cut-off as to what

20   "regularly" means; it's up to the judge -- we expect them to

21   join our bar.  So at some point, and I'll put you on notice,

22   you know, either I in another case or another one of my

23   colleagues is going to require you to join this bar and to

24   go through that process.  Okay?  So just put that in your

25   hat.  Okay?

1          Second, we were all here in person last week,

2     Mr. Pierce, and we postponed that -- including the defendant

3     and all of her family -- and we were not able to go forward

4     with that because you had a health condition.  Now we have

5     Mr. Roots.

6          Why couldn't Mr. Roots have stood in -- if he's

7     going to handle this this week, why couldn't he have handled

8     this last week and avoided this entire disruption and folks

9     traveling from New Hampshire to come down here?

10         MR. PIERCE:  Well, I mean -- well, the -- I mean,

11    the direct answer is, Your Honor, he was -- you know, he

12    came in, really honestly, at the very, very, very last

13    minute.  And, number one, he was not -- we had not submitted

14    any PHV at that time because we did not anticipate that this

15    would come up, and so I was anticipating doing it, and then,

16    you know --

17         THE COURT:  Well, if you were prepared to do it

18    last week, why aren't you doing it now?

19         MR. PIERCE:  Well, Your Honor, I mean -- I mean,

20    as I've probably, you know, said to numerous courts -- you

21    know, sometimes we probably don't get much sympathy -- we

22    have -- we have so, so, so much going on that we often have

23    to sort of, you know, put resources where things, you know,

24    come up right away, and --

25         THE COURT:  Well, I assume, when you had to go to

1    the emergency room last week, that was unexpected, and that

2    you had fully prepared for this sentencing last week.

3              MR. PIERCE:  Well, I mean, everything, of course,

4    is relative.  I mean, I prepared as much as I could, and I

5    was prepared to go forward.

6              I mean, now -- you know, I mean, for today we've

7    had Mr. Roots really preparing.  I mean, that -- I'm not

8    trying to prevaricate, Your Honor.  I apologize for

9    anything.  But that's -- you know, I mean, we're honestly --

10             THE COURT:  I think both of you get my point.  All

11   right?

12             MR. PIERCE:  Yes, Your Honor.

13             THE COURT:  All right.  Let's start -- with that

14   out of the way, let's start with the factual findings in the

15   presentence investigation report.  There were no objections

16   to the factual findings -- let's put the criminal history

17   and prior convictions to the side -- regarding the

18   circumstances of the offense.  The factual section from the

19   PSR is drawn mostly from trial evidence.

20             You know, are there -- Mr. Pierce, or I suppose

21   Mr. Roots, are there objections to the factual narrative

22   regarding the circumstances of this offense?

23             MR. ROOTS:  If I could address that?  I'll just

24   say I do believe we do object to a lot of -- a lot of it

25   seems to be taken from the complaint and the indictment in

1    the case.  We are going through the transcript of the trial,

2    and we don't actually see a lot of evidence that was

3    submitted on the transcript indicating individualized

4    involvement in crime.

5              Granted, for Ms. Niemela, you know, there was an

6    alarm going off, and so the entry and remaining in an

7    unauthorized area count, you know, there may be factual

8    support for that, at least if the jury determined that the

9    alarm going off was evidence of that.

10             Then there's these other counts, the disorderly

11   conduct counts and the picketing and parading, and our

12   review of the transcript thus far does not indicate she

13   picketed or paraded.  She did not yell.  She did not shout.

14   So we actually -- I think we do contest at least the tone

15   and the tenor of those allegations, and we think the jury

16   may have found guilt on those three counts that was

17   unwarranted.

18             THE COURT:  All right.  I sat through the trial.

19   I heard the evidence.  I read the facts presented in the

20   presentence report and find that they are generally

21   consistent with the trial evidence, and I have not -- I

22   didn't get any post-trial motions challenging the

23   sufficiency of the evidence, at least not yet, and so I

24   would not have granted any such motion based on my

25   recollection of the trial evidence.

```
1              So the Court will accept the factual narrative in
2    the PSR for purposes of this sentencing.
3              Ms. Niemela, has Mr. Roots or Mr. Pierce reviewed
4    the presentence investigation report with you?
5              MR. ROOTS:  Yes, I think we've all been --
6              THE COURT:  I was asking her, sir.
7              Have they reviewed it with you?  Have you read it?
8              THE DEFENDANT:  I read it after the due date.  I'm
9    not really sure.  I feel like I got more than one report so
10   I'm a little confused on some of them.
11             THE COURT:  Okay.  But you have read the final
12   presentence report?
13             THE DEFENDANT:  Yes.  The one from Sherry Baker?
14             THE COURT:  Yes.
15             THE DEFENDANT:  Yes.
16             THE COURT:  And have you been satisfied with your
17   sentencing counsel thus far in the case?
18             THE DEFENDANT:  I'm struggling with adequate
19   defense all the way around since the start of this, to be
20   honest with you.
21             THE COURT:  They've furnished you the presentence
22   investigation report and have been able to answer your
23   questions about it?
24             THE DEFENDANT:  Yes, sir.
25             THE COURT:  Okay.  Again, the Court will accept
```

1    the factual findings in the PSR regarding the circumstances

2    of the offense; and therefore those facts, as stated, will

3    be adopted by the Court for purposes of sentencing.

4           All right.  Let's move to the calculation of the

5    guidelines range.

6           There were four counts of conviction.  Two of them

7    are subject to the guidelines as Class A misdemeanors, so

8    Count 3, the entering and remaining in the restricted

9    building count in violation of 1752(a)(1), and Count 4,

10    disorderly and disruptive conduct in a restricted building

11    and grounds in violation of 1752(a)(2).  The remaining two

12    counts are not subject to the guidelines as Class B

13    misdemeanors.

14           Under Guideline Section 3D1.2(b), probation

15    grouped the two 1752(a) offenses because they involved the

16    same victim, namely Congress, and because two or more of the

17    underlying acts were connected by a common objective or

18    plan.

19           For those two grouped counts, the probation office

20    supplied the guideline for obstruction of justice found at

21    Guidelines Section 2A2.4 because that had the highest base

22    offense level, which was 10.

23           The other count that was subject to the

24    guidelines, the 1752(a)(1) count, the probation office found

25    that the trespass guideline at Section 2B2.3 applied, and

1    that has a base offense level of 4.

2         Under the grouping analysis, probation applied the

3    guideline with the highest base offense level, which was 10.

4    There were no specific offense enhancements.  There were no

5    role reductions.  There was no acceptance of responsibility

6    reduction because Ms. Niemela chose to go to trial.  That

7    led to an adjusted offense level of 10.

8         Ms. Niemela was assigned one criminal history

9    point based on a 2019 simple assault conviction in Nashua,

10   New Hampshire, at an establishment called Dolly Shakers,

11   which is terrific name and sounds like a pretty fun place.

12   But be that as it may, neither of her other adult

13   convictions were counted, and that led to a criminal history

14   category of 1.

15        At Offense Level 10, that resulted in an advisory

16   guideline range of 6 to 12 months.

17        Now, Mr. Pierce or Mr. Roots, I noticed in the

18   latest supplement to your sentencing memo you noted an

19   objection.  There were no objections filed to the draft

20   presentence report.  There was no objection, I don't

21   believe, to the base offense level in the initial sentencing

22   memos.  The morning of sentencing is not the time to raise

23   objections to offense levels or guidelines calculations, so

24   I believe you've waived that.

25        But, you know, obviously the Court has an

1    independent obligation to ensure that the guidelines

2    calculation is correct, so do you want to be heard briefly

3    on your objection to the Base Offense Level 10 or any other

4    aspect of the calculation?

5            MR. ROOTS:  Yes.  I'll just say ironically it's

6    the other case, the *Alberts* case, which we had before you,

7    Judge, and we just encountered the same issue where the

8    probation office appears to be wrongly giving ten points to

9    disorderly conduct and suggesting that because the

10   guidelines don't have a specific baseline, base offense

11   level for disorderly conduct, that they then look to the

12   base level for opposing and resisting officers, ten points.

13           Now, that actually is a felony baseline.  That

14   does not apply to this.  This is a misdemeanor, Class A

15   misdemeanor.  And there's no evidence in the record and

16   nothing in the indictment, the charging instruments, that

17   she opposed or resisted officers.  It just absolutely does

18   not apply.

19           And, again, that's a felony application that the

20   probation office is -- but they're also doing it in the

21   *Alberts* case, which actually led me to investigate this.  It

22   just does not apply.

23           For Class A misdemeanors, the U.S. Sentencing

24   Guidelines -- and I think there's a footnote put in there in

25   what was filed today -- is six points.  If there is

1     absolutely no designated similar offense in the guidelines,

2     it's six points.  And I --

3                    THE COURT:  Where is that?

4                    MR. ROOTS:  I believe it's in a footnote of what

5     we just filed this morning.

6                    For Class A misdemeanors without an assimilated

7     charge -- in other words, where a Court can find no

8     comparables -- it's six points --

9                    THE COURT:  Well, the question is what is the most

10    analogous guideline to the --

11                   MR. ROOTS:  Yes, and there's another thing --

12                   THE COURT:  -- to the disorderly and disruptive

13    count.  Is it trespass, or is it the obstruction guideline

14    that probation applies?  And tell me why one is more

15    analogous than the other.

16                   MR. ROOTS:  Well, I would say in this case

17    specifically there is no evidence of opposing or

18    resisting -- no contact with officers.  No yelling at

19    officers.  No threatening officers.

20                   THE COURT:  Well, you don't have to contact

21    or threaten in order to obstruct, right?  And there's

22    evidence -- and I'm sure Mr. Gordon will point this out --

23    that she crossed three different police lines, and he will

24    remind me how close she was to those lines when she did that

25    and what effect it had.

1          Whether that was the crime charged or not, the

2     question is whether the evidence supports the application of

3     one guideline or another.

4          So, Mr. Gordon, why don't you pipe in.

5          MR. GORDON:  Thank you, Your Honor.

6          So, first, Mr. Roots is sort of wrong as a

7     matter of basic reading comprehension.  So on Appendix A of

8     the guidelines, there is an index that lists for every

9     statute -- or actually, that's the point, not for every

10    statute, for most statutes -- what the applicable guideline

11    is.  And then there are some statutes that are not addressed

12    in the guideline, and that's where the catch-all provision

13    that Mr. Roots is referencing comes into play.

14         Here, Page 567 of the 2021 guidelines manual is

15    that index, and it shows that for convictions under 18 USC

16    1752, which is the statute that comprises Count 1 and Count

17    2 in this case, the applicable guideline is 2A2.4 and 2B2.3.

18         So the guidelines expressly designate the

19    applicable base offense level for Ms. Niemela's offense as

20    the one probation applied.  There isn't --

21         THE COURT:  Well, but those two provisions, those

22    two sections of the guidelines, have two different base

23    offense levels.

24         MR. GORDON:  Yes, Your Honor.

25         THE COURT:  So how does probation know which one

1     to apply?

2              MR. GORDON:  Because 2A2.4 has to do -- it's

3     basically under the assault or forcible resistance set of

4     guidelines.  Right?  That's where that falls under.  Whereas

5     2B2.3 is a lesser conduct that does not rise to the level

6     of, you know, forcible contact with officers, but instead

7     conduct that is otherwise disorderly or disruptive to

8     officers.  So that's --

9              THE COURT:  But if I find that her conduct did not

10    involve forcible interaction with others, can I nonetheless

11    apply the guideline at 2B2 -- 2A2.4?

12             MR. GORDON:  Well, yes, Your Honor, you can

13    anyway.  Because if you look at the text of 2A2.4

14    specifically, and I'll pull that up to read from it here --

15    or I will as soon as my network complies.  There we go.

16             So 2A2.4, obstructing or impeding officers, has a

17    specific offense characteristic and enhancement if the

18    offense involved physical contact or enhancement if a

19    dangerous weapon was involved or an enhancement if there was

20    bodily injury.  Thus, those are not required as elements of

21    the application of that guideline.

22             Here --

23             THE COURT:  What required probation to apply 2A2.4

24    based on a conviction of 1752(a)(2)?

25             MR. GORDON:  Because in this case Ms. Niemela was

1    part of three separate breaches of police lines within the

2    Capitol when the officers were trying to first block rioters

3    from further progressing and then trying to clear rioters

4    from the Capitol.

5              THE COURT:  Okay.  So let me just interrupt you.

6    So the conviction itself, under that statute, does not

7    require the application of 2A2.4.  What requires it is her

8    offense conduct, which may not qualify for an enhancement

9    but the sort of heartland conduct involved breaching the

10   police lines.

11             MR. GORDON:  Correct, Your Honor.  The same

12   offense conduct that we've already, in the previous section

13   of this hearing, accepted as established in the PSR.

14             THE COURT:  Okay.

15             All right.  Very quickly, Mr. Roots, last word.

16             MR. ROOTS:  Yes.  Well, there is no -- we're

17   looking for the transcript -- through the transcript of

18   these three breaches.  I don't believe that's -- from my

19   reading thus far, I don't see evidence that she breached --

20   the most the prosecution has said -- in places they say that

21   she moved to the front.  Well, short people move to the

22   front.  If you look at a group photograph, short people move

23   to the front.  That just absolutely is so far away from

24   resisting or opposing officers.

25             There's no evidence in the record -- and by the

1     way, going back to just the categorization of the charge

2     called disorderly conduct in an unauthorized area, that

3     statute and subsection apply to things like having your

4     music too loud, you know, sitting when you should be

5     standing, or standing when you should be sitting.  There's

6     nothing in there that's even remotely connected to opposing

7     or resisting officers.

8                THE COURT:  Okay.  Again, the Court sat through

9     the trial.  Particularly the video evidence that the

10    government displayed numerous times is consistent with the

11    characterization that she, perhaps not at the very front of

12    the line, was part of a group that breached three different

13    police lines and supports the application of the probation

14    office's chosen guideline at 2A2.4.  The Court, therefore,

15    finds that the probation office has correctly calculated the

16    range, which is Level 10 at Criminal History Category 1, at

17    6 to 12 months.

18                All right.

19                MR. ROOTS:  Could I make --

20                THE COURT:  Your objection is noted.  Your

21    objection is noted for the record, Mr. Roots.

22                And, Mr. Gordon, the government has objected to

23    the sequencing of the grouping analysis.  This has come up

24    in a number of cases.  It doesn't affect the calculation,

25    and so I'm not going to address it, but I have sort of

1    counseled the U.S. Attorney's Office and probation to,

2    perhaps, consult with the Sentencing Commission and come to

3    ground on the proper sequencing of the grouping analysis so

4    that we don't have to waste paper in further cases.  And I

5    would just reiterate that here.

6              MR. GORDON:  Yes, Your Honor.

7              THE COURT:  All right.  So probation has made a

8    recommendation of eight months imprisonment, which is

9    squarely within the guidelines range that the Court has now

10   calculated, plus 12 months of supervised release as to

11   Counts 3 and 4, and six months concurrent on the two

12   nonguidelines counts.

13             The government has recommended 12 months and one

14   year supervised release, $500 restitution, $70 in special

15   assessment, and a $3,672 fine.  I assume you will let me

16   know why you got to that particular figure, so that's a good

17   segue to the 3553(a) factors, Mr. Gordon.

18             MR. GORDON:  Yes, Your Honor.

19             So I'd like to start with the defense's contention

20   that this is just, as they call it over and over again, a

21   mere trespass.  That's not what this case is.  That's not

22   what any of the January 6th cases are.

23             This is not akin to jumping over your neighbor's

24   fence to retrieve a ball that your kid accidentally threw

25   over it.  This is not reentering a store after the owner

1     told you you were not allowed to go back in and receiving a

2     trespass notice.  Those are also misdemeanor trespass

3     offenses.  They bear no resemblance to the defendant's

4     conduct on this day, nor its impact.

5           Those kinds of offenses don't force Congress to

6     halt the certification of an Electoral College vote, fear

7     for their lives, evacuate the building, or take shelter in

8     place.  They don't cause interruption to the peaceful

9     transfer of power that's the bedrock of our democracy.

10          Ms. Niemela's actions did that.

11          Now, not alone.  She was one of the thousand

12    rioters who entered the building.  But the fact that she was

13    not among the worst of them, the fact that she did not

14    herself assault police or steal things or vandalize things,

15    none of that is mitigated.  If she had done those things,

16    she would have been charged with those things, and we would

17    be having an entirely different sentencing proceeding.

18          The government's recommendation -- which, Your

19    Honor, I believe, is 11 months, not 12 -- the government's

20    recommendation is not based on what anyone else did.  It's

21    based on what she did, and it's based on the impact that she

22    has of not accepting responsibility, of going to trial, and

23    of losing the three points for acceptance that she would

24    have gotten had she, you know, chosen a different path.

25          So I know Your Honor sat through the trial.  I

1    know that you heard all the witness testimony.  I know you

2    saw the exhibits.  So I'm not going to sort of redo my

3    closing argument now.

4         But I do want to highlight, as you mentioned a few

5    minutes earlier, this defendant was part of three separate

6    breaches of police lines.  But before even we get to that,

7    there's the matter of her entrance.

8         She entered the Capitol early on.  Right?  Just

9    about 11 minutes after the first breach of the Senate Wing

10   Doors.  And as she did show, there were broken windows on

11   either side that rioters were climbing through.  There was

12   broken glass in the Senate Wing Door itself that she walked

13   through.  And the video shows there were loud alarms

14   blaring.  Right?  There can be no suggestion that she had --

15   that she thought she was allowed in.

16        Counsel -- trial counsel tried to make that

17   argument.  The jury rejected it.

18        Not only that, but within minutes of entering --

19   actually, within one minute of entering, she responded to a

20   Tweet where the author wrote, "Breaking:  Trump supporters

21   have breached the Capitol building, tearing down four layers

22   of security fencing and are attempting to occupy the

23   building, fighting federal police who are overrun.  This is

24   the craziest thing I've ever seen in my life.  Thousands.

25   Police can't stop them."  This is Government Exhibit 822.

1          And as established by the timing, the metadata,

2     she responded to that with her own video, which we were not

3     able to recover, within one minute of entering the Capitol

4     building.

5          So she knew exactly what she was doing, and there

6     can be no doubt about what her purpose was due to her own

7     social media, text messages, and conversations with others

8     in the days leading up to January 6th.

9          Ms. Niemela has gone on, you know, at least one

10    YouTube interview after trial and argued that the government

11    is trying to punish her for First Amendment protected

12    speech.

13         I know Your Honor knows that as a matter of law

14    that's wrong.  It's, unfortunately, a view of the First

15    Amendment that many people hold incorrectly because they

16    don't understand it.

17         The government here isn't punishing Ms. Niemela

18    for what she said.  She was convicted because of what she

19    did.  And the things she said are relevant, they were

20    admissible, because they provide a window into what she was

21    thinking when she did them.  That's evidence of intent, an

22    important element.

23         So your speech -- partly I'm speaking to

24    Ms. Niemela here and anybody who fortunately is listening --

25    your speech is not in some isolated silo that the government

1    can't ever look at or use.  If your speech is indicative or

2    a window into or expresses your intent, then it will

3    absolutely and can be used against you, and it's not

4    violative of the First Amendment to do it.

5            Here Ms. Niemela provided that kind of evidence

6    against herself.

7            So what did she do once she got into the Capitol?

8            First, she went down to the Crypt.  There she

9    encountered a line of police officers who had spread across

10   the sort of middle of the Crypt; only about seven, eight,

11   maybe ten total officers, far too few to block that area.

12   Immediately overwhelmed.  And these officers, for a very

13   short amount of time, had blocked the rioters from further

14   penetrating.

15           But then other rioters -- not Ms. Niemela --

16   crashed through that police line.  Admittedly, she was

17   nowhere near the front of that.  Right?  She was many rows

18   back from the front.

19           She is not one of the ones herself who pushed

20   through or caused the brief breach, but she took advantage

21   of it, and as sort of some of your colleagues have expressed

22   in their own sentencing hearings, the strength of the mob on

23   January 6th was in its numbers.  That was its power.  It was

24   the officers' inability to block such a massive block of

25   people when they were so massively outnumbered, and so they

1    didn't.

2              Could officers have, you know, pulled out a weapon

3    and fired a shot in the air?  Maybe.

4              Would have that scared rioters into dispersing?

5    Maybe.

6              But there are extraordinary risks with doing that,

7    including that none of these people had gone through any

8    kind of security screening or metal detectors.  Police had

9    no idea who might have been armed in that crowd and with

10   what.

11             And although there was no sort of conference among

12   the officers, no chance to huddle up and discuss, no

13   briefing from their supervisors, every single one of those

14   officers in the Crypt made the decision not to use their

15   weapons because they knew that doing so could have

16   exacerbated the conflict.

17             So when the rioters started pushing through, the

18   officers didn't really have much option other than to yield,

19   which they did.

20             Ms. Niemela took advantage of that breach and

21   progressed further.

22             From there she made her way to the next area,

23   which was outside of the Memorial Doors.  Here she pushed up

24   toward the front where her co-defendant, Michael Eckerman,

25   was in the very, very front of that line.  Your Honor has

1    already sentenced Mr. Eckerman, and you've already watched

2    the video of his conduct sort of frame by frame in our

3    prior sentencing hearing; and so I'm sure you'll remember

4    Mr. Eckerman was one who pushed an officer in the shoulder

5    causing that officer to tumble down the stairs and then be

6    sprayed with a fire extinguisher.  And when that breach of

7    the police line happened, the rioters streamed through.

8           At that moment Ms. Niemela was sort of --

9           THE COURT:  Just let me interrupt you.  I think

10   there -- he pushed him.  I think there was a factual dispute

11   as to whether he tumbled down the stairs, but...

12          MR. GORDON:  That's right, Your Honor.  The

13   government's interpretation of the video evidence and the

14   statement of the officer is that he did tumble down the

15   stairs.

16          I recognize that the video is less than sort of

17   perfectly clear on that point, but that is what the officer

18   says happened to him, and the video does not contradict

19   that.

20          At that moment, when Mr. Eckerman did that,

21   Ms. Chiguer was holding onto Mr. Eckerman's backpack.  She

22   was standing right behind him, and Ms. Niemela was right

23   behind Ms. Chiguer.  I think the three of them were at the

24   very front with Eckerman in front.

25          From there, when that breach happened, they

1    charged up the stairs.  And this is one of the moments where

2    the rioters first gained access to the next floor of the

3    Capitol.  This was a really important breach.  Right?

4         Each of these moments, first the Crypt allowing

5    rioters to spread out through the Capitol, and then that

6    breach at the Memorial Doors that gave rioters access to the

7    stairway where they reached the main floor of the Capitol --

8    because that's the floor that the Rotunda is on.  That's the

9    floor that Speaker Pelosi's office is on.  Right?  That's

10   the floor that the House and Senate Chambers are on.

11        But that breach was a particularly important

12   moment in the riot.  And when it happened, Ms. Niemela was

13   right behind Chiguer and Eckerman following sort of a

14   column, and there they progressed up the stairs and made

15   their way just outside of the House Chamber.

16        At that moment a large number of members of the

17   House of Representatives and their staff were still in the

18   House.  They were being evacuated slowly.  There were -- you

19   know, there's -- remember, there's hundreds of members of

20   Congress in there, plus their staff, so they can't all get

21   out at once.

22        There are many members of Congress still in.

23   Their evacuation routes have been partly compromised to the

24   point where at that moment officers had used furniture

25   within the House Chamber to barricade the door and have

1    drawn their weapons and are pointing them at the door.  They

2    are anticipating a breach.  Some members of the House and

3    their staffs had taken sort of cover underneath benches or

4    desks.  Some worked frantically trying to call their

5    families, worried that they were about to die.  Some were

6    making make-shift weapons out of anything they could find.

7            That was one of the most critical and fraught and

8    dangerous moments in all of January 6th, and Ms. Niemela was

9    right towards the front of that mob outside the House

10   Chamber banding to get through.

11           At that point there were about eight officers.

12   Your Honor saw repeated video of that conflict, of where

13   Ms. Niemela was.  And as soon as rioters pushed through,

14   she, from either the second or the third row of those

15   rioters, followed suit.

16           It is, again, a minor miracle that no officers

17   fired shots in that area and that no one died and that a

18   massacre did not result.

19           Now, from there Ms. Niemela didn't exit the

20   building.  She continued through the hallways.  She passed a

21   clearly marked exit, and, instead, she posed for selfies

22   within the Rayburn Room.  Celebratory photographs.

23           Throughout the time inside the Capitol,

24   Ms. Niemela wore her sunglasses, and she kept her gaiter

25   pulled up over her face in an attempt, an obvious attempt,

1    to obscure her identity, something that she told her co-

2    defendant or urged her co-defendant to do, Ms. Chiguer,

3    repeatedly, well aware that there were cameras, that what

4    she was doing was wrong, and taking any effort she could to

5    obscure her face.

6           Obviously she's not somebody who is covering her

7    mouth out of any kind of COVID precaution.  She has, by all

8    accounts in all forums, including the incident at the

9    hospital, expressed over and over and over again, including

10   on social media, her disdain for masks, her belief that

11   COVID is largely a hoax, and her refusal to wear them

12   wherever possible.  This is not that she was protecting

13   herself from a virus.  She was attempting to protect herself

14   from being identified.

15          Then she exited the Capitol approximately -- after

16   spending approximately 20 minutes inside.

17          That's her conduct on January 6th.

18          But lest there be any suggestion that this was all

19   just completely out of left field for her, right, that she

20   never would have contemplated anything like this, her own

21   statements or her own social media posts or shares or

22   endorsements suggest otherwise.  The most important one from

23   there is Government Exhibit 818 where she shared a post by

24   another person who wrote, "I gotta say if I were a

25   Congressman called to D.C. on January 6th knowing every one

1      of the traitors are together at one location and there was

2      some one million pissed off patriots outside, I would be

3      rather nervous as to how I would safely exit the building.

4      Not a good situation."

5              The threat to harm politicians -- that is not even

6      implicit, that is explicit -- in that statement is

7      unmistakable, and it is chilling and actually endorsed by

8      Ms. Niemela in the week leading up to January 6th.

9              The fact that her conduct was endangering Congress

10     and halting the certification was not an accident, mistake.

11     It was not a, you know, ancillary problem of her behavior or

12     side effect.  It was the intended effect, and she achieved

13     it.

14             Arguments to the contrary were raised by the trial

15     counsel and quickly rejected by the jury.  I anticipate that

16     sentencing counsel will make the same arguments here.  Your

17     Honor should reject them just as the jury had.

18             But we're not here to relitigate the trial.

19     we're here to decide what the appropriate sentence is for

20     Ms. Niemela based on that conduct.

21             Now, guidelines put the range at 6 to 12 months

22     for this conduct.  Probation's recommended 8 months.  While

23     the government certainly respects probation's sort of

24     assessment, we think they've got it wrong here because the

25     recommendation that they've made does not account for Ms.

1    Niemela's past, does not account for her dangerousness in

2    the future, and it is not in line with the sentencing that

3    similarly situated defendants have received.

4              THE COURT:  Why don't I stop you there.

5              I've read the analogs that you presented in your

6    memo of misdemeanants who have gone on trial and been

7    convicted, and the ranges tend to be somewhere in the 4- to

8    12-month area.

9              Probation's recommendation is right in the

10   heartland of that range.

11             Why is she at the top end as opposed to the low or

12   middle end?

13             MR. GORDON:  Right.  Because the defendants who

14   got towards the lower end of that each had sort of

15   mitigating factors that did not have the kind of post-trial

16   conduct that she does or the kind of past that she does.

17             So first just dealing with her January 6th

18   conduct, those defendants didn't participate in three

19   separate breaches.  They weren't in the most -- some of the

20   most sensitive areas.  Right?  They were at most in one

21   breached area.  So her conduct within that range is at the

22   upper end of sort of the dangerousness and disorderly and

23   disruptiveness and, frankly, obstructing the officers in

24   multiple places at multiple times in multiple --

25             THE COURT:  And these are all cases that did not

1      involve felonies, where folks were not charged with assault

2      or violence or civil disorder or resisting officers or any

3      of the standard felony charges we see?

4                MR. GORDON:  Correct, Your Honor.  These are

5      people with the same situation as Ms. Niemela, charged only

6      with the standard for misdemeanors, chose to go to trial,

7      were convicted.  So she's part of that -- the universe of

8      six total people, including herself, who are in that

9      situation.

10               And I'll note, Your Honor, that, you know,

11     Ms. Niemela, of course, has every right to go to trial.

12     She's not in any way being sort of punished or her sentence

13     is not based on that right.  But this was folly on her part,

14     and we tried to express that to her.

15               Your Honor may not be aware that Ms. Arco and I

16     flew to New Hampshire once before trial and sat down with

17     Ms. Niemela, Mr. Garrity, and Mr. Monteith and conducted an

18     extensive reverse proffer with Ms. Niemela.  We were there

19     for hours.  We showed her probably 80 percent, if not more,

20     of the evidence that we ended up presenting at trial.

21     Right?  We showed her the impact of the guidelines about

22     pleading guilty.  We showed her the sentencing ranges that

23     people had received, you know, who had pled guilty and those

24     who had not.  We offered her a plea to the parading count.

25     Right?  The lowest charge.

1              She rejected all of that and chose to go to trial.

2              So be it.  Right?  She has every right to do that.

3              But it's important to understand -- and I think

4    it's going to come up in a second in my presentation -- it's

5    part and parcel of the rest of her mindset.

6              So going back, though, to the -- how she is

7    different than the other defendants who received perhaps

8    lower sentences, looking at Ms. Niemela's criminal history,

9    all right, her past.

10             Mr. Roots and Mr. Pierce are right about the

11   guidelines scoring, but they're wrong in their

12   understanding, in their mistaken belief that if something

13   does not receive points under the guidelines, that it is

14   beyond the Court's consideration at sentencing under the

15   3553(a) factors.  Mr. Pierce and Mr. Roots seem to be

16   completely unaware of the interaction between those two

17   things and how they are distinct.

18             Remarkably, in their own sentencing memorandum

19   they cite the Supreme Court case that establishes that,

20   which I'll point the Court to *Nichols v. United States*, 511

21   U.S. 738, showing that district courts have traditionally

22   considered defendant's prior criminal conduct even when the

23   conduct did not result in conviction.  And that's the

24   situation for Ms. Niemela here.

25             This is not her first run-in with the police.

1          THE COURT:  As a matter of fact, the Court can

2    consider acquitted conduct even if a defendant goes to trial

3    and is acquitted by a jury; the Court is not precluded from

4    considering that case or that conduct.

5          MR. GORDON:  Exactly, Your Honor.  And partly

6    because the standard here at sentencing is different, right?

7    We're dealing with preponderance of the evidence and not

8    beyond a reasonable doubt, and we don't have to relitigate

9    underlying cases from other courts at other times.

10         So Ms. Niemela's history here shows a concerning

11   pattern.  Right?  She is by all accounts a heavy drinker.

12   She is somebody who, when she drinks or otherwise, is known

13   to be violent.  Her co-defendant -- her prior co-defendant,

14   now separately charged defendant, Stephanie Chiguer, with

15   whom she was formerly in a relationship, once had to get a

16   restraining order against Ms. Niemela due to that violence

17   and did so.

18         Ms. Niemela has obstructed police previously given

19   the incident in the hospital where she was outraged about

20   being asked to wear a mask, in a hospital no less, during

21   the height of COVID.

22         So she has demonstrated disrespect for the law

23   previously, and these factors are relevant, and they're

24   different from the lower level -- not lower level, the

25   defendants who received lesser sentences who are similarly

1    situated to her because they speak to her likelihood of

2    reoffending.  Right?  They speak to the need for specific

3    deterrence.

4          And the same thing comes up with her post-trial

5    conduct.  Obviously the ship has long since sailed for

6    Ms. Niemela to receive acceptance of responsibility under

7    the guidelines, but perhaps, and as many defendants do, she

8    can express remorse to the Court today and therefore ask for

9    leniency under sort of a longer version of "I promise I'll

10   never do anything like this again; I am sorry and humbled by

11   what I did."

12         If Ms. Niemela were to say something like that

13   today -- and I don't expect that she will -- it would be

14   inconsistent with everything she has said in every available

15   forum before, during, and after her trial.

16         Ms. Niemela has been, to the contrary, absolutely

17   insistent that she did nothing wrong, that the system has

18   been rigged against her from the start.  Everything is

19   someone else's fault but hers.  Donald Trump didn't lose the

20   election; it was rigged.  Members of the Trump supporters

21   are not responsible for January 6th; it was Antifa.  It was

22   the police's fault for letting them in or not acting

23   differently.  It was Speaker Pelosi's fault for not having

24   ordered more guards to be present in the Capitol.  She

25   wasn't properly found guilty.  Your Honor was unfair.  The

1    jury was unfair.  The prosecutors were unethical, which

2    brings us to her, you know, so-called notice of grievances

3    that she provided yesterday.  It's always someone else's

4    fault, never hers.

5            She's never satisfied with defense counsel,

6    including apparently she has misgivings about sentencing

7    counsel now because they don't tell her what she wants to

8    hear.  Right?  They don't tell her that she's blameless.

9            In trying to take retaliatory action against

10   prosecutors on her case, which is what she's doing here, not

11   only is she further demonstrating her lack of remorse or any

12   semblance of acceptance of the fact that she is to blame for

13   her criminal conduct on January 6th, but it's also

14   concerning that she tried to essentially fake or imitate the

15   headers that would come on a properly filed document and

16   wrote "Filed 6/7/23" on the notice that she so-called

17   provided.

18           Ms. Niemela, at every stage, is doing the opposite

19   of demonstrating a sort of changed perspective.  She gives

20   no suggestion that she will not do the exact same thing if

21   the situation presented itself.

22           So, Your Honor, looking at all of these factors,

23   we're not seeking the top end of the guidelines of the

24   available sentence.  Right?  We're not seeking 12 months,

25   which is what one of her similarly situated people received.

1    We're not asking for that.  And we're not asking for

2    consecutive sentences, which we could ask for.  All right?

3    So we're not asking for the top.

4           We're asking for her to receive 11 months in jail,

5    which would be one month less than Alberts [sic] received,

6    followed by 12 months of supervision.  We feel at the end of

7    that supervision period we think the Court should order her

8    to seek a mental health evaluation or treatment as needed or

9    as recommended by probation.

10          We're also asking Your Honor to, as a condition of

11   her release, you know, forbid contact with Stephanie Chiguer

12   for the duration of her supervision period as well as to

13   forbid her from --

14          THE COURT:  I'm sorry, is that a request that

15   Ms. Chiguer has made, or is that a unilateral request by the

16   government?

17          MR. GORDON:  It is a unilateral request from the

18   government based on our conversations with Ms. Chiguer and

19   her counsel.  We have not -- we did not ask specifically

20   about this point, but Ms. Chiguer has expressed that she is

21   physically fearful of Ms. Niemela, and they continue to live

22   in the same community.

23          Ms. Niemela, I believe, believes that Ms. Chiguer

24   may have helped the government in some manner against her,

25   and therefore may wish to retaliate or harass Ms. Chiguer in

1   some manner.

2           MR. ROOTS:  Your Honor, we would just object to

3   all of this discussion.  We haven't been able to cross-

4   examine --

5           THE COURT:  You'll get a chance, okay?

6           MR. GORDON:  And as part of that, we'd also ask

7   that she be prohibited from directing anyone else to contact

8   Ms. Chiguer on her behalf.

9           Your Honor, I'm not trying to present Ms. Niemela

10  as if she is one of the worst of the worst of the January

11  6th.  She isn't.  Right?  She isn't.  There were hundreds --

12  there have been hundreds of people charged with assaulting

13  federal officers.  She was not one of them.

14          But amongst those only charged with the

15  misdemeanors, right, that's a universe of approximately --

16  if I look at the number, it's approximately 312 defendants,

17  about a third of the people charged so far.  Within that

18  312, 285 of them -- right? --  have been sentenced to

19  parading charges, meaning that they were offered that plea

20  and accepted it.

21          THE COURT:  I'm sorry, two hundred and what?

22          MR. GORDON:  285 for parading have been sentenced.

23          THE COURT:  Out of 312?

24          MR. GORDON:  Uh-huh.  Of those misdemeanor

25  defendants, 48 of them were offered pleas to 1752(a)(1),

1    Count 1 in this case.  Okay?

2          Looking at those defendants -- so those are not of

3    the five that went to trial who were convicted of the top

4    charge; these are people who pled to this as the top

5    charge -- those people received sentences that have ranged

6    from, you know, seven months in jail all the way down to two

7    months of probation.  But only 14 of those people received

8    probation alone, which is what the defense is requesting.

9          THE COURT:  Well, if you thought that her conduct

10   was at the high end of misdemeanant defendants, why did you

11   offer her the Class B misdemeanor as opposed to the Class A

12   misdemeanor?

13         MR. GORDON:  That's a good question, Your Honor.

14         We did it because at the time we were -- frankly,

15   it's a resources issue.  At the time we were dealing with

16   these cases was in the sort of height of the Department of

17   Justice charging and trying to move cases and having sort of

18   a limited capacity to handle these.  So relevant to --

19   relative to misdemeanor defendants, she's at the high end.

20   Relative to January 6th defendants, she was towards the low

21   end.

22         So any of those cases that we could resolve,

23   we were trying to resolve.  And we were trying to give

24   Ms. Niemela sort of the best benefit of the doubt we

25   possibly could.  So we made her the best offer we could.

1          And we expressed that to her.  We expressed that

2     to her in the reverse proffer, that this was a sweetheart

3     offer, that we would not sort of take a similar approach at

4     sentencing.  We previewed that as not how we would argue

5     this case where we are today.

6          Ms. Niemela is one of the worst misdemeanant-only

7     defendants.  And, frankly, I have some regret personally

8     that we did not charge her with the 1512 based on her social

9     media posts.  But we didn't.  And so the Court shouldn't

10    consider that or sentence her accordingly.

11         But just in terms of, you know, squaring with the

12    Court about how I view this case, that's how I view it.  I

13    think it's at the -- it would be at the lowest end of 1512

14    cases, the high end of misdemeanors, and so erring on the

15    side of leniency essentially.  But that's where we are.

16         THE COURT:  And how did you come up with the fine

17    number?

18         MR. GORDON:  The fine number, Your Honor, comes

19    from Ms. Niemela's GiveSendGo fundraising.  So this is a

20    common avenue that defendants have used to try to raise

21    funds, you know, crowd source funds nationwide.

22         Ms. Niemela created or her mother on her behalf

23    created a GiveSendGo website and in it makes an appeal based

24    on January 6th.  It portrays Ms. Niemela as being wrongfully

25    and politically persecuted, and sort of bemoans the cost

1    that Ms. Niemela has incurred as a result of going to trial,

2    specifically buying new clothes for trial, hotel expenses

3    for trial, travel expenses for trial, et cetera, and asks

4    people to contribute money to that account.

5            At the time we filed the sentencing memorandum, it

6    had the number that's in it.  Ms. Niemela -- people have

7    since contributed more money, so at the time the PSR was

8    filed, which was after our sentencing memorandum, that

9    number was up to $5,466.  And I can -- I'm actually going to

10   access it now as we're here and see what it is currently.

11           The key here is that Ms. Niemela's appeal sort of

12   cites, you know, unidentified legal expenses and then also

13   personal expenses like those I described.

14           Mr. Pierce has largely on, you know, Twitter --

15   largely on Twitter and other places has advertised his

16   willingness to take cases of January 6th for free

17   essentially and then has fundraised on the back of that

18   reputation.

19           I don't know what the fee arrangement here is

20   given that Mr. Pierce and Mr. Roots have been retained for

21   sentencing, and it's obviously not my place to inquire, and

22   so I don't -- I'm not seeking to do so.  It is possible that

23   they have the same arrangement with Ms. Niemela that they

24   have with other defendants where they've taken the case for

25   free and fundraising as a result of it, and that's how

1        they're getting paid.  It's possible she's paying them some

2        of this money.

3                Regardless, she does cite as part of the appeal

4        the need to reimburse her for personal expenses, including

5        lost income, as a result of -- you know, as a result of her

6        involvement here.  And so the Court should not allow her to

7        profit financially from her conduct on January 6th.  Any

8        dollar she pockets for fundraising -- not that she doesn't

9        give to her lawyer, that she pockets -- she'll reimburse

10       herself for expenses or make up for lost income or anything

11       else as a result of her participation here and appealing to

12       the public as her page is titled "Support for J6 Freedom

13       Fighter," the Court should take that from her.  Not only for

14       that reason, but --

15               THE COURT:  Well, I hear your point, but, you

16       know, for instance, reimbursing her travel costs from New

17       Hampshire or her hotels, that's not profiting, is it?

18               MR. GORDON:  I mean, not in the business sense in

19       that you would sort of look at a spreadsheet and identify

20       something as, you know, revenues versus profits, but in the

21       sense that she is getting that money based on an appeal that

22       she has done nothing wrong and is being politically

23       persecuted.  That's her pitch to donators.  And so that is

24       profiting.  That is money that she would have had to expend

25       by her own choice, and getting reimbursed for it on that

1    appeal is wrong.

2              Additionally, she had court-appointed counsel for

3    trial.  Right?  The government paid for her lawyers.  So the

4    government should be reimbursed by her, then, for the money

5    that she is raising to pay for her legal defense, if that's

6    the idea, for trial defense, not for sentencing.  Sentencing

7    is separate.  Right?

8              But that's not what her -- you know, part of what

9    her pitch is now is for past expenses and part of it is for

10   current expenses.  I don't know how to parse that number --

11   right? -- without, you know, further examination of

12   financial records.  It does say she now has to figure out a

13   way to come up with the funds necessary to retain a private

14   attorney who will actually fight for her, specifically

15   through filing an effective appeal and representing her at

16   sentencing.

17             We don't dispute that any funds raised to pay

18   Mr. Pierce and Mr. Roots are appropriate and that she should

19   keep.  But any funds raised for her trial counsel and her

20   own expenses should be clawed back.

21             THE COURT:  All right.  Anything else?

22             MR. GORDON:  No, Your Honor.  Thank you.

23             THE COURT:  All right.  Before I hear from

24   Mr. Roots, Ms. Jenkins, I know we have another matter at

25   11:00, which obviously we're not going to be able to get to.

1    Have we made arrangements to move that to the afternoon or

2    later?

3              THE COURTROOM DEPUTY:  I'm in communications now

4    with the parties, Your Honor.

5              THE COURT:  Okay.  See if they could appear after

6    lunch, 1:30 or 2:00.

7              THE COURTROOM DEPUTY:  I will let you know.

8              MR. GORDON:  I'm sorry, I just wanted to let you

9    know that the amount in the GiveSendGo as of today is

10   $5,466, 5-4-6-6.

11             THE COURT:  Okay.  Thank you.

12             Mr. Roots.

13             MR. ROOTS:  Thank you, Your Honor.  My laptop is

14   running on battery.  I may have to move during this

15   discussion to an outlet.

16             But let me just start by saying:  Where was the

17   picketing?  Where was the parading?  Where was the

18   disorderly conduct?

19             Ms. Niemela obviously entered the Capitol along

20   with hundreds of others, at least -- I honestly don't know

21   the number.  Scores of others.

22             As I said, in terms of whether there was

23   sufficient evidence for a jury to find unauthorized entry

24   and remaining, the counsel for the government pointed out,

25   you know, there were alarms going off.  There was broken

1    glass, everything the government said there, sufficient for

2    a jury -- for it to go to a jury, at least.

3          But in some ways the January 6th, you know, entry

4    into the Capitol building by all those hundreds of people is

5    a lot like a soccer field.  Like we've seen a baseball

6    field, football, where at the end of the game the crowd

7    rushes the field, and, you know, the first ten people who

8    rush the field, you know, in a soccer victory or something,

9    the first 10 or 20 or 50 or 100 people might be under the

10   understanding they're doing something wrong.  They're not

11   supposed to be on the field.

12         But what about the second hundred?  What about the

13   third hundred?

14         THE COURT:  Mr. Roots, let me interrupt you.

15   Okay?  The jury has spoken.  They have made findings beyond

16   a reasonable doubt that her conduct satisfied every element

17   of those four offenses.

18         So we're not here to argue a Rule 29 insufficiency

19   motion.  We're here for you to tell me why her conduct,

20   which violated those four statutes, does not merit the

21   sentence that the government has proposed and merits a

22   different sentence which you are recommending.  Okay?  So

23   let's stick to that.

24         MR. ROOTS:  Well, let me address that

25   specifically.

1      Counsel for the government said they flew to New

2  Hampshire and said they had this reverse proffer meeting

3  and -- you know, to try to convince her she was guilty of

4  picketing and parading.  I would say it's the honorable

5  thing to do -- for an American citizen, it is the honorable

6  thing to do, when you're sitting there scratching your head

7  saying, "Well, why would I plead guilty when I didn't picket

8  and I didn't parade?"

9      And understood, the jury -- the jury came in

10  otherwise.  Your Honor has ruled otherwise.

11      But putting yourself in the perspective of

12  Ms. Niemela at a reverse proffer session, it is the

13  honorable thing to do -- when you think you have valid

14  defenses, constitutional defenses, it is the honorable thing

15  to do to say, "No, I am not guilty of this.  I'm going to

16  trial."

17      And she should not be punished for rejecting a

18  plea to picketing and parading if, in her own good faith,

19  she decided that that did not apply to the facts of her

20  case, and she decided that she had a defense.  It is to her

21  honor.  She should be rewarded.  Americans should be

22  rewarded for saying, "No, I'm not pleading guilty to

23  something that I think I didn't commit."  Americans should

24  be honored, not punished.

25      You know, the government points to these social

1    media posts, things like where she observed things.  Trump

2    supporters breached four lines, quote, I'd be rather

3    nervous.  She shared that.  Didn't write that.  I would be

4    rather nervous, you know, if I were in Congress or

5    something.  She shared that.  She did not originate that.

6             So these are observations.  These were not her

7    intent.  This was not her state of mind.  She didn't say, "I

8    breached four lines."  She said, "Trump supporters breached

9    four lines."  No one should be punished for what they are

10   observing.

11            You know, they talk about how -- I've already made

12   the point she is a person of smaller stature, and short

13   people -- I'm one of them myself; I'm not a tall person --

14   we tend to go to the front because we want to see what's

15   going on.

16            She shouldn't be punished for what other people

17   do.  There's no evidence here that she, in any aggravated

18   sense, yelled, shouted, disturbed, jumped up and down.

19   Disorderly conduct at a minimum requires jumping up and

20   down.  She didn't even do that.  She should be at the very

21   lowest end of these ranges that we're discussing.

22            I want to briefly address this stuff about the

23   government trying to seize the very money -- the government

24   has vast resources.  Vast.  Millions and millions of

25   dollars.  Congress keeps giving them more money to prosecute

1     these cases.

2           Most of the -- Ms. Niemela is not a wealthy

3     person, and so she does what she has to do, which is reach

4     out, "Hey, can someone support me?"  Social media or on

5     GiveSendGo.  And she's raised a paltry sum.  And I will just

6     represent to the Court --

7           THE COURT:  Mr. Roots, am I correct that she

8     declined to cooperate with probation and did not submit a

9     financial disclosure or consent to probation to access her

10     financial information?

11           MR. ROOTS:  Yes, I do believe that's true, but --

12           THE COURT:  How am I to make a finding -- how am I

13     to make a finding, then, that she doesn't have the ability

14     to pay a fine?

15           MR. ROOTS:  Well, let's put it this way:

16     Probation can certainly analyze her job, her -- you know,

17     it's not -- I don't believe it's even in question that she's

18     not a rich person.  I don't believe that's even contested.

19           THE COURT:  Well, I'm not saying she's a rich

20     person.  I'm saying -- I'm not suggesting she's rich, but

21     the question is not whether she's rich or poor.  The

22     question is whether she has the ability to pay a fine,

23     including the fine that the government has proposed, which

24     is $3,500 or thereabouts.

25           MR. ROOTS:  I would say the government's not

1    suggesting that as a fine.  They are really suggesting it in

2    a way that is theft.  It is stealing from the defense.

3         So it's not restitution.  She didn't damage any

4    property.

5         They call it a fine, but what they're really doing

6    is trying to toll it specifically to the dollar amounts that

7    she has raised in her defense.  And I will submit those are

8    lower than her actual legal bill to us right now.  So she

9    isn't even able to pay her legal bills, and yet the

10   government just wants to take the money.

11        And this chills -- this chills advocacy.  It

12   chills defendants, all these January defendants.  When

13   donors are out there wanting to help, and they hear the

14   government just seizes and steals the money, this is

15   designed by the federal prosecutors to chill donations.

16        This is really outrageous, what the government is

17   trying to do here.  And I think the Court has to step in and

18   say, no, this cannot happen.  We cannot send a signal that

19   the American people cannot contribute to legal defense funds

20   for these people because the government just takes the

21   money.  This is so chilling, and it's just outrageous that

22   they're trying to do this.

23        I do want to say that she's also on a red flag --

24   sort of a no fly list.  Not a no fly list specifically, but

25   she has been placed without due process on a red flag list

 1    where she goes through extra security at airports.  We would

 2    like the Court to step in -- this is without due process --

 3    and issue an order for the FBI and the U.S. Attorney's

 4    Office to remove her.

 5            This is a misdemeanor case.  She should not have

 6    travel restrictions.

 7            THE COURT:  Just on that point, Mr. Roots, there's

 8    a process at the Department of Homeland Security that

 9    administers the no fly list and the FBI that administers

10    other travel watch lists.  It's called the DHS TRIP program

11    where there's an ability to file a grievance and get one's

12    name removed from various lists.

13            So the Court has no jurisdiction over that.  I

14    would suggest she go to DHS if, in fact, she's on some no

15    fly list or watch list.  All right?

16            MR. ROOTS:  Okay.  Well, I would urge the Court

17    to sentence Ms. Niemela at the bottom range, at the very

18    bottom range.  Ms. Niemela, you know, for all her advocacy

19    and her -- you know, her stout -- and, again, I think she

20    should be honored for her stern -- her stern standing on

21    freedom.

22            She is a freedom activist.  She is a gay rights

23    activist.  She should be honored, not punished.  She should

24    be honored for going to trial when she didn't believe she

25    was guilty, not punished for going to trial.

1           If you really look at all the conduct, all the

2     videos that we've seen, she doesn't even jump up and down.

3     She is in the midst of large numbers of people; some of whom

4     are doing wrong things, some of -- many of whom are not.

5           Ms. Niemela falls into the category of someone who

6     is just really there.  She's wearing a -- you know, a flag

7     or a cape going around.  And obviously it's persuasive, and

8     she's expressing herself, and she is seeking redressive

9     grievances.

10          She honestly and earnestly believed the election

11    was improperly calculated in 2020, and I would urge the

12    Court to sentence her at the very bottom of the range.

13          THE COURT:  Okay.  Thank you.

14          Ms. Niemela, is there anything you'd like to tell

15    me before I impose your sentence?

16          THE DEFENDANT:  Your Honor, I was told that I

17    would be able to speak today, so --

18          THE COURT:  This is your chance.

19          THE DEFENDANT:  -- so I have prepared a speech.

20          So I've struggled quite a bit on deciding whether

21    or not I was going to make a statement today.  My three

22    choices would be to either remain silent and never have my

23    day in court, appease the Court by expressing remorse and

24    accepting responsibility and essentially admitting guilt for

25    crimes I do not believe I committed, or to stay true to

myself, defend my innocence, and speak out about the unfair
and unjust treatment that I and other January 6th defendants
have endured.  I feel I have a duty and an obligation to
speak out and stand up for what is right.

One of the reasons I feel compelled to speak today
is because I was denied the opportunity in my trial.  My
court-appointed attorneys not only refused to present any
evidence on my behalf that would contradict the prosecutor's
vision of events, but they became extremely hostile and
threatening towards me when I told them I wanted to testify.
One of my lawyers literally screamed at me in a private
room, which there are witnesses, that I would be F-ing
insane if I got on that stand.

At that point I knew it was over.  They not only
failed to provide me with adequate representation and
presented no evidence in my defense, they dismissed the
wrong jurors on accident, and then they intimidated me not
to testify.  My Sixth Amendment rights to adequate
representation were blatantly violated as well as my right
to a trial by an impartial jury of my peers.

Since apparently my history and characteristics
seem to have an impact on my impeding sentencing, I would
like to share a little background information.

Hopefully you have taken the time to read all of
the leniency letters and character references that were

1     submitted to the Court.  I think they clearly show me in a

2     different light than how the prosecution has painted me.

3     These letters are from people from all walks of life and

4     even some of them who have different political views than I.

5     They felt it was important to write in support of me as they

6     have seen how all of us have been treated.

7          I am at no means a perfect person, but I am a good

8     person, and I have a really big heart.  From a young age I

9     have suffered immense loss, pain, and trauma.  For one,

10    waking up to my mother screaming for someone to call 911

11    because her boyfriend, who was like a father to me, had

12    hanged himself was obviously extremely traumatic and

13    heartbreaking.

14         I was then ripped away from my mother and my

15    siblings and was caught in the middle of a custody battle

16    that lasted many years.  While living with my father, I was

17    treated as an outsider.  I was verbally and physically

18    abused by his girlfriend.

19         After my mom finally won back custody, we moved to

20    North Carolina, and I've never spoken to my father again.

21    While living there, I was constantly being bullied for the

22    color of my skin and being gay.  It has affected me so much

23    that I actually dropped out of school and ran away several

24    times.

25         We later then moved to Florida, being closer to my

grandparents, and then I suffered another devastating loss

when my grandfather passed away.  At that same time I had

also lost my best friend who was hit by a car while riding

his scooter.

I have moved several times.  I've been homeless

more than once, and I've struggled financially.  These

experiences are just some of the challenges that I've faced

in my life, and they would shape my future in both ways good

and bad.

Because of how I was mistreated by others and felt

betrayed and abandoned by my whole family, I know how

painful it is to not be accepted or feel loved.  This is why

I make a point to never judge anybody based on race, sexual

preference, or anything else.  So when people label me as a

racist, bigot, white supremacist, as the current narrative

implies, it is very hurtful because nothing could be further

from the truth.

When I make new friends, I tend to go out of my

way to help support and encourage them in any way that I

can.  I am trusting and loyal, sometimes to a fault.

I have allowed many people who I thought were my

friends to take advantage of me.  I realize now that I

didn't always choose the right kind of friends and, as a

result, have made some poor decisions in my life.  I do not

claim to be perfect, as I am only human.  I have lived and

1    learned, sometimes the hard way, but I have worked very hard

2    to better myself and have grown tremendously over the years.

3    But like everybody else, I make mistakes sometimes.

4           One such mistake was befriending Stephanie

5    Chiguer, my current co-defendant.  As a single mother,

6    Stephanie was struggling with many issues that I tried to

7    help her with.  I babysat her children so she could work

8    before she lost her job.  I helped her with issues with her

9    ex-husband, her family problems, and even assisting

10   financially, even to the point where her own sister wanted

11   to take away her kids.

12          Shortly after our trip to D.C., we had a falling

13   out, and she got a temporary restraining order against me.

14   Now, what the Court needs to know is that, when we went to

15   court, the judge did not grant her a final because she lied.

16          I believe her efforts are to try and make me look

17   worse to try and save herself from any punishment relating

18   to January 6th.  Throughout this investigation she has lied.

19   She has contradicted her own statements that I was able to

20   read but not obtain a copy of.

21          The same woman took a plea deal last August, was

22   never called to testify against me, and still has yet to be

23   sentenced.

24          It was my loyal, protective nature and genuine

25   concern for her and her children that has landed me here

1          today.  And I take full responsibility for that.

2                  However, I cannot take responsibility and express

3          remorse for actions and intentions of other people.  My

4          biggest regret that day was having the back of somebody not

5          realizing that today she would stab me in the back.

6                  Since I do not have -- I did not have adequate

7          defense, my accounts of January 6th have gone unheard.  I

8          feel it is imperative that I get to share my experience from

9          that day.

10                 When I heard about the Trump rally being held at

11         the Ellipse, Stephanie and I decided to go.  My mom had also

12         asked Mark -- who was not a chaperone, as the government has

13         assumed -- who was also my boss at the time to accompany us

14         since she couldn't go.  She was worried about our safety

15         because at the previous rallies we were followed and

16         threatened by members of Antifa.  So a bunch of Proud Boys

17         had escorted us, who I did not know who they were, because

18         they could see that we were in trouble.

19                 On January 5th, we had traveled to D.C.  We stayed

20         overnight, got up very early, and spent most of the day at

21         the Ellipse listening to other speakers before Trump.

22                 Toward the end of the speech Trump suggested that

23         we all walk down to the Capitol peacefully and patriotically

24         to make our voices heard and to show our support to the

25         brave members of Congress who were going to be objecting to

1    the state certifications.  I can honestly say that it was

2    the most peaceful and patriotic gathering I've ever been to.

3    On our walk to the Capitol, everybody was singing the

4    national anthem, waving American flags, and even praying

5    along the way.

6           I had videos that were not presented in my case

7    that show that I did not immediately go down to the Capitol

8    from the Ellipse.  We had stopped a few times, taken

9    pictures, videos, and enjoyed the positive atmosphere.  We

10   did not hear anybody in the crowd making plans to storm the

11   Capitol or take part in any violence.

12          We finally arrived at the Capitol at approximately

13   2:00 p.m.  And what really happened as opposed to what the

14   prosecutors stated at trial in the sentencing memorandum is

15   quite different.  They insisted that we walked past fencing

16   that had signs that said "Area Closed" and, despite these

17   clear signs, that my presence on the Capitol grounds was

18   unlawful.  I was undeterred, climbed a tree, and took a

19   selfie.

20          Well, I did climb a tree, and I did take a selfie,

21   but the prosecutors' interpretation of that selfie is

22   factually untrue.  They said that the photo shows nobody

23   else near me on the grass beyond the fencing, making it

24   obvious that I was in a restricted area.

25          If you look at the photo, which the jury did, that

1   may seem like a factual statement; however, what the

2   prosecutor didn't tell the jury was that there were a few

3   other photos on my camera facing the other way, which would

4   actually be the Capitol grass.  Those pictures the

5   prosecutors had access to as well as my attorneys show

6   hundreds, if not thousands, of people on the lawn of the

7   Capitol.  What the prosecutors did was pick one photo off of

8   my phone that fit my narrative and ignored the rest.

9           I was not alone in the so-called restricted areas

10   the prosecution falsely and deliberately asserts as fact.  I

11   also never walked past and never saw any fencing with the

12   "Area Closed" signs.  Although there is some fencing in the

13   background of the selfie I took, the fencing is behind me

14   with signs facing outward towards a street, the street that

15   I never walked down.

16           We came straight down Pennsylvania Avenue and

17   entered the lawn from there.  There was no fencing or

18   barricades of any kind.  In fact, the prosecution's own

19   video montage and witness testimony confirmed that the

20   fencing had been completely removed by 1:00 p.m. along with

21   the signs that had been on it when we arrived.  There was no

22   indication that the lawn that was filled with thousands of

23   people was a restricted area.  I never saw any police

24   officers in riot gear or fighting with protesters.

25           After entering onto the lawn, we found a tree off

1    to the left where we had planted -- where we had planned to

2    stay for the protest.  After about 10 to 15 minutes, I

3    noticed Stephanie was missing.  I immediately started to

4    panic because I was pretty sure that Antifa and other bad

5    actors would be among the crowd, and I was concerned for her

6    safety.

7             I took off looking for her.  Mark tried to follow

8    me, but apparently had to turn back when a mutation landed

9    on his boot and he was overcome by gas.  I wasn't even aware

10   that that happened until after I had left the Capitol.

11            Once again, the prosecutors twisted the facts and

12   stated that I had -- I had to have smelled the gas because

13   Mark and I were standing 10 to 15 feet apart.  This claim is

14   also factually untrue as I was not standing still.  I was

15   moving through the crowd frantically trying to locate

16   Stephanie.  I do not have eyes in the back of my head so I

17   did not see nor smell anything that might have hit Mark.

18            By some miracle I was able to locate Stephanie and

19   Mike, a guy that we had met the night before.  We followed a

20   crowd of people up a flight of exterior stairs and saw

21   hundreds of people entering the building.  Stephanie headed

22   for the door and said, "I'm going in."  I was determined not

23   to let her out of my sight again because I did not want to

24   be the one to tell her two children that were at my house

25   that something had happened to their mother.

1          I followed Mike and Stephanie in through an open

2     door.  There were no officers in sight.

3          Though the prosecutors insist that because there

4     were people climbing through broken windows and alarms were

5     ringing, that those were clear signs of an unlawful entry.

6     The assertion is also factually untrue.  If an alarm goes

7     off because some idiot decided to break a window or pull a

8     fire alarm, that does not denote that it is unlawful to

9     enter through an open door.

10         At some point everybody had stopped.  We stood in

11    place for about five minutes as confirmed in the memorandum.

12    I do not think that armed insurrectionists would be so

13    patient for five minutes.

14         Eventually a man got on a bullhorn and told us

15    that police were going to let us in, that we just needed to

16    be peaceful.  Mind you, that man was standing side by side

17    with an officer that he had just spoke to for five minutes.

18    At no point did the cops get on any type of a loudspeaker

19    and say, "You are committing a crime.  You need to leave."

20         The next thing I know, the crowd starts moving

21    forward.  No officers issued any commands.  We stood to the

22    side, and when I saw that some of the protesters were

23    banging on doors was when I told Stephanie and Mike that we

24    needed to go.  Mike would have testified in my trial to that

25    had he been allowed by his counsel or my defense attorneys

1    really did any defense.

2         We did enter a room where we took a selfie in

3    front of a portrait of George Washington, but it wasn't a

4    celebratory photograph, as the prosecutors characterized it,

5    and it certainly wasn't an act of violence.

6         At no time during the 20 minutes that we were

7    inside did any member of law enforcement tell us that our

8    presence there was unlawful, nor that we had to leave.  I

9    did not break anything.  I did not steal, assault, or

10   threaten anybody.  I never engaged in any violence, and I

11   never encouraged others to do so.  I was not chanting,

12   yelling, or acting in a loud, disorderly manner.  And I was

13   not demonstrating, parading, or picketing.  I was simply

14   following my friend to protect her from any potential harm

15   or threat.

16        I'm glad I did because on our way out as we were

17   exiting the building was when Ashli Babbitt, an unarmed

18   female veteran, was shot and killed by Capitol Police.  If I

19   hadn't convinced her, that could have been her, I, or

20   anybody else.

21        The prosecution claims that I responded to a Tweet

22   one minute after entering the building.  However, my phone

23   died, and I only have an 11-second video that I recorded

24   when I entered.  The prosecutors took it upon themselves to

25   speculate what this alleged video contained, yet they say

1    they can provide no such video; but they had full access to

2    my phone and to my Facebook that they shut down.

3          The prosecution maintains that I breached three

4    police lines inside; however, in their memorandum they

5    acknowledge that inside what they call the Crypt I am

6    towards the back of the crowd.  Being 5'6" surrounded by

7    people much taller than me, I couldn't really see what was

8    going on, let alone if and where the police line was.  I

9    never purposely surged forward in any attempt to breach a

10   police line.  I was surrounded by people, so when the crowd

11   moved, I had no other choice but to move with it.

12         The prosecution even admits that there were

13   dozens, if not hundreds, of people in front of me.  So it's

14   safe to say they would have broken the police line with or

15   without me present in the room.

16         Throughout the building I am simply following

17   behind Stephanie, holding on to her, which is seen in

18   videos.  As I have never been inside the Capitol before, I

19   had no idea where we were.  I had no specific destination,

20   plans, or intentions except to make sure nothing happened to

21   my friend.

22         When we came upon a room that had velvet ropes to

23   indicate where people should walk, I peacefully walked

24   between the ropes.  I remember seeing the police officer

25   walking around, but he never approached us or said we were

1      not allowed to be there.

2             My heart goes out to anybody who was injured or

3      killed that day or who felt the need to take their own life

4      since this day.  Nobody deserved to die.  And to hear that

5      people say that the four Trump supporters who died that day

6      got what they deserved is absolutely despicable.  I do not

7      condone violence or vandalism, and I believe that anybody

8      who engaged in such acts should be held accountable.  That

9      is also public in my interviews.

10            However, I also believe that anybody accused of

11     assault, destruction of property, or any other crime that

12     day should be afforded due process as the law requires and,

13     if found guilty beyond a reasonable doubt with a jury of

14     their peers, should receive an appropriate and just

15     punishment.  Unfortunately, this has not been the case with

16     January 6th defendants.

17            Holding defendants in jail, some for up to two

18     years while awaiting trial, is completely unacceptable and

19     purely vindictive.  Sending SWAT teams to raid people's

20     homes with guns drawn at children is inexcusable.

21     Threatening to add more charges or impose harsher sentences

22     simply because a defendant refuses to take a plea deal is

23     disgraceful.  And there are plenty of witnesses that that

24     has happened to.  So many people's lives have been

25     completely destroyed by these overly aggressive prosecutions

1   and inadequate sentences.

2          The weaponization of this Justice Department

3   against conservatives, especially Trump supporters, is

4   blatantly obvious, egregious, and completely

5   unconstitutional.  The Fourteenth Amendment guarantees all

6   citizens equal protection under the law, yet somehow this

7   right is being violated when it comes to anybody on the

8   right side of the political aisle.

9          The Biden DOJ is putting politics before the rule

10  of law and unjustly punishing anybody with a different

11  opinion.  There is a two-tiered justice system in this

12  country, one for the left, and one that is very different

13  for conservatives.

14         Many of the January 6th defendants committed no

15  violence at all, like myself, yet they are being

16  aggressively prosecuted and treated like mass murderers and

17  actual terrorists.  The left wing media and Democratic

18  leaders go on TV saying that January 6th was the worst.  It

19  was worse than 9/11 and Pearl Harbor.  That is absolutely

20  insanity.

21         During the 2020 riots that lasted almost a year,

22  violent mobs set fires to businesses, cop cars, police

23  precincts, courthouses, assaulted hundreds of police

24  officers, killed innocent people, destroyed and looted

25  cities.  And offenders were either never charged or they had

1    their charges dropped altogether.

2        There were never -- there was never a nationwide

3    FBI manhunt issued to bring those criminals to justice.  In

4    fact, Kamala Harris went on Twitter asking people to donate

5    to the Minnesota Freedom Fund to bail the violent rioters

6    out of jail so that they could get back onto the streets and

7    cause more destruction.

8        Now the prosecutors are crucifying January 6ers

9    for setting up GiveSendGo accounts to help with their legal

10   fees and other expenses, and they're asking judges to order

11   defendants to pay the money they have collected as a fine.

12   That is unbelievable.

13       One other issue I would like to raise is my issue

14   with Special Agent Hastbacka.  It came to my attention

15   before my arrest that his stepson is best friends with Mark

16   Leach's son.  When I heard that people were being rounded up

17   as domestic terrorists, I called Hastbacka -- and I have

18   that recording, and I notified him I was recording --

19   personally to ask him if I'd been indicted or if there was a

20   warrant out for my arrest.  My intent was to self-surrender

21   as opposed to my home being raided or being arrested at my

22   job.  He told me no at this time.

23       When a warrant was issued, instead of calling me

24   to let me know like they did for Ms. Chiguer, he had a

25   Hudson cop wrongfully pull me over for kind of speeding,

1   which I wasn't, and then about six cars surrounded me.  The

2   cop almost pulled my arm out of the socket, which I had

3   informed him that I have an issue with my shoulder.  He then

4   threatened to throw me on the ice.

5        Is this tactic -- it's the tactics like this that

6   are completely uncalled for when I have -- when I would have

7   self-surrendered had he extended me the courtesy of the

8   phone call like he did to my other co-defendant.

9        My only intention when I woke up January 6th was

10   to attend a Trump rally.  Once we decided to walk to the

11   Capitol, my only intention at that time was to exercise my

12   First Amendment right to peacefully assemble and to petition

13   the government for a redress of grievances.

14        We all want a fair and free election, and there

15   always needs to be transparency.  The prosecutors keep

16   insinuating that my goal was to disrupt the election

17   certification, which is the exact opposite of what I wanted.

18   I wanted the proceedings to take place so that the

19   objections could be made and debated and appropriate action

20   taken.

21        While I am not trying to defend or downplay the

22   violence that did happen that day, it is very hard to ignore

23   how easily it was allowed to happen.  While anybody who

24   simply entered the people's house and walked around and even

25   some who didn't are labeled as insurrectionists, domestic

1  terrorists, fired from their jobs, disowned by their

2  families and have had their lives turned upside down, a lot

3  of people cannot help but wonder if the events of that day

4  would have played out differently if security had been

5  better.

6          Trump authorized 10,000 to 20,000 National Guard

7  troops to be present that day, but Nancy Pelosi and Mayor

8  Bowser refused.  Intelligence knew that there was a high

9  probability that violent groups were coming to D.C. and

10  there could also be a large crowd that they could see that

11  morning, yet somehow they didn't have enough law enforcement

12  in to control the crowd which is why they said stand down.

13          Why did they use bicycle racks as security fencing

14  but then put up a nonscalable fence after January 6th?

15          When Capitol Police Chief Steven Sund requested

16  the National Guard several times, which is on their own

17  documents, why did it take several hours?

18          These are just some of the questions that people

19  have asked for two years.

20          However, now there are even more questions that

21  need to be answered.

22          Not long after January 6th videos came out online

23  showing police removing bike racks, waving people on to the

24  grounds, and standing in doorways allowing them to enter.

25  These are videos that I gave to my attorney to argue, but

1    they refused to show any video or any picture in my defense.

2           We later found out that there are over 44,000

3    hours of video footage that has been withheld from

4    defendants, which I believe is a *Brady* violation.  Some

5    January 6th defendants have had access while others have

6    not.  Some of these -- this footage could exonerate people,

7    but this exculpatory evidence is being wrongfully and

8    illegally withheld.

9           Kevin McCarthy promised to release it to the

10   public months ago.  Never did.  Tucker Carlson then said he

11   was given access, which he would air the footage.  He only

12   showed a few clips before he was shut down.  Fortunately for

13   him, Jacob Chansley, who was already in jail, one of those

14   clips aired of the Capitol Police escorting him.  Mind you,

15   he was not with a crowd.  They could have arrested him, but

16   they didn't.  Several cops escorted him, opening the doors

17   of the Senate, allowing him to pray and escorting him out.

18   Shortly after this video he was released from prison.

19          Just this past week three independent journalists

20   were granted access to the footage and have been releasing

21   somewhat of what they have found.  These videos show

22   multiple undercover officers helping people climb up the

23   scaffolding and walls, telling them, "keep going, go, go,

24   go," and chanting along with protesters.  They show magnetic

25   doors, which is also on video for everybody to see, that

1    they were remotely opened from the inside, and that police

2    were allowing people into the building.

3            One video also shows Nancy Pelosi's daughter, who

4    was conveniently there filming that day, following Nancy

5    around with a video camera and her and other Congress

6    members calmly evacuating into a secure location.  It's

7    almost like it was a scripted movie, just like we found out

8    the other day, that the January 6th Committee hearings were

9    also scripted with Hollywood actors on their payroll.

10           Nancy Pelosi's daughter has also on video met with

11   January 6th defendants and visits her Proud Boy member

12   friends in jail.  The video also shows that police brutality

13   against protesters that day.

14           Probably the biggest question that remains

15   unanswered is where is Ray Epps and why hasn't he been

16   charged like the rest of us?  He is seen in several videos

17   inciting people to go into the Capitol.

18           He was never charged with anything.  He has now

19   been spotted in nearly -- in newly released videos on the

20   Capitol steps later after he lied to the FBI saying that he

21   was never on the grounds.

22           Videos like this are going to keep being released

23   until the whole truth comes out about that day that has

24   ruined so many lives including mine.  I have been slandered,

25   defamed because the FBI got a call from a tipster saying

1    that I had shown a video of me breaking a window in the

2    Capitol.  Now, mind you, this, as soon as you Google my

3    name, is every article on the Internet, and that I was a

4    member of the Proud Boys.

5            Apparently the FBI takes everything that a tipster

6    alleges, whether false or not, and types it up as a

7    statement of fact even though they are lies.  Then they not

8    only use that document to get an indictment against me, but

9    then it gets released to the public.

10           I lost income, family, friends.  Customers no

11   longer wanted me to work in their homes because they thought

12   I was a violent criminal.

13           I have also been red flagged at the airport, and I

14   have to go through extra security while other passengers

15   stare at me as if I'm a terrorist.  I have had other

16   passengers come up to me -- which I have videos of all of

17   this -- and tell me that undercover police or air marshals

18   were watching and following me, and they even peeked inside

19   the ladies' room while I was in there.

20           This is extremely humiliating, totally

21   unnecessary, and a violation of my privacy.

22           Now the government is issuing my arrest record to

23   make me look like a career criminal.  One indictment took

24   place in 2019 at a bar where I had stopped and asked for a

25   lighter.  I was then verbally attacked and called a dyke and

1    a faggot.  Then they called the police and lied about things

2    that I didn't do.  I was the one who was arrested, even

3    though I was the one being attacked.

4         There is a brief mention that I tried to hang

5    myself while in a holding cell.  The statement on that

6    report is untrue.

7         Your Honor, I did not try to hang myself.  I did

8    hang myself.  I was at a breaking point in my life, and I

9    wondered if it was worth living.  Why?  Because just a few

10   months prior to the incident, which the prosecutors failed

11   to mention -- they only chose half-truths of the things that

12   they have quoted -- I went out one night with a close friend

13   of mine who I considered a brother.  Well, that night he

14   raped me, and I felt so ashamed, used, betrayed, and abused.

15   I was in physical pain, depressed, and felt so disgusted of

16   my own body that I wanted to crawl out of my skin.

17        These feelings were still haunting me when I was

18   sitting in that cell having been discriminated yet again and

19   wrongfully arrested.  I took my shirt off, and I hanged

20   myself.

21        When a cop later found me in my cell, he realized

22   that he didn't have the key, so they had to run back and

23   find one while I was left there hanging in my cell.  By the

24   time they got to me, I had been -- I had to be intubated

25   multiple times, and I woke up in a hospital in

1    Massachusetts.

2            When I finally got up the courage to confront my

3    abuser, he blackmailed me and said if I was thinking about

4    telling anybody to just remember that he knows that I was at

5    the Capitol on January 6th.

6            In case you haven't made the connection yet, that

7    FBI tipster that said I broke a window, which I didn't, said

8    I was a member of a Proud Boys, which I am not, is the very

9    man who raped me.

10           I thank God for saving my life that night.  I was

11   also told that I would never get my full voice back after

12   that night.  Fortunately God saved that, too, and that is

13   another reason why I feel compelled to use my voice to fight

14   for justice, freedom, and to stand up for children.

15           But in this very moment I am fighting for myself.

16   So I am not sitting here begging the Court for mercy, as God

17   is the only one who can grant me that.  All I am asking is

18   that you judge me only for my actions on that day and to not

19   wrongfully punish me for actions of others.

20           Your Honor, can I just take a brief second just so

21   I can --

22           THE COURT:  All right.  Why don't we take a brief

23   five-minute recess.  We've been at this a while.  The court

24   reporter needs a break anyway.

25           I will give you a few brief more words,

1    Ms. Niemela -- you've given me a lot to chew on -- and then

2    I'll pronounce the sentence.  Okay?

3              So let's stand in recess for five minutes.

4              (Recess taken)

5              THE DEFENDANT:  Your Honor, if I could just have a

6    few moments?

7              THE COURT:  Okay.

8              THE DEFENDANT:  So, you know, also the counsel

9    says that I have a drinking problem, which I would like to

10   note -- which they have access to those, too, and this is my

11   issue with them only presenting half-truths -- is that I was

12   ordered -- when I pled guilty to disorderly conduct, it was

13   not simple assault, which I have those files so I'm not

14   understanding the miscommunication, but I was ordered a

15   LADAC as part of that.  And I took a LADAC evaluation, and

16   that is also in my file and --

17             THE COURT:  I'm sorry, Ms. Niemela, I'm not

18   familiar with that term.  What is a LADAC?

19             THE DEFENDANT:  LADAC is when you're court ordered

20   to have a drug and alcohol evaluation.  It's by a third-

21   party that does not accept insurance, and nine times out of

22   ten everybody gets ordered to take classes.  I was not.

23             And, you know, to kind of point out -- touch on

24   something that you had said, you know, I just feel like this

25   is a retaliation against me for not taking their deal;

1    which, again, I would question why they offered me the deal

2    they did if I'm such a violent criminal.  That raises an

3    issue of abuse of power and punishing me based off of

4    statements from somebody who, A, did not get granted a

5    restraining order, who has written multiple statements

6    saying that, one, our relationship was platonic -- I mean,

7    I've read these.  I don't know if you have, but they're all

8    over the place.  And I just don't believe that these should

9    be used against me.

10            And yes, I will admit, I used to drink.  I used to

11   drink to numb my feelings.  But I am not that person.  And I

12   am court-ordered by you or this Court to go to counseling,

13   which I do every single week, which my counselor wrote you a

14   letter.

15            You know, this crime happened two and a half years

16   ago.  I've been on federal probation for a year and a half.

17   I've had no violations.  I'm drug tested.  I'm red flagged

18   on an airline.

19            I mean, you know, I missed some valuable things

20   that I can never get back.  And, you know, by everybody who

21   knows me outside of what the prosecutors have painted me, I

22   am a huge family person.  I am the mother without the child.

23   I will never get back missing that birth and the potential

24   next birth.

25            THE COURT:  All right.  Ms. Niemela, thank you.

1          Where do I start after all that?

2          Let me say, I wish that you had cooperated with

3   the probation office and had given me some of this

4   information beforehand so that I would have a better

5   opportunity to process it and get the government's responses

6   to some of the things that you have said.  But let me just

7   start where you left off before the break.

8          Obviously you have a number of grievances.  You

9   have espoused a number of theories about why January 6th

10  happened and how the government and why the government has

11  responded to it, and you've asked that I not judge you on

12  anything else but what you did as opposed to what other

13  people did.

14         You know, I don't -- it's not my role to assess

15  these various theories and your grievances about things that

16  do not relate to your conduct or the conduct of people who

17  may have done other things that day.  And I want to assure

18  you that in fashioning a sentence I have considered all of

19  the factors that I am required to, but only as they relate

20  to your conduct.  All right?

21         As you know, we have -- we'll ultimately have

22  upwards of a thousand of these cases in our district.  I

23  probably have 50 of them.  And I can only sentence based on

24  the individual before me, and I've done that in your case.

25         Let me start with what you did -- okay? -- the

1      nature and seriousness of the offense that you committed,

2      not that anybody else committed.

3              You were only charged with misdemeanors.  Right?

4      And as we've discussed, that reflects many of the things

5      that you and Mr. Roots have emphasized today:  that you

6      weren't a leader, that you weren't a Proud Boy, that you

7      didn't break anything or hurt anybody, that you didn't

8      assault law enforcement, that you didn't engage in any

9      violence.  All right?

10             You keep saying that, you know, the government

11     thinks you're a violent terrorist or a violent offender, and

12     "I'm not any of those things."

13             No one's saying you're any of those things, at

14     least with respect to this offense.  You're not charged with

15     any violence or any felonious conduct whatsoever.  So the

16     government acknowledges all of the factors that you have

17     indicated that suggest that you are a lower -- a relatively

18     lower-level offender in the cases that have been brought in

19     our court.

20             But I agree with Mr. Gordon that, as misdemeanants

21     go, you did more than many and perhaps more than most.  You

22     touted violence both before and after.  And Mr. Gordon has

23     gone over the quotes, you know, "GITMO for our government,

24     let's hang them."  You reTweeted that you'd be rather

25     nervous as to how I would exit the building.

1          And what those texts tell me is that your focus

2     that day, at least at some point, was not just coming to a

3     rally to hear the former president.  Okay?

4          A lot of the misdemeanants that I sentence, I

5     think that was their focus.  They were there for the rally.

6     They had no idea or didn't care what was going on in the

7     Capitol, and they just happened to follow some folks there,

8     and they went in, and they went out.  Okay.

9          But those Tweets and texts suggest to me that it

10    was also your focus what was going on at the Capitol, and

11    that you knew what was going on there.

12         Now, you're not being charged with obstruction

13    of the certification proceeding, but -- and you're not, as

14    Mr. Gordon says, being charged for, you know, what you said

15    in those quotes, in those Tweets.  But your words have

16    consequences.  They -- you are free to express them, but

17    they are not free.  They have consequences.  And so your

18    words can be used to assess what your motivations were, what

19    you intended to do, and that's all that your words here are

20    being used for.

21         I'm not going to go over Mr. Gordon's

22    presentation.  I thought it was fulsome; it was

23    comprehensive; and it accurately summarized the evidence at

24    trial and the reasons that you were convicted of the

25    offenses that you were.

1          But most importantly, you know, you helped breach

2    three police lines along with your friends, and those lines

3    included officers that were standing right outside of the

4    House Chamber.  And you went into private areas where

5    members of the public were not otherwise or would not have

6    otherwise been invited if the Capitol had been open that

7    day.  And so, you know, that places your conduct at least in

8    the heartland and probably, you know, somewhat above average

9    for the other misdemeanant defendants that we see in this

10   court.

11          We've talked a lot about acceptance of

12   responsibility.  You obviously chose to go to trial.  That

13   is your right, and so you don't get any, you know, credit

14   under the Sentencing Guidelines for acceptance of

15   responsibility.

16          But your lack of acceptance of responsibility

17   seems to me to go a lot farther than that, and, you know, it

18   was just demonstrated, I think, in the statement that you

19   made to the Court.

20          You have cast yourself as the victim.  You say you

21   didn't get a fair trial.  You say your lawyers did not

22   adequately represent you.  You said that the government's

23   witnesses lied.  You said that you are a victim of political

24   persecution, and I could go on.  I think Mr. Gordon is

25   absolutely right that you have attempted to blame virtually

1    everyone under the sun for conduct that you personally

2    engaged in.

3          And let me just pause here to address a couple of

4    those things.  I don't have to do this, but I want to,

5    particularly your criticisms of the trial, because at least

6    in part it is my responsibility to make sure that you

7    received a fair trial; and, frankly, I think that you did.

8          You know, I've seen some of your YouTube

9    appearances, and you've said that you didn't have a

10   pretrial.  That's been a pretty consistent refrain.

11         And as I recall, we, for scheduling reasons, moved

12   your pretrial to maybe the day before or even the day of

13   jury selection.  But I went back, and we covered everything

14   in your pretrial that I would ordinarily cover in a pretrial

15   conference in any case.

16         We dealt with motions, and I believe there were a

17   couple of motions that your lawyers filed.  There were some

18   motions to keep out evidence of your, you know, potential

19   QAnon affiliations.  And I agreed with your lawyer.  I

20   thought that that would not be fair, and it wasn't relevant,

21   so I didn't let that evidence come in.

22         I think we discussed evidence about your sexual

23   orientation, which you have mentioned today.  And I believe

24   that I ruled -- I'm not sure, you know, but I believe that I

25   ruled that unless it bore some relevance to the actual

1    charges and why you were there and who you were with, that

2    that was irrelevant, and that the jury should not hear that.

3           We went over your lawyer's objections to some of

4    the other government evidence.  We went over the expected

5    witnesses.  We went over how jury selection would work.  We

6    went over courtroom procedures, how to use the AV system,

7    all that routine stuff that I do in every single case.  And

8    so I don't understand the objection or the notion that you

9    didn't get a pretrial.

10          I also think we selected a fair jury in this case.

11   We spent a lot of time on jury selection, as you know,

12   because you sat through it.

13          As a general matter, if you come to D.C., and you

14   commit a crime, you should expect to be tried before a D.C.

15   jury, okay, not a jury in Boston.

16          You know, there are a lot of stereotypes about

17   D.C. jurors, but frankly I don't think that they bear that

18   weight.

19          I went back and looked at the jurors that we had

20   on your case.  There was a sign language interpreter.  There

21   was a clerk at the Lowe's store.  There was a customer

22   service rep for a vacation rental company, a couple of

23   retirees.  There was an accountant.  We had a law professor

24   and a law student, people who obviously take the rule of law

25   and the legal process very seriously.

1          These weren't politicos.  These weren't partisans.

2     These were not zealots.  And as far as I could tell, there

3     was no one who was directly affected by January 6th on the

4     jury.

5          So I think your criticisms are misplaced; and

6     frankly, I think that those jurors should be celebrated, not

7     denigrated.

8          You've also said that you were innocent, and

9     you've repeated that today, and that your lawyers didn't do

10    enough to defend you.  You called them public pretenders, if

11    I'm not mistaken.

12         Obviously I'm not privy to your conversations with

13    your lawyers about case strategy or whether to testify or

14    not, but I did sit through the trial, and I observed the

15    evidence.  And it was not a very close case, ma'am.  It

16    really wasn't.

17         And I pointed this out to another defendant I

18    think a week or two ago.  While you or perhaps Mr. Roots

19    might think it should be legal to enter the Capitol and

20    express whatever opinions you might have while the Secret

21    Service is there trying to protect the vice president, it's

22    not, and it's not for an obvious and important reason.

23    People want to assassinate those officials, and people have

24    tried to assassinate those officials.

25         And I'm not judging you for what other people

1    said, but you could see it on January 6th.  "Hang Mike

2    Pence."  Right?  And the Secret Service is there to keep

3    that from happening.  And it makes their job a heck of a lot

4    more difficult if anybody can just waltz into the Capitol

5    and interfere with their responsibilities.

6              And that's exactly what happened on January 6th.

7    Right?  And that's why you were charged with those lead two

8    counts.

9              And, you know, the elements were that the building

10   was restricted.  The government certainly proved that.  That

11   you entered; the government certainly proved that.  You

12   entered.  You filmed yourself entering.  That you remained.

13   You were there for 20, 30 -- I forget the exact amount of

14   time, but you remained there after you entered.

15             So the only question was whether you knowingly

16   entered.  All right?  And I know that, you know, today

17   you're saying that, you know, you didn't see the police.

18   You didn't see the signs.  You didn't hear the alarms.  And

19   even if you did, you know, it could have been just somebody

20   setting off alarm -- an alarm inadvertently.  All right?

21             You know, you were there long enough.  You knew --

22   when you saw people climbing through windows, through broken

23   glass, you knew you weren't supposed to be there.  All

24   right?

25             I don't think you knew that you were going to get

1    caught or that, you know, the consequences would end up

2    being what they are.  I believe that.  But there's no way,

3    given when you went in, what was going on all around you,

4    how long you stayed, what you obviously saw, whether you're

5    5'2" or 6'4", that told you that that was a place where you

6    were supposed to be that day.  Okay?

7         And so I don't think it was difficult for the jury

8    to make that finding.  And, frankly, you could have had

9    Johnny Cochran representing you, and I don't think the

10   result would have been any different; or you could have had

11   a jury up in Boston looking at the same facts, and I don't

12   think the result would have been any different.  All right?

13   So I think you got a fair trial.

14        We've talked about the First Amendment issues.

15   This is not about the First Amendment.  It's not about your

16   political views.  It's not about who you affiliate with.

17   It's about what you did and where you did it.  Okay?

18        And, you know, we talk about acceptance of

19   responsibility a lot.  And it's not important just to, you

20   know, bring a defendant to heel.  Okay?  That's not my job.

21   All right?  But it's important for what it says about

22   deterrence, about deterrence of you specifically and about

23   deterrence of people who might be listening to you or

24   following you on social media, all these YouTube appearances

25   that you've been making.

1          You know, you've made yourself a face, and you

2     feel, as you've stated here in court, that you are a --

3     you're being persecuted; that you're a martyr; that you're a

4     tool in a broader political effort to silence certain

5     people.  And so, you know, folks are listening to you,

6     whether you like it or not, and, you know, this sentence has

7     to say something to those people.

8          We also have to consider -- and I do -- you know,

9     your history as a person.  Until you gave me your statement

10    today, I didn't know very much about you as a person because

11    unfortunately you didn't cooperate with probation.  You

12    didn't testify at trial, which is your right.

13         I've read the letters.  They suggest to me that

14    you are a good friend, you are a hard worker, that you do

15    have goodness in your heart.  I don't doubt any of those

16    things.

17         In terms of the challenges that you face,

18    including those that you have described here today, you

19    know, I have empathy for that.  But that doesn't detract

20    from the need for the sentence here today to reflect what

21    you did and to serve all of the other purposes of

22    sentencing.

23         I also draw from the record a couple of things

24    about you.  You're stubborn.  You resist authority.  You

25    have temper issues.  Whether those have ripened into

1        violence or not, I wasn't at the Dolly Shakers, or I wasn't

2        at the hospital, or I don't know the ins and outs of your

3        relationship with Ms. Chiguer or why she put out a

4        restraining order against you.  I do know you have temper

5        issues.  You have impulsivity issues.  You can exhibit

6        really poor judgment, and you can make very poor decisions,

7        which I think has been, you know, confirmed throughout this

8        case.

9                I did not let in the QAnon stuff.  I don't know

10       what you believe and what you don't believe.  You can

11       believe whatever you want to believe.

12               When you talk about saving the children, I think

13       you were wearing a T-shirt that said "Save the Children."

14       If that is believing that there is some conspiracy among

15       certain politicians to, you know, traffic in child

16       pornography or that they're pedophiles or, you know, some

17       other crazier stuff that QAnon has been spouting, all that

18       shows me is that you are completely detached from reality --

19       all right? -- which is relevant to the deterrent value of

20       the sentence that I have to impose.

21               In terms of disparities, you know, look, it's

22       clear -- I've looked at other misdemeanor defendants who

23       have chosen to go to trial, have not gotten acceptance of

24       responsibility points, and they range between four months to

25       twelve months, and so the sentences that both probation and

1    the government have recommended are in the heartland of

2    other cases and neither would create an undue disparity

3    between you and other defendants.

4            At the end of the day, Ms. Niemela, I've got to

5    say I was prepared to trend towards the probation office

6    recommendation, but your complete lack of any responsibility

7    for your actions, your attempts to blame everybody, from the

8    Court to the jury to the prosecutors to your lawyers to

9    other politicians, you know, I have no comfort or I would

10   not be comfortable sentencing you to anything less than what

11   the government has recommended in this case.  So in many

12   ways you have left me no choice.

13           So with that, pursuant to the Sentencing Reform

14   Act of 1984 and in consideration of the provisions of 18 USC

15   3553, as well as the guidelines range, it is the judgment of

16   the Court that you, Kirstyn Niemela, are hereby committed to

17   the custody of the Bureau of Prisons for concurrent terms of

18   11 months on Counts 3 and 4, and six months on Counts 6 and

19   8.

20           You are further sentenced to serve concurrent

21   terms of supervised release of 12 months on Counts 3 and 4.

22           In addition, you are ordered to pay a special

23   assessment of $25 on each of Counts 3 and 4, and $10 on each

24   of Counts 8 and 6, for a total of $70 in accordance with 18

25   USC 3013.

 1          While on supervision, you shall abide by the

 2    following mandatory conditions as well as all discretionary

 3    conditions recommended by the probation office in the

 4    presentence report, which are imposed to establish the basic

 5    expectations for your conduct while on supervision.

 6          The mandatory conditions include:

 7          You must not commit another local, federal or

 8    state crime.

 9          You must not unlawfully possess a controlled

10    substance.

11          You must not -- you must refrain from any unlawful

12    use of a controlled substance.

13          You must submit to one drug test within 15 days of

14    placement on supervision and at least two periodic drug

15    tests thereafter as determined by the Court.

16          You must make restitution in accordance with 18

17    USC 3663 and 3663A, or any other statute authorizing a

18    sentence of restitution.

19          You shall also comply with the following special

20    conditions:

21          You must undergo a mental health assessment.

22          You must undergo substance abuse testing to

23    determine if you have used a prohibited substance.

24          You must not attempt to obstruct or tamper with

25    the testing methods.

1          You must provide the probation officer access to

2     any requested financial information and authorize the

3     release of any financial information.  The probation office

4     may share financial information with the United States

5     Attorney's Office.

6          You must not incur any new credit charges or open

7     additional lines of credit without the approval of your

8     probation officer.

9          And you shall remove any firearms, destructive

10    devices, or other dangerous weapons from areas over which

11    you have access or control until the term of supervision

12    expires.

13         The Court will also accept the government's

14    recommendation that you be ordered to not have any contact,

15    physical or otherwise, with Stephanie Chiguer for the

16    remainder of your supervised -- for the duration of your

17    supervised release period.

18         Within 60 days of release from incarceration or

19    placement on supervision, you will appear before the Court

20    for a reentry progress hearing.

21         Prior to the hearing, the probation officer will

22    submit a report summarizing your status and compliance with

23    the release conditions.  If you are supervised by a district

24    outside of the Washington, D.C., metropolitan area, the

25    probation office in that district will submit a progress

1    report to the Court within 60 days of commencement of

2    supervision.  Upon receipt of the report, the Court will

3    determine if your appearance is required.

4          With respect to the fine, you know, I think

5    Mr. Roots and Ms. Niemela make some valid points with

6    respect to the government's position on charitable

7    contributions for the support of defendants to defray

8    certain court-related expenses.  However, to the extent that

9    the defendants attempt to raise money off of their notoriety

10   by spreading or, you know, peddling information that is

11   inconsistent with the facts or with the jury findings, you

12   know, I think that there is a line between those two things.

13   And so unfortunately I do not have a financial disclosure

14   report by Ms. Niemela, which I otherwise would have had she

15   cooperated with probation.

16         I infer from all of the facts that she is not a

17   wealthy woman, but I do think that on principle, you know,

18   raising money from the public based on misrepresentations

19   from the record and the trial evidence is not something

20   that should be countenanced and should go -- at least some

21   of it -- back to the government who was put to great expense

22   to prove these charges.

23         So with that, whether this is the right amount or

24   not, I don't know, but you're ordered to pay a fine in the

25   amount of $1,000.  The Court determines that you do not have

1    the ability to pay interest and therefore waives any

2    interest or penalties that may accrue on the balance.

3         You are also ordered to make restitution in the

4    amount of $500 to the Architect of the Capitol.  The Court

5    determines that you do not have the ability to pay interest

6    and therefore waives any interest or penalties that may

7    accrue on the balance.

8         The restitution payments shall be made to the

9    Clerk of the Court for the U.S. District Court here for

10   disbursement to the Architect of the Capitol, and the

11   address will be indicated in the judgment.

12        Payment during the term of supervised release will

13   commence within 30 days after release from -- the

14   restitution obligation, payment for that during the term of

15   supervised release will commence within 30 days after

16   release from imprisonment.  The Court will set the payment

17   plan based on an assessment of the defendant's ability to

18   pay.  So the Court will set restitution payments at $50 over

19   the course of ten months.

20        The probation office shall release the presentence

21   investigation report to all appropriate agencies, including

22   the probation office in the approved district of residence

23   in order to execute the sentence of the Court.  The Court

24   will transfer supervision to -- Mr. Roots, Ms. Niemela plans

25   to reside in New Hampshire upon her release presumably?

```
1              MR. ROOTS:  I believe so.

2              THE COURT:  Ms. Niemela?

3              THE DEFENDANT:  Yes, as I own a house.

4              THE COURT:  Okay.  The Court will transfer

5     supervision in this matter to the District of New Hampshire,

6     but will maintain jurisdiction.  So if there are any

7     violations of supervised release conditions, those will come

8     back before me.

9              The probation office shall release the presentence

10    investigation report to all appropriate agencies including

11    the United States -- strike that.

12             The financial obligations are immediately payable

13    to the Clerk of the Court.  Within 30 days of any change of

14    address, you shall notify the Clerk of the Court of the

15    change until such time as the financial obligation is paid

16    in full.  Obviously that is exclusive of the restitution

17    obligation for which there is a payment schedule.

18             The probation office shall release the presentence

19    investigation report to all appropriate agencies, including

20    the probation office in the approved district of residence.

21             You have the right to appeal your conviction of

22    guilt to the United States Court of Appeals for the D.C.

23    Circuit.  You also have a statutory right to appeal your

24    sentence to the D.C. Circuit in certain circumstances,

25    including if you believe the sentence was imposed in
```

1    violation of law or as a result of an incorrect application

2    of the Sentencing Guidelines or is more severe than the

3    maximum established in the guidelines range.

4          You may also appeal your sentence if you believe

5    you received ineffective assistance of counsel at

6    sentencing.

7          You also have the right to challenge the

8    conviction entered or the sentence imposed under 28 USC 2255

9    to the extent permitted by that statute.

10          Any notice of appeal must be filed within 14 days

11    of the entry of judgment or within 14 days of the filing of

12    a notice of appeal by the government.

13          If you are unable to afford the cost of an appeal,

14    you may request permission from the Court to file an appeal

15    without cost to you.  On appeal, you may also apply for

16    court-appointed counsel.

17          Any other objections that have not already been

18    noted, Mr. Roots?

19          MR. ROOTS:  We would move to stay the imprisonment

20    pending the outcome of her appeal and would like to

21    supplement that with some written arguments.

22          THE COURT:  Mr. Gordon?

23          MR. GORDON:  I would object to that, Your Honor.

24    There's -- I don't think there's grounds to do that and, you

25    know, that could be years in the process here.  I think

1    there's a public interest in finality.

2           We would, however, have no objection to allowing

3    Ms. Niemela to self-surrender --

4           THE COURT:  Okay.

5           MR. GORDON:  -- and give her a period to do that.

6           THE COURT:  The Court will deny the defense's oral

7    motion to -- for a stay pending appeal.

8           Mr. Roots, you're certainly welcome to move for

9    reconsideration of that ruling based on any case law or

10   factual submission you'd like to make, but the Court will

11   deny the motion.

12          The Court will so permit Ms. Niemela to remain on

13   her current conditions until she is informed of where she

14   needs to report by the Bureau of Prisons.

15          Mr. Roots, a placement recommendation?

16          MR. ROOTS:  I think somewhere closest to New

17   Hampshire, lowest level.

18          THE COURT:  All right.  The Court will make a

19   recommendation for an appropriate placement close to

20   Ms. Niemela's home in New Hampshire.

21          Ms. Niemela, you know, you may not believe this,

22   but it gives me no comfort to impose this sentence.  I'm not

23   entirely sure what all led you to this place.  You know, you

24   have lots of friends.  You seem to have, you know, a

25   supportive family.

1          I would counsel you -- and take this for what it

2     is worth -- that, you know, perhaps when you get this

3     experience behind you that you sort of take comfort in them

4     as opposed to perhaps some of the other sort of external

5     forces that you have been attracted to for whatever reason.

6     All right?

7          You're a young woman.  You have lots to give.  You

8     obviously -- as I said, you're a hard worker and a dedicated

9     and good friend to many.  And I would just counsel you to

10    get through this and to focus on those aspects of your life.

11    All right?

12         Anything else, Counsel?

13         MR. ROOTS:  Nothing from the defense.

14         MR. GORDON:  Not from the government, Your Honor.

15         THE COURT:  Okay.  We're adjourned.

16         (Whereupon the hearing was

17          concluded at 12:36 p.m.)

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL COURT REPORTER

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

**NOTE:**  This hearing was held remotely by Zoom or some other virtual platform and is subject to the technological limitations of court reporting remotely.

Dated this 18th day of June, 2023.


/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001